UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| GAIL OSBORN, TIM MCCONNELL SEABA, AND GORDON SEABA, <br><br> Plaintiffs, <br><br> v. <br><br> CHAUNCEY MOULDING, KELSEY KOENIG, AND JEFFERSON COUNTY IOWA, <br><br> Defendants. | Case No. 4:25-cv-183 -SHL-SBJ <br><br><br> **DEFENDANT KELSEY KOENIG'S MEMORANDUM IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** |

**COMES NOW** Defendant, Kelsey Koenig, and for her Memorandum in Support of

Motion for Summary Judgment, states the following:

## TABLE OF CONTENTS

INTRODUCTION …………………………………………………………………...…2

FACTUAL SUMMARY…………………………………………………………………..2
  I. Initial Report to IHHS & First Visit to Seaba Property ………………………………2
  II. Events Between First and Second Visit to Seaba Property……………………………4
  III. Second Visit to Seaba Property……………………………………………………..5

SUMMARY JUDGMENTSTANDARD…………...…………………………………………7

ARGUMENT…………………………………………………………………………...8
  I. Koenig is Protected by Qualified Immunity……………………………………...……8
    A. Koenig did not violate Plaintiffs' constitutional rights…………………………9
    B. It was not clearly established at the time of this incident that IHHS
     and law enforcement knew they could not search the property because the
     property owner had given consent…………………………………………..16

CONCLUSION………………………………………………………………………..19

1

**INTRODUCTION**

This case arises from an anonymous report of a 2-month-old baby purportedly born to and residing in Plaintiff Gail Osborn's care, and the investigation that followed by the Iowa Department of Health & Human Services ("IIHHS"), the Jefferson County Attorney's Office, and sheriffs' deputies from both Washington and Jefferson counties.

Although ultimately no baby was found, the concerns by IHHS and law enforcement were real as Osborn had a documented history of creating dangerous conditions for her children and using methamphetamine. As the following will show, the Court should dismiss the one and only Section 1983 claim against child protection worker Kelsey Koenig because she is shielded by qualified immunity for doing precisely what her job entails—investigating the health and welfare of a child.

**FACTUAL SUMMARY**

Although Defendant Koenig's Separate Statement of Undisputed Material Facts provides the complete factual record, a summary of the facts is provided below.

**I.      Initial Report to IHHS & First Visit to Seaba Property.**

On November 15, 2024, IHHS central intake received an anonymous report alleging that Gail Osborn had given birth to a daughter named Charlotte two months prior and was using methamphetamine while caring for the child. (Statement of Facts ("SOF") ¶ 13). Upon receipt of this report, IHHS child protection worker Kelsey Koenig was assigned to complete an assessment by her supervisor, David Rippey. (SOF ¶ 14).

Koenig arrived at Plaintiffs' property at approximately 10:15 a.m. (SOF ¶ 18). The property is located at 3251 110th Street in Brighton, Iowa, which is in Jefferson County. (SOF ¶ 1). At the time of Koenig's visit, Plaintiff Gordon Seaba lived in the main house on the property, while

Plaintiff Tim McConnell Seaba and Osborn resided in a small cottage behind the main house. (SOF ¶ 4). Seaba is the father of McConnell Seaba, and Osborn and McConnell Seaba are in a romantic relationship. (SOF ¶¶ 2, 5). Osborn and McConnell Seaba have a daughter together, but their daughter was previously removed from their home and placed into a guardianship with another family. (SOF ¶¶ 11, 41). Osborn has been investigated multiple times by IIHHS,[1] and she has a history of drug use, including methamphetamine, cocaine, pills, and marijuana. (SOF ¶ 12).

Upon her arrival, Koenig encountered Seaba on his porch, who confirmed that he lived in the main house and that Osborn and McConnell Seaba lived in a separate house behind the main house. (SOF ¶ 19). Moments later, Osborn drove up the driveway and appeared upset. (SOF ¶ 20). As Koenig described why she was there, Oborn became frustrated and lifted up her shirt to show that she had not been recently pregnant. (SOF ¶ 21). Osborn also stated, "Do I look like I'm on drugs?", to which Koenig replied that she didn't see any indicators. (SOF ¶ 22).

However, while they were speaking, Osborn stated she had been with some children recently and even showed Koenig a car seat in her vehicle. This was confusing to Koenig because the reported age of the child—a 2-month-old—did not match the age of the child for the car seat, which was for an older child. (SOF ¶ 23). Osborn then invited Koenig to come back and view her and McConnell Seaba's residence. (SOF ¶ 24).

After allowing Koenig to view their cottage, Osborn went outside and started to feed some pigs, and Koenig followed. While outside, Osborn told Koenig that the property was Seaba's, and that when Seaba dies, it will be her and McConnell Seaba's property. (SOF ¶ 25).

When they returned to the main house, Seaba gave permission to Koenig to inspect his home. (SOF ¶¶ 26-27). Koenig asked her to see Seaba's house in its entirety, but she was denied

---

[1] Through its predecessor agency, the Iowa Department of Human Services ("IDHS").

that request, and Osborn only permitted her to see the downstairs. (SOF ¶¶ 28-29). Koenig did not observe anything indicating a baby had been recently present in the home or that Osborn was using illegal substances. (SOF ¶ 30).

## II. Events Between First and Second Visit to Seaba Property.

After her visit, Koenig drove toward her office in Washington, Iowa. (SOF ¶ 31). At approximately 11:36 a.m., Koenig called Washington County Sheriff's Office Investigator Jayce Horning. (SOF ¶ 32). Investigator Horning told Koenig that Osborn had been recently calling the local police station to inquire about safe haven boxes to drop off newborn babies. (SOF ¶ 34). During their conversation, Horning told Koenig that he was becoming concerned based on the information that she was telling him. (SOF ¶ 35). But then Horning looked up the property and realized it was in Jefferson County and told Koenig that this would not be Washington County's case. (SOF ¶ 36).

Around 11:51 a.m., Koenig spoke with Alicia White. (SOF ¶ 37). White explained that she and Osborn were not friends, but she knew Osborn because she frequented the probation office. (SOF ¶ 38). White told Koenig that she had not seen Osborn being pregnant recently. (SOF ¶ 39). After speaking with White, Koenig received a call from assistant Jefferson County attorney Elizabeth Estey, who said that Osborn had contacted the county attorney's office a couple of times after Koenig's visit, and that this was unusual, and that she and Jefferson County Attorney Chauncey Moulding had found this very concerning. (SOF ¶ 40).

At 2:26 p.m., Koenig spoke with Sarah Rosonke by phone, who is the guardian of Osborn and McConnell Seaba's child. (SOF ¶ 41). Rosonke stated that Osborn hadn't seen her children since December 2023, and that McConnell Seaba has never visited his daughter. (SOF ¶ 42).

Eventually, Koenig arrived back at her office and started reviewing old IHHS assessments related to Osborn. (SOF ¶ 43). Koenig reviewed one assessment where one of Osborn's children had been found to be positive for methamphetamine when born. (SOF ¶ 44). In another case, Koenig discovered that Osborn did not participate in services offered by IHHS, and that she was supposed to have a safety plan where her child would live with Osborn's sister in a neighboring town. (SOF ¶ 45). But rather than drop her child off with her sister, Osborn took the child back to the Seaba property, and law enforcement had to go out there and locate the child. (SOF ¶46).

Koenig then reviewed an assessment where Osborn had falsely claimed that her and McConnell Seaba's child had epilepsy and another assessment where Osborn had been living with a different child of hers in a car in Montana, and the child had rotted teeth. (SOF ¶ 47). Based on her review of these assessments, Koenig became concerned about Osborn's credibility, as her actions in past assessments which were similar to how she had acted with Koenig. (SOF ¶ 48).

Around 3:23 p.m., Koenig spoke with Jefferson County Attorney Chauncey Moulding. (SOF ¶ 49). During their conversation, Koenig discussed what she had reviewed, including Osborn's past history, Koenig's concerns, and additional information on the IHHS assessment form for the case. (SOF ¶¶ 49, 51). In response, Moulding said they needed to go back out to the Seaba property. (SOF ¶ 52).

### III. Second Visit to Seaba Property.

Later that afternoon, the Defendants went back out and arrived at Plaintiffs' property at approximately 4 p.m. (SOF ¶ 53). Koenig and Moulding were joined by Estey, and deputies from Jefferson and Washington counties. (SOF ¶ 54). The Defendants did not possess a search warrant for Plaintiffs' property. (SOF ¶ 56). According to Moulding, he did not view the situation as a

criminal investigation, but rather an investigation to check on the health and welfare of a reported new baby. (SOF ¶ 57).

Moulding arrived at the property first and drove up the driveway and parked his vehicle. (SOF ¶ 58). Koenig followed Moulding up the driveway and parked her own vehicle. (SOF ¶ 59). The sheriffs' deputies and Estey remained at the bottom of the driveway and parked on the road. (SOF ¶ 60).

Koenig watched Moulding walk up to the front door of Seaba's house and knock on the door. (SOF ¶ 61). Moulding entered the house at Seaba's invitation. (SOF ¶ 62). Eventually, Koenig walked up to the house, knocked on the door, and asked to come inside. (SOF ¶ 63). Neither Osborn nor McConnell Seaba were present for their conversation with Seaba. (SOF ¶ 64). Koenig proceeded to tell Seaba that Moulding and the deputies wanted to look around the property for a baby. (SOF ¶ 65). Seaba told Koenig to go ahead and agreed to a 10-minute time limit. (SOF ¶ 66).

Moulding then contacted Jefferson County Sheriff's Deputy Mark Miller and advised him of Gordon's consent and to begin the search. (SOF ¶ 67). Deputy Miller had been out to the Seaba residence for other calls in the past and had always known the property to belong to Gordon Seaba. (SOF ¶ 68).

Moulding then began directing the deputies where to look. (SOF ¶ 69). At one point, Moulding entered Osborn and McConnell's small cottage. (SOF ¶ 70). He was inside the cottage for approximately 30 seconds. (SOF ¶ 71). Koenig did not go into the cottage. (SOF ¶ 72). After looking around the property, Moulding, Koenig, and the deputies walked back to their vehicles and eventually left. (SOF ¶ 74). As depicted on body camera video, the entire search lasts approximately 7 minutes. (SOF ¶ 75).

6

## SUMMARY JUDGMENT STANDARD

Summary judgment should be granted when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); accord *United States v. Story Cnty*., 28 F. Supp. 3d 861, 867 (S.D. Iowa 2014). Once the motion is made and supported, it places an affirmative burden on the non-moving party to go beyond the pleadings and "by affidavit or otherwise" designate "specific facts showing that there is a genuine issue for trial." *Commercial Union Ins. Co. v. Schmidt,* 967 F.2d 270, 217 (8th Cir. 1992). In designating specific facts, "the mere existence of *some* alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary" because Rule 56(c) requires "that there be no *genuine* issue of material fact." *Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-248 (1986) (emphasis in original)).

While the Federal Rules of Civil Procedure give "[d]ue deference" to the "rights of litigants to have their claims adjudicated by the appropriate finder of fact . . . equal deference must be given under Rule 56 to the rights of those defending against such claims to have a just, speedy, and inexpensive determination of the action where the claims have no factual basis." *Anderson v. Indus. Elec. Reels, Inc.*, 812 F. Supp. 999, 1002 (D. Neb. 1993). Consequently, summary judgment is appropriate where resolution of a question of law is controlling. *See Ferezy v. Wells Fargo Bank, N.A.*, 755 F. Supp. 1010, 1013 (S.D. Iowa 2010). Because there is no genuine issue of material fact with regard to Plaintiffs' claim against Defendant Koenig, and because she is entitled to a grant of qualified immunity with regard to Plaintiffs' Section 1983 claim, this Court should grant summary judgment in favor of Koenig and dismiss this lawsuit against her.

**ARGUMENT**

**I.      Koenig is Protected by Qualified Immunity.**

Qualified immunity is immunity from suit rather than mere defense to liability. *Pearson v. Callahan,* 555 U.S. 223, 237 (2009).  It protects public officials from Section 1983 damages if their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known. *Pearson v. Callahan,* 555 U.S. 223, 231 (2009); *Stanley v. Hutchinson,* 12 F.4th 834, 838 (8th Cir. 2021).

The protection of qualified immunity applies regardless of whether the government official's error is "a mistake of law, mistake of fact, or a mistake based on mixed questions of law and fact." *Pearson¸* 555 U.S. at 231; *See also, Groh v. Ramirez,* 540 U.S. 551, 567 (2004).  To determine whether a defendant is entitled to qualified immunity, the Court considers (1) whether the official's conduct violated a constitutional right; and (2) whether the violated right was clearly established. *Stanley,* 12 F.4th at 838.  Courts may exercise their sound discretion in deciding which of the two prongs should be addressed first in light of the circumstances of the particular case at hand. *Pearson,* 555 U.S. at 236.

In cases involving children, child protection and family integrity issues often require government officials to weigh conflicting and competing interests in situations where immediate protective action may be necessary. Thus, the defense of qualified immunity to Section 1983 claims "is properly difficult to overcome." *Stanley v. Hutchinson,* 12 F.4th 834, 845 (8th Cir. 2021). It requires more than the mere recitation of an improper state of mind such as malice, bad faith, retaliatory motive or conspiracy in an action under Section 1983 to defeat qualified immunity by a defendant otherwise entitled to that defense. *Stanley,* 12 F.4th at 841-842.

The Iowa Supreme Court has applied qualified immunity to IDHS and IHHS workers for Section 1983 claims. For example, in *Minor v. State,* 819 N.W.2d 383 (Iowa 2012), the Court held that a social worker is entitled to qualified immunity for his or her investigatory acts. *Id.* at 389.

**A. Koenig did not violate Plaintiffs' constitutional rights.**

The Fourth Amendment to the United States Constitution secures "the persons, houses, papers and effects of the people against unreasonable searches and seizures by the government, and requires a showing of probable cause prior to the issuance of warrant." *U.S. v. Martin,* 806 F.2d 204, 206 (8th Cir. 1986); *See also* U.S. Const. Amend. IV. The "physical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed." *United States v. U.S. Dist.,* 407 U.S. 297, 313 (1972).

Although the warrant procedure is the preferred method by which law enforcement officers perform searches and seizures, the overriding principle of the Fourth Amendment is reasonableness. *Martin,* 806 F.2d at 206. An action is "reasonable" under the Fourth Amendment "as long as the circumstances, viewed *objectively*, justify [the] action. *Scott v. United States,* 436 U.S. 128, 138 (1978) (emphasis in the original). Thus, a government actor's subjective motivation is irrelevant. *Bond v. United States,* 529 U.S. 334, 338, n.2 (2000).

Social workers, like other state officers, are governed by the Fourth Amendment's warrant requirement, which means that social workers must obtain consent, have sufficient grounds to believe that exigent circumstances exist, or qualify under another recognized exception to the warrant requirement before engaging in warrantless entries and searches of homes. *Kovacic v. Cuyahoga County Dept. of Children and Family Services,* 724 F.3d 687, 695 (8th Cir. 2013).

1. <u>Exceptions to the warrant requirement.</u>

Because the ultimate Fourth Amendment touchstone is "reasonableness," the warrant requirement is subject to certain exceptions. *Riley v. California,* 573 U.S. 373 (2014); *Luer v. Clinton,* 987 F.3d 1160, 1165 (8th Cir. 2021). Consent is one such exception. *U.S. v. Golinveaux,* 611 F.3d 956, 959 (8th Cir. 2010). Others include (1) when police provide "emergency assistance to an injured occupant," (2) are "in hot pursuit of a fleeing suspect," or (3) "need to prevent the imminent destruction of evidence." *Luer* at 1165 (quoting *Kentucky v. King,* 563 U.S. 452, 459 (2011)). The government bears the burden of proving that an exception applies. *U.S. v. Kennedy,* 427 F.3d 1136, 1140 (8th Cir. 2005).

Another recognized exception is the "community caretaker" exception, first announced in *Cady v. Dombrowski,* 413 U.S. 433 (1973). Under this exception, a search or seizure is reasonable if the governmental interest in law enforcement's exercise of that function, based on specific and articulable facts, outweighs the individual's interest in freedom from government's intrusion. *United States v. Harris,* 747 F.3d 1013, 1017 (8th Cir. 2014) (cert. denied). This exception allows officers to respond to potential emergencies if (1) they have a reasonable belief an emergency exists, and (2) their response is carefully tailored to address the emergency. *United States v. Halter,* 988 F.3d 1042, 1046 (8th Cir. 2021).

But the warrantless intrusion must be limited in scope to the extent necessary to carry out the caretaking function. *Luer v. Clinton,* 987 F.3d 1160, 1166 (8th Cir. 2021). This exception is "totally divorced from the detection, investigation, or acquisition of evidence relating to the violation of a criminal statute. *Cady,* 413 U.S. at 433. The mere fact that protection of the public might, in abstract, have been accomplished by less intrusive means does not, by itself, render a

police intrusion unreasonable and outside the scope of the "community caretaker" exception to the warrant requirement. *U.S. v. Smith,* 820 F.3d 356 (8th Cir. 2016).

2. <u>Plaintiff Gordon Seaba gave consent to search his property</u>.

A search occurs under the Fourth Amendment when "the government violates a subjective expectation of privacy that society recognizes as reasonable." *Kylo v. United States,* 533 U.S. 27, 31-33 (2001). But a warrantless search is valid if conducted pursuant to a knowing and voluntary consent of the person subjected to the search. *U.S. v. Farnell,* 701 F.3d 256, 263 (8th Cir. 2012). Thus, "[a]n individual may validly consent to an otherwise impermissible search if, in the totality of the circumstances, consent is freely and voluntarily given, and not the produce of implicit or explicit coercion." *Id.* (quoting *United States v. Castellanos,* 518 F.3d 965, 969 (8th Cir. 2008)).

Furthermore, consent to a warrantless search by one who possesses common authority or other sufficient relationship to the premises or effect sought to be inspected is valid against an absent, nonconsenting person with whom that authority is shared. *U.S. v. Matlock,* 415 U.S. 164 (1974). Additionally, when someone who reasonably appears to have control of the premises in question consents to a search, there is no constitutional violation. *U.S. v. Brokaw,* 985 F.3d 951, 953 (8th Cir. 1993),

This analysis becomes more complicated when an individual with a property interest is on the property at the time of the search and objects. In those situations, the police may not rely on a third party's consent to "intentionally bypass" a person who is present and has a privacy interest in the premises that is *superior* to that of the consenting party and who objects to the search. *See, United States v. Impink,* 728 F.3d 1228, 1234 (9th Cir. 1984) (emphasis added); *United States v. Bradley,* 869 F.32d 417, 419 (8th Cir. 1989) (following the rationale applied in *Impink*).

11

Even in situations where a third party lacks actual authority to consent to a search or seizure of shared property or the premises, the Fourth Amendment is not violated if the officers reasonably relied on the third party's apparent authority to consent, because the Fourth Amendment's reasonableness requirement demands of government agents not that they always be correct, but that they always be reasonable. *U.S. v. Clutter,* 674 F.3d 980, 983 (8th Cir. 2012).

In the present case, Plaintiff Gordon Seaba gave permission to Jefferson County Attorney Chauncey Moulding and IHHS worker Kelsey Koenig to search his property. They had received permission to look around for 10 minutes while speaking with Seaba alone in his residence. Neither Plaintiff Gail Osborn nor Tim McConnell Seaba were present for this conversation.

It was also reasonable for Moulding and Koenig to rely on Seaba's consent. When Koenig made her initial visit to the property that day, Osborn had told Koenig that the property belonged to Seaba. Koenig had also spoken with Seaba that morning and asked for permission to look around, which he provided. Furthermore, Jefferson County Sheriff's Deputy Mark Miller, who had been to the Seaba property for calls in the past and had previously interacted with Seaba, had always known the property belonged to Seaba.

In addition, Plaintiffs have acknowledged in discovery for this case that Seaba owned the property in a life estate, and McConnell Seaba was a remainderman. This distinction between Seaba possessing a "life estate" and McConnell Seaba being a "remainderman" is an important consideration. In Iowa, a remainder's interest "is a *future* interest created in someone other than the transferor that, according to the terms of its creation, will become a present estate (if ever) immediately upon, and no sooner than, the expiration of all prior particular estates created simultaneously with it." *In re Will of Uchtorff,* 693 N.W.2d 790, 793 (Iowa 2005) (emphasis added.)

Therefore, by all parties' accounts, Seaba was the owner of the subject property on November 15, 2024. Since Seaba had granted them permission to search, Defendants reasonably relied on this consent to search the premises, which included the outbuildings and abandoned vehicles on the property. Therefore, the consent exception was met in this instance, and no constitutional violation occurred.

3. IHHS and law enforcement's concerns were reasonable and justified the belief that exigent circumstances existed.

The "exigent circumstances" exception to the warrant requirement permits a warrantless entry when the needs of law enforcement are so compelling that a warrantless search is objectively reasonable. *Mincey v. Arizona,* 437 U.S. 385, 393-394 (1978). The need to assist persons who are seriously injured or threatened with such injury can justify the warrantless entry or search if officers have an objectively reasonable basis for believing that a person within the house is in need of immediate aid. *United States v. Quarterman,* 877 F.3d 794, 798 (8th Cir. 2017).

The circumstances purporting to show exigency are unique to each individual case. For example, in *Capenter v. Gage,* 686 F.3d 644 (8th Cir. 2012), deputies had received reports that Carpenter had threatened first responders with a baseball bat while ordering them out of his house in Arkansas. *Id.* at 647. The deputies were further advised by Carpenter's companion that he kept a rifle in the home, and that Carpenter withdrew into his home to retrieve his gun. *Id.* Since neither deputy knew where the gun was located, the court found that it was reasonable for them to fear that they lacked time to make a safe retreat, and that a reasonable officer therefore could have concluded that allowing Carpenter to go unaccompanied back into his home posed a threat to the lives of law enforcement officers and first responders outside the home. *Id.* at 648. On these facts, the Eighth Circuit Court of Appeals found that the district court had correctly dismissed Carpenter's claim alleging an unreasonable search under the Fourth Amendment. *Id.*

In this case, Koenig only had some initial, limited information prior to visiting the Seaba property that morning, as she had been called by her supervisor while she was driving out in the field and told to immediately go to the residence. Her concerns then began to mount throughout the day, first with her observations of Osborn's aggressive and erratic behavior during the morning visit, and Osborn's statements about recently being with children, but also with Osborn's limiting of Koenig's inspection to the downstairs of the main house.

Koenig then uncovered further concerning information throughout the afternoon, including reviewing past assessments where Osborn exhibited similar behavior in similar circumstances. It was thus appropriate and reasonable for Koenig to share this information with the Jefferson County Attorney's Office, particularly given the fact that this office handled these types of investigations. Given all that was discovered within a span of a few hours, it was further reasonable for the Defendants to conclude that an emergency existed, particularly given the report of an alleged two-month-old newborn baby who had not been found yet, and who obviously could not care for herself. Again, Defendants' actions were reasonable under the circumstances.

4. The "community caretaking" exception also applied due to a reported 2-month-old child in danger.

The Eighth Circuit has repeatedly found the "community caretaker" exception to apply to warrantless searches. For example, in *United States v. Halter,* 988 F.3d 1042 (8th Cir. 2021), the Court found the "community caretaking" exception justified a stop of a defendant's vehicle to check on the welfare of a child. *Id.* at 1047. In that case, law enforcement officers had received a report that a little girl's mother had heard her daughter screaming and crying during a phone call with the girl's father. The mother also reported that the father had a firearm and threatened to kill anyone else who tried to come get the child. *Id.* Officers were reasonably concerned about the

14

girl's well-being and, since Halter left his house before they could respond, the officers were justified in stopping Halter's vehicle in order to check on the welfare of the child. *Id.*

In *Luer v. Clinton,* 987 F.3d 1160 (8th Cir. 2021), an intoxicated person skipped out on paying his cab fare and the cab driver called the police. Officers soon arrived at the location where the person fled and conducted a sweep of neighboring yards, looked into his backyard, and even entered into his attached garage through an open side door. The court found the officers were permitted to do so under the "community caretaking" exception and had qualified immunity for those actions. *Id.,* 987 F.3d at 1167-1168. However, once the officers went into the plaintiff's home and searched every floor, culminating in an encounter with the surprised plaintiff outside of his bedroom, the court found that the exception no longer applied and that reasonable officers acting as community caretakers should have left the home. *Id.*

Despite the "community caretaking" exception's long-recognized history, a significant change occurred in 2021, when the U.S. Supreme Court unanimously decided that this exception no longer applies to warrantless searches and seizures in the home. *See, Caniglia v. Strom,* 593 U.S. 194, 196 (2021) ("The question today is whether *Cady's* acknowledgment of these 'caretaking' duties creates a standalone doctrine that justifies warrantless searches and seizures in the home. It does not.").

Although this was clearly a departure from long-standing case law, the court's opinion was limited to the home and did not undo the exception for searches of vehicles or curtilage, or when exigent circumstances applied. *Id.* at 1600. In fact, *Caniglia* specifically reiterated "that law enforcement officers may enter private property without a warrant when certain exigent circumstances exist, including the need to 'render emergency assistance to an injured occupant or to protect an occupant from imminent injury.'" *Id.* at 1599.

15

The Iowa Supreme Court has also recognized the "community caretaking" exception, even as recently as 2023, after *Caniglia* was decided. In *State v. Abu Youm,* 988 N.W.2d 713 (Iowa 2023), the Court concluded that "*Caniglia* does not foreclose the use of the emergency aid doctrine under the community caretaking exception to the warrant requirement under the Fourth Amendment." *Id.* at 720.

Although the ruling in *Caniglia* has to some degree limited this exception, it does not bar Koenig from asserting it in the present case. The exception should still apply to the search of other areas of the Seaba property, including the outbuildings and the abandoned vehicles. Furthermore, as it relates to the search of Osborn and McConnell Seaba's residence, Koenig never entered their home, only Moulding did. Thus, the exception still applies.

**B. It was not clearly established at the time of this incident that IHHS and law enforcement knew they could not search the property because the property owner had given consent.**

To be clearly established, a legal principle must have a sufficiently clear foundation in then-existing precedent, so that every reasonable official would interpret it to establish the particular rule the plaintiff seeks to apply. *Luer,* 987 F.3d. at 1165 (citing *District of Columbia v. Wesby,* 583 U.S. 48, 63 (2018)). In other words, existing law "must have placed the constitutionality of the [government actor's] conduct 'beyond debate.'" *Id.* As such, "this demanding standard protects "all but the plainly incompetent or those who knowingly violate the law." *Id.*

A plaintiff can show that law is "clearly established" for qualified immunity purposes in three ways: (1) plaintiff may identify existing circuit precedent involving sufficiently similar facts that squarely governs the situation, (2) plaintiff may point to robust consensus of cases of persuasive authority establishing that facts of plaintiff's case make out a violation of a clearly

established right, or (3) in rare instances, that a general constitutional rule applies with obvious clarity to facts at issue, which carries the day for plaintiff. *Hovick v. Patterson,* 37 F.4th 511, 517 (8th Cir. 2022).

1. <u>There is no existing circuit precedent or a robust set of cases establishing that Defendant Koenig would know she was violating a clearly established right in these circumstances.</u>

Although the Fourth Amendment protects against unreasonable searches and seizures, "the seizing of a child who may be the victim of abuse presents a different Fourth Amendment dynamic than seizing an individual suspected of criminal wrongdoing. In the latter case, the government seizes the individual in order to keep that individual from harming others, while in the former case, the child is seized to keep others from harming him." *Stanley*, 12 F.4th at 842 (quoting *Gates v. Tex. Dep't. of Protective and Reg. Servs.,* 537 F.3d 404, 427-428 (5th Cir. 2008)). As the Supreme Court has noted, "We do not question the assertion that neglectful parents may be separated from their children." *Stanley v. Illinois,* 405 U.S. 645, 653 (1972).

The Eighth Circuit has found that it is clearly established that the removal of children from their parents' custody violates a constitutional right if the removal occurs without reasonable suspicion of child abuse. *Stanley,* 12 F.4th at 840 (citing *Heartland Acad. Cmty. Church v. Waddle,* 427 F.3d 525, 534 (8th Cir. 2005)). This is because "[p]arents have a liberty interest in the care, custody, and management of their children." But this interest is "limited by the state's compelling interest in protecting a child.*" Id.* at 840. So to balance such competing interests, the Eighth Circuit has adopted the rule that "when a state official pursuing a child abuse investigation takes an action which would otherwise unconstitutionally disrupt familial integrity, he or she is entitled to qualified immunity, if such action is founded upon a reasonable suspicion of child abuse." *Id.*

Although the foregoing highlights the extent to which qualified immunity protects governmental actors when a child is seized and removed based on suspicion of child abuse, no such conduct occurred here. This case involved a search for a reported baby that was never found. There was no disruption of familial integrity, no seizures, and no arrests made. Furthermore, Koenig and IHHS closed out the investigation and determined the alllegations to be unfounded. No evidence was collected, no investigation into criminal activity occurred, no criminal charges were brought, and no child in need of assistance (CINA) petition was filed. If anything, the Plaintiffs were validated and cleared of this anonymous complaint by allowing the government officials to view their property.

2. <u>It is not clearly established that a remainderman to a property interest could prohibit or otherwise revoke consent previously given by the property owner.</u>

Plaintiffs will be unable to show that the law was clearly established at the time of this incident and that Koenig knew she was in violation of the law when she walked the grounds of the Seaba property on November 15, 2024, with permission from the property owner. On this point, at least one federal circuit has held that social workers do not violate clearly established law by exceeding the limited consent to search that the property owner gives them. *See Brent v. Wayne County Dept. of Human Services,* 901 F.3d 656, 686 (6th Cir. 2018).

But even if McConnell Seaba or Osborn objected to Koenig's presence and told her to "get a warrant," the law was not clearly established at the time such that this would nullify or revoke the consent which Seaba had already provided, or alert Koenig to the fact that she wasn't allowed on the property, or alert a reasonable IHHS worker that his or her conduct was unlawful in the present case. *See Patterson,* 37 F.4th at 518.

As previously stated, a remainderman's interest is *a future interest* that will only become a present estate upon the expiration of all prior estates created simultaneously with it. *See In re Will*

*of Uchtorff,* 693 N.W.2d at 793. Furthermore, "it is undoubtedly a correct proposition that the remainderman, whether vested or contingent, cannot maintain an action for ejectment, or other action of possessory nature, before the termination of a life estate upon which such remainder depends." *Ward v. Meredith,* 173 N.W. 246, 249 (Iowa 1919). In other words, with a yet-to-be vested property interest, a remainderman is limited in what he can do with the property, such as overruling or revoking the owner's consent to search.

At the time Defendants were on the Seaba property, Gordon Seaba was alive and owned the property in a life estate. Seaba's son, McConnell Seaba, concedes he was a remainderman to Seaba's life estate, and Osborn held no property interest. Seaba had also consented to searching the property for 10 minutes, and the Defendants abided by this limited consent.

The only area where Seaba's consent could be limited was the small cottage where McConnell Seaba and Osborn resided. But that would not nullify or revoke the consent the Defendants obtained for searching the other parts of the property. Thus, it is certainly not "beyond debate" that the Defendants were in violation of the law, or knew they were in violation of the law, or that Plaintiffs' constitutional rights were being violated when they set about searching the property's outbuildings and abandoned vehicles with the permission of Seaba. *Luer,* 987 F.3d. at 1165. Koenig also stood by while law enforcement officers conducted this limited search and did not actively participate. As such, qualified immunity applies here and Koenig's motion should be granted.

### CONCLUSION

**WHEREFORE**, Defendant Kelsey Koening respectfully requests the Court to grant her motion for summary judgment and dismiss her from this lawsuit.

Respectfully Submitted,

**BRENNA BRID**
Attorney General of Iowa

**/s/ RYAN P. SHEAHAN**
**RYAN P. SHEAHAN**
Assistant Attorney General
Hoover Building, Second Floor
Des Moines, Iowa 50319
PHONE: (515) 281-6658
FAX: (515) 281-4209
E-MAIL: ryan.sheahan@ag.iowa.gov
ATTORNEY FOR DEFENDANT KOENIG

*Original filed electronically.*
*Copy electronically served on all parties of record.*

| **PROOF OF SERVICE** |
|---|
| The undersigned certifies that the foregoing instrument was served upon each of the persons identified as receiving a copy by delivery in the following manner on May 29, 2026. |
| ☐ U.S. Mail      ☐ FAX |
| ☐ Hand Delivery      ☐ Overnight Courier |
| ☐ Federal Express      ☐ Other |
| ☒ ECF System Participant (Electronic Service) |
| Signature: /s/Jodi R. Watson_____ |