UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| GAIL OSBORN, TIM MCCONNELL SEABA, AND GORDON SEABA,<br><br>    Plaintiffs,<br><br>v.<br><br>CHAUNCEY MOULDING, KELSEY KOENIG, AND JEFFERSON COUNTY IOWA,<br><br>    Defendants. | Case No. 4:25-cv-183 -SHL-SBJ<br><br><br>**APPENDIX IN SUPPORT OF DEFENDANTS KOENIG'S MOTION FOR SUMMARY JUDGMENT**<br><br>**(VOLUME I)** |

## **TABLE OF CONTENTS**

**Volume I**

Miller deposition 03/04/26…………...…………………………………………………………1

Moulding deposition 03/04/26…………………………………………...………………………17

Koenig deposition 04/21/26…………………………………………………………………...51

McConnell Seaba deposition 04/21/26……………………………………………………...92

Osborn deposition 04/21/26……………………………………………………….……………118

Jefferson Co. Assessor Parcel No. 04-02-400-008 (Burnett deposition exhibit #1)……………153

**Volume II - SEALED**

Plaintiffs' Answers to Koenig Interrogatories……………………………………………..155

Child Protective Services Child Abuse Assessment Summary 12/16/24 (STATE 001-009)…...182

White email; Re: Gail Osborn (STATE 010-011)..………………………………………..191

Safety Assessment, Form 470-4132 or 470-4132(S) (STATE 18-20)…………………………...193

Family Risk Assessment, Form 470-4133 (STATE 21-23)…………………………………..196

Family Functioning Domain Criteria, Form 470-4138 (STATE 24)………..…………………199

Koenig signed Position Description Questionnaire (STATE 087-90)…………………………..200

Child Protective Services Child Abuse Assessment Summary 1/13/20 (STATE 196-203)……..204

Child Protective Services Child Abuse Assessment Summary 3/31/21 (STATE 244-267)…….212

Child Protective Services Child Abuse Assessment Summary 10/26/21 (STATE 268-285) …..236

Child Protective Services Child Abuse Assessment Summary 9/11/17 (STATE 178-186) …….254

**Volume III - SEALED**

Bodycam video of Deputy Miller (PLFS-OSBORN-30)…………………………………….263

Respectfully Submitted,

**BRENNA BRID**
Attorney General of Iowa

**/s/ RYAN P. SHEAHAN**
**RYAN P. SHEAHAN**
Assistant Attorney General
Hoover Building, Second Floor
Des Moines, Iowa 50319
PHONE: (515) 281-6658
FAX: (515) 281-4209
E-MAIL: ryan.sheahan@ag.iowa.gov
ATTORNEY FOR DEFENDANT KOENIG

*Original filed electronically.*
*Copy electronically served on all parties of record.*

<table>
<tr><td colspan="2" align="center">**PROOF OF SERVICE**</td></tr>
<tr><td colspan="2">The undersigned certifies that the foregoing instrument was served upon each of the persons identified as receiving a copy by delivery in the following manner on May 29, 2026.</td></tr>
<tr><td>☐ U.S. Mail</td><td>☐ FAX</td></tr>
<tr><td>☐ Hand Delivery</td><td>☐ Overnight Courier</td></tr>
<tr><td>☐ Federal Express</td><td>☐ Other</td></tr>
<tr><td colspan="2">☒ ECF System Participant (Electronic Service)</td></tr>
<tr><td colspan="2">Signature: /s/Jodi R. Watson</td></tr>
</table>

2

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

GAIL OSBORN, TIMOTHY )
MCCONNELL-SEABA, and )
GORDON SEABA,          ) Case No. 4:25-cv-183
                       )
         Plaintiffs,   )
                       )
    vs.                )
                       ) DEPOSITION OF
CHAUNCEY MOULDING,     ) MARK MILLER
KELSEY KOENIG, and     )
JEFFERSON COUNTY,      )
IOWA,                  )
                       )
         Defendants.   )
--------------------)

THE DEPOSITION OF MARK MILLER, taken before Buffy Nelson, Registered Professional Reporter and Notary Public, commencing at 10:54 a.m. on March 4, 2026, at 2910 Grand Avenue, Des Moines, Iowa.

Reported by: Buffy Nelson, R.P.R.

A P P E A R A N C E S

Plaintiffs by:
GINA MESSAMER
Attorney at Law
Parrish Kruidenier, LLP
2910 Grand Avenue
Des Moines, IA 50312
(515) 284-5737
gmessamer@parrishlaw.com
    -and-
EDWARD HARVEY
Attorney at Law
1600 Wonder Way
Fairfield, IA 52556
(641) 919-8696

Defendants Chauncey Moulding and Jefferson County, Iowa, by:
BRENT HINDERS
CAMRYN HUYSER
Attorneys at Law
Hinders, Updegraff & Franklin, PLC
1104 Sunset Drive
Norwalk, IA 50211
(515) 981-7044
brent@hinderslaw.com
camryn@hinderslaw.com

Defendant Kelsey Koenig by:
RYAN PATRICK SHEAHAN
Assistant Attorney General
Hoover State Office Building
1305 East Walnut Street
Des Moines, IA 50319
(515) 281-5881
ryan.sheahan@ag.iowa.gov

I N D E X

Examination by:          Page
Ms. Messamer        4, 39, 43
Mr. Hinders         32
Mr. Sheahan         34, 42


Exhibit                    Marked

Exhibit 8   Aerial Map        19

Exhibit 9   Aerial Map        20

MARK MILLER, called as a witness, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MESSAMER:

Q. We'll start off by, what did you review to prepare for today?

A. I watched my body camera videos and read my report.

Q. Did you talk to anybody besides an attorney?

A. No.

Q. How long have you been with the county?

A. I've been at Jefferson County going on nineteen years.

Q. Did you have any other law enforcement jobs before that?

A. I was a reserve deputy in Van Buren County for eleven prior to that.

Q. Do you have any special role within the county?

A. I do not.

Q. How long have you known Chauncey Moulding?

**App. 001**

**5**

A.  Basically since he was appointed.

Q.  And what is your understanding of his authority over you as an employee?  Like does he have the ability to discipline you, change your pay, fire you, anything like that?

A.  He would have indirect authority over me, I would call it.

Q.  How so?

A.  Just by being the county attorney. I've always been told that's the structure.

Q.  What kind of indirect authority do you think he has over you?  What could he do?

A.  I don't think he could, I guess, directly impact me.

Q.  How could he indirectly impact you?

A.  I don't think there would be any way.

Q.  Okay.  And just to kind of make sure I'm understanding, I thought you had said that you thought he could have indirect authority over you.  Are you now more saying, like, no, that's not his role?

A.  It's my knowledge that the county attorney's the chief law enforcement officer of the county, of any county.

Q.  But you don't think he has any authority over your status as an employee?

A.  Not that I'm aware of.

Q.  That would just be the sheriff?

A.  Yes.

Q.  Kind of in terms of chain of command, if Chauncey gave you an order, is that something that you think you're obligated to follow?

A.  Yes.

Q.  And that would have to do more with him being the chief law enforcement officer?

A.  Yes.

Q.  Do you think that Chauncey is a superior of the sheriff?

A.  I do.

Q.  Okay.  Let's talk, then, about how you got involved with this case.  So according to your report, you got a call from Chauncey Moulding.  Tell me what you remember Chauncey saying.

A.  I remember him saying that a call had come in to DHS in Washington County and that there was some confusion as to which county this person resided in.  And if I remember correctly, he was aware that it was in our

**7**

county and just requested us to go up there.

Q.  In terms of the call that came in, would that have been DHS calling Washington County or like this anonymous complaint came in to Washington County?

A.  I can't answer that.

Q.  What knowledge did you have, if any, of Gail Osborn?

A.  I'm familiar with Gail.

Q.  How did you know Gail?

A.  I've known her from previous contacts and previous residents of that property.

Q.  Would your previous contacts with her have been involved with cases where she was a defendant?

A.  It was an unrelated DHS matter.

Q.  And at that time with that DHS matter, was it at this same property out on 110th Street?

A.  It was.

Q.  How many times do you think you'd been out to that property?

A.  I've been out there multiple times, but nothing -- maybe just a couple related to Gail.  It was a prior resident.

**8**

Q.  Have you ever had dealings with Tim Seaba?

A.  Yes.

Q.  What would be the context of those?

A.  Just his sister used to live there and would frequently get warrants, so we would commonly run into him when we were up there.

Q.  How about Gordon, the older gentleman that lived there?

A.  It would be the same interaction.

Q.  Okay.  So after you get this call from Chauncey Moulding, what did you do?

A.  It was a short time later.  I guess we waited a little bit for other people to get in place and went up there.

Q.  Did you have any further contacts with Chauncey?

A.  I probably -- maybe like right before we went up to the house maybe.

Q.  Did you have any contact with the Washington County deputies before you got out there?

A.  No.

Q.  As you remember it, like who arrived to the residence first?

**9**

A.   I believe DHS probably pulled in the driveway first.

Q.   Did you get there all around the same time?

A.   Yes.

Q.   Like did you see DHS pull in?

A.   I believe I did.

Q.   And then I understand Chauncey pulled up the driveway too; correct?

A.   Yes.

Q.   And maybe I'll have you -- where did those exhibits go to?  Like in Exhibit 4, is that truck, is that Chauncey's truck?

A.   Yes.

Q.   And then Exhibit 3, would that white vehicle, a van -- that was DHS's?

A.   Yes.

Q.   Okay.  Where did you park your vehicle?

A.   It would have been behind DHS.

Q.   Did you chat, then, with the DHS worker and Chauncey before going up to the house?

A.   I don't recall.

Q.   Did Chauncey either -- at some point

**10**

before you went up to the house, did Chauncey tell you that this had been an anonymous report?

A.   Yes.

Q.   Okay.  Anything else that you were given in terms of detail about the report from either the DHS worker or Chauncey?

A.   I believe Chauncey had just told me that there was complaints made about an infant that had been born that was not reported.

Q.   Were you told anything about the infant being injured or unsafe?

A.   I don't recall.

Q.   Did you know the DHS worker?

A.   Not -- I'm not -- I mean, I believe I've seen her before.  I'm not familiar with her.

Q.   Not somebody you ever worked with?

A.   It's possible.

Q.   Closely or --

A.   No, no.

Q.   Okay.  So you guys all pick up in the driveway.  Just kind of walk me through what happens next.

A.   When I first got there, I was met by

**11**

Tim at the road, and Tim was unhappy about us being there, law enforcement in general, but just felt that he was being harassed.

Q.   Did Tim talk to Chauncey or DHS as they pulled up the driveway?

A.   I don't know.

Q.   Where did Tim come from?  Like which direction?  I've seen him in the road, but I didn't know where he came from.

A.   I believe he was just working at the end of the driveway.

Q.   I'm sorry to repeat yourself, but you said you don't know if Tim talked to Chauncey or DHS?

A.   I'm not positive.

Q.   He could have, you just don't know?

A.   Yeah.

Q.   Do you know Alisha White?

A.   No.

Q.   Did you have any conversation with Chauncey or the DHS worker about Tim's request to have them leave the property?

A.   I don't think -- I don't think I did that wasn't in front of them.

Q.   That wasn't in front of Tim?

**12**

A.   That wasn't in front of Chauncey.

Q.   Oh, okay.

A.   When we got ready to leave, I believe that was the only time.

Q.   Did you ever go up to the main house?

A.   Yes.

Q.   Did you ever go inside?

A.   No.

Q.   Maybe I should just pull up your video here.  So I was given three body camera videos from you; is that correct?

A.   Yes.

Q.   Anything beyond those three videos that exist in terms of body camera?

A.   No.

(Portion of video played.)

Q.   We'll just pause right here at the beginning.  So at second 14 there are two white cars parked in the road.  Who do those belong to?

A.   I believe the front one is Elizabeth Estey, the assistant county attorney.  I -- the second might be Deputy Burnett.

Q.   So at this point Chauncey and the DHS worker had already pulled up the driveway;

**App. 003**

**13**

correct?

A. Yes.

Q. Did you talk to Chauncey or the DHS worker in the street before they pulled up there?

A. I don't believe so.

Q. Okay. So this video is about 2 minutes 49 seconds. And if I go to 2:30, who is this officer that's standing there?

(Portion of video played.)

A. I don't know him by name. He's a Washington County deputy.

Q. And this video ends with you coming up to Elizabeth Estey. Is it Estey or Etsey?

A. Estey.

Q. Did you hear what she said to you at the end?

A. Sounded like, "Not his property."

(Video paused.)

Q. What was your understanding of who was the owner of this property?

A. I can't say the owner.

Q. Do you have something in your car that you can, like, type in and pull up who is associated with a given property?

**14**

A. Yes.

Q. And based on your prior dealings with the property, where was your -- who was your -- who did you understand lived in the main house on this property?

A. So when I've gone there in the past, the people I've had interaction with would be Gordon Seaba, Ashley Seaba, and Gail.

Q. In the main house?

A. Yes.

Q. Have you ever had an interaction with somebody who lived in, like, a separate house on the property?

A. Yes. I'm aware that Tim has -- does or has lived there.

Q. How about Gail?

A. I can't say that I've ever seen her out there. It's always been my understanding that was Tim's. I don't know.

Q. Okay. So I'll go to your video number 2 here.

(Portion of video played.)

Q. If your other video was 2 minutes 50 seconds long and you were getting into this one, do you think there was much of a break

**15**

between where your first video ended and where the second video started?

A. I don't believe so.

Q. Anything of substance you can remember happening when the video was not on?

A. No.

Q. Do you have much of an independent recollection of this day, or is it most of your memory just kind of based on body camera?

A. I have a fair amount of independent memory.

Q. I'm going to skip ahead in this video a little bit. Maybe I'll just start playing here at around the 3:12 mark.

I'm pausing at 3:21. Who were you just talking to on the radio?

A. Deputy Burnett.

(Portion of video played.)

Q. Okay. I'm pausing here at 3:42. Is this Chauncey that calls you on your phone?

A. Yes.

Q. And I thought I could hear him, but just to your memory and from what you hear, I thought he said, "Good to go"; is that correct?

A. Yes.

**16**

(Portion of video played.)

Q. Okay. So pausing at 4:07 after that conversation ends, what did Chauncey tell you? Can you make any of it out and kind of piece it together from your memory? Let me know if you want me to replay anything too.

A. I believe he had said something about -- asking me to search the campers or outbuildings.

Q. Anything else? What would -- what did he say when you asked about Gail and Tim's residence in the back?

A. I don't recall specifically.

Q. Did you have any knowledge of who the campers and the outbuildings belonged to?

A. No.

Q. And what was your understanding of why you were good to search?

A. I assumed he had gotten permission.

Q. From?

A. Gordon.

Q. We'll just play it from here. We'll play from 4:12.

(Portion of video played.)

Q. And at 4:40 who's this sheriff that

**17**

you're talking to?

A.   I didn't catch the name on that deputy.

Q.   But he's Washington County?

A.   Yes.

Q.   When you said, "Gordon is," what were the question that you were responding to?

A.   I didn't hear it.

Q.   We'll go back and see if we can make it out.

A.   I can't hear that.

(Video paused.)

Q.   Do you have any knowledge one way or the other if Chauncey was correct that Gordon had given consent or if Gail was correct that Gordon had not given consent?

A.   No.

Q.   What's your understanding -- okay.  So if two people own a property and one says, "Yeah, you can come search my property," and the other one says, "No, you can't come search the property," do you think that you are allowed to search under those circumstances?

A.   I don't.

Q.   You think you are not allowed to

**18**

search?

A.   Correct.

Q.   So in terms of this situation with Gordon saying it was okay to search, Tim indicating the opposite, kind of what was your assessment of the situation?

A.   My assessment would be that Tim's would be -- Tim's permissions would be limited.

Q.   In what way?

A.   As we've always known it was Gordon's residence just from past interactions.

Q.   Okay.  So you were just working off the assumption that this property was not Tim's; is that correct?

A.   Correct.

Q.   But you personally had not pulled it up on the assessor or anything to see who owned the property?

A.   I had not.

Q.   Okay.  We'll keep playing here from 5:43.

(Portion of video played.)

(Video paused.)

Q.   Here you just called somebody.  Who are you calling?

**19**

A.   I didn't see on the phone.

(Portion of video played.)

(Video paused.)

Q.   Okay.  So after you're done with that phone call, do you know who you were talking to?

A.   Deputy Burnett.

Q.   I'll give you a map here.

(Exhibit 8 was marked for identification by the reporter.)

Q.   Okay.  This is Exhibit 8.  I'll hand it to you this way.  That is north at the top.

A.   Okay.

Q.   If you could, to the best of your memory, could you just draw your route that you took around the property, at least until where we are right now in the video at 7:05?

A.   This is the trash fire that you saw that I walked past.

Q.   Go ahead and circle it.

A.   (Indicating.)  It doesn't look like -- I can't tell in this picture, but I don't see that I saw the camper, I don't believe.

Q.   I'll give you a different version too in case that's not helpful.

**20**

(Exhibit 9 was marked for identification by the reporter.)

Q.   Okay.  So is that a better one, showing more of the stuff in the yard?

A.   Yeah.

Q.   You can use that one if that's better for you.  Just trace your route.

A.   I guess I believed there were two campers in the front yard.  I only see one camper, but I was at the north-side window of a camper.

Q.   Okay.  So you had kind of gone directly west of the front of the yard?

A.   I had walked up the driveway going north and turned east to the campers.

Q.   I'm sorry, I'm opposite.  That's east.  Okay.  I'll play here from 7:05.

(Portion of video played.)

Q.   This camper at 7:15, any idea who this one belonged to?

A.   I don't.

Q.   At 8:15 what was that exchange you just had?

A.   I didn't hear it.

Q.   I'll back up a little bit.

**21**

A.  I don't hear the question.

Q.  This camper you're going into at 8:38, any idea whose camper this was?

A.  No.

Q.  So pausing at 9:48, this is Chauncey in the blazer, correct, and then the DHS worker in the white parka?

A.  Yes.

Q.  And at 9:42 we kind of see the DHS worker and Chauncey doing something to search this trash pit, is that correct, burn pit?

(Portion of video played.)

A.  It looks like it.  I wasn't aware of that.

Q.  Pausing at 9:48, did Chauncey just say, "Let's go back to that shack before they get here"?

A.  I couldn't say for sure.

Q.  I'll wait until these sirens pass and try again.

(Portion of video played.)

A.  That sounds correct.

Q.  Okay.  Something about going back to the shack before they get back.

And in terms of "before they get

**22**

back," it would be referring to Gail and Tim; is that correct?

A.  I don't know.

Q.  Pausing here at 10:22, this is when you're talking about you haven't heard of Ashley for a while.  That's the sister?

A.  That's correct.

(Portion of video played.)

Q.  I'll have you kind of pay attention to your route too.  I'm going to have you draw this.

(Video paused.)

Q.  So here at 10:50 I assume you would have opened the door of that outbuilding?

A.  I must have.

Q.  Can you identify where the heck that is on one of our pictures?

A.  I believe it would be right here (indicating).

Q.  I'll maybe have you draw 10:50 next to that.

A.  (Indicating.)

MR. HINDERS:  Just for the record, he did draw 10:50 on the map.

MS. MESSAMER:  Correct.

**23**

(Portion of video played.)

(Video paused.)

Q.  Why don't you just draw on the map too where we are here at 11:32.

A.  I should be right here (indicating), I believe.

Q.  Okay.  So on Exhibit 9 you've drawn that in.

MR. HINDERS:  So may the record reflect that he's drawn on Exhibit 9 11:32.

Q.  Okay.  We'll keep playing here, 11:32.

(Portion of video played.)

(Video paused.)

Q.  So here at 12:06 where are we?  Can you mark 12:06 on one of these maps too?

A.  (Indicating.)

Q.  Okay.  And you have done that on Exhibit 9.

MR. HINDERS:  May the record reflect that the witness has marked 12:06 on Exhibit 9.

Q.  Any idea who this little storage unit belonged to?

A.  No.

Q.  We'll play it.

**24**

(Portion of video played.)

(Video paused.)

Q.  Okay.  So here at 12:42 could you just -- maybe just circle what their actual residence was.

A.  (Witness complied.)

Q.  12:42 you can write on there.

A.  (Witness complied.)

MR. HINDERS:  May the record reflect that the witness has circled a structure or made a circle on Exhibit 9, indicating 12:42.

Q.  Was it your understanding that this structure here at 12:42 was Gail and Tim's residence?

A.  In the past interactions I've had, Tim has told me that he lives in the backyard, so I've always assumed that's Tim's home.

Q.  How about Gail?

A.  Most of the time that I've been there, Gail comes out of the house.

(Portion of video played.)

Q.  I guess here at 12:52 when Gail is upset about Chauncey being in the house, were you aware of probable cause to go into that

**App. 006**

**25**

house?

A.  With what I knew, I was not.

Q.  Pausing here at 13:10, as you understand Fourth Amendment law from your training, if Gail didn't consent to somebody going into that house, could Gordon kind of consent on her behalf, or does Gordon's consent trump what Gail wants?

A.  On my knowledge, not knowing the living arrangement, I don't have the answer to that.

Q.  What more would you need to know?

A.  I don't know if there was any specific knowledge Chauncey had.  I can't speak for that.

Q.  Under what set of facts would Gordon's consent to search that house trump what Gail was telling Chauncey there?

A.  If -- if Chauncey was to think that was Gordon's and not hers, I don't know.

Q.  Have you been out on -- in other investigations where Chauncey has come out and participated in the investigation?

A.  Yes.

Q.  Tell me about the first one that comes

**26**

to mind.

A.  It would be search warrants.  He commonly comes to search warrants.

Q.  What role does he play when it comes to the search warrant?

A.  I'm assuming he's just there if we find something to assist us with a secondary warrant, that kind of thing.

Q.  Does he go in the house or in the residence?

A.  At times he's in the house, yes.

Q.  Does he participate in the searches?

A.  Not to my knowledge.

Q.  Does he go in with the first officers, or does --

A.  Secondary.

Q.  Does he always wait until you're done with your search?

A.  To my knowledge.

Q.  And when he comes out on those, does he wear a body camera?

A.  No.

Q.  Does he carry a weapon when he comes out on those?

A.  I don't know.  He usually has a jacket

**27**

on.

Q.  Did you ever personally talk to Gordon about this visit to his property?

A.  No.

Q.  Have you talked to Gail, Tim, or Gordon since this happened?

A.  No.

Q.  Have you talked to Chauncey about this since it happened?

A.  No.

Q.  Anybody else in your department you've talked to about this?

A.  Yes.

Q.  Who would that be?

A.  Just coworkers.

Q.  Did you talk to the sheriff about it?

A.  I believe so.

Q.  Did you get any feedback on your involvement on this from the sheriff or anyone else in your department?

A.  No.  Just basically had to set up scheduling to work around things.

Q.  In terms of getting a warrant, like how quickly could you get a warrant if you needed one for an emergency today?

**28**

A.  With the computers today, quick.

Q.  What are we talking?  An hour, less than that?

A.  It all depends how quick you can get ahold of a judge or a judge responds.

Q.  Well, what would be, like, the shortest time frame where you've ever gotten one?

A.  Ten minutes.

Q.  And if you are in a hurry to get one, what would you do to make sure it gets processed quickly?

A.  Find another judge if you can't get a response.

Q.  Do your warrants have to be approved by Chauncey?

A.  Yes.

Q.  And if you're wanting to get something through, do you just call him up and have him look at it?

A.  Yes.

Q.  And then from that point you would be also the one to then call the judge next?

A.  Yes.

Q.  If you had to do this situation over,

**29**

anything that you would do differently?

A. Send a coworker.

Q. And stay out of it, is that what you mean?

A. Yeah.

Q. Why do you say that?

A. It's -- it was just a mess.

Q. In what sense?

A. Just -- just awkward spot to be in.

Q. Do you think that Chauncey acted beyond his legal authority in going in the house?

A. Without -- I can't speak for him. I don't know what -- what he knows or what --

Q. Based on what you know --

MR. HINDERS: And, again, I'm going to interpose an objection. Form of the question. Assuming facts not in the record with the term "house."

MR. SHEAHAN: I'll join.

Q. But based on the facts as you knew them in terms of an anonymous complaint about a baby, you would not have felt comfortable going in that house, that you had probable cause; is that correct?

**30**

A. Yes.

Q. Anything about Chauncey's role as county attorney that you think gives him special privileges in this realm at all?

A. I don't know what his powers are necessarily.

Q. Anything that you're aware of?

A. No.

Q. Do you ever see Chauncey socially?

A. No.

Q. Your relationship is just professional?

A. Yes.

Q. Do you, like, go to the shooting range with him, anything like that?

A. He's at qualifications, yes.

Q. Like he participates in qualifications, he has to qualify?

A. Yes.

Q. Who administers that?

A. I can't answer that.

Q. Is that like just the local sheriff has you all qualify?

A. It's a yearly requirement.

Q. Is that for the --

**31**

A. ILEA.

Q. Yeah, is that right?

A. Yes.

Q. Do you recall ever chatting with Chauncey about this circumstance anywhere?

A. He might have said something about this was going to come up at the range.

Q. What did he say about it?

A. Just said that he -- just saw that he had some paperwork that he had to look over yet.

Q. Like that depositions were coming up or the lawsuit?

A. No. This has been quite some time back. He just told me that he had been served some papers.

Q. What did you say back to him?

A. At that point I don't think I heard anything.

Q. Anything that you heard from him subsequent to that about this case?

A. No.

Q. Has Chauncey ever been less than honest or forthcoming with you?

A. Not that I'm aware of.

**32**

Q. Would you personally vouch for Chauncey's credibility?

A. I don't have anything to discredit.

MS. MESSAMER: I think that's all I have. Thank you.

CROSS-EXAMINATION

BY MR. HINDERS:

Q. Deputy Miller, you spoke at the beginning about a main house where Gail and other people resided, in your experience; is that accurate?

A. Yes.

Q. Who all resided in that main house?

A. The people that I've seen come out of the house would be Gordon, Ashley, and Gail in past interactions.

Q. And when you say main house, can you describe that structure?

A. The farmhouse.

Q. What's it look like?

A. It's the large house.

Q. Okay. The other structures on the property that the plaintiffs' attorney has described as houses, do you know if there's ever been any certificate of occupancy issued

**33**

for any of those structures?

A. I don't know.

Q. Is it legal in Jefferson County to live in a structure that has not been issued a certificate of occupancy?

A. I can't answer whether it's legal. It's a very common practice.

Q. What about living in a camper on someone's property? Is it -- is it legal in Jefferson County to live in -- permanently live in a camper on your property?

A. To my knowledge, it's not. It's prohibited in some areas.

Q. And if you weren't issued a certificate of occupancy, what would be the concerns, in your training, education, and experience, living in such a property?

A. Would you restate that?

Q. So do you have any concerns of someone living in a structure that hasn't been issued a certificate of occupancy?

A. The problems we've had are where a small parcel of ground is owned and it gets multiple campers that show up on it, no septic, no so on and so forth.

**34**

Q. Other than a certificate of occupancy, would there be any way to know that a structure is or isn't lived in?

A. I suppose not.

MR. HINDERS: I don't have any other questions.

CROSS-EXAMINATION

BY MR. SHEAHAN:

Q. Deputy Miller, I met you outside here. I represent the DHS worker, Kelsey Koenig, in this case. I'm with the Attorney General's Office.

Sir, I think I saw on video there that you were trying to explain either to Miss Osborn or Mr. Seaba that you have had calls before or you've gone to properties and found babies in distress; is that right?

A. Yes.

Q. Has that happened in Jefferson County?

A. Yes.

Q. Do you have any idea how often that has happened in your career?

A. Once of my own calls.

Q. Okay. And was that a situation kind of a rural residence like this or in town

**35**

somewhere?

A. It was in an incorporated city.

Q. And in that situation, not to get too far into it, but how did you hear about or how did you find yourself at the property? Did someone make a report about it?

A. Yes.

Q. Anonymous or known report?

A. Known report.

Q. And then you followed up?

A. Yes.

Q. Even if someone makes an anonymous report, do you, as a law enforcement officer, believe it's prudent to follow up on that report?

A. Yes.

Q. And why is that?

A. Sometimes serious crimes are reported anonymously.

Q. Either way, though, you want to get down to the bottom of it to see whether there's truth there or not?

A. Yes.

Q. Have you ever -- I know you mentioned earlier in your testimony that you've been to

**36**

this property before. Have you ever gone out to this property with a DHS worker before?

A. Yes.

Q. Why?

A. I believe it was for the removal of Gail's children.

Q. "Gail" meaning the lady wearing the red coat on the screen up there behind you?

A. Yes.

Q. That's Gail Osborn?

A. Yes.

Q. When you arrived on scene, sir, I know -- actually, when you started pulling up to the residence in your truck, you got a phone call from Chauncey Moulding?

A. Yes.

Q. Chauncey is the one who told you, "We just talked to Gordon Seaba. He gave us permission to search the outer buildings"; correct?

A. Correct.

Q. Chauncey Moulding also explained you didn't have permission to search Gail and Tim's residence, though; correct?

A. I don't remember the exact wording,

**37**

but yes.

Q. Well, do you have any reason to dispute what was said on the body cam?

A. No.

Q. And then as far as any involvement from Kelsey Koenig, it looked like any direction you were receiving at the scene was from Chauncey Moulding, the county attorney; is that right?

A. Yes.

Q. Kelsey Koenig, the DHS worker, didn't instruct you or direct you to go search any part of the property, did she?

A. No.

Q. Did you really have any interaction with Miss Koenig?

A. Very little.

Q. Was she more or less a bystander?

A. From what I participated in, yes.

Q. Did she appear -- I mean, we can all see the body cam, but she was basically following Moulding around as he was instructing her where to go, wasn't he?

A. Yes.

Q. Or wasn't she, I should say?

**38**

A. Yes.

Q. In terms of any information you received at the scene, it's really all from Attorney Moulding; correct?

A. I would say so.

Q. In terms of what even the property owners -- what they have said and haven't said about whether you could search or not; correct?

A. Yes.

Q. In terms of this idea that there may have been a child endangered on the property, does the fact that you've been to that property before and dealt with Gail Osborn regarding other children, does that factor into the equation of going to that property for you?

A. Yes.

Q. Why?

A. Just Gail gets hyped up. She's very -- I guess just very outspoken.

Q. Okay. But does that lend any sort of credence to the need to investigate the matter, considering that you've been there before on other child welfare calls concerning Gail Osborn?

A. I suppose so.

**39**

Q. Okay. In terms of the DHS worker who made the visit that day, Kelsey Koenig, what is your understanding of a DHS worker in terms of going to a scene and looking for a child in danger?

A. Restate that.

Q. Yeah. That was a bad question.

Isn't that the exact job of a DHS worker in terms of one who works in Child Protective Services, that if there's a call about a child in danger, that they would go out and look at -- review the scene and see if that child was actually in danger?

A. Yes.

Q. That's the exact job of a DHS worker?

A. Yes.

Q. Kelsey Koenig, what she was doing that day is exactly what she's supposed to do as a DHS worker; correct?

A. Yes.

MR. SHEAHAN: I have no further questions. Thank you.

REDIRECT EXAMINATION

BY MS. MESSAMER:

Q. In terms of your prior visit to Gail's

**40**

property about her kids, roughly what year would that have been or how long ago?

A. It's been some time ago, quite some time.

Q. Like years?

A. Yes.

Q. Like more than five years or less than five years?

A. Right at, right in the ballpark, I'm guessing.

Q. Were you out there pursuant to a removal order?

A. I went out there to accompany DHS. I don't remember exactly if it was a removal order or what nature it was.

Q. Do you recall if you took Gail's kids from her on that date?

A. I believe the DHS worker did. I'm not certain.

Q. What ages would you say her kids were?

A. I don't recall.

Q. Did Gail try to hide the kids?

A. No.

Q. Oh, and when you searched this property that this case is about, did you find

**41**

anything that indicated there had ever been a baby out there or was a baby out there?

A.  No.

Q.  Nothing indicated they hid a baby or hurt a baby; correct?

A.  No.  Correct, yes.

Q.  I was thinking the same thing.

In terms of anonymous complaints, would you say an anonymous complaint is enough to give you probable cause for a search?

A.  Not always.

Q.  Can you think of a warrant you've written based solely on an anonymous complaint?

A.  Not without follow-up.

Q.  Would you agree typically an anonymous complaint does not provide enough information for probable cause?

A.  Most likely not.

Q.  And typically you would do some follow-up and talk to people, investigate a little bit more to try to corroborate what was in the anonymous complaint; correct?

A.  Yes.

Q.  Before you would file for a warrant; right?

**42**

A.  Yes.

Q.  To your knowledge, does DHS have an ability to search property without consent or probable cause?

A.  To my knowledge, no.

MS. MESSAMER:  That's all I've got.

MR. HINDERS:  I have nothing.

RECROSS-EXAMINATION

BY MR. SHEAHAN:

Q.  I had one question for you.

Just in terms of the typical search warrant where you're going to a residence, that usually consists of going into the residence and doing more than just hands in the pocket looking around, doesn't it?

A.  Yes.

Q.  Like can you just describe for us a typical example of conducting a search warrant or search at a residence based on a search warrant?  What do you typically do?

A.  You are limited to the areas that an item can be concealed, and you -- you can't look for a person in a toilet bowl.

Q.  Right.

MR. SHEAHAN:  Okay.  I'll just

**43**

leave it there, thank you.  I have no further questions.

FURTHER REDIRECT EXAMINATION

BY MS. MESSAMER:

Q.  If you're applying for a warrant, do you typically look up the property somehow to put the details in there?

A.  Yes.

Q.  And how do you do that?

A.  Plot map.

Q.  Is that the same thing as the county assessor's?

A.  Yes.

MS. MESSAMER:  Okay.  No further questions.

(Deposition concluded at 11:50 a.m.)

**44**

CERTIFICATE

I, the undersigned, a Registered Professional Reporter and Notary Public, do hereby certify that I acted as the Registered Professional Reporter in the foregoing matter at the time and place indicated herein; that I took in shorthand the proceedings had at said time and place; that said shorthand notes were reduced to typewriting under my supervision and direction, and that the foregoing pages are a full and correct transcript of the shorthand notes so taken; that said deposition was not submitted for review.

I further certify that I am neither attorney nor counsel for, or related to or employed by any of the parties in the foregoing matter, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 16th day of March, 2026.

_____
REGISTERED PROFESSIONAL REPORTER and NOTARY PUBLIC

## 1

**10:22** [1] - 22:4
**10:50** [3] - 22:13, 22:20, 22:24
**10:54** [1] - 1:16
**1104** [1] - 2:12
**110th** [1] - 7:18
**11:32** [3] - 23:4, 23:10, 23:11
**11:50** [1] - 43:16
**12:06** [3] - 23:14, 23:15, 23:20
**12:42** [4] - 24:3, 24:7, 24:12, 24:14
**12:52** [1] - 24:23
**1305** [1] - 2:17
**13:10** [1] - 25:3
**14** [1] - 12:18
**1600** [1] - 2:7
**16th** [1] - 44:13
**19** [1] - 3:7

## 2

**2** [3] - 13:8, 14:21, 14:23
**20** [1] - 3:8
**2026** [2] - 1:16, 44:13
**281-5881** [1] - 2:18
**284-5737** [1] - 2:5
**2910** [2] - 1:16, 2:4
**2:30** [1] - 13:8

## 3

**3** [1] - 9:15
**32** [1] - 3:3
**34** [1] - 3:4
**39** [1] - 3:3
**3:12** [1] - 15:14
**3:21** [1] - 15:15
**3:42** [1] - 15:19

## 4

**4** [3] - 1:16, 3:3, 9:12
**42** [1] - 3:4
**43** [1] - 3:3
**49** [1] - 13:8
**4:07** [1] - 16:2
**4:12** [1] - 16:23
**4:25-cv-183** [1] - 1:4
**4:40** [1] - 16:25

## 5

**50** [1] - 14:23
**50211** [1] - 2:13
**50312** [1] - 2:4

**50319** [1] - 2:18
**515** [3] - 2:5, 2:13, 2:18
**52556** [1] - 2:8
**5:43** [1] - 18:21

## 6

**641** [1] - 2:8

## 7

**7:05** [2] - 19:17, 20:17
**7:15** [1] - 20:19

## 8

**8** [3] - 3:7, 19:9, 19:11
**8:15** [1] - 20:22
**8:38** [1] - 21:2

## 9

**9** [7] - 3:8, 20:1, 23:7, 23:10, 23:18, 23:21, 24:11
**919-8696** [1] - 2:8
**981-7044** [1] - 2:13
**9:42** [1] - 21:9
**9:48** [2] - 21:5, 21:15

## A

**a.m** [2] - 1:16, 43:16
**ability** [2] - 5:4, 42:3
**accompany** [1] - 40:13
**according** [1] - 6:17
**accurate** [1] - 32:11
**acted** [2] - 29:10, 44:3
**action** [1] - 44:11
**actual** [1] - 24:4
**administers** [1] - 30:20
**Aerial** [2] - 3:7, 3:8
**ages** [1] - 40:20
**ago** [2] - 40:2, 40:3
**agree** [1] - 41:15
**ahead** [2] - 15:12, 19:20
**ahold** [1] - 28:5
**Alisha** [1] - 11:18
**allowed** [2] - 17:23, 17:25
**Amendment** [1] - 25:4
**amount** [1] - 15:10
**anonymous** [10] - 7:4, 10:2, 29:22, 35:8, 35:12, 41:8, 41:9, 41:13, 41:15, 41:22

**anonymously** [1] - 35:19
**answer** [4] - 7:6, 25:10, 30:21, 33:6
**appear** [1] - 37:20
**applying** [1] - 43:5
**appointed** [1] - 5:1
**approved** [1] - 28:15
**areas** [2] - 33:13, 42:21
**arrangement** [1] - 25:10
**arrived** [2] - 8:24, 36:12
**Ashley** [3] - 14:8, 22:6, 32:15
**assessment** [2] - 18:6, 18:7
**assessor** [1] - 18:17
**assessor's** [1] - 43:12
**assist** [1] - 26:7
**Assistant** [1] - 2:16
**assistant** [1] - 12:22
**associated** [1] - 13:25
**assume** [1] - 22:13
**assumed** [2] - 16:19, 24:18
**assuming** [2] - 26:6, 29:18
**assumption** [1] - 18:13
**attention** [1] - 22:9
**Attorney** [5] - 2:3, 2:7, 2:16, 34:11, 38:4
**attorney** [8] - 4:11, 5:9, 12:22, 30:3, 32:23, 37:8, 44:9, 44:10
**attorney's** [1] - 5:23
**Attorneys** [1] - 2:11
**authority** [6] - 5:3, 5:6, 5:11, 5:19, 6:1, 29:11
**Avenue** [2] - 1:17, 2:4
**aware** [7] - 6:2, 6:25, 14:14, 21:13, 24:25, 30:7, 31:25
**awkward** [1] - 29:9

## B

**babies** [1] - 34:17
**baby** [5] - 29:23, 41:2, 41:4, 41:5
**backyard** [1] - 24:17
**bad** [1] - 39:7
**ballpark** [1] - 40:9
**based** [6] - 14:2, 15:9, 29:15, 29:21, 41:13, 42:19

**beginning** [2] - 12:18, 32:9
**behalf** [1] - 25:7
**behind** [2] - 9:20, 36:8
**belong** [1] - 12:19
**belonged** [3] - 16:15, 20:20, 23:23
**best** [1] - 19:14
**better** [2] - 20:3, 20:6
**between** [1] - 15:1
**beyond** [2] - 12:13, 29:11
**bit** [4] - 8:14, 15:13, 20:25, 41:21
**blazer** [1] - 21:6
**body** [7] - 4:8, 12:10, 12:14, 15:9, 26:21, 37:3, 37:21
**born** [1] - 10:10
**bottom** [1] - 35:21
**bowl** [1] - 42:23
**break** [1] - 14:25
**BRENT** [1] - 2:10
**brent@hinderslaw. com** [1] - 2:14
**Buffy** [2] - 1:14, 1:25
**Building** [1] - 2:17
**buildings** [1] - 36:19
**Buren** [1] - 4:19
**burn** [1] - 21:11
**Burnett** [3] - 12:23, 15:17, 19:7
**BY** [6] - 4:5, 32:7, 34:8, 39:24, 42:9, 43:4
**bystander** [1] - 37:18

## C

**cam** [2] - 37:3, 37:21
**camera** [5] - 4:8, 12:10, 12:14, 15:9, 26:21
**camper** [8] - 19:23, 20:10, 20:11, 20:19, 21:2, 21:3, 33:8, 33:11
**campers** [5] - 16:8, 16:15, 20:9, 20:15, 33:24
**CAMRYN** [1] - 2:11
**camryn@hinderslaw .com** [1] - 2:14
**car** [1] - 13:23
**career** [1] - 34:22
**carry** [1] - 26:23
**cars** [1] - 12:19
**case** [5] - 6:17, 19:25, 31:21, 34:11, 40:25
**Case** [1] - 1:4

**cases** [1] - 7:14
**catch** [1] - 17:2
**CENTRAL** [1] - 1:2
**certain** [1] - 40:19
**certificate** [5] - 32:25, 33:5, 33:15, 33:21, 34:1
**certify** [2] - 44:3, 44:8
**chain** [1] - 6:5
**change** [1] - 5:4
**chat** [1] - 9:21
**chatting** [1] - 31:4
**Chauncey** [41] - 2:9, 4:24, 6:6, 6:13, 6:18, 6:19, 8:12, 8:17, 9:8, 9:22, 9:25, 10:1, 10:7, 10:8, 11:4, 11:13, 11:21, 12:1, 12:24, 13:3, 15:20, 16:3, 17:14, 21:5, 21:10, 21:15, 24:24, 25:14, 25:18, 25:19, 25:22, 27:8, 28:16, 29:10, 30:9, 31:5, 31:23, 36:15, 36:17, 36:22, 37:8
**CHAUNCEY** [1] - 1:7
**Chauncey's** [3] - 9:13, 30:2, 32:2
**chief** [2] - 5:23, 6:11
**child** [5] - 38:11, 38:23, 39:4, 39:11, 39:13
**Child** [1] - 39:9
**children** [2] - 36:6, 38:14
**circle** [3] - 19:20, 24:4, 24:11
**circled** [1] - 24:10
**circumstance** [1] - 31:5
**circumstances** [1] - 17:23
**city** [1] - 35:2
**closely** [1] - 10:20
**coat** [1] - 36:8
**comfortable** [1] - 29:23
**coming** [2] - 13:13, 31:12
**command** [1] - 6:5
**commencing** [1] - 1:15
**common** [1] - 33:7
**commonly** [2] - 8:7, 26:3
**complaint** [6] - 7:4, 29:22, 41:9, 41:13, 41:16, 41:22
**complaints** [2] - 10:9,

41:8
**complied** [2] - 24:6, 24:8
**computers** [1] - 28:1
**concealed** [1] - 42:22
**concerning** [1] - 38:23
**concerns** [2] - 33:16, 33:19
**concluded** [1] - 43:16
**conducting** [1] - 42:18
**confusion** [1] - 6:23
**consent** [7] - 17:15, 17:16, 25:5, 25:7, 25:17, 42:3
**considering** [1] - 38:22
**consists** [1] - 42:13
**contact** [1] - 8:20
**contacts** [3] - 7:11, 7:13, 8:16
**context** [1] - 8:4
**conversation** [2] - 11:20, 16:3
**correct** [26] - 9:9, 12:11, 13:1, 15:24, 17:14, 17:15, 18:2, 18:14, 18:15, 21:6, 21:11, 21:22, 22:2, 22:7, 22:25, 29:25, 36:20, 36:21, 36:24, 38:4, 38:8, 39:19, 41:5, 41:6, 41:22, 44:6
**correctly** [1] - 6:25
**corroborate** [1] - 41:21
**counsel** [2] - 44:9, 44:10
**county** [12] - 4:14, 4:22, 5:9, 5:22, 5:24, 6:23, 7:1, 12:22, 30:3, 37:8, 43:11
**COUNTY** [1] - 1:8
**County** [12] - 2:10, 4:15, 4:20, 6:22, 7:4, 7:5, 8:21, 13:12, 17:4, 33:3, 33:10, 34:19
**couple** [1] - 7:24
**COURT** [1] - 1:1
**coworker** [1] - 29:2
**coworkers** [1] - 27:15
**credence** [1] - 38:21
**credibility** [1] - 32:2
**crimes** [1] - 35:18
**CROSS** [2] - 32:6, 34:7
**CROSS-EXAMINATION** [2] - 32:6, 34:7

**D**

**danger** [3] - 39:5, 39:11, 39:13
**date** [1] - 40:17
**dealings** [2] - 8:1, 14:2
**dealt** [1] - 38:13
**Defendant** [1] - 2:15
**defendant** [1] - 7:15
**Defendants** [2] - 1:9, 2:9
**department** [2] - 27:11, 27:20
**deposition** [1] - 44:7
**Deposition** [1] - 43:16
**DEPOSITION** [2] - 1:6, 1:13
**depositions** [1] - 31:12
**deputies** [1] - 8:21
**deputy** [4] - 4:19, 13:12, 17:3, 19:7
**Deputy** [4] - 12:23, 15:17, 32:8, 34:9
**Des** [3] - 1:17, 2:4, 2:18
**describe** [2] - 32:18, 42:17
**described** [1] - 32:24
**detail** [1] - 10:6
**details** [1] - 43:7
**DHS** [28] - 6:22, 7:3, 7:16, 7:17, 9:1, 9:6, 9:20, 9:21, 10:7, 10:14, 11:4, 11:14, 11:21, 12:24, 13:3, 21:6, 21:9, 34:10, 36:2, 37:11, 39:1, 39:3, 39:8, 39:15, 39:19, 40:13, 40:18, 42:2
**DHS's** [1] - 9:16
**different** [1] - 19:24
**differently** [1] - 29:1
**DIRECT** [1] - 4:4
**direct** [1] - 37:12
**direction** [3] - 11:8, 37:7, 44:6
**directly** [2] - 5:14, 20:13
**discipline** [1] - 5:4
**discredit** [1] - 32:3
**dispute** [1] - 37:3
**distress** [1] - 34:17
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:2
**done** [3] - 19:4, 23:17, 26:17
**door** [1] - 22:14

**down** [1] - 35:21
**draw** [5] - 19:15, 22:10, 22:20, 22:24, 23:3
**drawn** [2] - 23:7, 23:10
**Drive** [1] - 2:12
**driveway** [7] - 9:2, 9:9, 10:23, 11:5, 11:11, 12:25, 20:14
**duly** [1] - 4:2

**E**

**east** [2] - 20:15, 20:16
**East** [1] - 2:17
**education** [1] - 33:16
**EDWARD** [1] - 2:6
**either** [4] - 9:25, 10:7, 34:14, 35:20
**eleven** [1] - 4:20
**Elizabeth** [2] - 12:21, 13:14
**emergency** [1] - 27:25
**employed** [2] - 44:9, 44:10
**employee** [3] - 5:3, 6:1, 44:10
**end** [2] - 11:11, 13:17
**endangered** [1] - 38:11
**ended** [1] - 15:1
**ends** [2] - 13:13, 16:3
**enforcement** [5] - 4:17, 5:23, 6:11, 11:2, 35:13
**equation** [1] - 38:15
**Estey** [4] - 12:22, 13:14, 13:15
**Etsey** [1] - 13:14
**exact** [3] - 36:25, 39:8, 39:15
**exactly** [2] - 39:18, 40:14
**EXAMINATION** [6] - 4:4, 32:6, 34:7, 39:23, 42:8, 43:3
**Examination** [1] - 3:2
**example** [1] - 42:18
**exchange** [1] - 20:22
**Exhibit** [13] - 3:6, 3:7, 3:8, 9:12, 9:15, 19:9, 19:11, 20:1, 23:7, 23:10, 23:18, 23:21, 24:11
**exhibits** [1] - 9:12
**exist** [1] - 12:14
**experience** [2] - 32:10, 33:17
**explain** [1] - 34:14

**explained** [1] - 36:22

**F**

**fact** [1] - 38:12
**factor** [1] - 38:14
**facts** [3] - 25:16, 29:18, 29:21
**fair** [1] - 15:10
**Fairfield** [1] - 2:8
**familiar** [2] - 7:9, 10:16
**far** [2] - 35:4, 37:5
**farmhouse** [1] - 32:19
**feedback** [1] - 27:18
**felt** [2] - 11:3, 29:23
**file** [1] - 41:24
**financially** [1] - 44:11
**fire** [2] - 5:5, 19:18
**first** [7] - 4:2, 8:25, 9:2, 10:25, 15:1, 25:25, 26:14
**five** [2] - 40:7, 40:8
**follow** [4] - 6:8, 35:14, 41:14, 41:20
**follow-up** [2] - 41:14, 41:20
**followed** [1] - 35:10
**following** [1] - 37:22
**follows** [1] - 4:3
**foregoing** [3] - 44:3, 44:6, 44:9
**Form** [1] - 29:17
**forth** [1] - 33:25
**forthcoming** [1] - 31:24
**Fourth** [1] - 25:4
**frame** [1] - 28:7
**Franklin** [1] - 2:12
**frequently** [1] - 8:6
**front** [6] - 11:24, 11:25, 12:1, 12:21, 20:9, 20:13
**full** [1] - 44:6
**FURTHER** [1] - 43:3

**G**

**GAIL** [1] - 1:3
**Gail** [26] - 7:8, 7:9, 7:10, 7:25, 14:8, 14:16, 16:11, 17:15, 22:1, 24:14, 24:19, 24:21, 24:23, 25:5, 25:8, 25:17, 27:5, 32:9, 32:15, 36:7, 36:10, 36:23, 38:13, 38:18, 38:23, 40:22
**Gail's** [3] - 36:6, 39:25, 40:16

**General** [1] - 2:16
**general** [1] - 11:2
**General's** [1] - 34:11
**gentleman** [1] - 8:8
**GINA** [1] - 2:2
**given** [5] - 10:6, 12:10, 13:25, 17:15, 17:16
**gmessamer@ parrishlaw.com** [1] - 2:5
**Gordon** [12] - 8:8, 14:8, 16:21, 17:6, 17:14, 17:16, 18:4, 25:6, 27:2, 27:6, 32:15, 36:18
**GORDON** [1] - 1:4
**Gordon's** [4] - 18:10, 25:7, 25:16, 25:20
**Grand** [2] - 1:16, 2:4
**ground** [1] - 33:23
**guess** [5] - 5:13, 8:13, 20:8, 24:23, 38:19
**guessing** [1] - 40:10
**guys** [1] - 10:22

**H**

**hand** [2] - 19:11, 44:13
**hands** [1] - 42:14
**harassed** [1] - 11:3
**HARVEY** [1] - 2:6
**hear** [8] - 13:16, 15:22, 15:23, 17:8, 17:11, 20:24, 21:1, 35:4
**heard** [3] - 22:5, 31:18, 31:20
**heck** [1] - 22:16
**helpful** [1] - 19:25
**hereby** [1] - 44:3
**herein** [1] - 44:4
**hereto** [1] - 44:11
**hereunto** [1] - 44:12
**hid** [1] - 41:4
**hide** [1] - 40:22
**HINDERS** [9] - 2:10, 22:23, 23:9, 23:19, 24:9, 29:16, 32:7, 34:5, 42:7
**Hinders** [2] - 2:12, 3:3
**home** [1] - 24:18
**honest** [1] - 31:24
**Hoover** [1] - 2:17
**hour** [1] - 28:2
**house** [22] - 8:19, 9:23, 10:1, 12:5, 14:4, 14:9, 14:12, 24:21, 24:24, 25:1, 25:6, 25:17, 26:9,

**App. 013**

26:11, 29:12, 29:19, 29:24, 32:9, 32:13, 32:15, 32:17, 32:21
**houses** [1] - 32:24
**hurry** [1] - 28:10
**hurt** [1] - 41:5
**HUYSER** [1] - 2:11
**hyped** [1] - 38:18

**I**

**IA** [4] - 2:4, 2:8, 2:13, 2:18
**idea** [5] - 20:19, 21:3, 23:22, 34:21, 38:10
**identification** [2] - 19:10, 20:2
**identify** [1] - 22:16
**ILEA** [1] - 31:1
**impact** [2] - 5:14, 5:15
**IN** [1] - 44:12
**incorporated** [1] - 35:2
**independent** [2] - 15:7, 15:10
**indicated** [3] - 41:1, 41:4, 44:4
**indicating** [4] - 18:5, 19:21, 23:5, 24:12
**Indicating** [2] - 22:22, 23:16
**indicating)** [1] - 22:19
**indirect** [3] - 5:6, 5:11, 5:19
**indirectly** [1] - 5:15
**infant** [2] - 10:9, 10:12
**information** [2] - 38:2, 41:16
**injured** [1] - 10:12
**inside** [1] - 12:7
**instruct** [1] - 37:12
**instructing** [1] - 37:22
**interaction** [4] - 8:10, 14:7, 14:11, 37:15
**interactions** [3] - 18:11, 24:16, 32:16
**interested** [1] - 44:11
**interpose** [1] - 29:17
**investigate** [2] - 38:21, 41:20
**investigation** [1] - 25:23
**investigations** [1] - 25:22
**involved** [2] - 6:17, 7:14
**involvement** [2] - 27:19, 37:5
**IOWA** [2] - 1:1, 1:8
**Iowa** [2] - 1:17, 2:10

**issued** [4] - 32:25, 33:4, 33:14, 33:20
**item** [1] - 42:22

**J**

**jacket** [1] - 26:25
**JEFFERSON** [1] - 1:8
**Jefferson** [5] - 2:10, 4:15, 33:3, 33:10, 34:19
**job** [2] - 39:8, 39:15
**jobs** [1] - 4:18
**join** [1] - 29:20
**judge** [4] - 28:5, 28:13, 28:23

**K**

**keep** [2] - 18:20, 23:11
**Kelsey** [6] - 2:15, 34:10, 37:6, 37:11, 39:2, 39:17
**KELSEY** [1] - 1:7
**kids** [4] - 40:1, 40:16, 40:20, 40:22
**kind** [13] - 5:11, 5:17, 6:5, 10:23, 15:9, 16:4, 18:5, 20:12, 21:9, 22:9, 25:6, 26:8, 34:24
**knowing** [1] - 25:9
**knowledge** [11] - 5:22, 7:7, 16:14, 17:13, 25:9, 25:14, 26:13, 26:19, 33:12, 42:2, 42:5
**known** [5] - 4:24, 7:11, 18:10, 35:8, 35:9
**knows** [1] - 29:14
**Koenig** [7] - 2:15, 34:10, 37:6, 37:11, 37:16, 39:2, 39:17
**KOENIG** [1] - 1:7
**Kruidenier** [1] - 2:3

**L**

**lady** [1] - 36:7
**large** [1] - 32:21
**law** [6] - 4:17, 5:23, 6:11, 11:2, 25:4, 35:13
**Law** [3] - 2:3, 2:7, 2:11
**lawsuit** [1] - 31:13
**least** [1] - 19:16
**leave** [3] - 11:22, 12:3, 43:1
**legal** [4] - 29:11, 33:3, 33:6, 33:9

**lend** [1] - 38:20
**less** [4] - 28:2, 31:23, 37:18, 40:7
**likely** [1] - 41:18
**limited** [2] - 18:8, 42:21
**live** [4] - 8:5, 33:4, 33:10
**lived** [5] - 8:9, 14:4, 14:12, 14:15, 34:3
**lives** [1] - 24:17
**living** [4] - 25:10, 33:8, 33:17, 33:20
**LLP** [1] - 2:3
**local** [1] - 30:22
**look** [7] - 19:21, 28:20, 31:10, 32:20, 39:12, 42:23, 43:6
**looked** [1] - 37:6
**looking** [2] - 39:4, 42:15
**looks** [1] - 21:13

**M**

**main** [6] - 12:5, 14:4, 14:9, 32:9, 32:13, 32:17
**Map** [2] - 3:7, 3:8
**map** [4] - 19:8, 22:24, 23:3, 43:10
**maps** [1] - 23:15
**March** [2] - 1:16, 44:13
**mark** [2] - 15:14, 23:15
**MARK** [3] - 1:7, 1:13, 4:1
**Marked** [1] - 3:6
**marked** [3] - 19:9, 20:1, 23:20
**matter** [5] - 7:16, 7:17, 38:21, 44:3, 44:10
**MCCONNELL** [1] - 1:3
**MCCONNELL-SEABA** [1] - 1:3
**mean** [3] - 10:15, 29:4, 37:20
**meaning** [1] - 36:7
**memory** [5] - 15:9, 15:11, 15:23, 16:5, 19:15
**mentioned** [1] - 35:24
**mess** [1] - 29:7
**Messamer** [1] - 3:3
**MESSAMER** [8] - 2:2, 4:5, 22:25, 32:4, 39:24, 42:6, 43:4, 43:14
**met** [2] - 10:25, 34:9
**might** [2] - 12:23, 31:6
**Miller** [2] - 32:8, 34:9

**MILLER** [3] - 1:7, 1:13, 4:1
**mind** [1] - 26:1
**minutes** [3] - 13:8, 14:23, 28:9
**Miss** [2] - 34:15, 37:16
**Moines** [3] - 1:17, 2:4, 2:18
**most** [3] - 15:8, 24:20, 41:18
**Moulding** [9] - 2:9, 4:25, 6:19, 8:12, 36:15, 36:22, 37:8, 37:22, 38:4
**MOULDING** [1] - 1:7
**MR** [13] - 22:23, 23:9, 23:19, 24:9, 29:16, 29:20, 32:7, 34:5, 34:8, 39:21, 42:7, 42:9, 42:25
**MS** [6] - 4:5, 22:25, 32:4, 39:24, 42:6, 43:4
**multiple** [2] - 7:23, 33:24
**must** [1] - 22:15

**N**

**name** [2] - 13:11, 17:2
**nature** [1] - 40:15
**necessarily** [1] - 30:6
**need** [2] - 25:12, 38:21
**needed** [1] - 27:25
**Nelson** [2] - 1:14, 1:25
**next** [3] - 10:24, 22:20, 28:23
**nineteen** [1] - 4:16
**north** [3] - 19:12, 20:10, 20:15
**north-side** [1] - 20:10
**Norwalk** [1] - 2:13
**NOTARY** [1] - 44:16
**Notary** [2] - 1:15, 44:2
**notes** [2] - 44:5, 44:7
**nothing** [3] - 7:24, 41:4, 42:7
**number** [1] - 14:20

**O**

**objection** [1] - 29:17
**obligated** [1] - 6:7
**occupancy** [5] - 32:25, 33:5, 33:15, 33:21, 34:1
**OF** [3] - 1:1, 1:6, 1:13
**Office** [2] - 2:17, 34:12
**officer** [4] - 5:23, 6:11, 13:9, 35:13

**officers** [1] - 26:14
**often** [1] - 34:21
**older** [1] - 8:8
**once** [1] - 34:23
**one** [19] - 12:21, 14:25, 17:13, 17:19, 17:21, 20:3, 20:6, 20:9, 20:20, 22:17, 23:15, 25:25, 27:25, 28:8, 28:10, 28:23, 36:17, 39:9, 42:10
**opened** [1] - 22:14
**opposite** [2] - 18:5, 20:16
**order** [3] - 6:6, 40:12, 40:15
**Osborn** [5] - 7:8, 34:15, 36:10, 38:13, 38:24
**OSBORN** [1] - 1:3
**outbuilding** [1] - 22:14
**outbuildings** [2] - 16:9, 16:15
**outer** [1] - 36:19
**outside** [1] - 34:9
**outspoken** [1] - 38:19
**own** [2] - 17:19, 34:23
**owned** [2] - 18:17, 33:23
**owner** [2] - 13:21, 13:22
**owners** [1] - 38:7

**P**

**Page** [1] - 3:2
**pages** [1] - 44:6
**papers** [1] - 31:16
**paperwork** [1] - 31:10
**parcel** [1] - 33:23
**park** [1] - 9:18
**parka** [1] - 21:7
**parked** [1] - 12:19
**Parrish** [1] - 2:3
**part** [1] - 37:13
**participate** [1] - 26:12
**participated** [2] - 25:23, 37:19
**participates** [1] - 30:17
**parties** [2] - 44:9, 44:11
**pass** [1] - 21:19
**past** [5] - 14:6, 18:11, 19:19, 24:16, 32:16
**PATRICK** [1] - 2:16
**pause** [1] - 12:17
**paused** [8] - 13:19, 17:12, 18:23, 19:3,

**App. 014**

22:12, 23:2, 23:13, 24:2
**pausing** [7] - 15:15, 15:19, 16:2, 21:5, 21:15, 22:4, 25:3
**pay** [2] - 5:5, 22:9
**people** [6] - 8:14, 14:7, 17:19, 32:10, 32:14, 41:20
**permanently** [1] - 33:10
**permission** [3] - 16:19, 36:19, 36:23
**permissions** [1] - 18:8
**person** [2] - 6:24, 42:23
**personally** [3] - 18:16, 27:2, 32:1
**phone** [4] - 15:20, 19:1, 19:5, 36:14
**pick** [1] - 10:22
**picture** [1] - 19:22
**pictures** [1] - 22:17
**piece** [1] - 16:4
**pit** [2] - 21:11
**place** [3] - 8:15, 44:4, 44:5
**Plaintiffs** [2] - 1:5, 2:2
**plaintiffs'** [1] - 32:23
**play** [5] - 16:22, 16:23, 20:17, 23:25, 26:4
**played** [16] - 12:16, 13:10, 14:22, 15:18, 16:1, 16:24, 18:22, 19:2, 20:18, 21:12, 21:21, 22:8, 23:1, 23:12, 24:1, 24:22
**playing** [3] - 15:13, 18:20, 23:11
**PLC** [1] - 2:12
**plot** [1] - 43:10
**pocket** [1] - 42:14
**point** [4] - 9:25, 12:24, 28:22, 31:18
**Portion** [16] - 12:16, 13:10, 14:22, 15:18, 16:1, 16:24, 18:22, 19:2, 20:18, 21:12, 21:21, 22:8, 23:1, 23:12, 24:1, 24:22
**positive** [1] - 11:15
**possible** [1] - 10:19
**powers** [1] - 30:5
**practice** [1] - 33:7
**prepare** [1] - 4:7
**previous** [3] - 7:11, 7:12, 7:13
**privileges** [1] - 30:4
**probable** [5] - 24:25, 29:24, 41:10, 41:17,

42:4
**problems** [1] - 33:22
**proceedings** [1] - 44:4
**processed** [1] - 28:12
**Professional** [3] - 1:14, 44:2, 44:3
**PROFESSIONAL** [1] - 44:16
**professional** [1] - 30:12
**prohibited** [1] - 33:13
**properties** [1] - 34:16
**property** [33] - 7:12, 7:18, 7:22, 11:22, 13:18, 13:21, 13:25, 14:3, 14:5, 14:13, 17:19, 17:20, 17:22, 18:13, 18:18, 19:16, 27:3, 32:23, 33:9, 33:11, 33:17, 35:5, 36:1, 36:2, 37:13, 38:6, 38:11, 38:12, 38:15, 40:1, 40:25, 42:3, 43:6
**Protective** [1] - 39:10
**provide** [1] - 41:16
**prudent** [1] - 35:14
**Public** [2] - 1:15, 44:2
**PUBLIC** [1] - 44:16
**pull** [3] - 9:6, 12:9, 13:24
**pulled** [6] - 9:1, 9:8, 11:5, 12:25, 13:4, 18:16
**pulling** [1] - 36:13
**pursuant** [1] - 40:11
**put** [1] - 43:7

**Q**

**qualifications** [2] - 30:16, 30:18
**qualify** [2] - 30:18, 30:23
**questions** [4] - 34:6, 39:22, 43:2, 43:15
**quick** [2] - 28:1, 28:4
**quickly** [2] - 27:24, 28:12
**quite** [2] - 31:14, 40:3

**R**

**R.P.R** [1] - 1:25
**radio** [1] - 15:16
**range** [2] - 30:14, 31:7
**read** [1] - 4:9
**ready** [1] - 12:3
**really** [2] - 37:15, 38:3
**realm** [1] - 30:4

**reason** [1] - 37:2
**received** [1] - 38:3
**receiving** [1] - 37:7
**recollection** [1] - 15:8
**record** [5] - 22:23, 23:9, 23:19, 24:9, 29:18
**RECROSS** [1] - 42:8
**RECROSS-EXAMINATION** [1] - 42:8
**red** [1] - 36:8
**REDIRECT** [2] - 39:23, 43:3
**reduced** [1] - 44:5
**referring** [1] - 22:1
**reflect** [3] - 23:10, 23:20, 24:10
**regarding** [1] - 38:13
**REGISTERED** [1] - 44:16
**Registered** [3] - 1:14, 44:2, 44:3
**related** [2] - 7:24, 44:9
**relationship** [1] - 30:11
**relative** [1] - 44:10
**remember** [7] - 6:19, 6:21, 6:24, 8:24, 15:4, 36:25, 40:14
**removal** [3] - 36:5, 40:12, 40:14
**repeat** [1] - 11:12
**replay** [1] - 16:6
**report** [9] - 4:9, 6:18, 10:3, 10:6, 35:6, 35:8, 35:9, 35:13, 35:15
**Reported** [1] - 1:25
**reported** [2] - 10:10, 35:18
**Reporter** [3] - 1:15, 44:2, 44:3
**reporter** [2] - 19:10, 20:2
**REPORTER** [1] - 44:16
**represent** [1] - 34:10
**request** [1] - 11:21
**requested** [1] - 7:1
**requirement** [1] - 30:24
**reserve** [1] - 4:19
**resided** [3] - 6:24, 32:10, 32:13
**residence** [12] - 8:25, 16:12, 18:11, 24:5, 24:15, 26:10, 34:25, 36:14, 36:24, 42:12, 42:13, 42:19

**resident** [1] - 7:25
**residents** [1] - 7:12
**responding** [1] - 17:7
**responds** [1] - 28:5
**response** [1] - 28:14
**restate** [2] - 33:18, 39:6
**review** [3] - 4:7, 39:12, 44:7
**road** [3] - 11:1, 11:8, 12:19
**role** [4] - 4:21, 5:21, 26:4, 30:2
**roughly** [1] - 40:1
**route** [3] - 19:15, 20:7, 22:10
**run** [1] - 8:7
**rural** [1] - 34:25
**RYAN** [1] - 2:16
**ryan.sheahan@ag. iowa.gov** [1] - 2:19

**S**

**saw** [4] - 19:18, 19:23, 31:9, 34:13
**scene** [5] - 36:12, 37:7, 38:3, 39:4, 39:12
**scheduling** [1] - 27:22
**screen** [1] - 36:8
**Seaba** [5] - 8:2, 14:8, 34:15, 36:18
**SEABA** [2] - 1:3, 1:4
**seal** [1] - 44:13
**search** [23] - 16:8, 16:18, 17:20, 17:21, 17:23, 18:1, 18:4, 21:10, 25:17, 26:2, 26:3, 26:5, 26:18, 36:19, 36:23, 37:12, 38:8, 41:10, 42:3, 42:11, 42:18, 42:19
**searched** [1] - 40:24
**searches** [1] - 26:12
**second** [3] - 12:18, 12:23, 15:2
**secondary** [2] - 26:7, 26:16
**seconds** [2] - 13:8, 14:24
**see** [11] - 9:6, 17:9, 18:17, 19:1, 19:22, 20:9, 21:9, 30:9, 35:21, 37:21, 39:12
**send** [1] - 29:2
**sense** [1] - 29:8
**separate** [1] - 14:12
**septic** [1] - 33:24
**serious** [1] - 35:18

**served** [1] - 31:15
**Services** [1] - 39:10
**set** [3] - 25:16, 27:21, 44:12
**shack** [2] - 21:16, 21:24
**SHEAHAN** [6] - 2:16, 29:20, 34:8, 39:21, 42:9, 42:25
**Sheahan** [1] - 3:4
**sheriff** [6] - 6:3, 6:14, 16:25, 27:16, 27:19, 30:22
**shooting** [1] - 30:14
**short** [1] - 8:13
**shortest** [1] - 28:7
**shorthand** [3] - 44:4, 44:5, 44:6
**show** [1] - 33:24
**showing** [1] - 20:4
**side** [1] - 20:10
**sirens** [1] - 21:19
**sister** [2] - 8:5, 22:6
**situation** [5] - 18:3, 18:6, 28:25, 34:24, 35:3
**skip** [1] - 15:12
**small** [1] - 33:23
**socially** [1] - 30:9
**solely** [1] - 41:13
**someone** [3] - 33:19, 35:6, 35:12
**sometimes** [1] - 35:18
**somewhere** [1] - 35:1
**sorry** [2] - 11:12, 20:16
**sort** [1] - 38:20
**sounded** [1] - 13:18
**sounds** [1] - 21:22
**SOUTHERN** [1] - 1:1
**special** [2] - 4:21, 30:4
**specific** [1] - 25:13
**specifically** [1] - 16:13
**spot** [1] - 29:9
**standing** [1] - 13:9
**start** [2] - 4:6, 15:13
**started** [2] - 15:2, 36:13
**State** [1] - 2:17
**STATES** [1] - 1:1
**status** [1] - 6:1
**stay** [1] - 29:3
**storage** [1] - 23:22
**street** [1] - 13:4
**Street** [2] - 2:17, 7:19
**structure** [7] - 5:10, 24:11, 24:14, 32:18, 33:4, 33:20, 34:2
**structures** [2] - 32:22,

33:1
**stuff** [1] - 20:4
**submitted** [1] - 44:7
**subsequent** [1] - 31:21
**substance** [1] - 15:4
**Sunset** [1] - 2:12
**superior** [1] - 6:14
**supervision** [1] - 44:5
**suppose** [2] - 34:4, 38:25
**supposed** [1] - 39:18
**sworn** [1] - 4:3

### T

**ten** [1] - 28:9
**term** [1] - 29:19
**terms** [17] - 6:5, 7:2, 10:6, 12:14, 18:3, 21:25, 27:23, 29:22, 38:2, 38:6, 38:10, 39:1, 39:3, 39:9, 39:25, 41:8, 42:11
**testified** [1] - 4:3
**testimony** [1] - 35:25
**THE** [1] - 1:13
**thinking** [1] - 41:7
**three** [2] - 12:10, 12:13
**Tim** [12] - 8:1, 11:1, 11:4, 11:7, 11:13, 11:25, 14:14, 18:4, 22:1, 24:16, 27:5
**Tim's** [9] - 11:21, 14:19, 16:11, 18:7, 18:8, 18:14, 24:14, 24:18, 36:23
**TIMOTHY** [1] - 1:3
**today** [3] - 4:7, 27:25, 28:1
**together** [1] - 16:5
**toilet** [1] - 42:23
**took** [3] - 19:16, 40:16, 44:4
**top** [1] - 19:12
**town** [1] - 34:25
**trace** [1] - 20:7
**training** [2] - 25:5, 33:16
**transcript** [1] - 44:6
**trash** [2] - 19:18, 21:11
**truck** [3] - 9:13, 36:14
**trump** [2] - 25:8, 25:17
**truth** [1] - 35:22
**try** [3] - 21:20, 40:22, 41:21
**trying** [1] - 34:14
**turned** [1] - 20:15

**two** [3] - 12:18, 17:19, 20:8
**type** [1] - 13:24
**typewriting** [1] - 44:5
**typical** [2] - 42:11, 42:18
**typically** [4] - 41:15, 41:19, 42:20, 43:6

### U

**under** [3] - 17:23, 25:16, 44:5
**undersigned** [1] - 44:2
**unhappy** [1] - 11:1
**unit** [1] - 23:22
**UNITED** [1] - 1:1
**unrelated** [1] - 7:16
**unsafe** [1] - 10:12
**up** [31] - 7:1, 8:7, 8:15, 8:19, 9:9, 9:22, 10:1, 10:22, 11:5, 12:5, 12:9, 12:25, 13:4, 13:13, 13:24, 18:17, 20:14, 20:25, 27:21, 28:19, 31:7, 31:12, 33:24, 35:10, 35:14, 36:8, 36:13, 38:18, 41:14, 41:20, 43:6
**Updegraff** [1] - 2:12
**upset** [1] - 24:24

### V

**Van** [1] - 4:19
**van** [1] - 9:16
**vehicle** [2] - 9:16, 9:19
**version** [1] - 19:24
**video** [28] - 12:9, 12:16, 13:7, 13:10, 13:13, 13:19, 14:20, 14:22, 14:23, 15:1, 15:2, 15:5, 15:12, 15:18, 16:1, 16:24, 18:22, 19:2, 19:17, 20:18, 21:12, 21:21, 22:8, 23:1, 23:12, 24:1, 24:22, 34:13
**Video** [7] - 17:12, 18:23, 19:3, 22:12, 23:2, 23:13, 24:2
**videos** [3] - 4:8, 12:10, 12:13
**visit** [3] - 27:3, 39:2, 39:25
**vouch** [1] - 32:1
**vs** [1] - 1:6

### W

**wait** [2] - 21:19, 26:17
**waited** [1] - 8:14
**walk** [1] - 10:23
**walked** [2] - 19:19, 20:14
**Walnut** [1] - 2:17
**wants** [1] - 25:8
**warrant** [10] - 26:5, 26:8, 27:23, 27:24, 41:12, 41:24, 42:12, 42:18, 42:20, 43:5
**warrants** [4] - 8:6, 26:2, 26:3, 28:15
**Washington** [6] - 6:22, 7:3, 7:5, 8:21, 13:12, 17:4
**watched** [1] - 4:8
**weapon** [1] - 26:23
**wear** [1] - 26:21
**wearing** [1] - 36:7
**welfare** [1] - 38:23
**west** [1] - 20:13
**WHEREOF** [1] - 44:12
**white** [3] - 9:15, 12:18, 21:7
**White** [1] - 11:18
**window** [1] - 20:10
**witness** [3] - 4:2, 23:20, 24:10
**Witness** [2] - 24:6, 24:8
**WITNESS** [1] - 44:12
**Wonder** [1] - 2:7
**wording** [1] - 36:25
**worker** [17] - 9:22, 10:7, 10:14, 11:21, 12:25, 13:4, 21:6, 21:10, 34:10, 36:2, 37:11, 39:1, 39:3, 39:9, 39:15, 39:19, 40:18
**works** [1] - 39:9
**write** [1] - 24:7
**written** [1] - 41:13

### Y

**yard** [3] - 20:4, 20:9, 20:13
**year** [1] - 40:1
**yearly** [1] - 30:24
**years** [4] - 4:16, 40:5, 40:7, 40:8
**yourself** [2] - 11:12, 35:5

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

GAIL OSBORN, TIMOTHY )
MCCONNELL-SEABA, and )
GORDON SEABA, ) Case No. 4:25-cv-183
)
Plaintiffs, )
)
vs. )
) DEPOSITION OF
CHAUNCEY MOULDING, ) CHAUNCEY MOULDING
KELSEY KOENIG, and )
JEFFERSON COUNTY, )
IOWA, )
)
Defendants. )
--------------------)

THE DEPOSITION OF CHAUNCEY MOULDING,

taken before Buffy Nelson, Registered

Professional Reporter and Notary Public,

commencing at 12:34 p.m. on March 4, 2026, at

2910 Grand Avenue, Des Moines, Iowa.

Reported by:  Buffy Nelson, R.P.R.

---

I N D E X

| Examination by: | Page |
| --- | --- |
| Ms. Messamer | 4, 90 |
| Mr. Hinders | 77 |
| Mr. Sheahan | 81 |

| Exhibit | | Marked/Offered |
| --- | --- | --- |
| Exhibit 10 | Newspaper Article | 20 |
| Exhibit 11 | Text Messages | 76 |
| Exhibit 12 | Email from Alisha White to Kelsey Koenig | 76 |
| Exhibits 1-12 | | 93 |

---

A P P E A R A N C E S

Plaintiffs by:
GINA MESSAMER
Attorney at Law
Parrish Kruidenier, LLP
2910 Grand Avenue
Des Moines, IA 50312
(515) 284-5737
gmessamer@parrishlaw.com
-and-
EDWARD HARVEY
Attorney at Law
1600 Wonder Way
Fairfield, IA 52556
(641) 919-8696

Defendants Chauncey Moulding and
Jefferson County, Iowa, by:
BRENT HINDERS
CAMRYN HUYSER
Attorneys at Law
Hinders, Updegraff & Franklin, PLC
1104 Sunset Drive
Norwalk, IA 50211
(515) 981-7044
brent@hinderslaw.com
camryn@hinderslaw.com

Defendant Kelsey Koenig by:
RYAN PATRICK SHEAHAN
Assistant Attorney General
Hoover State Office Building
1305 East Walnut Street
Des Moines, IA 50319
(515) 281-5881
ryan.sheahan@ag.iowa.gov

---

CHAUNCEY MOULDING,

called as a witness, having been first duly

sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MESSAMER:

Q.   Hi there.

A.   Hi.

Q.   I'm Gina.  So let's just maybe start out talking a little bit about your background. You are from Fairfield; correct?

A.   I wasn't born there, but I grew up there, so yeah.

Q.   And then you went to elementary -- I heard mention of this MSAE school.

A.   Yes.

Q.   That's not a traditional public school; is that correct?

A.   It's a private school.

Q.   What is different about it than a public school, to the extent you know?

A.   It's associated with the transcendental meditation movement.

Q.   Do you take a similar curriculum?

A.   Yeah.

Q.   Are there classes that are different

**5**

than public school?

A.    The only language that's offered is Sanskrit.  But it's got the traditional, you know, math, science curriculum.  It's just got some extra stuff.

Q.    Like different extracurriculars?

A.    I never went to public school, so I'm not sure what is offered there.

Q.    What grades does that cover?

A.    Well, I was there from third through twelfth, but I think it goes down to kindergarten.

Q.    And then what made you decide to go to law school?

A.    What made me decide to go to law school?  It was in the cards.  It was something I was considering after getting out of the service.  So I don't know if there was specifically an incident.  It was always an option, I would say.

Q.    When you were in law school, was there a particular job you thought you were going to end up in?

A.    There was a few things I was vacillating between.  Prosecuting was always a

**6**

principal consideration.

Q.    And I understand you clerked after you got out of law school?

A.    Yes, ma'am.

Q.    What judges did you work with mostly?

A.    Worked in the Third District covering Sioux City and then the Eighth District out of Ottumwa.

Q.    Just with all the different judges?

A.    Yeah.

Q.    That was a good experience?

A.    It was.

Q.    Was that just a term clerkship or you could have stayed?

A.    I could have stayed.  It started as a term and transitioned.

Q.    What made you end up switching, then, to -- I understand your next job was assistant county attorney?

A.    Yeah.  I was working on a case with Judge Yates and was considering what my next steps were.  Had an application with a federal agency, and Yates recommended that I put in for a position that he knew was opening up in Washington and Keokuk counties, so I took his

**7**

advice and took that position.

Q.    And then when you took that position, how many attorneys were there in your office?

A.    So I was technically a Keokuk County employee, and I worked for John Schroeder, but I was on loan -- or a shared position with the Washington County office, so I worked under John Schroeder and then John Gish in Washington.  In both offices there was a total of five attorneys.

Q.    How did you get trained on what the job of being county attorney was?

A.    Just kind of tossed into it and learned from my supervising attorneys.

Q.    Does the AG's office put on any specific CLEs for, like, new county attorneys?

A.    Yes.

Q.    Did you go to those?

A.    I did.

Q.    What type of things would that cover?

A.    It's about a four-day, three- or four-day training, basically covers the basics of -- well, let me take that back.  I actually went to new county attorney's school after being elected to the Jefferson County office

**8**

because they put it on every four years.  So I didn't go to that while I was assistant county attorney.

Q.    Does that training handle, like, Fourth Amendment and suppression-type issues?

A.    I don't recall specifically, but I'm certain that it does.  The rubric is probably available online.

Q.    As county attorney do you provide training to law enforcement officers?

A.    I do.

Q.    Tell me about that.

A.    Well, training -- I provide advice, so there's not, like, a regimented training program, but there is advice on Fourth Amendment issues.

Q.    Just kind of catch as catch can?

A.    Sure.

Q.    I think Polk County does maybe some more standardized things with Des Moines Police, but you don't have any standardized training program where monthly updates or yearly updates?

A.    It's a small office.  We just work as needed together.

**9**

Q. When you were an assistant county attorney, did you participate in searches or search warrant executions there?

A. Yes. Yes.

Q. Tell me about that.

A. What?

Q. Was it a couple times, or was it a frequent thing?

A. I -- I'm not sure. Like how many times, you're asking?

Q. Sure. I mean, I'm guessing you can't give me an exact number.

A. Right.

Q. I'm just wondering if it was a frequent thing or infrequent.

A. So it was more often in Keokuk County, because in Washington County John handled the search warrant issues. But it was not infrequent for me to advise on those particular issues.

Q. And when you would go on scene, what would your role be?

A. Supervising the -- whatever the issue might be.

Q. So you would actually, like, go in the

**10**

home while they were conducting the search?

A. You're asking general questions, so I don't know how to answer that, but that would not be outside of the norm.

Q. Okay. Versus just, like, standing outside and you're just on call?

A. That also wouldn't be outside of the norm. So situation dependent.

Q. Did other county attorneys participate in searches and search warrant executions?

A. Yes.

Q. In both counties?

A. Honestly, I don't know how to answer that. I'm not -- I'm not quite sure. The answer is yes, but I can't recall specifics.

Q. Was it standard that you guys would go to every search warrant execution?

A. No.

Q. More like just notable cases or things where they thought there might be problems?

A. Situation dependent, but, like, you know, not for, like, a blood draw for an OWI, for instance.

Q. What was your docket when you were an assistant county attorney?

**11**

A. General docket in Keokuk County and indictable misdemeanors in Washington County.

Q. When you say "general," are you talking civil too or --

A. I can't recall a specific civil issue that arose. I wasn't -- I wasn't counsel on any civil issues in Keokuk County, but I handled the felony docket as well as the misdemeanor docket in Keokuk County.

Q. What then led you to run for county attorney?

A. The position -- I was approached about the possibility. I weighed it back and forth. Eventually I decided that it would be something I would be interested in doing. Originally I was considering running for the Keokuk County Attorney that same cycle. But I grew up in Fairfield, so I decided to run for the Jefferson County position.

Q. And when you started in that job, how many attorneys were there in the office?

A. In Jefferson County?

Q. Yes.

A. It was myself and my assistant.

Q. Full-time assistant?

**12**

A. Yes.

Q. And I understand now you've got a full-time assistant and a half-time assistant?

A. Correct. It's a half-time assistant, but that half-time position is shared with the Board of Adjustment, so he's half-time in my office, but his duties are shared.

Q. And the way you've got your office organized now, what is your caseload?

A. Like whose responsibilities are where?

Q. Yeah.

A. Magistrate court and Board of Adjustment issues and Board of Supervisors are handled by the part-time assistant. Juvenile docket and mental health commitments and indictable misdemeanors are handled by my full-time assistant. Felony caseload, civil caseload, and also supervisor issues are handled by myself.

Q. So all felony cases are yours?

A. More or less. There may be some outliers, but --

Q. Did you have an opportunity to hire both Elizabeth, the full-time, and then the part-time assistant yourself?

**13**

A.   I was the person that -- they work for me.  It was collaborative.

Q.   Neither one of them were there before you, though?

A.   Right.

Q.   To your knowledge, has the county been sued for any Fourth Amendment violations since you've been the county attorney?

A.   To my knowledge -- could you ask that again?

Q.   Yeah.  Since you've been county attorney, has the county been sued for any Fourth Amendment violations?

A.   Yes.

Q.   What was the nature of that case?

A.   I'm reluctant to discuss civil litigation unrelated to this case.

Q.   Is that the one where the guy blinded himself?  I guess that was in the paper I read about.

A.   Yeah, that -- I don't know if that's a Fourth -- that was not a Fourth Amendment issue.  That was a -- There's a, you know, public -- obviously, publicly available documents relating to a former ambulance

**14**

employee that's suing the county.

Q.   Okay.  Gotcha.  I know what you're talking about.  And that is one where you have been named as a defendant; correct?

A.   Correct.

Q.   Outside of that, anything else?

A.   Not since I took over in 2019.  And I could amend that if I -- if there's something that comes up, but nothing is coming to mind.

Q.   I guess I didn't look up the one involving the EMS person where you're a defendant.  Is your -- is Mr. Hinders representing you in that case too?

A.   No.

Q.   Do you still have a habit of being involved with search warrant executions and searches of places?

A.   Involved?

Q.   Yeah, like you're on the scene.

A.   Yes.

Q.   And is that a common practice of yours or that's kind of a rare case?

A.   I don't mean to, you know, split hairs.  Common?  It happens.  I'm not sure what you would define as common.

**15**

Q.   I don't know.  I would need you to tell me.

A.   It's not uncommon.

Q.   Okay.  Like how many would happen in a six-month span?

A.   I don't know.  Depends.

Q.   Like one or are we talking, like, ten?

A.   So the last one was last month.  Before that I don't recall.  But it's not uncommon.

Q.   Does law enforcement, the deputies or police officers, call you up in advance and ask you to come?

A.   Yes.

Q.   When you go out on a search warrant execution or a search, do you wear a body camera?

A.   No.

Q.   Do you have a body camera?

A.   No.

Q.   Do you ever personally search?

A.   Do I ever personally search?  I don't have the practice of doing that, no.  I'm not saying it hasn't happened as a rarity, but that's not my -- that's not my practice.

**16**

Q.   Within your county attorney's office, do you have an investigator?

A.   No.

Q.   So during your investigations you just have to rely on the police department or sheriff's office?

A.   Or state agencies.

Q.   Do you ever use private investigators?

A.   Yes.

Q.   On criminal cases?

A.   It may have happened, but I can't recall a specific incident.  But we have hired private investigators.

Q.   Do you ever personally contact witnesses to try to collect evidence?

A.   I don't know how -- I contact witnesses.  I don't know what you mean by collect evidence.

Q.   I would be thinking before a case has been filed.

A.   I don't know.  I guess I don't know how to answer that.  I talk to witnesses fairly often.

Q.   Do both the Fairfield police and the sheriff's office in Jefferson County have body

**17**

cameras?

A.   Yes.

Q.   Are you involved at all with their policies in terms of when they're supposed to be recording?

A.   I don't know what you mean by "involved," but I don't write the policy for the agency.

Q.   Do you have any involvement in the review of those, consultations of policies?

A.   I don't think I have discussed policies for utilization of body cams with the agency.  We have discussed when evidence may or may not have been, like, generated, right, like why wasn't your camera on at this point or what have you, but as far as written policies, no.

Q.   In terms of other equipment that would be similar to law enforcement, do you have a bulletproof vest?

A.   Yes.

Q.   How about firearm?

A.   Yes.

Q.   And I'm talking not private firearms, but ones that would be county issued.

A.   Yes.

**18**

Q.   Pepper spray?

A.   No.

Q.   Cuffs?

A.   No.

Q.   Anything else that you would have issued that would be similar to things that officers wear on their duty belt?

A.   Just running through what somebody has on their duty belt.  I don't think so.

Q.   Do you have something that hooks you in with law enforcement, like radio, dispatch --

A.   Yes.

Q.   Is that just in your office, or do you have that in your car?

A.   I have a portable.

Q.   Is that something you use on a monthly basis?

A.   Could you ask that another way?  Do I use it on a monthly basis?  It's always on.

Q.   In terms of your weapon, do you have to -- I was talking to Elizabeth about this. Do you have to qualify to use that?

A.   Yes.

Q.   Who administers that?

**19**

A.   I qualify annually with the sheriff's office, police department.

Q.   And why do you have to qualify?

A.   Why do I have to qualify?

Q.   Like what's the -- is that like a local policy or that's a statewide policy?

A.   It's my policy.  I don't know if it's in any other requirements, but it's good practice to make sure that you're within rights.

Q.   I didn't know if that was a requirement in order for you to carry -- or use it in certain ways.

A.   I'm not aware one way or the other, but we do.

Q.   So just because it's your policy in order to be well trained on it?

A.   Well, that's what I do.

Q.   When you went out to the Osborn residence and the Seaba residence, did you carry a weapon that day?

A.   I don't specifically recall, but I would -- I would assume yes.

Q.   And why would you assume yes?

A.   It's typical.

**20**

Q.   And how do you carry it?  Do you just have, like, a waistband holster?

A.   I've got a holster on my belt that is typically covered by a jacket.

Q.   I saw that you had talked to the paper about this case.  It would be to an Andy Hallman.  Do you recall that?

A.   I don't recall the conversation specifically, but I recall the article.

Q.   Okay.  Have you reviewed it before?

A.   I read it when it came out in the paper.  I haven't read it since.

Q.   When it came out, did you think your quotes were accurate?

A.   I don't have a reason to think that they weren't.

Q.   Do you want to look at them?

A.   I can answer any specific question. I'm not saying they're inaccurate.

Q.   I'll just give this to you so you can confirm.

          (Exhibit 10 was marked for
          identification by the reporter.)

Q.   So we marked this 10.  And your section would be under the heading, "Moulding

**21**

Responds," on the second page, if you could just take a minute and review your quotes.

A. Okay.

Q. Anything --

A. Do you want me to read this whole thing?

Q. Just the parts that you're quoted. You're also, I think, at the top of the third page.

A. Okay. Sure.

Q. You're good?

A. Yeah.

Q. You're done reading? Okay. So upon reviewing it, anything that you were quoted on saying that is inaccurate?

A. I don't recall the quote -- is there something specific that you're wondering is accurate or not?

Q. Just this whole thing, if there's -- I want you to tell me if these are correct quotes or if there's anything that the reporter misquoted you on.

A. Okay. So I don't recall any particular misquotes or what I specifically stated, so at this point I wouldn't be able to

**22**

say one way or the other, but nothing looks wrong.

Q. And you mentioned that Gail has a 2014 conviction in Calhoun County for making a false allegation of sex abuse.

A. Right.

Q. What do you know about that case?

A. I don't know anything about that case except for what's available on Iowa Courts Online.

Q. Would you have access to pull up anything in that case?

A. Would I have access?

Q. Uh-huh.

A. Well, I pulled her up on the publicly available Iowa Courts Online.

Q. As a law enforcement officer do you have access to any other documents in that case?

A. I didn't request anything. I didn't look at anything from a confidential standpoint. It's just available when you put her name into the public system.

Q. Have you talked to anybody involved with that case?

**23**

A. I have not.

Q. In terms of this case about the search of the property, are there any statements that Gail has made or allegations that Gail has made that you believe are untrue?

A. Yeah. Well, I guess you're talking about claims in the petition or claims from Gail herself? Because I'm not sure if there's a difference there.

Q. Both. Let's just start with anything that Gail said out at the residence that you thought is untrue.

A. Well, I don't know if this is coming from Gail, but I had concerns in claims in the petition that Mr. Seaba, Gordon, did not give permission. I think that's a fundamental misattribution.

Q. Anything else?

A. That's the main one.

Q. Anything besides that main one?

A. Well, I suppose I'd like the opportunity to provide others if necessary, but that's -- that's the big one. As far as Gail's statements, you mean outside of -- outside of what context?

**24**

Q. Huh? I don't understand the question.

A. So you're asking if Gail has made false statements at any point in these -- since November of 2024 or --

Q. Sure.

A. Okay. I don't know. Probably.

Q. And that's why -- in terms of your quote, you said, "As in any case in which credibility is central to the claims." I'm just trying to get a sense of what about the claims you are alleging is untrue.

A. Oh.

Q. I understand there might be legal arguments about the proprietary of the search and whatever, but I just want to know factually, you know, what are you thinking of that there's a factual dispute about?

A. Permission to be on the property.

Q. Anything else that comes to mind as you sit here?

A. I don't know. Possible. I'll give that some thought.

Q. Okay. So let's just start talking here about how you first heard about this baby being an issue on the property.

**25**

A. So, actually, I believe my first kind of involvement in any of this was that phone call from Gail to my office, which I gave it some thought last night. I don't have an exact time, but I think it was sometime after lunch, between maybe 12 and 1:30, she contacted my office. A portion of that phone call, I think, has been provided. So that was my first hint that something was going on.

Q. We have that recording. What's the mechanism by which you recorded that?

A. I recorded that on my work phone. And I -- I don't normally make a practice of doing that, but, frankly, the phone call was so outside of the ordinary, the claims that she was making were odd enough that I thought it would be valuable to have a recording of that.

Q. Okay. So she called and you got that recording. Anything else notable that she told you during that phone call that is not represented in the recording?

A. Sure. I'm certain that she had made a statement that bothered me enough to start the recording, but I don't recall what her specific statement was that was odd enough to start

**26**

that.

Q. Have your -- has your office prosecuted someone for making a false complaint to DHS before, to HHS?

A. There was a case. I'm trying to recall if we got a conviction or not or if it was just stopped at the investigative stage. I do believe somebody had made 38 separate phone calls to DHS over the course of several months, and that was definitely investigated. I can't recall the outcome of that. It would have been a while ago, maybe 2019, 2020. That's the one that jumps out just because it was so egregious.

Q. So after you had that phone call with Gail, what did you do next?

A. So there was a phone call with Gail. I believe -- and the order of this could be swapped. I either spoke with Assistant County Attorney Estey or the DHS investigator. My -- I want to say that I talked with Miss Estey first and asked her like, "Hey, I got a weird phone call from Miss Osborn." And then Elizabeth indicated that she had also gotten a phone call.

**27**

I've been doing this for a while, and I cannot recall a single instance where a mother under investigation by DHS has contacted my office the same day. So the fact that she contacted my office twice certainly jumped out as out of the ordinary. So I think that was the order.

Conferred with Miss Estey, and then I believe I received a call -- I don't know -- I don't know if my office contacted the DHS investigator or if she contacted my office. But certainly there was a conversation with Miss Koenig.

Q. And what, between those conversations, did you understand the allegations to be and kind of the factual concerns?

A. Sure. Certainly the bulk of the information came from Miss Koenig. She indicated that she had been at the -- take a step back -- that an anonymous phone call had come into DHS, that the caller indicated a substantial amount of knowledge about the -- a concern -- a child with concerning features. They had date of birth, they had a name, they had personal contact with the child. This is

**28**

being relayed thirdhand, so I'm sure if there's a record of the call, or Miss Koenig would be better able to state what came in. But it was relayed to me that they had that information and that the child was in distress and had been utilized -- or that controlled substance, methamphetamine, had been used in its presence, that it possibly needed medical care and possibly needed food.

And it was kind of my reading of it or -- I don't want to speak for Miss Koenig, but it sounded like the reporting party was trying to report these things without admitting that maybe they were at the residence utilizing methamphetamine. That was kind of the -- between the lines, but that -- that certainly wasn't said in any report.

Q. Anything else supporting the concern that there was a kid out there?

A. Yeah. So Miss Koenig got the anonymous reporting. Frankly, I'm not the juvenile prosecutor in the office, so I'm a little rusty on this in Keokuk County. But they -- I think the anonymous report comes into the standardized central reporting system, and

**29**

the work flow from there, I'm not sure, but at some point it was assigned to Miss Koenig. And then it's my understanding that she made some -- some contacts to -- for some reason there's some confusion about the jurisdiction. I think that there was a belief -- the residence is right on the county line, so there was some belief that it might have actually been in Washington County. So I believe Miss Koenig had some contact with an investigator out of Washington County who indicated that Miss Osborn had been calling various fire station safe drop boxes requesting information about the process for, I guess, the no-questions-asked surrender of a child.

And I'm not sure where this information came from, but there was some -- a belief that Mr. -- that Tim Seaba, who is Miss Osborn's paramour, was starkly against having a child, which I think raised some concerns on the part of DHS that this would have been a secret child.

There were some conversations back and forth, and I believe I told Miss Osborn on the phone that it's not -- it's not a criminal

**30**

offense to have a secret child. That's not -- it's not a crime in Iowa, a requirement to report. So, in any event, better person to ask about those things would be Miss Koenig.

But from my recollection of my conversation with her, those were the principal matters of concern that raised her alarm.

Q. Did you consider getting a search warrant for the property at that point?

A. We did not. There was no crime.

Q. If somebody had meth at their residence and had a child there, that would be child endangerment; correct?

A. It could be, but that wasn't -- that wasn't being considered.

Q. If a child wasn't receiving adequate medical care or food, that would be child endangerment too; right?

A. That wasn't being investigated. The principal concern was providing aid and welfare to a distressed infant.

Q. Well, my question is, yes or no, if somebody isn't providing necessary food and medical care to a child, that is child endangerment; correct?

**31**

A. Certainly could be.

Q. And if you've used meth around the child, that would also be child endangerment; correct?

A. It's not that black and white, but it could be.

Q. The statute says that child endangerment is knowingly permitting a child to be present at a location where amphetamine or methamphetamine is manufactured or possessed; correct?

A. I don't have the statute in front of me, but that sounds right.

Q. Were you provided any information from Koenig that the baby had been wounded?

A. I don't recall a wound conversation, no.

Q. How about if the baby was actually dead or had been murdered?

A. No, that was never reported. There might have been a report of that. I wasn't provided that information.

Q. Okay. So under your conversations with Koenig and --

A. Let me pause. There certainly was

**32**

some conversation that we hoped that if the baby was there, it was alive, but there wasn't any information to suggest otherwise.

Q. Okay. So you talked to both Elizabeth and Kelsey to get this information. Anyone else that you talked to before going out to the residence about this matter?

A. I can't recall if I spoke with Deputy Miller or if Kelsey spoke with Deputy Miller. Somebody spoke with Deputy Miller, and I think it was Kelsey, but I think I was there. I think that was the nature of it. But it could have been me. But Deputy Miller was definitely involved in the conversation. I just don't think I called him. I think it was Kelsey. But if the phone records show otherwise, I would stand by those.

Q. What's your involvement with applying for warrants?

A. What's my involvement with applying for warrants? It depends on the context, I guess.

Q. I don't know anything about this. You just tell me the different contexts. We'll start there.

**33**

A.   Well, we're not dealing with a search warrant case in this case.  But, generally speaking, an officer would swear out an affidavit, send it to my office.  These days -- I can't recall if we switched over to electronic search warrants at this point or not.  These days they go to an application on my phone, I consider, approve, send it to the magistrate, and then the magistrate says whether you get a search warrant.

Q.   If there's an emergency where you really need to get in and search someplace, how do you expedite that process?

A.   Depends on the context and the circumstance.

Q.   What do you do to make it go faster between when the application is filed and when it would be granted?

A.   It's a relatively expeditious process.

Q.   Like how long would it take on the short end?

A.   On the short end, well, depending how long it takes to prepare the affidavit, you can get a warrant in an hour.

Q.   Is that the fastest you think you

**34**

could get one?

A.   Depends on how fast you can type or the officer can type.

Q.   But in terms of your approval and the judge's approval, that would just take getting somebody on the phone?

A.   Once the warrant is put together, the approval process is pretty rapid.

Q.   Based on the information that Kelsey relayed to you, do you think there would have been probable cause to apply for a warrant?

A.   This isn't a criminal investigation, so no.

Q.   If it were a criminal investigation, would -- like if you were investigating child endangerment, would there have been enough information for probable cause for a warrant?

A.   I don't know how to answer that.  It wasn't being investigated as a criminal matter.

Q.   What's the significance to you of the fact that you weren't investigating it as a crime?

A.   Nobody was going to jail that day.  It was just trying to get eyes on the child in distress.

**35**

Q.   Do you think that different rules apply if you're not pursuing a criminal matter?

A.   Do I think different rules apply?  Well, there are certain constitutional protections and shields that exist to protect people from criminal liability.

Q.   Do you think that -- well, I'm trying to understand, I guess, did you ever tell anybody explicitly that you were not doing a criminal investigation?

A.   I think that conversation probably happened at the Seaba residence, but I would defer to the body cam.  I don't recall.  But I think that conversation definitely happened with the Seabas or with Miss Osborn and the Seabas.  But I would defer to the recordings.

Q.   Did you have any knowledge of Gail Osborn before this date?

A.   So Miss Osborn knew me.  I did not recall how I knew her.  When I was in Washington County, there was a case that I prosecuted, I think it was 2017, where she was involved in a multi-county fraud -- what would you call that?  I don't know how to describe it.  The case involved her staying in bed and

**36**

breakfasts in various towns all over the state utilizing either -- I can't recall if it was a bad check or a bad credit card.  So I think it might have been seven different felony charges, could be a couple more or less, in various counties throughout the state.  Washington County was one of them, and I was the prosecutor on the case.

So I didn't have any independent recollection of that matter, but I do recall now that I was involved in that prosecution.  But I don't even know that I ever put a name to a face, that I ever had individual face-to-face contact with Miss Osborn.  I could have.  But there were so many counties involved, and I don't recall where she was living at the time, but during the pendency of that case I would have just liaised with her attorney probably.

Q.   Okay.  So besides this involvement with that case that you discovered kind of afterwards, anything else about Gail that you knew going into this day that you just knew yourself, not that you heard from Kelsey?

A.   Right.  So I did have a conversation with her in 2022 -- I think I indicated that in

**37**

my filings here -- where she was sitting on my office stoop when I came back from lunch when I was running a county attorney's election against plaintiffs' counsel here, and she was extremely emotional, tears in her eyes. It was an odd conversation. And she was very concerned about ensuring that Mr. Harvey didn't become county attorney. That was an odd conversation.

Q. How long do you think you talked to her?

A. How long did that conversation take? Less than ten minutes, probably more than five. Somewhere between five and ten minutes.

Q. What were her concerns?

A. As indicated in the filing, she was concerned about his behavior when he was her attorney on a different matter.

Q. How about your relationship with Kelsey Koenig? Is she somebody that you worked with before?

A. Yes.

Q. And what about Tim Seaba? Had you had any interaction with him?

A. I don't think I had ever seen him or

**38**

heard of him before that day.

Q. How about Gordon?

A. No, definitely not him.

Q. And since that November 15, 2024, have you had any interaction with the three of them since then?

A. No, I don't think so.

Q. So it sounds like what you described so far is also oral communication. Did you have any email communication about this incident?

A. With the plaintiffs?

Q. No. With Kelsey or Elizabeth.

A. No. We were all in the same place. I don't think there was any email communication about it.

Q. Did you actually ever see the anonymous complaint or hear it?

A. No. I would have liked to. I don't know how that process works. But I didn't hear it or see it. And I don't know that anybody from DHS did either. Anybody that -- Kelsey didn't. Somebody who works for DHS did. I'm not aware if those types of calls are recorded or what type of documentation exists.

**39**

Q. Did Kelsey tell you that she had been out there and talked to Gail?

A. Yes. She indicated that she went out there. She was alone. She had some conversation with Gail, but that the conversation was -- the investigation was not complete based on some concerns that she had developed. I think she was just kind of freaked out being out there by herself.

Q. Did she tell you that she had gone inside Gail's house?

A. I don't recall.

Q. Did she tell you that she had talked to Tim on the phone while she was out there?

A. I don't recall. I do recall her talking about her conversation with Gail, but beyond that, I don't recall any mention of Tim.

Q. Do you know who Alisha White is?

A. I have talked to her on the phone. I don't think I've ever met her in person. I know she is a DOC probation/parole officer.

Q. Did Kelsey tell you that she had spoken with Alisha White?

A. I believe she did.

Q. What did she tell you about that?

**40**

A. It's on the -- it's on the recording. Something about -- something about Alisha being my best friend. She knows -- honestly, I don't recall exactly. But Alisha did come up.

Q. And what recording are you referencing?

A. The phone call that she made to my office.

Q. Okay. Did --

A. And maybe not. If it's not on there -- if it's not on there, Alisha White's name maybe did come up from Miss Koenig.

Q. And that's what I was going to ask you about. Did she tell you that she had talked to Alisha White?

A. I don't recall, but maybe. Yeah, I -- you know what? I do recall. She did say that, yeah. She indicated that she called Alisha, that Alisha said that she knows Gail, but that they're not best friends. I think that Miss Osborn had possibly indicated that they were closer than maybe Miss White would attest to.

Q. Did Alisha indicate that Gail had been pregnant?

**App. 026**

**41**

A.   I wasn't on that call, but Miss Koenig didn't indicate that Alisha said that.

Q.   Was there anything from the anonymous complaint that you understood had been corroborated?

A.   Corroborated how?  I think there was a lot of identifying information, but I don't think that that was independently corroborated by any other party.  I think that the specificity of the complaint was what was notable.

Q.   As you understand the law, is DHS allowed to search a property absent probable cause or consent?

A.   I would defer to DHS on that.

Q.   When you went out to the property on November 15 of 2024, did you believe that DHS could search a property without probable cause or consent?

A.   Well, the objective there was to speak with the property owner and see if he would provide consent, so that was the objective.

Q.   I understand that.  But my question still is, the day you were there, you know, absent consent or probable cause, was it your

**42**

understanding that DHS could search the property?  Did you think it was a requirement that you had to get consent before you could take further action?

A.   I wouldn't -- I don't know.  Our objective was to see if the property owner would provide consent.  That was the point of talking to her.

Q.   Did you think that it was necessary in order to search the property?

A.   Did I think it was necessary to search the property?  Well, this case involved exigency and permission, consent.  Those are the two -- that's why we're here.  So I don't know that DHS's individual authorities to preserve health and welfare of children -- I'm not sure how to kind of square that with your question, I guess.

Q.   Would you agree that a person is not obligated to cooperate with HHS?

A.   Yes.

Q.   Would you agree that the Fourth Amendment still applies with investigations by DHS?

A.   Fourth Amendment always applies.

**43**

Q.   Would you agree that co-tenant's consent does not allow law enforcement to search if the other tenant objects?

A.   I don't know that it's always that simple, but I think that there's a reality there, yes.

Q.   Do you agree or disagree that a landlord cannot consent to the search of a tenant's property?

A.   Yes.

Q.   Do you agree or disagree that community caretaking is not a stand-alone exception to the Fourth Amendment?

A.   I don't know that I would necessarily agree with that.  Community caretaking exception to the Fourth Amendment -- when you say "stand-alone," when do you mean by that?

Q.   Would you agree or disagree that an anonymous tip does not ordinarily contain sufficient indicia of viability to provide reasonable suspicion or probable cause?

A.   I would disagree on the facts as stated, but I know what you're saying.  It depends on the tip, though.

Q.   What about this tip provided

**44**

sufficient indicia of reliability?

A.   I'm not saying it did.  I'm saying the question as posed is broad.

Q.   Okay.

A.   Not to split hairs, but --

Q.   Okay.  Do you believe that this anonymous complaint had sufficient indicia of reliability to provide reasonable suspicion or probable cause?

A.   For a search warrant or --

Q.   For --

A.   -- that a crime had occurred?  Because probable cause is a criminal standard.

Q.   Yeah.

A.   This was not a criminal investigation.  So nobody was investigating probable cause and reasonable suspicion regardless.

Q.   But a search occurred; correct?

A.   There was an attempt to locate a child in distress, yes.

Q.   Do you agree or disagree that you searched Gordon's property?

A.   Yeah.  Well, so okay.  In the broadest definition of search, certainly, yes.

Q.   Do you agree or disagree that you

**45**

searched Tim's property?

A.   It's not clear to me where Tim's -- what is Tim's property.

Q.   Before you went out there, did you pull up any information about this property?

A.   Yes.

Q.   What did you pull up?

A.   Beacon website, I believe, indicated that this was property belonging to Gordon Seaba.

Q.   Is Beacon the same thing as the assessor's website?

A.   I believe so, yeah.

Q.   Okay.  Like this Exhibit 1, is this Jefferson County assessor, is that the type of format?

A.   Yeah.  And there's a -- there's a hole through the part I was hoping to look at there.  But, yes, this is -- looks like Beacon to me.

Q.   And if you flip onto the back side, does it have information about who owns the property?

A.   There it is.  Okay.  It does.

Q.   And Tim Seaba would be an owner of that property?

**46**

A.   Looks like it.  Well, I'm not sure what this second line is on this document.

Q.   It looks like there's a hole through the word "Seaba."  Gordon Life Estate is deed holder.

A.   Okay.

Q.   And then --

A.   So I believe that's why we believed Gordon Seaba to be the property owner.

Q.   And then the buyer, in terms of who had the property in 2006, that's where it lists Tim Seaba?

A.   Uh-huh.

Q.   Are you saying you just didn't read that part?

A.   No.  I'm not sure that all the information that we were looking at at the time of the review with Beacon is contained on that document.

Q.   What do you recall seeing on Beacon?

A.   I recall -- and also I think this was indicated by conversations with the deputies, that that property belonged to Gordon Seaba.

Q.   Did you have information that Tim Seaba lived there?

**47**

A.   I didn't know who Tim Seaba was.

Q.   Did you have any information that Gail Osborn lived there?

A.   According to Miss Koenig, yes, that was where she saw Gail.

Q.   Is it your understanding that you can rely on an anonymous complaint as long as you're not trying to investigate a crime?

A.   What do you mean by "rely"?

Q.   You can search a place based on an anonymous complaint as long as you're not investigating a crime?

A.   I don't know how to answer that.  I don't know that that's what happened in this case.  Are you saying that's what happened in this case?

Q.   No.  I'm just asking you a question.

A.   Okay.  I don't know.

MS. MESSAMER:  Can you re-read that question for me?

(The requested portion of the record was read.)

A.   I can't answer that yes or no.  That's not a black-or-white question.  It's a legal question that's very complicated.  I think

**48**

you're oversimplifying the consideration.  Again, I'm not trying to be difficult.

Q.   What was the exigent circumstance here that allowed you to search the property?

A.   The concern of the well-being of an infant.

Q.   How would you define probable cause?

A.   How would I define it?  It's the legal standard that determines whether or not there are grounds to arrest and charge with a crime.

Q.   What is the legal standard?

A.   What is the legal standard for probable cause?  That the acts probably occurred and that the individual charged probably performed the act.

Q.   Based on the information you had in this case, do you think that there was enough information to say there was probably a baby out there?

A.   I don't know.  Based on the information I have now?  Could you re-ask the question?  Now or then?

Q.   Let's start with now.

A.   Knowing now, knowing what I know now, I don't think that there was a baby on the

**49**

property at the time that we were there. I didn't have that information at the time.

Q. So at the time, based on the information you had, did you think you had enough information to say there was probably a baby there?

A. No.

Q. Did you personally take any actions before going out there to verify any information from the anonymous complaint?

A. I did not personally.

Q. Did you have any communication with Sheriff Richmond prior to going out to the home?

A. You're asking me if I had conversations with another county official?

Q. Yes, about the facts of this incident before going out to the home.

A. Okay. As I indicated in my response, I'm not going to talk about conversations I had with different elected officials.

Q. And why not?

A. I'm a legal advisor to these officials.

Q. Are you suggesting that you legally

**50**

advised the sheriff about this incident before you went out to the house?

A. I'm not suggesting one way or the other. I'm declining to answer the question as protecting the attorney-client privilege.

Q. It's only protected if you gave him legal counsel about this.

A. The question is not a question that I can answer.

Q. You can't tell me if you talked to him?

A. You asked the same question about the supervisors, right, in the Interrogatories? I'm -- I'm declining to answer questions about my conversations with other Jefferson County elected officials. I hope you understand that, that that's not an intent to dodge anything.

Q. It is to the extent that's only a legitimate privilege if you gave him legal advice about this before going out to the house.

A. The question whether or not there was a conversation is still privileged. I guess I don't know what you're trying to get at here. I hope you appreciate my position here.

**51**

Q. I'm asking you a factual question about the investigation that led up to this.

A. Okay.

Q. And if, in the development of this all, you had any conversations with the sheriff about it before you went out to the house.

A. Okay. I understand you're asking if I had conversations with my client. I'm declining to answer.

Q. Do you consider the individual deputies your clients?

A. Not in this context.

Q. Why not?

A. Because -- why aren't they my clients?

Q. What's the difference between the sheriff and the deputies in this context?

A. Well, you're asking factual questions about the investigation. You've already deposed the deputies; right?

Q. Yeah.

A. So those facts are out there. My engagement and involvement on that property is why we're here. My conversations with Jefferson County elected officials are protected.

**52**

Q. To the extent you're giving them legal advice. Are you suggesting you had a conversation with Bart Richmond before your search of this property when you're giving him legal advice?

A. Again I'm not suggesting anything. I'm just declining to answer.

Q. Are you acting as counsel to the Board of Supervisors on this lawsuit where you're a defendant?

A. Am I acting as counsel to the Board of Supervisors? I am counsel to the Board of Supervisors. We have counsel for this case.

Q. Are you representing the county in this matter?

A. I'm the attorney for the county. I'm not -- I'm not -- I haven't filed an appearance on this case.

Q. Okay. So when you pull up to the property, who was the first one to get there?

A. I don't recall if it was myself or a deputy. I can't say whose car was in front. But I think we caravanned, so it was everybody getting there basically at the same time.

Q. And when you arrived, Tim Seaba was at

**53**

the intersection of the driveway and the street; correct?

A.   He was on a tractor.  I don't recall exactly where his tractor was.  It was somewhere -- he was on the street.

Q.   And did you talk to him as you approached?

A.   So I drove up.  I asked him, "Are you Mr. Seaba?  Are you Gordon?"

And he asked me if I had a warrant.

And I asked him again, "Are you Gordon?"

And I can't recall what he said after that.  Something nonresponsive to the question, at which point I realized that Gordon, who I'd never met, nor Tim -- I knew Gordon to be an elderly gentleman, and I determined that he was not Gordon.

Q.   Where was Kelsey at this point?

A.   She might have been in my car.  She might have been in my car.

Q.   And you were still in your car when you talked to Tim?

A.   I was in my car when I talked to him. I don't recall where Kelsey was.  But I believe

**54**

she was in my car.

Q.   What did Tim say after he asked you if you had a warrant?

A.   Like I said, I don't recall what his next statement was, but it was -- I recall that it wasn't responsive to my request who I was talking to.  I was trying to talk to Gordon. "Are you Mr. Seaba?  Are you Gordon?"  Because I -- then I figured out he wasn't Gordon.

Q.   Did he tell you to leave the property?

A.   I wasn't on the property, so I don't think he told me to leave the property.  He also -- he might have had his cell phone out. I don't recall.  So if he did, that would be a better indication of what was said.  But this is just running off my memory.  I think -- I wasn't on the property, so I don't think he told me to get off the property.

Q.   Did he indicate he did not want you to come onto the property?

A.   That was indicative by his tone, if nothing else.

Q.   Did you ask him who he was in relation to the property?

A.   I asked him who he was.  I didn't ask

**55**

that specific question.

Q.   Did he tell you?

A.   He didn't tell me who he was.

Q.   What did he say when you asked him who he was?

A.   He didn't answer the question at all.

Q.   What did he do?

A.   Like I said, my first question was, "Are you Gordon Seaba?"

His response was, "Do you have a warrant?"

I then asked him again, "Are you Gordon Seaba?"

And his next statement, I don't recall what it was, but it was not responsive to the question.

Q.   Had Kelsey mentioned anything to you about who the father of this supposed child was?

A.   I don't think so.  I mean, look.  I don't think anybody would have been in a position to know at that point, so -- but I don't recall Kelsey indicating who the father was.  I do recall Kelsey indicating that Tim was Gail's paramour or significant other and

**56**

that there were concerns that Tim was extremely opposed to having a child.

Q.   Okay.  So you drive past Tim.  What does he do?

A.   I don't know.  I don't recall who was behind me.  There was another car behind me.  I don't know what he did after that.

Q.   Okay.  What did you do next?

A.   I went to the house and spoke with Mr. Seaba, Gordon Seaba.

Q.   Was anyone else at the house?

A.   So I was with Miss Koenig.  Gail Osborn was in and out of that -- that house at that time, so she -- and she had her phone with her.  I believe that was recording.  But she was in the house, and then she left the house, and I think she came back into the house and then left the house.  So in the house at various times were Mr. -- was Gordon Seaba, Miss Koenig, myself, and at times Miss Osborn.

Q.   Anyone else?

A.   I don't think there was anybody else in the residence.

Q.   Tell me about going up to the house. What's the entrance to the house like?

**57**

A.   It's an old house.  There's a front porch, steps up to the front porch, wood construction, older, probably early 1900s build, farmhouse.  There was a burn pit on the south side of the house, RV on the property southeast corner.

Q.   Did the house have a doorbell, or did you knock?

A.   I don't think it has a doorbell.

Q.   Did you knock?

A.   I don't think so.  I think Kelsey knocked.  Someone knocked.  I can't recall if it was me or Miss Koenig.

Q.   Then what happened?

A.   Miss Osborn -- Miss Osborn may have entered -- I don't recall.  I know there's an allegation that I opened the door and entered into Gordon Seaba's residence.  That is blatantly false.  I would never do such a thing.  I didn't just go barge into this residence.  So that didn't happen.

Who opened the door, I think it was Gordon.  And I think I asked if we could talk inside because Gail was being extremely noisy, and it was difficult to have a conversation.

**58**

Q.   What was Gordon like?

A.   Gordon was subdued.  He looked tired.  He's an elderly gentleman.  I think he was wanting -- well, he wanted this -- all the stuff with Gail to subside.  I talked to him about concerns.  Kelsey did, I think, most of the talking about the report from the anonymous caller.

And I indicated to him that, look, the issue here is just confirming whether or not this baby needs care and is in distress on the property.  I asked him if we could look around the property, confirm that there's no child, and we would be finished within ten minutes.  It was probably a two-minute conversation, possibly two and a half.

Gordon indicated, look, ten minutes, look around the property, determine whether or not there's a child.

At that point I contacted Deputy Miller and indicated we had permission.

Q.   Where were you in the house when you had this conversation?

A.   So you walk in.  And I think when you walk in, you are in the southwest corner of the

**59**

residence.  There's kind of a main living room.  You turn to the right, there's kind of a table, I don't know if it's a kitchen table or dining room table.  Mr. Seaba went and sat at a table that would have been -- I think it would have been the southernmost center room of the house.  I would probably call that a living room, but they might call it a dining room.  He sat at a chair.

Q.   He sat in the living room, you said?

A.   I would call it a dining room.  There was a dining room table there.  I don't know what you would call the room.

Q.   Okay.  So you recall him opening the door and inviting you guys inside?

A.   I think I might have asked if we can have this conversation inside in order to get away from the disruption of Miss Osborn.

Q.   What did Gordon say?

A.   Yes.

Q.   At what --

A.   I don't know if he said the word yes.  He assented.

Q.   At what point -- and how did he assent?

**60**

A.   I don't recall his words.  Either, "Sure," or, "Come on in," or, "That's all right," something along those lines.

Q.   Where was Gail when you were at the front door?

A.   She was back and forth.  I think what happened was a deputy drove up after me, and she went to -- I don't recall.  I don't recall exactly where she went.  She was at times on the porch and at times away from the porch.  But my attention was not on her.  It was on Mr. Seaba.

Q.   Gail has indicated in the video -- have you watched the body cam video?

A.   I watched parts of it.  I think there's -- are there four?  How many do you have?

Q.   There are five.

A.   There's five?  Okay.  I've only seen portions of some of them.

Q.   And Gail indicated at various times in the video that Gordon had told you guys to get the hell out.  Did that happen?

A.   He didn't -- Gordon didn't tell me to get the hell out, no.

**61**

Q. Gordon never said that?

A. To get the hell out?

Q. Uh-huh.

A. No. He gave us permission to be on the property.

Q. Do you have any idea why Gail would say that?

A. I'll be honest with you, ma'am, I don't have any idea why Gail was behaving the way she was to begin with. Part of this whole case was her extremely unusual behavior from the jump to start with the phone calls to my office. I've never seen somebody acting the way that she was acting. So I don't know if that answers your question.

Q. You thought it was strange that somebody would be upset about somebody calling DHS and falsely reporting that she had a baby?

A. I understand her concern, frustration about that, I do. It's the way that she manifested her frustrations.

Q. How do you think she should have manifested them?

A. I'm not going to pass judgment on that, but, like I said, I've handled DHS cases

**62**

for over a decade, and I've never seen somebody respond the way Gail responded.

Q. Have you ever had a false complaint about a baby being born that didn't exist?

A. I am certain that a percentage of reports to DHS are false. I don't know what the percentage is. But I'm certain that happens. Like I said, we had at least one prior for prosecuting such claims. And the response was Miss Osborn I've never had.

Q. Have you ever had a case where someone has had a baby that they didn't tell anybody about and the baby was being abused?

A. The baby was what?

Q. Being abused or mistreated.

A. Well, in what time frame?

Q. Since you've been county attorney.

A. No. What I mean is -- it's not a crime to have a secret baby. Do babies that don't have Social Security numbers at some point in their lives get abused? I'm sure. So have I had a case? I don't recall. But maybe.

Q. Have you had any cases with babies that were unreported and they didn't get Social Security numbers?

**63**

A. That's not a crime. So I wouldn't have that case. It's not -- that's not a case; right? Whether the child gets abused or not, that can be a case.

Q. Okay. Well, have you had that case where there's been an unregistered baby that was being abused?

A. Have I had a case where an unregistered baby was being abused? We don't register babies, so I don't know. Have I had cases where babies are abused? Yes. Have I had criminal cases about unregistered babies? No.

Q. Okay. So what's Gordon say exactly that he gives you permission to do?

A. To search the property. I told him that if -- we want to be out of his hair. "We'll be out of here in ten minutes."

He said, "Fine. You can look on the property, confirm that" -- he indicated, "There's no baby here. You can look at the property to make sure."

We did so. Or we indicated we would do so after he provided his consent.

Q. What was your understanding about

**64**

where Gail specifically resided?

A. I had no information.

Q. It was clear to you that Gail did not want you to search her property; correct?

A. Gail was very adamant, yes.

Q. Did you think that Gordon had given consent to search somewhere Gail lived?

A. I had no information about possessory layout of that property at the time.

Q. Do you think it's important or unimportant to know who has possessory interests of places before you search them?

A. Gail tried to keep me from talking to Gordon.

Q. My question is, do you think it's important or unimportant to find out who has possessory interests before you search various locations?

A. Possessory interests are always relevant.

Q. Did you ask Kelsey where Gail lived?

A. I don't specifically recall asking Kelsey that. I think that I did not.

Q. Did you ask Gordon which outbuildings belonged to Gail?

**65**

A.   I don't recall doing that.

Q.   Did you do anything to try to determine which of these places that Gail had possessory interest in?

A.   Gary -- Gail, from my first attempt to talk with Gordon, was telling me to, "Get the hell out of my house."  And I believe one of my concerns was that this was not your house.  Her attempts to keep us from even conversing with Gordon from the jump were odd and added to the concern.  So she was claiming -- she was claiming possession over Gordon's house specifically when she was telling me not to talk to him.  But, again, I didn't know whose possessory interests lied -- laid where.  We had permission from Gordon to search the property.

Q.   At the point that you went into the building at the back of the house -- or, you know, behind the back of the house where Gail was telling you not to go in there -- do you recall what I'm talking about?

A.   The one that ended up being Gail's house?

Q.   Yes.

**66**

A.   Okay.

Q.   Is it your testimony as you went into that house, you did not know that's where Gail resided?

A.   I think she probably said that.  Well, I would defer to the body camera.  I don't recall what she said specifically about that residence.  She was talking the entire time.

Q.   As you sit here today, do you think that you had legal justification to enter Gail's home?

A.   Yes.

Q.   And what would that be?

A.   Exigency, permission.

Q.   You believe that Gordon can give you permission to enter a home where Gail lived?

A.   At the time we entered, I believe that Gordon had provided consent to search the property.

Q.   And you thought that could trump Gail's denial?

A.   I believe that included the outbuilding.

Q.   And you thought that that trumped Gail's denial; is that correct?

**67**

A.   Gail's denial, what way?

Q.   Of consent.

A.   So I didn't know what Gail had interest in and not.  But we had the property owner's consent.  She -- Gail's behavior from the beginning really made it difficult to converse with her about these issues.  She was acting -- well, she was very difficult to talk to.

Q.   Do you believe that Gordon could give consent to search Gail's home over Gail's denial of consent?

A.   At the time I believe Gordon had provided valid consent to search the property, including the outbuildings.

MS. MESSAMER:  Could you please read that question back.  It's a yes-or-no question.

MR. HINDERS:  Let me interpose an objection to form of the question and the term "home."  It has not been established in the record.

(Requested portion of the record was read.)

A.   I believe Gordon could give permission

**68**

to search the buildings on the property.

Q.   Did you think Gail lived somewhere else besides this property?

A.   Honestly, I thought Gail might have lived in the main house based on the way she was acting.  Wasn't sure.

Q.   So if you thought Gail lived in the main house, you entered the main house against Gail's consent too; is that correct?

A.   I entered the main house at Gordon's invitation.

Q.   While Gail was actively telling you not to go in there; correct?

A.   She was trying to keep me from putting eyes on Gordon and talking to him.  He invited me and Miss Koenig into the residence to talk with him.

Q.   And Gail didn't -- expressed to you she did not want you to go into the main house?

A.   Can I ask you, does Gail have a recording of that conversation?  Because I would defer to that.  But from my recollection, she said, "No, you can't talk to him."  I think she says the words, "No, you can't talk to him."

**69**

Q.   What else did she say as you were approaching the house?

A.   I don't know.  She had her phone out, so I -- I would defer to any recording she has.

Q.   Do you think you have more ability to search places than a regular deputy?

A.   No.

Q.   And how about your ability to search versus DHS?  Do you think you have more or less of an authority to search somewhere?

A.   I don't claim any more additional authorities than anybody else.

Q.   Do you think that Kelsey, as an HHS worker, has more authority to search than a regular law enforcement officer?

A.   Her authorities are different, but I -- I would defer to DHS counsel on the authorities of DHS.

Q.   If you could go back, anything you would do differently?

A.   If I go back, would I do anything differently?

Q.   Uh-huh.

A.   Knowing what I know now?

Q.   Yeah.

**70**

A.   Now I know there was no indication of a child on the residence, so I wouldn't have even, you know, done the search.  If I knew what I know now -- I already know it all.

Q.   Do you think that you owe anybody an apology?

A.   Do I owe anyone an apology?  Well, I don't know.  I think the deputies took a whole day to come up here, so I apologize for wasting their time.  Not that it's a waste of time.

Beyond that -- I'll tell you, I would be happy to talk with Gail or anybody else about the incident.  I think that her feelings were extremely hurt by this.  My reading on it, honestly, she felt personally hurt by this.  So I'd be happy to talk with her about that.

Q.   Hurt in what sense?

A.   I think she called me -- I think the reason she called me is because -- well, I don't honestly know.  I'd be curious in asking Gail about that.  But the fact that she showed up on my door- -- on my office doorstep to implore me about her concerns with Mr. Harvey, the fact that she called me after DHS showed up at the residence, I don't know what her

**71**

relationship -- her single-sided relationship was with me or my office.  But if she feels like that was injured in some way, I'd be happy to talk with her about that.

Q.   Do you believe the reason she called is the reason she gave you, that she wanted you to look into the false complaint?

A.   Maybe.

Q.   What other purpose do you think that she had?

A.   Honestly, she could have been fishing for information.  I don't really know.

Q.   Is that what you believed at the time?

A.   I don't know.

Q.   What do you mean you don't know?  Like you don't remember?

A.   No.  I mean, I don't know what her -- what her reason for calling was.  And I don't know that I determined a -- I certainly wasn't certain as to why she would have called.  It was a very weird situation.  I'm just trying to be frank with you.  It was odd and unfortunate.

Q.   Do you have any experts retained --

A.   No.

Q.   -- for this case?

**72**

Is there anyone else you talked to from the media about this case besides Andy Hallman?

A.   I'll be frank with you, I was bothered by the way this case started.  I would have appreciated a heads-up, because my first notice before I was served was a call from Kauffman from -- from the agency here in Des Moines.

Q.   Capital Dispatch?

A.   Yeah.  So he called me asking for comment.  I said, "I don't know what you're talking about."  So that's an issue that I have with how the case was commenced.  I would have appreciated a heads-up from somebody other than the media.

Q.   Anybody else from the media that you talked to?

A.   I talked to Mr. Kauffman.

Q.   Between Deputy Burnett, Deputy Miller, Officer Ulin, Officer Hansen, Dave Rippey, and Kelsey Koenig, who do you have the closest relationship with?

A.   Well, could you state the two Washington County deputies?

Q.   Yeah.  Ulin and Hansen.

**73**

A.   I don't know Hansen. I think he might be Lyle Hansen's son. You asked me who I have the closest relationship with?

Q.   Yeah.

A.   Well, I work with Burnett and Miller, and I work with Kelsey. I worked with Dave. But he's no longer with the agency.

Q.   Have you talked to Dave about this case at all?

A.   You know, I want to say no, but it may have come up ancillarily, but not in any meaningful sense.

Q.   Did you have any communication with Dave Rippey before going out to the property that day?

A.   No. Not about this case.

Q.   It seems like as we sit here today, you recognize that that back property that you entered was Gail's residence; is that correct?

A.   I've been informed that, certainly. Yeah.

Q.   At what point did you realize that?

A.   Well, look, you couldn't really tell what it was from the outside. It looked like a shed, like an outbuilding. It looked like a

**74**

residence on the inside, so --

Q.   Were you able to determine at that point that it was Gail's residence versus someone else?

A.   I certainly didn't search looking for indicia of ownership. I had no reason to believe that it was.

Q.   I'm going to pull up Deputy Burnett's second body camera here.

(Portion of video played.)

Q.   So he's approaching the house. This truck that we see at, like, second 4 off to the right, is that your truck?

A.   It is.

Q.   And this white vehicle that's closer to the street than yours, whose vehicle is that?

A.   I don't know.

Q.   Okay. Skipping ahead to second 17, there's a woman out front in a purple T-shirt.

A.   Could you get closer? I don't know that I recognize that. No, I don't know who that is.

Q.   Did you have any interaction with that person when you were there?

**75**

A.   Not in any meaningful way.

Q.   Was that person inside the house?

A.   I don't recall. But I don't know that person's name. I have no recollection of who that would be.

Q.   And then the person on the porch, do you know who that is?

A.   Not from this distance.

Q.   Are you able to tell at all as we got closer?

A.   No. Yeah, I'm not sure.

Q.   Do you expect officers that you're working with to wear a body camera when they are engaged with the public?

A.   It's regular practice, but if they didn't, I wouldn't say it's an egregious violation of policy. But it's normal.

Q.   It's what?

A.   It's normal for them to do so.

Q.   To wear it or to not wear it?

A.   To wear it.

Q.   Why didn't you just have law enforcement search the property and not do it yourself?

A.   Why?

**76**

Q.   Uh-huh.

A.   I don't know what to tell you. I'm not sure how to answer that question.

(Exhibit 11 was marked for identification by the reporter.)

Q.   So just to mark this one for the record, this was provided in discovery. My assumption, when I got this, was that this was a text -- on page 1 here where it's marked Jefferson - 4 at the bottom, that this was a text that you sent to Deputy Miller and Elizabeth Estey; is that correct? Or, wait, no. Yeah, Elizabeth Estey.

A.   I think that's correct, yeah.

Q.   And then the back side of this, which would be Jefferson - 5 at the bottom, this I took to be a text you had sent to Kelsey Koenig.

A.   That sounds accurate.

(Exhibit 12 was marked for identification by the reporter.)

Q.   So this, what I just marked number 12, this is an email from Alisha White to Kelsey Koenig. Did Kelsey provide this to you?

A.   I don't think that I've ever seen

**77**

this.  I think Kelsey referred to some of the information provided in here, but I don't think I've ever seen this email.

Q.   As you read it, what popped out to you as things that she did tell you?

A.   The never gone to dinner -- to lunch with her, dinner, drinks, nothing like that I recall, because I think I said previously -- I think -- I don't want to put words in Kelsey's mouth, but she felt that Gail was overstating her relationship with Alisha.

Q.   Did that contribute to your suspicion about the existence of a baby?

A.   I don't recall a conversation with Kelsey about Alisha being particularly substantive.

MS. MESSAMER:  I think that's all I have.

THE WITNESS:  Okay.

CROSS-EXAMINATION

BY MR. HINDERS:

Q.   Mr. Moulding, you talked about a couple of structures apart from the main house.  And what I mean main house, I just indicate to the video.  I believe it's Burnett's body cam

**78**

video at 24 seconds.  There's a large structure there.  To you is that a house?

A.   That is a house.

Q.   And you entered that house with the permission of Gordon Seaba; correct?

A.   I did.

Q.   And it appears to be a house on the inside where people would normally be living?

A.   Yes, sir.

Q.   And residing?

A.   Yes.

Q.   The other structures on the property, did they have any indicia that they were houses or otherwise residences to you when you approached them?

A.   There was an RV off, I think, where we're looking at right now, would have been off to the right.  Certainly could have had somebody sleeping in it.  But I don't know that there was any indicia specifically of occupancy in that RV or any other structure, at least from the outside.

Q.   Does Jefferson County require a certificate of occupancy for buildings in which people can live and reside?

**79**

A.   No.

Q.   So you can live and reside anywhere in Jefferson County in any structure without any sort of certificate that allows you to be there?

A.   There may be requirements for individual municipalities, but not a separate county.

Q.   And so we've talked a lot about search.  That term that you searched has been used a lot; is that fair?

A.   It has been used a lot.

Q.   Can you please describe for the record what it is that you did that you would say in reference -- or that you understood is a search?  What did you do on that property as a search?

A.   Honestly it was a brief survey of areas that baby could be easily located.  The body cameras would probably have better timing.  But if I want to estimate, the entire sweep of the property took less than ten minutes.

Q.   And Mr. Seaba, Mr. Gordon Seaba, when you talked to him, requested that you -- consented to you being on the property,

**80**

consented that you could go look through the property, but he gave you the time limit of ten minutes?

A.   I told him that we could be out of here in ten minutes.  And he said that's fine.

Q.   And did you take every effort to comply with both the assent of consent that you were granted and the timeliness that you told Mr. Seaba?

A.   Yes, sir.

Q.   Do you know any other way that you could have corroborated a baby living on the property other than going to the property?

A.   No.

Q.   Were you at all times taking direction and working with Miss Koenig in efforts to further her goals as an HHS/DHS agent?

A.   Yes.  This was not a -- while there were deputies on scene, this was not a criminal investigation.  This was a DHS operation.

Q.   And this was at the request of Miss Koenig and her -- her investigation into the information she had gotten; is that accurate?

A.   Yes.

**81**

MR. HINDERS: I don't have any further questions.

CROSS-EXAMINATION

BY MR. SHEAHAN:

Q. That last question by Mr. Hinders was about taking direction from Miss Koenig. What direction did you take from her?

A. Maybe taking direction is the wrong way to phrase it. It was a collaborative conversation and operation.

Q. You talked to Miss Koenig over the phone prior to going back to the scene with her --

A. I think she was at my office.

Q. You now think she was at your office telling you this?

A. I don't think I indicated it was on the phone. I don't think I had a phone call with Miss Koenig that day. She came to the Jefferson County Attorney's Office to discuss it.

Q. Okay. Did she tell you that she had been there that morning, that there was no -- as far as the allegation of dangerous substances, that was not confirmed, did she

**82**

tell you that?

A. I don't know if she told me that that was unconfirmed, but she did say that Miss Osborn didn't appear to be under the influence of controlled substances.

Q. And in terms of the baby or evidence of a baby being there, what specifically did she tell you?

A. She indicated that there was a car seat in the back of the car, that there was some dispute over the age of the child who was sitting in that car seat. I didn't inquire as to the relevance of that, but there was a conversation about that. We talked in detail about the concerns from the anonymous reporting party and the conversation that Miss Koenig had with the Washington County investigator about the fire station drops or Safe Haven drops. And then we discussed the conversations that -- well, I discussed the conversation that I had with Miss Osborn, and I believe Miss Estey also indicated the nature of the conversation she had with Miss Osborn earlier in the day.

Q. The reason I ask is my understanding is that she cleared the area or she cleared the

**83**

report that morning. And so when you're having this conversation after the fact and it's talking about going back to the crime scene, why would Miss Koenig -- not the crime scene, excuse me, the house, why would Miss Koenig be asking you to go back?

A. Why would she be asking me to go back? She doesn't have to ask me. This was her matter, but we were discussing it. And, frankly, we all thought it was extremely odd --

Q. Yeah.

A. -- and concerning.

Q. I guess my point is, weren't you the one saying, "Let's go back to the scene"?

A. I definitely said, "Let's go back to the scene." I don't know that I was the only one saying, "Let's go back to the scene."

Q. And when you got there, because it's on body cam, I mean, you're the one who's directing the officers in terms of which outbuildings to go and look at; correct?

A. I definitely called Deputy -- I think it was Deputy Miller after Mr. Seaba gave permission and asked that he would take a look at -- I think I asked him to look at the RV.

**84**

I'm not sure.

Q. And then you -- there was one building that looked -- ultimately ends up looking like a shed of some kind, like a work shed, and you open the door, and you had Miller go look in that. Do you recall that happening?

A. I recall that. I don't think we entered. But there were no windows. We tried to look in windows. There were no windows there. So we just opened it up, saw it was empty, and closed it.

Q. And then after that you went over to what appeared to be Gail Osborn's residence because she's yelling at you at that point, "Don't go in there"?

A. After the fact it's very clear that is the place she's asserting to be her residence. Opened the door, went in there. Honestly, I wouldn't have gone in if it was visible from the exterior, and I would have been out of there far more quickly -- I reviewed the body camera. I think I was in there a total of fifteen seconds. I would have been out of there in a couple if Miss Osborn wasn't threatening to assault me from outside.

**85**

Q.   Okay.  In terms of, you know, any -- again, this is all on body camera, but in terms of actual structures that Miss Koenig went to, the only evidence is her going into the main house, correct, where Mr. Seaba was with you?

A.   I know she was in the main house with me.  I don't think that she went to other locations, but I could be wrong.

Q.   Okay.  I didn't see her on the -- at least on the body cam opening any doors like you did to say, "Come look inside here."  Do you recall her doing that?

A.   I don't recall her doing that.

Q.   Let me ask you just quickly, you mentioned you've handled HHS cases over ten years?

A.   I'll tell you this.  I used to handle HHS cases specifically.  I do not do that anymore.  My assistant county attorney does that.  So I'm a little rusty.  But it's certainly something I've done in the past and I continue to have happen in my office.

Q.   That's okay.  You know, we've kind of thrown the term "DHS" out today as well as "HHS."  But you understand that those two

**86**

organizations are effectively the same thing, there's just been a name change in the last couple years by the state?

A.   I use them interchangeably.

Q.   Okay.  Just in terms of what you know about CPS workers and when there's been a report about a baby or a small child that's potentially in danger, I mean, that's sort of like the job of the CPS worker to go out and determine if something's, in fact, happening; correct?

A.   I think they will need to ascertain within twenty-four hours or -- yeah.

Q.   And that's consistent with all the HHS cases that you've handled over the years --

A.   Yes.

Q.   -- as far as a prosecutor?

In terms of, you know, whether it's an anonymous report or known report, meaning they know the person who's making the report, the important thing is to actually investigate; correct?

A.   Yeah, I don't think the nature of the report has any bearing on the duties of the investigator to follow through if the

**87**

centralized reporting system deems it to be worthy of investigation.

Q.   Here at least what I'm understanding from you is even the anonymous report had some pretty specific information about specific date of birth --

A.   Name.

Q.   -- name, location?

A.   That they had made visible contact with the child very recently.  This was not -- not to dismiss -- all reports are important, but this is certainly not a throw-away report.  This was indicative of personal knowledge.

Q.   And so in terms of Miss Koenig going to the residence, at least based on that initial report, that was squarely within what you would consider her job duties as a CPS worker; correct?

A.   Certainly.

Q.   And then going back to the scene, I know there's some -- there's certainly -- once she leaves that property, she does some investigation, she has the conversation with you, she has the conversation with the Assistant County Attorney Etsey (sic)?

**88**

A.   Estey.

Q.   Estey, excuse me.  And you also talk a little bit more about the situation at hand, the decision to go back to the scene.  You guys all go back.  That's consistent with a CPS worker returning to the scene with additional information?  You think that's appropriate?

A.   I would think that's appropriate.  I would also -- Miss Koenig can testify to her concerns more specifically, but I recall her saying that she was uncomfortable being out there alone.  I do recall referring her to Deputy Torres earlier in the day for a -- for a follow-up.  But either because of a shift change or whatnot, Deputy Torres wasn't responsive, and Miller and Burnett were.

Q.   I want to ask you just a little bit about obtaining a search warrant.  I was a prosecutor in a different state, so I don't know all the specifics here, but generally they're the same criminal procedure-wise.

But in terms of a -- have you had ever heard of a CPS worker obtaining a search warrant?

A.   I have not.  I'm not saying that it's

**89**

not possible, but it's not something we've ever done.

Q.   Maybe an investigator who is adjacent to CPS or HHS would be the one responsible for drafting an affidavit, maybe running it by -- obviously submitting it to the magistrate for approval, but a CPS worker, you've never heard of that, have you?

A.   I think there may have been instances where the information came from a CPS worker, was utilized during the determination for probable cause, but they were not the affiant on the search warrant.

Q.   Thank you.
The typical way for a CPS worker is usually to start with a, "Hey, can I have your permission to look around?"  Is that fair?

A.   Yes.

Q.   And your understanding, both in the morning visit by Miss Koenig and then when you two had talked with Mr. Seaba that afternoon, you believed you had permission to be on the property and search around?

A.   Yes, sir.

MR. SHEAHAN:  I think that's all I

**90**

have.  Thank you, sir.

REDIRECT EXAMINATION

BY MS. MESSAMER:

Q.   I think it's been asked already, but just to make sure, when you talked to Gordon in the house, he confirmed he had not seen any baby; correct?

A.   Yeah.  I think he indicated -- I don't know how he -- he said it in kind of a colloquial way.  He's a funny guy.  But the thrust of his statement was, "You can look. You're not going to find a baby."

Q.   And when you say he's a funny guy, how so?

A.   He's just got a funny air about him. He wasn't in a great mood that day, but I think he has a good sense of humor.

Q.   What makes you say he wasn't in a good mood?

A.   He was frustrated by -- by the whole dynamic.  He just seemed like a -- like an elderly gentleman that was exasperated by the circumstances.

Q.   Did he say anything to indicate he was frustrated?

**91**

A.   It was more of his mannerisms.

Q.   There was a question about checking a certificate of occupancy.  I guess, as I understand it, there would not have been a certificate of occupancy for this property? You're not required to do that?

A.   I don't have a knowledge of a requirement for that on a county level.  There are issues, obviously, if it's sanitarian issues and determining the number of, you know, rest- -- bath- -- bedrooms flowing into a particular septic system.  There are issues with that, but that's separate from this.

Q.   Did Gordon ever indicate to you and/or Kelsey when you were there that he wanted you and/or Kelsey to leave the property?

A.   Gordon did not.

Q.   And you mentioned that there was some inquiry Gail made about a Safe Haven drop?

A.   I don't have any personal knowledge of that.  That was relayed to me by Miss Koenig.

Q.   Any idea of the time frame?

A.   I don't have that information.  I don't know if that was relayed from the Washington County investigator.

**92**

Q.   Was the information you got that Gail had a baby she wanted to drop there?

A.   That was certainly the implication if it wasn't outright stated.  I don't recall. Again, this is the investigator telling -- DHS or HHS investigator telling me, so I don't actually know what was relayed in that conversation.

Q.   And before you went out there, you did know that Gail had other children that she had some visitation with; correct?

A.   I think I forgot to mention this.  A piece of information that was relayed to me that further exacerbated concerns from DHS was that Gail had previously had an engagement with DHS, and I think there was an order for removal, and Gail instead fled the state to the state of Montana with the children.  And I forgot to mention that.  But that was another factor that kind of increased the concern here.

Q.   My question was, you knew Gail had other kids that she had visitation with; correct?

A.   I don't know that I personally knew that she had other kids and had visitation with

93

those kids, but after my phone call with her, she did indicate something about her other kids. So sure. But I have no information about the details of her children situation.

Q.   What you just said about fleeing to Montana, who told you that?

A.   Miss Koenig.

Q.   Before you went out to the house?

A.   Yes. And if I got the state wrong, that's fair. But I think it was Montana. Might have been Wyoming.

MS. MESSAMER: That's all I have. Thank you.

THE WITNESS: Thank you.

MR. HINDERS: Nothing further.

MR. SHEAHAN: That's all I have. Thank you.

(An off-the-record discussion was held.)

MS. MESSAMER: I will move to admit these Exhibits 1 through 12.

MR. HINDERS: And just general objection to foundation on all exhibits.

MR. SHEAHAN: Join.

94

(Deposition concluded at 2:27 p.m.)

C E R T I F I C A T E

I, the undersigned, a Registered Professional Reporter and Notary Public, do hereby certify that I acted as the Registered Professional Reporter in the foregoing matter at the time and place indicated herein; that I took in shorthand the proceedings had at said time and place; that said shorthand notes were reduced to typewriting under my supervision and direction, and that the foregoing pages are a full and correct transcript of the shorthand notes so taken; that said deposition was not submitted for review.

I further certify that I am neither attorney nor counsel for, or related to or employed by any of the parties in the foregoing matter, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto, or financially interested in the action.

IN WITNESS WHEREOF, I have hereunto set my hand and seal this 16th day of March, 2026.

_____
REGISTERED PROFESSIONAL REPORTER and NOTARY PUBLIC

**App. 040**

## 1

**1** [3] - 45:14, 76:9, 93:21
**1-12** [1] - 3:10
**10** [3] - 3:7, 20:22, 20:24
**11** [2] - 3:8, 76:4
**1104** [1] - 2:12
**12** [5] - 3:8, 25:6, 76:20, 76:22, 93:21
**12:34** [1] - 1:16
**1305** [1] - 2:17
**15** [2] - 38:4, 41:17
**1600** [1] - 2:7
**16th** [1] - 94:17
**17** [1] - 74:19
**1900s** [1] - 57:3
**1:30** [1] - 25:6

## 2

**20** [1] - 3:7
**2006** [1] - 46:11
**2014** [1] - 22:3
**2017** [1] - 35:22
**2019** [2] - 14:7, 26:12
**2020** [1] - 26:12
**2022** [1] - 36:25
**2024** [3] - 24:4, 38:4, 41:17
**2026** [2] - 1:16, 94:17
**24** [1] - 78:1
**281-5881** [1] - 2:18
**284-5737** [1] - 2:5
**2910** [2] - 1:17, 2:4
**2:27** [1] - 94:1

## 3

**38** [1] - 26:8

## 4

**4** [4] - 1:16, 3:3, 74:12, 76:10
**4:25-cv-183** [1] - 1:4

## 5

**5** [1] - 76:16
**50211** [1] - 2:13
**50312** [1] - 2:4
**50319** [1] - 2:18
**515** [3] - 2:5, 2:13, 2:18
**52556** [1] - 2:8

## 6

**641** [1] - 2:8

## 7

**76** [2] - 3:8, 3:9
**77** [1] - 3:3

## 8

**81** [1] - 3:4

## 9

**90** [1] - 3:3
**919-8696** [1] - 2:8
**93** [1] - 3:10
**981-7044** [1] - 2:13

## A

**ability** [2] - 69:5, 69:8
**able** [4] - 21:25, 28:3, 74:2, 75:9
**absent** [2] - 41:13, 41:25
**abuse** [1] - 22:5
**abused** [7] - 62:13, 62:15, 62:21, 63:3, 63:7, 63:9, 63:11
**access** [3] - 22:11, 22:13, 22:18
**according** [1] - 47:4
**accurate** [4] - 20:14, 21:18, 76:19, 80:24
**act** [1] - 48:15
**acted** [1] - 94:7
**acting** [6] - 52:8, 52:11, 61:13, 61:14, 67:8, 68:6
**action** [2] - 42:4, 94:15
**actions** [1] - 49:8
**actively** [1] - 68:12
**acts** [1] - 48:13
**actual** [1] - 85:3
**adamant** [1] - 64:5
**added** [1] - 65:10
**additional** [2] - 69:11, 88:6
**adequate** [1] - 30:16
**adjacent** [1] - 89:3
**Adjustment** [2] - 12:6, 12:13
**administers** [1] - 18:25
**admit** [1] - 93:20
**admitting** [1] - 28:13
**advance** [1] - 15:12

**advice** [6] - 7:1, 8:13, 8:15, 50:20, 52:2, 52:5
**advise** [1] - 9:19
**advised** [1] - 50:1
**advisor** [1] - 49:23
**affiant** [1] - 89:12
**affidavit** [3] - 33:4, 33:23, 89:5
**afternoon** [1] - 89:21
**afterwards** [1] - 36:21
**AG's** [1] - 7:15
**age** [1] - 82:11
**agencies** [1] - 16:7
**agency** [5] - 6:23, 17:8, 17:13, 72:8, 73:7
**agent** [1] - 80:17
**ago** [1] - 26:12
**agree** [9] - 42:19, 42:22, 43:1, 43:7, 43:11, 43:15, 43:18, 44:21, 44:25
**ahead** [1] - 74:19
**aid** [1] - 30:20
**air** [1] - 90:15
**alarm** [1] - 30:7
**Alisha** [14] - 3:8, 39:18, 39:23, 40:2, 40:4, 40:11, 40:15, 40:18, 40:19, 40:24, 41:2, 76:23, 77:11, 77:15
**alive** [1] - 32:2
**allegation** [3] - 22:5, 57:17, 81:24
**allegations** [2] - 23:4, 27:15
**alleging** [1] - 24:11
**allow** [1] - 43:2
**allowed** [2] - 41:13, 48:4
**allows** [1] - 79:4
**alone** [4] - 39:4, 43:12, 43:17, 88:12
**ambulance** [1] - 13:25
**amend** [1] - 14:8
**Amendment** [9] - 8:5, 8:16, 13:7, 13:13, 13:22, 42:23, 42:25, 43:13, 43:16
**amount** [1] - 27:22
**amphetamine** [1] - 31:9
**ancillarily** [1] - 73:11
**Andy** [2] - 20:6, 72:2
**annually** [1] - 19:1
**anonymous** [14] - 27:20, 28:21, 28:24, 38:18, 41:3, 43:19,

44:7, 47:7, 47:11, 49:10, 58:7, 82:15, 86:19, 87:4
**answer** [15] - 10:3, 10:13, 10:15, 16:22, 20:18, 34:18, 47:13, 47:23, 50:4, 50:9, 50:14, 51:9, 52:7, 55:6, 76:3
**answers** [1] - 61:15
**apart** [1] - 77:23
**apologize** [1] - 70:9
**apology** [2] - 70:6, 70:7
**appear** [1] - 82:4
**appearance** [1] - 52:17
**appeared** [1] - 84:13
**application** [3] - 6:22, 33:7, 33:17
**applies** [2] - 42:23, 42:25
**apply** [3] - 34:11, 35:2, 35:3
**applying** [2] - 32:18, 32:20
**appreciate** [1] - 50:25
**appreciated** [2] - 72:6, 72:14
**approached** [3] - 11:12, 53:7, 78:15
**approaching** [2] - 69:2, 74:11
**appropriate** [2] - 88:7, 88:8
**approval** [4] - 34:4, 34:5, 34:8, 89:7
**approve** [1] - 33:8
**area** [1] - 82:25
**areas** [1] - 79:19
**arguments** [1] - 24:14
**arose** [1] - 11:6
**arrest** [1] - 48:10
**arrived** [1] - 52:25
**Article** [1] - 3:7
**article** [1] - 20:9
**ascertain** [1] - 86:12
**assault** [1] - 84:25
**assent** [2] - 59:25, 80:7
**assented** [1] - 59:23
**asserting** [1] - 84:17
**assessor** [1] - 45:15
**assessor's** [1] - 45:12
**assigned** [1] - 29:2
**assistant** [13] - 6:18, 8:2, 9:1, 10:25, 11:24, 11:25, 12:3, 12:4, 12:14, 12:17, 12:25, 85:19

**Assistant** [3] - 2:16, 26:19, 87:25
**associated** [1] - 4:21
**assume** [2] - 19:23, 19:24
**assumption** [1] - 76:8
**attempt** [2] - 44:19, 65:5
**attempts** [1] - 65:9
**attention** [1] - 60:11
**attest** [1] - 40:22
**attorney** [18] - 6:19, 7:12, 8:3, 8:9, 9:2, 10:25, 11:11, 13:8, 13:12, 36:18, 37:8, 37:18, 50:5, 52:16, 62:17, 85:19, 94:13, 94:14
**Attorney** [6] - 2:3, 2:7, 2:16, 11:17, 26:20, 87:25
**Attorney's** [1] - 81:20
**attorney's** [3] - 7:24, 16:1, 37:3
**attorney-client** [1] - 50:5
**Attorneys** [1] - 2:11
**attorneys** [6] - 7:3, 7:10, 7:14, 7:16, 10:9, 11:21
**authorities** [4] - 42:15, 69:12, 69:16, 69:18
**authority** [2] - 69:10, 69:14
**available** [5] - 8:8, 13:24, 22:9, 22:16, 22:22
**Avenue** [2] - 1:17, 2:4
**aware** [2] - 19:14, 38:24

## B

**babies** [5] - 62:19, 62:23, 63:10, 63:11, 63:12
**baby** [26] - 24:24, 31:15, 31:18, 32:2, 48:18, 48:25, 49:6, 58:11, 61:18, 62:4, 62:12, 62:13, 62:14, 62:19, 63:6, 63:9, 63:21, 77:13, 79:19, 80:12, 82:6, 82:7, 86:7, 90:7, 90:12, 92:2
**background** [1] - 4:9
**bad** [2] - 36:3
**barge** [1] - 57:20
**Bart** [1] - 52:3

**based** [8] - 34:9, 39:7, 47:10, 48:16, 48:20, 49:3, 68:5, 87:15
**basics** [1] - 7:22
**basis** [2] - 18:18, 18:20
**bath** [1] - 91:11
**Beacon** [5] - 45:8, 45:11, 45:19, 46:18, 46:20
**bearing** [1] - 86:24
**become** [1] - 37:8
**bed** [1] - 35:25
**bedrooms** [1] - 91:11
**begin** [1] - 61:10
**beginning** [1] - 67:6
**behaving** [1] - 61:9
**behavior** [3] - 37:17, 61:11, 67:5
**behind** [3] - 56:6, 65:20
**belief** [3] - 29:6, 29:8, 29:18
**belonged** [2] - 46:23, 64:25
**belonging** [1] - 45:9
**belt** [3] - 18:7, 18:9, 20:3
**best** [2] - 40:3, 40:20
**better** [4] - 28:3, 30:3, 54:15, 79:20
**between** [8] - 5:25, 25:6, 27:14, 28:16, 33:17, 37:14, 51:15, 72:19
**beyond** [2] - 39:17, 70:11
**big** [1] - 23:23
**birth** [2] - 27:24, 87:6
**bit** [3] - 4:9, 88:3, 88:17
**black** [2] - 31:5, 47:24
**black-or-white** [1] - 47:24
**blatantly** [1] - 57:19
**blinded** [1] - 13:18
**blood** [1] - 10:22
**Board** [6] - 12:6, 12:12, 12:13, 52:8, 52:11, 52:12
**body** [15] - 15:16, 15:19, 16:25, 17:12, 35:13, 60:14, 66:6, 74:9, 75:13, 77:25, 79:20, 83:19, 84:21, 85:2, 85:10
**born** [2] - 4:11, 62:4
**bothered** [2] - 25:23, 72:4
**bottom** [2] - 76:10,

76:16
**boxes** [1] - 29:13
**breakfasts** [1] - 36:1
**BRENT** [1] - 2:10
**brent@hinderslaw. com** [1] - 2:14
**brief** [1] - 79:18
**broad** [1] - 44:3
**broadest** [1] - 44:23
**Buffy** [2] - 1:14, 1:25
**build** [1] - 57:4
**building** [2] - 65:19, 84:2
**Building** [1] - 2:17
**buildings** [2] - 68:1, 78:24
**bulk** [1] - 27:17
**bulletproof** [1] - 17:19
**burn** [1] - 57:4
**Burnett** [3] - 72:19, 73:5, 88:16
**Burnett's** [2] - 74:8, 77:25
**buyer** [1] - 46:10
**BY** [4] - 4:5, 77:21, 81:4, 90:3

**C**

**Calhoun** [1] - 22:4
**caller** [2] - 27:21, 58:8
**cam** [5] - 35:13, 60:14, 77:25, 83:19, 85:10
**camera** [8] - 15:17, 15:19, 17:15, 66:6, 74:9, 75:13, 84:22, 85:2
**cameras** [2] - 17:1, 79:20
**CAMRYN** [1] - 2:11
**camryn@hinderslaw .com** [1] - 2:14
**cams** [1] - 17:12
**cannot** [2] - 27:2, 43:8
**Capital** [1] - 72:9
**car** [11] - 18:15, 52:22, 53:20, 53:21, 53:22, 53:24, 54:1, 56:6, 82:9, 82:10, 82:12
**caravanned** [1] - 52:23
**card** [1] - 36:3
**cards** [1] - 5:16
**care** [4] - 28:8, 30:17, 30:24, 58:11
**caretaking** [2] - 43:12, 43:15
**carry** [3] - 19:12, 19:21, 20:1
**Case** [1] - 1:4

**case** [42] - 6:20, 13:15, 13:17, 14:13, 14:22, 16:19, 20:6, 22:7, 22:8, 22:12, 22:19, 22:25, 23:2, 24:8, 26:5, 33:2, 35:21, 35:25, 36:8, 36:17, 36:20, 42:12, 47:15, 47:16, 48:17, 52:13, 52:18, 61:11, 62:11, 62:22, 63:2, 63:4, 63:5, 63:8, 71:25, 72:2, 72:5, 72:13, 73:9, 73:16
**caseload** [3] - 12:9, 12:17, 12:18
**cases** [10] - 10:19, 12:20, 16:10, 61:25, 62:23, 63:11, 63:12, 85:15, 85:18, 86:15
**catch** [2] - 8:17
**cell** [1] - 54:13
**center** [1] - 59:6
**CENTRAL** [1] - 1:2
**central** [2] - 24:9, 28:25
**centralized** [1] - 87:1
**certain** [7] - 8:7, 19:13, 25:22, 35:4, 62:5, 62:7, 71:20
**certainly** [16] - 27:5, 27:12, 27:17, 28:16, 31:1, 31:25, 44:24, 71:19, 73:20, 74:5, 78:18, 85:21, 87:12, 87:19, 87:21, 92:3
**certificate** [4] - 78:24, 79:4, 91:3, 91:5
**certify** [2] - 94:7, 94:12
**chair** [1] - 59:9
**change** [2] - 86:2, 88:15
**charge** [1] - 48:10
**charged** [1] - 48:14
**charges** [1] - 36:4
**Chauncey** [1] - 2:9
**CHAUNCEY** [4] - 1:7, 1:13, 4:1
**check** [1] - 36:3
**checking** [1] - 91:2
**child** [29] - 27:23, 27:25, 28:5, 29:15, 29:20, 29:22, 30:1, 30:12, 30:13, 30:16, 30:17, 30:24, 31:3, 31:7, 31:8, 34:15, 34:24, 44:19, 55:18, 56:2, 58:13, 58:19, 63:3, 70:2, 82:11,

86:7, 87:10
**children** [4] - 42:16, 92:10, 92:18, 93:4
**circumstance** [2] - 33:15, 48:3
**circumstances** [1] - 90:23
**City** [1] - 6:7
**civil** [5] - 11:4, 11:5, 11:7, 12:17, 13:16
**claim** [1] - 69:11
**claiming** [2] - 65:11, 65:12
**claims** [7] - 23:7, 23:14, 24:9, 24:11, 25:15, 62:9
**classes** [1] - 4:25
**clear** [3] - 45:2, 64:3, 84:16
**cleared** [2] - 82:25
**clerked** [1] - 6:2
**clerkship** [1] - 6:13
**CLEs** [1] - 7:16
**client** [2] - 50:5, 51:8
**clients** [2] - 51:11, 51:14
**closed** [1] - 84:11
**closer** [4] - 40:22, 74:15, 74:21, 75:10
**closest** [2] - 72:21, 73:3
**co** [1] - 43:1
**co-tenant's** [1] - 43:1
**collaborative** [2] - 13:2, 81:9
**collect** [2] - 16:15, 16:18
**colloquial** [1] - 90:10
**coming** [2] - 14:9, 23:13
**commenced** [1] - 72:13
**commencing** [1] - 1:16
**comment** [1] - 72:11
**commitments** [1] - 12:15
**common** [3] - 14:21, 14:24, 14:25
**communication** [5] - 38:9, 38:10, 38:15, 49:12, 73:13
**community** [2] - 43:12, 43:15
**complaint** [10] - 26:3, 38:18, 41:4, 41:10, 44:7, 47:7, 47:11, 49:10, 62:3, 71:7
**complete** [1] - 39:7
**complicated** [1] -

47:25
**comply** [1] - 80:7
**concern** [8] - 27:23, 28:18, 30:7, 30:20, 48:5, 61:19, 65:11, 92:20
**concerned** [2] - 37:7, 37:17
**concerning** [2] - 27:23, 83:12
**concerns** [12] - 23:14, 27:16, 29:21, 37:15, 39:7, 56:1, 58:6, 65:8, 70:23, 82:15, 88:10, 92:14
**concluded** [1] - 94:1
**conducting** [1] - 10:1
**conferred** [1] - 27:8
**confidential** [1] - 22:21
**confirm** [3] - 20:21, 58:13, 63:20
**confirmed** [2] - 81:25, 90:6
**confirming** [1] - 58:10
**confusion** [1] - 29:5
**consent** [19] - 41:14, 41:19, 41:22, 41:25, 42:3, 42:7, 42:13, 43:2, 43:8, 63:24, 64:7, 66:18, 67:2, 67:5, 67:11, 67:12, 67:14, 68:9, 80:7
**consented** [2] - 79:25, 80:1
**consider** [4] - 30:8, 33:8, 51:10, 87:17
**consideration** [2] - 6:1, 48:1
**considered** [1] - 30:15
**considering** [3] - 5:17, 6:21, 11:16
**consistent** [2] - 86:14, 88:5
**constitutional** [1] - 35:4
**construction** [1] - 57:3
**consultations** [1] - 17:10
**contact** [6] - 16:14, 16:16, 27:25, 29:10, 36:14, 87:9
**contacted** [6] - 25:6, 27:3, 27:5, 27:10, 27:11, 58:20
**contacts** [1] - 29:4
**contain** [1] - 43:19
**contained** [1] - 46:18
**context** [5] - 23:25,

**App. 042**

32:21, 33:14, 51:12, 51:16
**contexts** [1] - 32:24
**continue** [1] - 85:22
**contribute** [1] - 77:12
**controlled** [2] - 28:6, 82:5
**conversation** [32] - 20:8, 27:12, 30:6, 31:16, 32:1, 32:14, 35:11, 35:14, 36:24, 37:6, 37:9, 37:12, 39:5, 39:6, 39:16, 50:23, 52:3, 57:25, 58:15, 58:23, 59:17, 68:21, 77:14, 81:10, 82:14, 82:16, 82:20, 82:22, 83:2, 87:23, 87:24, 92:8
**conversations** [11] - 27:14, 29:23, 31:23, 46:22, 49:16, 49:20, 50:15, 51:5, 51:8, 51:23, 82:19
**converse** [1] - 67:7
**conversing** [1] - 65:9
**conviction** [2] - 22:4, 26:6
**cooperate** [1] - 42:20
**corner** [2] - 57:6, 58:25
**correct** [29] - 4:10, 4:17, 12:4, 14:4, 14:5, 21:20, 30:13, 30:25, 31:4, 31:11, 44:18, 53:2, 64:4, 66:25, 68:9, 68:13, 73:19, 76:12, 76:14, 78:5, 83:21, 85:5, 86:11, 86:22, 87:18, 90:7, 92:11, 92:23, 94:10
**corroborated** [4] - 41:5, 41:6, 41:8, 80:12
**counsel** [10] - 11:6, 37:4, 50:7, 52:8, 52:11, 52:12, 52:13, 69:17, 94:13, 94:14
**counties** [4] - 6:25, 10:12, 36:6, 36:15
**COUNTY** [1] - 1:8
**county** [28] - 6:19, 7:12, 7:16, 7:24, 8:2, 8:9, 9:1, 10:9, 10:25, 11:10, 13:6, 13:8, 13:11, 13:12, 14:1, 16:1, 17:24, 29:7, 35:23, 37:3, 37:8, 49:16, 52:14, 52:16,

62:17, 79:8, 85:19, 91:8
**County** [32] - 2:10, 7:4, 7:7, 7:25, 8:19, 9:16, 9:17, 11:1, 11:2, 11:7, 11:9, 11:16, 11:19, 11:22, 16:25, 22:4, 26:19, 28:23, 29:9, 29:11, 35:21, 36:7, 45:15, 50:15, 51:24, 72:24, 78:23, 79:3, 81:20, 82:17, 87:25, 91:25
**couple** [5] - 9:7, 36:5, 77:23, 84:24, 86:3
**course** [1] - 26:9
**COURT** [1] - 1:1
**court** [1] - 12:12
**Courts** [2] - 22:9, 22:16
**cover** [2] - 5:9, 7:20
**covered** [1] - 20:4
**covering** [1] - 6:6
**covers** [1] - 7:22
**CPS** [9] - 86:6, 86:9, 87:17, 88:5, 88:23, 89:4, 89:7, 89:10, 89:15
**credibility** [1] - 24:9
**credit** [1] - 36:3
**crime** [11] - 30:2, 30:10, 34:22, 44:12, 47:8, 47:12, 48:10, 62:19, 63:1, 83:3, 83:4
**criminal** [13] - 16:10, 29:25, 34:12, 34:14, 34:19, 35:2, 35:6, 35:10, 44:13, 44:15, 63:12, 80:19, 88:21
**CROSS** [2] - 77:20, 81:3
**CROSS-EXAMINATION** [2] - 77:20, 81:3
**cuffs** [1] - 18:3
**curious** [1] - 70:20
**curriculum** [2] - 4:23, 5:4
**cycle** [1] - 11:17

## D

**danger** [1] - 86:8
**dangerous** [1] - 81:24
**date** [3] - 27:24, 35:18, 87:5
**Dave** [4] - 72:20, 73:6, 73:8, 73:14
**days** [2] - 33:4, 33:7

**dead** [1] - 31:19
**dealing** [1] - 33:1
**decade** [1] - 62:1
**decide** [2] - 5:13, 5:15
**decided** [2] - 11:14, 11:18
**decision** [1] - 88:4
**declining** [4] - 50:4, 50:14, 51:9, 52:7
**deed** [1] - 46:4
**deems** [1] - 87:1
**defendant** [3] - 14:4, 14:12, 52:10
**Defendant** [1] - 2:15
**Defendants** [2] - 1:9, 2:9
**defer** [7] - 35:13, 35:16, 41:15, 66:6, 68:22, 69:4, 69:17
**define** [3] - 14:25, 48:7, 48:8
**definitely** [6] - 26:10, 32:13, 35:14, 38:3, 83:15, 83:22
**definition** [1] - 44:24
**denial** [4] - 66:21, 66:25, 67:1, 67:12
**department** [2] - 16:5, 19:2
**dependent** [2] - 10:8, 10:21
**deposed** [1] - 51:19
**Deposition** [1] - 94:1
**DEPOSITION** [2] - 1:6, 1:13
**deposition** [1] - 94:11
**deputies** [8] - 15:11, 46:22, 51:11, 51:16, 51:19, 70:8, 72:24, 80:19
**Deputy** [13] - 32:8, 32:9, 32:10, 32:13, 58:20, 72:19, 74:8, 76:11, 83:22, 83:23, 88:13, 88:15
**deputy** [3] - 52:22, 60:7, 69:6
**Des** [5] - 1:17, 2:4, 2:18, 8:20, 72:8
**describe** [2] - 35:24, 79:13
**described** [1] - 38:8
**detail** [1] - 82:14
**details** [1] - 93:4
**determination** [1] - 89:11
**determine** [4] - 58:18, 65:3, 74:2, 86:10
**determined** [2] - 53:17, 71:19

**determines** [1] - 48:9
**determining** [1] - 91:10
**developed** [1] - 39:8
**development** [1] - 51:4
**DHS** [26] - 26:4, 26:9, 26:20, 27:3, 27:10, 27:21, 29:21, 38:22, 38:23, 41:12, 41:15, 41:17, 42:1, 42:24, 61:18, 61:25, 62:6, 69:9, 69:17, 69:18, 70:24, 80:20, 85:24, 92:5, 92:14, 92:16
**DHS's** [1] - 42:15
**difference** [2] - 23:9, 51:15
**different** [12] - 4:19, 4:25, 5:6, 6:9, 32:24, 35:1, 35:3, 36:4, 37:18, 49:21, 69:16, 88:19
**differently** [2] - 69:20, 69:22
**difficult** [4] - 48:2, 57:25, 67:6, 67:8
**dining** [4] - 59:3, 59:8, 59:11, 59:12
**dinner** [2] - 77:6, 77:7
**DIRECT** [1] - 4:4
**directing** [1] - 83:20
**direction** [5] - 80:15, 81:6, 81:7, 81:8, 94:10
**disagree** [6] - 43:7, 43:11, 43:18, 43:22, 44:21, 44:25
**discovered** [1] - 36:20
**discovery** [1] - 76:7
**discuss** [2] - 13:16, 81:20
**discussed** [4] - 17:11, 17:13, 82:19, 82:20
**discussing** [1] - 83:9
**discussion** [1] - 93:18
**dismiss** [1] - 87:11
**Dispatch** [1] - 72:9
**dispatch** [1] - 18:12
**dispute** [2] - 24:17, 82:11
**disruption** [1] - 59:18
**distance** [1] - 75:8
**distress** [4] - 28:5, 34:25, 44:20, 58:11
**distressed** [1] - 30:21
**District** [2] - 6:6, 6:7
**DISTRICT** [2] - 1:1, 1:1
**DIVISION** [1] - 1:2
**DOC** [1] - 39:21

**docket** [5] - 10:24, 11:1, 11:8, 11:9, 12:15
**document** [2] - 46:2, 46:19
**documentation** [1] - 38:25
**documents** [2] - 13:25, 22:18
**dodge** [1] - 50:17
**done** [4] - 21:13, 70:3, 85:21, 89:2
**door** [7] - 57:17, 57:22, 59:15, 60:5, 70:22, 84:5, 84:18
**doorbell** [2] - 57:7, 57:9
**doors** [1] - 85:10
**doorstep** [1] - 70:22
**down** [1] - 5:11
**drafting** [1] - 89:5
**draw** [1] - 10:22
**drinks** [1] - 77:7
**Drive** [1] - 2:12
**drive** [1] - 56:3
**driveway** [1] - 53:1
**drop** [3] - 29:13, 91:19, 92:2
**drops** [2] - 82:18
**drove** [2] - 53:8, 60:7
**duly** [1] - 4:2
**during** [4] - 16:4, 25:20, 36:17, 89:11
**duties** [3] - 12:7, 86:24, 87:17
**duty** [2] - 18:7, 18:9
**dynamic** [1] - 90:21

## E

**early** [1] - 57:3
**easily** [1] - 79:19
**East** [1] - 2:17
**EDWARD** [1] - 2:6
**effectively** [1] - 86:1
**effort** [1] - 80:6
**efforts** [1] - 80:16
**egregious** [2] - 26:14, 75:16
**Eighth** [1] - 6:7
**either** [5] - 26:19, 36:2, 38:22, 60:1, 88:14
**elderly** [3] - 53:17, 58:3, 90:22
**elected** [4] - 7:25, 49:21, 50:16, 51:24
**election** [1] - 37:3
**electronic** [1] - 33:6
**elementary** [1] - 4:13

**App. 043**

**Elizabeth** [7] - 12:24, 18:22, 26:24, 32:4, 38:13, 76:12, 76:13
**email** [4] - 38:10, 38:15, 76:23, 77:3
**Email** [1] - 3:8
**emergency** [1] - 33:11
**emotional** [1] - 37:5
**employed** [2] - 94:13, 94:14
**employee** [3] - 7:5, 14:1, 94:14
**empty** [1] - 84:11
**EMS** [1] - 14:11
**end** [4] - 5:23, 6:17, 33:21, 33:22
**endangerment** [6] - 30:13, 30:18, 30:25, 31:3, 31:8, 34:16
**ended** [1] - 65:23
**ends** [1] - 84:3
**enforcement** [8] - 8:10, 15:11, 17:18, 18:11, 22:17, 43:2, 69:15, 75:23
**engaged** [1] - 75:14
**engagement** [2] - 51:22, 92:15
**ensuring** [1] - 37:7
**enter** [2] - 66:10, 66:16
**entered** [8] - 57:16, 57:17, 66:17, 68:8, 68:10, 73:19, 78:4, 84:8
**entire** [2] - 66:8, 79:21
**entrance** [1] - 56:25
**equipment** [1] - 17:17
**established** [1] - 67:21
**Estate** [1] - 46:4
**Estey** [8] - 26:20, 26:21, 27:8, 76:12, 76:13, 82:21, 88:1, 88:2
**estimate** [1] - 79:21
**Etsey** [1] - 87:25
**event** [1] - 30:3
**eventually** [1] - 11:14
**evidence** [5] - 16:15, 16:18, 17:13, 82:6, 85:4
**exacerbated** [1] - 92:14
**exact** [2] - 9:12, 25:4
**exactly** [4] - 40:4, 53:4, 60:9, 63:14
**EXAMINATION** [4] - 4:4, 77:20, 81:3, 90:2

**Examination** [1] - 3:2
**exasperated** [1] - 90:22
**except** [1] - 22:9
**exception** [2] - 43:13, 43:16
**excuse** [2] - 83:5, 88:2
**execution** [2] - 10:17, 15:16
**executions** [3] - 9:3, 10:10, 14:16
**Exhibit** [8] - 3:6, 3:7, 3:8, 3:8, 20:22, 45:14, 76:4, 76:20
**Exhibits** [2] - 3:10, 93:21
**exhibits** [1] - 93:23
**exigency** [2] - 42:13, 66:14
**exigent** [1] - 48:3
**exist** [2] - 35:5, 62:4
**existence** [1] - 77:13
**exists** [1] - 38:25
**expect** [1] - 75:12
**expedite** [1] - 33:13
**expeditious** [1] - 33:19
**experience** [1] - 6:11
**experts** [1] - 71:23
**explicitly** [1] - 35:9
**expressed** [1] - 68:18
**extent** [3] - 4:20, 50:18, 52:1
**exterior** [1] - 84:20
**extra** [1] - 5:5
**extracurriculars** [1] - 5:6
**extremely** [6] - 37:5, 56:1, 57:24, 61:11, 70:14, 83:10
**eyes** [3] - 34:24, 37:5, 68:15

**F**

**face** [3] - 36:13
**face-to-face** [1] - 36:13
**fact** [7] - 27:4, 34:21, 70:21, 70:24, 83:2, 84:16, 86:10
**factor** [1] - 92:20
**facts** [3] - 43:22, 49:17, 51:21
**factual** [4] - 24:17, 27:16, 51:1, 51:17
**factually** [1] - 24:16
**fair** [3] - 79:11, 89:17, 93:10
**Fairfield** [4] - 2:8,

4:10, 11:18, 16:24
**fairly** [1] - 16:22
**false** [7] - 22:4, 24:3, 26:3, 57:19, 62:3, 62:6, 71:7
**falsely** [1] - 61:18
**far** [6] - 17:16, 23:23, 38:9, 81:24, 84:21, 86:17
**farmhouse** [1] - 57:4
**fast** [1] - 34:2
**faster** [1] - 33:16
**fastest** [1] - 33:25
**father** [2] - 55:18, 55:23
**features** [1] - 27:23
**federal** [1] - 6:22
**feelings** [1] - 70:13
**felony** [4] - 11:8, 12:17, 12:20, 36:4
**felt** [2] - 70:15, 77:10
**few** [1] - 5:24
**fifteen** [1] - 84:23
**figured** [1] - 54:9
**filed** [3] - 16:20, 33:17, 52:17
**filing** [1] - 37:16
**filings** [1] - 37:1
**financially** [1] - 94:15
**fine** [2] - 63:19, 80:5
**finished** [1] - 58:14
**fire** [2] - 29:13, 82:18
**firearm** [1] - 17:21
**firearms** [1] - 17:23
**first** [9] - 4:2, 24:24, 25:1, 25:8, 26:22, 52:20, 55:8, 65:5, 72:6
**fishing** [1] - 71:11
**five** [5] - 7:10, 37:13, 37:14, 60:18, 60:19
**fled** [1] - 92:17
**fleeing** [1] - 93:5
**flip** [1] - 45:20
**flow** [1] - 29:1
**flowing** [1] - 91:11
**follow** [2] - 86:25, 88:14
**follow-up** [1] - 88:14
**follows** [1] - 4:3
**food** [3] - 28:9, 30:17, 30:23
**foregoing** [3] - 94:7, 94:10, 94:13
**forgot** [2] - 92:12, 92:19
**form** [1] - 67:20
**format** [1] - 45:16
**former** [1] - 13:25

**forth** [3] - 11:13, 29:24, 60:6
**foundation** [1] - 93:23
**four** [5] - 7:21, 7:22, 8:1, 60:16, 86:13
**four-day** [2] - 7:21, 7:22
**Fourth** [10] - 8:5, 8:15, 13:7, 13:13, 13:22, 42:22, 42:25, 43:13, 43:16
**frame** [2] - 62:16, 91:22
**frank** [2] - 71:22, 72:4
**Franklin** [1] - 2:12
**frankly** [3] - 25:14, 28:21, 83:10
**fraud** [1] - 35:23
**freaked** [1] - 39:9
**frequent** [2] - 9:8, 9:15
**friend** [1] - 40:3
**friends** [1] - 40:20
**front** [6] - 31:12, 52:22, 57:1, 57:2, 60:5, 74:20
**frustrated** [2] - 90:20, 90:25
**frustration** [1] - 61:19
**frustrations** [1] - 61:21
**full** [5] - 11:25, 12:3, 12:17, 12:24, 94:10
**full-time** [4] - 11:25, 12:3, 12:17, 12:24
**fundamental** [1] - 23:16
**funny** [3] - 90:10, 90:13, 90:15

**G**

**Gail** [57] - 22:3, 23:4, 23:8, 23:11, 23:14, 24:2, 25:3, 26:16, 26:17, 35:17, 36:21, 39:2, 39:5, 39:16, 40:19, 40:24, 47:2, 47:5, 56:12, 57:24, 58:5, 60:4, 60:13, 60:21, 61:6, 61:9, 62:2, 64:1, 64:3, 64:5, 64:7, 64:13, 64:21, 64:25, 65:3, 65:5, 65:20, 66:3, 66:16, 67:3, 68:2, 68:4, 68:7, 68:12, 68:18, 68:20, 70:12, 70:21, 77:10, 84:13, 91:19, 92:1, 92:10, 92:15, 92:17, 92:21

**GAIL** [1] - 1:3
**Gail's** [14] - 23:23, 39:11, 55:25, 65:23, 66:11, 66:21, 66:25, 67:1, 67:5, 67:11, 68:9, 73:19, 74:3
**Gary** [1] - 65:5
**general** [4] - 10:2, 11:1, 11:3, 93:22
**General** [1] - 2:16
**generally** [2] - 33:2, 88:20
**generated** [1] - 17:14
**gentleman** [3] - 53:17, 58:3, 90:22
**GINA** [1] - 2:2
**Gina** [1] - 4:8
**Gish** [1] - 7:8
**given** [1] - 64:6
**gmessamer@ parrishlaw.com** [1] - 2:5
**goals** [1] - 80:17
**GORDON** [1] - 1:4
**Gordon** [45] - 23:15, 38:2, 45:9, 46:4, 46:9, 46:23, 53:9, 53:12, 53:15, 53:16, 53:18, 54:7, 54:8, 54:9, 55:9, 55:13, 56:10, 56:19, 57:18, 57:23, 58:1, 58:2, 58:17, 59:19, 60:22, 60:24, 61:1, 63:14, 64:6, 64:14, 64:24, 65:6, 65:10, 65:16, 66:15, 66:18, 67:10, 67:13, 67:25, 68:15, 78:5, 79:23, 90:5, 91:14, 91:17
**Gordon's** [3] - 44:22, 65:12, 68:10
**gotcha** [1] - 14:2
**grades** [1] - 5:9
**Grand** [2] - 1:17, 2:4
**granted** [2] - 33:18, 80:8
**great** [1] - 90:16
**grew** [2] - 4:11, 11:17
**grounds** [1] - 48:10
**guess** [11] - 13:19, 14:10, 16:21, 23:6, 29:14, 32:22, 35:8, 42:18, 50:23, 83:13, 91:3
**guessing** [1] - 9:11
**guy** [3] - 13:18, 90:10, 90:13
**guys** [4] - 10:16, 59:15, 60:22, 88:4

## H

**habit** [1] - 14:15
**hair** [1] - 63:17
**hairs** [2] - 14:24, 44:5
**half** [5] - 12:3, 12:4, 12:5, 12:6, 58:16
**half-time** [4] - 12:3, 12:4, 12:5, 12:6
**Hallman** [2] - 20:7, 72:3
**hand** [2] - 88:3, 94:17
**handle** [2] - 8:4, 85:17
**handled** [8] - 9:17, 11:8, 12:14, 12:16, 12:19, 61:25, 85:15, 86:15
**Hansen** [3] - 72:20, 72:25, 73:1
**Hansen's** [1] - 73:2
**happy** [3] - 70:12, 70:16, 71:3
**HARVEY** [1] - 2:6
**Harvey** [2] - 37:7, 70:23
**Haven** [2] - 82:18, 91:19
**heading** [1] - 20:25
**heads** [2] - 72:6, 72:14
**heads-up** [2] - 72:6, 72:14
**health** [2] - 12:15, 42:16
**hear** [2] - 38:18, 38:20
**heard** [6] - 4:14, 24:24, 36:23, 38:1, 88:23, 89:7
**held** [1] - 93:19
**hell** [4] - 60:23, 60:25, 61:2, 65:7
**hereby** [1] - 94:7
**herein** [1] - 94:8
**hereto** [1] - 94:15
**hereunto** [1] - 94:16
**herself** [2] - 23:8, 39:9
**HHS** [9] - 26:4, 42:20, 69:13, 85:15, 85:18, 85:25, 86:14, 89:4, 92:6
**HHS/DHS** [1] - 80:17
**hi** [2] - 4:6, 4:7
**himself** [1] - 13:19
**HINDERS** [6] - 2:10, 67:19, 77:21, 81:1, 93:15, 93:22
**hinders** [2] - 14:12, 81:5
**Hinders** [2] - 2:12, 3:3
**hint** [1] - 25:8
**hire** [1] - 12:23

**hired** [1] - 16:12
**holder** [1] - 46:5
**hole** [2] - 45:17, 46:3
**holster** [2] - 20:2, 20:3
**home** [7] - 10:1, 49:14, 49:18, 66:11, 66:16, 67:11, 67:21
**honest** [1] - 61:8
**honestly** [8] - 10:13, 40:3, 68:4, 70:15, 70:20, 71:11, 79:18, 84:18
**hooks** [1] - 18:10
**Hoover** [1] - 2:17
**hope** [2] - 50:16, 50:25
**hoped** [1] - 32:1
**hoping** [1] - 45:18
**hour** [1] - 33:24
**hours** [1] - 86:13
**house** [45] - 39:11, 50:2, 50:21, 51:6, 56:9, 56:11, 56:13, 56:16, 56:17, 56:18, 56:24, 56:25, 57:1, 57:5, 57:7, 58:22, 59:6, 65:7, 65:8, 65:12, 65:19, 65:20, 65:24, 66:3, 68:5, 68:8, 68:10, 68:19, 69:2, 74:11, 75:2, 77:23, 77:24, 78:2, 78:3, 78:4, 78:7, 83:5, 85:5, 85:6, 90:6, 93:8
**houses** [1] - 78:13
**humor** [1] - 90:17
**hurt** [3] - 70:14, 70:15, 70:17
**HUYSER** [1] - 2:11

## I

**IA** [4] - 2:4, 2:8, 2:13, 2:18
**idea** [3] - 61:6, 61:9, 91:22
**identification** [3] - 20:23, 76:5, 76:21
**identifying** [1] - 41:7
**implication** [1] - 92:3
**implore** [1] - 70:23
**important** [4] - 64:10, 64:16, 86:21, 87:11
**IN** [1] - 94:16
**inaccurate** [2] - 20:19, 21:15
**incident** [6] - 5:19, 16:12, 38:11, 49:17, 50:1, 70:13

**included** [1] - 66:22
**including** [1] - 67:15
**increased** [1] - 92:20
**independent** [1] - 36:9
**independently** [1] - 41:8
**indicate** [7] - 40:24, 41:2, 54:19, 77:24, 90:24, 91:14, 93:2
**indicated** [24] - 26:24, 27:19, 27:21, 29:12, 36:25, 37:16, 39:3, 40:18, 40:21, 45:8, 46:22, 49:19, 58:9, 58:17, 58:21, 60:13, 60:21, 63:20, 63:23, 81:17, 82:9, 82:22, 90:8, 94:8
**indicating** [2] - 55:23, 55:24
**indication** [2] - 54:15, 70:1
**indicative** [2] - 54:21, 87:13
**indicia** [6] - 43:20, 44:1, 44:7, 74:6, 78:13, 78:20
**indictable** [2] - 11:2, 12:16
**individual** [5] - 36:13, 42:15, 48:14, 51:10, 79:7
**infant** [2] - 30:21, 48:6
**influence** [1] - 82:5
**information** [35] - 27:18, 28:4, 29:14, 29:17, 31:14, 31:22, 32:3, 32:5, 34:9, 34:17, 41:7, 45:5, 45:21, 46:17, 46:24, 47:2, 48:16, 48:18, 48:21, 49:2, 49:4, 49:5, 49:10, 64:2, 64:8, 71:12, 77:2, 80:23, 87:5, 88:7, 89:10, 91:23, 92:1, 92:13, 93:3
**informed** [1] - 73:20
**infrequent** [2] - 9:15, 9:19
**initial** [1] - 87:16
**injured** [1] - 71:3
**inquire** [1] - 82:12
**inquiry** [1] - 91:19
**inside** [8] - 39:11, 57:24, 59:15, 59:17, 74:1, 75:2, 78:8, 85:11
**instance** [2] - 10:23, 27:2

**instances** [1] - 89:9
**instead** [1] - 92:17
**intent** [1] - 50:17
**interaction** [3] - 37:24, 38:5, 74:24
**interchangeably** [1] - 86:4
**interest** [2] - 65:4, 67:4
**interested** [2] - 11:15, 94:15
**interests** [4] - 64:12, 64:17, 64:19, 65:15
**interpose** [1] - 67:19
**Interrogatories** [1] - 50:13
**intersection** [1] - 53:1
**investigate** [2] - 47:8, 86:21
**investigated** [3] - 26:10, 30:19, 34:19
**investigating** [4] - 34:15, 34:21, 44:16, 47:12
**investigation** [12] - 27:3, 34:12, 34:14, 35:10, 39:6, 44:15, 51:2, 51:18, 80:20, 80:22, 87:2, 87:23
**investigations** [2] - 16:4, 42:23
**investigative** [1] - 26:7
**investigator** [10] - 16:2, 26:20, 27:11, 29:11, 82:17, 86:25, 89:3, 91:25, 92:5, 92:6
**investigators** [2] - 16:8, 16:13
**invitation** [1] - 68:11
**invited** [1] - 68:15
**inviting** [1] - 59:15
**involved** [11] - 14:16, 14:18, 17:3, 17:7, 22:24, 32:14, 35:23, 35:25, 36:11, 36:15, 42:12
**involvement** [6] - 17:9, 25:2, 32:18, 32:20, 36:19, 51:22
**involving** [1] - 14:11
**IOWA** [2] - 1:1, 1:8
**Iowa** [5] - 1:17, 2:10, 22:9, 22:16, 30:2
**issue** [6] - 9:23, 11:5, 13:23, 24:25, 58:10, 72:12
**issued** [2] - 17:24, 18:6

**issues** [11] - 8:5, 8:16, 9:18, 9:20, 11:7, 12:13, 12:18, 67:7, 91:9, 91:10, 91:12

## J

**jacket** [1] - 20:4
**jail** [1] - 34:23
**JEFFERSON** [1] - 1:8
**Jefferson** [13] - 2:10, 7:25, 11:19, 11:22, 16:25, 45:15, 50:15, 51:24, 76:10, 76:16, 78:23, 79:3, 81:20
**job** [6] - 5:22, 6:18, 7:12, 11:20, 86:9, 87:17
**John** [4] - 7:5, 7:8, 9:17
**join** [1] - 93:24
**Judge** [1] - 6:21
**judge's** [1] - 34:5
**judges** [2] - 6:5, 6:9
**judgment** [1] - 61:24
**jump** [2] - 61:12, 65:10
**jumped** [1] - 27:5
**jumps** [1] - 26:13
**jurisdiction** [1] - 29:5
**justification** [1] - 66:10
**juvenile** [2] - 12:14, 28:22

## K

**Kauffman** [2] - 72:7, 72:18
**keep** [3] - 64:13, 65:9, 68:14
**Kelsey** [32] - 2:15, 3:9, 32:5, 32:9, 32:11, 32:15, 34:9, 36:23, 37:20, 38:13, 38:22, 39:1, 39:22, 53:19, 53:25, 55:17, 55:23, 55:24, 57:11, 58:6, 64:21, 64:23, 69:13, 72:21, 73:6, 76:17, 76:23, 76:24, 77:1, 77:15, 91:15, 91:16
**KELSEY** [1] - 1:7
**Kelsey's** [1] - 77:9
**Keokuk** [8] - 6:25, 7:4, 9:16, 11:1, 11:7, 11:9, 11:16, 28:23
**kid** [1] - 28:19
**kids** [4] - 92:22, 92:25, 93:1, 93:3

**kind** [16] - 7:13, 8:17, 14:22, 25:1, 27:16, 28:10, 28:15, 36:20, 39:8, 42:17, 59:1, 59:2, 84:4, 85:23, 90:9, 92:20
**kindergarten** [1] - 5:12
**kitchen** [1] - 59:3
**knock** [2] - 57:8, 57:10
**knocked** [2] - 57:12
**knowing** [3] - 48:24, 69:24
**knowingly** [1] - 31:8
**knowledge** [7] - 13:6, 13:9, 27:22, 35:17, 87:13, 91:7, 91:20
**known** [1] - 86:19
**knows** [2] - 40:3, 40:19
**KOENIG** [1] - 1:7
**Koenig** [37] - 2:15, 3:9, 27:13, 27:18, 28:2, 28:11, 28:20, 29:2, 29:10, 30:4, 31:15, 31:24, 37:20, 40:12, 41:1, 47:4, 56:12, 56:20, 57:13, 68:16, 72:21, 76:18, 76:24, 80:16, 80:22, 81:6, 81:11, 81:19, 82:16, 83:4, 83:5, 85:3, 87:14, 88:9, 89:20, 91:21, 93:7
**Kruidenier** [1] - 2:3

**L**

**laid** [1] - 65:15
**landlord** [1] - 43:8
**language** [1] - 5:2
**large** [1] - 78:1
**last** [5] - 15:8, 25:4, 81:5, 86:2
**Law** [3] - 2:3, 2:7, 2:11
**law** [13] - 5:14, 5:15, 5:21, 6:3, 8:10, 15:11, 17:18, 18:11, 22:17, 41:12, 43:2, 69:15, 75:22
**lawsuit** [1] - 52:9
**layout** [1] - 64:9
**learned** [1] - 7:14
**least** [5] - 62:8, 78:21, 85:10, 87:3, 87:15
**leave** [3] - 54:10, 54:12, 91:16
**leaves** [1] - 87:22
**led** [2] - 11:10, 51:2
**left** [2] - 56:16, 56:18

**legal** [11] - 24:13, 47:24, 48:8, 48:11, 48:12, 49:23, 50:7, 50:19, 52:1, 52:5, 66:10
**legally** [1] - 49:25
**legitimate** [1] - 50:19
**less** [5] - 12:21, 36:5, 37:13, 69:9, 79:22
**level** [1] - 91:8
**liability** [1] - 35:6
**liaised** [1] - 36:18
**lied** [1] - 65:15
**Life** [1] - 46:4
**limit** [1] - 80:2
**line** [2] - 29:7, 46:2
**lines** [2] - 28:16, 60:3
**lists** [1] - 46:11
**litigation** [1] - 13:17
**live** [2] - 78:25, 79:2
**lived** [8] - 46:25, 47:3, 64:7, 64:21, 66:16, 68:2, 68:5, 68:7
**lives** [1] - 62:21
**living** [6] - 36:16, 59:1, 59:7, 59:10, 78:8, 80:12
**LLP** [1] - 2:3
**loan** [1] - 7:6
**local** [1] - 19:6
**locate** [1] - 44:19
**located** [1] - 79:19
**location** [2] - 31:9, 87:8
**locations** [2] - 64:18, 85:8
**look** [22] - 14:10, 20:17, 22:21, 45:18, 55:20, 58:9, 58:12, 58:17, 58:18, 63:19, 63:21, 71:7, 73:23, 80:1, 83:21, 83:24, 83:25, 84:5, 84:9, 85:11, 89:17, 90:11
**looked** [4] - 58:2, 73:24, 73:25, 84:3
**looking** [4] - 46:17, 74:5, 78:17, 84:3
**looks** [4] - 22:1, 45:19, 46:1, 46:3
**lunch** [3] - 25:5, 37:2, 77:6
**Lyle** [1] - 73:2

**M**

**ma'am** [2] - 6:4, 61:8
**magistrate** [4] - 12:12, 33:9, 89:6
**main** [12] - 23:19,

23:20, 59:1, 68:5, 68:8, 68:10, 68:19, 77:23, 77:24, 85:4, 85:6
**manifested** [2] - 61:21, 61:23
**mannerisms** [1] - 91:1
**manufactured** [1] - 31:10
**March** [2] - 1:16, 94:17
**mark** [1] - 76:6
**marked** [6] - 20:22, 20:24, 76:4, 76:9, 76:20, 76:22
**Marked/Offered** [1] - 3:6
**math** [1] - 5:4
**matter** [9] - 32:7, 34:19, 35:2, 36:10, 37:18, 52:15, 83:9, 94:7, 94:14
**matters** [1] - 30:7
**MCCONNELL** [1] - 1:3
**MCCONNELL-SEABA** [1] - 1:3
**mean** [14] - 9:11, 14:23, 16:17, 17:6, 23:24, 43:17, 47:9, 55:20, 62:18, 71:15, 71:17, 77:24, 83:19, 86:8
**meaning** [1] - 86:19
**meaningful** [2] - 73:12, 75:1
**mechanism** [1] - 25:11
**media** [3] - 72:2, 72:15, 72:16
**medical** [3] - 28:8, 30:17, 30:24
**meditation** [1] - 4:22
**memory** [1] - 54:16
**mental** [1] - 12:15
**mention** [4] - 4:14, 39:17, 92:12, 92:19
**mentioned** [4] - 22:3, 55:17, 85:15, 91:18
**Messages** [1] - 3:8
**MESSAMER** [8] - 2:2, 4:5, 47:19, 67:16, 77:17, 90:3, 93:12, 93:20
**Messamer** [1] - 3:3
**met** [2] - 39:20, 53:16
**meth** [2] - 30:11, 31:2
**methamphetamine** [3] - 28:7, 28:15, 31:10
**might** [14] - 9:24, 10:20, 24:13, 29:8, 31:21, 36:4, 53:20,

53:21, 54:13, 59:8, 59:16, 68:4, 73:1, 93:11
**Miller** [11] - 32:9, 32:10, 32:13, 58:21, 72:19, 73:5, 76:11, 83:23, 84:5, 88:16
**mind** [2] - 14:9, 24:19
**minute** [2] - 21:2, 58:15
**minutes** [8] - 37:13, 37:14, 58:14, 58:17, 63:18, 79:22, 80:3, 80:5
**misattribution** [1] - 23:17
**misdemeanor** [1] - 11:9
**misdemeanors** [2] - 11:2, 12:16
**misquoted** [1] - 21:22
**misquotes** [1] - 21:24
**Miss** [50] - 26:21, 26:23, 27:8, 27:13, 27:18, 28:2, 28:11, 28:20, 29:2, 29:10, 29:12, 29:19, 29:24, 30:4, 35:15, 35:19, 36:14, 40:12, 40:21, 40:22, 41:1, 47:4, 56:12, 56:20, 57:13, 57:15, 59:18, 62:10, 68:16, 80:16, 80:22, 81:6, 81:11, 81:19, 82:4, 82:16, 82:21, 82:23, 83:4, 83:5, 84:24, 85:3, 87:14, 88:9, 89:20, 91:21, 93:7
**mistreated** [1] - 62:15
**Moines** [5] - 1:17, 2:4, 2:18, 8:20, 72:8
**Montana** [3] - 92:18, 93:6, 93:10
**month** [2] - 15:5, 15:8
**monthly** [3] - 8:22, 18:17, 18:20
**months** [1] - 26:9
**mood** [2] - 90:16, 90:19
**morning** [3] - 81:23, 83:1, 89:20
**most** [1] - 58:6
**mostly** [1] - 6:5
**mother** [1] - 27:3
**Moulding** [3] - 2:9, 20:25, 77:22
**MOULDING** [4] - 1:7, 1:13, 4:1
**mouth** [1] - 77:10

**move** [1] - 93:20
**movement** [1] - 4:22
**MR** [8] - 67:19, 77:21, 81:1, 81:4, 89:25, 93:15, 93:22, 93:24
**MS** [7] - 4:5, 47:19, 67:16, 77:17, 90:3, 93:12, 93:20
**MSAE** [1] - 4:14
**multi** [1] - 35:23
**multi-county** [1] - 35:23
**municipalities** [1] - 79:7
**murdered** [1] - 31:19

**N**

**name** [8] - 22:23, 27:24, 36:12, 40:12, 75:4, 86:2, 87:7, 87:8
**named** [1] - 14:4
**nature** [4] - 13:15, 32:12, 82:22, 86:23
**necessarily** [1] - 43:14
**necessary** [4] - 23:22, 30:23, 42:9, 42:11
**need** [3] - 15:1, 33:12, 86:12
**needed** [3] - 8:25, 28:8, 28:9
**needs** [1] - 58:11
**Nelson** [2] - 1:14, 1:25
**never** [10] - 5:7, 31:20, 53:16, 57:19, 61:1, 61:13, 62:1, 62:10, 77:6, 89:7
**new** [2] - 7:16, 7:24
**Newspaper** [1] - 3:7
**next** [6] - 6:18, 6:21, 26:16, 54:5, 55:14, 56:8
**night** [1] - 25:4
**no-questions-asked** [1] - 29:15
**nobody** [2] - 34:23, 44:16
**noisy** [1] - 57:24
**nonresponsive** [1] - 53:14
**norm** [2] - 10:4, 10:8
**normal** [2] - 75:17, 75:19
**normally** [2] - 25:13, 78:8
**Norwalk** [1] - 2:13
**notable** [3] - 10:19, 25:19, 41:11
**NOTARY** [1] - 94:20

**Notary** [2] - 1:15, 94:6
**notes** [2] - 94:9, 94:11
**nothing** [5] - 14:9, 22:1, 54:22, 77:7, 93:15
**notice** [1] - 72:6
**November** [3] - 24:4, 38:4, 41:17
**number** [3] - 9:12, 76:22, 91:10
**numbers** [2] - 62:20, 62:25

## O

**objection** [2] - 67:20, 93:23
**objective** [3] - 41:20, 41:22, 42:6
**objects** [1] - 43:3
**obligated** [1] - 42:20
**obtaining** [2] - 88:18, 88:23
**obviously** [3] - 13:24, 89:6, 91:9
**occupancy** [4] - 78:20, 78:24, 91:3, 91:5
**occurred** [3] - 44:12, 44:18, 48:14
**odd** [7] - 25:16, 25:25, 37:6, 37:8, 65:10, 71:22, 83:10
**OF** [3] - 1:1, 1:6, 1:13
**off-the-record** [1] - 93:18
**offense** [1] - 30:1
**offered** [2] - 5:2, 5:8
**office** [30] - 7:3, 7:7, 7:15, 7:25, 8:24, 11:21, 12:7, 12:8, 16:1, 16:6, 16:25, 18:14, 19:2, 25:3, 25:7, 26:2, 27:4, 27:5, 27:10, 27:11, 28:22, 33:4, 37:2, 40:8, 61:13, 70:22, 71:2, 81:14, 81:15, 85:22
**Office** [2] - 2:17, 81:20
**officer** [5] - 22:17, 33:3, 34:3, 39:21, 69:15
**Officer** [2] - 72:20
**officers** [5] - 8:10, 15:12, 18:7, 75:12, 83:20
**offices** [1] - 7:9
**official** [1] - 49:16
**officials** [4] - 49:21,

49:24, 50:16, 51:24
**often** [2] - 9:16, 16:23
**old** [1] - 57:1
**older** [1] - 57:3
**once** [2] - 34:7, 87:21
**one** [25] - 13:3, 13:18, 14:3, 14:10, 15:7, 15:8, 19:14, 22:1, 23:19, 23:20, 23:23, 26:12, 34:1, 36:7, 50:3, 52:20, 62:8, 65:7, 65:23, 76:6, 83:14, 83:17, 83:19, 84:2, 89:4
**ones** [1] - 17:24
**Online** [2] - 22:10, 22:16
**online** [1] - 8:8
**open** [1] - 84:5
**opened** [4] - 57:17, 57:22, 84:10, 84:18
**opening** [3] - 6:24, 59:14, 85:10
**operation** [2] - 80:20, 81:10
**opportunity** [2] - 12:23, 23:22
**opposed** [1] - 56:2
**option** [1] - 5:20
**oral** [1] - 38:9
**order** [7] - 19:12, 19:17, 26:18, 27:7, 42:10, 59:17, 92:16
**ordinarily** [1] - 43:19
**ordinary** [2] - 25:15, 27:6
**organizations** [1] - 86:1
**organized** [1] - 12:9
**originally** [1] - 11:15
**Osborn** [20] - 19:19, 26:23, 29:12, 29:24, 35:15, 35:18, 35:19, 36:14, 40:21, 47:3, 56:13, 56:20, 57:15, 59:18, 62:10, 82:4, 82:21, 82:23, 84:24
**OSBORN** [1] - 1:3
**Osborn's** [2] - 29:19, 84:13
**otherwise** [3] - 32:3, 32:16, 78:14
**Ottumwa** [1] - 6:8
**outbuilding** [2] - 66:23, 73:25
**outbuildings** [3] - 64:24, 67:15, 83:21
**outcome** [1] - 26:11
**outliers** [1] - 12:22
**outright** [1] - 92:4

**outside** [10] - 10:4, 10:6, 10:7, 14:6, 23:24, 25:15, 73:24, 78:22, 84:25
**oversimplifying** [1] - 48:1
**overstating** [1] - 77:10
**owe** [2] - 70:5, 70:7
**OWI** [1] - 10:22
**owner** [4] - 41:21, 42:6, 45:24, 46:9
**owner's** [1] - 67:5
**ownership** [1] - 74:6
**owns** [1] - 45:21

## P

**p.m** [2] - 1:16, 94:1
**page** [3] - 21:1, 21:9, 76:9
**Page** [1] - 3:2
**pages** [1] - 94:10
**paper** [3] - 13:19, 20:5, 20:12
**paramour** [2] - 29:19, 55:25
**Parrish** [1] - 2:3
**part** [6] - 12:14, 12:25, 29:21, 45:18, 46:15, 61:10
**part-time** [2] - 12:14, 12:25
**participate** [2] - 9:2, 10:9
**particular** [4] - 5:22, 9:19, 21:24, 91:12
**particularly** [1] - 77:15
**parties** [2] - 94:13, 94:15
**parts** [2] - 21:7, 60:15
**party** [3] - 28:12, 41:9, 82:16
**pass** [1] - 61:24
**past** [2] - 56:3, 85:21
**PATRICK** [1] - 2:16
**pause** [1] - 31:25
**pendency** [1] - 36:17
**people** [3] - 35:6, 78:8, 78:25
**pepper** [1] - 18:1
**percentage** [2] - 62:5, 62:7
**performed** [1] - 48:15
**permission** [14] - 23:16, 24:18, 42:13, 58:21, 61:4, 63:15, 65:16, 66:14, 66:16, 67:25, 78:5, 83:24, 89:17, 89:22
**permitting** [1] - 31:8

**person** [9] - 13:1, 14:11, 30:3, 39:20, 42:19, 74:25, 75:2, 75:6, 86:20
**person's** [1] - 75:4
**personal** [3] - 27:25, 87:13, 91:20
**personally** [7] - 15:21, 15:22, 16:14, 49:8, 49:11, 70:15, 92:24
**petition** [2] - 23:7, 23:15
**phone** [26] - 25:2, 25:7, 25:12, 25:14, 25:20, 26:8, 26:15, 26:17, 26:23, 26:25, 27:20, 29:25, 32:16, 33:8, 34:6, 39:14, 39:19, 40:7, 54:13, 56:14, 61:12, 69:3, 81:12, 81:18, 93:1
**phrase** [1] - 81:9
**piece** [1] - 92:13
**pit** [1] - 57:4
**place** [5] - 38:14, 47:10, 84:17, 94:8, 94:9
**places** [4] - 14:17, 64:12, 65:3, 69:6
**plaintiffs** [1] - 38:12
**Plaintiffs** [2] - 1:5, 2:2
**plaintiffs'** [1] - 37:4
**played** [1] - 74:10
**PLC** [1] - 2:12
**point** [18] - 17:15, 21:25, 24:3, 29:2, 30:9, 33:6, 42:7, 53:15, 53:19, 55:22, 58:20, 59:24, 62:21, 65:18, 73:22, 74:3, 83:13, 84:14
**Police** [1] - 8:21
**police** [4] - 15:12, 16:5, 16:24, 19:2
**policies** [4] - 17:4, 17:10, 17:12, 17:16
**policy** [6] - 17:7, 19:6, 19:7, 19:16, 75:17
**Polk** [1] - 8:19
**popped** [1] - 77:4
**porch** [5] - 57:2, 60:10, 75:6
**portable** [1] - 18:16
**portion** [3] - 25:7, 47:21, 67:23
**Portion** [1] - 74:10
**portions** [1] - 60:20
**posed** [1] - 44:3
**position** [9] - 6:24, 7:1, 7:2, 7:6, 11:12,

11:19, 12:5, 50:25, 55:22
**possessed** [1] - 31:10
**possession** [1] - 65:12
**possessory** [6] - 64:8, 64:11, 64:17, 64:19, 65:4, 65:15
**possibility** [1] - 11:13
**possible** [2] - 24:21, 89:1
**possibly** [4] - 28:8, 28:9, 40:21, 58:16
**potentially** [1] - 86:8
**practice** [6] - 14:21, 15:23, 15:25, 19:9, 25:13, 75:15
**pregnant** [1] - 40:25
**prepare** [1] - 33:23
**presence** [1] - 28:7
**present** [1] - 31:9
**preserve** [1] - 42:16
**pretty** [2] - 34:8, 87:5
**previously** [2] - 77:8, 92:15
**principal** [3] - 6:1, 30:6, 30:20
**private** [4] - 4:18, 16:8, 16:13, 17:23
**privilege** [2] - 50:5, 50:19
**privileged** [1] - 50:23
**probable** [12] - 34:11, 34:17, 41:13, 41:18, 41:25, 43:21, 44:9, 44:13, 44:16, 48:7, 48:13, 89:12
**probation/parole** [1] - 39:21
**problems** [1] - 10:20
**procedure** [1] - 88:21
**procedure-wise** [1] - 88:21
**proceedings** [1] - 94:8
**process** [5] - 29:14, 33:13, 33:19, 34:8, 38:20
**PROFESSIONAL** [1] - 94:20
**Professional** [3] - 1:15, 94:6, 94:7
**program** [2] - 8:15, 8:22
**property** [65] - 23:3, 24:18, 24:25, 30:9, 41:13, 41:16, 41:18, 41:21, 42:2, 42:6, 42:10, 42:12, 43:9, 44:22, 45:1, 45:3, 45:5, 45:9, 45:22,

45:25, 46:9, 46:11, 46:23, 48:4, 49:1, 51:22, 52:4, 52:20, 54:10, 54:11, 54:12, 54:17, 54:18, 54:20, 54:24, 57:5, 58:12, 58:13, 58:18, 61:5, 63:16, 63:20, 63:22, 64:4, 64:9, 65:17, 66:19, 67:4, 67:14, 68:1, 68:3, 73:14, 73:18, 75:23, 78:12, 79:16, 79:22, 79:25, 80:2, 80:13, 87:22, 89:23, 91:5, 91:16
**proprietary** [1] - 24:14
**prosecuted** [2] - 26:3, 35:22
**prosecuting** [2] - 5:25, 62:9
**prosecution** [1] - 36:11
**prosecutor** [4] - 28:22, 36:8, 86:17, 88:19
**protect** [1] - 35:5
**protected** [2] - 50:6, 51:25
**protecting** [1] - 50:5
**protections** [1] - 35:5
**provide** [8] - 8:9, 8:13, 23:22, 41:22, 42:7, 43:20, 44:8, 76:24
**provided** [9] - 25:8, 31:14, 31:22, 43:25, 63:24, 66:18, 67:14, 76:7, 77:2
**providing** [2] - 30:20, 30:23
**public** [7] - 4:16, 4:20, 5:1, 5:7, 13:24, 22:23, 75:14
**Public** [2] - 1:15, 94:6
**PUBLIC** [1] - 94:20
**publicly** [2] - 13:24, 22:15
**pull** [5] - 22:11, 45:5, 45:7, 52:19, 74:8
**pulled** [1] - 22:15
**purple** [1] - 74:20
**purpose** [1] - 71:9
**pursuing** [1] - 35:2
**put** [7] - 6:23, 7:15, 8:1, 22:22, 34:7, 36:12, 77:9
**putting** [1] - 68:14

## Q

**qualify** [4] - 18:23,

19:1, 19:3, 19:4
**questions** [5] - 10:2, 29:15, 50:14, 51:17, 81:2
**quickly** [2] - 84:21, 85:14
**quite** [1] - 10:14
**quote** [2] - 21:16, 24:8
**quoted** [2] - 21:7, 21:14
**quotes** [3] - 20:14, 21:2, 21:20

## R

**R.P.R** [1] - 1:25
**radio** [1] - 18:11
**raised** [2] - 29:20, 30:7
**rapid** [1] - 34:8
**rare** [1] - 14:22
**rarity** [1] - 15:24
**re** [2] - 47:19, 48:21
**re-ask** [1] - 48:21
**re-read** [1] - 47:19
**read** [10] - 13:19, 20:11, 20:12, 21:5, 46:14, 47:19, 47:22, 67:17, 67:24, 77:4
**reading** [3] - 21:13, 28:10, 70:14
**reality** [1] - 43:5
**realize** [1] - 73:22
**realized** [1] - 53:15
**really** [4] - 33:12, 67:6, 71:12, 73:23
**reason** [8] - 20:15, 29:4, 70:19, 71:5, 71:6, 71:18, 74:6, 82:24
**reasonable** [3] - 43:21, 44:8, 44:17
**received** [1] - 27:9
**receiving** [1] - 30:16
**recently** [1] - 87:10
**recognize** [2] - 73:18, 74:22
**recollection** [4] - 30:5, 36:10, 68:22, 75:4
**recommended** [1] - 6:23
**record** [7] - 28:2, 47:22, 67:22, 67:23, 76:7, 79:13, 93:18
**recorded** [3] - 25:11, 25:12, 38:24
**recording** [11] - 17:5, 25:10, 25:17, 25:19, 25:21, 25:24, 40:1, 40:5, 56:15, 68:21,

69:4
**recordings** [1] - 35:16
**records** [1] - 32:16
**REDIRECT** [1] - 90:2
**reduced** [1] - 94:9
**reference** [1] - 79:15
**referencing** [1] - 40:6
**referred** [1] - 77:1
**referring** [1] - 88:12
**regardless** [1] - 44:17
**regimented** [1] - 8:14
**register** [1] - 63:10
**Registered** [3] - 1:14, 94:6, 94:7
**REGISTERED** [1] - 94:20
**regular** [3] - 69:6, 69:15, 75:15
**related** [1] - 94:13
**relating** [1] - 13:25
**relation** [1] - 54:23
**relationship** [6] - 37:19, 71:1, 72:22, 73:3, 77:11
**relative** [1] - 94:14
**relatively** [1] - 33:19
**relayed** [7] - 28:1, 28:4, 34:10, 91:21, 91:24, 92:7, 92:13
**relevance** [1] - 82:13
**relevant** [1] - 64:20
**reliability** [2] - 44:1, 44:8
**reluctant** [1] - 13:16
**rely** [3] - 16:5, 47:7, 47:9
**remember** [1] - 71:16
**removal** [1] - 92:17
**report** [15] - 28:13, 28:17, 28:24, 30:3, 31:21, 58:7, 83:1, 86:7, 86:19, 86:20, 86:24, 87:4, 87:12, 87:16
**Reported** [1] - 1:25
**reported** [1] - 31:20
**reporter** [4] - 20:23, 21:21, 76:5, 76:21
**REPORTER** [1] - 94:20
**Reporter** [3] - 1:15, 94:6, 94:7
**reporting** [6] - 28:12, 28:21, 28:25, 61:18, 82:15, 87:1
**reports** [2] - 62:6, 87:11
**represented** [1] - 25:21
**representing** [2] -

14:13, 52:14
**request** [3] - 22:20, 54:6, 80:21
**requested** [2] - 47:21, 79:24
**Requested** [1] - 67:23
**requesting** [1] - 29:13
**require** [1] - 78:23
**required** [1] - 91:6
**requirement** [4] - 19:12, 30:2, 42:2, 91:8
**requirements** [2] - 19:8, 79:6
**reside** [2] - 78:25, 79:2
**resided** [2] - 64:1, 66:4
**residence** [22] - 19:20, 23:11, 28:14, 29:7, 30:12, 32:7, 35:12, 56:23, 57:18, 57:21, 59:1, 66:8, 68:16, 70:2, 70:25, 73:19, 74:1, 74:3, 84:13, 84:17, 87:15
**residences** [1] - 78:14
**residing** [1] - 78:10
**respond** [1] - 62:2
**responded** [1] - 62:2
**Responds** [1] - 21:1
**response** [3] - 49:19, 55:10, 62:10
**responsibilities** [1] - 12:10
**responsible** [1] - 89:4
**responsive** [3] - 54:6, 55:15, 88:16
**rest** [1] - 91:11
**retained** [1] - 71:23
**returning** [1] - 88:6
**review** [4] - 17:10, 21:2, 46:18, 94:11
**reviewed** [2] - 20:10, 84:21
**reviewing** [1] - 21:14
**Richmond** [2] - 49:13, 52:3
**rights** [1] - 19:10
**Rippey** [2] - 72:20, 73:14
**role** [1] - 9:22
**room** [9] - 59:1, 59:4, 59:6, 59:7, 59:8, 59:10, 59:11, 59:12, 59:13
**rubric** [1] - 8:7
**rules** [2] - 35:1, 35:3
**run** [2] - 11:10, 11:18
**running** [5] - 11:16,

18:8, 37:3, 54:16, 89:5
**rusty** [2] - 28:23, 85:20
**RV** [4] - 57:5, 78:16, 78:21, 83:25
**RYAN** [1] - 2:16
**ryan.sheahan@ag. iowa.gov** [1] - 2:19

## S

**Safe** [2] - 82:18, 91:19
**safe** [1] - 29:13
**sanitarian** [1] - 91:9
**Sanskrit** [1] - 5:3
**sat** [3] - 59:4, 59:8, 59:10
**saw** [3] - 20:5, 47:5, 84:10
**scene** [12] - 9:21, 14:19, 80:19, 81:12, 83:3, 83:4, 83:14, 83:16, 83:17, 87:20, 88:4, 88:6
**school** [11] - 4:14, 4:17, 4:18, 4:20, 5:1, 5:7, 5:14, 5:16, 5:21, 6:3, 7:24
**Schroeder** [2] - 7:5, 7:8
**science** [1] - 5:4
**Seaba** [30] - 19:20, 23:15, 29:18, 35:12, 37:23, 45:10, 45:24, 46:4, 46:9, 46:12, 46:23, 46:25, 47:1, 52:25, 53:9, 54:8, 55:9, 55:13, 56:10, 56:19, 59:4, 60:12, 78:5, 79:23, 80:9, 83:23, 85:5, 89:21
**SEABA** [2] - 1:3, 1:4
**Seaba's** [1] - 57:18
**Seabas** [2] - 35:15, 35:16
**seal** [1] - 94:17
**search** [54] - 9:3, 9:18, 10:1, 10:10, 10:17, 14:16, 15:15, 15:16, 15:21, 15:22, 23:2, 24:14, 30:8, 33:1, 33:6, 33:10, 33:12, 41:13, 41:18, 42:1, 42:10, 42:11, 43:3, 43:8, 44:10, 44:18, 44:24, 47:10, 48:4, 52:4, 63:16, 64:4, 64:7, 64:12, 64:17, 65:16, 66:18, 67:11,

**App. 048**

67:14, 68:1, 69:6, 69:8, 69:10, 69:14, 70:3, 74:5, 75:23, 79:10, 79:16, 79:17, 88:18, 88:23, 89:13, 89:23
**searched** [3] - 44:22, 45:1, 79:10
**searches** [3] - 9:2, 10:10, 14:17
**seat** [2] - 82:10, 82:12
**second** [5] - 21:1, 46:2, 74:9, 74:12, 74:19
**seconds** [2] - 78:1, 84:23
**secret** [3] - 29:22, 30:1, 62:19
**section** [1] - 20:25
**Security** [2] - 62:20, 62:25
**see** [6] - 38:17, 38:21, 41:21, 42:6, 74:12, 85:9
**seeing** [1] - 46:20
**send** [2] - 33:4, 33:8
**sense** [4] - 24:10, 70:17, 73:12, 90:17
**sent** [2] - 76:11, 76:17
**separate** [3] - 26:8, 79:7, 91:13
**septic** [1] - 91:12
**served** [1] - 72:7
**service** [1] - 5:18
**set** [1] - 94:16
**seven** [1] - 36:4
**several** [1] - 26:9
**sex** [1] - 22:5
**shared** [3] - 7:6, 12:5, 12:7
**SHEAHAN** [5] - 2:16, 81:4, 89:25, 93:16, 93:24
**Sheahan** [1] - 3:4
**shed** [3] - 73:25, 84:4
**sheriff** [3] - 50:1, 51:5, 51:16
**Sheriff** [1] - 49:13
**sheriff's** [3] - 16:6, 16:25, 19:1
**shields** [1] - 35:5
**shift** [1] - 88:14
**shirt** [1] - 74:20
**short** [2] - 33:21, 33:22
**shorthand** [3] - 94:8, 94:9, 94:10
**show** [1] - 32:16
**showed** [2] - 70:21, 70:24

**sic** [1] - 87:25
**side** [3] - 45:20, 57:5, 76:15
**sided** [1] - 71:1
**significance** [1] - 34:20
**significant** [1] - 55:25
**similar** [3] - 4:23, 17:18, 18:6
**simple** [1] - 43:5
**single** [2] - 27:2, 71:1
**single-sided** [1] - 71:1
**Sioux** [1] - 6:7
**sit** [3] - 24:20, 66:9, 73:17
**sitting** [2] - 37:1, 82:12
**situation** [5] - 10:8, 10:21, 71:21, 88:3, 93:4
**six** [1] - 15:5
**six-month** [1] - 15:5
**skipping** [1] - 74:19
**sleeping** [1] - 78:19
**small** [2] - 8:24, 86:7
**Social** [2] - 62:20, 62:24
**someone** [4] - 26:3, 57:12, 62:11, 74:4
**someplace** [1] - 33:12
**something's** [1] - 86:10
**sometime** [1] - 25:5
**somewhere** [5] - 37:14, 53:5, 64:7, 68:2, 69:10
**son** [1] - 73:2
**sort** [2] - 79:4, 86:8
**sounded** [1] - 28:12
**sounds** [3] - 31:13, 38:8, 76:19
**south** [1] - 57:5
**southeast** [1] - 57:6
**SOUTHERN** [1] - 1:1
**southernmost** [1] - 59:6
**southwest** [1] - 58:25
**span** [1] - 15:5
**speaking** [1] - 33:3
**specific** [9] - 7:16, 11:5, 16:12, 20:18, 21:17, 25:24, 55:1, 87:5
**specifically** [13] - 5:19, 8:6, 19:22, 20:9, 21:24, 64:1, 64:22, 65:13, 66:7, 78:20, 82:7, 85:18, 88:10
**specificity** [1] - 41:10

**specifics** [2] - 10:15, 88:20
**split** [2] - 14:23, 44:5
**spoken** [1] - 39:23
**spray** [1] - 18:1
**square** [1] - 42:17
**squarely** [1] - 87:16
**stage** [1] - 26:7
**stand** [3] - 32:17, 43:12, 43:17
**stand-alone** [2] - 43:12, 43:17
**standard** [5] - 10:16, 44:13, 48:9, 48:11, 48:12
**standardized** [3] - 8:20, 8:21, 28:25
**standing** [1] - 10:5
**standpoint** [1] - 22:22
**starkly** [1] - 29:19
**start** [9] - 4:8, 23:10, 24:23, 25:23, 25:25, 32:25, 48:23, 61:12, 89:16
**started** [3] - 6:15, 11:20, 72:5
**State** [1] - 2:17
**state** [10] - 16:7, 28:3, 36:1, 36:6, 72:23, 86:3, 88:19, 92:17, 92:18, 93:9
**statement** [5] - 25:23, 25:25, 54:5, 55:14, 90:11
**statements** [3] - 23:3, 23:24, 24:3
**STATES** [1] - 1:1
**statewide** [1] - 19:6
**station** [2] - 29:13, 82:18
**statute** [2] - 31:7, 31:12
**stayed** [2] - 6:14, 6:15
**staying** [1] - 35:25
**step** [1] - 27:20
**steps** [2] - 6:22, 57:2
**still** [5] - 14:15, 41:24, 42:23, 50:23, 53:22
**stoop** [1] - 37:2
**stopped** [1] - 26:7
**strange** [1] - 61:16
**street** [3] - 53:2, 53:5, 74:16
**Street** [1] - 2:17
**structure** [3] - 78:1, 78:21, 79:3
**structures** [3] - 77:23, 78:12, 85:3
**stuff** [2] - 5:5, 58:5
**subdued** [1] - 58:2

**submitted** [1] - 94:11
**submitting** [1] - 89:6
**subside** [1] - 58:5
**substance** [1] - 28:6
**substances** [2] - 81:25, 82:5
**substantial** [1] - 27:22
**substantive** [1] - 77:16
**sued** [2] - 13:7, 13:12
**sufficient** [3] - 43:20, 44:1, 44:7
**suggest** [1] - 32:3
**suggesting** [4] - 49:25, 50:3, 52:2, 52:6
**suing** [1] - 14:1
**Sunset** [1] - 2:12
**supervising** [2] - 7:14, 9:23
**supervision** [1] - 94:9
**supervisor** [1] - 12:18
**supervisors** [1] - 50:13
**Supervisors** [4] - 12:13, 52:9, 52:12, 52:13
**supporting** [1] - 28:18
**suppose** [1] - 23:21
**supposed** [2] - 17:4, 55:18
**suppression** [1] - 8:5
**suppression-type** [1] - 8:5
**surrender** [1] - 29:15
**survey** [1] - 79:18
**suspicion** [4] - 43:21, 44:8, 44:17, 77:12
**swapped** [1] - 26:19
**swear** [1] - 33:3
**sweep** [1] - 79:21
**switched** [1] - 33:5
**switching** [1] - 6:17
**sworn** [1] - 4:3
**system** [4] - 22:23, 28:25, 87:1, 91:12

## T

**T-shirt** [1] - 74:20
**table** [5] - 59:2, 59:3, 59:4, 59:12
**tears** [1] - 37:5
**technically** [1] - 7:4
**ten** [10] - 15:7, 37:13, 37:14, 58:14, 58:17, 63:18, 79:22, 80:2, 80:5, 85:15
**tenant** [1] - 43:3
**tenant's** [2] - 43:1,

43:9
**term** [5] - 6:13, 6:16, 67:20, 79:10, 85:24
**terms** [15] - 17:4, 17:17, 18:21, 23:2, 24:7, 34:4, 46:10, 82:6, 83:20, 85:1, 85:2, 86:5, 86:18, 87:14, 88:22
**testified** [1] - 4:3
**testify** [1] - 88:9
**testimony** [1] - 66:2
**Text** [1] - 3:8
**text** [3] - 76:9, 76:11, 76:17
**THE** [3] - 1:13, 77:19, 93:14
**thinking** [2] - 16:19, 24:16
**Third** [1] - 6:6
**third** [2] - 5:10, 21:8
**thirdhand** [1] - 28:1
**threatening** [1] - 84:25
**three** [2] - 7:21, 38:5
**throughout** [1] - 36:6
**throw** [1] - 87:12
**throw-away** [1] - 87:12
**thrown** [1] - 85:24
**thrust** [1] - 90:11
**Tim** [15] - 29:18, 37:23, 39:14, 39:17, 45:24, 46:12, 46:24, 47:1, 52:25, 53:16, 53:23, 54:2, 55:24, 56:1, 56:3
**Tim's** [3] - 45:1, 45:2, 45:3
**timeliness** [1] - 80:8
**timing** [1] - 79:20
**TIMOTHY** [1] - 1:3
**tip** [3] - 43:19, 43:24, 43:25
**tired** [1] - 58:2
**today** [3] - 66:9, 73:17, 85:24
**together** [2] - 8:25, 34:7
**tone** [1] - 54:21
**took** [8] - 6:25, 7:1, 7:2, 14:7, 70:8, 76:17, 79:22, 94:8
**top** [1] - 21:8
**Torres** [2] - 88:13, 88:15
**tossed** [1] - 7:13
**total** [2] - 7:9, 84:22
**towns** [1] - 36:1
**tractor** [2] - 53:3, 53:4

**App. 049**

**traditional** [2] - 4:16, 5:3
**trained** [2] - 7:11, 19:17
**training** [6] - 7:22, 8:4, 8:10, 8:13, 8:14, 8:22
**transcendental** [1] - 4:22
**transcript** [1] - 94:10
**transitioned** [1] - 6:16
**tried** [2] - 64:13, 84:8
**truck** [2] - 74:12, 74:13
**trump** [1] - 66:20
**trumped** [1] - 66:24
**try** [2] - 16:15, 65:2
**trying** [11] - 24:10, 26:5, 28:13, 34:24, 35:7, 47:8, 48:2, 50:24, 54:7, 68:14, 71:21
**turn** [1] - 59:2
**twelfth** [1] - 5:11
**twenty** [1] - 86:13
**twenty-four** [1] - 86:13
**twice** [1] - 27:5
**two** [6] - 42:14, 58:15, 58:16, 72:23, 85:25, 89:21
**two-minute** [1] - 58:15
**type** [6] - 7:20, 8:5, 34:2, 34:3, 38:25, 45:15
**types** [1] - 38:24
**typewriting** [1] - 94:9
**typical** [2] - 19:25, 89:15
**typically** [1] - 20:4

### U

**Ulin** [2] - 72:20, 72:25
**ultimately** [1] - 84:3
**uncomfortable** [1] - 88:11
**uncommon** [2] - 15:3, 15:10
**unconfirmed** [1] - 82:3
**under** [6] - 7:7, 20:25, 27:3, 31:23, 82:4, 94:9
**undersigned** [1] - 94:6
**understood** [2] - 41:4, 79:15
**unfortunate** [1] - 71:22
**unimportant** [2] -

64:11, 64:16
**UNITED** [1] - 1:1
**unregistered** [3] - 63:6, 63:9, 63:12
**unrelated** [1] - 13:17
**unreported** [1] - 62:24
**untrue** [3] - 23:5, 23:12, 24:11
**unusual** [1] - 61:11
**up** [31] - 4:11, 5:23, 6:17, 6:24, 11:17, 14:9, 14:10, 15:12, 22:11, 22:15, 40:4, 40:12, 45:5, 45:7, 51:2, 52:19, 53:8, 56:24, 57:2, 60:7, 65:23, 70:9, 70:22, 70:24, 72:6, 72:14, 73:11, 74:8, 84:3, 84:10, 88:14
**updates** [2] - 8:22, 8:23
**Updegraff** [1] - 2:12
**upset** [1] - 61:17
**utilization** [1] - 17:12
**utilized** [2] - 28:6, 89:11
**utilizing** [2] - 28:14, 36:2

### V

**vacillating** [1] - 5:25
**valid** [1] - 67:14
**valuable** [1] - 25:17
**various** [6] - 29:13, 36:1, 36:5, 56:19, 60:21, 64:17
**vehicle** [2] - 74:15, 74:16
**verify** [1] - 49:9
**versus** [3] - 10:5, 69:9, 74:3
**vest** [1] - 17:19
**viability** [1] - 43:20
**video** [6] - 60:13, 60:14, 60:22, 74:10, 77:25, 78:1
**violation** [1] - 75:17
**violations** [2] - 13:7, 13:13
**visible** [2] - 84:19, 87:9
**visit** [1] - 89:20
**visitation** [3] - 92:11, 92:22, 92:25
**vs** [1] - 1:6

### W

**waistband** [1] - 20:2
**wait** [1] - 76:12
**walk** [2] - 58:24, 58:25
**Walnut** [1] - 2:17
**warrant** [20] - 9:3, 9:18, 10:10, 10:17, 14:16, 15:15, 30:9, 33:2, 33:10, 33:24, 34:7, 34:11, 34:17, 44:10, 53:10, 54:3, 55:11, 88:18, 88:24, 89:13
**warrants** [3] - 32:19, 32:21, 33:6
**Washington** [12] - 6:25, 7:7, 7:9, 9:17, 11:2, 29:9, 29:11, 35:21, 36:6, 72:24, 82:17, 91:25
**waste** [1] - 70:10
**wasting** [1] - 70:9
**watched** [2] - 60:14, 60:15
**ways** [1] - 19:13
**weapon** [2] - 18:21, 19:21
**wear** [6] - 15:16, 18:7, 75:13, 75:20, 75:21
**website** [2] - 45:8, 45:12
**weighed** [1] - 11:13
**weird** [2] - 26:22, 71:21
**welfare** [2] - 30:20, 42:16
**well-being** [1] - 48:5
**whatnot** [1] - 88:15
**WHEREOF** [1] - 94:16
**White** [6] - 3:9, 39:18, 39:23, 40:15, 40:22, 76:23
**white** [3] - 31:5, 47:24, 74:15
**White's** [1] - 40:11
**whole** [5] - 21:5, 21:19, 61:10, 70:8, 90:20
**windows** [3] - 84:8, 84:9
**wise** [1] - 88:21
**WITNESS** [3] - 77:19, 93:14, 94:16
**witness** [1] - 4:2
**witnesses** [3] - 16:15, 16:17, 16:22
**woman** [1] - 74:20
**Wonder** [1] - 2:7
**wondering** [2] - 9:14,

21:17
**wood** [1] - 57:2
**word** [2] - 46:4, 59:22
**words** [3] - 60:1, 68:24, 77:9
**worker** [8] - 69:14, 86:9, 87:18, 88:6, 88:23, 89:7, 89:10, 89:15
**workers** [1] - 86:6
**works** [2] - 38:20, 38:23
**worthy** [1] - 87:2
**wound** [1] - 31:16
**wounded** [1] - 31:15
**write** [1] - 17:7
**written** [1] - 17:16
**Wyoming** [1] - 93:11

### Y

**Yates** [2] - 6:21, 6:23
**yearly** [1] - 8:23
**years** [4] - 8:1, 85:16, 86:3, 86:15
**yelling** [1] - 84:14
**yes-or-no** [1] - 67:17
**yourself** [3] - 12:25, 36:23, 75:24

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF IOWA

CENTRAL DIVISION

GAIL OSBORN,                )
TIM MCCONNELL SEABA,        )
and GORDON SEABA,           )
                            )Case No.
          Plaintiffs,       )4:25-cv-00183
                            )
vs.                         )DEPOSITION OF
                            )
CHAUNCEY MOULDING,          )KELSEY KOENIG
KELSEY KOENIG, and          )
JEFFERSON COUNTY, IOWA,     )
                            )
          Defendants.       )
_____)

THE DEPOSITION OF KELSEY KOENIG,

taken before Gale Sweeney Christensen,

Certified Shorthand Reporter, Registered

Professional Reporter, and Notary Public of

the State of Iowa, commencing at 2:37 p.m.,

April 21, 2026, at 2910 Grand Avenue,

Des Moines, Iowa.

Reported by:  Gale Sweeney Christensen,
              CSR, RPR

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

A P P E A R A N C E S

Plaintiffs by: GINA MESSAMER
               Attorney at Law
               Parrish Kruidenier, LLP
               2910 Grand Avenue
               Des Moines, Iowa 50312
               gmessamer@parrishlaw.com

               and

               ED HARVEY
               Attorney at Law
               1600 Wonder Way
               Fairfield, Iowa 52556
               edwardgharvey98@yahoo.com

Defendant Kelsey Koenig
by:            RYAN SHEAHAN
               Assistant Attorney General
               Second Floor
               Hoover State Office Building
               1305 East Walnut Street
               Des Moines, Iowa 50319
               ryan.sheahan@ag.iowa.gov

Chauncey Moulding and Jefferson County, Iowa
by:            BRENT HINDERS
               JONATHAN LEWIS
               Attorneys at Law
               Hinders Updegraff & Franklin,
               P.L.C.
               1104 Sunset Drive
               Norwalk, Iowa 50211
               brent@hinderslaw.com
               jlewis@hinderslaw.com

Also present:  Timothy McConnell-Seaba
               Gail Osborn

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

3

INDEX OF EXAMINATION

Examination by          Page
Ms. Messamer            4
Mr. Hinders             115
Mr. Sheahan             118

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

4

KELSEY KOENIG,

called as a witness, having been first duly

sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MESSAMER:

Q.   Hi there.  I'm Gina.

A.   Thank you.

Q.   One question we've had, I feel like
everybody has been bouncing around, is how do
you pronounce your last name?

A.   Koenig.

Q.   Okay.  And you still work for DHS right
now?

A.   Yes.

Q.   But you are not in Jefferson County
anymore; is that right?

A.   Right.

Q.   Where are you now?

A.   Des Moines County.

Q.   How come you made that move?

A.   It's closer to where I live.

Q.   When did you switch offices?

A.   Good question.  It was all -- I think
the end of February, the last week of
February.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 051**

5

Q. How long were you in Jefferson?

A. Until then -- I think I started in 2022, in September.

Q. When you started in Jefferson, was Chauncey Moulding already the county attorney?

A. I don't know. So for -- it took me a while to get to know all of that. I think I recall, because I think I had my first court case, he hadn't been -- or he had just started being the county attorney because I think I had met the other one who has become Judge; right, who was the Judge -- sorry -- and everywhere, all those counties, Washington, Jefferson on the way out. So I think it was sometime within my first six months of the department.

Q. What counties did you cover when you were down in Jefferson?

A. Van Buren, Jefferson and Washington, and I primarily covered Washington County.

Q. How many DHS or HHS caseworkers or people that were in your position were there for those three counties?

A. Three.

6

Q. And you each kind of had your main county you were assigned?

A. That's how we did it there, yes.

Q. And you said your main one was Washington?

A. Yes.

Q. So how did you end up with this Jefferson case?

A. Well, that morning that I was assigned the case, it was because I knew -- well, one of my coworkers was out for medical for something with their family. And then my other coworker was unable to take the case because she was having difficulties putting something in the computer and was just tied up for the day, so they asked me to take it.

Q. Okay. And let's just start at the beginning of how like the whole process works with DHS. So how did this even come to your attention?

A. How did this case come to my attention?

Q. Yes.

A. So I was actually out on another call that morning, because it was a Friday, and Fridays with the department are always pretty

7

hectic. And so I was already out, and I was close to Brighton, on that highway between Washington and Brighton, because I specifically remember getting the call and having to pull over. It was my supervisor and asked me to take another case and said can you please help out.

And I said, well, I am close -- I think I'm close to there. You never really know until you look at the MapQuest, I guess. But I'm like I'm almost to Brighton, so, yeah, I could head out there and take the case, if needed.

I mean, I really didn't have a choice. I couldn't be like, no, thank you, you know. I had to take it. But, yes, I did say I was out there, because he also requested that I go out on it right away.

Q. So did he give you any material about this, or like what information did you have then, when you were driving that way?

A. So then you get -- so what we would do is get an email with an incident number on the assessment, and then you can pull it up there. So then I stopped, and I -- so from

8

your phone -- I don't have it on right now -- but the screen is pretty small. So you can -- you look. And I stop, and I can see the assessment and allegation.

And sometimes -- I'm not sure if this case in particular -- but like when you're on call, they'll send a PDF document to your email so that you can see it as well.

Q. So you said the assessment. What is the assessment? Like what's that look like? What's the format?

A. The child abuse assessment. It comes with the allegation, the household comps, the address. I'm not, I guess, sure of the question. That looks like you have it in front of you, so that's what it would --

MS. MESSAMER: And, Brent, what number did you have --

(An off-the-record discussion was held.)

BY MS. MESSAMER:

Q. We'll just use this one, because it's already been used, but it's the same as what I have here. So I'll pass you number Exhibit 13. So this is what you're saying --

9

could you maybe just tell me in this document like what the initial parts of this that you get are.

A. I believe the full document. I mean, I have access to the full --

Q. Well, most of this was filled out by you after --

A. Oh, after -- I'm like, well, I mean, but blank. I'm not sure what you are -- so it will come with the address, the household composition and the -- like the household composition -- that's there (indicating) -- and then the allegation, which is there (indicating).

Q. Where is the allegation? Sorry. Like where is the allegation that you would have -- that would have been in here that you initially got?

A. It's in here. It's page 2.

Q. Oh, just this check box of the dangerous substances?

A. It says concerns reported.

Q. Oh, concerns reported. Okay.

A. Uh-huh.

Q. Was there any more substantive

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

10

information that you got besides that?

A. Yes. So when I can -- I don't know -- so we have a system -- well, you mean like right away, so I don't want to jump ahead.

Q. Before we get --

A. So right away I get this allegation. My supervisor calls me. He always reviews the past history of the department, too, before he calls us almost every time so that he's aware. Like he will look up the past history, and then he will call. And he called me that day because I was out.

Now, if you're in the office, I can look up things differently as well when I get an assessment. But for this, while I was out -- is that what you're asking me? This is what I would have seen, the allegation or whatever my supervisor provided to me at the time.

Q. Okay.

A. But there is additional information, yes, that comes with it that I can see too besides that.

Q. Tell me -- I want to know just what you knew before you went to Gail's house that

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

11

morning. So that's what I want to just limit this part of our conversation to.

A. Okay. That morning, when I get assigned the assessment, I think I looked up the mom's name, looked up the -- so I can search her name in the Jarvis. And I just vaguely looked at past history so that I could see.

Before I went out to the home, I could see that there was a baby born positive with meth history in the past. I could see that there was an allegation of Mom falsely reporting that her child had epilepsy, and I could see that the -- there was an extensive history. So regarding my allegation I could see that there was past history of meth use and another child that was born positive with methamphetamine.

Q. Did you have any more information about this particular complaint that had come in?

A. My supervisor had let me know that I needed to go on it now because he had the information. Like I think he had reviewed all -- like he was sitting at his computer, so when he gets something, he checks the past history. And so all that I had was that my

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

12

supervisor was telling me that I needed to go now, not to wait and to go right now to go assure safety.

Q. And who writes or puts together this assessment that gets sent to you?

A. The -- the intake unit.

Q. Tell me about that.

A. The -- so the intake unit is where all the calls come for -- that get distributed throughout the State. It's the call center, like the number you call if you Googled it, like Google child abuse hotline for Iowa. So that's our intake unit. So they take all the calls, either accept or reject it, whatever falls under the guidelines, and they distribute to the appropriate county.

Q. Do you get to like hear the original -- is it a voicemail that they were leaving, or is it they are actually talking to the person on the phone?

A. They are talking to an intake worker.

Q. And in this case, my understanding is, it was an anonymous complaint; is that right?

A. This case, yes.

Q. How do you know if it's anonymous or

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

13

not?

A. We had access to all reporters. And in this case I didn't have access, so I can't state for certain, because sometimes an anonymous reporter comes in. It still comes with phone number, but their name will remain anonymous. But typically, we always have access to the reporter. It's just confidential.

Q. So in this case are you able to see a phone number or a name of the original --

A. That's what I stated. I don't recall. Sometimes you can, if it says anonymous. I don't recall what that states or what this case -- if it had a phone number or not.

Q. How would you find that out?

A. Well, I can't right now because that's locked for me to view due to this. So, I mean, I just have to -- I don't know. I don't know how to find that out right now. Normally, I can just access it and reopen it. But as of right now, for this case in particular, I can't reopen the case.

Q. And why is that?

A. Because it's locked right now because of

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

14

this case, I believe.

Q. Does that mean just you can't open it?

A. No. It's just -- no, I think everybody. I don't know who has access, just the main people, I would say, higher up.

Q. But if you were able to get in there, you think there would be a name and a phone number possibly?

A. I don't know. I don't know.

Q. But that is normal, that even if it comes in as anonymous, that there would still be a phone number?

A. Yes, it's not not normal.

Q. Well, when -- well, did you have any contact then with anybody besides your supervisor before you went out to Gail's house?

A. I don't recall.

Q. Have you ever had interactions with Gail before?

A. No.

Q. Did you know her from Adam?

A. No.

Q. And did you know Tim McConnell-Seaba, her partner?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

15

A. No.

Q. Did you ever know anybody that lived out at that property?

A. No.

Q. Let's just walk through then what happens when you get there. What do you remember? Like who is the first person you talk to when you get out to the property?

A. I pull up. It was further out than I remembered, so I end up kind of in the middle of nowhere. And I pull down along the driveway, and I end up talking to an elderly gentleman, which was Gordon Seaba, which was very friendly.

And I asked him if Gail and Tim had lived there, and he said that they did and that this was -- I asked if this was his home, and he said they lived in the back house on the property. I don't remember exactly what he said, but there was a house in the back of the property. And I think I even started to kind of walk to look to the right, and I didn't see anything, and he said, no, you have to drive around the back to see there, where they resided.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

16

Q. Where was he at when you were talking to him?

A. On the front porch of his home.

Q. What's the next thing that happens then after this initial conversation?

A. So then Gail had come up like pretty quickly in the driveway and like was very upset immediately. She knew immediately that I was DHS. I was in my own van. She started saying she knew I was DHS, and the conversation got started. And I slowly started talking to her about what I was doing out there because she was very escalated.

Q. In your job do you train on deescalation?

A. I would say not particularly, no. I mean, I don't know what you're asking, like did -- like a training on deescalation?

Q. Yes.

A. I haven't attended a specific training on deescalation.

Q. Okay. So what's the next thing that happens in your conversation?

A. Well, she did deescalate after talking to me eventually. And what is your next

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

17

question? Sorry. What are you wanting to know?

Q. What is the next part of the conversation?

A. We talked about the allegations. I believe she like was frustrated, and she like lifted up her shirt and like showed me that she was not pregnant. And then she asked me if she looked like she was on drugs, and I said I don't -- I mean, at the moment I don't have any behavioral indicators that you are under the influence, no, but, you know, I have to check this out. So she seemed to be okay.

I believe that she had made a comment about having some children with her recently or there was a car seat in her backseat, and she like had shown me the car seat. And at this point I was confused by the age, and I had to call my supervisor to verify because I think the age and the car seat didn't match. And I was confused at that point. Like we had an allegation of a certain age, but the car seat wouldn't necessarily match the age of the allegation.

18

Then at that point Gail told me that I could come back to see her -- the spot that she lived.

Q. Let me stop you there for a second. Did you say like you called your supervisor right then?

A. I think it was right after Gail told me we could go back, so I called him on the way back there. So that would have been -- I can't -- I'll have to take that piece back, because I don't remember if I went and sat in my van while Gail waited to let me go back because it was like a very strange like encounter.

Like I sat in the van potentially to call to verify age and get back out to talk to Gail, is a possibility, but then I also had to call him again on the way back. So I talked to him at least three to four times throughout this visit, which isn't typical.

Q. And kind of explain what the age confusion was or what you ended up sorting out.

A. He had let me know what the actual age

19

of the allegation was. And I stated, okay, the car seat like wouldn't match. Like it was for an older child and not -- like that was not a car seat that would match. I think -- I don't want to misspeak, but I believe it was a two-month-old.

Q. What kind of car seat was it, like a booster type like for an older kid?

A. With the back (indicating), yeah, in the car.

Q. Okay. So generally speaking, next thing you do is go back to Gail's property?

A. Yes. Then Gail goes back, and I'm explaining to him like what was stated, letting him know I verified that and I was going back to her home in the back, that I had let him know even in the initial phone call that I felt uneasy being out there by myself at that time. And he stated to go back and view her home.

So I had clarified everything that they had said at that point with him, and then he advised to continue to go back and see the home. So I'm like, okay, well, I'm going back with her now. So I let him know

20

that I was headed back because I felt the need to let someone know that I'm going back on this property, that I don't know where I'm going and I don't feel good about it.

But he's still like you must go, and I'm like okay. So I went. So I went with Gail back to the home that she and Tim stayed at, that Gordon stated that they were staying on his property at in the back.

Q. And just to go back a little bit, you mentioned Gail pulled her shirt up and showed you her stomach?

A. Yes.

Q. Anything on her stomach that looked like she just had a baby?

A. I couldn't state that. I mean, I'm not -- everybody looks different, and every body is different, so that wouldn't tell me anything. I've seen all sorts of body types have a baby and appear not to have a baby, so that's not for me to say either way.

Q. What was her body type like?

A. I mean, she's like thin, thinner, but, I mean, she had a little bit of a belly. So, I mean, I'm not -- I don't know how to answer

21

that necessarily. I'm not trying to sound -- I don't want to really -- her body type is thinner, but like she did have a belly, I do believe. I mean, she has had children in the past as well.

Q. And then you said you didn't see any indication she was on meth. Have you been trained on indicators for people that are --

A. Behavioral indicators, yes. I didn't notice any that day that she was actively on meth. Like I -- or on -- I didn't have any behavioral indicators that day that she had just used.

Q. What are the behavioral indicators of meth?

A. It's like movement, your pupils. I guess, mostly that, just how you're moving and talking and communicating. But, I mean, I stated that, but there were -- I did have concerns about the way she was communicating. It was -- like I said, there wasn't behavioral indicator of meth.

But the way she was communicating to me was the reason that I felt uneasy. And that's more of my gut instinct like than

22

anything that I can state. A lot of the things weren't -- just weren't making sense, and I was just trying to kind of sort it out at that point.

Q. When you first got there and talked to Gordon on his front porch, did you ask him if Gail had a baby?

A. No. Well, I mean, I didn't know that -- at that point if Gail was going to be frustrated, or I didn't know, you know, if I could just talk to Gail. At that point I didn't know what I didn't know. Like I could have easily went and found Gail, and, you know, it could have been an easier conversation, I think, but that's kind of how it went.

Q. All right. So you drive back to Gail's house. What then happens?

A. Well, at that point she shows me -- it's just like a little bedroom with a shower. I think I'm in there. There was a gun above the bed. It was -- and I just kind of see it, and Gail is kind of telling me all these things that -- or just making me uneasy.

Like she was trying -- or stating

23

that there was -- somebody was like setting her up for DHS to -- because they were trying to take her children, I think is like what she had stated. But I was getting really confused as to how we got to that conversation.

And then she said she was getting like terminated parental rights. She had just gotten a letter and that she believed these people were the reason that I was there. And then she random -- I don't know. I kind of was just very -- she was trying to tell me -- she had given me a business card about what her business was. And I just was escalated of like my whole alarms were going off that I just needed to get out of the home. Like I can't explain that any further than that, but I knew I needed to leave and this is not for me to be out here by myself just by the way this conversation was going. I don't have an explicit like explanation for that besides my gut.

But Gail then went outside. So I got outside, and I felt a little bit more comfortable at the moment. I think Gail was

24

maybe chatting with me because then she started to -- or she was, but then she started to feed the pigs. And she had told me that this was Gordon's property, and as soon as he passes away, this will be her and Tim's property. And I was -- just remembered thinking that she just kept stating things to me that I wasn't asking, and it just felt very uncomfortable.

So I go, and I say, okay, Gail, give me a minute. I go into the van again. I call my supervisor again. I say I've seen the home, I've talked to Gail, I don't have, you know, anything at this moment like that I've seen that like I can do. I'm going to go.

And my supervisor said, no, you have to -- David Rippey, he said you have to go to the main house and you have to look in the main house. So I'm like I don't -- I didn't necessarily want to. I said I don't really want to do that. I remember him telling that, not by myself. I don't know who is in there, I don't know anything about it, and my gut it telling me to go away, like

25

to get out, you know, and I don't know why. And he said, nope, you have to go.

And okay. So I hang up the phone, and I go ask Gail like, okay, hey, my supervisor wants me to go see the main house. So I don't recall if we walked or if -- we had to have driven. We must have driven because it's like far or -- yeah, it's far like to walk.

So I'm like trying to think. I feel like we started, and then I think I changed my mind. But we started to walk because she started to walk. And I said, no, I'm going to drive, because it's pretty far, not just a little scoot like by foot. Like in case something were to be dangerous, like I needed to have my van. And I'm always hypervigilant, no matter where I am, so my van needs to be out where I can leave, if I need to.

So we get to the front, and I think I remember I did start to talk to Gordon, and Gail just continuously was just talking over him, like would not let me -- like she did not want me talk to Gordon. And I remember

26

being like, okay, I'm just -- I will not talk to Gordon. Let's see.

We'd walk through the house very quickly. Like she was frustrated at this point. She was mad at this point. It wasn't to the point like -- she was very frustrated. Like it wasn't to the point that I thought she was going to physically harm me at that time or anything like that, but she went back to being frustrated.

She walked me very quickly through the house, and I just remember kind of being in defense mode. I kept my eyes open. I didn't say anything. I got in the house. I got out of the house. I left.

I called my supervisor, listen, I got in the house, I don't see anything that's -- that has a baby or anything at this point here like that I can say. So then I leave. So my supervisor -- I don't think we talked about much more right in that moment. I think he's -- I'm just letting him know, too, I'm off the property so that he can be like move on, because I remember it was an extremely busy day, like back to back things

27

too. So then I left.

Q. Okay. Pause here for a second. Okay. You went up, and then you talked to Gordon again. Where did that conversation take place with Gordon the second time?

A. I think Gordon was on the porch still.

Q. Like in a rocker, or what's he have out there?

A. There is a chair out there. I don't know what the chair -- he was just sitting out there, so --

Q. And I understand that Gail was around, too, but what do you remember your conversation with Gordon was? What did he say? What did you say to him?

A. Well, I can't recall, because I think Gail might have started running around being like has anybody seen me with a baby? Like I think he was eccentric and like -- so even if like I would have had a chance to explain, she was kind of overtalking the whole situation. But I also wasn't going to escalate her. So I -- she was kind of yelling out, okay, no baby, everybody -- like let's get out of here, like you need to go.

28

And so then I'm like, okay, I'm going to go.

I know she had mentioned that point, when we were going to go in the house, that that was when she was stating that I needed to contact Alisha White because that was her best friend and that she -- that I was going to be in trouble and that Alisha White was going to get me in trouble. And so -- and that she -- that I should contact her. So that's -- I think also was stated before I entered the main home.

Q. So when Gail is saying does somebody see a baby around here or making statements about not seeing a baby, did Gordon agree there was no baby? Did you get any indication from Gordon about whether a baby was there?

A. I wouldn't say Gordon agreed or disagreed. I don't think anybody really understood why she was saying that. Like it wasn't stopped and explained, like, hey, there is a concern. It was like has anybody, you know, seen me with a baby and get me out of here as fast as possible. Like I said, I was kind of in defense mode at that point. I was nervous to go into the big house.

29

Q. Did you see anybody else inside of the house?

A. I recall -- I thought there might have been somebody sleeping in a bedroom, but I couldn't -- she wasn't letting me stop. Like I don't know who it was, but I thought -- and there was a bedroom off the kitchen that I think she had stopped and said like there was a person sleeping. I didn't see if it was a male or a female.

She wouldn't let me -- because she came out and led me right back through, but she yelled at that person do you see me having a baby. And she goes, see, no baby. And I'm like I didn't even hear what he -- what they said or he or she. I'm like I didn't hear them. I didn't see them, but the way she was rushing me through, I just went with her to get out. You know, like, again, if that's her -- if that's how we are going, like I didn't want to stay any longer than I had to, so --

Q. When you say she was rushing you, was she ahead of you, or was --

A. Right next to me, showing me what I

30

could look at. Like I only got through the downstairs. Like there was just like a room. It almost looked like construction-y. Like there was tools, I feel like. And then you go into the kitchen, and there is a side bedroom. And then I was like escorted like right out the front door. Like I got to go in around just that loop of the kitchen and right back out. So I just abided by her requests, and I left. So she let me in, and I got out.

Q. Did you ask to see the upstairs?

A. She told me before I went in this is all that I was seeing. She had let me know. And that's okay. I mean, that's okay, you know, for now. Like you can -- she's letting me see that, you know, at that point. Like, okay, because people are allowed to do that, like I said, at that point, until I -- later with staff with my supervisor.

But like I said, she didn't live there. She showed me the downstairs. She let me in. Well, Gordon let me in too, but that's what she said all I could see. So she told me that's all I was seeing, and if I

31

wanted to go talk to that person, I'm getting like rushed out like around the circle and right back out the door.

Q. Did you ask to see the upstairs?

A. I don't recall. I did -- yeah, I did ask to see the home in its entirety, and so that would include everything. So she had stated before I went in like this is what I was seeing and got me out. And she did not want me to speak with Gordon. That was obvious. Anything I even tried to say, like hi or any kind of small talk, was kind of interrupted and the Alisha White stuff. And then she was back to escalated, so I just went around the downstairs and left.

Q. Did she tell you you couldn't talk with Gordon?

A. I don't recall. That is a possibility, because of the way that I felt that I knew I wasn't able to communicate with this person, or it was just body language and the way she was speaking. I don't recall.

Q. And where were you when you were talking to Gordon? Were you up on the porch?

A. Yes, I believe we were on the porch

32

before we went into the home.

Q. Where were you, and where was Gail?

A. Gail would have been in front of me. And I don't -- Gail would have been like right in front of me, and Gordon would have been to the side of me, is what I recall, anyway, to my best recollection.

Q. So, you know, correct me if I'm wrong. But it sounds like you could have talked to Gordon some more but just that you were feeling uncomfortable and you were just trying to hustle out of there?

A. Nope, I was worried that I couldn't have talked to Gordon, even if I wanted to, because I was so interrupted. And Gail was -- her presence was so frustrated that, when I attempted to, I knew that she did not want me speaking to Gordon and that I just was not trying to frustrate her any further. And we went along into the home to walk through.

Q. Did you specifically ask Gail to talk to Gordon?

A. I don't recall.

Q. Did you ever ask Gail to like step away

33

so you could talk to Gordon?

A. I don't recall that either.

Q. Okay. So then you take off and let your supervisor know that you're leaving. What do you remember doing from there? Do you work on something else, or did you continue to work on this case?

A. No, I continued to work on this case, since I had to go back to the office in Washington, is where I went. I don't recall if I stopped -- because I think it's probably lunchtime at that time, if I'm remembering, because I kind of remember being on the phone, probably eating because I had called Detective Corning to kind of run it by him to see if he had any concerns because I thought it was Washington County.

So in Washington County, the City of Washington, there is an identified detective. So that's like a normal thing like on all cases. Like if there is a concern, we kind of staff it with a detective too.

So I contacted Jayse Horning because he would have been County. So I'm

34

thinking this is Washington County, because I'm thinking I just left Brighton. I think it maybe says Brighton. I think the address is Brighton, but they are actually Jefferson County.

So I contacted either Jayse or Alisha. I don't know if it's Alisha or Alisha, how to appropriately state her name, but I contacted one of the two first. I don't recall which one. But I remember kind of talking to Jayse in the car in particular. Like I must have been stopping to eat and parked the car, because I asked him if he had any information. He said he did and that Gail had been calling.

Like that's the first he'd ever heard of the fireman's boxes. I didn't know what that was until he had explained that to me. He said that was recent that she had been calling the station. It's not the fire station. It was the police station. It's just called a fireman's box, to my understanding, but that's like a safe kind of in -- this is what was explained to me by Jayse.

35

So I said, okay, well, thanks for like that information. That's -- you know, this is the concern that I have at the moment. But then I -- I don't know if I had like let him know or if he had asked me that we go back to property, because somehow in that conversation like he was concerned -- Alisha called him -- sorry.

I apologize. I want to make sure it's very accurate. I think I called Alisha and she didn't answer, because she had beeped in, and I had let Jayse go to talk to Alisha. And then -- do you want me to go from there, or do you have another question? I'm sure that was --

Q. And when you're saying Jayse?

A. Jayse Horning, yeah, Jayse.

Q. Could you spell it.

A. I think it's J-a-y-s-e. I think it's J-a-y-s-e, Horning, H-o-r-n-i-n-g, because I always spell it wrong. I always think it's a C.

Q. When did he say Gail had called in?

A. He said it was recent. That's all he said. He didn't give me like a date and time

36

or anything. He said that's because -- he said that's the way he knew her name, because he had never heard of a fireman's box before. So he was now concerned because of the concern that I have, and then that was, you know, something that she had called around at that point.

So then I think Alisha White had called me back, and I just like let him go to take that phone call. I had spoken to her. She provided -- she stated that she and Gail were not friends. She said she was someone who frequented the probation office.

She said the things that were stated in my report, that she had also asked that she did not want Gail to know that they were not friends because she did not want any negative interaction with Gail so that they -- she identified they weren't friends. She doesn't know why Gail is saying they weren't friends and she doesn't want that noted that Gail and her were not friends because she doesn't want any negative interactions with Gail.

Q. Like she didn't want to hurt Gail's

37

feelings?

A. That's just what she had stated.

Q. Do you remember that as a direct quote, like, no, I don't want negative interactions with Gail?

A. I don't recall her direct coat -- quote, but that she did not feel comfortable with Gail knowing that they are not friends.

Q. Did she tell you that she talked to Gail multiple times a week though?

A. I don't recall exactly what she had stated. I believe -- oh, I don't recall exactly what she stated, so --

Q. But she indicated to you that she did know Gail and spoke to her on a regular basis; is that correct?

A. Yes.

Q. What was your understanding of what her relationship was with Gail?

A. That Gail came in to talk to her all the time and that Alisha was -- didn't want to be rude or make her feel bad and let her come in to just talk to her at the probation office and that she came all the time. So I don't know why Gail would go to the probation

38

office. It wasn't really that significant to me in that moment.

Q. Was there anything significant about that conversation from your perspective?

A. Well, that Gail had stated they were best friends, her and Alisha, and Alisha is claiming that they were not best friends and she would come into -- I don't know why you would go into probation office several times a week to speak with someone.

Alisha was uncomfortable with it but wasn't going to state that because she didn't want Gail to, like I say, have anything negative towards her or have any sort of animosity in that manner. So I don't know why like someone would go to the probation office several times a week, if you weren't on probation, to talk to somebody. To me that was the only thing that was strange.

Q. Was there anything about your conversation that corroborated the anonymous complaint that Gail had a baby recently?

A. I don't know that there was anything that didn't necessary corroborate it. I

39

think Alisha White said that she didn't see her pregnant and, if she was, I think it was beyond her. And she saw her in several different things, but again, I'm not one to state what someone looks like or the months. You know, and at this point I still don't have like -- I'm still in my head a little bit flustered from going there and trying to gather everything.

I don't think that someone telling me that they are not friends with someone, they are kind of -- don't know why they are always in the probation office, talking to them, kind of giving me -- giving her vague details about her life that she doesn't -- like that's just not a typical situation, is what I say.

So just because someone tells me, well, I didn't necessarily note that she was pregnant doesn't necessarily mean that she noted that she was or wasn't. I mean, it doesn't tell me anything, I guess.

Q. Was there anything she told you that was additional evidence that Gail had a baby?

A. Like that Gail had a baby? No.

40

Q. The only evidence that she really had on the baby issue was that she said she had not noticed Gail looking pregnant, even though she had seen her in a lot of different outfits over on a frequent basis?

A. Right.

Q. So the only evidence on the baby issue would have been on the side that Gail did not have a baby; right?

A. I guess I don't know how -- can you reask me that question.

Q. Yeah. The only evidence or relevant thing she had to say about whether Gail had a baby or not was that she didn't see Gail pregnant and she saw Gail frequently in a lot of different outfits; right?

A. That would be the only thing that she stated about the pregnancy. And if -- if she was, it was like -- I think she made a statement like it was unclear to her or not obvious to her, something of that nature.

Q. And she also that said she had not seen any indications that Gail had been using methamphetamine; right?

A. I don't recall if that was how she

41

worded that.

Q. Well, what were your impression of what she had to say about if Gail was sober or not?

A. I don't recall. I don't recall her specifically stating that she noted that Gail had any behavioral indicators of methamphetamine.

Q. Sorry. Say that one more time.

A. I don't recall Alisha White specifically stating that Gail had any behavioral indicators during her visitation of methamphetamine.

Q. So you talked to her, and you talked to Detective Corning. What else are you doing that day? Are you still working on other cases, or are you just working this one?

A. Well, so I'm still working on this one. So then I called Detective Horning back. I let him know kind of what Alisha stated. And we all kind of have a professional relationship there. So like we all kind of understand. So I let him know what she stated, you know, either -- this is where we are at. He had stated, if there was anything

42

else and we needed to go back out, he would want to go back out to the home at that point.

So I told him everything that Alisha had stated to me at that point, and he said we would go back out if needed. So I staffed that with my supervisor then, David Rippey. And he says, okay, at that point this is where we are at. So I just let him kind of know where I'm at, this is who I've talked to at this point, because -- just to stay on the same page because I'm not -- this is kind of -- it's really a unique allegation that there is a child that doesn't exist, you know, or a child -- so it's a unique allegation that, of course, I have not had.

So I'm staying in contact with this -- with my supervisor more regularly than normal. So Detective Corning says we'll go back out. I think there was some point that he had either called me because he had looked up more information and said that this is not their case. This is -- they live in Jefferson County.

So I somewhere -- I still have not

43

gone to the office. I'm heading back to the Washington office. This is the only other place that I went, was the Washington office. So I'm heading back there at some point. I don't know where I ate, but I feel like I'm eating because I remember sitting in the parking lot in the car on these conversations.

So then at some point Elizabeth Este, if I'm saying it correctly -- I think I am -- Elizabeth Este had like communicated with me that she needed to either speak with me or -- I cannot recall if she called me or how we communicated. I think she might have called me, because I remember driving and seeing her call.

And then she tells me about Gail having communication with her office that I had been out there and that this was not a typical situation, that she had concerns by the way that Gail was communicating to her and that this wasn't typical about what she was stating about me being out at the house. I don't recall specifically what the concerns were, but that's also not typical for

44

Elizabeth to contact and state that she's concerned about someone or something, and that is not a typical situation. So I just made note of that, and then I kind of remained in contact.

At that point I think that Elizabeth -- I don't remember if I had to let her go or something, but I remember her having to call me back. I don't remember if she had to let me go, but then she called me back and then reiterated that Gail had either -- there was a second time that she communicated. I don't know if she's letting me know that she also contacted Chauncey. I don't recall. But there was like, I want to say, a couple different instances where Gail had contacted the County Attorney's Office that they found concerning and were just trying to verify what was going on.

And at that time I didn't know what was going to be Jefferson County. I'm still thinking it was Washington County, you know, like until -- I don't even know when -- whenever Jayse had communicated back to me that this is not Washington County. And that

45

was just sometime randomly in this time.

So I finally get back to the office. I feel like this was within a span of like three-ish hours probably. So I get back to the office. I start reviewing. So then I can get in, and I can review the details of past child abuse assessments. So then, because I can see it on my phone, but it's small, like I said.

So when I'm being told to go straight out there, that's really not typical if we have a lot going on, but he also -- my supervisor, David Rippey, will also send you right out like if he's concerned. Like go now like, and you're not going to be like, no, thank you. You know, I have to go. I have to do what I'm told.

So I go back up to the office. I review all of the information myself. Do you have any questions so far?

Q. Keep going.

A. Okay. So I get back to the office. I review all the information myself. I'm reviewing past history. Especially my focus would have been the methamphetamine and the

46

child born positive in that case. And so I reviewed that case.

There was a lot of history that three of Gail's children were removed, that in the one case in particular that Gail had not participated in services particularly, and she was supposed to safety plan her child to her sister that lived in a neighboring town. And when she went to go drop off to her sister, she kind of took off and took the child out to Gordon Seaba's property, and then law enforcement had to go out there to like locate the child when Gail was not supposed to have the child at that time. She knew like at that point.

So that's when I started getting concerned as the credibility, and I'm like -- this sounds pretty repetitive, and a lot of the things she was stating in that assessment sounded like a lot of the statements she was giving me. Like she wasn't up front with that worker either at first. So then I'm starting to be like I don't know. Like what don't I know.

So I'm sharing this with my

47

supervisor. This is just the process. So as I'm reading through, there was another allegation of Gail stating that her child had epilepsy. There was in that -- in that assessment there was a part where Gail had resided in her car with eight cats and her child. I don't recall which one, if this was the one that was removed out of Montana, I believe, but she was completely not well cared for. Her teeth were rotted.

And so there were a history, a long history, an elaborate history of concerns that if there were a child born, which then when you read my assessment there is additional information page. So that's the one that I don't think we have.

So that would be the page that -- I don't think we have it, unless you do. I would be surprised because they don't normally print -- that's what I'm like trying -- the additional information page is what the reporter says. So this is all directly -- since this is confidential, this is that sheet that I have access to on the computer. I don't think it's on these.

48

So that additional information page is very elaborate and explains like where this child's name, the date of birth, like that they were seen either with Gail or at the property, et cetera.

So I review all of that, and then I staff it with my supervisor. I tell him I've talked to Elizabeth today. I tell him, Jayse. I tell him the fireman box thing. I tell him all of the things at this point, and he says staff that with the county attorney.

So then I call -- I don't remember if I called Chauncey or if I called Elizabeth back, because I've been communicating with Elizabeth. But at this point I think either I talk to Elizabeth and she put me on speakerphone and I talked to her and Chauncey at the same time, and/or I had -- Chauncey had to call me back, or I called Chauncey and he had to call me right back. And I don't recall who was there, and I'm trying to be as honest as possible because there has been a lot of staff meetings with those two.

But for this case in particular, I just remember I talked to Elizabeth earlier,

49

but I don't necessarily remember talking to her the second time. I think I called Chauncey directly, or he had also called me because of the concern with Gail, too, that he had a follow-up question about her visit. So I wish I could tell you that a hundred percent, but I can't.

But when I get on the phone within Chauncey, I review everything. I review past history. I review my concerns. The county attorney is the only one that had access to the reporters as well. So the county attorney is the only one that can like disseminate that information to like law enforcement, just so you guys are aware, to make it clear, so -- but I don't know if the county attorney in a different county has access to. So like the things I described to you would have been Henry County, just to make that clear.

But -- so I provided Chauncey with all of the information, all of the concerns. I read him the entire additional information sheet per my supervisor. Like I -- per David Rippey, he told me to call Chauncey, which is

50

not typical -- or not not typical. That's a normal procedure in Jefferson County, like I said. So in Washington County you would contact the detective first, per se. And in Jefferson County they don't have like a detective, so you would contact the county attorney or Elizabeth first, is just kind of how it goes.

So I contact Chauncey. I tell him all the things. At this point I don't know. So this is like where my mind was truly. I don't know what he knows or what he -- or if he's not -- I don't ever know at this point if law enforcement tells you everything, too. Like I don't know.

So I'm just sitting here. Like he asked me -- he said we need to go back out there, let's go back out there. I did not want to go out there because I didn't want to be out there. And after reviewing that, there was also a piece in there that I read in particular.

I don't know that -- I believe I shared there was concerns with her being like an outburst or aggressive against the

51

department, but there was even a statement made in the past history that she had like tried to back into another worker's car. Like I just knew something was telling me not to go out there.

So Chauncey is like let's go out there. And I'm thinking nobody necessarily just goes out there because I'm providing concern. So I'm thinking that they have more or know something different that I don't. And that is truly where my head was at in that moment. I mean, I'm not saying the things I shared were not very concerning, but the county attorney says let's go back out there.

So I call my supervisor. I don't -- I wasn't like -- I know I wasn't like sure, like let's go out there, because I didn't want to go. It was like 3:00 on a Friday, if I'm being super honest. I've already been out there. I'm not like somebody who is going to go -- like I would love to -- I would love to miraculously know what the truth is. You know, like so this is where I was at, you know, at that time.

52

Like I'm not going to go be this helper, is what I'm thinking, you know, but if there was a child that was located, given the circumstance, if there had been a child hidden, you know, out there essentially to divert DHS in the past, then I have to be there because I'm the department who is going to have to be there if a child is located.

So I call my supervisor, David Rippey. I say I don't want to go out there. I said I have got the worst feeling ever. I do not want to go out there. I don't think this is -- like I don't know what it is, but I don't want to go. This is like word for word, because I won't forget it because I didn't want to go out there.

And it had nothing to do with like anything but my gut instinct. It had nothing to do with anything but that. So there is nothing really further about that, except for I just didn't want to go. So he says you have to go, you have to go, the county attorney is going, you have to go out there.

So I'm like, okay, well, let's go out. Again, it's probably 3:30 by this time.

53

I'm heading clear back out in the middle of nowhere, like I said, on a Friday afternoon. And I don't know anything further than thinking law enforcement isn't going to do this, unless there is something they know that I don't, you know, I guess. So then -- do you have any questions thus far, anything you need clarified?

Q. Yeah. So I guess you're kind of saying you assume they had more information because you thought, although the stuff you knew was concerning, you had already been out there and you saw nothing, so you didn't see another reason to go back and do the same thing?

A. I didn't necessarily -- no, that's not how I would state that. It was very concerning. And right then and there, the way it was -- I could just feel like this wasn't the right approach. Like we needed to either contact her or like just not to show up back out there.

No, it was very concerning after rereading all of that stuff. And it was concerning enough for a second home visit,

54

but we have twenty days as well, not to say that I don't want to rush back out there, you know, if there was something. But, again, I had just been there, so I knew that she already was escalated.

So there is a second home visit that gives time to like decompress -- or, you know, everybody to reevaluate or whatever. This just felt very rushed, and I didn't know. You know, I just didn't feel like that was the time that I would choose to go right back out there because there is -- our policy is typically a second home visit as well.

So I head out there -- oh, sorry. Are you ready?

Q. Okay. And you said that Chauncey Moulding would have access to this additional information page, like you did, that would have the name and number of the anonymous?

A. No, I said he has access to the reporter. I don't know if he has access to the additional information page, but he would have access to who the reporter is. So I don't know if he gets to see -- I don't see what they see, but I know he would know like

55

on the -- but for his county, so that this would be. But I'm stating like the other ones necessarily like that were from other counties. I don't know. Maybe they do. I just don't know. So, yes, he would have access to who our reporter is and the assessment.

Q. Any reason why you didn't call the anonymous complainant?

A. I don't know what you're asking, why I didn't call --

Q. Well, as I understand it, you would have had the phone number of the person who called in the complaint; correct?

A. I didn't -- I didn't clarify that I had the phone number. I said sometimes in the assessments they can be anonymous and have a phone number, and I stated that I didn't know if this one did or not.

Q. And you have no memory of looking into that or trying to contact a person or, I guess, seeing there wasn't the number?

A. Well, I guess I have to clarify for you I don't know what's confidential or not at this point for me to share that. So I did --

56

I think there is additional information that I did make some additional contacts in my assessment before going out there that I did speak with other people who either Gail had mentioned she thought was reporting this. Do I not have that in my assessment?

Q. You have that you called Sarah Rosonke.

A. And I think that, if my memory serves me, that Gail was stating that that was the person who she thought called this in. So I contacted, just as a collateral contact, to see any statement that she had to make.

Q. Did that Sarah woman tell you that she thought Gail had a baby, a new baby?

A. I don't recall what she exactly stated, but I'm sorry. I'm getting off topic with you because now I'm confused with what we are talking about.

Q. I'm asking about when you called this Sarah Rosonke, who Gail, I think, had mentioned had guardianship of her other daughter. Did Sarah tell you that she thought Gail had a new baby that was on meth?

A. Am I able to look at this contact because --

57

Q. Yes, yes, in --

A. Well, from my memory, Sarah, I thought, had stated -- it would have been -- sorry. It's earlier on.

MR. SHEAHAN: I see some entries on page 6, to speed this up.

A. Yeah. Sorry. Okay. So that's just -- okay. So that was just a contact that she had stated. So, no, she did not state anything at that time. I feel like -- oh, I apologize. So I am mixing up the statement of Sarah and Michelle, but that would have been -- so Michelle is who I was thinking and not Sarah.

I spoke with Michelle. She didn't have any knowledge about having a baby. And she said if she felt comfortable saying if she did -- if I had any knowledge about another baby, it would be extremely concerning. And then she stated that she wouldn't put it past Gail to make up a lie that she had another baby. And Michelle stated I have no doubt that she would harm the baby. So I believe that was a concerning phone call to me.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

58

Q. And then, going up to the top of that page 6, the 2:26 p.m. phone contact that you had with the Sarah woman, you don't say anything in the report that Sarah said Gail had a baby that was on meth. So --

A. Well, I don't just like call people and let them know that there is like allegations. You know, I don't call everybody and be like, hey, there is this concern. I think that that was to verify Gail had said she had been with her children recently, and so I think that they had not. And so I was a little bit more concerned kind of with this car seat. I was still trying to figure it out, I think, at that point. So Gail had stated she had been around her children recently.

Q. And then Gail had also suggested to you that she suspected that this false meth baby complaint was made by the person who was seeking to terminate her rights on her other child? Do you recall that?

A. Yes.

Q. And who was that person that was seeking to terminate her rights?

A. That's what I don't recall. I know she

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

59

was telling me about that at the home, like I said, but I don't recall which -- what her name was.

Q. Okay. So on page 5 of your report, about a third of the way down, you noted that Gail stated that Sarah Rosonke has stolen her other children and was trying to keep them and showed you a court order providing Gail with a date of termination of parental rights hearing.

So then my question, with that background, so when you talked to Sarah Rosonke later that afternoon, did you ask her about the termination of parental rights?

A. I don't recall. I don't recall what was stated in that conversation.

Q. And so am I correct that you never contacted the person who made the anonymous complaint?

A. I don't know --

MR. SHEAHAN: Object, asked and answered.

But go ahead.

A. Again, I don't know what you mean by contacting a person who made an anonymous

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

60

complaint. It's an anonymous person. I stated I don't know if there is a phone number, so who was I contacting?

Q. Well, that's my question to you. Like, I assume, if you're doing an investigation like this and you have a number associated with the complaint that came in, you would call that number?

A. I keep stating that I don't know that there was a phone number. I stated that it's not untypical that there could be a phone number, and in this case I don't recall. So, no, there is -- if there was a phone number, I would have contacted it for this case, is what I would state.

Q. That's kind of what my inference would be, too. If there were a phone number, you would have called them?

A. Right.

Q. And there is nothing in my report indicating that you called the anonymous complaint person. So did you not call them? Is that a fair chain of inferences to make?

A. This person is anonymous, so, yes, there was, again, still unknown who the person who

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

61

made the report is. The only person who would have the information would be our intake, like I said, and I am not able to get that or access those phone calls.

Q. But back then, if there had been a number there, you would have called it?

A. Yes.

Q. So the fact that you didn't call anybody indicates to us that there was no number associated with this; is that fair?

MR. SHEAHAN: Just object, misstates the testimony.

But if you can answer.

A. Yes.

Q. And I think you said you had never had a complaint like this about like a hidden baby or something like that?

A. Well, it's not -- I don't know if hidden is the right word, but like a baby that essentially didn't exist, yeah. If Gail is stating she didn't give birth, that was the confusing like thing. There is a name. There is a date of birth, and there is -- so, no, I haven't had another case where there is a name and date of birth and I am unable to

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

62

locate a child.

Q. And allegations in this case were that Gail had this baby and like didn't have it at a hospital and didn't report it to anybody; is that right?

A. Right.

Q. Have you ever had a call like that before?

A. There are -- I personally don't recall having that be my case. I have been involved with cases like that, where I've been a provider prior to this and there had been a mother who has had children in their bathtub at home or on their bed or et cetera and then get their child removed, you know, because they are positive with methamphetamine.

So, yes, I have been associated with cases of that, and that happens quite often, especially with parents who have previously removed children.

Q. If you have a case where you have some concern, you got to do your check and check on the kid but the parents won't show you the kid or let you in the house, what do you do next?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

63

A. I staff it with my supervisor, and then I do whatever he is stating to do next. So then we normally will staff it with a county attorney, either him or I or both, for next steps.

Q. And assuming the parent -- you know, maybe you contacted them, or law enforcement contacts. Then the parent is still refusing to allow law enforcement or you in the home. What do you do at that point, if you can't get consent to come check out the kid in the house?

A. And then the county attorney would advise, typically, and then we could put in and write an affidavit for an Order to Compel.

Q. Tell me about that process. How does that work?

A. I am actually -- I've never had to do one. But you write one, write an affidavit and submit it to the county attorney. And then it's, I believe, submitted to the Judge, and then it's either approved or not proved by the Judge.

Q. And what's the Order to Compel? What is

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

64

compel?

A. As I stated, I've never had one before. So it would be to provide the child -- to provide the child to the department so that we could view them for safety.

Q. When you went out to Gail's house in the morning, did you talk to Tim McConnell-Seaba, who is Gail's partner?

A. I -- Gail called Tim on speakerphone, and Gail talked to Tim. I did forget that part when we were going through the questions. And it was like right before I got in the car, take -- to call my supervisor. But Gail had done the majority of the talking. Like I don't feel like I had a good conversation of like, Tim, these are the allegations, this is what happened and that's what I have to do, like this is what I'm concerned about.

Gail kind of orchestrated that phone call as well, like, hey, they are here, they are trying to say I had a baby. And it was just kind of like a quick like phone call between Gail and Tim. He was on speaker, so I was present, but it wasn't a very long

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

65

conversation at all. Like I was not given time to be like, hey, Tim, this Kelsey, like this is the allegation. It was a very quick kind of unusual phone call.

Q. In your report you noted: Gail called Tim, and CPW Koenig read the allegations via speakerphone.

A. Oh, did I say that? Okay. Well, I apologize I didn't recall that. But it wasn't like -- I didn't get to talk to Tim. I must have stated the allegations then, and Gail and Tim were like talking to each other. Like I remember standing there -- I apologize. I'm trying to go off memory, and so I'm not trying to misspeak.

But I remember calling Tim kind of standing far away from me. I stated -- she was stating what was going on. I must have stated the allegation, just so he was aware, but I didn't get to like, I feel like, have a good conversation with Tim.

Q. But you did note that Tim denied all of the allegations; correct?

A. Yes.

Q. And he specifically denied that she had

66

a baby?

A. Yes.

Q. And he specifically denied that she had been using methamphetamine too; right?

A. I don't recall, but if I wrote that, then yes. But then, when I went back to the office, like I said, and discovered the -- this is like a historically -- they denied in the past assessments as well in the same manner that they did with me. So historically their credibility to me, when I went back and read this, is almost the exact same conversation I had with the previous CPW with their prior child.

So, typically, like, yes, like I said, that's what they stated. But then, when I went back and reviewed, this is a -- it appears to be like to me kind of a history repeat of conversations, like we are denying, but there was actually concern, so I didn't know. At that point, when I got back to the office, that's when I staffed with all of the appropriate people.

Q. And in terms of this report, with all of the detail in it that you wrote, like when

67

did you fill this out? Did you fill this out as you went that day?

A. Some of it probably I put -- like I put notes to the side. I always had like a side kind of Word document. I keep notes in there. I'm like kind of all over the place with that. I keep -- like I have my notes and my Word document, and then sometimes I fill it out in the contact.

But with this report I could not tell you how. I don't have like a particular way. I'm sure I sat there and was probably typing in while I was talking that day. And then you fill in, you know, as you go at times, but I cannot testify to my exact process of how I did this exact report.

Q. And so you have a Word document open. Like how are your files organized? Is this like all in some --

A. No.

Q. -- shared location that everybody in HHS has access to --

A. No.

Q. -- or is this on your personal computer?

A. I don't have a personal computer at

68

work. Like it would be in my file that's private for our -- like it's just a Word document of notes.

Q. And you have one for like each case you're working on, or how do you organize it?

A. Sometimes. Like I said, I don't have a particular way. Like I did that then because I was out a lot more, but if I can be at the office, it depends on when you're busy or not. When I'm at the office, I'm writing into the contact as soon as I can, so I try to keep up with it the best I can. Sometimes it's messy, so you put it in the Word document, if I'm sloppy with my periods and punctuation. So that would be that reason, if I'm rushing.

Q. So who, I guess, ultimately made the decision to go back out to Gail's house a second time?

A. It was Chauncey, the county attorney. I did not want to go back out there.

Q. And I understand you told your supervisor you didn't want to go. Did you tell Chauncey you did not want to go?

A. I didn't state that to him. I just said

69

he said we're going back out, like we need to go back out there and I just said like okay. I didn't argue with the county attorney, again, as I'm advised as to I have to do whatever -- from my supervisor, David Rippey, at the time, what I knew to be true. Again, I think I was a year and a half in to the department at that time. And so I have to do what the county attorney told me to do.

So I said, okay, I mean, I -- I guess I'm going. But I wasn't like, okay, I agree or any kind of conversation like that. I said okay. He kind of let me go quickly, and then I called Dave. And I'm like I don't want to go, and he said you have to go. So that's kind of where we are at.

Q. How many cases do you think you had with Chauncey Moulding by this point?

A. Not -- I worked in Washington County, so I think this is truly one of maybe three or four. I really had to -- I have not had several. I may have staffed several because, I know, in my first six months, I kind of -- I worked at the office for six months, just so you guys are aware of what I mean by that.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

70

So then I know I was in Fairfield at that time. So I think I maybe had a couple more then that I'm just not really remembering now like that's bunched in. But so I think a handful of times is what I would say.

I work with Jen Lerner like, I would say, lots and lots of times. So like versus her, I'd say he is like a handful that I've ever worked with him and Jen Lerner, who I work with like all the time. So I'm used to her, and she's my regular go-to county attorney that I worked with at that time -- like at that time in life, is what I was saying, is Jen Lerner. And Jen Lerner --

MR. SHEAHAN: Let her ask questions.

THE WITNESS: I'm sorry. You threw me off. I apologize.

BY MS. MESSAMER:

Q. Had Chauncey Moulding ever gone out to the house with you before?

A. Yes, he had. And I just thought that was the process, you know. That was when I was newer, and I contact, kind of like I described. So my understanding, like the

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

71

detectives in Washington went out with you, and then, if you were in Fairfield, Chauncey went out with you. And I didn't know anything else. Like, you know, this is my -- that was my impression of what happened, like how it worked.

Q. And you said in Washington who went out with you?

A. The detectives. So it would have been the City detective or the County detective.

Q. And Jen Lerner is the county attorney in Washington?

A. Yes. She has never -- well, she's the assistant county attorney. I apologize. That's who I deal with. I don't think I've ever hardly spoken to the actual county attorney in Washington. Lerner takes care of everything, but she's only assistant. I apologize. So the real, the actual county attorney, I think I've only talked to maybe twice in Washington over all the cases that I've had.

Q. Did Jen Lerner go to people's houses with you?

A. No.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

72

Q. And then tell me again the counties that you're in right now.

A. Now?

Q. Yeah.

A. Now I'm in Des Moines County.

Q. Only Des Moines?

A. Yeah. That's bigger, so it's only one.

Q. And does any county attorney or assistant county attorney go out with you to homes in --

A. No.

Q. -- Des Moines County? All right. And just kind of describe to me, like on your other experiences with Chauncey where he would go to houses, what was the protocol? Like what was his role when you went out to homes besides Gail Osborn's?

A. I -- I would just follow his lead and that, whatever he -- like I said, when he was there, like I said, I was pretty -- yeah, I thought, so, whatever Chauncey Moulding -- like if he had to go, which I think was probably only with me one other time, it was a pretty significant case, though.

So it's like I do recall him kind

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

73

of being a leader, though, like I stated.  I remember I just had to follow his lead.  But I don't know how else to say that.  He was -- like I'm not allowed to argue.  Like that would be the person that I have to abide by, like I said.

Now, after working for a longer time like, you know, I kind of -- I understand everything a little bit more clearly.  But at that time, yeah, I just like followed what I needed to do by the county attorney, because you staff everything with the county attorney.

Q.  And when you said you kind of understand things more clearly now that you've had a little bit more experience, what do you mean by that?

A.  Well, I still would -- like I still don't know, if you're going to ask me this situation, I think, going back out to the home, I do think I'm more of like so state -- like I was scared that I would get in trouble at that time for any pushback, I do think, at this point.  I -- I'm very strong with pushback.  I know the policies more.  I know

74

what -- not necessarily the policies, but know that like, if this is my -- you know, if it's case, you know, as I'm -- like I'm going to like run my -- my own kind of case.

But, again, if law enforcement is like needing information or something like that, like I still cooperate with law enforcement.  But like I guess I would state it's not as intertwined per se.  Like it's my child abuse assessment is my child abuse assessment process, and, yes, we work together, law enforcement and I.  But then, yeah, that law enforcement is separate.  You know, law enforcement is separate, which I knew that.

But I still, no matter what, cannot tell a county attorney no if they are telling me to do something, and especially if my supervisor is also stating you have to do something.  So no matter what in that situation was I ever going to be able to be like, no, this is my -- like this is where I'm at.  I have to do that.

Q.  And as I understand it, the county

75

attorney isn't, though, like your boss in a sense though; right, because you're a State employee, and he's a County employee; correct?

A.  Right.

Q.  So what makes you say you couldn't tell the county attorney no?

A.  Because my supervisor stated you have to do what the county attorney directs you to do.  David Rippey said that, you have to do what the county attorney states to do.

Q.  And when you said that, are you talking about just this incident with Gail Osborn or generally speaking?

A.  He always has me staff everything with the county attorney.  That's normal -- like a normal process.  Not every single case, I would say.  There's -- but the majority, especially with a child abuse assessment.

Q.  And so take, for example, Washington County, where detectives would go out with you if you went to a home visit.  In those situations would you take the lead, or would it be the detective would takes the lead?

A.  I would more take the lead, I would say,

76

in those situations, and the detective just stands there and just in case there is a safety concern.  Sometimes they will ask questions, or they will have a huge history with these people.

We are from a very small area.  You know, Washington County is small, you know, like comparatively.  So they have a huge history and know these people.  And so it was always -- sometimes it was really helpful, and we could have that kind of relationship built.  I don't know why I went that direction, but that's true.  Like that's why they will -- they will either be helpful or -- in any way.  They are my safety, but they don't typically say anything typically, no.

Q.  And like in Des Moines County would that also be true, where you're taking lead and law enforcement there to back you up and be cooperative and helpful, if they can?

A.  Yes, and the -- I think the Des Moines county attorney is -- they -- they follow like the child abuse assessments.  But that's all gone through, like I said, the supervisor

77

a little bit more.  Like it's a bigger area too.  It's not such a small area, so then I don't call the county attorney myself there.  It would be my supervisor.

Q.  As you sit here today, if you had this to do over again, you would have been more assertive on speaking with Chauncey or to your supervisor about handling this differently?

A.  As I sit here today, I would have pushed back and stated that I was not willing to help out and take the case, if I'm being honest, because that's where it all starts in the first place, is that my coworker was busy, this was not my turn, so -- if I was being completely honest.

But secondly, I could not have -- no, I could not have said no to my supervisor, who I -- I -- I showed my frustration with communication because I didn't even want to go in the main house the first time.  And so -- and I do believe, like I said, in those situations now I -- I -- like I'm -- if I'm following my gut, so if I'm nervous and I'm not going in somewhere,

78

that's what I'm stating.  I think those are the only things I would change.

But in this situation, after reading what I read and the concerns that I had, I couldn't not provide any of that to my supervisor and to my county attorney.  I could not do that.  So then, when they tell me I have to go out, I can't say no.  And so that's where I would be at with that.  It's just that this was, I would say, a unique situation.

Q.  And in terms of the training that you get for HHS, do they train you on like people's Fourth Amendment rights and what you can and cannot do with searches or going in people's homes?

A.  I don't recall -- there is not a specific Fourth-Amendment-type training, no.

Q.  Are you taught that you can go into people's house for any reason, even if they don't consent?

A.  I got -- I gained consent.  So we would get consent from the homeowner.  So, yes, as long as you have consent by the homeowner, you are able to whatever the homeowner agrees

79

to.

Q.  I guess I'm kind of curious about the opposite and your understanding from your training.  If a homeowner doesn't give consent, are there any reasons where you can go in, even if they don't consent?

A.  If the homeowner or property owner didn't give consent -- sorry.  Like why would you go in?  Is that what you asked me?

Q.  Just like have you done any training on --

A.  No, there is no training on -- no, there is not a particular training on if a homeowner doesn't give consent to be on their property.  Is that what you're asking me?

Q.  Yeah.  Have you ever been told you can go in under certain circumstances, even if a homeowner doesn't give consent?

MR. SHEAHAN:  You're asking if she's been trained by that?

A.  Told by who?  I'm confused.

Q.  Yeah, yeah, in your, either your supervisor or official training --

A.  I haven't --

Q.  Let me finish so that she can -- when we

80

talk over, she can't get it.

A.  Go ahead.

Q.  Yeah.  My question is, have you ever been told at work any kind of training that you can go into somebody's house, even if they don't consent?

A.  No.  But, again, even with this situation, Gail had provided me that Tim -- or that Gordon Seaba was the homeowner.  My supervisor looked up also and verified that Gordon Seaba was the property owner, nobody else at that time that I was provided the information to.

Gordon himself told me he was the property owner, and Gail told me, when Gordon passed away, specifically that then her and Tim would get the property, which I didn't ask.  I didn't even think of it.  I was there to see Gail's back property and to go.  So like that wasn't even a priority in my mind.  And then the county attorney told me that this is Gordon Seaba's property, in which he's -- though any time I had interact with him, was fine with me being there or being present and said it was okay.  So --

81

Q. And as you understood the property ownership out there, did you think that Gordon could give you consent to search Gail and Tim's little house in the back?

A. I didn't go into Gail and Tim's little house in the back.

Q. I know. That's not my question.

A. Then what's the question? What's the relevance?

(The requested portion of the record was read by the court reporter.)

A. If I'm answering --

MR. SHEAHAN: I'm going to just object, probably calls for a legal conclusion, but --

A. If I was just answering as a person, I would just like --

Q. You are just a person.

A. Well, just with no like -- just being myself, like I would assume so, but I didn't out of -- I didn't feel a need to go in there, like I stated, so I didn't personally go in. But most -- and I don't -- if Gail would have led me. But Gail was standing

82

there like -- if Gail would have been standing there and been a little bit more calmed down, but she was like -- her and Chauncey just, from the second I got in the property, were like just -- I don't know how to -- that's not a -- but just at each other. So I wasn't even -- I didn't even want to -- can we -- can we -- I apologize. Can we sort of like -- are you going to ask me about like how we got there? Do you want me to just start telling you about that, like getting --

MR. SHEAHAN: Why don't you wait until she asks you a question.

THE WITNESS: Okay. Go ahead. Sorry.

MR. SHEAHAN: This will take you a lot longer, if you just keep going.

THE WITNESS: Sorry. Go ahead.

BY MS. MESSAMER:

Q. And you said you didn't personally see a reason to go back into Gail's home; correct?

A. I didn't in the moment, no. Gail was very clear like that she was upset and frustrated, and I just wanted to leave, like I said, the entire time.

83

Q. And when you went in Gail's house the first time, you mentioned there's -- is it just a bedroom and a shower? That's all the house is?

A. Yeah, if I recall, just a bed. Like a gun was over the bed, a long one. I don't know if it's like real gun or not -- I don't know -- and then a shower like in the corner.

Q. So there wasn't really any more area for you to search inside the house? You had already seen it the first time; correct?

A. Right, uh-huh.

Q. And for her --

A. Yes, yes. I'm sorry. Yes.

Q. So when you go back the second time, my understanding is that Chauncey is in his car ahead of you, you're in your white van, Chauncey pulls up first, and then you pull in behind him; is that correct?

A. That, I can't recall, because I remember like specifically not wanting to pull into the driveway for some reason. So I don't know if there was like some law enforcement in between us or if we are or if the video just shows me right behind them. Like I

84

don't know if they -- I truly don't recall that, but I just remember that I like slowly got there.

And like I didn't -- they were already like out of the car, like having some sort of dispute like when I finally decided to get out of my van, because I think that I just didn't want to get out of my van. So I mean, I remember just everything was slow, like how do I -- because I thought maybe they would have a conversation and we'd just go. You know, I really thought that at the moment.

Q. Let me stop you there. When you said they were outside, who was out there?

A. Gail and Chauncey, particular.

Q. Where were they when you first pulled up?

A. Outside like to the left of the driveway, like pull up the driveway. I feel like they were standing there to the left kind of like, I want to call it, bickering. I couldn't really hear what they were saying, but like it was kind of a verbal back and forth.

85

Q. Did you get out of the car while that was still going on?

A. I had to get out of the car at some point. I just -- I don't know if that was the exact time or when I decided, okay, I have to get out of the car. I don't remember being like made to get out of the car.

I also kind of -- I just don't know if anybody else walked up. I -- I couldn't remember -- I can't remember if Elizabeth Este walked up and then I got out to talk to her and then she walked back to her car or if I just finally got out to try to deescalate the situation to like calm -- calm everybody down so we could get a move on again, because like I just -- in my head the whole time the goal was to go.

So I -- I don't know if I got out at that time, but I remember I went back because they were still arguing. I went back to the vehicle, but I think I ended up getting in Chauncey's truck because it was close and I was getting scared. Like I got scared at one point for some reason.

Like I don't know if it's the

86

statements they were making. It -- I really -- I don't recall. But I just know I got -- I didn't want to be out in the open. Like I wanted to be in the vehicle. I thought they would have a conversation at that point and then that we would maybe go, is where my head was at.

Q. Do you recall, as you pulled up to the house, seeing Tim on his tractor like in the driveway?

A. I saw him on the tractor, yes.

Q. Any interaction with him?

A. Not that I recall like myself. I don't recall. It was very chaotic. When I pulled up to the scene, again, my thought earlier, like why are we going out. But there was two counties of law enforcement, a county attorney assistant and the county attorney. And I was like what is going on. Like that's what I thought, like why -- why are -- why is everybody here. I remember specifically thinking that.

And I remember like, well, maybe they -- like something is going on that I didn't know. I specifically remember

87

thinking that when I got there. I don't believe -- I called my supervisor again at that point. I don't recall talking to him until maybe after, but it was after 4:30. I don't know if he waited around or not. But I don't know if I called him to ask him again, like, okay, this is what's going on to let him know or -- I think I might have done a quick phone call, but I can't -- I can't state that.

I'm like, hey, I got two county law enforcements here, just so someone knows you're safe. You know what I mean? Like I always kind of let somebody know, because you never know what's going to happen, so --

Q. So when you first pulled up, did you see Chauncey talking to Tim at the bottom of the driveway on the tractor?

A. No, I don't recall that.

Q. Did Tim say anything or gesture anything towards you as you pulled up?

A. Tim and Gail had like a lot of hand gestures, but like I don't know what. Like they were just kind of -- it was a little bit bizarre like, so I don't know how to explain

88

that. They just were kind of like -- they were kind of like that throughout the whole thing, so I guess you would have to clarify what you mean. Like they waved their hands around to talk a lot, but I didn't have any interaction at the bottom of the driveway, if that's what you're asking me.

Q. Did you see Tim gesture anything at the bottom of the driveway when you were first pulling up?

A. No, I don't have any particular memory of that, no.

Q. Then, when you pulled up and you said that Gail and Chauncey were bickering in the driveway, did you see Gail gesturing at that point?

A. She, like I said, talked like with her hands. So I know a lot of times throughout there was a lot of -- like she would use the middle finger a lot but mostly not towards me, I think towards Chauncey. Like I didn't -- at that point I don't think -- is that what you're asking? Sorry. I don't know what you mean by gesturing. You'd have to clarify.

89

Q. Did she ever like point down the driveway, like go that way, anything like that, when you saw them bickering in the driveway?

A. I don't particularly recall that.

Q. So you see them bickering. And then, when you got out of the car, were they still in the driveway, or where had they gone from there?

A. Well, they -- that's where I'm -- I -- I can't recall when I got out of the car where they were standing. I remember getting out of the car, and they were still bickering, and I got back into the car. But I think it was not my car. I think I got into Chauncey's car, but I actually think he directed me to because I would have never just jumped in his truck. I think he said get in his truck like immediately.

Like so that's what happened, so that's why -- yes, because I'm like why are you doing this. And then nothing was said -- he had then gotten in the truck, and nothing was said. Like there was no -- he did get in the truck for a second, and I don't remember

90

anything being said at all in that moment.

But I know he got right back out of the truck and, I think, went up to talk to Gordon. I think he said he was going to go attempt to talk to Gordon. And so then I stayed back again because I didn't want to get out, because Gail was out there, and I wasn't sure at that point what the plan was going to be. So then I -- I don't recall at that moment.

Q. So you're sitting in his truck right in front of Gordon's main house; correct?

A. Yes.

Q. And when Chauncey got up to go and talk to Gordon, where was Gail at that point?

A. Gail was kind of all over the place. So that's hard to say. Gail was truly like in the front and the side and the -- down the driveway. So I can't say at that moment where Gail was.

Q. Did you ever see Gail with a dog?

A. I don't -- well, I don't recall a dog, if I did.

Q. Did you see Chauncey go up to, then, Gordon's door?

91

A. Yes.

Q. And you don't remember where Gail was at that point?

A. No.

Q. Well, tell me then about what you saw next.

A. I think Chauncey had -- he was up, knocking on the door. All I know is that I think I -- I looked -- I got -- I don't know how he ended up at the house, so I can't state that. Like I did see Gordon at some point. I believe I can't state when. It was such chaos, but I know he got out and went up to the house. That's what I know for sure. So I was in the truck still. He got out and went up to the house.

Q. Where is the first place you were seeing Gordon?

A. In the house.

Q. Did you go in the house, or you like saw this from a truck?

A. No. So I -- at some point there was another officer, I thought, also in the house. So when I went up to the house, I knocked on the door. And I yelled, and I

92

asked if I could come in. And then Gordon himself said yes, and then I went in.

And then I kind of just asked everybody, because they still -- I don't even know what the conversation was. But I just asked, hey, Gordon, these guys just want to look around the property, just looking for a baby that could potentially be on this property, would you mind if we had like ten minutes 10 minutes out and look.

I remember I was the one who stated that. I don't know if Chauncey had asked that right before I walked in, but I specifically stated that and asked if we could have ten minutes, because I wanted to like get out of here, like why are we still here. So I did that to rush everybody along.

Gordon was super friendly to me. Like even his mannerisms lightened up a little bit from the conversation with Chauncey to then the conversation with me. He was like go ahead. He said ten -- I think he even replied like ten minutes. I'm like, okay, let's go.

So then I didn't do anything. And

93

then I just followed Chauncey wherever he went so that we could leave.  Like, I mean, I don't know that I particularly -- like I didn't say let's go here or go here or anything.  I just essentially followed Chauncey to help try to get out and whatever.  And at the end I tried to re-explain I don't know why -- you know, why this is so escalated.  I don't know why everybody is so mad and then like got out.

Q.  Okay.  So as you see in your mind's eye, when you went up to Gordon's house and went inside, where was everybody?

A.  Just like right there in the front (indicating).  I just can't recall if there was an officer.  And I don't know any of the officers.  I apologize.  Like I said, I didn't know anybody's name or anything or what county or which one is which.  So I have no idea, but I'm almost certain like an officer was either standing right on the porch or like in the doorway or right there, and then Chauncey was next, and then Gordon was sitting at a table.

Q.  Was the door open when you went up

94

there?

A.  Yes, I still, like, believe I knocked and asked if I could go inside because I did not even, like, want to go in there.  So I made sure that it was okay to go in, but Gail was not there, that I recall, when I approached the house.

Q.  I'm sorry.  Where did you say Chauncey was when you got up to the door?

A.  Chauncey was inside.

Q.  And where was Gordon?  Was he standing out there or sitting down?

A.  Gordon was sitting at a table over to the right.

Q.  How long do you think you were in the house?

A.  Very quickly.  Like I just stated that, and then we got right to it.  Like I went right outside.

Q.  Do you have any memory of seeing Chauncey go in the house?

A.  I -- if I did, I would definitely state that.  I just don't -- I don't recall if I was distracted when he got out to go in the house.  I don't even know if that was his

95

plan.

I just remember there was so much going on that I just like looked back and wondered where everybody was at and why everybody was in a line down -- this is truly what I was thinking:  Like why is everybody down the driveway?  Why is Elizabeth out in the road?  I'm like what is going -- you know, should I -- I remember being like why are we -- why do I have to be here, like what's going -- I just kept thinking what is going on.  You know, I just remember that, like let's get out of here.

Maybe if I -- so if any way I can help -- like if I could stop Chauncey and Gail from arguing, I thought maybe that would help.  So then I thought, maybe if I can just talk to Gordon and he'll let me talk, because he's been friendly with me like every time I talk to him.  Like I said, he seems very nice.  He was nice to me, anyway, personally.  So he was fine, like fine.  So I wondered what was taking so long there anyway with Gordon.  He was like, sure, go ahead.  So I have no idea.

96

I just -- that's what I was doing.  So when he went in, that was at some point to where -- I don't know why I was told to get in the truck, you know, because I'm thinking something's happening.  And I remember trying -- like I said, all I was doing was soaking in what was happening around me at that point.  That's all I can recall.

Q.  How long do you think it was between when Chauncey went in the house and then when you went up to the house?

A.  I wouldn't know.  It was just one of those things where everything felt slow, and it wasn't slow, because like -- I like, oh, maybe I should be doing that.  Because I remember also thinking am I supposed to be -- do I look like I'm not -- am I supposed to be doing something.  You know what I mean?  Sorry, but it's true.

Like I remember being like do I need to be standing with him or can I stay back until they are done, is what I remember thinking, like can I just wait, like if there is no concern, we are just going to leave.  But then I kind of just -- nothing seemed

97

like there was an end is, what I was kind of -- like why is this -- why are we still having this conversation, like why are we still having -- why is this still escalated, let's go, you know, or let's ask, and if they say no, let's go, is kind of where I was at. If Gordon was going to be like, no, get off my property to me or say anything like that, then, yes, I still got everybody to go. You know, regardless my goal was to go.

Q. So do you think it was ten minutes Chauncey was in there before you came in?

A. No, I don't think ten minutes. I can't tell you in definitive minutes, but I wouldn't have sat in the truck for a full -- that's a long kind of time in that situation, so I just stayed a few minutes. Like I probably soaked it all in, looked around, and kind of wondered am I supposed to be there. You know, that's what I remember thinking.

Q. Do you remember seeing Gail go in the house after Chauncey went in?

A. I can't specifically remember when because, like I said, Gail was in the house, she was out of the house, she was down the

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

98

driveway, she was in the yard. I really -- she said she had a dog. I didn't see a dog, so I don't know what Gail was kind of doing.

I really didn't know if Gail -- and I didn't know why Gail was so -- like she seemed to know Chauncey personally. And I thought what did I -- what is going on. They seemed to like know each other. So that's how I was -- I got really confused immediately. That was straight out the gate.

I'm like so they clearly know each other, and they clearly have history, is exactly what I thought. And they clearly -- it's not positive, and I have no idea. You know, like I haven't been filled in on any of this at this point. I had no idea.

Q. At that initial time before you went in and talked to Gordon, did you have any interaction with Gail?

A. I don't recall. I don't recall like what it would be. I remember I thought there was one point where I like attempted to deescalate the conversation between her and Chauncey, but I couldn't tell you what was said or if I said anything. I just remember

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

99

something about that interaction and you go back to the car, that I'm like, okay, I'm just staying over here.

And I also remember at one point Chauncey -- well, because when I had to get in his truck, I think he even like touched my shoulder, like go that direction. And, you know, when you're kind of in survival mode, I remember being, okay -- I think I was actually trying to walk back to my van and not go that way. Like I remember him like specifically like doing that piece. And I remember like I think I was trying to go the opposite direction, if I'm honest. Like I was trying to go to my van.

Q. When you've gone out with Chauncey on home visits, has he carried a weapon?

A. I -- I can't -- I want to say yes. I want to -- but I -- like if I would say my vague memory, yes, that I've seen him have -- yes, because I remember that he did have a weapon, because that's why I was following him specifically, because I think -- I don't know if it's on like the holster.

I just remember thinking -- or that

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

100

was what I thought, anyway, is I'm walking with someone, if there was danger, that -- you know, because, like I said, my bells and whistles are going off, that I'm walking with someone that has a weapon, because I wasn't with law enforcement.

So somehow I knew that I was -- like that I was with someone who has a weapon, because that's just kind of important to DHS workers in general when there is like an escalated safety concern, not necessarily this specific. But I remember thinking I'm walking with someone that had a weapon.

Q. And you mentioned that, when you walked into the house to talk to Gordon and Chauncey was in there, that Gordon kind of visibly lightened up or -- could you explain more what you mean by that.

A. Like it looked like they were having a -- I don't know -- use my term -- they looked like they were having a pretty bounding conversation, is what I'll call it. And they -- as soon as I walked in, he just seemed to -- oh, like okay, sure, like you again, basically, you know, like go ahead,

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 075**

101

get out of here then.  Yeah, he didn't like say that, but you asked me to describe.

That's what I recall what that looked like, not get out of here in an angry way, but go look, and leave.  And I'm -- okay, let's do that, and everybody, let's do that.  And then I think I let everybody know Gordon said, okay, let's do this.  And then that's when then I just followed Chauncey, I believe.

Q.  And this conversation, did you hear them exchanging any words?

A.  No.  It was silent, I want to say, when I walked in.  Like everything was just kind of where they either had a break in their conversation or -- it didn't look -- I wouldn't say escalated, like they were fighting or that they were in sort of verbal like altercation.

But it just went from like you sitting there like that and then you seeing me and being like, okay, not like you're smiling or so excited to see me but like, oh, sure, go ahead, when I ask you a question, you know.  So that would be how I would

102

describe the interaction for when I walked up.  And I was so relieved because I remember thinking like, oh, great, let's just go, let's go see, make sure nobody is here and go home.

Q.  And then, after you're done with the interaction with Gail and Tim and Gordon -- well, let me ask this:  Did you talk to Gordon ever again before you left the property?

A.  I don't recall.  I don't think so.  I don't recall, though.  I don't remember.

Q.  All right.  So then, after you're done talking to Gail, Tim, or Gordon, like was there any conversation with law enforcement or Chauncey before you guys all left the property?

A.  Before we left the property?  I don't think so.  I think everybody just kind of -- I mean, again, I was super in survival mode.  So at that point I am just exasperated.  I'm like ready to get off the property.  So I remember everybody just kind of leaving.  I really don't have a definitive memory of how it ended.

103

Q.  And in your report you noted that at 5:30 you staffed a case with Chauncey and there was not enough evidence found to continue search.  What do you remember about that conversation and where it happened or how it happened?

A.  Chauncey must have, yeah, talked to me and said there must have been, like I would state, criminal, like I stated, that was, you know, early on in my writing.  But like so he had stated no criminal, like, charges or criminal -- I think something like that like in his wording.

So like he wouldn't have any -- I don't want to misstate, but like essentially the essence is that he doesn't have any further criminal concern there, I guess, was the intent behind it, would be what I meant.  My wording is probably poor.

Q.  Did you have any more contact with Chauncey about this case then before you closed it?

A.  I don't recall.

Q.  Do you remember having any conversations generally with Chauncey about this case

104

after?

A.  I don't have any like specific like memory, unless it's written in my assessment.  Is it in my assessment?  Like a statement, I mean?  Like I --

Q.  There is nothing further about --

A.  Like I said, I don't have a specific memory, because if he told me there, there was nothing further, like, okay, then what I would have done is talk with my supervisor and then close it.  You can't confirm.  We have no -- you know, close it would be -- so what we say is can't confirm, founded, non-founded, not confirm case.  You can close the case, would be the next, probably, conversation about that I would have with my supervisor, besides filling him in on the entirety of the situation in which I did not want to go to.  So there was a long conversation about that, but --

Q.  Just kind of skipping around here a little bit, but -- so Gail told you about this termination of parental rights.  Did you do anything to pull that case up and see what was happening there?

105

A. I did not. Again, this was just day one of getting a case. Just so you guys are aware, like we have twenty days to kind of get everything together. So this was also, like I stated, very rushed. Like we have twenty days to kind of process and gather and check things out. And this was all kind of done in a span of like four hours, if that makes sense -- or probably longer, but it felt like smashed, so --

Q. Is there any information that you had from your investigation in the morning that you would not have shared with Chauncey Moulding before you went back out to the house, or did you pretty much go through everything in your report?

A. I -- on the report that I got at the -- like when I went back to the office? Is that what you're asking me, when I get all of the additional --

Q. Let me ask a better question. Okay. So your report obviously goes through like everything you did. You talked to Detective Horning. You talked to Alisha White. You talked to this Sarah woman. Did you let

106

Chauncey know you talked to these people you talked to?

A. Like before I went back out?

Q. Yeah.

A. I recalled telling him -- I don't recall specifically like our conversation, but I know I provided him -- I mean, I disclosed everything that I had. I don't know specifically. I could -- it's also -- I apologize.

Even though with all of the stuff in front of me, it's also a couple years ago now, you know, so I don't want to misspeak. But I would have divulged anything that I was thinking, is what I would say, and tell him. Like I wasn't not telling him anything, but my process was like in that moment like I just let him know probably everything that I knew before going out.

Like I -- I staffed everything. I staffed with my supervisors that happened that day. That's what we call it. So you call it staff with your supervisor throughout the day. So I staffed everything with my supervisor, and then he had said provide it

107

to Chauncey, so I did. Any information I had, I would have told him.

Q. When you were there with Gail the first time, at the end, when you were leaving, did you tell Gail that you were going to come back?

A. I don't recall.

Q. Do you think you would have told her I've checked now and I won't be back?

A. I don't recall, and I don't know that I can state that conversation. I truly have zero memory of it, but it is typical to go back like a second. That is our procedure. Unless you get it approved, like you go back a second home visit. So I don't know if I explained that to her or we talked about that. I have no recollection of that conversation, but it is our procedure to do two home visits.

Q. So if somebody does make a false complaint to DHS, like what type of accountability is there for that?

A. Well, I would love if there was some at some point. You got to remember there is so many repetitive calls at times that I don't

108

know if you're asking me specifically if they really do anything about that. You know, I don't know. I think that -- I've heard -- like I don't have any specific information because so many people call in things so many times.

So you're like -- I think there is like a -- however many in a row it has to be, I think, what Dave explained to me at one point, and they kind of flag it up at, you know, central office in Des Moines -- actually central office here. I'm here.

So I think there is a process, but as a worker, you would never know. We would never know. So I would never know, even if like a reporter did get in trouble for false reporting. Like I don't know if they wouldn't call like any sort of worker, you know. So I wouldn't know anyways if they did.

Q. When Chauncey was going up to the house, I think you said you didn't see Gordon necessarily open the door and let him in; is that right?

A. I don't know that I was even looking at

109

the door, like I said, not perfectly.  I really don't -- I don't recall, because I remember being like, oh, like I need to go up there.  So I can't state that.  I know that I wasn't paying any attention to the door at that time.

I know he got out.  I know I had started looking around.  And I know I was like full-circle moment, like we are still here, we need to leave.  And I got out to like go see what was going on and what our like ETA was like of leaving the residence.

Q.  And when Chauncey ended up going to Gail and Tim's residence, I think you were standing right outside when he went in there; is that correct?

A.  Well, I was back, I think, maybe even with law enforcement to the right, because I wasn't -- like I couldn't have reached out and touched them like, I would say, but I was further back.  Like I stayed back the most I could.

Q.  And based on what you knew, did you think that Chauncey had the right to go in her house at that point?

110

A.  I was -- I can't answer that right now.

MR. SHEAHAN:  I'll object, speculation.

But you can answer, if you can.

A.  It's speculation, I guess.  I'm just going to answer honestly.  At that point I'm like what is the deal with Chauncey and Gail.  Like they clearly like have some sort of like animosity towards each other, is what I thought.  And then -- what was your question again?  Ask me again.

Q.  Just as you understood things, did you think he had like a legal reason to go in her house?

MR. HINDERS:  Again, I'm going to object because it calls for a legal conclusion.

Q.  And this is just kind of -- this question is based on like the facts that you knew and your observations.

A.  I don't have any legal knowledge of what he's able to do or not do or what their role is, so that's a guess what I would state that.

Q.  It's more just it made you uncomfortable

111

based on the dynamics?

A.  Because of their interaction.  It was the interaction that was the uncomfortableness, not necessarily the interaction of what was kind of happening.  It was like the interaction between Gail and Chauncey.  Like it was just negative, that I didn't like that.

Q.  Did it seem like he was going in there to antagonize her?

A.  I don't have any way to speak on that.  I don't know that that was a reason, no.  I think she was -- if Chauncey was present, it seemed like Gail was just naturally angered every single time that he was there.

Now, I know that she had stated things to me at some point.  I know at some point she had called me a name or whatever, but somehow in my role that's kind of a normal.  Like I didn't feel anything other than just another day, you know.  It's very true, you know, just another day at the office.

Like she wasn't like as aggressive toward me, like maybe called me some things

112

just because I'm present, but it wasn't the same manner as it was with Chauncey.  It was just the whole time.  I'm like that's the whole reason since the get-go of the driveway like it was going on, so --

Q.  And when you were out at Gail's house in the morning, and I know you said she was frustrated and kind of agitated, did you feel like it was personal to you or like that she was -- you know, kind of like you're saying was it just another day, or did it feel more personal in that she felt threatening to you?

A.  It wasn't personal.  Kind of just the statements she was making felt like I wasn't sure why she was saying some -- like it wasn't a typical conversation.  I would be like I don't know why you're telling me these -- like why are you telling me this property would be yours if Gordon died while you're feeding pigs.  Why did you just stop and start feeding the pigs.  Like things got weird in my mind, and it wasn't typical, right.

So I can't tell you anything other than my gut, like I said.  And it was just

113

the way she was communicating with me, like stating she had had kids potentially in the car recently but then like going a different direction a bit.

And then I just -- the car seat, and it was like none of it made any sense. But it wasn't necessarily -- like I said, it was the first time I'm communicating with her; right, so I'm trying to kind of figure -- everybody communicates a little bit differently. And I don't know anything right now at this point about her mental health or if she has any diagnoses or any of that stuff. So like I said, I'm just trying to make sense of what she's saying at that point, not necessarily like debunk everything she's saying. But it all just felt very uncomfortable. Like that's how I would put that.

Q. When DHS gets a complaint, and what kind of notifications do you have to provide to family members?

A. When they get a complaint? Like so -- I'm sorry. So like if we get an assessment? Like you mean like the same day?

114

Q. I don't know. I don't know any of it. So that's why I want you --

A. They do send out -- they do send out, and it's like parental notices to the parents. They are like parental notices that state like the category of what the child abuse is. And they always look really -- like they'll say like the whole category, but they don't say the particular allegation, is what my understanding.

Q. And that just goes out automatically at the beginning?

A. Five days.

Q. Is that something you send, or is that something central office sends?

A. Central office sends -- well, I click it, but I don't send it, if that makes sense. Like central office sends it.

Q. Any other notifications that are required to be sent in cases like this?

A. You mean of the opening of a case? I can't think of anything.

Q. And I take it this whole report gets sent at the end of a case?

A. I think at that time they did. They no

115

longer do. So I'm pretty sure they still did at that time. I don't know. Everything changes so much. So now you don't get to request them. I don't know when that happens, but I do feel like, since this is 2024, that at that time, yes.

Q. So this whole Exhibit 13 that we've been talking about that has all your notes in it and things like that, that's something that's required to be sent to the parents?

A. I believe so, yes.

MS. MESSAMER: I think that's all my questions. Thank you.

MR. SHEAHAN: Do you have any questions?

MR. HINDERS: I do.

MR. SHEAHAN: Go ahead.

CROSS-EXAMINATION

BY MR. HINDERS:

Q. Kelsey, thanks so much. I appreciate everything you had to say today.

When you went out to the Seaba property both initially and with Chauncey, would you agree with me you were investigating the safety of the child?

116

A. Yes.

Q. And in your experience is that an important function for Child Protective Services to do?

A. Yes.

Q. I mean, sort of implicated in the name of your agency?

A. Yes.

Q. Were you investigating at any time a criminal matter?

A. No.

Q. You were just looking for whether this child existed or not; is that accurate?

A. Yes.

Q. You stated that, when you pulled up, Gail and Chauncey were at each other and that it appeared that they had some sort of previous relationship. Is that a fair summation of what you said?

A. That's what I would describe it as, yes.

Q. Why do you think that, just from what happened?

A. Just the way they were communicating or interacting, like him like -- I remember him calling her Gail or like -- and her calling

117

him Chauncey, first-name basis, maybe, at the time. Maybe something of that nature made it strange, but also like what -- I don't know what the animosity was, if it was just us coming for this concern, if that makes sense. Like I don't know why it was so escalated.

Q. Had Chauncey ever said anything to you about any previous interaction with Gail?

A. I can't recall besides that day, of that day the unusual interaction. I don't recall if he had stated anything else about her that was relevant like super sticks in my mind.

Q. But just in your observation it appeared that they had a previous relationship or --

A. Yes, acknowledge each other, yes.

Q. Yeah. Gordon Seaba, when you spoke to him that afternoon, he gave you ten minutes to look around the property?

A. Yes.

Q. Did it take you about ten minutes to look around the property?

A. I think so. I think, with all of the yelling, it was kind of pausing it, because that was another reason I was pretty frustrated, because of the interaction of the

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

118

argument at Gail's home. That was our time. Like let's go. Like I said -- like I said now -- at this point I've been given ten minutes. I'm abiding by that respectfully. We're going, you know.

Q. So if it went beyond ten minutes, it wasn't within sort of your power or anyone's; it was due to the interaction with Gail or Tim or anyone else --

A. Yes.

Q. -- that lived on the property?

A. Yes, I would say yes.

MR. HINDERS: I don't have any other questions.

CROSS-EXAMINATION

BY MR. SHEAHAN:

Q. Just briefly. Investigating the health and safety of children is your principal job duty, isn't it?

A. Yes.

Q. In terms of investigations, you talked about oftentimes there are two home visits for an assessment?

A. Yes.

Q. Was the first visit and the second visit

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

119

effectively the two visits for this assessment?

A. Yes.

Q. So you didn't have to go back and do a visit?

A. No, I wouldn't have had to, no.

Q. And there is no policy that says you need to do visit one on day zero, and then visit ten is your second visit?

A. Correct.

Q. So you did the two visits that day, and you made an assessment that was not confirmed, safety findings were safe --

A. Yes.

Q. -- in terms of the category that you checked?

A. Yes.

MR. SHEAHAN: I have no further questions. Thank you.

MS. MESSAMER: Me neither.

(Deposition concluded at 4:38 p.m.)

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

120

C E R T I F I C A T E

I, Gale Sweeney Christensen, a Certified Shorthand Reporter of the State of Iowa and Registered Professional Reporter, do hereby certify that there came before me at the time, date, and place hereinbefore indicated, the witness named on the caption sheet hereof, who was by me duly sworn to testify to the truth of said witness's knowledge, touching and concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination taken down by me in shorthand, and later reduced to printed form under my supervision and direction, and that the deposition is a true record of the testimony given and of all objections interposed.

I further certify that I am neither attorney or counsel for, or related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

Dated at Des Moines, Iowa, this 15th day of May, 2026.

----------------------------
CERTIFIED SHORTHAND REPORTER,
REGISTERED PROFESSIONAL
REPORTER, AND NOTARY PUBLIC

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

1

## 1

**10** [1] - 92:10
**1104** [1] - 2:17
**115** [1] - 3:4
**118** [1] - 3:5
**13** [2] - 8:25, 115:7
**1305** [1] - 2:12
**15th** [1] - 120:17
**1600** [1] - 2:7

## 2

**2** [1] - 9:19
**2022** [1] - 5:2
**2024** [1] - 115:6
**2026** [2] - 1:17, 120:18
**21** [1] - 1:17
**2910** [2] - 1:17, 2:3
**2:26** [1] - 58:2
**2:37** [1] - 1:16

## 3

**3:00** [1] - 51:19
**3:30** [1] - 52:25

## 4

**4** [1] - 3:3
**4:25-cv-00183** [1] - 1:6
**4:30** [1] - 87:4
**4:38** [1] - 119:21

## 5

**5** [1] - 59:4
**50211** [1] - 2:17
**50312** [1] - 2:4
**50319** [1] - 2:12
**52556** [1] - 2:8
**5:30** [1] - 103:2

## 6

**6** [2] - 57:6, 58:2

## A

**abide** [1] - 73:5
**abided** [1] - 30:9
**abiding** [1] - 118:4
**able** [8] - 13:10, 14:6, 31:20, 56:24, 61:3, 74:21, 78:25, 110:22

**abuse** [8] - 8:12, 12:12, 45:7, 74:10, 75:19, 76:24, 114:7
**accept** [1] - 12:14
**access** [16] - 9:5, 13:2, 13:3, 13:8, 13:21, 14:4, 47:24, 49:11, 49:18, 54:17, 54:20, 54:21, 54:23, 55:6, 61:4, 67:22
**accountability** [1] - 107:22
**accurate** [2] - 35:10, 116:13
**acknowledge** [1] - 117:15
**action** [2] - 120:13, 120:15
**actively** [1] - 21:10
**actual** [3] - 18:25, 71:16, 71:19
**Adam** [1] - 14:22
**additional** [11] - 10:21, 39:24, 47:15, 47:21, 48:1, 49:23, 54:17, 54:22, 56:1, 56:2, 105:20
**address** [3] - 8:14, 9:10, 34:3
**advise** [1] - 63:14
**advised** [2] - 19:23, 69:4
**affidavit** [2] - 63:15, 63:20
**afternoon** [3] - 53:2, 59:13, 117:17
**age** [7] - 17:20, 17:21, 17:24, 17:25, 18:16, 18:22, 18:25
**agency** [1] - 116:7
**aggressive** [2] - 50:25, 111:24
**agitated** [1] - 112:8
**ago** [1] - 106:12
**agree** [3] - 28:14, 69:12, 115:24
**agreed** [1] - 28:17
**agrees** [1] - 78:25
**ahead** [12] - 10:4, 29:24, 59:23, 80:2, 82:14, 82:18, 83:17, 92:22, 95:24, 100:25, 101:24, 115:17
**alarms** [1] - 23:15
**Alisha** [19] - 28:5, 28:7, 31:13, 34:7, 34:8, 35:8, 35:10, 35:12, 36:8, 37:21, 38:6, 38:11, 39:1,

41:10, 41:20, 42:5, 105:24
**allegation** [18] - 8:4, 8:13, 9:13, 9:15, 9:16, 10:6, 10:17, 11:11, 11:14, 17:23, 17:25, 19:1, 42:13, 42:16, 47:3, 65:3, 65:19, 114:9
**allegations** [7] - 17:5, 58:7, 62:2, 64:17, 65:6, 65:11, 65:23
**allow** [1] - 63:9
**allowed** [2] - 30:18, 73:4
**almost** [5] - 7:11, 10:9, 30:3, 66:12, 93:20
**altercation** [1] - 101:19
**Amendment** [2] - 78:14, 78:18
**AND** [1] - 120:22
**angered** [1] - 111:14
**angry** [1] - 101:4
**animosity** [3] - 38:15, 110:9, 117:4
**anonymous** [15] - 12:23, 12:25, 13:5, 13:7, 13:13, 14:11, 38:22, 54:19, 55:9, 55:17, 59:18, 59:25, 60:1, 60:21, 60:24
**answer** [6] - 20:25, 35:11, 61:13, 110:1, 110:4, 110:6
**answered** [1] - 59:22
**answering** [2] - 81:13, 81:17
**antagonize** [1] - 111:10
**anyway** [4] - 32:7, 95:21, 95:23, 100:1
**anyways** [1] - 108:19
**apologize** [10] - 35:9, 57:11, 65:9, 65:14, 70:18, 71:14, 71:19, 82:8, 93:17, 106:10
**appear** [1] - 20:20
**appeared** [2] - 116:17, 117:13
**appreciate** [1] - 115:20
**approach** [1] - 53:20
**approached** [1] - 94:7
**appropriate** [2] - 12:16, 66:23
**appropriately** [1] - 34:8
**approved** [2] - 63:23,

107:14
**April** [1] - 1:17
**area** [4] - 76:6, 77:1, 77:2, 83:9
**argue** [2] - 69:3, 73:4
**arguing** [2] - 85:20, 95:16
**argument** [1] - 118:1
**assertive** [1] - 77:7
**assessment** [23] - 7:24, 8:4, 8:9, 8:10, 8:12, 10:15, 11:4, 12:5, 46:19, 47:5, 47:14, 55:7, 56:3, 56:6, 74:10, 74:11, 75:19, 104:3, 104:4, 113:24, 118:23, 119:2, 119:12
**assessments** [4] - 45:7, 55:17, 66:9, 76:24
**assigned** [3] - 6:2, 6:9, 11:3
**Assistant** [1] - 2:10
**assistant** [4] - 71:14, 71:18, 72:9, 86:18
**associated** [3] - 60:6, 61:10, 62:17
**assume** [3] - 53:10, 60:5, 81:21
**assuming** [1] - 63:6
**assure** [1] - 12:3
**ate** [1] - 43:5
**attempt** [1] - 90:5
**attempted** [2] - 32:17, 98:22
**attended** [1] - 16:20
**attention** [3] - 6:20, 6:21, 109:5
**attorney** [38] - 5:6, 5:11, 48:11, 49:11, 49:13, 49:17, 50:7, 51:14, 52:23, 63:4, 63:13, 63:21, 68:20, 69:3, 69:9, 70:12, 71:11, 71:14, 71:17, 71:20, 72:8, 72:9, 73:12, 73:13, 74:17, 75:1, 75:7, 75:9, 75:11, 75:16, 76:23, 77:3, 78:6, 80:21, 86:18, 120:12, 120:14
**Attorney** [3] - 2:2, 2:7, 2:10
**Attorney's** [1] - 44:17
**Attorneys** [1] - 2:15
**automatically** [1] - 114:11
**Avenue** [2] - 1:17, 2:3

**aware** [5] - 10:10, 49:15, 65:19, 69:25, 105:3

## B

**baby** [37] - 11:9, 20:15, 20:20, 22:7, 26:18, 27:18, 27:24, 28:13, 28:14, 28:15, 28:16, 28:22, 29:14, 38:23, 39:24, 39:25, 40:2, 40:7, 40:9, 40:14, 56:14, 56:23, 57:16, 57:19, 57:22, 57:24, 58:5, 58:18, 61:16, 61:19, 62:3, 64:22, 66:1, 92:8
**background** [1] - 59:12
**backseat** [1] - 17:18
**bad** [1] - 37:22
**based** [3] - 109:23, 110:19, 111:1
**basis** [3] - 37:16, 40:5, 117:1
**bathtub** [1] - 62:13
**become** [1] - 5:12
**bed** [4] - 22:22, 62:14, 83:5, 83:6
**bedroom** [5] - 22:20, 29:4, 29:7, 30:6, 83:3
**beeped** [1] - 35:11
**beginning** [2] - 6:18, 114:12
**behavioral** [7] - 17:11, 21:9, 21:12, 21:14, 21:22, 41:7, 41:11
**behind** [3] - 83:19, 83:25, 103:18
**bells** [1] - 100:3
**belly** [2] - 20:24, 21:3
**best** [5] - 28:6, 32:7, 38:6, 38:7, 68:12
**better** [1] - 105:21
**between** [6] - 7:2, 64:24, 83:24, 96:9, 98:23, 111:6
**beyond** [2] - 39:3, 118:6
**bickering** [5] - 84:22, 88:14, 89:3, 89:6, 89:13
**big** [1] - 28:25
**bigger** [2] - 72:7, 77:1
**birth** [4] - 48:3, 61:21, 61:23, 61:25
**bit** [14] - 20:10, 20:24,

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 081**

23:24, 39:8, 58:12, 73:9, 73:16, 77:1, 82:2, 87:24, 92:20, 104:22, 113:4, 113:10
**bizarre** [1] - 87:25
**blank** [1] - 9:9
**body** [5] - 20:18, 20:19, 20:22, 21:2, 31:21
**booster** [1] - 19:8
**born** [4] - 11:9, 11:16, 46:1, 47:13
**boss** [1] - 75:1
**bottom** [3] - 87:17, 88:6, 88:9
**bouncing** [1] - 4:9
**bounding** [1] - 100:22
**box** [4] - 9:20, 34:22, 36:3, 48:9
**boxes** [1] - 34:17
**break** [1] - 101:15
**Brent** [1] - 8:17
**BRENT** [1] - 2:14
**brent@hinderslaw. com** [1] - 2:18
**briefly** [1] - 118:17
**Brighton** [6] - 7:2, 7:3, 7:11, 34:2, 34:3, 34:4
**Building** [1] - 2:11
**built** [1] - 76:12
**bunched** [1] - 70:4
**Buren** [1] - 5:20
**business** [2] - 23:13, 23:14
**busy** [3] - 26:25, 68:9, 77:15
**BY** [6] - 4:5, 8:21, 70:19, 82:19, 115:19, 118:16

## C

**calm** [2] - 85:14
**calmed** [1] - 82:3
**cannot** [4] - 43:13, 67:15, 74:16, 78:15
**caption** [1] - 120:5
**car** [31] - 17:17, 17:18, 17:21, 17:24, 19:2, 19:4, 19:7, 19:10, 34:11, 34:13, 43:7, 47:6, 51:3, 58:13, 64:13, 83:16, 84:5, 85:1, 85:3, 85:6, 85:7, 85:12, 89:7, 89:11, 89:13, 89:14, 89:15, 89:16, 99:2,

113:3, 113:5
**card** [1] - 23:13
**care** [1] - 71:17
**cared** [1] - 47:10
**carried** [1] - 99:17
**case** [46] - 5:10, 6:8, 6:10, 6:13, 6:21, 7:6, 7:13, 8:6, 12:22, 12:24, 13:3, 13:10, 13:15, 13:22, 13:23, 14:1, 25:16, 33:7, 33:8, 42:23, 46:1, 46:2, 46:5, 48:24, 60:12, 60:14, 61:24, 62:2, 62:10, 62:21, 68:4, 72:24, 74:3, 74:4, 75:17, 76:2, 77:12, 103:2, 103:21, 103:25, 104:14, 104:15, 104:24, 105:2, 114:21, 114:24
**Case** [1] - 1:5
**cases** [7] - 33:21, 41:17, 62:11, 62:18, 69:17, 71:21, 114:20
**caseworkers** [1] - 5:22
**category** [3] - 114:6, 114:8, 119:15
**cats** [1] - 47:6
**center** [1] - 12:10
**central** [5] - 108:11, 108:12, 114:15, 114:16, 114:18
**CENTRAL** [1] - 1:3
**certain** [4] - 13:4, 17:24, 79:17, 93:20
**CERTIFIED** [1] - 120:21
**Certified** [2] - 1:14, 120:3
**certify** [2] - 120:4, 120:12
**cetera** [2] - 48:5, 62:14
**chain** [1] - 60:23
**chair** [2] - 27:9, 27:10
**chance** [1] - 27:20
**change** [1] - 78:2
**changed** [1] - 25:12
**changes** [1] - 115:3
**chaos** [1] - 91:13
**chaotic** [1] - 86:14
**charges** [1] - 103:11
**chatting** [1] - 24:1
**CHAUNCEY** [1] - 1:8
**Chauncey** [69] - 2:14, 5:5, 44:14, 48:13, 48:17, 48:18, 48:19, 49:3, 49:9, 49:21,

49:25, 50:9, 51:6, 54:16, 68:20, 68:24, 69:18, 70:20, 71:2, 72:14, 72:21, 77:7, 82:4, 83:16, 83:18, 84:16, 87:17, 88:14, 88:21, 90:14, 90:24, 91:7, 92:12, 92:21, 93:1, 93:6, 93:23, 94:8, 94:10, 94:21, 95:15, 96:10, 97:12, 97:22, 98:6, 98:24, 99:5, 99:16, 100:15, 101:9, 102:16, 103:2, 103:7, 103:21, 103:25, 105:13, 106:1, 107:1, 108:21, 109:13, 109:24, 110:7, 111:7, 111:13, 112:2, 115:23, 116:16, 117:1, 117:7
**Chauncey's** [2] - 85:22, 89:16
**check** [6] - 9:20, 17:13, 62:22, 63:11, 105:7
**checked** [2] - 107:9, 119:16
**checks** [1] - 11:24
**Child** [1] - 116:3
**child** [32] - 8:12, 11:12, 11:16, 12:12, 19:3, 42:14, 42:15, 45:7, 46:1, 46:7, 46:11, 46:13, 46:14, 47:3, 47:7, 47:13, 52:3, 52:4, 52:8, 58:21, 62:1, 62:15, 64:3, 64:4, 66:14, 74:10, 75:19, 76:24, 114:6, 115:25, 116:13
**child's** [1] - 48:3
**children** [10] - 17:16, 21:4, 23:3, 46:4, 58:11, 58:16, 59:7, 62:13, 62:20, 118:18
**choice** [1] - 7:15
**choose** [1] - 54:11
**Christensen** [3] - 1:13, 1:24, 120:3
**circle** [2] - 31:2, 109:9
**circumstance** [1] - 52:4
**circumstances** [1] - 79:17
**City** [2] - 33:18, 71:10
**claiming** [1] - 38:7

**clarified** [2] - 19:21, 53:8
**clarify** [4] - 55:15, 55:23, 88:3, 88:25
**clear** [4] - 49:16, 49:20, 53:1, 82:23
**clearly** [6] - 73:10, 73:15, 98:11, 98:12, 98:13, 110:8
**click** [1] - 114:16
**close** [7] - 7:2, 7:8, 7:9, 85:23, 104:11, 104:12, 104:14
**closed** [1] - 103:22
**closer** [1] - 4:21
**coat** [1] - 37:6
**collateral** [1] - 56:11
**comfortable** [3] - 23:25, 37:7, 57:17
**coming** [1] - 117:5
**commencing** [1] - 1:16
**comment** [1] - 17:16
**communicate** [1] - 31:20
**communicated** [4] - 43:11, 43:14, 44:13, 44:24
**communicates** [1] - 113:10
**communicating** [8] - 21:18, 21:20, 21:23, 43:21, 48:14, 113:1, 113:8, 116:23
**communication** [2] - 43:18, 77:20
**comparatively** [1] - 76:8
**Compel** [2] - 63:16, 63:25
**compel** [1] - 64:1
**complainant** [1] - 55:9
**complaint** [13] - 11:19, 12:23, 38:23, 55:14, 58:19, 59:19, 60:1, 60:7, 60:22, 61:16, 107:21, 113:20, 113:23
**completely** [2] - 47:9, 77:16
**composition** [2] - 9:11, 9:12
**comps** [1] - 8:13
**computer** [5] - 6:15, 11:23, 47:25, 67:24, 67:25
**concern** [14] - 28:21, 33:22, 35:3, 36:5, 49:4, 51:9, 58:9, 62:22, 66:20, 76:3,

96:24, 100:11, 103:17, 117:5
**concerned** [7] - 35:7, 36:4, 44:2, 45:14, 46:17, 58:13, 64:19
**concerning** [9] - 44:18, 51:13, 53:12, 53:18, 53:23, 53:25, 57:20, 57:24, 120:7
**concerns** [11] - 9:22, 9:23, 21:20, 33:16, 43:20, 43:24, 47:12, 49:10, 49:22, 50:24, 78:4
**concluded** [1] - 119:21
**conclusion** [2] - 81:16, 110:17
**confidential** [3] - 13:9, 47:23, 55:24
**confirm** [3] - 104:11, 104:13, 104:14
**confirmed** [1] - 119:13
**confused** [6] - 17:19, 17:22, 23:5, 56:17, 79:21, 98:9
**confusing** [1] - 61:22
**confusion** [1] - 18:23
**consent** [12] - 63:11, 78:21, 78:22, 78:23, 78:24, 79:5, 79:6, 79:8, 79:14, 79:18, 80:6, 81:3
**construction** [1] - 30:3
**construction-y** [1] - 30:3
**contact** [19] - 14:15, 28:5, 28:9, 42:17, 44:1, 44:5, 50:4, 50:6, 50:9, 53:21, 55:21, 56:11, 56:24, 57:8, 58:2, 67:9, 68:11, 70:24, 103:20
**contacted** [9] - 33:24, 34:6, 34:9, 44:14, 44:17, 56:11, 59:18, 60:14, 63:7
**contacting** [2] - 59:25, 60:3
**contacts** [2] - 56:2, 63:8
**continue** [3] - 19:23, 33:6, 103:4
**continued** [1] - 33:8
**continuously** [1] - 25:23
**controversy** [1] - 120:7
**conversation** [37] -

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 082**

11:2, 16:5, 16:11, 16:23, 17:4, 22:15, 23:6, 23:20, 27:4, 27:14, 35:7, 38:4, 38:22, 59:16, 64:16, 65:1, 65:21, 66:13, 69:12, 84:11, 86:5, 92:5, 92:20, 92:21, 97:3, 98:23, 100:22, 101:11, 101:16, 102:15, 103:5, 104:16, 104:20, 106:6, 107:11, 107:18, 112:16
**conversations** [3] - 43:8, 66:19, 103:24
**cooperate** [1] - 74:7
**cooperative** [1] - 76:21
**corner** [1] - 83:8
**Corning** [3] - 33:15, 41:15, 42:19
**correct** [12] - 32:8, 37:16, 55:14, 59:17, 65:23, 75:4, 82:21, 83:11, 83:19, 90:12, 109:16, 119:10
**correctly** [1] - 43:10
**corroborate** [1] - 38:25
**corroborated** [1] - 38:22
**counsel** [2] - 120:12, 120:14
**counties** [6] - 5:14, 5:18, 5:24, 55:4, 72:1, 86:17
**COUNTY** [1] - 1:9
**county** [42] - 5:5, 5:11, 6:2, 12:16, 48:11, 49:10, 49:12, 49:17, 50:6, 51:14, 52:22, 55:1, 63:3, 63:13, 63:21, 68:20, 69:3, 69:9, 70:11, 71:11, 71:14, 71:16, 71:19, 72:8, 72:9, 73:11, 73:13, 74:17, 74:25, 75:7, 75:9, 75:11, 75:16, 76:23, 77:3, 78:6, 80:21, 86:17, 86:18, 87:11, 93:19
**County** [26] - 2:14, 4:15, 4:19, 5:21, 33:17, 33:18, 33:25, 34:1, 34:5, 42:24, 44:17, 44:21, 44:22, 44:25, 49:19, 50:2, 50:3, 50:5, 69:19, 71:10, 72:5, 72:12,

75:3, 75:21, 76:7, 76:18
**couple** [3] - 44:16, 70:2, 106:12
**course** [1] - 42:16
**COURT** [1] - 1:1
**court** [3] - 5:9, 59:8, 81:11
**cover** [1] - 5:18
**covered** [1] - 5:21
**coworker** [2] - 6:13, 77:14
**coworkers** [1] - 6:11
**CPW** [2] - 65:6, 66:13
**credibility** [2] - 46:17, 66:11
**criminal** [5] - 103:9, 103:11, 103:12, 103:17, 116:10
**CROSS** [2] - 115:18, 118:15
**CROSS-EXAMINATION** [2] - 115:18, 118:15
**CSR** [1] - 1:24
**curious** [1] - 79:2

**D**

**danger** [1] - 100:2
**dangerous** [2] - 9:20, 25:16
**date** [6] - 35:25, 48:3, 59:9, 61:23, 61:25, 120:5
**Dated** [1] - 120:17
**daughter** [1] - 56:22
**Dave** [2] - 69:14, 108:9
**David** [7] - 24:18, 42:7, 45:13, 49:24, 52:9, 69:5, 75:10
**days** [4] - 54:1, 105:3, 105:6, 114:13
**deal** [2] - 71:15, 110:7
**debunk** [1] - 113:16
**decided** [2] - 84:6, 85:5
**decision** [1] - 68:18
**decompress** [1] - 54:7
**deescalate** [3] - 16:24, 85:13, 98:23
**deescalation** [3] - 16:15, 16:18, 16:21
**Defendant** [1] - 2:9
**Defendants** [1] - 1:10
**defense** [2] - 26:13, 28:24
**definitely** [1] - 94:22
**definitive** [2] - 97:14,

102:24
**denied** [4] - 65:22, 65:25, 66:3, 66:8
**denying** [1] - 66:19
**department** [7] - 5:17, 6:25, 10:8, 51:1, 52:7, 64:4, 69:8
**DEPOSITION** [2] - 1:7, 1:12
**deposition** [3] - 119:21, 120:10, 120:13
**Des** [11] - 1:18, 2:4, 2:12, 4:19, 72:5, 72:6, 72:12, 76:18, 76:22, 108:11, 120:17
**describe** [4] - 72:13, 101:2, 102:1, 116:20
**described** [2] - 49:18, 70:25
**detail** [1] - 66:25
**details** [2] - 39:15, 45:7
**Detective** [5] - 33:15, 41:15, 41:19, 42:19, 105:23
**detective** [8] - 33:20, 33:22, 50:4, 50:6, 71:10, 75:24, 76:1
**detectives** [3] - 71:1, 71:9, 75:21
**DHS** [10] - 4:12, 5:22, 6:19, 16:9, 16:10, 23:2, 52:6, 100:10, 107:21, 113:20
**diagnoses** [1] - 113:13
**died** [1] - 112:19
**different** [9] - 20:17, 20:18, 39:4, 40:4, 40:16, 44:16, 49:17, 51:10, 113:3
**differently** [3] - 10:14, 77:9, 113:11
**difficulties** [1] - 6:14
**direct** [2] - 37:3, 37:6
**DIRECT** [1] - 4:4
**directed** [1] - 89:17
**direction** [5] - 76:13, 99:7, 99:14, 113:4, 120:9
**directly** [2] - 47:23, 49:3
**directs** [1] - 75:9
**disagreed** [1] - 28:18
**disclosed** [1] - 106:7
**discovered** [1] - 66:7
**discussion** [1] - 8:19
**dispute** [1] - 84:6

**disseminate** [1] - 49:14
**distracted** [1] - 94:24
**distribute** [1] - 12:16
**distributed** [1] - 12:9
**DISTRICT** [2] - 1:1, 1:2
**divert** [1] - 52:6
**DIVISION** [1] - 1:3
**divulged** [1] - 106:14
**document** [8] - 8:7, 9:1, 9:4, 67:5, 67:8, 67:17, 68:3, 68:14
**dog** [4] - 90:21, 90:22, 98:2
**done** [8] - 64:14, 79:10, 87:8, 96:22, 102:6, 102:13, 104:10, 105:8
**door** [10] - 30:7, 31:3, 90:25, 91:8, 91:25, 93:25, 94:9, 108:23, 109:1, 109:5
**doorway** [1] - 93:22
**doubt** [1] - 57:23
**down** [12] - 5:19, 15:11, 59:5, 82:3, 85:15, 89:1, 90:18, 94:12, 95:5, 95:7, 97:25, 120:8
**downstairs** [3] - 30:2, 30:22, 31:15
**drive** [3] - 15:24, 22:17, 25:14
**Drive** [1] - 2:17
**driven** [2] - 25:7
**driveway** [17] - 15:12, 16:7, 83:22, 84:20, 86:10, 87:18, 88:6, 88:9, 88:15, 89:2, 89:4, 89:8, 90:19, 95:7, 98:1, 112:4
**driving** [2] - 7:21, 43:15
**drop** [1] - 46:9
**drugs** [1] - 17:9
**due** [2] - 13:18, 118:8
**duly** [2] - 4:2, 120:6
**during** [1] - 41:12
**duty** [1] - 118:19
**dynamics** [1] - 111:1

**E**

**early** [1] - 103:10
**easier** [1] - 22:14
**easily** [1] - 22:13
**East** [1] - 2:12
**eat** [1] - 34:12
**eating** [2] - 33:14,

43:6
**eccentric** [1] - 27:19
**ED** [1] - 2:6
**edwardgharvey98@yahoo.com** [1] - 2:8
**effectively** [1] - 119:1
**eight** [1] - 47:6
**either** [19] - 12:14, 20:21, 33:2, 34:6, 41:24, 42:21, 43:12, 44:12, 46:22, 48:4, 48:15, 53:21, 56:4, 63:4, 63:23, 76:14, 79:22, 93:21, 101:15
**elaborate** [2] - 47:12, 48:2
**elderly** [1] - 15:12
**Elizabeth** [12] - 43:9, 43:11, 44:1, 44:7, 48:8, 48:13, 48:15, 48:16, 48:25, 50:7, 85:10, 95:7
**email** [2] - 7:23, 8:8
**employed** [2] - 120:13, 120:14
**employee** [3] - 75:3, 120:14
**encounter** [1] - 18:14
**end** [8] - 4:24, 6:7, 15:10, 15:12, 93:7, 97:1, 107:4, 114:24
**ended** [5] - 18:23, 85:21, 91:10, 102:25, 109:13
**enforcement** [17] - 46:12, 49:15, 50:14, 53:4, 63:7, 63:9, 74:5, 74:8, 74:12, 74:13, 74:14, 76:20, 83:23, 86:17, 100:6, 102:15, 109:18
**enforcements** [1] - 87:12
**entered** [1] - 28:11
**entire** [2] - 49:23, 82:25
**entirety** [2] - 31:6, 104:18
**entries** [1] - 57:5
**epilepsy** [2] - 11:12, 47:4
**escalate** [1] - 27:23
**escalated** [9] - 16:13, 23:15, 31:14, 54:5, 93:9, 97:4, 100:11, 101:17, 117:6
**escorted** [1] - 30:6
**especially** [4] - 45:24, 62:19, 74:18, 75:19
**essence** [1] - 103:16

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**essentially** [4] - 52:5, 61:20, 93:5, 103:16
**Este** [3] - 43:10, 43:11, 85:11
**et** [2] - 48:5, 62:14
**ETA** [1] - 109:12
**eventually** [1] - 16:25
**everywhere** [1] - 5:14
**evidence** [5] - 39:24, 40:1, 40:7, 40:12, 103:3
**exact** [4] - 66:12, 67:15, 67:16, 85:5
**exactly** [5] - 15:20, 37:11, 37:13, 56:15, 98:13
**EXAMINATION** [4] - 3:1, 4:4, 115:18, 118:15
**examination** [1] - 120:8
**Examination** [1] - 3:2
**examined** [1] - 120:8
**example** [1] - 75:20
**exasperated** [1] - 102:21
**except** [1] - 52:20
**exchanging** [1] - 101:12
**excited** [1] - 101:23
**Exhibit** [2] - 8:25, 115:7
**exist** [2] - 42:14, 61:20
**existed** [1] - 116:13
**experience** [2] - 73:16, 116:2
**experiences** [1] - 72:14
**explain** [6] - 18:22, 23:17, 27:20, 87:25, 93:7, 100:17
**explained** [5] - 28:20, 34:18, 34:24, 107:16, 108:9
**explaining** [1] - 19:14
**explains** [1] - 48:2
**explanation** [1] - 23:21
**explicit** [1] - 23:21
**extensive** [1] - 11:13
**extremely** [2] - 26:25, 57:19
**eye** [1] - 93:11
**eyes** [1] - 26:13

**F**

**fact** [1] - 61:8
**facts** [1] - 110:19

**fair** [3] - 60:23, 61:10, 116:18
**Fairfield** [3] - 2:8, 70:1, 71:2
**falls** [1] - 12:15
**false** [3] - 58:18, 107:20, 108:16
**falsely** [1] - 11:11
**family** [2] - 6:12, 113:22
**far** [6] - 25:8, 25:14, 45:20, 53:7, 65:17
**fast** [1] - 28:23
**February** [2] - 4:24, 4:25
**feed** [1] - 24:3
**feeding** [2] - 112:20, 112:21
**feelings** [1] - 37:1
**felt** [13] - 19:18, 20:1, 21:24, 23:24, 24:8, 31:19, 54:9, 57:17, 96:13, 105:10, 112:12, 112:14, 113:17
**female** [1] - 29:10
**few** [1] - 97:17
**fighting** [1] - 101:18
**figure** [2] - 58:14, 113:10
**file** [1] - 68:1
**files** [1] - 67:18
**fill** [4] - 67:1, 67:9, 67:14
**filled** [2] - 9:6, 98:15
**filling** [1] - 104:17
**finally** [3] - 45:2, 84:6, 85:13
**financially** [1] - 120:15
**findings** [1] - 119:13
**fine** [3] - 80:24, 95:22
**finger** [1] - 88:20
**finish** [1] - 79:25
**fire** [1] - 34:20
**fireman** [1] - 48:9
**fireman's** [3] - 34:17, 34:22, 36:3
**first** [24] - 4:2, 5:9, 5:16, 15:7, 22:5, 34:9, 34:16, 46:22, 50:4, 50:7, 69:23, 77:14, 77:22, 83:2, 83:11, 83:18, 84:17, 87:16, 88:9, 91:17, 107:3, 113:8, 117:1, 118:25
**first-name** [1] - 117:1
**five** [1] - 114:13
**flag** [1] - 108:10
**Floor** [1] - 2:11

**flustered** [1] - 39:8
**focus** [1] - 45:24
**follow** [4] - 49:5, 72:18, 73:2, 76:23
**follow-up** [1] - 49:5
**followed** [4] - 73:11, 93:1, 93:5, 101:9
**following** [2] - 77:24, 99:22
**follows** [1] - 4:3
**foot** [1] - 25:15
**forget** [2] - 52:15, 64:10
**form** [1] - 120:9
**format** [1] - 8:11
**forth** [1] - 84:25
**founded** [2] - 104:13, 104:14
**four** [3] - 18:19, 69:21, 105:8
**Fourth** [2] - 78:14, 78:18
**Fourth-Amendment-type** [1] - 78:18
**Franklin** [1] - 2:16
**frequent** [1] - 40:5
**frequented** [1] - 36:13
**frequently** [1] - 40:15
**Friday** [3] - 6:24, 51:20, 53:2
**Fridays** [1] - 6:25
**friend** [1] - 28:6
**friendly** [3] - 15:14, 92:18, 95:19
**friends** [9] - 36:12, 36:17, 36:19, 36:21, 36:22, 37:8, 38:6, 38:7, 39:11
**front** [12] - 8:16, 16:3, 22:6, 25:21, 30:7, 32:3, 32:5, 46:21, 90:12, 90:18, 93:14, 106:12
**frustrate** [1] - 32:19
**frustrated** [9] - 17:6, 22:10, 26:4, 26:6, 26:10, 32:16, 82:24, 112:8, 117:25
**frustration** [1] - 77:20
**full** [4] - 9:4, 9:5, 97:15, 109:9
**full-circle** [1] - 109:9
**function** [1] - 116:3

**G**

**Gail** [133] - 2:20, 14:19, 15:15, 16:6, 18:1, 18:7, 18:12,

18:17, 19:13, 20:7, 20:11, 22:7, 22:9, 22:11, 22:13, 22:23, 23:23, 23:25, 24:10, 24:13, 25:4, 25:23, 27:12, 27:17, 28:12, 32:2, 32:3, 32:4, 32:15, 32:22, 32:25, 34:15, 35:23, 36:11, 36:16, 36:18, 36:20, 36:22, 36:24, 37:5, 37:8, 37:9, 37:15, 37:19, 37:20, 37:25, 38:5, 38:13, 38:23, 39:24, 39:25, 40:3, 40:8, 40:13, 40:14, 40:15, 40:23, 41:3, 41:6, 41:11, 43:17, 43:21, 44:11, 44:16, 46:5, 46:13, 47:3, 47:5, 48:4, 49:4, 56:4, 56:9, 56:14, 56:20, 56:23, 57:21, 58:4, 58:10, 58:15, 58:17, 59:6, 59:8, 61:20, 62:3, 64:9, 64:10, 64:14, 64:20, 64:24, 65:5, 65:12, 72:17, 75:13, 80:8, 80:15, 81:3, 81:5, 81:24, 81:25, 82:1, 82:22, 84:16, 87:22, 88:14, 88:15, 90:7, 90:15, 90:16, 90:17, 90:20, 90:21, 91:2, 94:5, 95:16, 97:21, 97:24, 98:3, 98:4, 98:5, 98:19, 102:7, 102:14, 104:22, 107:3, 107:5, 109:13, 110:7, 111:6, 111:14, 116:16, 116:25, 117:8, 118:8
**GAIL** [1] - 1:4
**Gail's** [14] - 10:25, 14:16, 19:12, 22:17, 36:25, 46:4, 64:6, 64:8, 68:18, 80:19, 82:21, 83:1, 112:6, 118:1
**gained** [1] - 78:22
**Gale** [3] - 1:13, 1:24, 120:3
**gate** [1] - 98:10
**gather** [2] - 39:9, 105:6
**general** [1] - 100:10
**General** [1] - 2:10
**generally** [3] - 19:11,

75:14, 103:25
**gentleman** [1] - 15:13
**gesture** [2] - 87:20, 88:8
**gestures** [1] - 87:23
**gesturing** [2] - 88:15, 88:24
**get-go** [1] - 112:4
**Gina** [1] - 4:6
**GINA** [1] - 2:2
**given** [5] - 23:13, 52:3, 65:1, 118:3, 120:10
**gmessamer @ parrishlaw.com** [1] - 2:4
**go-to** [1] - 70:11
**goal** [2] - 85:17, 97:10
**Google** [1] - 12:12
**Googled** [1] - 12:11
**GORDON** [1] - 1:5
**Gordon** [54] - 15:13, 20:8, 22:6, 25:22, 25:25, 26:2, 27:3, 27:5, 27:6, 27:14, 28:14, 28:16, 28:17, 30:23, 31:10, 31:17, 31:24, 32:5, 32:10, 32:14, 32:18, 32:23, 33:1, 46:11, 80:9, 80:11, 80:14, 80:15, 80:22, 81:3, 90:4, 90:5, 90:15, 91:11, 91:18, 92:1, 92:6, 92:18, 93:23, 94:11, 94:13, 95:18, 95:24, 97:7, 98:18, 100:15, 100:16, 101:8, 102:7, 102:9, 102:14, 108:22, 112:19, 117:16
**Gordon's** [4] - 24:4, 90:12, 90:25, 93:12
**Grand** [2] - 1:17, 2:3
**great** [1] - 102:3
**guardianship** [1] - 56:21
**guess** [17] - 7:10, 8:14, 21:17, 39:22, 40:10, 53:6, 53:9, 55:22, 55:23, 68:17, 69:11, 74:8, 79:2, 88:3, 103:18, 110:5, 110:23
**guidelines** [1] - 12:15
**gun** [3] - 22:21, 83:6, 83:7
**gut** [6] - 21:25, 23:22, 24:25, 52:18, 77:24, 112:25
**guys** [5] - 49:15,

69:25, 92:6, 102:16, 105:2

**H**

**half** [1] - 69:7
**hand** [1] - 87:22
**handful** [2] - 70:5, 70:8
**handling** [1] - 77:8
**hands** [2] - 88:4, 88:18
**hang** [1] - 25:3
**hard** [1] - 90:17
**hardly** [1] - 71:16
**harm** [2] - 26:8, 57:23
**HARVEY** [1] - 2:6
**head** [6] - 7:12, 39:7, 51:11, 54:14, 85:16, 86:7
**headed** [1] - 20:1
**heading** [3] - 43:1, 43:4, 53:1
**health** [2] - 113:12, 118:17
**hear** [5] - 12:17, 29:15, 29:17, 84:23, 101:11
**heard** [3] - 34:17, 36:3, 108:3
**hearing** [1] - 59:10
**hectic** [1] - 7:1
**held** [1] - 8:20
**help** [5] - 7:7, 77:12, 93:6, 95:15, 95:17
**helper** [1] - 52:2
**helpful** [3] - 76:10, 76:14, 76:21
**Henry** [1] - 49:19
**hereby** [1] - 120:4
**hereinbefore** [1] - 120:5
**hereof** [1] - 120:6
**hereto** [1] - 120:15
**HHS** [3] - 5:22, 67:21, 78:13
**hi** [2] - 4:6, 31:12
**hidden** [3] - 52:5, 61:16, 61:18
**higher** [1] - 14:5
**highway** [1] - 7:2
**himself** [2] - 80:14, 92:2
**HINDERS** [5] - 2:14, 110:15, 115:16, 115:19, 118:13
**Hinders** [2] - 2:16, 3:4
**historically** [2] - 66:8, 66:11

**history** [18] - 10:8, 10:11, 11:7, 11:10, 11:14, 11:15, 11:25, 45:24, 46:3, 47:11, 47:12, 49:10, 51:2, 66:18, 76:4, 76:9, 98:12
**holster** [1] - 99:24
**home** [29] - 11:8, 15:18, 16:3, 19:16, 19:20, 19:24, 20:7, 23:17, 24:13, 28:11, 31:6, 32:1, 32:20, 42:2, 53:25, 54:6, 54:13, 59:1, 62:14, 63:9, 73:21, 75:22, 82:21, 99:17, 102:5, 107:15, 107:19, 118:1, 118:22
**homeowner** [8] - 78:23, 78:24, 78:25, 79:4, 79:7, 79:14, 79:18, 80:9
**homes** [3] - 72:10, 72:17, 78:16
**honest** [5] - 48:22, 51:20, 77:13, 77:16, 99:14
**honestly** [1] - 110:6
**Hoover** [1] - 2:11
**Horning** [5] - 33:24, 35:17, 35:20, 41:19, 105:24
**HORNING** [1] - 35:20
**hospital** [1] - 62:4
**hotline** [1] - 12:12
**hours** [2] - 45:4, 105:8
**house** [55] - 10:25, 14:17, 15:19, 15:20, 22:18, 24:19, 24:20, 25:5, 26:3, 26:12, 26:14, 26:15, 26:17, 28:3, 28:25, 29:2, 43:23, 62:24, 63:12, 64:6, 68:18, 70:21, 77:21, 78:20, 80:5, 81:4, 81:6, 83:1, 83:4, 83:10, 86:9, 90:12, 91:10, 91:14, 91:16, 91:19, 91:20, 91:24, 93:12, 94:7, 94:16, 94:21, 94:25, 96:10, 96:11, 97:22, 97:24, 97:25, 100:15, 105:15, 108:21, 109:25, 110:14, 112:6
**household** [3] - 8:13, 9:10, 9:11
**houses** [2] - 71:23,

72:15
**huge** [2] - 76:4, 76:8
**hundred** [1] - 49:6
**hurt** [1] - 36:25
**hustle** [1] - 32:12
**hypervigilant** [1] - 25:18

**I**

**idea** [4] - 93:20, 95:25, 98:14, 98:16
**identified** [2] - 33:19, 36:19
**immediately** [4] - 16:8, 89:19, 98:10
**implicated** [1] - 116:6
**important** [2] - 100:9, 116:3
**impression** [2] - 41:2, 71:5
**incident** [2] - 7:23, 75:13
**include** [1] - 31:7
**INDEX** [1] - 3:1
**indicated** [2] - 37:14, 120:5
**indicates** [1] - 61:9
**indicating** [3] - 9:12, 19:9, 60:21
**indicating)** [2] - 9:14, 93:15
**indication** [2] - 21:7, 28:15
**indications** [1] - 40:23
**indicator** [1] - 21:22
**indicators** [7] - 17:11, 21:8, 21:9, 21:12, 21:14, 41:7, 41:12
**inference** [1] - 60:16
**inferences** [1] - 60:23
**influence** [1] - 17:12
**information** [26] - 7:20, 10:1, 10:21, 11:18, 11:22, 34:14, 35:2, 42:22, 45:19, 45:23, 47:15, 47:21, 48:1, 49:14, 49:22, 49:23, 53:10, 54:18, 54:22, 56:1, 61:2, 74:6, 80:13, 105:11, 107:1, 108:4
**initial** [4] - 9:2, 16:5, 19:17, 98:17
**inside** [5] - 29:1, 83:10, 93:13, 94:3, 94:10
**instances** [1] - 44:16
**instinct** [2] - 21:25,

52:18
**intake** [5] - 12:6, 12:8, 12:13, 12:21, 61:3
**intent** [1] - 103:18
**interact** [1] - 80:23
**interacting** [1] - 116:24
**interaction** [15] - 36:18, 86:12, 88:6, 98:19, 99:1, 102:1, 102:7, 111:2, 111:3, 111:5, 111:6, 117:8, 117:10, 117:25, 118:8
**interactions** [3] - 14:19, 36:24, 37:4
**interested** [1] - 120:15
**interposed** [1] - 120:11
**interrupted** [2] - 31:13, 32:15
**intertwined** [1] - 74:9
**investigating** [3] - 115:25, 116:9, 118:17
**investigation** [2] - 60:5, 105:12
**investigations** [1] - 118:21
**involved** [1] - 62:10
**IOWA** [2] - 1:2, 1:9
**Iowa** [10] - 1:16, 1:18, 2:4, 2:8, 2:12, 2:14, 2:17, 12:12, 120:4, 120:17
**ish** [1] - 45:4
**issue** [2] - 40:2, 40:7

**J**

**J-a-y-s-e** [1] - 35:19
**Jarvis** [1] - 11:6
**Jayse** [10] - 33:24, 34:6, 34:11, 34:25, 35:12, 35:16, 35:17, 44:24, 48:9
**JAYSE** [1] - 35:20
**JEFFERSON** [1] - 1:9
**Jefferson** [13] - 2:14, 4:15, 5:1, 5:4, 5:15, 5:19, 5:20, 6:8, 34:4, 42:24, 44:21, 50:2, 50:5
**Jen** [6] - 70:6, 70:9, 70:14, 71:11, 71:23
**jlewis@hinderslaw. com** [1] - 2:18
**job** [2] - 16:14, 118:18
**JONATHAN** [1] - 2:15

**Judge** [4] - 5:13, 63:22, 63:24
**jump** [1] - 10:4
**jumped** [1] - 89:18

**K**

**keep** [7] - 45:21, 59:7, 60:9, 67:5, 67:7, 68:12, 82:17
**KELSEY** [4] - 1:8, 1:8, 1:12, 4:1
**Kelsey** [3] - 2:9, 65:2, 115:20
**kept** [3] - 24:7, 26:13, 95:11
**kid** [4] - 19:8, 62:23, 62:24, 63:11
**kids** [1] - 113:2
**kind** [89] - 6:1, 15:10, 15:22, 18:22, 19:7, 22:3, 22:15, 22:22, 22:23, 23:12, 26:12, 27:21, 27:23, 28:24, 31:12, 33:13, 33:15, 33:22, 34:10, 34:23, 39:12, 39:14, 41:20, 41:21, 41:22, 42:10, 42:13, 44:4, 46:10, 50:7, 53:9, 58:13, 60:16, 64:20, 64:23, 65:4, 65:16, 66:18, 67:5, 67:6, 69:12, 69:13, 69:16, 69:23, 70:24, 72:13, 72:25, 73:8, 73:14, 74:4, 76:11, 79:2, 80:4, 84:22, 84:24, 85:8, 87:14, 87:24, 88:1, 88:2, 90:16, 92:3, 96:25, 97:1, 97:6, 97:16, 97:19, 98:3, 99:8, 100:9, 100:16, 101:14, 102:19, 102:23, 104:21, 105:3, 105:6, 105:7, 108:10, 110:18, 111:5, 111:19, 112:8, 112:10, 112:13, 113:9, 113:20, 117:23
**kitchen** [3] - 29:7, 30:5, 30:8
**knocked** [2] - 91:25, 94:2
**knocking** [1] - 91:8
**knowing** [1] - 37:8
**knowledge** [4] - 57:16, 57:18, 110:21, 120:7

**knows** [2] - 50:12, 87:12
**Koenig** [3] - 2:9, 4:11, 65:6
**KOENIG** [4] - 1:8, 1:8, 1:12, 4:1
**Kruidenier** [1] - 2:3

**L**

**language** [1] - 31:21
**last** [2] - 4:10, 4:24
**law** [18] - 46:12, 49:14, 50:14, 53:4, 63:7, 63:9, 74:5, 74:7, 74:12, 74:13, 74:14, 76:20, 83:23, 86:17, 87:11, 100:6, 102:15, 109:18
**Law** [3] - 2:2, 2:7, 2:15
**lead** [6] - 72:18, 73:2, 75:23, 75:24, 75:25, 76:19
**leader** [1] - 73:1
**least** [1] - 18:19
**leave** [8] - 23:18, 25:19, 26:20, 82:24, 93:2, 96:24, 101:5, 109:10
**leaving** [5] - 12:18, 33:4, 102:23, 107:4, 109:12
**led** [2] - 29:12, 81:25
**left** [10] - 26:15, 27:1, 30:10, 31:15, 34:2, 84:19, 84:21, 102:9, 102:16, 102:18
**legal** [4] - 81:15, 110:13, 110:16, 110:21
**Lerner** [7] - 70:6, 70:9, 70:14, 71:11, 71:17, 71:23
**letter** [1] - 23:9
**letting** [5] - 19:15, 26:22, 29:5, 30:16, 44:13
**LEWIS** [1] - 2:15
**lie** [1] - 57:21
**life** [2] - 39:15, 70:13
**lifted** [1] - 17:7
**lightened** [2] - 92:19, 100:17
**limit** [1] - 11:1
**line** [1] - 95:5
**listen** [1] - 26:16
**live** [3] - 4:21, 30:21, 42:23
**lived** [6] - 15:2, 15:16,

15:18, 18:3, 46:8, 118:11
**LLP** [1] - 2:3
**locate** [2] - 46:13, 62:1
**located** [2] - 52:3, 52:8
**location** [1] - 67:21
**locked** [2] - 13:18, 13:25
**look** [17] - 7:10, 8:3, 8:10, 10:10, 10:14, 15:22, 24:19, 30:1, 56:24, 92:7, 92:10, 96:17, 101:5, 101:16, 114:7, 117:18, 117:21
**looked** [14] - 11:4, 11:5, 11:7, 17:9, 20:14, 30:3, 42:22, 80:10, 91:9, 95:3, 97:18, 100:19, 100:21, 101:4
**looking** [6] - 40:3, 55:20, 92:7, 108:25, 109:8, 116:12
**looks** [3] - 8:15, 20:17, 39:5
**loop** [1] - 30:8
**love** [3] - 51:23, 107:23
**lunchtime** [1] - 33:12

**M**

**mad** [2] - 26:5, 93:10
**main** [9] - 6:1, 6:4, 14:4, 24:19, 24:20, 25:5, 28:11, 77:21, 90:12
**majority** [2] - 64:14, 75:18
**male** [1] - 29:10
**manner** [3] - 38:15, 66:10, 112:2
**mannerisms** [1] - 92:19
**MapQuest** [1] - 7:10
**match** [4] - 17:22, 17:25, 19:2, 19:4
**material** [1] - 7:19
**matter** [4] - 25:18, 74:16, 74:20, 116:10
**matters** [1] - 120:7
**MCCONNELL** [1] - 1:4
**McConnell** [3] - 2:19, 14:24, 64:7
**McConnell-Seaba** [3] - 2:19, 14:24, 64:7
**mean** [36] - 7:14, 9:4,

9:8, 10:3, 13:19, 14:2, 16:17, 17:10, 20:16, 20:23, 20:24, 20:25, 21:4, 21:18, 22:8, 30:15, 39:20, 39:21, 51:12, 59:24, 69:10, 69:25, 73:16, 84:9, 87:13, 88:4, 88:24, 93:2, 96:18, 100:18, 102:20, 104:5, 106:7, 113:25, 114:21, 116:6
**meant** [1] - 103:19
**medical** [1] - 6:11
**meetings** [1] - 48:23
**members** [1] - 113:22
**memory** [11] - 55:20, 56:8, 57:2, 65:14, 88:11, 94:20, 99:20, 102:24, 104:3, 104:8, 107:12
**mental** [1] - 113:12
**mentioned** [6] - 20:11, 28:2, 56:5, 56:21, 83:2, 100:14
**MESSAMER** [8] - 2:2, 4:5, 8:17, 8:21, 70:19, 82:19, 115:12, 119:20
**Messamer** [1] - 3:3
**messy** [1] - 68:13
**met** [1] - 5:12
**meth** [9] - 11:10, 11:15, 21:7, 21:11, 21:15, 21:22, 56:23, 58:5, 58:18
**methamphetamine** [7] - 11:17, 40:24, 41:8, 41:13, 45:25, 62:16, 66:4
**Michelle** [4] - 57:12, 57:13, 57:15, 57:22
**middle** [3] - 15:10, 53:1, 88:20
**might** [4] - 27:17, 29:3, 43:14, 87:8
**mind** [6] - 25:12, 50:11, 80:20, 92:9, 112:22, 117:12
**mind's** [1] - 93:11
**minute** [1] - 24:11
**minutes** [12] - 92:10, 92:15, 92:23, 97:11, 97:13, 97:14, 97:17, 117:17, 117:20, 118:4, 118:6
**miraculously** [1] - 51:23
**misspeak** [3] - 19:5,

65:15, 106:13
**misstate** [1] - 103:15
**misstates** [1] - 61:12
**mixing** [1] - 57:11
**mode** [4] - 26:13, 28:24, 99:8, 102:20
**Moines** [11] - 1:18, 2:4, 2:12, 4:19, 72:5, 72:6, 72:12, 76:18, 76:22, 108:11, 120:17
**Mom** [1] - 11:11
**mom's** [1] - 11:4
**moment** [14] - 17:10, 23:25, 24:14, 26:21, 35:4, 38:2, 51:12, 82:22, 84:13, 90:1, 90:10, 90:19, 106:17, 109:9
**Montana** [1] - 47:8
**month** [1] - 19:6
**months** [4] - 5:17, 39:5, 69:23, 69:24
**morning** [7] - 6:9, 6:24, 11:1, 11:3, 64:7, 105:12, 112:7
**most** [3] - 9:6, 81:24, 109:21
**mostly** [2] - 21:17, 88:20
**mother** [1] - 62:13
**MOULDING** [1] - 1:8
**Moulding** [7] - 2:14, 5:5, 54:17, 69:18, 70:20, 72:21, 105:14
**move** [3] - 4:20, 26:24, 85:15
**movement** [1] - 21:16
**moving** [1] - 21:17
**MR** [17] - 57:5, 59:21, 61:11, 70:15, 79:19, 81:14, 82:12, 82:16, 110:2, 110:15, 115:14, 115:16, 115:17, 115:19, 118:13, 118:16, 119:18
**MS** [7] - 4:5, 8:17, 8:21, 70:19, 82:19, 115:12, 119:20
**multiple** [1] - 37:10
**must** [7] - 20:5, 25:7, 34:12, 65:11, 65:18, 103:7, 103:8

**N**

**name** [17] - 4:10, 11:5, 11:6, 13:6, 13:11,

14:7, 34:8, 36:2, 48:3, 54:19, 59:3, 61:22, 61:25, 93:18, 111:18, 116:6, 117:1
**named** [1] - 120:5
**naturally** [1] - 111:14
**nature** [2] - 40:21, 117:2
**necessarily** [15] - 17:25, 21:1, 24:21, 39:19, 39:20, 49:1, 51:7, 53:16, 55:3, 74:1, 100:11, 108:23, 111:4, 113:7, 113:16
**necessary** [1] - 38:25
**need** [11] - 20:2, 25:20, 27:25, 50:17, 53:8, 69:1, 81:22, 96:21, 109:3, 109:10, 119:8
**needed** [12] - 7:13, 11:21, 12:1, 23:16, 23:18, 25:17, 28:5, 42:1, 42:6, 43:12, 53:20, 73:11
**needing** [1] - 74:6
**needs** [1] - 25:19
**negative** [5] - 36:18, 36:23, 37:4, 38:14, 111:7
**neighboring** [1] - 46:8
**nervous** [2] - 28:25, 77:25
**never** [12] - 7:9, 36:3, 59:17, 61:15, 63:19, 64:2, 71:13, 87:15, 89:17, 108:14, 108:15
**new** [2] - 56:14, 56:23
**newer** [1] - 70:24
**next** [12] - 16:4, 16:22, 16:25, 17:3, 19:11, 29:25, 62:25, 63:2, 63:4, 91:6, 93:23, 104:15
**nice** [2] - 95:21
**nobody** [3] - 51:7, 80:11, 102:4
**non** [1] - 104:14
**non-founded** [1] - 104:14
**none** [1] - 113:6
**normal** [8] - 14:10, 14:13, 33:20, 42:19, 50:2, 75:16, 75:17, 111:20
**normally** [3] - 13:21, 47:20, 63:3
**Norwalk** [1] - 2:17

SWEENEY  COURT  REPORTING  (515)  244-6373
320  Insurance  Exchange  Bldg.,  Des  Moines,  IA  50309
Page 6 to 6 of 11                                                                                    36 of 41 sheets

**App. 086**

**NOTARY** [1] - 120:22
**Notary** [1] - 1:15
**note** [3] - 39:19, 44:4, 65:22
**noted** [6] - 36:22, 39:21, 41:6, 59:5, 65:5, 103:1
**notes** [5] - 67:4, 67:5, 67:7, 68:3, 115:8
**nothing** [10] - 52:17, 52:18, 52:20, 53:13, 60:20, 89:22, 89:23, 96:25, 104:6, 104:9
**notice** [1] - 21:10
**noticed** [1] - 40:3
**notices** [2] - 114:4, 114:5
**notifications** [2] - 113:21, 114:19
**nowhere** [2] - 15:11, 53:2
**number** [23] - 7:23, 8:18, 8:24, 12:11, 13:6, 13:11, 13:15, 14:8, 14:12, 54:19, 55:13, 55:16, 55:18, 55:22, 60:3, 60:6, 60:8, 60:10, 60:12, 60:13, 60:17, 61:6, 61:9

**O**

**oath** [1] - 120:8
**object** [5] - 59:21, 61:11, 81:15, 110:2, 110:16
**objections** [1] - 120:10
**observation** [1] - 117:13
**observations** [1] - 110:20
**obvious** [2] - 31:11, 40:21
**obviously** [1] - 105:22
**OF** [4] - 1:2, 1:7, 1:12, 3:1
**off-the-record** [1] - 8:19
**office** [28] - 10:13, 33:9, 36:13, 37:23, 38:1, 38:9, 38:17, 39:13, 43:1, 43:2, 43:3, 43:18, 45:3, 45:5, 45:18, 45:22, 66:7, 66:22, 68:9, 68:10, 69:24, 105:18, 108:11,

108:12, 111:23, 114:15, 114:16, 114:18
**Office** [2] - 2:11, 44:17
**officer** [3] - 91:23, 93:16, 93:21
**officers** [1] - 93:17
**offices** [1] - 4:22
**official** [1] - 79:23
**often** [1] - 62:19
**oftentimes** [1] - 118:22
**old** [1] - 19:6
**older** [2] - 19:3, 19:8
**one** [35] - 4:8, 5:12, 6:4, 6:10, 8:22, 34:9, 34:10, 39:4, 41:9, 41:17, 41:18, 46:5, 47:7, 47:8, 47:16, 49:11, 49:13, 55:19, 63:20, 64:2, 68:4, 69:20, 72:7, 72:23, 83:6, 85:24, 92:11, 93:19, 96:12, 98:22, 99:4, 105:1, 108:9, 119:8
**ones** [1] - 55:3
**open** [6] - 14:2, 26:13, 67:17, 86:3, 93:25, 108:23
**opening** [1] - 114:21
**opposite** [2] - 79:3, 99:14
**orchestrated** [1] - 64:20
**order** [1] - 59:8
**Order** [2] - 63:15, 63:25
**organize** [1] - 68:5
**organized** [1] - 67:18
**original** [2] - 12:17, 13:11
**Osborn** [2] - 2:20, 75:13
**OSBORN** [1] - 1:4
**Osborn's** [1] - 72:17
**outburst** [1] - 50:25
**outfits** [2] - 40:5, 40:16
**outside** [6] - 23:23, 23:24, 84:15, 84:19, 94:19, 109:15
**overtalking** [1] - 27:21
**own** [2] - 16:9, 74:4
**owner** [3] - 79:7, 80:11, 80:15
**ownership** [1] - 81:2

**P**

**P.L.C** [1] - 2:16
**p.m** [3] - 1:16, 58:2, 119:21
**page** [11] - 9:19, 42:12, 47:15, 47:17, 47:21, 48:1, 54:18, 54:22, 57:6, 58:2, 59:4
**Page** [1] - 3:2
**parent** [2] - 63:6, 63:8
**parental** [6] - 23:8, 59:9, 59:14, 104:23, 114:4, 114:5
**parents** [4] - 62:19, 62:23, 114:5, 115:10
**parked** [1] - 34:13
**parking** [1] - 43:7
**Parrish** [1] - 2:3
**part** [4] - 11:2, 17:3, 47:5, 64:11
**participated** [1] - 46:6
**particular** [13] - 8:6, 11:19, 13:23, 34:11, 46:5, 48:24, 50:22, 67:11, 68:7, 79:13, 84:16, 88:11, 114:9
**particularly** [4] - 16:16, 46:6, 89:5, 93:3
**parties** [2] - 120:13, 120:15
**partner** [2] - 14:25, 64:8
**parts** [1] - 9:2
**pass** [1] - 8:24
**passed** [1] - 80:16
**passes** [1] - 24:5
**past** [14] - 10:8, 10:10, 11:7, 11:10, 11:15, 11:24, 21:5, 45:7, 45:24, 49:9, 51:2, 52:6, 57:21, 66:9
**pause** [1] - 27:2
**pausing** [1] - 117:23
**paying** [1] - 109:5
**PDF** [1] - 8:7
**people** [12] - 5:23, 14:5, 21:8, 23:10, 30:18, 56:4, 58:6, 66:23, 76:5, 76:9, 106:1, 108:5
**people's** [4] - 71:23, 78:14, 78:16, 78:20
**per** [4] - 49:24, 50:4, 74:9
**percent** [1] - 49:7
**perfectly** [1] - 109:1

**periods** [1] - 68:14
**person** [21] - 12:19, 15:7, 29:9, 29:13, 31:1, 31:20, 55:13, 55:21, 56:10, 58:19, 58:23, 59:18, 59:25, 60:1, 60:22, 60:24, 60:25, 61:1, 73:5, 81:17, 81:19
**personal** [5] - 67:24, 67:25, 112:9, 112:12, 112:13
**personally** [5] - 62:9, 81:23, 82:20, 95:21, 98:6
**perspective** [1] - 38:4
**phone** [28] - 8:1, 12:20, 13:6, 13:11, 13:15, 14:7, 14:12, 19:17, 25:3, 33:14, 36:10, 45:8, 49:8, 55:13, 55:16, 55:18, 57:25, 58:2, 60:2, 60:10, 60:11, 60:13, 60:17, 61:4, 64:21, 64:23, 65:4, 87:9
**physically** [1] - 26:8
**piece** [3] - 18:10, 50:21, 99:12
**pigs** [3] - 24:3, 112:20, 112:21
**place** [7] - 27:5, 43:3, 67:6, 77:14, 90:16, 91:17, 120:5
**Plaintiffs** [2] - 1:6, 2:2
**plan** [3] - 46:7, 90:8, 95:1
**point** [65] - 17:19, 17:23, 18:1, 19:22, 22:4, 22:9, 22:11, 22:19, 26:5, 26:6, 26:7, 26:19, 28:3, 28:24, 30:17, 30:19, 36:7, 39:6, 42:3, 42:5, 42:8, 42:11, 42:20, 43:4, 43:9, 44:6, 46:15, 48:10, 48:15, 50:10, 50:13, 55:25, 58:15, 63:10, 66:21, 69:18, 73:24, 85:4, 85:24, 86:6, 87:3, 88:16, 88:22, 89:1, 90:8, 90:15, 91:3, 91:12, 91:22, 96:2, 96:8, 98:16, 98:22, 99:4, 102:21, 107:24, 108:10, 109:25, 110:6, 111:17, 111:18, 113:12, 113:16,

118:3
**police** [1] - 34:21
**policies** [2] - 73:25, 74:1
**policy** [2] - 54:12, 119:7
**poor** [1] - 103:19
**porch** [6] - 16:3, 22:6, 27:6, 31:24, 31:25, 93:22
**portion** [1] - 81:10
**position** [1] - 5:23
**positive** [5] - 11:9, 11:16, 46:1, 62:16, 98:14
**possibility** [2] - 18:17, 31:18
**possible** [2] - 28:23, 48:22
**possibly** [1] - 14:8
**potentially** [3] - 18:15, 92:8, 113:2
**power** [1] - 118:7
**pregnancy** [1] - 40:18
**pregnant** [5] - 17:8, 39:2, 39:20, 40:3, 40:15
**presence** [1] - 32:16
**present** [5] - 2:19, 64:25, 80:25, 111:13, 112:1
**pretty** [11] - 6:25, 8:2, 16:6, 25:14, 46:18, 72:20, 72:24, 100:21, 105:15, 115:1, 117:24
**previous** [4] - 66:13, 116:18, 117:8, 117:14
**previously** [1] - 62:20
**primarily** [1] - 5:21
**principal** [1] - 118:18
**print** [1] - 47:20
**printed** [1] - 120:9
**priority** [1] - 80:20
**private** [1] - 68:2
**probation** [7] - 36:13, 37:23, 37:25, 38:9, 38:17, 38:18, 39:13
**procedure** [3] - 50:2, 107:13, 107:18
**process** [10] - 6:18, 47:1, 63:17, 67:16, 70:23, 74:11, 75:17, 105:6, 106:17, 108:13
**PROFESSIONAL** [1] - 120:21
**professional** [1] - 41:21

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 087**

**Professional** [2] - 1:15, 120:4
**pronounce** [1] - 4:10
**property** [34] - 15:3, 15:8, 15:19, 15:21, 19:12, 20:3, 20:9, 24:4, 24:6, 26:23, 35:6, 46:11, 48:5, 79:7, 79:15, 80:11, 80:15, 80:17, 80:19, 80:22, 81:1, 82:5, 92:7, 92:9, 97:8, 102:10, 102:17, 102:18, 102:22, 112:19, 115:23, 117:18, 117:21, 118:11
**Protective** [1] - 116:3
**protocol** [1] - 72:15
**proved** [1] - 63:23
**provide** [5] - 64:3, 64:4, 78:5, 106:25, 113:21
**provided** [6] - 10:18, 36:11, 49:21, 80:8, 80:12, 106:7
**provider** [1] - 62:12
**providing** [2] - 51:8, 59:8
**PUBLIC** [1] - 120:22
**Public** [1] - 1:15
**pull** [8] - 7:5, 7:24, 15:9, 15:11, 83:18, 83:21, 84:20, 104:24
**pulled** [8] - 20:11, 84:17, 86:8, 86:14, 87:16, 87:21, 88:13, 116:15
**pulling** [1] - 88:10
**pulls** [1] - 83:18
**punctuation** [1] - 68:15
**pupils** [1] - 21:16
**pushback** [2] - 73:23, 73:25
**pushed** [1] - 77:10
**put** [7] - 48:16, 57:21, 63:14, 67:3, 68:13, 113:18
**puts** [1] - 12:4
**putting** [1] - 6:14

**Q**

**questions** [9] - 45:20, 53:7, 64:12, 70:16, 76:4, 115:13, 115:15, 118:14, 119:19

**quick** [3] - 64:23, 65:3, 87:9
**quickly** [5] - 16:7, 26:4, 26:11, 69:13, 94:17
**quite** [1] - 62:18
**quote** [2] - 37:3, 37:6

**R**

**random** [1] - 23:11
**randomly** [1] - 45:1
**re** [1] - 93:7
**re-explain** [1] - 93:7
**reached** [1] - 109:19
**read** [7] - 47:14, 49:23, 50:21, 65:6, 66:12, 78:4, 81:11
**reading** [2] - 47:2, 78:4
**ready** [2] - 54:15, 102:22
**real** [2] - 71:19, 83:7
**really** [25] - 7:9, 7:14, 21:2, 23:4, 24:22, 28:18, 38:1, 40:1, 42:13, 45:11, 52:20, 69:21, 70:3, 76:10, 83:9, 84:12, 84:23, 86:2, 98:1, 98:4, 98:9, 102:24, 108:2, 109:2, 114:7
**reask** [1] - 40:11
**reason** [13] - 21:24, 23:10, 53:14, 55:8, 68:15, 78:20, 82:21, 83:22, 85:24, 110:13, 111:12, 112:4, 117:24
**reasons** [1] - 79:5
**recalled** [1] - 106:5
**recent** [2] - 34:19, 35:24
**recently** [5] - 17:17, 38:23, 58:11, 58:16, 113:3
**recollection** [2] - 32:7, 107:17
**record** [3] - 8:19, 81:11, 120:10
**reduced** [1] - 120:9
**reevaluate** [1] - 54:8
**refusing** [1] - 63:8
**regarding** [1] - 11:14
**regardless** [1] - 97:10
**Registered** [2] - 1:14, 120:4
**REGISTERED** [1] - 120:21

**regular** [2] - 37:15, 70:11
**regularly** [1] - 42:18
**reiterated** [1] - 44:11
**reject** [1] - 12:14
**related** [1] - 120:12
**relationship** [5] - 37:19, 41:22, 76:11, 116:18, 117:14
**relative** [1] - 120:14
**relevance** [1] - 81:9
**relevant** [2] - 40:12, 117:12
**relieved** [1] - 102:2
**remain** [1] - 13:6
**remained** [1] - 44:5
**remember** [66] - 7:4, 15:7, 15:19, 18:11, 24:22, 25:22, 25:25, 26:12, 26:24, 27:13, 33:5, 33:13, 34:10, 37:3, 43:6, 43:15, 44:7, 44:8, 44:9, 48:12, 48:25, 49:1, 65:13, 65:16, 73:2, 83:20, 84:2, 84:9, 85:6, 85:10, 85:19, 86:21, 86:23, 86:25, 89:12, 89:25, 91:2, 92:11, 95:2, 95:9, 95:12, 96:5, 96:16, 96:20, 96:22, 97:20, 97:21, 97:23, 98:21, 98:25, 99:4, 99:9, 99:11, 99:13, 99:21, 99:25, 100:12, 102:2, 102:12, 102:23, 103:4, 103:24, 107:24, 109:3, 116:24
**remembered** [2] - 15:10, 24:6
**remembering** [2] - 33:12, 70:3
**removed** [4] - 46:4, 47:8, 62:15, 62:20
**reopen** [2] - 13:21, 13:23
**repeat** [1] - 66:19
**repetitive** [2] - 46:18, 107:25
**replied** [1] - 92:23
**report** [15] - 36:15, 58:4, 59:4, 60:20, 61:1, 62:4, 65:5, 66:24, 67:10, 67:16, 103:1, 105:16, 105:17, 105:22, 114:23
**reported** [2] - 9:22,

9:23
**Reported** [1] - 1:24
**REPORTER** [2] - 120:21, 120:22
**reporter** [8] - 13:5, 13:8, 47:22, 54:21, 54:23, 55:6, 81:12, 108:16
**Reporter** [4] - 1:14, 1:15, 120:3, 120:4
**reporters** [2] - 13:2, 49:12
**reporting** [3] - 11:12, 56:5, 108:17
**request** [1] - 115:4
**requested** [2] - 7:18, 81:10
**requests** [1] - 30:10
**required** [2] - 114:20, 115:10
**rereading** [1] - 53:24
**resided** [2] - 15:25, 47:6
**residence** [2] - 109:12, 109:14
**respectfully** [1] - 118:5
**review** [7] - 45:6, 45:19, 45:23, 48:6, 49:9, 49:10
**reviewed** [3] - 11:22, 46:2, 66:17
**reviewing** [3] - 45:5, 45:24, 50:20
**reviews** [1] - 10:7
**rights** [7] - 23:8, 58:20, 58:24, 59:9, 59:14, 78:14, 104:23
**Rippey** [7] - 24:18, 42:8, 45:13, 49:25, 52:10, 69:5, 75:10
**road** [1] - 95:8
**rocker** [1] - 27:7
**role** [3] - 72:16, 110:22, 111:19
**room** [1] - 30:2
**Rosonke** [4] - 56:7, 56:20, 59:6, 59:13
**rotted** [1] - 47:10
**row** [1] - 108:8
**RPR** [1] - 1:24
**rude** [1] - 37:22
**run** [2] - 33:15, 74:4
**running** [1] - 27:17
**rush** [2] - 54:2, 92:17
**rushed** [3] - 31:2, 54:9, 105:5
**rushing** [3] - 29:18, 29:23, 68:16
**RYAN** [1] - 2:10

ryan.sheahan @ag.
iowa.gov [1] - 2:13

**S**

**safe** [3] - 34:23, 87:13, 119:13
**safety** [9] - 12:3, 46:7, 64:5, 76:3, 76:15, 100:11, 115:25, 118:18, 119:13
**Sarah** [12] - 56:7, 56:13, 56:20, 56:22, 57:2, 57:12, 57:14, 58:3, 58:4, 59:6, 59:12, 105:25
**sat** [4] - 18:11, 18:15, 67:12, 97:15
**saw** [7] - 39:3, 40:15, 53:13, 86:11, 89:3, 91:5, 91:20
**scared** [3] - 73:22, 85:23, 85:24
**scene** [1] - 86:15
**scoot** [1] - 25:15
**screen** [1] - 8:2
**se** [2] - 50:4, 74:9
**SEABA** [2] - 1:4, 1:5
**Seaba** [8] - 2:19, 14:24, 15:13, 64:7, 80:9, 80:11, 115:22, 117:16
**Seaba's** [2] - 46:11, 80:22
**search** [4] - 11:5, 81:3, 83:10, 103:4
**searches** [1] - 78:15
**seat** [9] - 17:17, 17:19, 17:22, 17:24, 19:2, 19:4, 19:7, 58:13, 113:5
**Second** [1] - 2:11
**second** [16] - 18:4, 27:2, 27:5, 44:12, 49:2, 53:25, 54:6, 54:13, 68:19, 82:4, 83:15, 89:25, 107:13, 107:15, 118:25, 119:9
**secondly** [1] - 77:17
**see** [55] - 8:3, 8:8, 10:22, 11:7, 11:9, 11:10, 11:13, 11:15, 13:10, 15:23, 15:25, 18:2, 19:24, 21:6, 22:22, 25:5, 26:2, 26:17, 28:12, 29:1, 29:9, 29:13, 29:14, 29:17, 30:12, 30:17,

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 088**

30:24, 31:4, 31:6, 33:16, 39:1, 40:14, 45:8, 53:13, 54:24, 54:25, 56:12, 57:5, 80:19, 82:20, 87:16, 88:8, 88:15, 89:6, 90:21, 90:24, 91:11, 93:11, 98:2, 101:23, 102:4, 104:24, 108:22, 109:11
**seeing** [11] - 28:14, 30:14, 30:25, 31:9, 43:16, 55:22, 86:9, 91:17, 94:20, 97:21, 101:21
**seeking** [2] - 58:20, 58:23
**seem** [1] - 111:9
**send** [6] - 8:7, 45:13, 114:3, 114:14, 114:17
**sends** [3] - 114:15, 114:16, 114:18
**sense** [7] - 22:2, 75:2, 105:9, 113:6, 113:15, 114:17, 117:5
**sent** [4] - 12:5, 114:20, 114:24, 115:10
**separate** [2] - 74:13, 74:14
**September** [1] - 5:3
**serves** [1] - 56:8
**services** [1] - 46:6
**Services** [1] - 116:4
**setting** [1] - 23:1
**several** [5] - 38:9, 38:17, 39:3, 69:22
**share** [1] - 55:25
**shared** [4] - 50:24, 51:13, 67:21, 105:13
**sharing** [1] - 46:25
**SHEAHAN** [14] - 2:10, 57:5, 59:21, 61:11, 70:15, 79:19, 81:14, 82:12, 82:16, 110:2, 115:14, 115:17, 118:16, 119:18
**Sheahan** [1] - 3:5
**sheet** [3] - 47:24, 49:24, 120:6
**shirt** [2] - 17:7, 20:11
**Shorthand** [2] - 1:14, 120:3
**shorthand** [1] - 120:9
**SHORTHAND** [1] - 120:21
**shoulder** [1] - 99:7
**show** [2] - 53:21, 62:23

**showed** [5] - 17:7, 20:11, 30:22, 59:8, 77:19
**shower** [3] - 22:20, 83:3, 83:8
**showing** [1] - 29:25
**shown** [1] - 17:18
**shows** [2] - 22:19, 83:25
**side** [6] - 30:5, 32:6, 40:8, 67:4, 90:18
**significant** [3] - 38:1, 38:3, 72:24
**silent** [1] - 101:13
**single** [2] - 75:17, 111:15
**sister** [2] - 46:8, 46:10
**sit** [2] - 77:5, 77:10
**sitting** [9] - 11:23, 27:10, 43:6, 50:16, 90:11, 93:24, 94:12, 94:13, 101:21
**situation** [12] - 27:22, 39:16, 43:20, 44:3, 73:20, 74:21, 78:3, 78:11, 80:8, 85:14, 97:16, 104:18
**situations** [3] - 75:23, 76:1, 77:23
**six** [3] - 5:16, 69:23, 69:24
**skipping** [1] - 104:21
**sleeping** [2] - 29:4, 29:9
**sloppy** [1] - 68:14
**slow** [3] - 84:9, 96:13, 96:14
**slowly** [2] - 16:11, 84:2
**small** [6] - 8:2, 31:12, 45:9, 76:6, 76:7, 77:2
**smashed** [1] - 105:10
**smiling** [1] - 101:23
**soaked** [1] - 97:18
**soaking** [1] - 96:7
**sober** [1] - 41:3
**someone** [14] - 20:2, 36:12, 38:10, 38:16, 39:5, 39:10, 39:11, 39:18, 44:2, 87:12, 100:2, 100:5, 100:8, 100:13
**something's** [1] - 96:5
**sometime** [2] - 5:16, 45:1
**sometimes** [9] - 8:5, 13:4, 13:13, 55:16, 67:8, 68:6, 68:12, 76:3, 76:10

**somewhere** [2] - 42:25, 77:25
**soon** [3] - 24:5, 68:11, 100:23
**sorry** [18] - 5:13, 9:15, 17:1, 35:8, 41:9, 54:14, 56:16, 57:3, 57:7, 70:17, 79:8, 82:15, 82:18, 83:14, 88:23, 94:8, 96:19, 113:24
**sort** [10] - 22:3, 38:15, 82:8, 84:6, 101:18, 108:18, 110:8, 116:6, 116:17, 118:7
**sorting** [1] - 18:23
**sorts** [1] - 20:19
**sound** [1] - 21:1
**sounded** [1] - 46:20
**sounds** [2] - 32:9, 46:18
**SOUTHERN** [1] - 1:2
**span** [2] - 45:3, 105:8
**speaker** [1] - 64:24
**speakerphone** [3] - 48:17, 64:9, 65:7
**speaking** [5] - 19:11, 31:22, 32:18, 75:14, 77:7
**specific** [6] - 16:20, 78:18, 100:12, 104:2, 104:7, 108:4
**specifically** [18] - 7:4, 32:22, 41:6, 41:10, 43:24, 65:25, 66:3, 80:16, 83:21, 86:21, 86:25, 92:14, 97:23, 99:12, 99:23, 106:6, 106:9, 108:1
**speculation** [2] - 110:3, 110:5
**speed** [1] - 57:6
**spell** [2] - 35:18, 35:21
**spoken** [2] - 36:10, 71:16
**spot** [1] - 18:2
**staff** [10] - 30:20, 33:22, 48:7, 48:11, 48:23, 63:1, 63:3, 73:12, 75:15, 106:23
**staffed** [7] - 42:7, 66:22, 69:22, 103:2, 106:20, 106:21, 106:24
**standing** [10] - 65:13, 65:17, 81:25, 82:2, 84:21, 89:12, 93:21, 94:11, 96:21, 109:15
**stands** [1] - 76:2
**start** [5] - 6:17, 25:22,

45:5, 82:11, 112:21
**started** [15] - 5:2, 5:4, 5:11, 15:22, 16:9, 16:11, 16:12, 24:2, 24:3, 25:11, 25:12, 25:13, 27:17, 46:16, 109:8
**starting** [1] - 46:23
**starts** [1] - 77:13
**State** [5] - 1:16, 2:11, 12:10, 75:2, 120:3
**state** [22] - 13:4, 20:16, 22:1, 34:8, 38:12, 39:5, 44:1, 53:17, 57:9, 60:15, 68:25, 73:21, 74:8, 87:10, 91:11, 91:12, 94:22, 103:9, 107:11, 109:4, 110:23, 114:6
**statement** [5] - 40:20, 51:1, 56:12, 57:11, 104:4
**statements** [4] - 28:13, 46:20, 86:1, 112:14
**states** [2] - 13:14, 75:11
**STATES** [1] - 1:1
**stating** [17] - 22:25, 24:7, 28:4, 41:6, 41:11, 43:23, 46:19, 47:3, 55:2, 56:9, 60:9, 61:21, 63:2, 65:18, 74:19, 78:1, 113:2
**station** [3] - 34:20, 34:21
**stay** [3] - 29:21, 42:12, 96:21
**stayed** [4] - 20:8, 90:6, 97:17, 109:21
**staying** [3] - 20:9, 42:17, 99:3
**step** [1] - 32:25
**steps** [1] - 63:5
**sticks** [1] - 117:12
**still** [32] - 4:12, 13:5, 14:11, 20:5, 27:6, 39:6, 39:7, 41:16, 41:18, 42:25, 44:21, 58:14, 60:25, 63:8, 73:18, 74:7, 74:16, 85:2, 85:20, 89:7, 89:13, 91:15, 92:4, 92:16, 94:2, 97:2, 97:4, 97:9, 109:9, 115:1
**stolen** [1] - 59:6
**stomach** [2] - 20:12,

20:14
**stop** [6] - 8:3, 18:4, 29:5, 84:14, 95:15, 112:20
**stopped** [4] - 7:25, 28:20, 29:8, 33:11
**stopping** [1] - 34:12
**straight** [2] - 45:11, 98:10
**strange** [3] - 18:13, 38:20, 117:3
**Street** [1] - 2:12
**strong** [1] - 73:24
**stuff** [5] - 31:13, 53:11, 53:24, 106:11, 113:14
**submit** [1] - 63:21
**submitted** [1] - 63:22
**substances** [1] - 9:21
**substantive** [1] - 9:25
**suggested** [1] - 58:17
**summation** [1] - 116:19
**Sunset** [1] - 2:17
**super** [4] - 51:20, 92:18, 102:20, 117:12
**supervision** [1] - 120:9
**supervisor** [41] - 7:5, 10:7, 10:18, 11:20, 12:1, 14:16, 17:20, 18:5, 24:12, 24:17, 25:5, 26:16, 26:20, 30:20, 33:4, 42:7, 42:18, 45:13, 47:1, 48:7, 49:24, 51:16, 52:9, 63:1, 64:14, 68:23, 69:5, 74:19, 75:8, 76:25, 77:4, 77:8, 77:19, 78:6, 79:23, 80:10, 87:2, 104:10, 104:17, 106:23, 106:25
**supervisors** [1] - 106:21
**supposed** [5] - 46:7, 46:14, 96:16, 96:17, 97:19
**surprised** [1] - 47:19
**survival** [2] - 99:8, 102:20
**suspected** [1] - 58:18
**Sweeney** [3] - 1:13, 1:24, 120:3
**switch** [1] - 4:22
**sworn** [2] - 4:3, 120:6
**system** [1] - 10:3

## T

**table** [2] - 93:24, 94:13
**taught** [1] - 78:19
**teeth** [1] - 47:10
**ten** [11] - 92:9, 92:15, 92:22, 92:23, 97:11, 97:13, 117:17, 117:20, 118:4, 118:6, 119:9
**term** [1] - 100:20
**terminate** [2] - 58:20, 58:24
**terminated** [1] - 23:8
**termination** [3] - 59:9, 59:14, 104:23
**terms** [4] - 66:24, 78:12, 118:21, 119:15
**testified** [1] - 4:3
**testify** [2] - 67:15, 120:6
**testimony** [2] - 61:12, 120:10
**THE** [4] - 1:12, 70:17, 82:14, 82:18
**thereupon** [1] - 120:8
**thin** [1] - 20:23
**thinking** [21] - 24:7, 34:1, 34:2, 44:22, 51:7, 51:9, 52:2, 53:4, 57:13, 86:22, 87:1, 95:6, 95:11, 96:4, 96:16, 96:23, 97:20, 99:25, 100:12, 102:3, 106:15
**thinner** [2] - 20:23, 21:3
**third** [1] - 59:5
**threatening** [1] - 112:12
**three** [6] - 5:24, 5:25, 18:19, 45:4, 46:4, 69:20
**three-ish** [1] - 45:4
**threw** [1] - 70:17
**throughout** [5] - 12:10, 18:20, 88:2, 88:18, 106:23
**tied** [1] - 6:15
**TIM** [1] - 1:4
**Tim** [25] - 14:24, 15:15, 20:7, 64:7, 64:9, 64:10, 64:16, 64:24, 65:2, 65:6, 65:10, 65:12, 65:16, 65:21, 65:22, 80:8, 80:17, 86:9, 87:17,

87:20, 87:22, 88:8, 102:7, 102:14, 118:9
**Tim's** [4] - 24:6, 81:4, 81:5, 109:14
**Timothy** [1] - 2:19
**today** [4] - 48:8, 77:5, 77:10, 115:21
**together** [3] - 12:4, 74:12, 105:4
**took** [3] - 5:7, 46:10
**tools** [1] - 30:4
**top** [1] - 58:1
**topic** [1] - 56:16
**touched** [2] - 99:6, 109:20
**touching** [1] - 120:7
**toward** [1] - 111:25
**towards** [5] - 38:14, 87:21, 88:20, 88:21, 110:9
**town** [1] - 46:9
**tractor** [3] - 86:9, 86:11, 87:18
**train** [2] - 16:14, 78:13
**trained** [2] - 21:8, 79:20
**training** [10] - 16:18, 16:20, 78:12, 78:18, 79:4, 79:10, 79:12, 79:13, 79:23, 80:4
**tried** [3] - 31:11, 51:3, 93:7
**trouble** [4] - 28:7, 28:8, 73:22, 108:16
**truck** [12] - 85:22, 89:18, 89:19, 89:23, 89:25, 90:3, 90:11, 91:15, 91:21, 96:4, 97:15, 99:6
**true** [6] - 69:6, 76:13, 76:19, 96:19, 111:22, 120:10
**truly** [7] - 50:11, 51:11, 69:20, 84:1, 90:17, 95:5, 107:11
**truth** [2] - 51:24, 120:6
**try** [3] - 68:11, 85:13, 93:6
**trying** [24] - 21:1, 22:3, 22:25, 23:2, 23:12, 25:10, 32:12, 32:19, 39:8, 44:19, 47:21, 48:21, 55:21, 58:14, 59:7, 64:22, 65:14, 65:15, 96:6, 99:10, 99:13, 99:15, 113:9, 113:14
**turn** [1] - 77:15
**twenty** [3] - 54:1, 105:3, 105:6

**twice** [1] - 71:21
**two** [9] - 19:6, 34:9, 48:23, 86:16, 87:11, 107:19, 118:22, 119:1, 119:11
**two-month-old** [1] - 19:6
**type** [5] - 19:8, 20:22, 21:2, 78:18, 107:21
**types** [1] - 20:19
**typical** [12] - 18:21, 39:16, 43:20, 43:22, 43:25, 44:3, 45:11, 50:1, 107:12, 112:16, 112:22
**typically** [6] - 13:7, 54:13, 63:14, 66:15, 76:16
**typing** [1] - 67:13

## U

**ultimately** [1] - 68:17
**unable** [2] - 6:13, 61:25
**unclear** [1] - 40:20
**uncomfortable** [5] - 24:9, 32:11, 38:11, 110:25, 113:18
**uncomfortableness** [1] - 111:4
**under** [5] - 12:15, 17:12, 79:17, 120:8, 120:9
**understood** [3] - 28:19, 81:1, 110:12
**uneasy** [3] - 19:18, 21:24, 22:24
**unique** [3] - 42:13, 42:15, 78:10
**unit** [3] - 12:6, 12:8, 12:13
**UNITED** [1] - 1:1
**unknown** [1] - 60:25
**unless** [4] - 47:18, 53:5, 104:3, 107:14
**untypical** [1] - 60:11
**unusual** [2] - 65:4, 117:10
**up** [64] - 6:7, 6:16, 7:24, 10:10, 10:14, 11:4, 11:5, 14:5, 15:9, 15:10, 15:12, 16:6, 17:7, 18:23, 20:11, 23:2, 25:3, 27:3, 31:24, 42:22, 45:18, 46:21, 49:5, 53:22, 57:6, 57:11, 57:21, 58:1, 68:12,

76:20, 80:10, 83:18, 84:18, 84:20, 85:9, 85:11, 85:21, 86:8, 86:15, 87:16, 87:21, 88:10, 88:13, 90:3, 90:14, 90:24, 91:7, 91:10, 91:13, 91:16, 91:24, 92:19, 93:12, 93:25, 94:9, 96:11, 100:17, 102:2, 104:24, 108:10, 108:21, 109:3, 109:13, 116:15
**Updegraff** [1] - 2:16
**upset** [2] - 16:8, 82:23
**upstairs** [2] - 30:12, 31:4

## V

**vague** [2] - 39:14, 99:20
**vaguely** [1] - 11:6
**van** [11] - 16:9, 18:12, 18:15, 24:11, 25:17, 25:19, 83:17, 84:7, 84:8, 99:10, 99:15
**Van** [1] - 5:20
**vehicle** [2] - 85:21, 86:4
**verbal** [2] - 84:24, 101:18
**verified** [2] - 19:15, 80:10
**verify** [4] - 17:21, 18:16, 44:19, 58:10
**versus** [1] - 70:8
**via** [1] - 65:6
**video** [1] - 83:24
**view** [3] - 13:18, 19:20, 64:5
**visibly** [1] - 100:16
**visit** [13] - 18:20, 49:5, 53:25, 54:6, 54:13, 75:22, 107:15, 118:25, 119:5, 119:8, 119:9
**visitation** [1] - 41:12
**visits** [5] - 99:17, 107:19, 118:22, 119:1, 119:11
**voicemail** [1] - 12:18
**vs** [1] - 1:7

## W

**wait** [3] - 12:2, 82:12, 96:23
**waited** [2] - 18:12,

87:5
**walk** [8] - 15:5, 15:22, 25:9, 25:12, 25:13, 26:3, 32:20, 99:10
**walked** [10] - 25:6, 26:11, 85:9, 85:11, 85:12, 92:13, 100:14, 100:23, 101:14, 102:1
**walking** [3] - 100:1, 100:4, 100:13
**Walnut** [1] - 2:12
**wants** [1] - 25:5
**Washington** [23] - 5:15, 5:20, 5:21, 6:5, 7:3, 33:10, 33:17, 33:18, 33:19, 34:1, 43:2, 43:3, 44:22, 44:25, 50:3, 69:19, 71:1, 71:7, 71:12, 71:17, 71:21, 75:20, 76:7
**waved** [1] - 88:4
**weapon** [5] - 99:17, 99:22, 100:5, 100:9, 100:13
**week** [4] - 4:24, 37:10, 38:10, 38:17
**weird** [1] - 112:22
**whistles** [1] - 100:4
**white** [1] - 83:17
**White** [7] - 28:5, 28:8, 31:13, 36:8, 39:1, 41:10, 105:24
**whole** [10] - 6:18, 23:15, 27:21, 85:16, 88:2, 112:3, 112:4, 114:8, 114:23, 115:7
**willing** [1] - 77:11
**wish** [1] - 49:6
**WITNESS** [3] - 70:17, 82:14, 82:18
**witness** [3] - 4:2, 120:5, 120:8
**witness's** [1] - 120:6
**woman** [3] - 56:13, 58:3, 105:25
**Wonder** [1] - 2:7
**wondered** [3] - 95:4, 95:22, 97:19
**Word** [5] - 67:5, 67:8, 67:17, 68:2, 68:13
**word** [3] - 52:14, 52:15, 61:19
**worded** [1] - 41:1
**wording** [2] - 103:13, 103:19
**words** [1] - 101:12
**worker** [4] - 12:21, 46:22, 108:14,

SWEENEY  COURT  REPORTING  (515)  244-6373
320  Insurance  Exchange  Bldg.,  Des  Moines,  IA  50309
Page 10 to 10 of 11                                                                                                40 of 41 sheets

**App. 090**

108:18
**worker's** [1] - 51:3
**workers** [1] - 100:10
**works** [1] - 6:18
**worried** [1] - 32:13
**worst** [1] - 52:11
**write** [3] - 63:15, 63:20
**writes** [1] - 12:4
**writing** [2] - 68:10, 103:10
**written** [1] - 104:3
**wrote** [2] - 66:5, 66:25

## Y

**yard** [1] - 98:1
**year** [1] - 69:7
**years** [1] - 106:12
**yelled** [2] - 29:13, 91:25
**yelling** [2] - 27:24, 117:23

## Z

**zero** [2] - 107:12, 119:8

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF IOWA

CENTRAL DIVISION

GAIL OSBORN,                    )
TIM MCCONNELL SEABA,            )
and GORDON SEABA,              )
                               )Case No.
          Plaintiffs,  )4:25-cv-00183
                               )
vs.                            )DEPOSITION OF
                               )
CHAUNCEY MOULDING,             )TIMOTHY RYAN
KELSEY KOENIG, and             )MCCONNELL-SEABA
JEFFERSON COUNTY, IOWA,        )
                               )
          Defendants.   )
_____)

THE DEPOSITION OF TIMOTHY RYAN

MCCONNELL-SEABA, taken before Gale Sweeney

Christensen, Certified Shorthand Reporter,

Registered Professional Reporter, and Notary

Public of the State of Iowa, commencing at

12:23 p.m., April 21, 2026, at 2910 Grand

Avenue, Des Moines, Iowa.

Reported by:  Gale Sweeney Christensen,
                   CSR, RPR

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

A P P E A R A N C E S

Plaintiffs by: GINA MESSAMER
               Attorney at Law
               Parrish Kruidenier, LLP
               2910 Grand Avenue
               Des Moines, Iowa 50312
               gmessamer@parrishlaw.com

               and

               ED HARVEY
               Attorney at Law
               1600 Wonder Way
               Fairfield, Iowa 52556
               Edwardgharvey98@yahoo.com

Defendant Kelsey Koenig
by:            RYAN SHEAHAN
               Assistant Attorney General
               Second Floor
               Hoover State Office Building
               1305 East Walnut Street
               Des Moines, Iowa 50319
               ryan.sheahan.ag.iowa.gov

Chauncey Moulding and Jefferson County, Iowa
by:            BRENT HINDERS
               JONATHAN LEWIS
               Attorneys at Law
               Hinders Updegraff & Franklin,
               P.L.C.
               1104 Sunset Drive
               Norwalk, Iowa 50211
               brent@hinderslaw.com
               jlewis@hinderslaw.com

Also present:  Gail Osborn

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

INDEX OF EXAMINATION

Examination by          Page
Mr. Hinders             4
Mr. Sheahan             47
Ms. Messamer            66

EXHIBITS

Exhibit
Number     Description                 Marked

Exhibit 13 Assessment                  33

Exhibit 14 Video                       38

Exhibit 15 Body cam video              45

INDEX OF ATTORNEY REQUESTS

Request by          Page   Line
Mr. Hinders         29     4
Mr. Hinders         31     7

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

TIMOTHY RYAN MCCONNELL-SEABA,

called as a witness, having been first duly

sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HINDERS:

Q.  Can you please speak and spell your name
for the record.

A.  Timothy, T-i-m-o-t-h-y, Ryan, R-y-a-n,
McConnell-Seaba, M-c-C-o-n-n-e-l-l, hyphen,
S-e-a-b-a.

Q.  And, Mr. McConnell-Seaba, would you like
me to refer to you as Timothy?  Tim?
Mr. McConnell-Seaba during the depositions?

A.  Tim is fine.

Q.  Tim?  Okay.  Tim, are you aware you're
being deposed in the case of Osborn versus
Jefferson County that is filed in federal
court in the State of Iowa?

A.  Yes.

Q.  Have you ever been deposed before?

A.  No.

Q.  Now, you were in here when Gail Osborn
was deposed; is that correct?

A.  Yes.

Q.  And you heard I went through some rules

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

5

with you; right?

A. Yes.

Q. So I'm just going to quickly remind you of those. The first one is, since we have a court reporter here transcribing everything, we need to make sure that we don't talk over each other. Are you able to understand that and abide by that rule?

A. Yes.

Q. The other one is -- and you're doing a great job with it -- is that you say yes or no to questions when they require a yes-or-no answer and not some other utterance. Are you able to do that and understand that requirement?

A. Yes.

Q. Again, you're under oath here. And that means that you have to tell the truth and everything that you state today. Are you able to do that as well?

A. Yes.

Q. The other part is -- let's see -- if you don't understand a question I ask, please let me know. I can either repeat the question, have the court reporter repeat the question,

6

or attempt to help you understand by asking another question. Will you please tell me if you don't understand a question?

A. Yes.

Q. And do you understand if you answer a question then the perception is is that you understood that question, that your answer is responsive to that question?

A. Yes.

Q. And then finally I just ask that if a question is pending that you answer that question. And then if you need to take a break, speak with counsel, you do after answering that question that's pending.

A. Yes.

Q. Tim, did you prepare for this deposition?

A. Yes.

Q. What did you do to prepare?

A. Watched video and conferred with counsel.

Q. Did you review any of the discovery, any of the written discovery?

A. Not today.

Q. Okay. Tim, what's your birth date?

7

A. April 2nd, 1986.

Q. And where were you born?

A. Iowa City, Iowa.

Q. Did you go to primary school in Iowa City?

A. Washington, Iowa.

Q. Did you graduate from high school there?

A. Washington, Iowa, yes.

Q. What year did you graduate?

A. 2004.

Q. Do you have any education past your high school education?

A. Some college.

Q. Where did you go to college at?

A. Indian Hills Community College in Ottumwa.

Q. Did you get a degree from there?

A. No.

Q. How long did you go to school there?

A. Year and a half.

Q. Okay. Did you just choose to drop out?

A. I was going for culinary arts. And I took the baking portion of the classes first, and I decided I wanted to be a baker rather than a chef.

8

Q. And have you been employed as a baker?

A. In most of my twenties I was, yes.

Q. What's your current address?

A. 3251 110 Street, Brighton, Iowa 52540.

Q. How long have you worked there?

A. How long have I worked there?

Q. Or excuse me. How long have you lived there?

A. The majority of my life.

Q. Okay. Now I'll ask you the question, where do you currently work, Tim?

A. Powercom Motor Control in Washington, Iowa.

Q. What's your job there?

A. I'm a technician.

Q. What do you do as a technician?

A. Lots of different things. We build electrical panels for farm equipment. We work on big lathes. I do some machine work, a lot of various projects.

Q. Are you an hourly worker?

A. Yes.

Q. How much money do you earn there hourly?

A. $25.

Q. And then as far as monthly before taxes,

9

what's your normal earnings?

A. Approximately $4,000.

Q. Besides your current employment in Washington, Iowa, what was your job previous to that?

A. I was the plant manager at W2Fuels in Crawfordsville, Iowa.

Q. How long did you do that?

A. About four years.

Q. Were you an hourly employee or a salary employee there?

A. When I started I was an operator. I was hourly. And then when I was promoted to plant manager, I was salary.

Q. How much did you approximately earn per month there in your last position that was salaried?

A. I'm not sure per month. Yearly it was about 77,000.

Q. Why did you leave that job?

A. The plant shut down.

Q. Outside of these two jobs, have you ever been fired, laid off, or quit a job rather than be terminated?

A. I don't think so.

10

Q. Have you ever filed a complaint or served or made a lawsuit against a previous employer?

A. No.

Q. Is there any time in the last 15 years that you haven't been continuously employed?

A. No.

Q. Do you currently receive any government benefits?

A. No.

Q. Have you ever filed for bankruptcy or had a judgment entered against you or sued for a debt?

A. No.

Q. Have you ever been convicted of any crime, misdemeanor, or felony?

A. Yes.

Q. What's that?

A. I have two fifth degree thefts in my early twenties. I have an OWI when I was 24, two possession of marijuana when I was in my early twenties, late teens, and a criminal mischief when I was 24.

Q. Okay. How old are you currently?

A. 40.

11

Q. So about 16 years ago was your last criminal offense that you would have been convicted of?

A. Correct.

Q. Did all of those occur in the state of Iowa or in other states?

A. Iowa.

Q. What counties did those occur in, if you recall?

A. Washington, Jefferson, Louisa. I believe that's all of them.

Q. Fair to say that you've lived in eastern Iowa most of your life?

A. Yes.

Q. Have you ever lived outside of the state of Iowa?

A. I lived in Louisiana for about six to nine months when I was 20.

Q. Okay. Why were you living in Louisiana?

A. I had a friend offer me a job in the carnival, so I was young, had no kids, and I thought, well, I'll try it out for a while.

Q. What did you do in a carnival?

A. Sold teddy bears.

Q. Like in a contest or anything --

12

A. It was a game, you know, kids game.

Q. Okay. What was the game?

A. There was a big piece of plywood behind me with lions painted on it, and there were holes cut where the lions' mouths were, and the kids threw a pork chop in it.

Q. Okay.

A. Prize every time for the kids.

Q. I'm not going to ask whether the game was rigged or anything like that, but that's interesting.

Why did you leave the carnival?

A. It didn't make a lot of money.

Q. Where were you at in Louisiana?

A. Carencro.

Q. What's that by?

A. It's a suburb of Lafayette.

Q. Let's see. Outside of your arrest and convictions, are you aware that you've ever been investigated by a law enforcement agency?

A. Not to my knowledge.

Q. Have you ever been a plaintiff in any other lawsuit other than the current lawsuit?

A. No.

13

Q.  Have you ever previously been married?

A.  No.

Q.  Have you ever been a defendant in any other lawsuit including a personal injury case, a custody case, or small claims case?

A.  No.

Q.  Do you have any children?

A.  One child.

Q.  Is that with Ms. Osborn?

A.  Yes.

Q.  Prior to November 15, 2024, have you or anyone that was part of your household been part of a Child Protective Services complaint or investigation?

A.  I believe so.

Q.  Who was that?

A.  Gail Osborn and myself.

Q.  And that was for your daughter that Gail stated was removed in a guardianship; is that correct?

A.  Correct.

Q.  And am I correct that that is the daughter that was removed in the guardianship, not the daughter that was part of the private termination of parental

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

14

rights?

A.  I believe that's the same case, I believe.

Q.  That daughter is subject to the termination of parental rights?

A.  That we have an appeal for.

Q.  Yes, understood.  Okay.  When was that -- how old was that daughter when she was removed?

A.  Year and a half.

Q.  Have you ever personally used methamphetamine, any illegal drug, or any other illegal drug or any drug in a manner not prescribed to you?

A.  In my early twenties I smoked marijuana.

Q.  No other substances?

A.  No.

Q.  Do you regularly drink alcohol?

A.  Yes.

Q.  Before today have you used any illegal drug or a prescription drug not in the fashion prescribed to you in the last, let's say, six months?

A.  No.

Q.  When was the last time you smoked

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

15

marijuana?

A.  It was when I was 24, probably, so 16 years.

Q.  Have you ever been in a substance abuse treatment program including AA or NA?

A.  Not AA or NA, no.

Q.  What was the program that you were involved in?

A.  When I had my OWI, I had to take some counseling.

Q.  When did you first meet Gail Osborn?

A.  Eight years ago.

Q.  How did you meet Gail?

A.  She moved into my dad's house with my sister.

Q.  Okay.  Where is your sister currently located?

A.  She lives in the main house on our property.

Q.  She still lives on that property in Brighton, Iowa?

A.  Yes.

Q.  Okay.  What was the nature of your relationship at the beginning with Gail Osborn?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

16

A.  We became close friends.

Q.  When did your romantic relationship start?

A.  Eight years ago.

Q.  Approximately eight years ago did you move into the other structure on the property where you two currently live together?

A.  I previously lived there.  I've lived there for approximately ten years.

Q.  Okay.  And have you and Gail lived together in that structure for the previous eight years?

A.  A majority of them, yes.

Q.  Has Gail ever moved out or anything along those lines?

A.  Yes.

Q.  When was that?

A.  Probably six years ago for a couple years.

Q.  Okay.  Just ended the relationship for a period of time?

A.  We just needed to live in our own separate homes for a little while.

Q.  Where did she live during that period of time?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

17

A. Washington.

Q. Do you have any relationship with Gail's other children that she doesn't share with you?

A. No.

Q. Have you ever met those children?

A. No.

Q. Other than the child you had with Gail, do you have any other children?

A. No.

Q. Was Gordon Seaba your father?

A. Yes.

Q. And I think you had already said this, but how long had you lived with Gordon at the property in Brighton?

A. He moved in after my mom died, which was 20 years ago.

Q. Okay. Is that property on the Jefferson County Assessor's website?

A. I believe so.

Q. As far as you know, is everything accurate on there?

A. I would believe so.

Q. Have you ever challenged the assessment of that property?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

18

A. No.

Q. Are you aware of any time Gordon has ever challenged the assessment of that property?

A. No.

Q. I understand that Gordon had a life estate during the term of his life. What is the current ownership interest that you have in it, if any?

A. I am a partial owner with my sister and my deceased brother.

Q. Okay. Previously Gail stated that you had constructed the structure that you live in. Approximately, when did you do that?

A. Ten years ago, so 2016.

Q. Okay. Do you have any licenses as a contractor, an electrician, plumber, anything along those lines?

A. No.

Q. Did anyone help you with that construction?

A. My best friend helped me build it, yes.

Q. Who is that?

A. Jeremy Payne.

Q. Now, you're aware that on November 15,

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

19

2024, that there was an anonymous complaint made about a child living at the property you shared with your sister and your father and Gail. Are you aware of that fact?

A. Yes.

Q. How did you become aware of that?

A. I was at work, and Gail called me, stating that there was an HHS worker there to investigate the claim.

Q. Would that have been on the morning of November 15th?

A. Yes.

Q. What did you do when you received that phone call?

A. I asked if Dad was going to give permission. I stated that he didn't have to, that was his choice, but he was willing to give permission, and I stated that I would be okay with our house being looked into just so the worker could do their job.

Q. Okay. Do you agree that an allegation of a drug-addicted newborn, an ongoing methamphetamine use by a caretaker is, generally speaking, an extremely serious matter?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

20

A. Yes.

Q. Is it your understanding that child protective services was allowed onto the property to look both in the structure in which you and Gail reside as well as the main house?

A. Yes.

Q. And to your knowledge did Gail give birth to a child in September 2024?

A. No.

Q. Has Gail ever used methamphetamine in your presence?

A. No.

Q. You've known Gail for eight years; is that accurate?

A. Yes.

Q. She's never used any illegal drugs, or specifically methamphetamine, during that time?

A. No.

Q. In 2024 did Gail ever exhibit any signs of pregnancy in your opinion?

A. No.

Q. Prior to the investigation by HHS on November 15, 2024, had you or Gail in your

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 096**

21

presence ever jokingly or hypothetically discussed the possibility of either Gail being pregnant or having a child?

A. No.

Q. Had anyone on the property ever commented to Gail in your presence that she looked like she was pregnant?

A. No.

Q. Tim, did you want any more kids with Gail?

A. I was -- I do not plan on having any more kids, no.

Q. Any idea who might have made the anonymous complaint to HHS?

A. I don't know.

Q. Do you know anyone that might be motivated to make such a complaint with HHS?

A. Possibly the guardians of our daughter.

Q. Have you ever investigated as to who might have made that anonymous complaint?

A. No.

Q. To your knowledge, outside of your daughter in which Gail had and you had involvement with Child Protective Services, are you aware that she had previous dealings

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

22

with Child Protective Services?

A. Yes.

Q. To your knowledge has Gail ever tested positive for methamphetamine or another illegal substance --

A. No.

Q. -- while pregnant with a child?

A. No.

Q. Were you present at all when Kelsey Koenig was on the property with Gail and your father?

A. In the afternoon, yes.

Q. That morning when it is just Kelsey there, were you present during any of that?

A. No.

Q. Did Gail tell you anything about Kelsey's visit that morning when you got back from work?

A. I believe so.

Q. Did you leave work early that day or at your regular time?

A. My regular time.

Q. And what time is that?

A. Get off work at 3:30 p.m.

Q. About how far is work from the property

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

23

in Brighton?

A. 20, 25 minutes.

Q. At any time prior to the deputies from Jefferson, the deputies from Washington, the Jefferson County Attorney, and Ms. Koenig returning, had you discussed Ms. Koenig's visit to the property with Gail?

A. Right when I got home from work.

Q. Do you remember what you discussed about it?

A. Just the utter disbelief of it all.

Q. So you got home around -- well, you get off work at 3:30; is that correct?

A. Yes.

Q. About what time did you get home?

A. Approximately 3:50.

Q. Were Ms. Koenig and Mr. Moulding already on the property with the sheriff's deputies at that time?

A. No.

Q. When did you first speak to either Ms. Koenig, Mr. Moulding, or any of the deputies that afternoon?

A. Approximately 4:05.

Q. Do you recall what you said?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

24

A. It was Chauncey Moulding first. I was on my tractor at the end of the driveway. Chauncey stopped his vehicle, asked if I was Gordon Seaba. I said no, I'm not. He said I need to speak to Gordon Seaba. I said I'm the property owner, how can I help you.

And we did that back and forth two or three times, and then he waved his hand and drove on by me, proceeded up the driveway.

Q. Were you there when Mr. Moulding spoke with your father?

A. No.

Q. At any time did you record any interaction with the deputies, Ms. Este, Mr. Moulding, or Ms. Koenig during the afternoon of November 15, 2024?

A. Just on my security cameras for the house.

Q. Just the in-house security cameras, nothing personally?

A. Correct.

Q. Other than your security cameras, have you ever viewed any recordings from that outside of the body cameras?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

25

A. The one that Gail recorded briefly in the house.

Q. That's the only recording other than the house recordings that you have; is that correct?

A. Correct.

Q. When was the first time after Mr. Moulding, Ms. Koenig, and the deputies had gone onto the property in Brighton, Iowa? When was the first time that you spoke to any of those individuals?

A. At the end of the driveway, after Chauncey and Kelsey drove past me.

Q. Okay. So they had driven past you around 4:00 or 5:00. And what time would you estimate that you spoke to them?

A. Just a couple minutes later.

Q. And what did you say to them?

A. I asked if they were able to help me trespass these people from my property because they were harassing me at this point.

Q. What do you mean by harassing you?

A. It was the second time in that day that they came on my property, and I felt like it was harassment at that point.

26

Q. Why do you feel like it was harassment?

A. Because we allowed the worker to do a check when she was there previously in the day to conclude that there was no baby on the property.

Q. Did you follow Mr. Moulding or Ms. Koenig around the property?

A. Towards the end of their visit, yes.

Q. Approximately how long do you think that they were on the property?

A. Half of an hour.

Q. Did you ever tell them explicitly that they didn't have permission to be on the property?

A. Yes.

Q. Were you present when Mr. Moulding entered the structure in which you and Gail reside?

A. I was walking up to my house when he was exiting.

Q. Okay. So didn't really observe him in the building, just exiting the building; was that accurate?

A. Yes.

Q. After he exited the building, what

27

happened next?

A. I explicitly asked them to leave my property because they were trespassing.

Q. Do you recall anyone raising their voice, arguing or being -- becoming confrontational?

A. Gail's voice was risen, yes.

Q. Did anyone make any physical threats towards anyone else?

A. No.

Q. So I think you said this already. Do you believe that your estimate of saying that they were on the property total was about 30 minutes?

A. Yes.

Q. Do you think it's more than 30 minutes, less than 30 minutes, or exactly 30 minutes?

A. No more than 40 minutes.

Q. After the defendants and deputies left the property, did you and Gail or you and Gordon or all three of you discuss what had happened?

A. Yes.

Q. What do you recall saying?

A. Just once again, the utter disbelief of

28

of it all and how we felt violated.

Q. After this time did you call the Attorney General's Office?

A. No.

Q. Did you call the ombudsman's office?

A. No.

Q. Did you contact a lawyer?

A. No.

Q. Did you file any complaints with any agency other than this lawsuit?

A. Yes.

Q. What was that?

A. I contacted the Federal Bureau of Investigations and made a complaint of the incident.

Q. Did you ever get a phone call back from the FBI?

A. I never got a phone call, no.

Q. Did you have some other communication with them?

A. I got an email in response.

Q. What was that email?

A. It was just saying that they were going to investigate it internally, I think.

Q. Okay. Do you have a copy of that email?

29

A. I should.

Q. Have you provided that with discovery?

A. I don't believe so.

Q. I would request that you provide that with discovery.

After Mr. Moulding, Ms. Koenig, Ms. Este, and both the deputies from Jefferson and Washington left, did you believe that the matter was resolved?

A. No because we are here today.

Q. Did you receive any further contact about the anonymous call after that time?

A. No.

Q. Any further investigation?

A. No.

Q. Any charges?

A. No.

Q. Did you, Gail, or Gordon take any pictures or video of the property afterwards to show any damage that was done by Mr. Moulding or any of the other individuals from Jefferson County or Washington County?

A. I don't believe so.

Q. Tim, have you ever been diagnosed with any mental health condition?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

30

A. No.

Q. Are you currently taking any medication for a mental health condition?

A. No.

Q. Are you taking any medication that would affect your perception or your abilities to remember things accurately?

A. No.

Q. Have you ever had any counseling, therapy, or psychological evaluation outside of your substance abuse evaluation?

A. No.

Q. Did you have to get any medical treatment, including mental health treatment, after November 15, 2024, related to those events?

A. I went to see a counselor once over at --

Q. Where was the counselor at?

A. Washington.

Q. Did you do that on your own? Did someone else suggest that you should do that?

A. I went on my own.

Q. When did you do that?

A. I don't recall the date, probably a year

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

31

ago.

Q. So somewhere around April of 2025?

A. Yes.

Q. So somewhere around five to six months after this event?

A. Yes.

MR. HINDERS: I just ask for those mental health records.

BY MR. HINDERS:

Q. Tim, if this went to trial, what do you believe will be a fair amount to compensate you for the events on November 15, 2024?

A. I don't have an answer for that at this current time.

Q. Why not?

A. I haven't thought enough about it yet.

Q. I mean, we are 18 months out from this event; correct?

A. Yes.

Q. You have not thought what would make you whole in this situation since that time?

A. I don't have a number, no.

Q. Is there anything that any of the defendants can do to make you whole for what happened on November 15, 2024?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

32

A. I don't know if they can give me back the sense of security of my property. I don't think that's something that they can do.

Q. So there is no amount of money and nothing they can do; is that accurate?

A. Not completely.

Q. Okay. So tell me where I got that wrong in what you just said.

A. I'm sure there is an amount. I just don't know what it is.

Q. Okay. And you haven't thought about that?

A. I don't have a number right now.

Q. Okay. And I'm going to hand you what --

MR. HINDERS: Gina, if you want to take a look at it in the packet I gave you, Plaintiffs' Osborn 3 through Plaintiffs' Osborn 4. It's part of the discovery. I will hand this to Mr. McConnell-Seaba. Mr. McConnell-Seaba, do you have a document in front of you? Is that a yes? Do you have a document in front of you, sir?

A. Yes, sir.

Q. Okay.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

33

MR. SHEAHAN: What are we marking this?

MR. HINDERS: Sorry. I think I missed a couple pages on that one for some reason. Here (indicating).

MR. SHEAHAN: I'm sorry. Is this the --

MR. HINDERS: This is the assessment.

Q. Here, here is two more pages for you.

MR. HINDERS: Can we mark this as 13.

(Deposition Exhibit 13 was marked for identification by the reporter.)

Q. Have you seen this document before?

A. I don't think so.

Q. Do you understand that this was turned over by your attorney and signed off on you as part of the discovery in this process?

A. Yes, I do.

Q. And if we look at Plaintiffs' Osborn 1, that is page 1 of Exhibit 13, there is a box checked there. And what does that say?

A. Not confirmed.

34

Q. Can you just read the whole thing.

A. Assessment findings not confirmed.

Q. So there is a box checked there on page 1.

A. Oh, I'm on the wrong page.

Q. Yep. What's it say?

A. This is to notify you that the department has completed its assessment of this report.

Q. And about two lines down do you see an area that's in boldface, darker color?

A. Yes.

Q. And what does that say?

A. The department's decision is this incident is not confirmed and not placed on the Central Abuse Registry. This decision may be different than the determination of abuse concerning your child. See below.

Q. And up in the left-hand corner there is a date here. What's that date?

A. 12/16/2024.

Q. Would that have been after the date which Mr. Moulding, Ms. Koenig, deputies from Jefferson, deputies from Washington, and Ms. Este came to your property in Brighton,

35

Iowa?

A. Yes.

Q. And this is signed off on by Ms. Koenig, if you look in the right-hand side, child protective worker?

A. Yes.

Q. And also a supervisor signed off on it, David Rippey. And that's spelled R-i-p-p-e-y. Is that also accurate?

A. Yes.

Q. And you've never seen this report?

A. I have not reviewed this, no.

Q. Okay. Page 3, go to page 3, there are two boxes there. So we are looking at Plaintiffs' Osborn 3, marked page 1 on here, but Plaintiffs' Osborn 3 of Exhibit 13. Do you see that page?

A. I believe so.

Q. There is two boxes here, assessment findings and safety assessment findings. Under assessment findings what is checked there?

A. Not confirmed.

Q. And under safety assessment findings, what's check-marked there?

36

A. Safe.

Q. Okay. And since you haven't seen this before, I'll allow you just a few minutes to look for it, look around if you need more time, let me know, and then I'll have a question for you after this.

A. Okay.

Q. Looking through this, you still don't recall ever receiving this?

A. I do remember going over this, yes.

Q. Okay. On Plaintiffs' Osborn page 4 of Exhibit 13, do you see the portion of that listed as summary of previously confirmed or founded reports concerning person of alleged responsible?

A. Yes.

Q. And there appears to be one, two, three, four, five incidents -- five reports but essentially six -- excuse me -- findings there against Gail Osborn. Is that accurate?

A. Yes.

Q. Do you have any knowledge of the circumstances surrounding the finding in October 26, 2021?

A. I don't know the details of that, no.

37

Q. Would that have involved your daughter that you share with Gail?

A. Yes.

Q. You didn't have any involvement in that?

A. No.

Q. That did not occur while you two were together?

A. I was not present for those, no.

Q. Any of the other four listed in 2017, 2012, 2021, or 2020?  Were you present for any of those?

A. No.

Q. Has Gail shared that information with you previously?

A. Yes.

Q. All right.  Let me see.  We'll get this video going.

        (An off-the-record discussion was
        held.)

        (Video was played back.)

BY MR. HINDERS:

Q. I'm going to pause this for one second. Tim, have you seen this video before?

A. Yes.

Q. Did you review this prior to the

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

38

deposition?

A. Yes.

Q. I'm going to ask that -- well, number one, I'm going to ask that Defendants' Exhibit 13 be admitted.  Any objection?

        MS. MESSAMER:  No.

        MR. SHEAHAN:  No objection.

        MR. HINDERS:  And I ask that this be marked as Defendants' 14 and be admitted. Any objections?

        MS. MESSAMER:  No.

        MR. SHEAHAN:  No.

        (Deposition Exhibit 14 was
        marked for identification by the
        reporter.)

        (Video played back.)

BY MR. HINDERS:

Q. Tim, is that you on the tractor in this video?

A. Yes.

Q. Do you recall talking to the officer there?

A. Yes.

Q. Do you remember what you said?

A. Essentially I was asking them what I

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

39

stated earlier to you about wanting to trespass these people from my property because I felt like I was being harassed, I was asking them for help.

Q. And what was the response by the officer?

A. They didn't know why they were there.

Q. At this point in time did you have any knowledge about whether or not your father had granted consent to search the property?

A. No.

Q. No idea whether he had revoked consent to search the property?

A. No.

Q. Were you aware at this time whether he had previously granted consent to search the property to Ms. Koenig earlier in the day?

A. Yes.

        (Video being played back.)

Q. Do you recall who you were calling at that point?

A. Gail.

Q. Now, you saw Ms. Osborn, Gail, holding up a phone there; correct?

A. Yes.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

40

Q. Do we have any of those recordings?

A. I don't know.

Q. Do you know if she was recording during that period of time?

A. I don't know.

Q. In holding up the camera like that, would that normally make you think that she was recording that?

A. Yes.

Q. Do you have any independent recollection of what Gail was saying during that period of time?

A. No.

Q. Is it your understanding or belief that while this is going on here that a search is occurring?

A. Yes.

Q. During the period of time that's showing right now, would you have still been on your tractor at the end of the driveway?

A. Yes.

        MR. SHEAHAN:  Brent, is there any way to turn the volume up?

        MR. HINDERS:  That's a wonderful question.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

41

MS. MESSAMER:  It's not working?

MR. HINDERS:  I don't know.  I'm hitting "volume up."

MS. MESSAMER:  This is a little louder; right?

MR. HINDERS:  Yes.  Good.

(Video being played back.)

BY MR. HINDERS:

Q.  Tim, is it true we've been watching this all the way through?  We saw you in your tractor at the end of the driveway, but we haven't seen you reappear since then?

A.  Correct.

Q.  Who is that individual in the -- the woman right there in the white, Tim?

A.  Kelsey.

Q.  Okay.  Had you had any contact with Kelsey prior to this day?

A.  No.

Q.  Looking at the porch there, was that your father sitting on the porch?

A.  Yes.

Q.  And there was another individual next to him.  Who was that?

A.  I didn't catch that.

42

Q.  I'll rewind it, if you can see it.  I'll pause it here for one second.  Can you see that individual standing there by the door?

A.  I do.

Q.  Any idea who that individual is?

A.  I believe that's my nephew's girlfriend.

Q.  Okay.  What's her name, if you recall?

A.  I don't know her name, honestly.

Q.  All right.  Okay.  So, Tim, is that you in the red shirt there?

A.  Yes, sir.

Q.  This is the first time we are seeing you off the tractor.  What had you been doing in that period between the beginning and now since you weren't with the other parties?

A.  I waited at the end of the driveway, and then I came up the driveway, and I briefly talked to my dad.

Q.  Okay.  Do you recall what your dad said to you?

A.  I asked him since these people are trespassing if it's okay if I ask them to leave the property because they are trespassing.  And he said they are going to do whatever they want.  I don't have any

43

control over it, that he didn't give them consent, and that he agreed that I could try and get them to leave again.

(Video being played back.)

Q.  So we are at 23 minutes.  Looking at the video, does it seem to indicate that Mr. Moulding at least has gotten into his vehicle at this point?

A.  For the time being he's in his vehicle.

Q.  Does he get back out?

A.  Yes.

Q.  What is that?

A.  Here in just a moment.

Q.  And why does he do that, if you recall?

A.  So that he can have the DHS lady say why she was here to me.

MR. SHEAHAN:  Hit that volume a couple more times.

MR. HINDERS:  Trying to.

MR. SHEAHAN:  Thanks.

BY MR. HINDERS:

Q.  At this point, Tim, is it fair to say that they are not actively searching the property?

A.  They are not actively searching the

44

property, no.

Q.  And they are on your driveway?

A.  Yes.

Q.  Tim, now does it appear that the Washington County deputy is trying to leave your property and the area?

A.  Yes, it appears that way.

Q.  Tim, why didn't you choose to sue the Washington County or the Washington County Sheriff's Department?

A.  Because I reside in Jefferson County.  Jefferson County was running the show, it seemed like.

Q.  But Washington County was also on your property; is that fair to say?

A.  That is fair to say.

Q.  And they were there as a law enforcement agency, not as private citizens; is that true?

A.  That's true.

Q.  And they entered onto that property, stayed on that property during the same period of time as Jefferson County; is that accurate?

A.  Yes.

45

Q. All right. And I'm going to one other body cam here, ask that it be marked as Exhibit 15.

(Deposition Exhibit 15 was marked for identification by the reporter.)

MR. HINDERS: Any objections?

MS. MESSAMER: No, no objection.

MR. SHEAHAN: No.

MR. HINDERS: Ask that it be admitted.

MS. MESSAMER: I'm happy to admit all of the videos without needing to watch them all, if that's why we are doing this, for foundation purposes.

MR. HINDERS: Oh, no.

(Video was played back.)

Q. Tim, is this you on the --

A. Yes.

Q. Is this you on the tractor?

A. Yes.

Q. And we've seen this from another angle; correct?

A. Yes.

Q. All right.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

46

(Video was played back.)

Q. Did you just say that you wanted anyone other than a police officer trespassed from your property?

A. Yes.

(Video was played back.)

Q. How did you know at this point that your father had said no, get the fuck out of my house?

A. Because Gail was just there, and she told me that.

Q. Okay.

(Video was played back.)

Q. Is it still your understanding at this point that your father, Gordon Seaba, has a life estate in that property?

A. Yes.

Q. And that's accurate as far as you know?

A. Yes.

Q. Did you just state to them that you have no problem with the police officers up there?

A. That is what I stated, correct.

MR. HINDERS: All right. I don't have any further questions for you, Tim. Thanks.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

47

CROSS-EXAMINATION

BY MR. SHEAHAN:

Q. Tim, Ryan Sheahan. I represent Ms. Koenig in this case. I'll just take a few minutes of your time, so I appreciate the opportunity to do that.

So obviously the morning visit, everything you're hearing about what happened came from Ms. Osborn here. Just to clarify for the record, are you and Ms. Osborn partners? Married? What's your classification in terms of your spouse?

A. She's my significant other, my partner.

Q. Okay. So, again, as far as everything that happened that morning, your understanding is that Ms. Koenig had permission to be there in her capacity as an HHS worker?

A. Yes.

Q. Both to look through your father's house and then even for your cottage?

A. Yes.

Q. Your real beef here is when they come back, you're home now from work, and they want to look through the property again;

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

48

correct?

A. Correct.

Q. Mr. Hinders had just played you a video where you said I have no problem with the sheriff's deputies going up and looking around the property. Was that accurate you had no problem with those guys looking around?

A. I thought they were going to help me.

Q. Okay. In what regard, sir?

A. By trying to get the other two people off my property.

Q. So as we sit here today, there is no baby on the property that day; correct?

A. Correct.

Q. Ms. Osborn had not been recently pregnant; correct?

A. Correct.

Q. Was there any criminal activity occurring on the property?

A. No.

Q. What was the issue with them looking around one more time?

A. They were already there once, and I have rights that are protected in the Constitution

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

49

that they violated.

Q. Did anybody indicate that they were investigating you for criminal activity?

A. No.

Q. I mean, did they seem to be concerned about finding a baby if there was one?

A. I don't know.

Q. Do you think that's a valid concern for an HHS worker?

A. Absolutely.

Q. What about law enforcement?

A. Yes.

Q. I want to just clarify this ownership issue on the property, because it sounds like your father owned a life estate, and you and your siblings were remaindermen; correct?

A. I believe so.

Q. So when you say you were on the deed, you may be on the deed as a remainderman, but your property interests are different than your father's; correct?

A. I believe so.

Q. In fact, the property doesn't pass to you and your siblings -- really you and your sister, because I know your brother was

50

deceased -- until your father had passed?

A. I don't know enough about the law.

Q. Well, that's the reason why you went and asked your father if I can ask them to leave the property because he was the owner of the property; wasn't he?

A. I did it out of respect for him because he was my father.

Q. He's also the owner of the property, and you knew that you had to have his blessing; correct?

A. I'm also an owner of the property. I asked him out of respect because he's my father.

Q. Did we learn anything new from the videos that you haven't already known about the interactions that day?

A. I don't believe so.

Q. Everything was just the same as when you reviewed those videos the first time?

A. Yeah, the videos were the same.

Q. I did not -- other than Ms. Koenig going into the main house to speak with your father, I did not see Ms. Koenig once go into a structure on your land. Would that be

51

accurate?

A. I saw her and Chauncey leaving my shop before Chauncey went into my house.

Q. Is that on the body cam video?

A. It's her and Chauncey exiting my shop, yes.

Q. In terms of going in -- and then in terms of going into your cottage, that appeared to be Mr. Moulding himself?

A. Yes.

Q. I'm trying to recall, you were kind of walking up to the scene at that point, correct, after Mr. Moulding had just exited your residence?

A. Correct.

Q. Going back to this anonymous complaint, sir, because it sounds like you and Ms. Osborn believed that it may have been the guardian of your daughter; right?

A. If we had to guess.

Q. Right. And you didn't do anything to investigate that?

A. I wouldn't know how to investigate it.

Q. Well, did you try to call this person and say, hey, did you make an anonymous

52

complaint about us?

A. No.

Q. Did you try to investigate or -- well, withdrawn.

Why do you believe that one of the guardians would be making an anonymous complaint against you?

A. They are the only people I would think that would have anything to gain.

Q. And, again, at that point the kids -- they are already the guardian of your daughter; correct?

A. Correct.

Q. So in terms of gain, what would they be gaining by making this anonymous complaint?

A. Complete custody of our child.

Q. Well, how long had it been since your child was taken from your home and was placed in their custody?

A. About three and a half years.

Q. So your daughter had been living with these folks for three and a half years prior to November 15th of 2024?

A. Yes.

Q. And you think that on that particular

53

day they figure I'm just going to stick it to these guys and make an anonymous complaint against you?

A. Because they had just filed for a TPR.

Q. Help me understand that. So your parental rights hadn't been terminated, but your child was living with them through a guardianship for those three years?

A. Correct, correct.

Q. Were you actively fighting to get the child back in the interim three years?

A. They did not allow us to have contact with our child.

Q. So that's what I'm trying to understand. Did you legally attempt to try to retain -- retain is not the right word. I don't know the legal word here is -- but get your daughter back from these folks in terms of the guardianship in those three and a half years?

A. Yes, Gail has been in and out of court trying to do that, yes.

Q. And had there been anything recent prior to that date other than the CPR? Was there a big blowup between you and the guardian that

54

occurred or anything else? I'm just trying to further understand the scenario.

A. No.

Q. You're aware of Gail's past history as far as her interactions with HHS?

A. Yes.

Q. And you were aware that Gail had prior interactions with HHS prior to November 15th of 2024?

A. Yes.

Q. And those concerned the living conditions that Gail was living in; correct?

A. Yes.

Q. It had to concern drug use?

A. That was a concern, yes.

Q. It had to concern the welfare of children before; correct?

A. Yes.

Q. And so when you're hearing about the allegations as to why HHS is there on November 15th, those are just the sort of same allegations that Gail has been investigated before by HHS; correct?

A. Yes.

Q. And that's why you had no problem with

55

her being there the first time, meaning the CPS worker; right?

A. Correct.

Q. Again, it's just the second time that -- I just want to make sure where you're alleging your constitutional violation is. It's the second visit when Moulding is there, Koenig is there, and the deputies from Washington and Jefferson Counties?

A. Correct.

Q. If Koenig had discovered additional information about either you or Ms. Osborn or just the property between the first visit and the second visit that created a concern for her, do you think it was appropriate for her to come back to the property for the second visit?

A. It depends on what the information that she obtained was.

Q. What if it was further information about prior reports regarding Gail Osborn and her children?

A. No, because she had been to the property previous and didn't see any signs of anything of the sort.

56

Q. You didn't know any information that Kelsey Koenig had other than these allegations prior to her first visit that day, did you?

A. No.

Q. Couple questions, this Alisha White person, do you understand her to be a close friend of Ms. Osborn's?

A. I believe that they had contact, yes.

Q. And Ms. Osborn had said that Ms. White had seen her a couple of days before. Do you have any idea whether that's true or not?

A. Yeah, that's true, yes.

Q. Is that because you saw Alisha White as well, or how do you know that information to be true?

A. Gail told me that she saw her.

Q. Gail, in her deposition, had talked about this is a desecration of her property, sir. And I'm just trying to clarify what that means. Do you believe that this was a desecration of your property?

A. I don't see myself using the word desecration. I feel like I'm scared every time a vehicle pulls into my driveway that I

57

don't know just because I don't know what's going to happen.

Q. Sir, does that happen a lot at your property?

A. No, it doesn't, but when it does, I don't know what's going to happen, you know, because things like this happen. And it turns into a horrible experience.

Q. Well, how many times has a CPS worker showed up to your property that's the subject of this lawsuit -- how many times has that happened to you in your lifetime living there?

A. Two or three, maybe.

Q. And the two earlier events, so not the 15th of November of '24, but those two earlier events, those resulted in what, your children being taken away?

A. That was the end goal of it all, yes.

Q. And of course at that time on those earlier events you had children living on the property, and those were the ones who were ultimately taken away?

A. No, the child was living with Gail at the time.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

58

Q. Okay. But -- I'm sorry. The child was living with Gail. Was that at a different residence than the one we are talking about?

A. Yes.

Q. Gotcha. But in any event, you've had CPS workers at this farmhouse on prior occasions, and that was factoring into your fear of, you know, what was happening that day?

A. Possibly, yes.

Q. Okay. I'm going to shift gears a little bit and just talk about your damages. I know Brent's asked you a few questions, but has this affected your ability to work for Powercom?

A. I'm here rather than being at work today, so yes.

Q. Well, I understand that. You also brought the lawsuit, but has it in any other way affected your job?

A. I don't think so.

Q. Have you have you tried for any sort of either employment opportunities or some other opportunity that you believe existed that was denied or withdrawn because of this incident?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

59

A. I don't think so.

Q. What I'm trying to understand is you're pissed that they were there that day, and the question for you is what is the monetary value of you being pissed that they were there that day? Do you have one in mind?

A. I don't have that number today.

Q. When are you going to get that number, sir?

A. I don't have that answer.

Q. Well, I mean, is it something where when you get that answer we should come back and ask you some questions about it?

A. I don't understand.

Q. We're just trying to be mindful of your time, sir. So I'll just keep asking some questions, and we'll see where we go here.

Again, second visit, just to confirm, you're not in the house with Moulding and the -- Ms. Koenig when they talk to your father. Any information you have pertaining to that conversation was given to you by Gail?

A. And my father.

Q. And your father. Okay. Speaking of

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

60

your father, I know Gail had talked about a couple of the ailments, and it sounds like they were more having to do with movement and stuff, but mentally faculty-wise he seemed to be doing okay?

A. Yes.

Q. I mean, his ability to recall conversations and such, you didn't believe that to be an issue on November 15th of 2024?

A. No.

Q. And so anything he was telling you, you believed to be accurate because there was no cognitive or mental issuing happening with your father on that date?

A. Absolutely.

Q. The same could be said, then, for any conversations that Mr. Moulding and Ms. Koenig had with your father then; right? They could trust what your father was saying on that day?

A. Yes.

Q. And finally just, again, at no point did any law enforcement officer, the county attorney, or Ms. Koenig say we are here to investigate a crime on your property?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 106**

61

A. No.

Q. Had you ever dealt with illegal searches and seizures before?

A. Yes.

Q. In what regard?

A. When I was 18 I was pulled over in Washington because I had out-of-county plates, and I was subsequently arrested for possession of marijuana, but the charges were thrown out because the officers did not have the right to pull me over because I had out-of-county plates.

Q. In terms of the fourth amendment, I know you're alleging that's your constitutional violation here, but, you know, that fourth amendment goes both ways. I mean, for instance, did you know if they didn't have a search warrant, they found what they call the fruits of the poisonous tree, but some criminal activity on your property, you have a right to challenge that in court as an illegal search and seizure. Are you aware of that?

A. Yes, sir.

Q. So you're aware that you also had

62

constitutional protections that day?

A. Yes.

Q. I know you visited someone, I believe in the City of Washington, sir, for at least one visit for a mental health treatment?

A. Yes.

Q. And that was five or six months after the events of this case?

A. Yes.

Q. Was that a one-time deal?

A. Yes.

Q. What prompted you five, six months later to go for that one-time visit?

A. I wanted to see if it was affecting me, just to see what it did to me, because I've never really experienced counseling, and I thought I would see if it could help me at all.

Q. And, sir, what was the medical reason why you went to go see the counselor that day?

A. Because I was drinking too much.

Q. That's the reason; right? That's the reason, you were trying to get some treatment for drinking too much?

63

A. No, I wasn't trying to get treatment for drinking too much. I wanted to see if my drinking was being affected by what was going on.

Q. What did you find out?

A. That I was handling it appropriately by having a few drinks.

Q. And I'm assuming here but by virtue of that conversation you had with that provider, that's why you never went back to the provider, because in your mind you were handling things appropriately?

A. And I couldn't afford it.

MR. SHEAHAN: I think I'm done here, but let me just double-check here. And I appreciate you being patient with us.

Q. I asked this of Ms. Osborn during the close of her deposition, just this Interrogatory Number 6, and this is your responses to Jefferson County's interrogatories, and I can send this to you or I can have you review -- in fact, can you hand that to him, number 6. Why don't you take a moment just to review that question and the answer, and I just have a question or

64

two, and I think I'll be done.

A. (The witness complied.) Okay.

Q. Can you see that back. Thank you. What I'm just trying to confirm again, sir, because it looks like at least in your written responses that you gave the deputies permission to be on your property that day, but you expressly asked Defendants Moulding and Koenig to leave the property; correct?

A. Correct.

Q. So when a sheriff's deputy went into your RV on the property and Moulding did as well, you were okay with the sheriff's deputy doing that but not Moulding; is that accurate?

A. I thought the sheriffs were going to help me get those two people off my property. I never said I was okay with them searching. I said I was okay with them being there because I thought they were going to help me remove these people.

Q. Okay. And just to that end just to tie this off, the sheriff's deputies, because we've seen the video here, did you feel like they were listening to you during your

65

interactions?

A.  About halfway.

Q.  Do you feel like they were trying to let Moulding and Koenig do their job, so to speak, and then they would be on their way? Did you get that feeling?

A.  They were complicit with it, yes.

Q.  Well -- never mind.  I did want to ask you just in terms of who -- because of a situation like that, it seemed like there was a certain individual directing traffic, if you will, on your property.  Did you believe that was Chauncey Moulding?

A.  Yes.

Q.  Did you believe anybody else was kind of telling people where to go and where to search?

A.  I don't know.

Q.  Well, you were there and you witnessed it?

A.  I witnessed about half of it.

Q.  And from the half that you witnessed, it looked like Moulding was kind of calling the shots?

A.  Yes.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

66

Q.  Are there any videos or recordings or any other documentation that you haven't provided yet to your attorney?

A.  No.

Q.  So everything as far as any of that stuff related to this lawsuit, you've already turned over and we should have?

A.  Yes.

MR. SHEAHAN:  I think that's all I have.  Thank you.

CROSS-EXAMINATION

BY MS. MESSAMER:

Q.  Just a few from me, too, Tim.  With this mental health treatment or the counseling that you went to get, do you know like what type of provider you saw?  Was it your regular doctor, or was it like somebody who was just a counselor?

A.  Just a counselor.

Q.  And was it at the hospital?

A.  No, it was at a private counseling service.

Q.  In terms of your conversations with your dad the day that the search happened, what did your dad tell you about the conversation

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

67

he had with Chauncey Moulding?

A.  Essentially that he said no, get out of my house.  And they kept on badgering him and, you know, we got to do this, we got to do this.  And my dad's the type where at that point he'll just -- he'll shut down, he'll sit down, you know.  And that's why, when I asked him when he was on the porch, can I ask these people to leave, and he said they're going to do whatever they want.  He didn't have any control.  He said no, and they did whatever they wanted anyways.

Q.  Did he tell you anything more in terms of a conversation that he would have had with the DHS person?

A.  No.

Q.  So that, what you just told me, was kind of the total of what he had to say in those conversations with Chauncey or Kelsey?

A.  Yes.

Q.  And that conversation that you had with him would have been when he walked up the driveway before you joined everybody who was searching?

A.  Correct.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

68

Q.  You mentioned that your shop on the property was searched.  Can you kind of just describe what that building is?

A.  It's adjacent to my house.  It's a little blacksmith shop.  It's where I keep my tools at and stuff, yeah.

Q.  Are there any buildings or campers or structures on the property that you consider more yours versus other structures are ones your dad used more?

A.  Yeah, my barn where I keep my pigs and my house and my shop.

Q.  And then what ones would be more considered Gordon's?

A.  His house, the garage, the campers.

Q.  Were any of the campers yours?

A.  No.

MS. MESSAMER:  That's all I have too.  Thank you.

MR. SHEAHAN:  Do you have any more?

MR. HINDERS:  I don't have any more, no.

MR. SHEAHAN:  I have nothing further.  Thank you, Tim.

(Deposition concluded at 2:07 p.m.)

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

69

C E R T I F I C A T E

I, Gale Sweeney Christensen, a Certified Shorthand Reporter of the State of Iowa and Registered Professional Reporter, do hereby certify that there came before me at the time, date, and place hereinbefore indicated, the witness named on the caption sheet hereof, who was by me duly sworn to testify to the truth of said witness's knowledge, touching and concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination taken down by me in shorthand, and later reduced to printed form under my supervision and direction, and that the deposition is a true record of the testimony given and of all objections interposed.

I further certify that I am neither attorney or counsel for, or related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

Dated at Des Moines, Iowa, this 14th day of May, 2026.

----------------------------
CERTIFIED SHORTHAND REPORTER,
REGISTERED PROFESSIONAL
REPORTER, AND NOTARY PUBLIC

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**$**

$25 [1] - 8:24
$4,000 [1] - 9:2

**'**

'24 [1] - 57:16

**1**

1 [4] - 33:22, 33:23, 34:4, 35:15
110 [1] - 8:4
1104 [1] - 2:17
12/16/2024 [1] - 34:21
12:23 [1] - 1:17
13 [7] - 3:11, 33:12, 33:13, 33:23, 35:16, 36:12, 38:5
1305 [1] - 2:12
14 [3] - 3:12, 38:9, 38:13
14th [1] - 69:17
15 [11] - 3:13, 10:5, 13:11, 18:25, 20:25, 24:17, 30:15, 31:12, 31:25, 45:3, 45:4
15th [6] - 19:11, 52:23, 54:8, 54:21, 57:16, 60:9
16 [2] - 11:1, 15:3
1600 [1] - 2:7
18 [2] - 31:17, 61:6
1986 [1] - 7:1

**2**

20 [3] - 11:18, 17:17, 23:2
2004 [1] - 7:10
2012 [1] - 37:10
2016 [1] - 18:15
2017 [1] - 37:9
2020 [1] - 37:10
2021 [2] - 36:24, 37:10
2024 [12] - 13:11, 19:1, 20:9, 20:21, 20:25, 24:17, 30:15, 31:12, 31:25, 52:23, 54:9, 60:9
2025 [1] - 31:2
2026 [2] - 1:17, 69:18
21 [1] - 1:17
23 [1] - 43:5
24 [3] - 10:20, 10:23, 15:2
25 [1] - 23:2
26 [1] - 36:24
29 [1] - 3:19
2910 [2] - 1:17, 2:3
2:07 [1] - 68:25
2nd [1] - 7:1

**3**

3 [5] - 32:18, 35:13, 35:15, 35:16
30 [4] - 27:14, 27:16, 27:17
31 [1] - 3:20
3251 [1] - 8:4
33 [1] - 3:11
38 [1] - 3:12
3:30 [2] - 22:24, 23:13
3:50 [1] - 23:16

**4**

4 [4] - 3:3, 3:19, 32:19, 36:11
40 [2] - 10:25, 27:18
45 [1] - 3:13
47 [1] - 3:4
4:00 [1] - 25:15
4:05 [1] - 23:24
4:25-cv-00183 [1] - 1:6

**5**

50211 [1] - 2:17
50312 [1] - 2:4
50319 [1] - 2:12
52540 [1] - 8:4
52556 [1] - 2:8
5:00 [1] - 25:15

**6**

6 [2] - 63:19, 63:23
66 [1] - 3:5

**7**

7 [1] - 3:20
77,000 [1] - 9:19

**A**

AA [2] - 15:5, 15:6
abide [1] - 5:8
abilities [1] - 30:6
ability [2] - 58:14, 60:7
able [4] - 5:7, 5:14, 5:20, 25:19
absolutely [2] - 49:10, 60:15
Abuse [1] - 34:16
abuse [3] - 15:4, 30:11, 34:18
accurate [12] - 17:22, 20:15, 26:23, 32:6, 35:9, 36:20, 44:24, 46:18, 48:6, 51:1, 60:12, 64:15
accurately [1] - 30:7
action [2] - 69:13, 69:15
actively [3] - 43:23, 43:25, 53:10
activity [3] - 48:19, 49:3, 61:20
addicted [1] - 19:22
additional [1] - 55:11
address [1] - 8:3
adjacent [1] - 68:4
admit [1] - 45:12
admitted [3] - 38:5, 38:9, 45:11
affect [1] - 30:6
affected [3] - 58:14, 58:20, 63:3
affecting [1] - 62:14
afford [1] - 63:13
afternoon [3] - 22:12, 23:23, 24:17
afterwards [1] - 29:19
agency [3] - 12:21, 28:10, 44:18
ago [8] - 11:1, 15:12, 16:4, 16:5, 16:18, 17:17, 18:15, 31:1
agree [1] - 19:21
agreed [1] - 43:2
ailments [1] - 60:2
alcohol [1] - 14:18
Alisha [2] - 56:6, 56:14
allegation [1] - 19:21
allegations [3] - 54:20, 54:22, 56:3
alleged [1] - 36:14
alleging [2] - 55:6, 61:14
allow [2] - 36:3, 53:12
allowed [2] - 20:3, 26:2
amendment [2] - 61:13, 61:16
amount [3] - 31:11, 32:5, 32:10
AND [1] - 69:22
angle [1] - 45:22
anonymous [9] - 19:1, 21:14, 21:20, 29:12, 51:16, 51:25, 52:6, 52:15, 53:2
answer [8] - 5:13, 6:5, 6:7, 6:11, 31:13, 59:10, 59:12, 63:25
answering [1] - 6:14
anyways [1] - 67:12
appeal [1] - 14:6
appear [1] - 44:4
appeared [1] - 51:9
appreciate [2] - 47:5, 63:16
appropriate [1] - 55:15
appropriately [2] - 63:6, 63:12
April [3] - 1:17, 7:1, 31:2
area [2] - 34:11, 44:6
arguing [1] - 27:5
arrest [1] - 12:18
arrested [1] - 61:8
arts [1] - 7:22
assessment [9] - 17:24, 18:3, 33:9, 34:2, 34:8, 35:19, 35:20, 35:21, 35:24
Assessment [1] - 3:11
Assessor's [1] - 17:19
Assistant [1] - 2:10
assuming [1] - 63:8
attempt [2] - 6:1, 53:15
attorney [5] - 33:19, 60:24, 66:3, 69:12, 69:14
ATTORNEY [1] - 3:17
Attorney [5] - 2:2, 2:7, 2:10, 23:5, 28:3
Attorneys [1] - 2:15
Avenue [2] - 1:18, 2:3
aware [12] - 4:15, 12:19, 18:2, 18:25, 19:4, 19:6, 21:25, 39:15, 54:4, 54:7, 61:22, 61:25

**B**

baby [3] - 26:4, 48:14, 49:6
badgering [1] - 67:3
baker [2] - 7:24, 8:1
baking [1] - 7:23
bankruptcy [1] - 10:11
barn [1] - 68:11
bears [1] - 11:24
became [1] - 16:1
become [1] - 19:6
becoming [1] - 27:5
beef [1] - 47:23
beginning [2] - 15:24, 42:14
behind [1] - 12:3
belief [1] - 40:14
below [1] - 34:18
benefits [1] - 10:9
best [1] - 18:22
between [3] - 42:14, 53:25, 55:13
big [3] - 8:19, 12:3, 53:25
birth [2] - 6:25, 20:9
bit [1] - 58:12
blacksmith [1] - 68:5
blessing [1] - 50:10
blowup [1] - 53:25
body [3] - 24:25, 45:2, 51:4
Body [1] - 3:13
boldface [1] - 34:11
born [1] - 7:2
box [2] - 33:23, 34:3
boxes [2] - 35:14, 35:19
break [1] - 6:13
Brent [1] - 40:22
BRENT [1] - 2:14
Brent's [1] - 58:13
brent@hinderslaw. com [1] - 2:18
briefly [2] - 25:1, 42:17
Brighton [6] - 8:4, 15:21, 17:15, 23:1, 25:9, 34:25
brother [2] - 18:11, 49:25
brought [1] - 58:19
build [2] - 8:17, 18:22
Building [1] - 2:11
building [4] - 26:22, 26:25, 68:3
buildings [1] - 68:7
Bureau [1] - 28:13
BY [8] - 4:5, 31:9, 37:21, 38:17, 41:8, 43:21, 47:2, 66:12

**C**

cam [3] - 3:13, 45:2, 51:4
camera [1] - 40:6
cameras [4] - 24:18, 24:20, 24:23, 24:25

campers [3] - 68:7, 68:15, 68:16
capacity [1] - 47:17
caption [1] - 69:5
Carencro [1] - 12:15
caretaker [1] - 19:23
carnival [3] - 11:21, 11:23, 12:12
case [7] - 4:16, 13:5, 14:2, 47:4, 62:8
Case [1] - 1:5
catch [1] - 41:25
Central [1] - 34:16
CENTRAL [1] - 1:3
certain [1] - 65:11
CERTIFIED [1] - 69:21
Certified [2] - 1:14, 69:3
certify [2] - 69:4, 69:12
challenge [1] - 61:21
challenged [2] - 17:24, 18:3
charges [2] - 29:16, 61:9
Chauncey [10] - 2:14, 24:1, 24:3, 25:13, 51:2, 51:3, 51:5, 65:13, 67:1, 67:19
CHAUNCEY [1] - 1:8
check [3] - 26:3, 35:25, 63:15
check-marked [1] - 35:25
checked [3] - 33:24, 34:3, 35:21
chef [1] - 7:25
child [16] - 13:8, 17:8, 19:2, 20:2, 20:9, 21:3, 22:7, 34:18, 35:4, 52:16, 52:18, 53:7, 53:11, 53:13, 57:24, 58:1
Child [3] - 13:13, 21:24, 22:1
children [8] - 13:7, 17:3, 17:6, 17:9, 54:17, 55:22, 57:18, 57:21
choice [1] - 19:17
choose [2] - 7:21, 44:8
chop [1] - 12:6
Christensen [3] - 1:14, 1:24, 69:3
circumstances [1] - 36:23
citizens [1] - 44:18
City [3] - 7:3, 7:5, 62:4
claim [1] - 19:9

claims [1] - 13:5
clarify [3] - 47:9, 49:13, 56:20
classes [1] - 7:23
classification [1] - 47:12
close [3] - 16:1, 56:7, 63:18
cognitive [1] - 60:13
college [2] - 7:13, 7:14
College [1] - 7:15
color [1] - 34:11
commencing [1] - 1:16
commented [1] - 21:6
communication [1] - 28:19
Community [1] - 7:15
compensate [1] - 31:11
complaint [12] - 10:1, 13:13, 19:1, 21:14, 21:17, 21:20, 28:14, 51:16, 52:1, 52:7, 52:15, 53:2
complaints [1] - 28:9
complete [1] - 52:16
completed [1] - 34:8
completely [1] - 32:7
complicit [1] - 65:7
complied [1] - 64:2
concern [5] - 49:8, 54:14, 54:15, 54:16, 55:14
concerned [2] - 49:5, 54:11
concerning [3] - 34:18, 36:14, 69:7
conclude [1] - 26:4
concluded [1] - 68:25
condition [2] - 29:25, 30:3
conditions [1] - 54:12
conferred [1] - 6:20
confirm [2] - 59:19, 64:4
confirmed [5] - 33:25, 34:2, 34:15, 35:23, 36:13
confrontational [1] - 27:6
consent [4] - 39:10, 39:12, 39:16, 43:2
consider [1] - 68:8
considered [1] - 68:14
Constitution [1] - 48:25
constitutional [3] - 55:6, 61:14, 62:1
constructed [1] -

18:13
construction [1] - 18:21
contact [5] - 28:7, 29:11, 41:17, 53:12, 56:9
contacted [1] - 28:13
contest [1] - 11:25
continuously [1] - 10:6
contractor [1] - 18:17
control [2] - 43:1, 67:11
Control [1] - 8:12
controversy [1] - 69:7
conversation [5] - 59:22, 63:9, 66:25, 67:14, 67:21
conversations [4] - 60:8, 60:17, 66:23, 67:19
convicted [2] - 10:15, 11:3
convictions [1] - 12:19
copy [1] - 28:25
corner [1] - 34:19
correct [37] - 4:23, 11:4, 13:20, 13:21, 13:22, 23:13, 24:22, 25:5, 25:6, 31:18, 39:24, 41:13, 45:23, 46:22, 48:1, 48:2, 48:14, 48:15, 48:17, 48:18, 49:16, 49:21, 50:11, 51:13, 51:15, 52:12, 52:13, 53:9, 54:12, 54:17, 54:23, 55:3, 55:10, 64:9, 64:10, 67:25
cottage [2] - 47:21, 51:8
counsel [4] - 6:13, 6:21, 69:12, 69:14
counseling [5] - 15:10, 30:9, 62:16, 66:14, 66:21
counselor [5] - 30:17, 30:19, 62:20, 66:18, 66:19
Counties [1] - 55:9
counties [1] - 11:8
County [13] - 2:14, 4:17, 17:19, 23:5, 29:22, 44:5, 44:9, 44:11, 44:12, 44:14, 44:23
county [3] - 60:23, 61:7, 61:12
COUNTY [1] - 1:9

County's [1] - 63:20
couple [7] - 16:18, 25:17, 33:4, 43:18, 56:6, 56:11, 60:2
course [1] - 57:20
court [5] - 4:18, 5:5, 5:25, 53:21, 61:21
COURT [1] - 1:1
CPR [1] - 53:24
CPS [3] - 55:2, 57:9, 58:6
Crawfordsville [1] - 9:7
created [1] - 55:14
crime [2] - 10:16, 60:25
criminal [5] - 10:22, 11:2, 48:19, 49:3, 61:20
CROSS [2] - 47:1, 66:11
CROSS-EXAMINATION [2] - 47:1, 66:11
CSR [1] - 1:24
culinary [1] - 7:22
current [5] - 8:3, 9:3, 12:24, 18:8, 31:14
custody [3] - 13:5, 52:16, 52:19
cut [1] - 12:5

**D**

dad [5] - 42:18, 42:19, 66:24, 66:25, 68:10
Dad [1] - 19:15
dad's [2] - 15:14, 67:5
damage [1] - 29:20
damages [1] - 58:12
darker [1] - 34:11
date [8] - 6:25, 30:25, 34:20, 34:22, 53:24, 60:14, 69:5
Dated [1] - 69:17
daughter [12] - 13:18, 13:23, 13:24, 14:4, 14:8, 21:18, 21:23, 37:1, 51:19, 52:12, 52:21, 53:18
David [1] - 35:8
days [1] - 56:11
deal [1] - 62:10
dealings [1] - 21:25
dealt [1] - 61:2
debt [1] - 10:13
deceased [2] - 18:11, 50:1
decided [1] - 7:24

decision [2] - 34:14, 34:16
deed [2] - 49:18, 49:19
Defendant [1] - 2:9
defendant [1] - 13:3
Defendants [2] - 1:10, 64:8
defendants [2] - 27:19, 31:24
Defendants' [2] - 38:4, 38:9
degree [2] - 7:17, 10:19
denied [1] - 58:25
department [1] - 34:8
Department [1] - 44:10
department's [1] - 34:14
deposed [3] - 4:16, 4:20, 4:23
DEPOSITION [2] - 1:7, 1:12
deposition [7] - 6:17, 38:1, 56:18, 63:18, 68:25, 69:10, 69:13
Deposition [3] - 33:13, 38:13, 45:4
depositions [1] - 4:13
deputies [14] - 23:3, 23:4, 23:18, 23:23, 24:15, 25:8, 27:19, 29:7, 34:23, 34:24, 48:5, 55:8, 64:6, 64:23
deputy [3] - 44:5, 64:11, 64:13
Des [4] - 1:18, 2:4, 2:12, 69:17
describe [1] - 68:3
Description [1] - 3:9
desecration [3] - 56:19, 56:22, 56:24
details [1] - 36:25
determination [1] - 34:17
DHS [2] - 43:15, 67:15
diagnosed [1] - 29:24
died [1] - 17:16
different [4] - 8:17, 34:17, 49:20, 58:2
DIRECT [1] - 4:4
directing [1] - 65:11
direction [1] - 69:9
disbelief [2] - 23:11, 27:25
discovered [1] - 55:11
discovery [6] - 6:22, 6:23, 29:2, 29:5, 32:19, 33:20

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309
Page 2 to 2 of 8                                                          20 of 26 sheets

**App. 111**

discuss [1] - 27:21
discussed [3] - 21:2, 23:6, 23:9
discussion [1] - 37:18
DISTRICT [2] - 1:1, 1:2
DIVISION [1] - 1:3
doctor [1] - 66:17
document [3] - 32:21, 32:23, 33:16
documentation [1] - 66:2
done [3] - 29:20, 63:14, 64:1
door [1] - 42:3
double [1] - 63:15
double-check [1] - 63:15
down [5] - 9:21, 34:10, 67:6, 67:7, 69:8
drink [1] - 14:18
drinking [4] - 62:22, 62:25, 63:2, 63:3
drinks [1] - 63:7
Drive [1] - 2:17
driven [1] - 25:14
driveway [10] - 24:2, 24:10, 25:12, 40:20, 41:11, 42:16, 42:17, 44:2, 56:25, 67:23
drop [1] - 7:21
drove [2] - 24:9, 25:13
drug [7] - 14:12, 14:13, 14:21, 19:22, 54:14
drug-addicted [1] - 19:22
drugs [1] - 20:17
duly [2] - 4:2, 69:6
during [12] - 4:13, 16:24, 18:7, 20:18, 22:14, 24:16, 40:3, 40:11, 40:18, 44:22, 63:17, 64:25

**E**

early [4] - 10:20, 10:22, 14:15, 22:20
earn [2] - 8:23, 9:15
earnings [1] - 9:1
East [1] - 2:12
eastern [1] - 11:12
ED [1] - 2:6
education [2] - 7:11, 7:12
edwardgharvey98@ yahoo.com [1] - 2:8
eight [5] - 15:12, 16:4, 16:5, 16:12, 20:14

either [5] - 5:24, 21:2, 23:21, 55:12, 58:23
electrical [1] - 8:18
electrician [1] - 18:17
email [3] - 28:21, 28:22, 28:25
employed [4] - 8:1, 10:6, 69:13, 69:14
employee [3] - 9:10, 9:11, 69:14
employer [1] - 10:3
employment [2] - 9:3, 58:23
end [8] - 24:2, 25:12, 26:8, 40:20, 41:11, 42:16, 57:19, 64:22
ended [1] - 16:20
enforcement [4] - 12:20, 44:17, 49:11, 60:23
entered [3] - 10:12, 26:17, 44:21
equipment [1] - 8:18
essentially [3] - 36:19, 38:25, 67:2
estate [3] - 18:7, 46:16, 49:15
Este [3] - 24:15, 29:7, 34:25
estimate [2] - 25:16, 27:12
evaluation [2] - 30:10, 30:11
event [3] - 31:5, 31:18, 58:5
events [6] - 30:16, 31:12, 57:15, 57:17, 57:21, 62:8
exactly [1] - 27:17
EXAMINATION [4] - 3:1, 4:4, 47:1, 66:11
examination [1] - 69:8
Examination [1] - 3:2
examined [1] - 69:8
excuse [2] - 8:7, 36:19
exhibit [1] - 20:21
Exhibit [12] - 3:9, 3:11, 3:12, 3:13, 33:13, 33:23, 35:16, 36:12, 38:5, 38:13, 45:3, 45:4
EXHIBITS [1] - 3:8
existed [1] - 58:24
exited [2] - 26:25, 51:13
exiting [3] - 26:20, 26:22, 51:5
experience [1] - 57:8
experienced [1] - 62:16

explicitly [2] - 26:12, 27:2
expressly [1] - 64:8
extremely [1] - 19:24

**F**

fact [3] - 19:4, 49:23, 63:22
factoring [1] - 58:7
faculty [1] - 60:4
faculty-wise [1] - 60:4
fair [5] - 11:12, 31:11, 43:22, 44:15, 44:16
Fairfield [1] - 2:8
far [7] - 8:25, 17:21, 22:25, 46:18, 47:14, 54:5, 66:5
farm [1] - 8:18
farmhouse [1] - 58:6
fashion [1] - 14:22
father [21] - 17:11, 19:3, 22:11, 24:12, 39:9, 41:21, 46:8, 46:15, 49:15, 50:1, 50:4, 50:8, 50:14, 50:24, 59:21, 59:24, 59:25, 60:1, 60:14, 60:18, 60:19
father's [2] - 47:20, 49:21
FBI [1] - 28:17
fear [1] - 58:8
Federal [1] - 28:13
federal [1] - 4:17
felony [1] - 10:16
felt [3] - 25:24, 28:1, 39:3
few [5] - 36:3, 47:5, 58:13, 63:7, 66:13
fifth [1] - 10:19
fighting [1] - 53:10
figure [1] - 53:1
file [1] - 28:9
filed [4] - 4:17, 10:1, 10:11, 53:4
finally [2] - 6:10, 60:22
financially [1] - 69:15
findings [6] - 34:2, 35:20, 35:21, 35:24, 36:19
fine [1] - 4:14
fired [1] - 9:23
first [13] - 4:2, 5:4, 7:23, 15:11, 23:21, 24:1, 25:7, 25:10, 42:12, 50:20, 55:1, 55:13, 56:3
five [5] - 31:4, 36:18,

62:7, 62:12
Floor [1] - 2:11
folks [2] - 52:22, 53:18
follow [1] - 26:6
follows [1] - 4:3
form [1] - 69:9
forth [1] - 24:7
foundation [1] - 45:15
founded [1] - 36:14
four [3] - 9:9, 36:18, 37:9
fourth [2] - 61:13, 61:15
Franklin [1] - 2:16
friend [3] - 11:20, 18:22, 56:8
friends [1] - 16:1
front [2] - 32:22, 32:23
fruits [1] - 61:19
fuck [1] - 46:8

**G**

GAIL [1] - 1:4
Gail [49] - 2:19, 4:22, 13:17, 13:18, 15:11, 15:13, 15:24, 16:10, 16:14, 17:8, 18:12, 19:4, 19:7, 20:5, 20:8, 20:11, 20:14, 20:21, 20:25, 21:2, 21:6, 21:10, 21:23, 22:3, 22:10, 22:16, 23:7, 25:1, 26:17, 27:20, 29:18, 36:20, 37:2, 37:13, 39:22, 39:23, 40:11, 46:10, 53:21, 54:7, 54:12, 54:22, 55:21, 56:17, 56:18, 57:24, 58:2, 59:23, 60:1
Gail's [3] - 17:2, 27:7, 54:4
gain [2] - 52:9, 52:14
gaining [1] - 52:15
Gale [3] - 1:13, 1:24, 69:3
game [4] - 12:1, 12:2, 12:9
garage [1] - 68:15
gears [1] - 58:11
General [1] - 2:10
General's [1] - 28:3
generally [1] - 19:24
GINA [1] - 2:2
Gina [1] - 32:16
girlfriend [1] - 42:6
given [2] - 59:22, 69:10

gmessamer @ parrishlaw.com [1] - 2:4
goal [1] - 57:19
Gordon [9] - 17:11, 17:14, 18:2, 18:6, 24:4, 24:5, 27:21, 29:18, 46:15
GORDON [1] - 1:5
Gordon's [1] - 68:14
gotcha [1] - 58:5
government [1] - 10:8
graduate [2] - 7:7, 7:9
Grand [2] - 1:17, 2:3
granted [2] - 39:10, 39:16
great [1] - 5:11
guardian [3] - 51:19, 52:11, 53:25
guardians [2] - 21:18, 52:6
guardianship [4] - 13:19, 13:24, 53:8, 53:19
guess [1] - 51:20
guys [2] - 48:7, 53:2

**H**

half [8] - 7:20, 14:10, 26:11, 52:20, 52:22, 53:19, 65:21, 65:22
halfway [1] - 65:2
hand [6] - 24:8, 32:15, 32:20, 34:19, 35:4, 63:23
handling [2] - 63:6, 63:12
happy [1] - 45:12
harassed [1] - 39:3
harassing [2] - 25:21, 25:22
harassment [2] - 25:25, 26:1
HARVEY [1] - 2:6
health [6] - 29:25, 30:3, 30:14, 31:8, 62:5, 66:14
heard [1] - 4:25
hearing [2] - 47:8, 54:19
held [1] - 37:19
help [10] - 6:1, 18:20, 24:6, 25:19, 39:4, 48:9, 53:5, 62:17, 64:17, 64:20
helped [1] - 18:22
hereby [1] - 69:4
hereinbefore [1] -

69:5
**hereof** [1] - 69:6
**hereto** [1] - 69:15
**HHS** [10] - 19:8, 20:24, 21:14, 21:17, 47:18, 49:9, 54:5, 54:8, 54:20, 54:23
**high** [2] - 7:7, 7:11
**Hills** [1] - 7:15
**himself** [1] - 51:9
**HINDERS** [22] - 2:14, 4:5, 31:7, 31:9, 32:16, 33:3, 33:8, 33:11, 37:21, 38:8, 38:17, 40:24, 41:2, 41:6, 41:8, 43:19, 43:21, 45:7, 45:10, 45:16, 46:23, 68:21
**Hinders** [5] - 2:16, 3:3, 3:19, 3:20, 48:3
**history** [1] - 54:4
**hit** [1] - 43:17
**hitting** [1] - 41:3
**holding** [2] - 39:23, 40:6
**holes** [1] - 12:5
**home** [5] - 23:8, 23:12, 23:15, 47:24, 52:18
**homes** [1] - 16:23
**honestly** [1] - 42:8
**Hoover** [1] - 2:11
**horrible** [1] - 57:8
**hospital** [1] - 66:20
**hour** [1] - 26:11
**hourly** [4] - 8:21, 8:23, 9:10, 9:13
**house** [18] - 15:14, 15:18, 19:19, 20:6, 24:19, 24:20, 25:2, 25:4, 26:19, 46:9, 47:20, 50:23, 51:3, 59:19, 67:3, 68:4, 68:12, 68:15
**household** [1] - 13:12
**hyphen** [1] - 4:9
**hypothetically** [1] - 21:1

**I**

**idea** [4] - 21:13, 39:12, 42:5, 56:12
**identification** [3] - 33:14, 38:14, 45:5
**illegal** [7] - 14:12, 14:13, 14:20, 20:17, 22:5, 61:2, 61:22
**in-house** [1] - 24:20

**incident** [3] - 28:15, 34:15, 58:25
**incidents** [1] - 36:18
**including** [3] - 13:4, 15:5, 30:14
**independent** [1] - 40:10
**INDEX** [2] - 3:1, 3:17
**Indian** [1] - 7:15
**indicate** [2] - 43:6, 49:2
**indicated** [1] - 69:5
**indicating)** [1] - 33:5
**individual** [5] - 41:14, 41:23, 42:3, 42:5, 65:11
**individuals** [2] - 25:11, 29:21
**information** [7] - 37:13, 55:12, 55:18, 55:20, 56:1, 56:15, 59:21
**injury** [1] - 13:4
**instance** [1] - 61:17
**interaction** [1] - 24:15
**interactions** [4] - 50:17, 54:5, 54:8, 65:1
**interest** [1] - 18:8
**interested** [1] - 69:15
**interesting** [1] - 12:11
**interests** [1] - 49:20
**interim** [1] - 53:11
**internally** [1] - 28:24
**interposed** [1] - 69:11
**interrogatories** [1] - 63:21
**Interrogatory** [1] - 63:19
**investigate** [6] - 19:9, 28:24, 51:22, 51:23, 52:3, 60:25
**investigated** [3] - 12:20, 21:19, 54:23
**investigating** [1] - 49:3
**investigation** [3] - 13:14, 20:24, 29:14
**Investigations** [1] - 28:14
**involved** [2] - 15:8, 37:1
**involvement** [2] - 21:24, 37:4
**IOWA** [2] - 1:2, 1:9
**Iowa** [26] - 1:16, 1:18, 2:4, 2:8, 2:12, 2:14, 2:17, 4:18, 7:3, 7:4, 7:6, 7:8, 8:4, 8:13, 9:4, 9:7, 11:6, 11:7,

11:13, 11:16, 15:21, 25:9, 35:1, 69:4, 69:17
**issue** [3] - 48:22, 49:14, 60:9
**issuing** [1] - 60:13

**J**

**Jefferson** [14] - 2:14, 4:17, 11:10, 17:18, 23:4, 23:5, 29:8, 29:22, 34:24, 44:11, 44:12, 44:23, 55:9, 63:20
**JEFFERSON** [1] - 1:9
**Jeremy** [1] - 18:24
**jlewis@hinderslaw. com** [1] - 2:18
**job** [9] - 5:11, 8:14, 9:4, 9:20, 9:23, 11:20, 19:20, 58:20, 65:4
**jobs** [1] - 9:22
**joined** [1] - 67:23
**jokingly** [1] - 21:1
**JONATHAN** [1] - 2:15
**judgment** [1] - 10:12

**K**

**keep** [3] - 59:16, 68:5, 68:11
**KELSEY** [1] - 1:8
**Kelsey** [8] - 2:9, 22:9, 22:13, 25:13, 41:16, 41:18, 56:2, 67:19
**Kelsey's** [1] - 22:17
**kept** [1] - 67:3
**kids** [7] - 11:21, 12:1, 12:6, 12:8, 21:9, 21:12, 52:10
**kind** [5] - 51:11, 65:15, 65:23, 67:17, 68:2
**knowledge** [7] - 12:22, 20:8, 21:22, 22:3, 36:22, 39:9, 69:7
**known** [2] - 20:14, 50:16
**Koenig** [24] - 2:9, 22:10, 23:5, 23:17, 23:22, 24:16, 25:8, 26:7, 29:6, 34:23, 35:3, 39:17, 47:4, 47:16, 50:22, 50:24, 55:8, 55:11, 56:2, 59:20, 60:18, 60:24, 64:9, 65:4

**KOENIG** [1] - 1:8
**Koenig's** [1] - 23:6
**Kruidenier** [1] - 2:3

**L**

**lady** [1] - 43:15
**Lafayette** [1] - 12:17
**laid** [1] - 9:23
**land** [1] - 50:25
**last** [5] - 9:16, 10:5, 11:1, 14:22, 14:25
**late** [1] - 10:22
**lathes** [1] - 8:19
**Law** [3] - 2:2, 2:7, 2:15
**law** [5] - 12:20, 44:17, 49:11, 50:2, 60:23
**lawsuit** [8] - 10:2, 12:24, 13:4, 28:10, 57:11, 58:19, 66:6
**lawyer** [1] - 28:7
**learn** [1] - 50:15
**least** [3] - 43:7, 62:4, 64:5
**leave** [10] - 9:20, 12:12, 22:20, 27:2, 42:23, 43:3, 44:5, 50:4, 64:9, 67:9
**leaving** [1] - 51:2
**left** [3] - 27:19, 29:8, 34:19
**left-hand** [1] - 34:19
**legal** [1] - 53:17
**legally** [1] - 53:15
**less** [1] - 27:17
**LEWIS** [1] - 2:15
**licenses** [1] - 18:16
**life** [6] - 8:9, 11:13, 18:6, 18:7, 46:16, 49:15
**lifetime** [1] - 57:12
**Line** [1] - 3:18
**lines** [3] - 16:15, 18:18, 34:10
**lions** [1] - 12:4
**lions'** [1] - 12:5
**listed** [2] - 36:13, 37:9
**listening** [1] - 64:25
**live** [4] - 16:7, 16:22, 16:24, 18:13
**lived** [8] - 8:7, 11:12, 11:15, 11:17, 16:8, 16:10, 17:14
**lives** [2] - 15:18, 15:20
**living** [10] - 11:19, 19:2, 52:21, 53:7, 54:11, 54:12, 57:12, 57:21, 57:24, 58:2
**LLP** [1] - 2:3

**located** [1] - 15:17
**look** [8] - 20:4, 32:17, 33:22, 35:4, 36:4, 47:20, 47:25
**looked** [3] - 19:19, 21:7, 65:23
**looking** [7] - 35:14, 36:8, 41:20, 43:5, 48:5, 48:7, 48:22
**looks** [1] - 64:5
**louder** [1] - 41:5
**Louisa** [1] - 11:10
**Louisiana** [3] - 11:17, 11:19, 12:14

**M**

**machine** [1] - 8:19
**main** [3] - 15:18, 20:5, 50:23
**majority** [2] - 8:9, 16:13
**manager** [2] - 9:6, 9:14
**manner** [1] - 14:13
**marijuana** [4] - 10:21, 14:15, 15:1, 61:9
**mark** [1] - 33:11
**Marked** [1] - 3:9
**marked** [7] - 33:14, 35:15, 35:25, 38:9, 38:14, 45:2, 45:5
**marking** [1] - 33:1
**married** [2] - 13:1, 47:11
**matter** [2] - 19:25, 29:9
**matters** [1] - 69:7
**McConnell** [5] - 4:9, 4:11, 4:13, 32:20, 32:21
**MCCONNELL** [5] - 1:4, 1:8, 1:13, 4:1, 4:9
**McConnell-Seaba** [5] - 4:9, 4:11, 4:13, 32:20, 32:21
**MCCONNELL- SEABA** [3] - 1:8, 1:13, 4:1
**mean** [6] - 25:22, 31:17, 49:5, 59:11, 60:7, 61:16
**meaning** [1] - 55:1
**means** [2] - 5:18, 56:21
**medical** [2] - 30:13, 62:19
**medication** [2] - 30:2,

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309
Page 4 to 4 of 8                                                                22 of 26 sheets

**App. 113**

30:5
**meet** [2] - 15:11, 15:13
**mental** [7] - 29:25, 30:3, 30:14, 31:8, 60:13, 62:5, 66:14
**mentally** [1] - 60:4
**mentioned** [1] - 68:1
**Messamer** [1] - 3:5
**MESSAMER** [9] - 2:2, 38:6, 38:11, 41:1, 41:4, 45:8, 45:12, 66:12, 68:18
**met** [1] - 17:6
**methamphetamine** [5] - 14:12, 19:23, 20:11, 20:18, 22:4
**might** [3] - 21:13, 21:16, 21:20
**mind** [3] - 59:6, 63:11, 65:8
**mindful** [1] - 59:15
**minutes** [10] - 23:2, 25:17, 27:14, 27:16, 27:17, 27:18, 36:3, 43:5, 47:5
**mischief** [1] - 10:23
**misdemeanor** [1] - 10:16
**missed** [1] - 33:4
**Moines** [4] - 1:18, 2:4, 2:12, 69:17
**mom** [1] - 17:16
**moment** [2] - 43:13, 63:24
**monetary** [1] - 59:4
**money** [3] - 8:23, 12:13, 32:5
**month** [2] - 9:16, 9:18
**monthly** [1] - 8:25
**months** [6] - 11:18, 14:23, 31:4, 31:17, 62:7, 62:12
**morning** [5] - 19:10, 22:13, 22:17, 47:7, 47:15
**most** [2] - 8:2, 11:13
**motivated** [1] - 21:17
**Motor** [1] - 8:12
**Moulding** [25] - 2:14, 23:17, 23:22, 24:1, 24:11, 24:16, 25:8, 26:6, 26:16, 29:6, 29:21, 34:23, 43:7, 51:9, 51:13, 55:7, 59:20, 60:17, 64:8, 64:12, 64:14, 65:4, 65:13, 65:23, 67:1
**MOULDING** [1] - 1:8
**mouths** [1] - 12:5
**move** [1] - 16:6

**moved** [3] - 15:14, 16:14, 17:16
**movement** [1] - 60:3
**MR** [34] - 4:5, 31:7, 31:9, 32:16, 33:1, 33:3, 33:6, 33:8, 33:11, 37:21, 38:7, 38:8, 38:12, 38:17, 40:22, 40:24, 41:2, 41:6, 41:8, 43:17, 43:19, 43:20, 43:21, 45:7, 45:9, 45:10, 45:16, 46:23, 47:2, 63:14, 66:9, 68:20, 68:21, 68:23
**MS** [8] - 38:6, 38:11, 41:1, 41:4, 45:8, 45:12, 66:12, 68:18

## N

**NA** [2] - 15:5, 15:6
**name** [3] - 4:6, 42:7, 42:8
**named** [1] - 69:5
**nature** [1] - 15:23
**need** [4] - 5:6, 6:12, 24:5, 36:4
**needed** [1] - 16:22
**needing** [1] - 45:13
**nephew's** [1] - 42:6
**never** [7] - 20:17, 28:18, 35:11, 62:16, 63:10, 64:18, 65:8
**new** [1] - 50:15
**newborn** [1] - 19:22
**next** [2] - 27:1, 41:23
**nine** [1] - 11:18
**normal** [1] - 9:1
**normally** [1] - 40:7
**Norwalk** [1] - 2:17
**Notary** [1] - 1:15
**NOTARY** [1] - 69:22
**nothing** [3] - 24:21, 32:6, 68:23
**notify** [1] - 34:7
**November** [13] - 13:11, 18:25, 19:11, 20:25, 24:17, 30:15, 31:12, 31:25, 52:23, 54:8, 54:21, 57:16, 60:9
**Number** [2] - 3:9, 63:19
**number** [6] - 31:22, 32:14, 38:3, 59:7, 59:8, 63:23

## O

**oath** [2] - 5:17, 69:8
**objection** [3] - 38:5, 38:7, 45:8
**objections** [3] - 38:10, 45:7, 69:10
**observe** [1] - 26:21
**obtained** [1] - 55:19
**obviously** [1] - 47:7
**occasions** [1] - 58:7
**occur** [3] - 11:5, 11:8, 37:6
**occurred** [1] - 54:1
**occurring** [2] - 40:16, 48:20
**October** [1] - 36:24
**OF** [5] - 1:2, 1:7, 1:12, 3:1, 3:17
**off-the-record** [1] - 37:18
**offense** [1] - 11:2
**offer** [1] - 11:20
**office** [1] - 28:5
**Office** [2] - 2:11, 28:3
**officer** [4] - 38:21, 39:6, 46:3, 60:23
**officers** [2] - 46:21, 61:10
**old** [2] - 10:24, 14:8
**ombudsman's** [1] - 28:5
**once** [4] - 27:25, 30:17, 48:24, 50:24
**one** [18] - 5:4, 5:10, 13:8, 25:1, 33:4, 36:17, 37:22, 38:4, 42:2, 45:1, 48:23, 49:6, 52:5, 58:3, 59:6, 62:4, 62:10, 62:13
**one-time** [2] - 62:10, 62:13
**ones** [3] - 57:22, 68:9, 68:13
**ongoing** [1] - 19:22
**operator** [1] - 9:12
**opinion** [1] - 20:22
**opportunities** [1] - 58:23
**opportunity** [2] - 47:6, 58:24
**Osborn** [23] - 2:19, 4:16, 4:22, 13:9, 13:17, 15:11, 15:25, 32:18, 32:19, 33:22, 35:15, 35:16, 36:11, 36:20, 39:23, 47:9, 47:10, 48:16, 51:18,

55:12, 55:21, 56:10, 63:17
**OSBORN** [1] - 1:4
**Osborn's** [1] - 56:8
**Ottumwa** [1] - 7:16
**out-of-county** [2] - 61:7, 61:12
**outside** [6] - 9:22, 11:15, 12:18, 21:22, 24:25, 30:10
**OWI** [2] - 10:20, 15:9
**own** [3] - 16:22, 30:21, 30:23
**owned** [1] - 49:15
**owner** [5] - 18:10, 24:6, 50:5, 50:9, 50:12
**ownership** [2] - 18:8, 49:13

## P

**P.L.C** [1] - 2:16
**p.m** [3] - 1:17, 22:24, 68:25
**packet** [1] - 32:17
**Page** [2] - 3:2, 3:18
**page** [8] - 33:23, 34:3, 34:5, 35:13, 35:15, 35:17, 36:11
**pages** [2] - 33:4, 33:10
**painted** [1] - 12:4
**panels** [1] - 8:18
**parental** [3] - 13:25, 14:5, 53:6
**Parrish** [1] - 2:3
**part** [6] - 5:22, 13:12, 13:13, 13:24, 32:19, 33:20
**partial** [1] - 18:10
**particular** [1] - 52:25
**parties** [3] - 42:15, 69:13, 69:15
**partner** [1] - 47:13
**partners** [1] - 47:11
**pass** [1] - 49:23
**passed** [1] - 50:1
**past** [4] - 7:11, 25:13, 25:14, 54:4
**patient** [1] - 63:16
**pause** [2] - 37:22, 42:2
**Payne** [1] - 18:24
**pending** [2] - 6:11, 6:14
**people** [9] - 25:20, 39:2, 42:21, 48:11, 52:8, 64:17, 64:21, 65:16, 67:9
**per** [2] - 9:15, 9:18

**perception** [2] - 6:6, 30:6
**period** [7] - 16:21, 16:24, 40:4, 40:11, 40:18, 42:14, 44:23
**permission** [5] - 19:16, 19:18, 26:13, 47:17, 64:7
**person** [4] - 36:14, 51:24, 56:7, 67:15
**personal** [1] - 13:4
**personally** [2] - 14:11, 24:21
**pertaining** [1] - 59:22
**phone** [4] - 19:14, 28:16, 28:18, 39:24
**physical** [1] - 27:8
**pictures** [1] - 29:19
**piece** [1] - 12:3
**pigs** [1] - 68:11
**pissed** [2] - 59:3, 59:5
**place** [1] - 69:5
**placed** [2] - 34:15, 52:18
**plaintiff** [1] - 12:23
**Plaintiffs** [2] - 1:6, 2:2
**Plaintiffs'** [6] - 32:18, 33:22, 35:15, 35:16, 36:11
**plan** [1] - 21:11
**plant** [3] - 9:6, 9:14, 9:21
**plates** [2] - 61:8, 61:12
**played** [10] - 37:20, 38:16, 39:19, 41:7, 43:4, 45:17, 46:1, 46:6, 46:13, 48:3
**plumber** [1] - 18:17
**plywood** [1] - 12:3
**point** [12] - 25:21, 25:25, 39:8, 39:21, 43:8, 43:22, 46:7, 46:15, 51:12, 52:10, 60:22, 67:6
**poisonous** [1] - 61:19
**police** [2] - 46:3, 46:21
**porch** [3] - 41:20, 41:21, 67:8
**pork** [1] - 12:6
**portion** [2] - 7:23, 36:12
**position** [1] - 9:16
**positive** [1] - 22:4
**possession** [2] - 10:21, 61:9
**possibility** [1] - 21:2
**possibly** [2] - 21:18, 58:10
**Powercom** [2] - 8:12, 58:15

**App. 114**

**pregnancy** [1] - 20:22
**pregnant** [4] - 21:3, 21:7, 22:7, 48:17
**prepare** [2] - 6:16, 6:19
**prescribed** [2] - 14:14, 14:22
**prescription** [1] - 14:21
**presence** [3] - 20:12, 21:1, 21:6
**present** [6] - 2:19, 22:9, 22:14, 26:16, 37:8, 37:10
**previous** [5] - 9:4, 10:2, 16:11, 21:25, 55:24
**previously** [7] - 13:1, 16:8, 18:12, 26:3, 36:13, 37:14, 39:16
**primary** [1] - 7:4
**printed** [1] - 69:9
**private** [3] - 13:25, 44:18, 66:21
**prize** [1] - 12:8
**problem** [4] - 46:21, 48:4, 48:7, 54:25
**proceeded** [1] - 24:9
**process** [1] - 33:20
**PROFESSIONAL** [1] - 69:21
**Professional** [2] - 1:15, 69:4
**program** [2] - 15:5, 15:7
**projects** [1] - 8:20
**promoted** [1] - 9:13
**prompted** [1] - 62:12
**property** [70] - 15:19, 15:20, 16:6, 17:15, 17:18, 17:25, 18:4, 19:2, 20:4, 21:5, 22:10, 22:25, 23:7, 23:18, 24:6, 25:9, 25:20, 25:24, 26:5, 26:7, 26:10, 26:14, 27:3, 27:13, 27:20, 29:19, 32:2, 34:25, 39:2, 39:10, 39:13, 39:17, 42:23, 43:24, 44:1, 44:6, 44:15, 44:21, 44:22, 46:4, 46:16, 47:25, 48:6, 48:12, 48:14, 48:20, 49:14, 49:20, 49:23, 50:5, 50:6, 50:9, 50:12, 55:13, 55:16, 55:23, 56:19, 56:22, 57:4, 57:10, 57:22, 60:25, 61:20, 64:7,

64:9, 64:12, 64:17, 65:12, 68:2, 68:8
**protected** [1] - 48:25
**protections** [1] - 62:1
**protective** [2] - 20:3, 35:5
**Protective** [3] - 13:13, 21:24, 22:1
**provide** [1] - 29:4
**provided** [2] - 29:2, 66:3
**provider** [3] - 63:9, 63:11, 66:16
**psychological** [1] - 30:10
**Public** [1] - 1:16
**PUBLIC** [1] - 69:22
**pull** [1] - 61:11
**pulled** [1] - 61:6
**pulls** [1] - 56:25
**purposes** [1] - 45:15

### Q

**questions** [6] - 5:12, 46:24, 56:6, 58:13, 59:13, 59:17
**quickly** [1] - 5:3
**quit** [1] - 9:23

### R

**R-i-p-p-e-y** [1] - 35:9
**raising** [1] - 27:4
**rather** [3] - 7:24, 9:23, 58:16
**read** [1] - 34:1
**real** [1] - 47:23
**really** [3] - 26:21, 49:24, 62:16
**reappear** [1] - 41:12
**reason** [5] - 33:5, 50:3, 62:19, 62:23, 62:24
**receive** [2] - 10:8, 29:11
**received** [1] - 19:13
**receiving** [1] - 36:9
**recent** [1] - 53:23
**recently** [1] - 48:16
**recollection** [1] - 40:10
**record** [5] - 4:7, 24:14, 37:18, 47:10, 69:10
**recorded** [1] - 25:1
**recording** [3] - 25:3, 40:3, 40:8
**recordings** [4] -

24:24, 25:4, 40:1, 66:1
**records** [1] - 31:8
**red** [1] - 42:10
**reduced** [1] - 69:9
**refer** [1] - 4:12
**regard** [2] - 48:10, 61:5
**regarding** [1] - 55:21
**REGISTERED** [1] - 69:21
**Registered** [2] - 1:15, 69:4
**Registry** [1] - 34:16
**regular** [3] - 22:21, 22:22, 66:17
**regularly** [1] - 14:18
**related** [3] - 30:15, 66:6, 69:12
**relationship** [4] - 15:24, 16:2, 16:20, 17:2
**relative** [1] - 69:14
**remainderman** [1] - 49:19
**remaindermen** [1] - 49:16
**remember** [4] - 23:9, 30:7, 36:10, 38:24
**remind** [1] - 5:3
**remove** [1] - 64:21
**removed** [3] - 13:19, 13:23, 14:9
**repeat** [2] - 5:24, 5:25
**report** [2] - 34:9, 35:11
**Reported** [1] - 1:24
**REPORTER** [2] - 69:21, 69:22
**reporter** [5] - 5:5, 5:25, 33:15, 38:15, 45:6
**Reporter** [4] - 1:14, 1:15, 69:3, 69:4
**reports** [3] - 36:14, 36:18, 55:21
**represent** [1] - 47:3
**Request** [1] - 3:18
**request** [1] - 29:4
**REQUESTS** [1] - 3:17
**require** [1] - 5:12
**requirement** [1] - 5:15
**reside** [3] - 20:5, 26:18, 44:11
**residence** [2] - 51:14, 58:3
**resolved** [1] - 29:9
**respect** [2] - 50:7, 50:13
**response** [2] - 28:21, 39:5

**responses** [2] - 63:20, 64:6
**responsible** [1] - 36:15
**responsive** [1] - 6:8
**resulted** [1] - 57:17
**retain** [2] - 53:15, 53:16
**returning** [1] - 23:6
**review** [4] - 6:22, 37:25, 63:22, 63:24
**reviewed** [2] - 35:12, 50:20
**revoked** [1] - 39:12
**rewind** [1] - 42:1
**rigged** [1] - 12:10
**right-hand** [1] - 35:4
**rights** [4] - 14:1, 14:5, 48:25, 53:6
**Rippey** [1] - 35:8
**risen** [1] - 27:7
**romantic** [1] - 16:2
**RPR** [1] - 1:24
**rule** [1] - 5:8
**rules** [1] - 4:25
**running** [1] - 44:12
**RV** [1] - 64:12
**Ryan** [2] - 4:8, 47:3
**RYAN** [5] - 1:8, 1:12, 2:10, 4:1, 4:8
**ryan.sheahan.ag. iowa.gov** [1] - 2:13

### S

**S-e-a-b-a** [1] - 4:10
**safe** [1] - 36:1
**safety** [2] - 35:20, 35:24
**salaried** [1] - 9:17
**salary** [2] - 9:10, 9:14
**saw** [6] - 39:23, 41:10, 51:2, 56:14, 56:17, 66:16
**scared** [1] - 56:24
**scenario** [1] - 54:2
**scene** [1] - 51:12
**school** [4] - 7:4, 7:7, 7:12, 7:19
**SEABA** [5] - 1:4, 1:5, 1:8, 1:13, 4:1
**Seaba** [9] - 4:9, 4:11, 4:13, 17:11, 24:4, 24:5, 32:20, 32:21, 46:15
**search** [8] - 39:10, 39:13, 39:16, 40:15, 61:18, 61:22, 65:17, 66:24

**searched** [1] - 68:2
**searches** [1] - 61:2
**searching** [4] - 43:23, 43:25, 64:18, 67:24
**second** [8] - 25:23, 37:22, 42:2, 55:4, 55:7, 55:14, 55:16, 59:18
**Second** [1] - 2:11
**security** [4] - 24:18, 24:20, 24:23, 32:2
**see** [20] - 5:22, 12:18, 30:17, 34:10, 34:18, 35:17, 36:12, 37:16, 42:1, 42:2, 50:24, 55:24, 56:23, 59:17, 62:14, 62:15, 62:17, 62:20, 63:2, 64:3
**seeing** [1] - 42:12
**seem** [2] - 43:6, 49:5
**seizure** [1] - 61:22
**seizures** [1] - 61:3
**send** [1] - 63:21
**sense** [1] - 32:2
**separate** [1] - 16:23
**September** [1] - 20:9
**serious** [1] - 19:24
**served** [1] - 10:2
**service** [1] - 66:22
**services** [1] - 20:3
**Services** [3] - 13:13, 21:24, 22:1
**share** [2] - 17:3, 37:2
**shared** [2] - 19:3, 37:13
**SHEAHAN** [14] - 2:10, 33:1, 33:6, 38:7, 38:12, 40:22, 43:17, 43:20, 45:9, 47:2, 63:14, 66:9, 68:20, 68:23
**Sheahan** [2] - 3:4, 47:3
**sheet** [1] - 69:6
**Sheriff's** [1] - 44:10
**sheriff's** [5] - 23:18, 48:5, 64:11, 64:13, 64:23
**sheriffs** [1] - 64:16
**shift** [1] - 58:11
**shirt** [1] - 42:10
**shop** [5] - 51:2, 51:5, 68:1, 68:5, 68:12
**SHORTHAND** [1] - 69:21
**Shorthand** [2] - 1:14, 69:3
**shorthand** [1] - 69:9
**shots** [1] - 65:24
**show** [2] - 29:20,

44:12
**showed** [1] - 57:10
**showing** [1] - 40:18
**shut** [2] - 9:21, 67:6
**siblings** [2] - 49:16, 49:24
**side** [1] - 35:4
**signed** [3] - 33:19, 35:3, 35:7
**significant** [1] - 47:13
**signs** [2] - 20:21, 55:24
**sister** [5] - 15:15, 15:16, 18:10, 19:3, 49:25
**sit** [2] - 48:13, 67:7
**sitting** [1] - 41:21
**situation** [2] - 31:21, 65:10
**six** [7] - 11:17, 14:23, 16:18, 31:4, 36:19, 62:7, 62:12
**small** [1] - 13:5
**smoked** [2] - 14:15, 14:25
**sold** [1] - 11:24
**someone** [2] - 30:22, 62:3
**somewhere** [2] - 31:2, 31:4
**sorry** [3] - 33:3, 33:6, 58:1
**sort** [3] - 54:21, 55:25, 58:22
**sounds** [3] - 49:14, 51:17, 60:2
**SOUTHERN** [1] - 1:2
**speaking** [2] - 19:24, 59:25
**specifically** [1] - 20:18
**spell** [1] - 4:6
**spelled** [1] - 35:8
**spouse** [1] - 47:12
**standing** [1] - 42:3
**start** [1] - 16:3
**started** [1] - 9:12
**state** [4] - 5:19, 11:5, 11:15, 46:20
**State** [4] - 1:16, 2:11, 4:18, 69:3
**states** [1] - 11:6
**STATES** [1] - 1:1
**stating** [1] - 19:8
**stayed** [1] - 44:22
**stick** [1] - 53:1
**still** [4] - 15:20, 36:8, 40:19, 46:14
**stopped** [1] - 24:3
**Street** [2] - 2:12, 8:4

**structure** [6] - 16:6, 16:11, 18:13, 20:4, 26:17, 50:25
**structures** [2] - 68:8, 68:9
**stuff** [3] - 60:4, 66:6, 68:6
**subject** [2] - 14:4, 57:10
**subsequently** [1] - 61:8
**substance** [3] - 15:4, 22:5, 30:11
**substances** [1] - 14:16
**suburb** [1] - 12:17
**sue** [1] - 44:8
**sued** [1] - 10:12
**suggest** [1] - 30:22
**summary** [1] - 36:13
**Sunset** [1] - 2:17
**supervision** [1] - 69:9
**supervisor** [1] - 35:7
**surrounding** [1] - 36:23
**Sweeney** [3] - 1:13, 1:24, 69:3
**sworn** [2] - 4:3, 69:6

**T**

**taxes** [1] - 8:25
**technician** [2] - 8:15, 8:16
**teddy** [1] - 11:24
**teens** [1] - 10:22
**ten** [2] - 16:9, 18:15
**term** [1] - 18:7
**terminated** [2] - 9:24, 53:6
**termination** [2] - 13:25, 14:5
**terms** [9] - 47:12, 51:7, 51:8, 52:14, 53:18, 61:13, 65:9, 66:23, 67:13
**tested** [1] - 22:3
**testified** [1] - 4:3
**testify** [1] - 69:6
**testimony** [1] - 69:10
**THE** [1] - 1:12
**thefts** [1] - 10:19
**therapy** [1] - 30:10
**thereupon** [1] - 69:8
**threats** [1] - 27:8
**three** [9] - 24:8, 27:21, 36:17, 52:20, 52:22, 53:8, 53:11, 53:19, 57:14

**threw** [1] - 12:6
**thrown** [1] - 61:10
**tie** [1] - 64:22
**tim** [1] - 47:3
**Tim** [22] - 4:12, 4:14, 4:15, 6:16, 6:25, 8:11, 21:9, 29:24, 31:10, 37:23, 38:18, 41:9, 41:15, 42:9, 43:22, 44:4, 44:8, 45:18, 46:24, 66:13, 68:24
**TIM** [1] - 1:4
**Timothy** [2] - 4:8, 4:12
**TIMOTHY** [4] - 1:8, 1:12, 4:1, 4:8
**today** [7] - 5:19, 6:24, 14:20, 29:10, 48:13, 58:17, 59:7
**together** [3] - 16:7, 16:11, 37:7
**took** [1] - 7:23
**tools** [1] - 68:6
**total** [2] - 27:13, 67:18
**touching** [1] - 69:7
**towards** [2] - 26:8, 27:9
**TPR** [1] - 53:4
**tractor** [6] - 24:2, 38:18, 40:20, 41:11, 42:13, 45:20
**traffic** [1] - 65:11
**transcribing** [1] - 5:5
**treatment** [7] - 15:5, 30:14, 62:5, 62:24, 63:1, 66:14
**tree** [1] - 61:19
**trespass** [2] - 25:20, 39:2
**trespassed** [1] - 46:3
**trespassing** [3] - 27:3, 42:22, 42:24
**trial** [1] - 31:10
**tried** [1] - 58:22
**true** [7] - 41:9, 44:19, 44:20, 56:12, 56:13, 56:16, 69:10
**trust** [1] - 60:19
**truth** [2] - 5:18, 69:6
**try** [5] - 11:22, 43:2, 51:24, 52:3, 53:15
**trying** [14] - 43:19, 44:5, 48:11, 51:11, 53:14, 53:22, 54:1, 56:20, 59:2, 59:15, 62:24, 63:1, 64:4, 65:3
**turn** [1] - 40:23
**turned** [2] - 33:18, 66:7

**turns** [1] - 57:8
**twenties** [4] - 8:2, 10:20, 10:22, 14:15
**two** [17] - 9:22, 10:19, 10:21, 16:7, 24:7, 33:10, 34:10, 35:14, 35:19, 36:17, 37:6, 48:11, 57:14, 57:15, 57:16, 64:1, 64:17
**type** [2] - 66:16, 67:5

**U**

**ultimately** [1] - 57:23
**under** [5] - 5:17, 35:21, 35:24, 69:8, 69:9
**understood** [2] - 6:7, 14:7
**UNITED** [1] - 1:1
**up** [13] - 24:9, 26:19, 34:19, 39:24, 40:6, 40:23, 41:3, 42:17, 46:21, 48:5, 51:12, 57:10, 67:22
**Updegraff** [1] - 2:16
**utter** [2] - 23:11, 27:25
**utterance** [1] - 5:13

**V**

**valid** [1] - 49:8
**value** [1] - 59:5
**various** [1] - 8:20
**vehicle** [4] - 24:3, 43:8, 43:9, 56:25
**versus** [2] - 4:16, 68:9
**Video** [7] - 3:12, 38:16, 43:4, 45:17, 46:1, 46:6, 46:13
**video** [13] - 3:13, 6:20, 29:19, 37:17, 37:20, 37:23, 38:19, 39:19, 41:7, 43:6, 48:3, 51:4, 64:24
**videos** [5] - 45:13, 50:16, 50:20, 50:21, 66:1
**viewed** [1] - 24:24
**violated** [2] - 28:1, 49:1
**violation** [2] - 55:6, 61:15
**virtue** [1] - 63:8
**visit** [12] - 22:17, 23:7, 26:8, 47:7, 55:7, 55:13, 55:14, 55:17, 56:3, 59:18, 62:5, 62:13

**visited** [1] - 62:3
**voice** [2] - 27:5, 27:7
**volume** [3] - 40:23, 41:3, 43:17
**vs** [1] - 1:7

**W**

**W2Fuels** [1] - 9:6
**waited** [1] - 42:16
**walked** [1] - 67:22
**walking** [2] - 26:19, 51:12
**Walnut** [1] - 2:12
**warrant** [1] - 61:18
**Washington** [18] - 7:6, 7:8, 8:12, 9:4, 11:10, 17:1, 23:4, 29:8, 29:22, 30:20, 34:24, 44:5, 44:9, 44:14, 55:9, 61:7, 62:4
**watch** [1] - 45:13
**watched** [1] - 6:20
**watching** [1] - 41:9
**waved** [1] - 24:8
**ways** [1] - 61:16
**website** [1] - 17:19
**welfare** [1] - 54:16
**white** [1] - 41:15
**White** [3] - 56:6, 56:10, 56:14
**whole** [3] - 31:21, 31:24, 34:1
**willing** [1] - 19:17
**wise** [1] - 60:4
**withdrawn** [2] - 52:4, 58:25
**witness** [4] - 4:2, 64:2, 69:5, 69:8
**witness's** [1] - 69:6
**witnessed** [3] - 65:19, 65:21, 65:22
**woman** [1] - 41:15
**Wonder** [1] - 2:7
**wonderful** [1] - 40:24
**word** [3] - 53:16, 53:17, 56:23
**worker** [9] - 8:21, 19:8, 19:20, 26:2, 35:5, 47:18, 49:9, 55:2, 57:9
**workers** [1] - 58:6
**written** [2] - 6:23, 64:6

**Y**

**year** [4] - 7:9, 7:20, 14:10, 30:25

SWEENEY  COURT  REPORTING  (515)  244-6373
320  Insurance  Exchange  Bldg.,  Des  Moines,  IA  50309
25 of 26 sheets                                                              Page 7 to 7 of 8

**App. 116**

8

**yearly** [1] - 9:18
**years** [19] - 9:9, 10:5, 11:1, 15:3, 15:12, 16:4, 16:5, 16:9, 16:12, 16:18, 16:19, 17:17, 18:15, 20:14, 52:20, 52:22, 53:8, 53:11, 53:20
**yes-or-no** [1] - 5:12
**young** [1] - 11:21

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF IOWA

CENTRAL DIVISION

GAIL OSBORN,
TIM MCCONNELL SEABA,
and GORDON SEABA,
                              )Case No.
        Plaintiffs,  )4:25-cv-00183
                              )
vs.                           )DEPOSITION OF
                              )
CHAUNCEY MOULDING,   )GAIL ANN OSBORN
KELSEY KOENIG, and   )
JEFFERSON COUNTY, IOWA, )
                              )
        Defendants.  )
_____)

THE DEPOSITION OF GAIL ANN OSBORN,

taken before Gale Sweeney Christensen,

Certified Shorthand Reporter, Registered

Professional Reporter, and Notary Public of

the State of Iowa, commencing at 10:06 a.m.,

April 21, 2026, at 2910 Grand Avenue,

Des Moines, Iowa.

Reported by:  Gale Sweeney Christensen,
              CSR, RPR

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

A P P E A R A N C E S

Plaintiffs by: GINA MESSAMER
               Attorney at Law
               Parrish Kruidenier, LLP
               2910 Grand Avenue
               Des Moines, Iowa 50312
               gmessamer@parrishlaw.com

               and

               ED HARVEY
               Attorney at Law
               1600 Wonder Way
               Fairfield, Iowa 52556
               Edwardgharvey98@yahoo.com

Defendant Kelsey Koenig
by:            RYAN SHEAHAN
               Assistant Attorney General
               Second Floor
               Hoover State Office Building
               1305 East Walnut Street
               Des Moines, Iowa 50319
               ryan.sheahan@ag.iowa.gov

Chauncey Moulding and Jefferson County, Iowa
by:            BRENT HINDERS
               JONATHAN LEWIS
               Attorneys at Law
               Hinders Updegraff & Franklin,
               P.L.C.
               1104 Sunset Drive
               Norwalk, Iowa 50211
               brent@hinderslaw.com
               jlewis@hinderslaw.com

Also present:  Timothy McConnell-Seaba

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

INDEX OF EXAMINATION

Examination by            Page

Mr. Hinders               4

Mr. Sheahan               53, 94

Ms. Messamer              86, 96

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

GAIL ANN OSBORN,

called as a witness, having been first duly

sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HINDERS:

Q.  Good morning, ma'am.  Could you please state your full name, and spell it for the record.

A.  Gail, G-a-i-l, Ann, A-n-n, Osborn, O-s-b-o-r-n.

Q.  And, Gail, today would you like me to refer to you as Gail, Ms. Osborn?  How would you like me to refer to you?

A.  Gail is fine.

Q.  Thanks, Gail.

A.  You're welcome.

Q.  And are you being deposed in the case of Osborn versus Jefferson County, Iowa?

A.  I am.

Q.  Have you ever been deposed before?

A.  No.

Q.  Has your counsel explained to you any of the rules for the deposition today?

A.  Yes, I have an understanding.

Q.  I'm just going to put on the record a

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 118**

5

few things.  First thing is, is that I ask that, because this is being taken down by a court reporter, you try to talk in even fashion, you don't talk over each other and that, when I finish a question, then you can answer that question.  Do you understand that?

A.  Yes, sir.

Q.  And you've pointed out a great point here already, that we need to be clear with our answers.  So if the answer is a yes or a no, that you do say yes or no and not just make sounds or other indications that might be clear to us in a regular conversation but aren't clear on a deposition.  Do you understand that?

A.  Yes, sir.

Q.  And unlike a regular conversation, the conversation here is under oath.  And you understand that you're under that obligation to tell the truth today?

A.  Yes, sir.

Q.  And the final one is is, if I ask you a question and you don't understand that question, please indicate to me I don't

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

6

understand that question, could you clarify, something along those lines, because if you do answer my question, that means that you do understand what I've said.  Do you understand that?

A.  Yes, sir.

Q.  Okay.  Gail, what have you done to prepare for the deposition today?

A.  I have conferred with Counsel.

Q.  Have you reviewed any documents?

A.  Yes.

Q.  What documents have you reviewed?

A.  I do not recall.

Q.  Okay.  Would they be in documents that you submitted as part of discovery?

A.  Yes.

Q.  Besides Counsel have you discussed this matter with anyone else?

A.  No.

Q.  Gail, besides your current name, Gail Ann Osborn, have you gone by any other names, nicknames, aliases in your life?

A.  Yes, sir.

Q.  What are those?

A.  Wegman, W-e-g-m-a-n, prior marriage

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

7

name.

Q.  Any other names?

A.  No.

Q.  Gail, when were you born?

A.  September 25th, 1989.

Q.  And where were you born?

A.  Chula Vista, California.

Q.  Where did you go to primary school at?

A.  Primary school?

Q.  Meaning kindergarten through twelfth grade, potentially.

A.  Multiple schools.

Q.  Did you graduate from high school?

A.  I did.

Q.  Where did you graduate from high school?

A.  Prairie Valley High School.

Q.  Is that in Iowa?

A.  It is.

Q.  Where were you living when you graduated from Prairie Valley?

A.  Gowrie, G-o-w-r-i-e, Iowa.

Q.  What year was that?

A.  2008.

Q.  What's your current address?

A.  3251 110th Street, Brighton, Iowa 52540.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

8

Q.  How long have you lived there?

A.  In total almost eight years.

Q.  Okay.  Prior to those eight years, where did you live before that?

A.  I'm -- sorry.  I lived in Fort Dodge; Gowrie, Iowa, and I believe that's it.

Q.  So you would have lived in Gowrie and Fort Dodge in the last ten years?

A.  There is a period of incarceration.

Q.  Where were you incarcerated at?

A.  Multiple county jails.

Q.  Okay.  But you weren't imprisoned anywhere?

A.  Not in prison, no.

Q.  And those jails would have been in places where you had lived otherwise; is that accurate?

A.  Lived in or visited, yes.

Q.  Which jails were those?

A.  Carroll County, Crawford County, Sac County, Calhoun County, Iowa County, Washington County.

Q.  And approximately how many months did you spend incarcerated in the last ten years?

A.  Close to ten months, I believe.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

9

Q. Okay. And that would be along all those different places?

A. Correct.

Q. Are you currently employed?

A. No.

Q. When was the last job that you held?

A. When I worked at RVAP.

Q. What is RVAP?

A. It was a Rape Victim Advocacy Program.

Q. Where was that at?

A. Iowa City.

Q. Approximately when was that?

A. 2022 to '24.

Q. Okay. Why did you leave that job?

A. We shut down.

Q. What was your position there?

A. Certified sexual assault advocate.

Q. How much did you make as a certified sexual assault advocate?

A. $16 an hour.

Q. Was that full employment? Part-time?

A. It was full-time.

Q. Did you have benefits with that?

A. I did.

Q. Since that time have you looked for

10

jobs?

A. Yes.

Q. Any places in particular that you've applied during that period of time?

A. I do not recall.

Q. Prior to working for RVAP, where were you employed?

A. I wasn't.

Q. Prior to that, that 2002 {sic} time period, when was the last time you were employed prior to that?

A. I believe 2015.

Q. Okay. Do you currently receive government benefits?

A. I have received SSI.

Q. Anything else besides SSI?

A. No.

Q. No food stamps, anything like that?

A. No.

Q. Okay. Have you ever filed for bankruptcy?

A. No.

Q. Have you ever had a judgment entered against you for a debt?

A. Yes.

11

Q. More than one?

A. Yes.

Q. Can you tell me about those.

A. Medical, unpaid credit cards. I don't recall the rest.

Q. You stated earlier that you'd been incarcerated several times. So have you ever been convicted of a misdemeanor or a felony?

A. Yes.

Q. Do you recall what those -- when those felonies or misdemeanors occurred?

A. Yes.

Q. Can you give me just a -- as far as your convictions, can you give me just a short list of locations and convictions.

A. Yes. I was convicted of three class D felonies, one in Carroll County, one in Calhoun, and one in Sac County.

Q. And would those have been theft charges?

A. They were.

Q. Can you tell me what led to those theft charges.

A. I was in a bad place, in active addiction at that point after a brief relapse. I take full accountability for that

12

and all actions that came after.

Q. What was it that you were alleged to have taken?

A. I don't understand.

Q. Well, these are theft charges; correct?

A. Correct.

Q. And part of a theft charge is means you take something that you don't have a right to. Is that also accurate or your understanding?

A. That -- that's my understanding.

Q. So what was it that --

A. I wrote bad checks on my own account.

Q. Did you also have a conviction out of Washington County?

A. Yes, it was deferred.

Q. And what was that -- what was that charge about?

A. That was a class D felony.

Q. Was that also a theft charge?

A. It was.

MR. HINDERS: Do you need to take a break?

MS. MESSAMER: No.

BY MR. HINDERS:

13

Q. Are there times that you've been arrested but not convicted?
A. Not to my knowledge.
Q. Did you have a child endangerment charge in Webster County?
A. Yes.
Q. Do you recall the circumstances around that?
A. I don't recall.
Q. And if the incident report on there indicated that you slapped and threw your daughter to the ground, would that sound accurate to you?
A. I do not recall that.
Q. Are you aware that your counsel, Ms. Messamer, sought to have that case expunged about a month ago?
A. I don't understand the question.
Q. Well, your current attorney is Gina Messamer; is that correct?
A. Yes.
Q. Did you know that in March she moved to expunge that charge, meaning erase it from the record?
A. I don't have any knowledge of that.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

14

Q. Okay. Any other charge that you've ever been arrested for but not convicted?
A. Not to my knowledge.
Q. Have you ever been investigated by a law enforcement agency?
A. Yes, I believe so.
Q. Can you tell me about that.
A. Prior to my convictions I was investigated.
Q. Any property that you've ever been at been subject to a search by law enforcement?
A. Not to my knowledge.
Q. Have you ever been investigated on anything drug related?
A. No.
Q. Besides this case have you ever been a plaintiff or a defendant in another lawsuit, including a small claims, divorce, custody, or personal injury case?
A. Could you repeat the question.
Q. Yeah. I'll break it down a little bit. Besides this case, have you ever previously been a plaintiff in another civil case, small claims case, divorce case, personal injury, maybe car accident, something like that?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

15

A. Not to my knowledge.
Q. Okay. Have you ever been a defendant in any of those cases?
A. Yes.
Q. You previously stated that you were married to a Mr. Wegman; is that right?
A. Yes, sir.
Q. Were you divorced? What happened there?
A. We were -- we divorced.
Q. When, approximately, were you divorced?
A. October 6th, 2011.
Q. 2011. So you would have been a party to at least a divorce; is that accurate?
A. Yes.
Q. Okay. Prior to November 15th of 2024, had you ever been the subject to a Child Protective Services investigation?
A. Yes.
Q. When was that?
A. On numerous occasions.
Q. Well, let's go through them. What's the oldest one that you can recall?
A. I do not recall exactly.
Q. Do you remember which county it was in?
A. Yes.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

16

Q. Which county was that?
A. Henry.
Q. Would that be more than ten years ago?
A. No.
Q. Right around ten years ago, so 2015, 2016?
A. No, sir.
Q. Early -- later than that?
A. Yes, sir.
Q. 2017, 2018?
A. I believe 2022.
Q. 2022. Okay. So within really the last four years?
A. Yes.
Q. And so that would have been out of Henry County?
A. Yes, sir.
Q. What happened in the Henry County Child Protective Services investigation?
A. My daughter was removed, and a CINA order was put in place.
Q. What was the order?
A. Sorry. I don't understand the question.
Q. So when a child is removed, there is eventually a permanency order. Do you agree

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

17

with me there?

A.  Yes, sir.

Q.  Is that matter still pending, or was there a permanency order entered?

A.  There was a permanency order entered.

Q.  What was the permanency order on that one?

A.  Guardianship.

Q.  So no termination?  They went for guardianship?

A.  Initially.

Q.  Where is the guardianship placed?

A.  Polk County.

Q.  Who was named as the guardian?

A.  I need to confer with Counsel for a moment.

(An off-the-record discussion was held.)

A.  Joshua and Sarah Rosonke are the guardians.

BY MR. HINDERS:

Q.  How are they related to you?

A.  They are not.

Q.  Okay.  So foster placement?

A.  I believe kinship.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

18

Q.  So they were related to the father of the child?

A.  No.

Q.  Okay.  Well, what do you mean by kinship?

A.  That was what the Court termed it.

Q.  But they were not -- they had no relation to you or the father?

A.  No.

Q.  And was it a guardianship -- was it a guardianship in lieu of termination?

A.  Yes.

Q.  And that's in 2022 out of Henry County.  What was the next child protective investigation that you were subject to?

A.  November 15th, 2024.

Q.  And that would be this matter?

A.  Yes.

Q.  When was the permanency order entered on -- was it one child or multiple children?

A.  One.

Q.  When was that order entered, approximately?

A.  December 21st, 2022.

Q.  And was it approximately a year prior to

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

19

that that they started the removal?

A.  To the best of my knowledge.

Q.  How many children do you have?

A.  I have three.

Q.  So besides this one child, you have custody of the other two?

A.  No.

Q.  Where are the other two placed?

A.  My son is with his father.  My oldest daughter is with -- in a guardianship with my youngest.

Q.  So those two children were placed in a guardianship in that action in Henry County?

A.  No, my youngest was.

Q.  So why did your daughter also go into guardianship?

A.  I don't know how to answer that.

Q.  Well, what's your understanding of why she went to the Rosonkes and she doesn't reside with you and she's in a guardianship?

A.  My oldest daughter is in a guardianship because I was arrested in Montana when I was indicted.

Q.  So you also have charges outside of the State of Iowa?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

20

A.  No.

Q.  Okay.  Tell me about your indictment in Montana.

A.  There was no indictment in Montana.

Q.  Oh, I thought that's what you just told us.

A.  I was indicted in Iowa for my felonies.

Q.  Okay.

A.  And I was in Montana for my arrest.

Q.  All right.  That makes more sense.

A.  My apologies.

Q.  No, that's fine.  Indicted in Iowa, arrested in Montana; am I accurate?

A.  Yes.

Q.  Just so I'm understanding that.  And that was on all those theft charges; correct?

A.  Yes, sir.

Q.  When were you discharged from parole or probation on your theft charges?

A.  May 21st, 2021.

Q.  '21.  So you have two children in a guardianship in Polk County; is that accurate?

A.  One is currently still in the guardianship.  There was a TPR filed for my

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 122**

21

youngest. I am currently -- we are currently in an appeal process with the Supreme Court.

Q. So the oldest -- and I apologize. I'm just trying to make sure everyone understands correctly. The oldest is in the guardianship. There is a TPR, which is the short version of termination of parental rights, and you're appealing that to the Supreme Court; is that accurate?

A. It is.

Q. Where was that TPR entered out of?

A. Polk County.

MR. HARVEY: Brad, if I could just speed it up for you, it was a TPR done by the guardians later. It wasn't a CINA TPR.

MR. HINDERS: Okay.

BY MR. HINDERS:

Q. So and then the third child lived with his father. Is that Mr. Wegman?

A. It is.

Q. Is that a male child?

A. It is.

Q. How old is he?

A. He's sixteen.

Q. Do you have regular contact with him?

22

A. No.

Q. With your child that's in a guardianship, do you have regular contact with that child, that daughter; correct?

A. My daughters have no contact with their brother.

Q. So you don't have any regular contact with any of your children?

A. Not my choice.

Q. Well, certainly not, but the answer is is you don't have any regular contact with your children?

A. No.

Q. Okay. Have you ever used any illegal drug or prescription medication not prescribed to you?

A. Yes.

Q. What drugs are that?

A. Methamphetamine, cocaine, pills, marijuana, and I take full accountability for that.

Q. When was the last time you used an illegal substance such as methamphetamine, cocaine, marijuana?

A. Been almost ten years.

23

Q. Okay. So that would be 2016, would be the last time?

A. Thereabouts.

Q. Okay. Nothing after that point in time?

A. No.

Q. Are you currently taking any medication prescribed to you for any mental condition?

A. I am.

Q. What is that?

A. It's hydroxyzine.

Q. Tell me about why you're prescribed hydroxyzine.

A. Panic attacks.

Q. Does hydroxyzine affect your ability to perceive or recall circumstances?

A. It can.

Q. Okay. Have you ever been in a substance abuse program such as AA or NA?

A. I have.

Q. Was it ordered by Court or by choice?

A. Personal choice.

Q. When was that?

A. 2022, I believe.

Q. Do you still attend AA or NA programs?

A. No.

24

Q. Any reason why you don't currently attend those?

A. I don't battle addiction anymore.

Q. Prior to the incident that the lawsuit is based off of on November 2024, did you have any negative preexisting feelings about police or law enforcement prior to that time?

A. I don't believe so.

Q. On November 15, 2024, am I correct that you were living at 3251 110th Street in Brighton, Iowa?

A. Yes, sir.

Q. Where on the property did you live?

A. We live in a small cottage.

Q. Who owned that property?

A. It is a life deed estate. There are three owners.

Q. Can you tell me more about that or at least your understanding.

A. My understanding of the life deed in this case, Gordon Seaba was the remainderman -- or sorry -- he was the life tenant. The remaindermen were my partner, Tim, and his sister, Ashley, and his deceased brother, Aaron.

25

Q. Prior this lawsuit did you have any knowledge about the life estate ownership of the property?

A. Yes, I knew.

Q. Is that property one that's listed on a Jefferson County Assessor's website?

A. It's listed in the county recorder, yes.

Q. Would the assessor also have that information on there?

A. I believe so.

Q. And do you believe that the Jefferson County Assessor is accurate in the records that it keeps?

A. I believe so.

Q. What was your relationship with Gordon Seaba?

MR. SHEAHAN:  Can I have the question read back.

(The requested portion of the record was read by the court reporter.)

A. Gordon was like a father to me.

Q. Okay.

A. He's my daughter's grandfather.  They are the best people I ever knew.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

26

Q. Would that have been one of the daughters that was -- that's placed in Polk County?

A. Yes.

Q. Your youngest daughter?

A. Yes.

Q. How did you come to know Gordon Seaba?

A. His daughter is actually my partner's sister.  We were in jail together, and I was just starting over.  And she invited me to come out to the house and stay until I got on my feet, and I met Gordon.

Q. Sorry.  Just to backtrack a little bit, what are the birthdays of your three children?

A. 6/17/09, 10/12/13, and 12/19 -- 12/18/19.  Sorry.

Q. 12/18/19?

A. (The witness indicated.)  I'm sorry. Yes.

Q. While living on the property in Brighton, Iowa, did you pay rent to Gordon Seaba or anyone else?

A. Not -- no, no.

Q. Have you ever signed a lease or any

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

27

agreement for habitation of any property on that --

A. No.

Q. -- Brighton residence?  How long did you live on that property?

A. I lived in the main house with Gordon and Ashley under a year, and then Tim and I moved in together in his house.

Q. When you say his house, what do you mean by that?

A. Can you repeat the question.  Sorry.

Q. You used the term you lived in the main house, and then you lived in his house, I believe, referring to Tim.

A. Yes, sir.

Q. What do you mean by his house?

A. Tim's house, our house, the cottage.

Q. Would the main house likely be the structure referred to as the dwelling on the Jefferson County Assessor's website?

A. Dwelling?  I'm sorry.  I don't understand the question.

Q. Would that likely be the structure -- you referred to the main house.  Would that likely be the large structure referred to as

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

28

a dwelling on the Jefferson County Assessor's website?

A. I don't know.

Q. Is it the largest structure on that property?

A. Yes.

Q. And there are several smaller structures; is that correct?

A. It is.

Q. One of those is a garage?

A. It is.

Q. Were there any utilities to any of those -- to any of the structures that were not the main house?

A. Utilities, water and electric go to our house as well.

Q. So there was water and electric ran to where you were staying with Tim?

A. Electric, and we have a pump outside, where we get our water.

Q. Do you know, the building that you live in with Tim, how was that constructed?

A. Tim built it.

Q. Okay.  Did anyone else have a key or permission to enter that structure?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

29

A. Only Tim and I.

Q. And you previously lived in, what you call, the main house; is that correct?

A. Correct.

Q. Did you have a key to that structure as well?

A. I did not.

Q. Looking back to November 15, 2024, are you aware that there was an anonymous complaint made that you had given birth to a daughter by the name of Charlotte approximately two months earlier and that the baby was born addicted to methamphetamine?

A. I was made aware of the allegation.

Q. And in your experience do you believe that an allegation that a child is born addicted to methamphetamine is a serious allegation and especially to Child Protective Services?

A. Yes.

Q. And you've previously denied giving birth to a child in September of 2024. Do you still say that you did not give birth to a child in September of 2024?

A. I did not give birth to a child in

30

September of 2024.

Q. And you've denied using methamphetamine in the last ten years. Would you continue to denying using methamphetamine in the last ten years?

A. Yes.

Q. Are you required through DHS or any other program to regularly take drug tests?

A. No.

Q. Are you required to regularly attend drug treatment?

A. No.

Q. Did you ever take a pregnancy test at any point in 2024?

A. I need to confer with Counsel for a moment, please.

(An off-the-record discussion was held.)

A. I probably did through my doctor.

BY MR. HINDERS:

Q. Did you ever express to anyone that you were experiencing changes in energy levels, sleep patterns, feeling nauseous, or having unusual cravings in 2024?

A. No.

31

Q. Had you ever discussed with anyone, either jokingly or hypothetically, being pregnant in 2024?

A. No.

Q. And before 2024, in that year did you ever have -- strike that -- did you ever express concern to anyone about being pregnant any time leading up to September 2024?

A. No.

Q. Prior to November 15, 2024, had you ever had any calls, texts or communications, indicating DHS may come and investigate the anonymous complaint?

A. Could you repeat the question. I'm sorry.

Q. Yeah. On or during November 15, 2024, had you ever received any calls, texts or communications, indicating that DHS may come and investigate the anonymous complaint?

A. No.

Q. Do you have any idea who might have made that complaint?

A. I have a suspicion.

Q. Who is that?

32

A. The guardians of my daughters.

Q. And why would they do that?

A. Because the TPR was filed just days before that happened.

Q. And that TPR, was that a private TPR, or was that filed through DHS?

A. It was private.

Q. Do you know who the attorney is for the Rosonkes?

A. I do.

Q. Who is that?

A. Caitlyn Kerr.

Q. Prior to November 15, 2024, had you ever had any contact with Kelsey Koenig?

A. Yes.

Q. What's been your previous contact with Ms. Koenig?

A. When I was living in Washington in an apartment complex.

Q. And that would be Washington, Iowa; is that accurate?

A. Yes, my apologies, Washington, Iowa. I believe 2022 to 2023 I had a neighbor who had multiple children. I tried to help her. And the day I met Kelsey for the first time, she

33

was there for her.  Outside of that, I've had no experience with Kelsey.

Q.  So just prior to that one contact with Kelsey; correct?

A.  Years ago, yes.

Q.  Approximately when was that?

A.  I believe it was 2023.

Q.  And did you speak with Kelsey Koenig on the morning of September {sic} 15, 2024?

A.  I do not recall.

Q.  Do you recall speaking to Kelsey prior to her and Chauncey Moulding and deputies from Washington County and Jefferson County coming onto your property?

A.  I apologize.  I misheard you.  I thought you said September.

Q.  Okay.

A.  November 15th, yes.

Q.  Tell me what you recall about that conversation.

A.  The initial conversation was Kelsey was at the house when I got there that morning.

Q.  Okay.  What do you recall her saying to you and you saying to her?

A.  I asked her what she was doing there.

34

She stated she had received a report of a child, an infant, that was born addicted to meth and hidden on the property.

Q.  What did you respond to that?

A.  I said absolutely not, and I asked her to not be there.  I asked her to leave.

Q.  What did she say in response to that?

A.  She needed to investigate.

Q.  Okay.  Did she leave?

A.  No.

Q.  Did she ask whether you had been pregnant in the last year?

A.  Yes.

Q.  Did she ask whether you had been using drugs, specifically methamphetamine?

A.  She did not ask.  She stated it was an allegation.

Q.  And you denied both those things?

A.  Yes.

Q.  Did Kelsey at that point look around the property?

A.  She was given consent from Gordon, and I called Tim and put him on speakerphone and communicated with him that Kelsey was there and notified him that Gordon had given

35

permission for her to go in the house, and we gave permission for her to go into our house.

Q.  So she went into both the main house and the structure in which you and Tim live in?

A.  Correct.

Q.  And voluntarily gave permission to do that?

A.  Yes.

Q.  About how long did Ms. Koenig's search last?

A.  I don't recall how long she was on the property.

Q.  You just don't recall how long she was there?

A.  I don't recall exactly how long she was there.

Q.  Was it more than an hour?

A.  I -- I really don't recall how long she was there.

Q.  But no objection to anything she did on the property?

A.  I was there with her the whole time.

    MR. HINDERS:  Can you read that question back.

    (The requested portion of the

36

record was read by the court reporter.)

A.  No.

Q.  How did that visit end?

A.  She stated that she would not be back, and she got in her van.  And she sat in it for a few minutes on the speakerphone on it, and then she left.

Q.  In the year 2024 would you have had any medical exams, blood tests, anything from a medical professional that would show that you were not pregnant during that previous nine months to September 2024?

A.  Yes.

Q.  Can we please have a copy of all those medical records.

A.  All those medical records have been provided.

    MR. HINDERS:  We just got 160 pages today, so we'll see.

Q.  But there might be something in there that would indicate that in the records we got today?

A.  That I was not at all pregnant?

Q.  Yeah.

**App. 126**

37

A.  That's correct.

Q.  Is there any way that someone who saw you from a distance or heard rumors could believe genuinely but mistakenly that you had recently given birth?

A.  No.

Q.  After Kelsey's visit to your house, did you contact County Attorney Chauncey Moulding?

A.  I did.

Q.  Do you recall what your discussion was with Chauncey?

A.  Yes.

Q.  What was that?

A.  I explained to him that Kelsey had been -- had come out to the property to investigate an allegation of a two-month-old child named Charlotte, and I discussed with Chauncey that that was a very serious allegation and it -- that it had me very upset.

I discussed, you know -- I asked him what my -- you know, if civil action was something I -- I could take, and he stated he's not -- he cannot give legal advice but

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

38

to contact an attorney.

Q.  Prior to November 15, 2024, have you ever had any personal or phone conversations with Chauncey Moulding prior to that time?

A.  No.

Q.  Never had any discussions with him?

A.  No.

Q.  Why would you call the county attorney if you've never talked to him before?

A.  Because he's the highest authority in the county.

Q.  But you're stating today you've never had any conversations with him prior to this?

A.  No.

Q.  But you felt comfortable enough to call him that day?

A.  He's someone in a position of authority.

Q.  So later that same day around 4 p.m., Defendants Koenig and Moulding came to your property; is that correct?

A.  It is.

Q.  And they were accompanied by deputies from Jefferson and Washington County; is that accurate?

A.  It is.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

39

Q.  And you sued Jefferson County in this matter.  Is there a reason you haven't sued Washington County?

A.  I don't know how to respond.

Q.  Well, do you know why you haven't sued Washington County?

A.  Washington County county attorney did not come to my home.  He did not violate my constitutional rights.  He did not desecrate my home.  He did not make me feel like I was nothing for the entirety of the duration that he was there.  He did not treat me like I was not worth seeing, hearing.

Q.  What you're describing is Chauncey Moulding?

A.  Yes.

Q.  He's an official.  You've also sued Jefferson County as an entity.  That includes the two deputies that came onto your property from Jefferson County, none of the two deputies from Washington County that came onto your property.

Is there a reason why Jefferson County is being sued and those two deputies are subject to this lawsuit, but the

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

40

Washington County deputies are not, to your understanding?

MS. MESSAMER:  I'm going to object as asked and answered.  She already gave her response to why they were sued.

Q.  So you're just seeking to sue Chauncey Moulding; is that accurate?

A.  I'm seeking to hold accountable Kelsey Koenig, Chauncey Moulding and, yes, the County.

Q.  But not Washington County?

A.  I defer to Counsel.

Q.  Well, this is your lawsuit.

A.  Yes.

Q.  So in your lawsuit you have not sued Washington County; is that accurate?

MS. MESSAMER:  Asked and answered.

Q.  But you don't have a reason why you're not suing Washington County but you are suing Jefferson, other than what you've stated regarding Chauncey Moulding?

A.  That is correct.

Q.  Okay.  When the deputies from Washington, Jefferson, Mr. Moulding, and Ms. Koenig came onto your property, what was

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

41

the first thing they said to you?

A. Chauncey's first words to me were hi, Gail.

Q. Was what?

A. Hi, Gail.

Q. And you'd never talked to Mr. Moulding prior to this time other than earlier in that morning?

A. Earlier that day with the phone call.

Q. Never had a discussion with him before?

A. No.

Q. Did you tell them explicitly what they could and could not do while on the property?

A. I believe I did.

Q. In the videos -- and we'll watch the videos -- you're holding up a camera. Did you record all of your interactions that day?

A. I recorded an interaction.

Q. Did you keep that recording?

A. Counsel has it.

Q. Have they given it to us yet?

A. That is my understanding.

Q. Okay. After Chauncey said hi, Gail, what do you recall after that time?

A. He drove past me. I had had my hand up

42

like this (indicating). My dog was leashed in this hand (indicating), and he drove past me after I said stop.

Q. Were you present when Chauncey Moulding went to the main house and spoke with Gordon Seaba?

A. Yes.

Q. And what do you recall about that conversation?

A. It was directly after Chauncey drove past me. He pulled in to our parking area. I had turned around, and he was already up on the steps. I had Pike. I was running to tie him up on the tree to the left of the staircase. By that point Chauncey already had the screen door and the main door open.

Q. Okay.

A. When I got up the stairs and got in the house, Gordon was still in his chair.

Q. Okay. And so you didn't hear any of the conversation between Chauncey or Kelsey and Gordon Seaba?

A. Kelsey was not in there when I was in there at that point.

Q. So it would have been just a

43

conversation with Chauncey and Gordon Seaba; is that true?

A. That would be true.

Q. And you didn't hear any of that conversation?

A. I heard Gordon tell him get out.

Q. Was there anyone else present there?

A. Myself, Chauncey and Gordon.

Q. And it's true that Gordon passed away; is that accurate?

A. Yes.

Q. What was Chauncey's response when Gordon said get the hell out?

A. Chauncey ignored it.

Q. How did Chauncey ignore him?

A. He stayed in the house.

Q. He didn't say anything, or he just stayed in the house?

A. In the video recording that I got, I asked Chauncey what he was doing here, and he said I'm not here for you. And Chauncey's back was to the door. I was standing here (indicating), and then Gordon was here (indicating). Gordon wanted him to leave.

Q. How do you know that?

44

A. Because he made it clear by saying get out.

Q. And Ms. Koenig was not there?

A. Not while I was there, no.

Q. And she would not have been able to hear any of this conversation?

A. No.

Q. So if Ms. Koenig testifies differently or Mr. Moulding has testified differently, they are not being honest?

A. They are committing perjury.

Q. Well, that's a legal standard, and we are not going to figure that one out. I don't recall talking about your law degree but that they would be being dishonest; is that fair?

A. Yes, they would be being dishonest, yes.

Q. About how long did Ms. Koenig and Mr. Moulding spend inside the main house?

        MR. SHEAHAN: I'm just going to object. Did you say Ms. Koenig and Mr. Moulding?

        MR. HINDERS: Yes.

        MR. SHEAHAN: I think we are talking about two different time periods

45

then.

BY MR. HINDERS:

Q. Mr. Moulding, when he met with Mr. Seaba, about how long did he stay there?

A. I don't know the exact time.

Q. Was it a short amount of time, a long amount of time?

A. I don't know for sure.

Q. At what point do you feel that your right against unlawful search was violated?

A. The minute Chauncey did not stop when I asked him to stop at the threshold where the power pole is while I was holding the dog.

Q. Did someone enter the structure that you and Tim lived in?

A. Yes, Chauncey Moulding did.

Q. How long was he in there?

A. Maybe thirty seconds.

Q. Was there any damage done to that property?

A. I don't know how to answer that one.

Q. Was anything broken?

A. Not physically.

Q. Was anything disturbed?

A. Not physically.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

46

Q. Was anything moved?

A. No.

Q. Did you see him touch anything?

A. I didn't see personally in our home.

Q. Were you ever handcuffed or physically restrained during this time on your property?

A. No.

Q. When Mr. Moulding was in the property, were you standing outside the door?

A. Can you clarify the question, please.

Q. Mr. Moulding entered the property that you and Tim live in; correct?

A. Correct.

Q. When he entered that property, did you stand outside the door?

A. Not directly outside, on the sidewalk, on the grass closer to the sidewalk.

Q. Is there a paved sidewalk there?

A. It's -- it's rocked.

Q. So it's a path? We're not talking about an egress or anything that's created by a city or a county?

A. No.

Q. So you stood outside. Do you recall what you said to Chauncey when he was in that

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

47

stretch here?

A. Yes.

Q. What did you say?

A. I told him he didn't have a warrant. I gave him a count of 3, 2, 1. I stated I was going in, and I was -- I believe I was told not to go in.

Q. Did you ever make a statement to Mr. Moulding that you're going to strike him or otherwise harm him?

A. I said I was going to sue him.

Q. But you don't recall making a statement about any sort of physical touching of Mr. Moulding?

A. Not to my knowledge.

Q. No physical threats to him?

A. No.

Q. Would you agree with me that you shouldn't physically threaten to harm people?

A. I would agree with that statement.

Q. Did you -- after Mr. Moulding was able to exit the structure that you and Tim stay in, did you continue to talk to him and Ms. Koenig?

A. I believe so, yes.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

48

Q. Did you continue to talk to the deputies?

A. Yes.

Q. And did you make statements that they should leave the property?

A. Repeatedly.

Q. And then, after you made those statements, did you continue to talk to them?

A. To get them to leave, yes.

MR. HINDERS: I'm going to have you read that question back.

Q. Let's see if you can answer this one.

(The requested portion of the record was read by the court reporter.)

A. Yes, I believe I continued to talk to them.

Q. In your experience did that cause some confusion about what your intent was?

A. I don't think my intent was ever unclear.

Q. How long do you estimate the entire incident went on?

A. An hour, maybe.

Q. You believe an hour?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

49

A.  I don't recall the exact time.

Q.  After the Jefferson County deputies, the Washington County deputies, Mr. Moulding and Ms. Koenig left, did you discuss this with Gordon and Tim?

A.  Everybody talked.  I think we were all still in shock, so I don't recall if we were talking about that.

Q.  After this incident did you contact the Attorney General's Office?

A.  I don't -- I don't think so.

Q.  Did you contact the State Ombudsman's Office?

A.  No.

Q.  When was the first time you contacted a lawyer?

MS. MESSAMER:  I am going to object.  I think this is attorney-client privilege.

MR. HINDERS:  I would just state that I'm just asking for when, not what she asked.  I'm not going to get into conversations or invade the attorney-client privilege.  As far as what was asked, her question, I think asking when you did

50

something isn't part of the attorney-client privilege.  So just as she said she discussed the deposition with you before, that's perfectly fine.  I'm not asking what she said to those individuals, just asking when.

MS. MESSAMER:  I think that's okay.

A.  I believe it was within days, a couple days of it happening.

BY MR. HINDERS:

Q.  So sometime in November?

A.  To the best of my recollection.

Q.  When was the first time you had a discussion or a contact with either with your current counsel?

MS. MESSAMER:  I'm going to object.  I think this is also privileged.  You're trying to get into who she's talked to for counsel and maybe -- I think that's --

I'm going to direct you not to answer that one.

MR. HINDERS:  I'm going to send an interrogatory on that one, so we'll get that.

BY MR. HINDERS:

Q.  Do you dispute that either Mr. Moulding or Ms. Koenig had a good reason to be

51

concerned about the conditions at your residence based off of the anonymous call?

A.  Could you repeat the question, please.

Q.  Do you believe that Mr. Moulding and Ms. Koenig had a reason to be concerned about the conditions at the property in Brighton, Iowa, that you resided on based off of the anonymous call?

A.  I don't understand the question.

Q.  Do you believe that there was concern -- that there was reasonable concern by Mr. Moulding or Ms. Koenig about the conditions at your property due to the anonymous call?

A.  I'm -- I'm not sure how to answer that.

Q.  What don't you understand there?

A.  I need to confer with Counsel for a minute.

(An off-the-record discussion was held.)

A.  Could you repeat it one more time, please.

(The requested portion of the record was read by the court reporter.)

52

A.  I don't believe that that was a reasonable assumption.

Q.  Why?

A.  Because Kelsey had been there earlier that day, and as she stated, she had no concerns.

MR. HINDERS:  Gina, I want to take a break because this is where I get into damages, and we can't do that today, so do you want me --

Can we go off the record for a second.

(An off-the-record discussion was held.)

(A recess was taken.)

BY MR. HINDERS:

Q.  Gail, you've stated before that you did record on your phone interactions at the property in Brighton, Iowa with Chauncey Moulding on November 15, 2024; is that accurate?

A.  It is.

Q.  Is the recording that you provided your counsel the only recording you made that day?

A.  Yes.

53

MR. HINDERS:  I don't have any questions.

CROSS-EXAMINATION

BY MR. SHEAHAN:

Q.  Thank you, Gail.  My name is Ryan Sheahan.  I represent Ms. Koenig in this case.  Do you prefer Gail or Ms. Osborn?

A.  Gail is fine.

Q.  Okay.  Thank you.  Speaking of that recording in the event that you turned over, what are we expected to see in that recording?

A.  It is only a few seconds long.  It has Chauncey by the door, Gordon standing here (indicating), me here (indicating).  And I asked Chauncey what are you doing here, and he stated I'm not here for you.

Q.  Okay.  I've seen a recording from, what looks like, a camera in a corner of a room, showing you opening up a bed sheet in front of someone?

A.  Yes, that's a home camera, not a cell phone.

Q.  So are we talking about two different recordings?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

54

A.  That is correct, sir.

Q.  So the one I've described to you we've gotten in discovery.  I've not seen or been produced the other video.  But you say it exists?

A.  It exists, and my counsel has it.

Q.  And it captures Chauncey Moulding's voice on the recording?

A.  That's correct, sir.

Q.  Does it also capture Gordon Seaba's voice?

A.  No.

Q.  I want to ask you -- I'm going to jump around here, so stay with me.  If at any point you get lost, just tell me to slow down or stop, and I will or repeat the question.

But I want to go first to this previous meeting you had with Kelsey Koenig.

A.  Okay.

Q.  You said you were in the City of Washington and you were living next door to someone and Koenig was visiting that lady?

A.  That is correct.

Q.  What was your interaction with Ms. Koenig that day?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

55

A.  I don't recall the depth of it.  I was just there, helping my neighbor with her kids when Kelsey showed up.

Q.  Did you have a conversation with Ms. Koenig?

A.  I believe I said hi, asked her what her name was, told her mine.  I believe that was the summation of it.

Q.  Other than that you had no other interactions with Ms. Koenig until November 15th, 2024?

A.  That is correct, sir.

Q.  Going back to the history of -- your history of DHS with the Iowa DHS, do you know what an assessment is?

A.  I do.

Q.  Tell me your understanding of what an assessment is in terms of DHS.

A.  An assessment is where the worker will either make contact via phone or in person and gather information regarding the family, the dynamic, the concerns, bringing forth the allegations and create a safety plan or proceed to CINA.

Q.  Had you been investigated by DHS for

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

56

living conditions in your home?

A.  Yes.

Q.  For drug use?

A.  Allegations of drug use, yes.

Q.  For being unable to provide food to your children?

A.  Allegations of said thing.

Q.  Of said thing, meaning of having no food in the home?

A.  Yes, it was an allegation.

Q.  And the children that have gone into guardianship, I guess it's unclear to me.  Can we just start again with your children.

A.  And to clarify, my oldest --

Q.  There are three of them?  Can you just tell us the names and the current ages of those.

A.  Rylan, R-y-l-a-n, she's 16; Isabelle, I-s-a-b-e-l-l-e, she's 12; Emelia, E-m-e-l-i-a, she is six.

Q.  Thank you.  That clears it up.  And you and Mr. McConnell here share Emelia?  That's your child together?

A.  Correct.

Q.  You mentioned earlier that there is --

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

57

well, do you know what a founded report is from HHS?

A. Yes.

Q. And I just said HHS and DHS.

A. It's the new --

Q. Do you understand they are the same entity?

A. Yes, they are a change in name.

Q. So maybe I'll just refer to it as HHS from this point forward, considering that they were HHS in 2024.

I think you had mentioned something earlier with Mr. Hinders about previous visits by CPS workers to your home?

A. Yes.

Q. You're also aware that there has been several founded reports by HHS regarding some of the allegations we've talked about, living conditions, no food in the home, things like that? You're aware of that?

A. I believe that they were founded, yes.

Q. And some of those allegations that you've been investigated before, when you heard from Ms. Koenig, who came for the first visit about those allegations, those are

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

58

consistent allegations with some of the things that you've been investigated by HHS before; correct?

A. I'm sorry. Could you repeat that question.

MR. SHEAHAN: Can you ask it, please.

(The requested portion of the record was read by the court reporter.)

Q. That's a terrible question. Let me retry that.

When Ms. Koenig shows up for her first visit on November 15th and she tells you the allegations that she's there to looking into, do you agree that those allegations that she was looking into are consistent with what HHS has looked into before with you?

A. I believe that they are the same thing that was reported, regardless of whether it was true or not.

Q. So at least on the first visit, when you understood the reason why Ms. Koenig was there, you thought she was there

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

59

appropriately as in her role as a child protection worker?

A. I know she was there as a child protective worker.

Q. Okay. My understanding -- and I think you mentioned this earlier in your testimony -- is that she showed up first, and then you arrived on scene?

A. Yes. So would you like me to explain how that --

Q. I would love for you to. Were you not at the house at the time?

A. I was not. I was in Washington, getting groceries. I was on my way home. I had pulled into the driveway. I observed a white minivan parked in the driveway, closer to the two white pickups that are seen in the video -- they are current still there -- well, they were there in the video.

I rolled down my window. She rolled down hers. I asked her what she was doing there. And she stated, you know, I'm Kelsey Koenig, I've got -- I've received -- you know, we have a report of a child -- two-month-old baby named Charlotte that was

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

60

born here without medical care and under the influence of methamphetamine.

Q. Okay. Did you immediately tell her something to the effect of I know you're with DHS or you're HHS, something like that?

A. Yes.

Q. And how did you know at that point that she was with HHS?

A. Because of our previous interaction years before.

Q. So you remembered her that clearly from your couple-minute interaction a couple years before?

A. Yes, I remember things well.

Q. When you're on -- excuse me. When she's on property, I guess it's my understanding, to kind of short-circuit the first visit, is you really have no problem with the first visit with Ms. Koenig; correct?

A. I did have a problem, but I wanted to her to leave as quickly as possible.

Q. Okay. Do you feel like she abided by that?

A. I feel like I gave her the opportunity to complete her job and leave.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 132**

61

Q. And in terms of completing her job, again, the understanding is she went into Mr. Seaba's house, the main house; correct?

A. Yes.

Q. Briefly looked around?

A. Yes.

Q. And then you allowed her to go into your cottage, the one that you and Tim share; correct?

A. Yes. I had made a phone call to Tim while he was at work and notified her {sic} that CPS was at the house. And I -- as we are a team, I asked for his -- also dual permission, you know, to -- because he's technically the owner -- permission for her to go in.

Q. And did Tim give it over the phone?

A. He did.

Q. And so how long was Ms. Koenig in your cottage?

A. Not long. I showed her the TPR paperwork because I believed she -- I believe that that call was part of that. She looked -- I allowed her to lift up our covers to see there was no infant hiding under

62

there, which she found was a body pillow. She observed no baby products, items of any kind. And then she left.

Q. Going back to this notion that there has been -- there has been child protection workers before who visited your homes; correct?

A. Correct.

Q. In terms of what Ms. Koenig did on the property that day versus other visits by CP workers, do you think that her actions were more invasive or less invasive than other experiences with HHS?

A. I think they are all invasive.

Q. Did she move anything?

A. Yes.

Q. What did she do?

A. She moved our comforter.

Q. Was that the extent of it?

A. To the best of my knowledge.

Q. Did it appear to you that she was looking to see if there was actually a child on the property?

A. I think that's -- I think she came to do her assessment and see if that was what was

63

what.

Q. And that's what her job is; right, to do an assessment?

A. That is correct.

Q. How did you two leave it when she left the property the first time?

A. I was very -- I was cordial throughout the process. She stated she didn't need to come back, that she found no -- nothing here. She sat in her van and put it on speakerphone, called someone, and then she left.

Q. Were you privy to that conversation?

A. No.

Q. You said that you were courteous to her. Was she courteous to you?

A. She was civil, yes.

Q. It's my understanding that you think that the current guardian of your two daughters was the one who made this anonymous phone call?

A. I have suspicion, yes.

Q. Well, I know you've talked about this TPR. Is there anything else, any other information that you have that we haven't

64

discussed as to why you think that person made the phone call?

A. No.

Q. And the person we are talking about is this Sarah Rosonke?

A. Rosonke.

Q. Rosonke. That's the person?

A. Yeah, that's the -- the female guardian, yes.

Q. Did you ever attempt to contact Sarah and ask her if she, in fact, made an anonymous phone call about you?

A. No.

Q. This private TPR process, I'm not really -- that's not an area that I practice, so can you just tell me from your understanding what a private TPR is.

A. It is a non-CINA, non-DHS/HHS action, where someone who is not a parent, who has, you know, guardianship or custody of a child chooses to negate the parents' rights.

Q. So that's outside of using the government agencies to do that?

A. That is my understanding of the process.

Q. And you were fighting that at the time?

65

A. Yes.

Q. And you continue to fight that today?

A. I will always fight for my daughter.

Q. So Kelsey Koenig leaves, and, again, my understanding is that she showed up about 10:15 in the morning. How long do you think she was on property, and what time do you think she left?

A. I don't recall the exact time she arrived. And I wouldn't know that because I pulled in after her, so I don't know how long she was there prior to my arrival.

Q. Was it your understanding, when you averaged, though, that she had already talked to Gordon Seaba in the main house?

A. I believe -- I believe Gordon stated after the fact that she had said something to him, asking where I was, but not that there had gotten any further conversation there.

Q. Were you aware that Gordon Seaba had given her permission to look around?

A. While I was there, yes, I observed him give consent while I was there.

Q. And you had no objection to it at the time?

66

A. It wasn't my place to object or --

Q. And why is that?

A. Because it wasn't my house.

Q. Okay. You've talked about the property ownership structure with Gordon having a life estate. Do you know where Tim comes into that? It's him and his sister and deceased brother. Would you understand kind of how the property ownership passes --

A. Yes.

Q. -- in that? What's your understanding?

A. Tim and Ashley and, I believe, either Kelsey, which is Tim's niece, or Aaron's wife -- Tim and Ashley's deceased brother, Aaron's, wife, either she or Kelsey would be next in line along with Ashley and Tim as life connects.

Q. But the trigger really is when Gordon Seaba passes away; correct?

A. He passed away March 6th.

Q. I know. But in terms of the ownership structure kind of changing and passing, it's when Gordon Seaba passes because he has a life estate. Do you understand that?

A. I do.

67

Q. I don't want to pry too much, but what is your understanding of the cause of death of Gordon Seaba?

A. He had lung cancer. He -- he was very sick.

Q. Okay.

A. And --

Q. Do you know how old he was at the time?

A. He was eighty.

Q. Going back to when Kelsey Koenig leaves after the first visit, you have no idea what time that was?

A. I don't recall the exact time, no.

Q. The next time they come back is sometime in mid- to late afternoon; correct?

A. Yes. It was shortly after Tim got back from work.

Q. Where does Tim work, by the way?

A. Powercom.

Q. Powercom?

A. I believe it's P-o-w-e-r-c-o-m-m {sic}.

Q. He was working there at the time. Does he still work there?

A. Yes.

Q. Where is Powercom at?

68

A. It is in Washington, Iowa.

Q. Prior to those -- to the next visit by folks, which at that time was Chauncey, Kelsey Koenig and deputies from Jefferson and Washington County; correct?

A. Along with Elizabeth Este.

Q. Who is Chauncey's number two at the office?

A. That's correct.

Q. Prior to that do you understand anything that those folks are doing in terms of gathering information or having conversations, anything that's happening between the first visit and the second?

A. No. After Kelsey left, we thought it was over.

Q. Okay. If you thought it was over, why did you call Chauncey Moulding?

A. Because the allegation in itself, in being accused of something of that magnitude, it would bother any reasonable human, and it bothered me because that's not something I could ever do.

Q. Did you have a child car seat in your vehicle?

69

A.  My daughter, Emelia's, yes.

Q.  Your parental rights are terminated.  So do you have -- you don't have contact with Emelia, do you?

A.  Not currently.

Q.  Can you tell me, at the time that this incident happened, November of '24, were your parental rights already terminated?

A.  No.

Q.  So were you having any contact with her?

A.  No.

Q.  But you kept the car seat in the vehicle just on the off chance you would have contact with her?

A.  I've never taken that car seat out.

Q.  Still in there today?

A.  It's not buckled in, but it is in the vehicle.

Q.  All right.  Thank you.  Just a few more questions.  I want to talk about this second visit.

Do you recall the order -- wait a second.  On the second visit are you there on the property, or just is Tim there first and then you show up?  I forget the order.

70

A.  Could you clarify the question, please.

Q.  Yeah.  I'm just trying to understand.  Do you have any understanding of the knowledge of when those individuals showed up to your property on the second visit?

A.  It was right around 4 o'clock, I believe.  Tim got home shortly -- shortly after like 3:45, I believe.

Q.  In terms of the order, though, do you know who shows up first?

A.  Chauncey was the first vehicle in the lineup.  Kelsey was second.  There was deputies.  Elizabeth Este was parked by our mailbox on the gravel.  I believe there was a Washington County sheriff's to one side, and then I don't recall where the other one was parked.

Q.  My understanding is that Kelsey remains in her vehicle and Mr. Moulding walks up to the main house to talk to Gordon Seaba.  Is that your understanding?

A.  Chauncey walked up, yes, first.  His vehicle was first.  He walked into the house by himself first.

Q.  Ms. Koenig remained by her vehicle at

71

that time; correct?

A.  I don't know where she was.

Q.  Well, she wasn't in the house; right?

A.  That is correct.

Q.  And at that point nobody is walking around your property; correct?

A.  Not at that point.

Q.  So the odds are she's probably down back by the vehicles towards the street, wouldn't you say?

A.  I don't have any knowledge of where she was.

Q.  Okay.  I know you've discussed this conversation inside the house with Chauncey and Gordon and your objection to Chauncey being there.  What happens once Chauncey Moulding leaves that house?

A.  He begins to search.

Q.  And who is on the search with Chauncey?  I know you call it a search, but what is Chauncey actually doing?

A.  He is violating our constitutional rights.  He's entering properties, buildings, desecrating our home.

Q.  I want to get into a few of those things

72

there.  But in terms of what buildings Chauncey Moulding goes into on the property, he went into the main house?

A.  Correct.

Q.  And then what other buildings did he go into?

A.  He went into our house.  He looked through campers.  I do not believe he went in our barn.

Q.  Okay.

A.  If memory serves, he took a flashlight and looked in the furthest down our driveway, the window, the last window before you reach our barn to the big garage.  But he -- I don't believe he entered it.

Q.  Did any of the sheriff's deputies go into any of the outer buildings?

A.  I believe they did based on body cam.

Q.  You didn't have any objection with the sheriff's deputies on property?  It was Chauncey Moulding and Ms. Koenig; correct?

A.  No.  I have an objection to every single person there without a warrant.

Q.  Did you review your discovery responses?

A.  I have.

73

Q. Do you think that's consistent with how you answered the discovery responses?

A. I need to confer with Counsel for a moment.

(An off-the-record discussion was held.)

A. Can I have a copy of it, please.

Q. I'm not sure I -- let me -- in the -- for the sake of time, I will look for that, but let me continue to ask you questions.

So, again, as we sit here today, you objected to anybody being on the property?

A. Yes, I believe that I was very vocal that I didn't -- I wanted everybody to leave.

Q. Okay. So prior to them walking around the property, Chauncey is in the house with Gordon Seaba. You're in the house. At a certain point did Kelsey Koenig, before they start walking around the other buildings -- does she come in the house as well?

A. Kelsey was never in the house with me, Chauncey and Gordon.

Q. Does Kelsey ever go into the main house?

A. I believe she does at some point. I was

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

74

not present for it.

Q. So my understanding is she has a conversation with Gordon at that time in the house, and you're not present for that conversation?

A. I was not present with Kelsey at any point in the main house.

Q. As far as other buildings that Kelsey went into, she went into the main house. She didn't go into any other buildings, did she?

A. I don't know that she did or didn't. I would have to watch the body cam again.

Q. Have you watched the body cam?

A. I have.

Q. And the body cam to you was accurate when you reviewed it?

A. I mean, it is -- the body cams are what happened.

Q. So they walk around the property. Does it appear to you that someone is effectively in charge of looking around and what to look into?

A. Yes, Kelsey and Chauncey both actively are in charge.

Q. Well, and when you say that, what are

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

75

you pointing to to say that both of these folks were kind of calling the shots?

A. Based on the way things happened, Chauncey would not have been there, had Kelsey not contacted him. So by that, in my opinion, they both had motive to be there.

Q. My question is a little bit different. As they are walking around and they are looking at like the RVs, there is a shed that go -- that a deputy walks into, there is the cottage that you walk into, Chauncey Moulding is the one that says look into that RV, look into that shed, look into the cottage; correct?

A. I believe so.

Q. Kelsey Koenig is not directing anybody to look in the buildings, is she?

A. Not to my knowledge.

Q. The interaction that you have at your cottage, it happens as they -- they've kind of already walked through an RV at that point. They looked into a little shed, and then they get to your cottage with you and Tim, which is out back. You're telling Chauncey Moulding don't go in there?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

76

A. Absolutely.

Q. Chauncey Moulding goes in there by himself?

A. Yes.

Q. Koenig never goes in there?

A. She had already been in there prior that day.

Q. Right. That morning; correct?

A. Correct.

Q. When you allowed her to go in there?

A. That's restricted consent.

Q. What does that mean?

A. It means she didn't have permission to go back in.

Q. Is that something you told her that morning?

A. I gave her consent when she was initially there that morning. Consent has not -- lapsed.

Q. But in any event she never asked you to go back in a second time, did she?

A. She did not.

Q. You had some sort of interaction with Chauncey. I can't remember because I haven't reviewed body camera right now, but -- or I

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 136**

77

haven't reviewed it very recently.  But do you then confront them inside your home, or do you just tell them to get out of your home?  What do you do?

A.  I told him he did not have a warrant, he did not have permission to go in there.  And then he decided he was going to go in anyway, so I gave a count 3, 2, 1 and was going to go in and yell until he left.

Q.  At any point did anybody tell you that you're under criminal investigation for anything?

A.  No.

Q.  Anybody say that you -- it's been alleged that you committed a crime?

A.  No.

Q.  Again, your understanding is that they are still looking for whether there is a baby on the property; right?

A.  I -- that is what was -- that was my belief.

Q.  Do you have any idea if Gordon Seaba gave them, hey, you know, some sort of permission to be on the property for X number of minutes?  Do you have any idea whether he

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

78

said anything in that regard?

A.  Gordon never gave permission to anyone to be there.

Q.  And your understanding of that is in conversation that you had after the fact with Gordon?

A.  When Gordon Seaba tells you to get out of his house, you get out.  No one had a right to be there.  No one had permission to be there.

Q.  Okay.  Again, I'm just trying to understand.  You're not there when Kelsey Koenig and Chauncey are with Gordon in the house; correct?

A.  That's correct.

Q.  So you don't know the contents of that conversation?

A.  I do not.

Q.  So these folks walk around the property.  They last visit your cottage, and they all walk around to the back of that -- to the front of the house again on the driveway.  And there is kind of a confrontation there; correct?

A.  Yes, they were asked to leave

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

79

repeatedly.

Q.  Well, as they are making their way back to their -- down the driveway towards their vehicles, isn't that an indication that they are attempting to leave?

A.  Based on body cam and Chauncey's actions, they were going to have a conversation on our property after they were told by Tim to take it off.

Q.  What do you mean by Chauncey's actions?

A.  Being there without a warrant, by entering properties and essentially doing whatever he wanted.

Q.  Okay.  What is Ms. Koenig doing as Chauncey is having this interaction with you guys?

A.  She's standing there.

Q.  She's not verbally aggressive to you or Mr. McConnell, is she?

A.  Not to my knowledge.

Q.  More of a passive bystander than anything else?

A.  I would not describe her as -- no.

Q.  What would you describe it as being?

A.  Complicit.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

80

Q.  So you all have a conversation at the front of the driveway.  And what's being discussed?

A.  That they are going -- Chauncey and Kelsey are going to have another conversation before they leave the property after being told to leave the property.

Q.  Okay.  And then do they then have this conversation away from you and Mr. McConnell?

A.  They do not leave the property.  Chauncey laughs at us.

Q.  Ms. Koenig doesn't do anything?

A.  I don't recall her exact facial expression or if she laughed or if she didn't.  She stayed.

Q.  At some point these folks leave, though; right?

A.  At some point, yes.

Q.  What is the impetus for them -- do you know why they -- what causes them to leave?

A.  I don't know what made them leave.

Q.  You mentioned earlier in your testimony today about these folks desecrating your home.  What do you mean by that?

A.  Violating my home, treating it like a --

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

81

a stomping ground for anyone to look through, touch, engage with.  That is desecrating my home.

Q.  When Mr. Moulding was inside your home on the second visit, there is a -- well, I don't know if the video covers this, but what is Mr. Moulding doing inside your home?

A.  He's looking for a baby.

Q.  What is he doing when he's looking?

A.  I believe he flipped up my bedding, and he was shining his flashlight around (indicating).

Q.  Was he opening cupboards?  Is he lifting anything else up?

A.  I don't recall exactly.  I would have to watch the video again.

Q.  I'm almost done.  So bear with me, Ms. Osborn.  I want to switch gears here and ask you about this person named Alisha White.

A.  Yes.

Q.  Who is Alisha White in your life?

A.  Alisha White was a friend.

Q.  And where does Ms. White work, if you know?

A.  I believe she currently works at the

82

Davenport Correctional Facility, the halfway house.

Q.  And what is your understanding of Ms. White's role, if anything, in the events of November 15th of 2024 at your property?

A.  She was a witness to me not being pregnant.

Q.  And can you just give me an idea of what you're talking about there.

A.  Alisha and I were friends.  We grew to know each other and -- over a period of a year and a half.  And she saw me -- we saw each other pretty regularly.  So she knew that I was not pregnant.  She knew that I was not under the influence of drugs of any kind.  And she did -- she supported me in that, in with what happened.

Q.  When was the last time Ms. White had seen you prior to November 15th of 2024?

A.  Probably a couple days before.

Q.  Have you talked to Ms. White about this incident after it occurred?

A.  I talked to her initially after Kelsey came that morning.

Q.  Okay.

83

A.  I did not discuss anything regarding the case with her.

Q.  Well, have you talked to Ms. White since November 15th of 2024?

A.  I have.

Q.  Have you discussed this incident with her?

A.  I have not discussed anything other than Kelsey's first stop at our house.

MR. SHEAHAN:  Okay.  I may be done here.  Let me just confer with my notes.

Q.  On that first visit by Ms. Koenig, my understanding is, at some point she exits the vehicle, and she sees you feeding some pigs?

A.  Yes, we have pigs.

Q.  Did you tell her that Tim never wanted kids?

A.  No, I did not.

Q.  Did you tell her, when his father dies, all of this will be ours?

A.  No.

Q.  Did you hand her a business card?

A.  I did.

Q.  What was your business card?

A.  My now nonexistent business.  I was a

84

horse trainer.

Q.  Did you tell her Sarah Rosonke stole my other children and is trying to keep them?

A.  I stated my older daughter was in a guardianship with her and Josh.

Q.  Did you claim Alisha White was your best friend?

A.  I stated we were friends.

Q.  Did you provide her with a court order for the next hearing involving your and Tim's daughter?

A.  I showed her a copy of the papers that I was served, yes.

Q.  Did she ask you at that point to see the big house and you say Gordon wouldn't like this?

A.  I say he would not like this, that is correct.

Q.  Did you also have a phone call with Elizabeth Este that day on November 14th -- or 15th?

A.  I did.

Q.  And what was the reason you called Elizabeth?

A.  Because Chauncey had told me that she

85

was the one who handled the HHS complaints.

Q. And what was your contents of your conversation with Ms. Este?

A. I don't really recall what the conversation entailed that morning.

Q. Okay. Have you done anything else to investigate who made this anonymous phone call?

A. I haven't, because how would I? It was anonymous.

Q. Just asking you questions. If there was a baby in need that was on your property that day, would you have wanted HHS to find it?

A. There wasn't a baby on my property that day.

Q. I know, but if there was, would you want HHS to find a baby that's in need?

MS. MESSAMER: Objection, speculation.

Q. You can answer.

A. There was no baby to find.

Q. You don't want to answer my question?

A. I would not want HHS on my property, regardless of what the issue was.

Q. Even with a baby in need?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

86

A. If there was a baby in need, I would call 911.

MR. SHEAHAN: With that, I think I am done, with the agreement that we are going to need to continue your deposition to talk about damages at some point in the future because we just received your medical records today.

THE WITNESS: Okay.

MR. SHEAHAN: No further questions.

CROSS-EXAMINATION

BY MS. MESSAMER:

Q. So now it's my turn. One thing I wanted to follow up on, you were asked about kind of your opinion of law enforcement before this happened. I wanted to ask you about, did you know any of the officers that were on your property that night?

A. I did.

Q. Or afternoon, I should say. Which officers did you know or from which departments?

A. Washington County.

Q. Was it just one or more than one?

A. I can't remember his name. He was the

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

87

one I was speaking to on the video. He had -- he had essentially saved my life at one point.

Q. Explain what your interactions with this officer were.

A. I had helped -- I had turned in a drug dealer, a meth dealer in Washington, and there was a restraining order pending at that point. And I had gone into Walmart late at night. This deputy was -- I called dispatch. They said this -- the deputy was not far out from Walmart in Washington.

He got there, and he met me in the store. And I showed him where Scott Probasco was, who was the person that I had a pending restraining order against. This deputy followed me all the way home, made sure I was safe, because he knew that this person was -- he -- Scott was dangerous.

Q. Did you have any other personal interactions with any of the other law enforcement that were at your house that afternoon for when Chauncey came and searched?

A. I worked the county fair in Washington

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

88

for multiple years. I interacted with probably all of them and never had a bad experience.

Q. And in your job as the sexual violence kind of coordinator -- what was the title there?

A. Sexual assault advocate.

Q. -- sexual assault advocate, did you work with law enforcement in that job?

A. I did.

Q. So generally speaking, as of the fall of 2024, did you have a positive or negative attitude about law enforcement?

A. I had a pretty positive one. I mean, I'm a firm believer we all have places where we can grow. And I think we can build on each other's strengths, and I think that matters.

Q. In terms of living on the property with Gordon, did you have any responsibilities then that came along with you living there?

A. Honestly, not really.

Q. In terms of the animals, did you have any specific responsibilities with them?

A. Taking care of them.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

89

Q. Did you have any caretaking responsibilities for Gordon or like cooking responsibilities, anything like that?

A. They weren't responsibilities. I -- I did it because I loved him.

Q. Anything else in terms of like housework or kind of farm work that you did on the property when you lived there?

A. I used to clean Gordon's house a lot. I would bring food up for him or sit with him or spend time with him, but -- yeah.

Q. There was some discussion of your prior involvement with HHS and there being founded reports. Roughly what time period would that have been?

A. Montana CPS would have been September 6th, 2017, when that case initiated in Montana before it was transferred to Iowa.

Q. Is that the only one?

A. That's for Isabelle. Emelia, I believe the first call came in 2021, shortly after the pandemic ended.

Q. One thing I wanted to understand a little bit better is, so in terms of the timeline, I understand Kelsey searched your

90

home and then also went through Gordon's home. Which one of those searches happened first?

A. On the first --

Q. In the morning when she came.

A. I believe she searched ours first -- no, she searched Gordon's first because we were already -- he was already on the porch. And then she drove back in her van around the garage to our house and parked there.

Q. So most of your conversation with Kelsey, where did that happen?

A. Outside, where we were parked, initially, where I pulled up. We did talk in the -- in Gordon's house. She never went above the first floor. She never went upstairs the first time. And then probably in our house was where the most conversation happened.

Q. Inside of your house?

A. Yes.

Q. Tell about what the search of Gordon's house looked like. Just kind of describe where she went, where you were, what room she went in.

91

A. I stayed beside her the whole time. She -- obviously, when you walk in, there is the living room to the left, th dining room to the right. You go through that doorway. There is -- the stairs go up, but she did not go upstairs. Then you go into the kitchen, which you can enter through the dining room or that entryway by the stairs.

She went in the kitchen, and then our nephew, Colten, was sleeping because he worked late that evening and hadn't gotten up for work yet. I knocked on the door. I opened it, and I said, Colten, CPS is here. They want to know if I've had a baby. And he goes (indicating), just, you know, teenage boy, don't wake me. And then I was like, okay, and I shut the door, and then we walked out.

Q. Was Kelsey with you when you opened the door to Colton's room?

A. Yes.

Q. Is there a reason you didn't go upstairs? What's upstairs?

A. She didn't ask to go upstairs.

Q. What is upstairs?

92

A. You go up the stairs. Then you come to a -- well, the first set you'll come to a landing, and then there used to be a bathroom. I don't know what's in there now. And then you go around the stairs. There is a bedroom here (indicating) and a bedroom here (indicating), and then there is a closet before the bathroom.

Q. Did anyone use that space in the house?

A. Ashley and -- Ashley lived in one bedroom. Kayden stayed -- her youngest stays in the other.

Q. Did they live there at the time Kelsey came?

A. No, Colten did, but Kayden and Ashley did not.

Q. So when she came into the house, nobody was living upstairs?

A. Correct.

Q. Was Gordon inside with you, too, or was he outside on the porch when she searched his house the first time?

A. He was outside on the porch.

Q. What kind of conversation did she have with Gordon?

93

A. It was just explaining -- she explained why she was there, what the allegation was. And he -- Gordon kind of laughed at it, like no, because I -- when she had initially pulled in, I hollered up to him because he was on the porch. I was like, hey, Dad, have you seen any magical miracle babies around here, and he laughed and said no.

Q. Any more conversation that they had?

A. No.

Q. And I wasn't sure. You mentioned that Kelsey at the end of her visit said that she didn't need to come back or that she did need to come back?

A. She didn't, stated that she did not need to come back.

Q. In terms of Gordon back in 2024, I know his health obviously got worse here. His health got worse, and he passed away. But back in 2024 what was his health like?

A. I mean, he -- he had a few bouts of bronchitis and tummy issues, things like that. He had his gallbladder removed couple years prior and issues with that, but otherwise he was -- he was an older man.

94

Q. Did he use a walker or anything like that?

A. No, he had full mobility.

Q. Was he able to drive?

A. Yes.

Q. Did he leave the house very much?

A. Not really.

Q. Where did he spend most of his time?

A. In his chair at the kitchen table.

Q. Is there a TV in there?

A. You'd walk -- step -- his chair was here (indicating), and the TV was in the living room, complete opposite, very large TV. He always complained about the crack in it. It had like -- I don't know what happened. It had fuzzy colors. But he would sit there most of the time, smoke cigarettes, drink Pepsi. He would occasionally go into Washington and go to McDonald's, go to Dollar General. He didn't really leave a whole lot.

MS. MESSAMER: I think that's all I have. Thank you.

RECROSS-EXAMINATION

BY MR. SHEAHAN:

Q. I just have one more thing. I'm going

95

to show you your answers to the interrogatories to Chauncey Moulding and Jefferson County, specifically Interrogatory Number 6. Let me know when you're done reviewing that.

A. (The witness complied.)

Q. Okay. Ms. Koenig {sic}, do you remember when I asked you who you gave permission to on the second visit?

A. Yes.

Q. Your interrogatory response, which is attested to under oath -- excuse me -- there is verification attached -- it says that you gave the police officers permission to be on your property, but you asked Defendants Moulding and Koenig to leave; is that correct?

A. I believe at one point I offered or allowed them to be there to get Chauncey and Kelsey off the property, but in total I wanted them all off the property.

Q. Is your Answer to Interrogatory 6 correct or not?

A. I need to confer with Counsel.

Q. I don't think so.

96

MS. MESSAMER: You can just go ahead and answer to the best of your knowledge.

A. It is to the best of my knowledge.

MR. SHEAHAN: That's all I have. Thank you.

RECROSS-EXAMINATION

BY MS. MESSAMER:

Q. Well, and I'll just follow up. So I think what we are talking about here is this last line: When Defendants returned at 4 p.m., I gave the police officers permission to be at my property, but I asked Defendants Moulding and Koenig to leave.

What do you remember about any specific conversations you would have had with officers about whether they could be there or not?

A. It comes back to do you have a warrant.

Q. Do you remember ever giving an officer specific consent to be there?

A. I don't recall that I -- I'm -- it's possible, but I don't recall fully.

Q. Would the body camera show what happened with the officers?

97

A.  Yes.

MS. MESSAMER:  I don't have anything else.

MR. SHEAHAN:  Nothing further. Thank you.

(Deposition concluded at 12:14 p.m.)

SWEENEY COURT REPORTING (515) 244-6373

320 Insurance Exchange Bldg., Des Moines, IA 50309

98

C E R T I F I C A T E

I, Gale Sweeney Christensen, a Certified Shorthand Reporter of the State of Iowa and Registered Professional Reporter, do hereby certify that there came before me at the time, date, and place hereinbefore indicated, the witness named on the caption sheet hereof, who was by me duly sworn to testify to the truth of said witness's knowledge, touching and concerning the matters in controversy in this cause; that the witness was thereupon examined under oath, the examination taken down by me in shorthand, and later reduced to printed form under my supervision and direction, and that the deposition is a true record of the testimony given and of all objections interposed.

I further certify that I am neither attorney or counsel for, or related to or employed by any of the parties to the action in which this deposition is taken, and further that I am not a relative or employee of any attorney or counsel employed by the parties hereto or financially interested in the action.

Dated at Des Moines, Iowa, this 14th day of May, 2026.

----------------------------
CERTIFIED SHORTHAND REPORTER,
REGISTERED PROFESSIONAL
REPORTER, AND NOTARY PUBLIC

SWEENEY COURT REPORTING (515) 244-6373

320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 142**

1

**$**

**$16** [1] - 9:20

**'**

**'21** [1] - 20:21
**'24** [2] - 9:13, 69:7

**1**

**1** [2] - 47:5, 77:8
**10/12/13** [1] - 26:16
**10:06** [1] - 1:16
**10:15** [1] - 65:6
**1104** [1] - 2:17
**110th** [2] - 7:25, 24:10
**12** [1] - 56:19
**12/18/19** [2] - 26:17, 26:18
**12/19** [1] - 26:16
**12:14** [1] - 97:6
**1305** [1] - 2:12
**14th** [2] - 84:20, 98:17
**15** [8] - 24:9, 29:8, 31:11, 31:17, 32:13, 33:9, 38:2, 52:20
**15th** [9] - 15:15, 18:16, 33:18, 55:11, 58:14, 82:5, 82:19, 83:4, 84:21
**16** [1] - 56:18
**160** [1] - 36:19
**1600** [1] - 2:7
**1989** [1] - 7:5

**2**

**2** [2] - 47:5, 77:8
**2002** [1] - 10:9
**2008** [1] - 7:23
**2011** [2] - 15:11, 15:12
**2015** [2] - 10:12, 16:5
**2016** [2] - 16:6, 23:1
**2017** [2] - 16:10, 89:17
**2018** [1] - 16:10
**2021** [2] - 20:20, 89:21
**2022** [7] - 9:13, 16:11, 16:12, 18:13, 18:24, 23:23, 32:23
**2023** [2] - 32:23, 33:7
**2024** [29] - 15:15, 18:16, 24:5, 24:9, 29:8, 29:22, 29:24, 30:1, 30:14, 30:24, 31:3, 31:5, 31:9, 31:11, 31:17, 32:13,

33:9, 36:9, 36:13, 38:2, 52:20, 55:11, 57:11, 82:5, 82:19, 83:4, 88:12, 93:17, 93:20
**2026** [2] - 1:17, 98:18
**21** [1] - 1:17
**21st** [2] - 18:24, 20:20
**25th** [1] - 7:5
**2910** [2] - 1:17, 2:3

**3**

**3** [2] - 47:5, 77:8
**3251** [2] - 7:25, 24:10
**3:45** [1] - 70:8

**4**

**4** [4] - 3:3, 38:18, 70:6, 96:12
**4:25-cv-00183** [1] - 1:6

**5**

**50211** [1] - 2:17
**50312** [1] - 2:4
**50319** [1] - 2:12
**52540** [1] - 7:25
**52556** [1] - 2:8
**53** [1] - 3:4

**6**

**6** [2] - 95:4, 95:22
**6/17/09** [1] - 26:16
**6th** [3] - 15:11, 66:20, 89:17

**8**

**86** [1] - 3:5

**9**

**911** [1] - 86:2
**94** [1] - 3:4
**96** [1] - 3:5

**A**

**a.m** [1] - 1:16
**AA** [2] - 23:18, 23:24
**Aaron** [1] - 24:25
**Aaron's** [2] - 66:13,

66:15
**abided** [1] - 60:22
**ability** [1] - 23:14
**able** [3] - 44:5, 47:21, 94:4
**absolutely** [2] - 34:5, 76:1
**abuse** [1] - 23:18
**accident** [1] - 14:25
**accompanied** [1] - 38:22
**account** [1] - 12:13
**accountability** [2] - 11:25, 22:20
**accountable** [1] - 40:8
**accurate** [15] - 8:17, 12:9, 13:13, 15:13, 20:13, 20:23, 21:9, 25:12, 32:21, 38:24, 40:7, 40:16, 43:10, 52:21, 74:15
**accused** [1] - 68:20
**action** [5] - 19:13, 37:23, 64:18, 98:13, 98:15
**actions** [4] - 12:1, 62:11, 79:7, 79:10
**active** [1] - 11:23
**actively** [1] - 74:23
**addicted** [3] - 29:13, 29:17, 34:2
**addiction** [2] - 11:24, 24:3
**address** [1] - 7:24
**advice** [1] - 37:25
**Advocacy** [1] - 9:9
**advocate** [4] - 9:17, 9:19, 88:7, 88:8
**affect** [1] - 23:14
**afternoon** [3] - 67:15, 86:20, 87:23
**agencies** [1] - 64:23
**agency** [1] - 14:5
**ages** [1] - 56:16
**aggressive** [1] - 79:18
**ago** [4] - 13:17, 16:3, 16:5, 33:5
**agree** [4] - 16:25, 47:18, 47:20, 58:16
**agreement** [2] - 27:1, 86:4
**ahead** [1] - 96:2
**aliases** [1] - 6:22
**Alisha** [5] - 81:19, 81:21, 81:22, 82:10, 84:6
**allegation** [9] - 29:14, 29:16, 29:18, 34:17, 37:17, 37:20, 56:10, 68:19, 93:2

**allegations** [9] - 55:23, 56:4, 56:7, 57:18, 57:22, 57:25, 58:1, 58:15, 58:17
**alleged** [2] - 12:2, 77:15
**allowed** [4] - 61:7, 61:24, 76:10, 95:19
**almost** [3] - 8:2, 22:25, 81:17
**amount** [2] - 45:6, 45:7
**AND** [1] - 98:22
**animals** [1] - 88:23
**ANN** [4] - 1:8, 1:12, 4:1, 4:9
**Ann** [2] - 4:9, 6:21
**anonymous** [10] - 29:9, 31:14, 31:20, 51:2, 51:8, 51:14, 63:20, 64:12, 85:7, 85:10
**Answer** [1] - 95:22
**answer** [12] - 5:6, 5:11, 6:3, 19:17, 22:10, 45:21, 48:12, 50:20, 51:15, 85:20, 85:22, 96:2
**answered** [3] - 40:4, 40:17, 73:2
**answers** [2] - 5:11, 95:1
**anyway** [1] - 77:7
**apartment** [1] - 32:19
**apologies** [2] - 20:11, 32:22
**apologize** [2] - 21:3, 33:15
**appeal** [1] - 21:2
**appealing** [1] - 21:8
**appear** [2] - 62:21, 74:20
**applied** [1] - 10:4
**appropriately** [1] - 59:1
**April** [1] - 1:17
**area** [2] - 42:11, 64:15
**arrest** [1] - 20:9
**arrested** [4] - 13:2, 14:2, 19:22, 20:13
**arrival** [1] - 65:12
**arrived** [2] - 59:8, 65:10
**Ashley** [7] - 24:24, 27:7, 66:12, 66:16, 92:10, 92:15
**Ashley's** [1] - 66:14
**assault** [4] - 9:17, 9:19, 88:7, 88:8
**assessment** [5] -

55:15, 55:18, 55:19, 62:25, 63:3
**assessor** [1] - 25:8
**Assessor** [1] - 25:12
**Assessor's** [3] - 25:6, 27:20, 28:1
**Assistant** [1] - 2:10
**assumption** [1] - 52:2
**attached** [1] - 95:13
**attacks** [1] - 23:13
**attempt** [1] - 64:10
**attempting** [1] - 79:5
**attend** [3] - 23:24, 24:2, 30:10
**attested** [1] - 95:12
**attitude** [1] - 88:13
**Attorney** [5] - 2:2, 2:7, 2:10, 37:8, 49:10
**attorney** [10] - 13:19, 32:8, 38:1, 38:8, 39:7, 49:18, 49:23, 50:1, 98:12, 98:14
**attorney-client** [3] - 49:18, 49:23, 50:1
**Attorneys** [1] - 2:15
**authority** [2] - 38:10, 38:17
**Avenue** [2] - 1:17, 2:3
**averaged** [1] - 65:14
**aware** [6] - 13:15, 29:9, 29:14, 57:16, 57:20, 65:20

**B**

**babies** [1] - 93:7
**baby** [12] - 29:13, 59:25, 62:2, 77:18, 81:8, 85:12, 85:14, 85:17, 85:21, 85:25, 86:1, 91:14
**backtrack** [1] - 26:13
**bad** [3] - 11:23, 12:13, 88:2
**bankruptcy** [1] - 10:21
**barn** [2] - 72:9, 72:14
**based** [6] - 24:5, 51:2, 51:7, 72:18, 75:3, 79:6
**bathroom** [2] - 92:4, 92:8
**battle** [1] - 24:3
**bear** [1] - 81:17
**bed** [1] - 53:20
**bedding** [1] - 81:10
**bedroom** [3] - 92:6, 92:11
**begins** [1] - 71:18
**belief** [1] - 77:21

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309
Page 1 to 1 of 10    26 of 35 sheets

**App. 143**

**believer** [1] - 88:15
**benefits** [2] - 9:23, 10:14
**beside** [1] - 91:1
**best** [7] - 19:2, 25:25, 50:11, 62:20, 84:6, 96:2, 96:4
**better** [1] - 89:24
**between** [2] - 42:21, 68:14
**big** [2] - 72:14, 84:15
**birth** [5] - 29:10, 29:22, 29:23, 29:25, 37:5
**birthdays** [1] - 26:14
**bit** [4] - 14:21, 26:13, 75:7, 89:24
**blood** [1] - 36:10
**body** [9] - 62:1, 72:18, 74:12, 74:13, 74:15, 74:17, 76:25, 79:6, 96:24
**born** [6] - 7:4, 7:6, 29:13, 29:16, 34:2, 60:1
**bother** [1] - 68:21
**bothered** [1] - 68:22
**bouts** [1] - 93:21
**boy** [1] - 91:16
**Brad** [1] - 21:13
**break** [3] - 12:23, 14:21, 52:8
**BRENT** [1] - 2:14
**brent@hinderslaw. com** [1] - 2:18
**brief** [1] - 11:24
**briefly** [1] - 61:5
**Brighton** [6] - 7:25, 24:11, 26:22, 27:4, 51:6, 52:19
**bring** [1] - 89:10
**bringing** [1] - 55:22
**broken** [1] - 45:22
**bronchitis** [1] - 93:22
**brother** [4] - 22:6, 24:25, 66:8, 66:14
**buckled** [1] - 69:17
**build** [1] - 88:16
**building** [1] - 28:21
**Building** [1] - 2:11
**buildings** [8] - 71:23, 72:1, 72:5, 72:17, 73:20, 74:8, 74:10, 75:17
**built** [1] - 28:23
**business** [3] - 83:22, 83:24, 83:25
**BY** [13] - 4:5, 12:25, 17:21, 21:17, 30:20, 45:2, 50:9, 50:23,

52:16, 53:4, 86:12, 94:24, 96:8
**bystander** [1] - 79:21

**C**

**Caitlyn** [1] - 32:12
**Calhoun** [2] - 8:21, 11:18
**California** [1] - 7:7
**cam** [5] - 72:18, 74:12, 74:13, 74:15, 79:6
**camera** [5] - 41:16, 53:19, 53:22, 76:25, 96:24
**campers** [1] - 72:8
**cams** [1] - 74:17
**cancer** [1] - 67:4
**cannot** [1] - 37:25
**caption** [1] - 98:5
**capture** [1] - 54:10
**captures** [1] - 54:7
**car** [4] - 14:25, 68:24, 69:12, 69:15
**card** [2] - 83:22, 83:24
**cards** [1] - 11:4
**care** [2] - 60:1, 88:25
**caretaking** [1] - 89:1
**Carroll** [2] - 8:20, 11:17
**case** [12] - 4:17, 13:16, 14:16, 14:19, 14:22, 14:23, 14:24, 24:21, 53:7, 83:2, 89:17
**Case** [1] - 1:5
**cases** [1] - 15:3
**causes** [1] - 80:20
**cell** [1] - 53:22
**CENTRAL** [1] - 1:3
**certain** [1] - 73:19
**certainly** [1] - 22:10
**CERTIFIED** [1] - 98:21
**Certified** [2] - 1:14, 98:3
**certified** [2] - 9:17, 9:18
**certify** [2] - 98:4, 98:12
**chair** [3] - 42:19, 94:9, 94:11
**chance** [1] - 69:13
**change** [1] - 57:8
**changes** [1] - 30:22
**changing** [1] - 66:22
**charge** [8] - 12:7, 12:18, 12:20, 13:4, 13:23, 14:1, 74:21, 74:24
**charges** [6] - 11:19,

11:22, 12:5, 19:24, 20:16, 20:19
**Charlotte** [3] - 29:11, 37:18, 59:25
**Chauncey** [54] - 2:14, 33:12, 37:8, 37:12, 37:19, 38:4, 39:14, 40:6, 40:9, 40:21, 41:23, 42:4, 42:10, 42:15, 42:21, 43:1, 43:8, 43:14, 43:15, 43:20, 45:11, 45:16, 46:25, 52:19, 53:14, 53:16, 54:7, 68:3, 68:18, 70:11, 70:22, 71:14, 71:15, 71:16, 71:19, 71:21, 72:2, 72:21, 73:17, 73:23, 74:23, 75:4, 75:11, 75:25, 76:2, 76:24, 78:13, 79:15, 80:4, 80:11, 84:25, 87:23, 95:2, 95:19
**CHAUNCEY** [1] - 1:8
**Chauncey's** [6] - 41:2, 43:12, 43:21, 68:7, 79:6, 79:10
**checks** [1] - 12:13
**Child** [3] - 15:16, 16:18, 29:18
**child** [24] - 13:4, 16:24, 18:2, 18:14, 18:20, 19:5, 21:18, 21:21, 22:2, 22:4, 29:16, 29:22, 29:24, 29:25, 34:2, 37:18, 56:23, 59:1, 59:3, 59:24, 62:5, 62:22, 64:20, 68:24
**children** [12] - 18:20, 19:3, 19:12, 20:21, 22:8, 22:12, 26:15, 32:24, 56:6, 56:11, 56:13, 84:3
**choice** [3] - 22:9, 23:20, 23:21
**chooses** [1] - 64:21
**choice** [1] - 64:21
**Christensen** [3] - 1:13, 1:24, 98:3
**Chula** [1] - 7:7
**cigarettes** [1] - 94:17
**CINA** [4] - 16:20, 21:15, 55:24, 64:18
**circuit** [1] - 60:17
**circumstances** [2] - 13:7, 23:15
**city** [1] - 46:22
**City** [2] - 9:11, 54:20
**civil** [3] - 14:23, 37:23, 63:17

**claim** [1] - 84:6
**claims** [2] - 14:18, 14:24
**clarify** [4] - 6:1, 46:10, 56:14, 70:1
**class** [2] - 11:16, 12:19
**clean** [1] - 89:9
**clear** [4] - 5:10, 5:14, 5:15, 44:1
**clearly** [1] - 60:11
**clears** [1] - 56:21
**client** [3] - 49:18, 49:23, 50:1
**close** [1] - 8:25
**closer** [2] - 46:17, 59:16
**closet** [1] - 92:7
**cocaine** [2] - 22:19, 22:24
**colors** [1] - 94:16
**Colten** [3] - 91:10, 91:13, 92:15
**Colton's** [1] - 91:20
**comfortable** [1] - 38:15
**comforter** [1] - 62:18
**coming** [1] - 33:14
**commencing** [1] - 1:16
**committed** [1] - 77:15
**committing** [1] - 44:11
**communicated** [1] - 34:24
**communications** [2] - 31:12, 31:19
**complained** [1] - 94:14
**complaint** [4] - 29:10, 31:14, 31:20, 31:23
**complaints** [1] - 85:1
**complete** [2] - 60:25, 94:13
**completing** [1] - 61:1
**complex** [1] - 32:19
**complicit** [1] - 79:25
**complied** [1] - 95:6
**concern** [3] - 31:7, 51:10, 51:11
**concerned** [2] - 51:1, 51:5
**concerning** [1] - 98:7
**concerns** [2] - 52:6, 55:22
**concluded** [1] - 97:6
**condition** [1] - 23:7
**conditions** [5] - 51:1, 51:6, 51:13, 56:1, 57:19
**confer** [6] - 17:15,

30:15, 51:17, 73:3, 83:11, 95:24
**conferred** [1] - 6:9
**confront** [1] - 77:2
**confrontation** [1] - 78:23
**confusion** [1] - 48:19
**connects** [1] - 66:17
**consent** [6] - 34:22, 65:23, 76:11, 76:17, 76:18, 96:21
**considering** [1] - 57:10
**consistent** [3] - 58:1, 58:18, 73:1
**constitutional** [2] - 39:9, 71:22
**constructed** [1] - 28:22
**contact** [18] - 21:25, 22:3, 22:5, 22:7, 22:11, 32:14, 32:16, 33:3, 37:8, 38:1, 49:9, 49:12, 50:13, 55:20, 64:10, 69:3, 69:10, 69:13
**contacted** [2] - 49:15, 75:5
**contents** [2] - 78:16, 85:2
**continue** [7] - 30:3, 47:23, 48:1, 48:8, 65:2, 73:10, 86:5
**continued** [1] - 48:16
**controversy** [1] - 98:7
**conversation** [28] - 5:14, 5:18, 5:19, 33:20, 33:21, 42:9, 42:21, 43:1, 43:5, 44:6, 55:4, 63:13, 65:19, 71:14, 74:3, 74:5, 78:5, 78:17, 79:8, 80:1, 80:5, 80:9, 85:3, 85:5, 90:11, 90:18, 92:24, 93:9
**conversations** [5] - 38:3, 38:13, 49:23, 68:13, 96:16
**convicted** [4] - 11:8, 11:16, 13:2, 14:2
**conviction** [1] - 12:14
**convictions** [3] - 11:14, 11:15, 14:8
**cooking** [1] - 89:2
**coordinator** [1] - 88:5
**copy** [3] - 36:15, 73:7, 84:12
**cordial** [1] - 63:7
**corner** [1] - 53:19

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**App. 144**

**correct** [48] - 9:3, 12:5, 12:6, 13:20, 20:16, 22:4, 24:9, 28:8, 29:3, 29:4, 33:4, 35:5, 37:1, 38:20, 40:22, 46:12, 46:13, 54:1, 54:9, 54:23, 55:12, 56:24, 58:3, 60:19, 61:3, 61:9, 62:7, 62:8, 63:4, 66:19, 67:15, 68:5, 68:9, 71:1, 71:4, 71:6, 72:4, 72:21, 75:14, 76:8, 76:9, 78:14, 78:15, 78:24, 84:18, 92:19, 95:17, 95:23
**Correctional** [1] - 82:1
**correctly** [1] - 21:5
**cottage** [9] - 24:14, 27:17, 61:8, 61:20, 75:11, 75:13, 75:20, 75:23, 78:20
**counsel** [9] - 4:22, 13:15, 41:20, 50:14, 50:18, 52:24, 54:6, 98:12, 98:14
**Counsel** [8] - 6:9, 6:17, 17:15, 30:15, 40:12, 51:17, 73:3, 95:24
**count** [2] - 47:5, 77:8
**county** [9] - 8:11, 15:24, 16:1, 25:7, 38:8, 38:11, 39:7, 46:22, 87:25
**COUNTY** [1] - 1:9
**County** [47] - 2:14, 4:18, 8:20, 8:21, 8:22, 11:17, 11:18, 12:15, 13:5, 16:16, 16:18, 17:13, 18:13, 19:13, 20:22, 21:12, 25:6, 25:12, 26:3, 27:20, 28:1, 33:13, 37:8, 38:23, 39:1, 39:3, 39:6, 39:7, 39:18, 39:20, 39:21, 39:24, 40:1, 40:10, 40:11, 40:16, 40:19, 49:2, 49:3, 68:5, 70:15, 86:23, 95:3
**couple** [5] - 50:7, 60:12, 82:20, 93:23
**couple-minute** [1] - 60:12
**Court** [4] - 18:6, 21:2, 21:9, 23:20
**court** [7] - 5:3, 25:20, 36:1, 48:14, 51:24,

58:9, 84:9
**COURT** [1] - 1:1
**courteous** [2] - 63:15, 63:16
**covers** [2] - 61:24, 81:6
**CP** [1] - 62:10
**CPS** [4] - 57:14, 61:12, 89:16, 91:13
**crack** [1] - 94:14
**cravings** [1] - 30:24
**Crawford** [1] - 8:20
**create** [1] - 55:23
**created** [1] - 46:21
**credit** [1] - 11:4
**crime** [1] - 77:15
**criminal** [1] - 77:11
**CROSS** [2] - 53:3, 86:11
**CROSS-EXAMINATION** [2] - 53:3, 86:11
**CSR** [1] - 1:24
**cupboards** [1] - 81:13
**current** [7] - 6:20, 7:24, 13:19, 50:14, 56:16, 59:18, 63:19
**custody** [3] - 14:18, 19:6, 64:20

**D**

**Dad** [1] - 93:6
**damage** [1] - 45:19
**damages** [2] - 52:9, 86:6
**dangerous** [1] - 87:19
**date** [1] - 98:5
**Dated** [1] - 98:17
**daughter** [13] - 13:12, 16:20, 19:10, 19:15, 19:21, 22:4, 26:5, 26:8, 29:11, 65:3, 69:1, 84:4, 84:11
**daughter's** [1] - 25:24
**daughters** [4] - 22:5, 26:2, 32:1, 63:20
**Davenport** [1] - 82:1
**days** [4] - 32:3, 50:7, 50:8, 82:20
**dealer** [2] - 87:7
**death** [1] - 67:2
**debt** [1] - 10:24
**deceased** [3] - 24:24, 66:7, 66:14
**December** [1] - 18:24
**decided** [1] - 77:7
**deed** [2] - 24:16, 24:20
**Defendant** [1] - 2:9

**defendant** [2] - 14:17, 15:2
**Defendants** [5] - 1:10, 38:19, 95:15, 96:11, 96:13
**defer** [1] - 40:12
**deferred** [1] - 12:16
**degree** [1] - 44:14
**denied** [3] - 29:21, 30:2, 34:18
**denying** [1] - 30:4
**departments** [1] - 86:22
**deposed** [2] - 4:17, 4:20
**DEPOSITION** [2] - 1:7, 1:12
**deposition** [8] - 4:23, 5:15, 6:8, 50:3, 86:5, 97:6, 98:10, 98:13
**depth** [1] - 55:1
**deputies** [14] - 33:12, 38:22, 39:19, 39:21, 39:24, 40:1, 40:23, 48:2, 49:2, 49:3, 68:4, 70:13, 72:16, 72:20
**deputy** [4] - 75:10, 87:10, 87:11, 87:16
**Des** [4] - 1:18, 2:4, 2:12, 98:17
**describe** [3] - 79:23, 79:24, 90:23
**described** [1] - 54:2
**describing** [1] - 39:14
**desecrate** [1] - 39:9
**desecrating** [3] - 71:24, 80:23, 81:2
**DHS** [10] - 30:7, 31:13, 31:19, 32:6, 55:14, 55:18, 55:25, 57:4, 60:5
**DHS/HHS** [1] - 64:18
**dies** [1] - 83:19
**different** [4] - 9:2, 44:25, 53:24, 75:7
**differently** [2] - 44:8, 44:9
**dining** [2] - 91:3, 91:7
**direct** [1] - 50:19
**DIRECT** [1] - 4:4
**directing** [1] - 75:16
**direction** [1] - 98:9
**directly** [2] - 42:10, 46:16
**discharged** [1] - 20:18
**discovery** [4] - 6:15, 54:3, 72:24, 73:2
**discuss** [2] - 49:4, 83:1

**discussed** [10] - 6:17, 31:1, 37:18, 37:22, 50:2, 64:1, 71:13, 80:3, 83:6, 83:8
**discussion** [9] - 17:17, 30:17, 37:11, 41:10, 50:13, 51:19, 52:13, 73:5, 89:12
**discussions** [1] - 38:6
**dishonest** [2] - 44:15, 44:17
**dispatch** [1] - 87:10
**dispute** [1] - 50:24
**distance** [1] - 37:3
**DISTRICT** [2] - 1:1, 1:2
**disturbed** [1] - 45:24
**DIVISION** [1] - 1:3
**divorce** [3] - 14:18, 14:24, 15:13
**divorced** [3] - 15:8, 15:9, 15:10
**doctor** [1] - 30:19
**documents** [3] - 6:10, 6:12, 6:14
**Dodge** [2] - 8:5, 8:8
**dog** [2] - 42:1, 45:13
**Dollar** [1] - 94:19
**done** [8] - 6:7, 21:14, 45:19, 81:17, 83:10, 85:6, 86:4, 95:4
**door** [10] - 42:16, 43:22, 46:9, 46:15, 53:14, 54:21, 91:12, 91:17, 91:20
**doorway** [1] - 91:4
**down** [10] - 5:2, 9:15, 14:21, 54:15, 59:20, 59:21, 71:8, 72:12, 79:3, 98:8
**drink** [1] - 94:17
**Drive** [1] - 2:17
**drive** [1] - 94:4
**driveway** [6] - 59:15, 59:16, 72:12, 78:22, 79:3, 80:2
**drove** [4] - 41:25, 42:2, 42:10, 90:9
**drug** [7] - 14:14, 22:15, 30:8, 30:11, 56:3, 56:4, 87:6
**drugs** [3] - 22:18, 34:15, 82:15
**dual** [1] - 61:13
**due** [1] - 51:13
**duly** [2] - 4:2, 98:6
**duration** [1] - 39:11
**during** [4] - 10:4, 31:17, 36:12, 46:6
**dwelling** [3] - 27:19, 27:21, 28:1

**dynamic** [1] - 55:22

**E**

**early** [1] - 16:8
**East** [1] - 2:12
**ED** [1] - 2:6
**edwardgharvey98@ yahoo.com** [1] - 2:8
**effect** [1] - 60:4
**effectively** [1] - 74:20
**egress** [1] - 46:21
**eight** [2] - 8:2, 8:3
**eighty** [1] - 67:9
**either** [6] - 31:2, 50:13, 50:24, 55:20, 66:12, 66:15
**electric** [3] - 28:15, 28:17, 28:19
**Elizabeth** [4] - 68:6, 70:13, 84:20, 84:24
**Emelia** [4] - 56:19, 56:22, 69:4, 89:20
**EMELIA** [1] - 56:20
**Emelia's** [1] - 69:1
**employed** [5] - 9:4, 10:7, 10:11, 98:13, 98:14
**employee** [1] - 98:14
**employment** [1] - 9:21
**end** [2] - 36:4, 93:12
**endangerment** [1] - 13:4
**ended** [1] - 89:22
**energy** [1] - 30:22
**enforcement** [7] - 14:5, 14:11, 24:7, 86:15, 87:22, 88:9, 88:13
**engage** [1] - 81:2
**entailed** [1] - 85:5
**enter** [3] - 28:25, 45:14, 91:7
**entered** [9] - 10:23, 17:4, 17:5, 18:19, 18:22, 21:11, 46:11, 46:14, 72:15
**entering** [2] - 71:23, 79:12
**entire** [1] - 48:22
**entirety** [1] - 39:11
**entity** [2] - 39:18, 57:7
**entryway** [1] - 91:8
**erase** [1] - 13:23
**especially** [1] - 29:18
**essentially** [2] - 79:12, 87:2
**estate** [4] - 24:16, 25:2, 66:6, 66:24

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309
Page 3 to 3 of 10                                                                    28 of 35 sheets

**App. 145**

**Este** [4] - 68:6, 70:13, 84:20, 85:3
**estimate** [1] - 48:22
**evening** [1] - 91:11
**event** [2] - 53:10, 76:20
**events** [1] - 82:4
**eventually** [1] - 16:25
**exact** [5] - 45:5, 49:1, 65:9, 67:13, 80:13
**exactly** [3] - 15:23, 35:15, 81:15
**EXAMINATION** [6] - 3:1, 4:4, 53:3, 86:11, 94:23, 96:7
**examination** [1] - 98:8
**Examination** [1] - 3:2
**examined** [1] - 98:8
**exams** [1] - 36:10
**excuse** [2] - 60:15, 95:12
**exists** [2] - 54:5, 54:6
**exit** [1] - 47:22
**exits** [1] - 83:13
**expected** [1] - 53:11
**experience** [4] - 29:15, 33:2, 48:18, 88:3
**experiences** [1] - 62:13
**experiencing** [1] - 30:22
**explain** [2] - 59:9, 87:4
**explained** [3] - 4:22, 37:15, 93:1
**explaining** [1] - 93:1
**explicitly** [1] - 41:12
**express** [2] - 30:21, 31:7
**expression** [1] - 80:14
**expunge** [1] - 13:23
**expunged** [1] - 13:17
**extent** [1] - 62:19

## F

**facial** [1] - 80:13
**Facility** [1] - 82:1
**fact** [3] - 64:11, 65:17, 78:5
**fair** [2] - 44:16, 87:25
**Fairfield** [1] - 2:8
**fall** [1] - 88:11
**family** [1] - 55:21
**far** [4] - 11:13, 49:24, 74:8, 87:11
**farm** [1] - 89:7
**fashion** [1] - 5:4
**father** [6] - 18:1, 18:8,

19:9, 21:19, 25:22, 83:19
**feeding** [1] - 83:14
**feelings** [1] - 24:6
**feet** [1] - 26:12
**felonies** [3] - 11:11, 11:17, 20:7
**felony** [2] - 11:8, 12:19
**felt** [1] - 38:15
**female** [1] - 64:8
**few** [6] - 5:1, 36:7, 53:13, 69:19, 71:25, 93:21
**fight** [2] - 65:2, 65:3
**fighting** [1] - 64:25
**figure** [1] - 44:13
**filed** [4] - 10:20, 20:25, 32:3, 32:6
**final** [1] - 5:23
**financially** [1] - 98:15
**fine** [4] - 4:14, 20:12, 50:4, 53:8
**finish** [1] - 5:5
**firm** [1] - 88:15
**first** [34] - 4:2, 5:1, 32:25, 41:1, 41:2, 49:15, 50:12, 54:17, 57:24, 58:14, 58:23, 59:7, 60:17, 60:18, 63:6, 67:11, 68:14, 69:24, 70:10, 70:11, 70:22, 70:23, 70:24, 83:9, 83:12, 89:21, 90:3, 90:4, 90:6, 90:7, 90:16, 90:17, 92:2, 92:22
**flashlight** [2] - 72:11, 81:11
**flipped** [1] - 81:10
**floor** [1] - 90:16
**Floor** [1] - 2:11
**folks** [6] - 68:3, 68:11, 75:2, 78:19, 80:16, 80:23
**follow** [2] - 86:14, 96:9
**followed** [1] - 87:17
**follows** [1] - 4:3
**food** [5] - 10:18, 56:5, 56:8, 57:19, 89:10
**forget** [1] - 69:25
**form** [1] - 98:9
**Fort** [2] - 8:5, 8:8
**forth** [1] - 55:22
**forward** [1] - 57:10
**foster** [1] - 17:24
**founded** [4] - 57:1, 57:17, 57:21, 89:13
**four** [1] - 16:13
**Franklin** [1] - 2:16
**friend** [2] - 81:22, 84:7

**friends** [2] - 82:10, 84:8
**front** [3] - 53:20, 78:22, 80:2
**full** [6] - 4:7, 9:21, 9:22, 11:25, 22:20, 94:3
**full-time** [1] - 9:22
**fully** [1] - 96:23
**furthest** [1] - 72:12
**future** [1] - 86:6
**fuzzy** [1] - 94:16

## G

**GAIL** [5] - 1:4, 1:8, 1:12, 4:1, 4:9
**Gail** [16] - 4:9, 4:11, 4:12, 4:14, 4:15, 6:7, 6:20, 7:4, 41:3, 41:5, 41:23, 52:17, 53:5, 53:7, 53:8
**Gale** [3] - 1:13, 1:24, 98:3
**gallbladder** [1] - 93:23
**garage** [3] - 28:10, 72:14, 90:10
**gather** [1] - 55:21
**gathering** [1] - 68:12
**gears** [1] - 81:18
**General** [2] - 2:10, 94:20
**General's** [1] - 49:10
**generally** [1] - 88:11
**genuinely** [1] - 37:4
**Gina** [2] - 13:19, 52:7
**GINA** [1] - 2:2
**given** [7] - 29:10, 34:22, 34:25, 37:5, 41:21, 65:21, 98:10
**gmessamer@ parrishlaw.com** [1] - 2:4
**Gordon** [46] - 24:21, 25:15, 25:22, 26:7, 26:12, 26:22, 27:6, 34:22, 34:25, 42:5, 42:19, 42:22, 43:1, 43:6, 43:8, 43:9, 43:12, 43:23, 43:24, 49:5, 53:14, 54:10, 65:15, 65:16, 65:20, 66:5, 66:18, 66:23, 67:3, 70:20, 71:15, 73:18, 73:23, 74:3, 77:22, 78:2, 78:6, 78:7, 78:13, 84:15, 88:20, 89:2, 92:20, 92:25, 93:3, 93:17

**GORDON** [1] - 1:5
**Gordon's** [5] - 89:9, 90:1, 90:7, 90:15, 90:22
**government** [2] - 10:14, 64:23
**Gowrie** [3] - 7:21, 8:6, 8:7
**GOWRIE** [1] - 7:21
**grade** [1] - 7:11
**graduate** [2] - 7:13, 7:15
**graduated** [1] - 7:19
**Grand** [2] - 1:17, 2:3
**grandfather** [1] - 25:24
**grass** [1] - 46:17
**gravel** [1] - 70:14
**great** [1] - 5:9
**grew** [1] - 82:10
**groceries** [1] - 59:14
**ground** [2] - 13:12, 81:1
**grow** [1] - 88:16
**guardian** [3] - 17:14, 63:19, 64:8
**guardians** [3] - 17:20, 21:15, 32:1
**guardianship** [17] - 17:8, 17:10, 17:12, 18:10, 18:11, 19:10, 19:13, 19:16, 19:20, 19:21, 20:22, 20:25, 21:6, 22:3, 56:12, 64:20, 84:5
**guess** [2] - 56:12, 60:16
**guys** [1] - 79:16

## H

**habitation** [1] - 27:1
**half** [1] - 82:12
**halfway** [1] - 82:1
**hand** [3] - 41:25, 42:2, 83:22
**handcuffed** [1] - 46:5
**handled** [1] - 85:1
**harm** [2] - 47:10, 47:19
**HARVEY** [2] - 2:6, 21:13
**health** [3] - 93:18, 93:19, 93:20
**hear** [3] - 42:20, 43:4, 44:5
**heard** [3] - 37:3, 43:6, 57:24
**hearing** [2] - 39:13,

84:10
**held** [6] - 9:6, 17:18, 30:18, 51:20, 52:14, 73:6
**hell** [1] - 43:13
**help** [1] - 32:24
**helped** [1] - 87:6
**helping** [1] - 55:2
**Henry** [5] - 16:2, 16:15, 16:18, 18:13, 19:13
**hereby** [1] - 98:4
**hereinbefore** [1] - 98:5
**hereof** [1] - 98:6
**hereto** [1] - 98:15
**HHS** [15] - 57:2, 57:4, 57:9, 57:11, 57:17, 58:2, 58:18, 60:5, 60:8, 62:13, 85:1, 85:13, 85:17, 85:23, 89:13
**hi** [4] - 41:2, 41:5, 41:23, 55:6
**hidden** [1] - 34:3
**hiding** [1] - 61:25
**high** [2] - 7:13, 7:15
**High** [1] - 7:16
**highest** [1] - 38:10
**himself** [2] - 70:24, 76:3
**HINDERS** [20] - 2:14, 4:5, 12:22, 12:25, 17:21, 21:16, 21:17, 30:20, 35:23, 36:19, 44:23, 45:2, 48:10, 49:20, 50:9, 50:21, 50:23, 52:7, 52:16, 53:1
**Hinders** [3] - 2:16, 3:3, 57:13
**history** [2] - 55:13, 55:14
**hold** [1] - 40:8
**holding** [2] - 41:16, 45:13
**hollered** [1] - 93:5
**home** [21] - 39:8, 39:10, 46:4, 53:22, 56:1, 56:9, 57:14, 57:19, 59:14, 70:7, 71:24, 77:2, 77:4, 80:24, 80:25, 81:3, 81:4, 81:7, 87:17, 90:1, 90:2
**homes** [1] - 62:6
**honest** [1] - 44:10
**honestly** [1] - 88:22
**Hoover** [1] - 2:11
**horse** [1] - 84:1

**hour** [4] - 9:20, 35:17, 48:24, 48:25
**house** [62] - 26:11, 27:6, 27:8, 27:9, 27:13, 27:16, 27:17, 27:18, 27:24, 28:14, 28:16, 29:3, 33:22, 35:1, 35:2, 35:3, 37:7, 42:5, 42:19, 43:16, 43:18, 44:19, 59:12, 61:3, 61:12, 65:15, 66:3, 70:20, 70:23, 71:3, 71:14, 71:17, 72:3, 72:7, 73:17, 73:18, 73:21, 73:22, 73:24, 74:4, 74:7, 74:9, 78:8, 78:14, 78:22, 82:2, 83:9, 84:15, 87:22, 89:9, 90:10, 90:15, 90:18, 90:20, 90:23, 92:9, 92:17, 92:22, 94:6
**housework** [1] - 89:6
**human** [1] - 68:21
**hydroxyzine** [3] - 23:10, 23:12, 23:14
**hypothetically** [1] - 31:2

## I

**idea** [5] - 31:22, 67:11, 77:22, 77:25, 82:8
**ignore** [1] - 43:15
**ignored** [1] - 43:14
**illegal** [2] - 22:14, 22:23
**immediately** [1] - 60:3
**impetus** [1] - 80:19
**imprisoned** [1] - 8:12
**incarcerated** [3] - 8:10, 8:24, 11:7
**incarceration** [1] - 8:9
**incident** [7] - 13:10, 24:4, 48:23, 49:9, 69:7, 82:22, 83:6
**includes** [1] - 39:18
**including** [1] - 14:18
**INDEX** [1] - 3:1
**indicate** [2] - 5:25, 36:22
**indicated** [3] - 13:11, 26:19, 98:5
**indicating** [9] - 31:13, 31:19, 42:2, 43:23, 53:15, 91:15, 92:6, 92:7, 94:12
**indicating )** [4] - 42:1,

43:24, 53:15, 81:12
**indication** [1] - 79:4
**indications** [1] - 5:13
**indicted** [3] - 19:23, 20:7, 20:12
**indictment** [2] - 20:2, 20:4
**individuals** [2] - 50:5, 70:4
**infant** [2] - 34:2, 61:25
**influence** [2] - 60:2, 82:15
**information** [4] - 25:9, 55:21, 63:25, 68:12
**initial** [1] - 33:21
**initiated** [1] - 89:17
**injury** [2] - 14:19, 14:24
**inside** [7] - 44:19, 71:14, 77:2, 81:4, 81:7, 90:20, 92:20
**intent** [2] - 48:19, 48:20
**interacted** [1] - 88:1
**interaction** [7] - 41:18, 54:24, 60:9, 60:12, 75:19, 76:23, 79:15
**interactions** [5] - 41:17, 52:18, 55:10, 87:4, 87:21
**interested** [1] - 98:15
**interposed** [1] - 98:11
**interrogatories** [1] - 95:2
**interrogatory** [2] - 50:22, 95:11
**Interrogatory** [2] - 95:3, 95:22
**invade** [1] - 49:23
**invasive** [3] - 62:12, 62:14
**investigate** [5] - 31:13, 31:20, 34:8, 37:17, 85:7
**investigated** [6] - 14:4, 14:9, 14:13, 55:25, 57:23, 58:2
**investigation** [4] - 15:17, 16:19, 18:15, 77:11
**invited** [1] - 26:10
**involvement** [1] - 89:13
**involving** [1] - 84:10
**IOWA** [2] - 1:2, 1:9
**Iowa** [28] - 1:16, 1:18, 2:4, 2:8, 2:12, 2:14, 2:17, 4:18, 7:17, 7:21, 7:25, 8:6, 8:21, 9:11, 19:25, 20:7,

20:12, 24:11, 26:22, 32:20, 32:22, 51:7, 52:19, 55:14, 68:1, 89:18, 98:4, 98:17
**Isabelle** [2] - 56:18, 89:20
**ISABELLE** [1] - 56:19
**issue** [1] - 85:24
**issues** [2] - 93:22, 93:24
**items** [1] - 62:2
**itself** [1] - 68:19

## J

**jail** [1] - 26:9
**jails** [3] - 8:11, 8:15, 8:19
**Jefferson** [17] - 2:14, 4:18, 25:6, 25:11, 27:20, 28:1, 33:13, 38:23, 39:1, 39:18, 39:20, 39:23, 40:20, 40:24, 49:2, 68:4, 95:3
**JEFFERSON** [1] - 1:9
**jlewis@hinderslaw. com** [1] - 2:18
**job** [7] - 9:6, 9:14, 60:25, 61:1, 63:2, 88:4, 88:9
**jobs** [1] - 10:1
**jokingly** [1] - 31:2
**JONATHAN** [1] - 2:15
**Josh** [1] - 84:5
**Joshua** [1] - 17:19
**judgment** [1] - 10:23
**jump** [1] - 54:13

## K

**Kayden** [2] - 92:11, 92:15
**keep** [2] - 41:19, 84:3
**keeps** [1] - 25:13
**Kelsey** [43] - 2:9, 32:14, 32:25, 33:2, 33:4, 33:8, 33:11, 33:21, 34:20, 34:24, 37:15, 40:8, 42:21, 42:23, 52:4, 54:18, 55:3, 59:23, 65:4, 66:13, 66:15, 67:10, 68:4, 68:15, 70:12, 70:18, 73:19, 73:22, 73:24, 74:6, 74:8, 74:23, 75:5, 75:16, 78:12, 80:5, 82:23, 89:25, 90:12, 91:19,

92:13, 93:12, 95:20
**KELSEY** [1] - 1:8
**Kelsey's** [2] - 37:7, 83:9
**kept** [1] - 69:12
**Kerr** [1] - 32:12
**key** [2] - 28:24, 29:5
**kids** [2] - 55:2, 83:17
**kind** [14] - 60:17, 62:3, 66:8, 66:22, 75:2, 75:20, 78:23, 82:15, 86:14, 88:5, 89:7, 90:23, 92:24, 93:3
**kindergarten** [1] - 7:10
**kinship** [2] - 17:25, 18:5
**kitchen** [3] - 91:6, 91:9, 94:9
**knocked** [1] - 91:12
**knowledge** [16] - 13:3, 13:25, 14:3, 14:12, 15:1, 19:2, 25:2, 47:15, 62:20, 70:4, 71:11, 75:18, 79:20, 96:3, 96:4, 98:7
**KOENIG** [1] - 1:8
**Koenig** [44] - 2:9, 32:14, 32:17, 33:8, 38:19, 40:9, 40:25, 44:3, 44:8, 44:18, 44:21, 47:24, 49:4, 50:25, 51:5, 51:12, 53:6, 54:18, 54:22, 54:25, 55:5, 55:10, 57:24, 58:13, 58:24, 59:23, 60:19, 61:19, 62:9, 65:4, 67:10, 68:4, 70:25, 72:21, 73:19, 75:16, 76:5, 78:13, 79:14, 80:12, 83:12, 95:7, 95:16, 96:14
**Koenig's** [1] - 35:9
**Kruidenier** [1] - 2:3

## L

**lady** [1] - 54:22
**landing** [1] - 92:3
**lapsed** [1] - 76:19
**large** [2] - 27:25, 94:13
**largest** [1] - 28:4
**last** [15] - 8:8, 8:24, 9:6, 10:10, 16:12, 22:22, 23:2, 30:3, 30:4, 34:12, 35:10, 72:13, 78:20, 82:18,

96:11
**late** [3] - 67:15, 87:9, 91:11
**laughed** [3] - 80:14, 93:3, 93:8
**laughs** [1] - 80:11
**law** [8] - 14:4, 14:11, 24:7, 44:14, 86:15, 87:21, 88:9, 88:13
**Law** [3] - 2:2, 2:7, 2:15
**lawsuit** [6] - 14:17, 24:4, 25:1, 39:25, 40:13, 40:15
**lawyer** [1] - 49:16
**leading** [1] - 31:8
**lease** [1] - 26:25
**leashed** [1] - 42:1
**least** [3] - 15:13, 24:19, 58:23
**leave** [22] - 9:14, 34:6, 34:9, 43:24, 48:5, 48:9, 60:21, 60:25, 63:5, 73:15, 78:25, 79:5, 80:6, 80:7, 80:10, 80:16, 80:20, 80:21, 94:6, 94:20, 95:16, 96:14
**leaves** [3] - 65:4, 67:10, 71:17
**led** [1] - 11:21
**left** [10] - 36:8, 42:14, 49:4, 62:3, 63:5, 63:12, 65:8, 68:15, 77:9, 91:3
**legal** [2] - 37:25, 44:12
**less** [1] - 62:12
**levels** [1] - 30:22
**LEWIS** [1] - 2:15
**lieu** [1] - 18:11
**life** [10] - 6:22, 24:16, 24:20, 24:22, 25:2, 66:5, 66:17, 66:24, 81:21, 87:2
**lift** [1] - 61:24
**lifting** [1] - 81:13
**likely** [3] - 27:18, 27:23, 27:25
**line** [2] - 66:16, 96:11
**lines** [1] - 6:2
**lineup** [1] - 70:12
**list** [1] - 11:15
**listed** [2] - 25:5, 25:7
**live** [8] - 8:4, 24:13, 24:14, 27:5, 28:21, 35:4, 46:12, 92:13
**lived** [13] - 8:1, 8:5, 8:7, 8:16, 8:18, 21:18, 27:6, 27:12, 27:13, 29:2, 45:15, 89:8, 92:10

**living** [12] - 7:19, 24:10, 26:21, 32:18, 54:21, 56:1, 57:18, 88:19, 88:21, 91:3, 92:18, 94:12
**LLP** [1] - 2:3
**locations** [1] - 11:15
**look** [9] - 34:20, 65:21, 73:9, 74:21, 75:12, 75:13, 75:17, 81:1
**looked** [8] - 9:25, 58:18, 61:5, 61:24, 72:7, 72:12, 75:22, 90:23
**looking** [9] - 29:8, 58:16, 58:17, 62:22, 74:21, 75:9, 77:18, 81:8, 81:9
**looks** [1] - 53:19
**lost** [1] - 54:15
**love** [1] - 59:11
**loved** [1] - 89:5
**lung** [1] - 67:4

### M

**ma'am** [1] - 4:6
**magical** [1] - 93:7
**magnitude** [1] - 68:20
**mailbox** [1] - 70:14
**main** [17] - 27:6, 27:12, 27:18, 27:24, 28:14, 29:3, 35:3, 42:5, 42:16, 44:19, 61:3, 65:15, 70:20, 72:3, 73:24, 74:7, 74:9
**male** [1] - 21:21
**man** [1] - 93:25
**March** [2] - 13:22, 66:20
**marijuana** [2] - 22:20, 22:24
**marriage** [1] - 6:25
**married** [1] - 15:6
**matter** [4] - 6:18, 17:3, 18:17, 39:2
**matters** [2] - 88:18, 98:7
**McConnell** [4] - 2:19, 56:22, 79:19, 80:9
**MCCONNELL** [1] - 1:4
**McConnell-Seaba** [1] - 2:19
**McDonald's** [1] - 94:19
**mean** [9] - 18:4, 27:9, 27:16, 74:17, 76:12, 79:10, 80:24, 88:14,

93:21
**meaning** [3] - 7:10, 13:23, 56:8
**means** [3] - 6:3, 12:7, 76:13
**medical** [7] - 11:4, 36:10, 36:11, 36:16, 36:17, 60:1, 86:7
**medication** [2] - 22:15, 23:6
**meeting** [1] - 54:18
**memory** [1] - 72:11
**mental** [1] - 23:7
**mentioned** [5] - 56:25, 57:12, 59:6, 80:22, 93:11
**Messamer** [3] - 3:5, 13:16, 13:20
**MESSAMER** [13] - 2:2, 12:24, 40:3, 40:17, 49:17, 50:6, 50:15, 85:18, 86:12, 94:21, 96:1, 96:8, 97:2
**met** [4] - 26:12, 32:25, 45:3, 87:13
**meth** [2] - 34:3, 87:7
**methamphetamine** [8] - 22:19, 22:23, 29:13, 29:17, 30:2, 30:4, 34:15, 60:2
**mid** [1] - 67:15
**might** [3] - 5:13, 31:22, 36:21
**mine** [1] - 55:7
**minivan** [1] - 59:16
**minute** [3] - 45:11, 51:18, 60:12
**minutes** [2] - 36:7, 77:25
**miracle** [1] - 93:7
**misdemeanor** [1] - 11:8
**misdemeanors** [1] - 11:11
**misheard** [1] - 33:15
**mistakenly** [1] - 37:4
**mobility** [1] - 94:3
**Moines** [4] - 1:18, 2:4, 2:12, 98:17
**moment** [3] - 17:16, 30:16, 73:4
**Montana** [7] - 19:22, 20:3, 20:4, 20:9, 20:13, 89:16, 89:18
**month** [3] - 13:17, 37:17, 59:25
**months** [4] - 8:23, 8:25, 29:12, 36:13
**morning** [11] - 4:6, 33:9, 33:22, 41:8,

65:6, 76:8, 76:16, 76:18, 82:24, 85:5, 90:5
**most** [4] - 90:11, 90:18, 94:8, 94:17
**motive** [1] - 75:6
**MOULDING** [1] - 1:8
**Moulding** [40] - 2:14, 33:12, 37:9, 38:4, 38:19, 39:15, 40:7, 40:9, 40:21, 40:24, 41:6, 42:4, 44:9, 44:19, 44:22, 45:3, 45:16, 46:8, 46:11, 47:9, 47:14, 47:21, 49:3, 50:24, 51:4, 51:12, 52:20, 68:18, 70:19, 71:17, 72:2, 72:21, 75:11, 75:25, 76:2, 81:4, 81:7, 95:2, 95:16, 96:14
**Moulding's** [1] - 54:7
**move** [1] - 62:15
**moved** [4] - 13:22, 27:8, 46:1, 62:18
**MR** [31] - 4:5, 12:22, 12:25, 17:21, 21:13, 21:16, 21:17, 25:17, 30:20, 35:23, 36:19, 44:20, 44:23, 44:24, 45:2, 48:10, 49:20, 50:9, 50:21, 50:23, 52:7, 52:16, 53:1, 53:4, 58:6, 83:10, 86:3, 86:10, 94:24, 96:5, 97:4
**MS** [12] - 12:24, 40:3, 40:17, 49:17, 50:6, 50:15, 85:18, 86:12, 94:21, 96:1, 96:8, 97:2
**multiple** [5] - 7:12, 8:11, 18:20, 32:24, 88:1

### N

**NA** [2] - 23:18, 23:24
**name** [8] - 4:7, 6:20, 7:1, 29:11, 53:5, 55:7, 57:8, 86:25
**named** [5] - 17:14, 37:18, 59:25, 81:19, 98:5
**names** [3] - 6:21, 7:2, 56:16
**nauseous** [1] - 30:23
**need** [16] - 5:10, 12:22, 17:15, 30:15, 51:17, 63:8, 73:3,

85:12, 85:17, 85:25, 86:1, 86:5, 93:13, 93:15, 95:24
**needed** [1] - 34:8
**negate** [1] - 64:21
**negative** [2] - 24:6, 88:12
**neighbor** [2] - 32:23, 55:2
**nephew** [1] - 91:10
**never** [14] - 38:6, 38:9, 38:12, 41:6, 41:10, 69:15, 73:22, 76:5, 76:20, 78:2, 83:16, 88:2, 90:15, 90:16
**new** [1] - 57:5
**next** [6] - 18:14, 54:21, 66:16, 67:14, 68:2, 84:10
**nicknames** [1] - 6:22
**niece** [1] - 66:13
**night** [2] - 86:18, 87:10
**nine** [1] - 36:12
**nobody** [2] - 71:5, 92:17
**non** [2] - 64:18
**non-CINA** [1] - 64:18
**non-DHS/HHS** [1] - 64:18
**none** [1] - 39:20
**nonexistent** [1] - 83:25
**Norwalk** [1] - 2:17
**NOTARY** [1] - 98:22
**Notary** [1] - 1:15
**notes** [1] - 83:11
**nothing** [4] - 23:4, 39:11, 63:9, 97:4
**notified** [2] - 34:25, 61:11
**notion** [1] - 62:4
**November** [19] - 15:15, 18:16, 24:5, 24:9, 29:8, 31:11, 31:17, 32:13, 33:18, 38:2, 50:10, 52:20, 55:10, 58:14, 69:7, 82:5, 82:19, 83:4, 84:20
**Number** [1] - 95:4
**number** [2] - 68:7, 77:24
**numerous** [1] - 15:20

### O

**o'clock** [1] - 70:6
**O-s-b-o-r-n** [1] - 4:10

**oath** [3] - 5:19, 95:12, 98:8
**object** [5] - 40:3, 44:21, 49:18, 50:15, 66:1
**objected** [1] - 73:12
**objection** [6] - 35:20, 65:24, 71:15, 72:19, 72:22, 85:18
**objections** [1] - 98:10
**obligation** [1] - 5:20
**observed** [3] - 59:15, 62:2, 65:22
**obviously** [2] - 91:2, 93:18
**occasionally** [1] - 94:18
**occasions** [1] - 15:20
**occurred** [2] - 11:11, 82:22
**October** [1] - 15:11
**odds** [1] - 71:8
**OF** [4] - 1:2, 1:7, 1:12, 3:1
**off-the-record** [5] - 17:17, 30:17, 51:19, 52:13, 73:5
**offered** [1] - 95:18
**Office** [3] - 2:11, 49:10, 49:13
**office** [1] - 68:8
**officer** [2] - 87:5, 96:20
**officers** [6] - 86:17, 86:21, 95:14, 96:12, 96:17, 96:25
**official** [1] - 39:17
**old** [4] - 21:23, 37:17, 59:25, 67:8
**older** [2] - 84:4, 93:25
**oldest** [6] - 15:22, 19:9, 19:21, 21:3, 21:5, 56:14
**Ombudsman's** [1] - 49:12
**once** [1] - 71:16
**one** [42] - 5:23, 11:1, 11:17, 11:18, 15:22, 17:7, 18:20, 18:21, 19:5, 20:24, 25:5, 26:1, 28:10, 33:3, 44:13, 45:21, 48:12, 50:20, 50:22, 51:21, 54:2, 61:8, 63:20, 70:15, 70:16, 75:12, 78:8, 78:9, 85:1, 86:13, 86:24, 87:1, 87:3, 88:14, 89:19, 89:23, 90:2, 92:10, 94:25, 95:18

open [1] - 42:16
opened [2] - 91:13, 91:19
opening [2] - 53:20, 81:13
opinion [2] - 75:6, 86:15
opportunity [1] - 60:24
opposite [1] - 94:13
order [14] - 16:21, 16:22, 16:25, 17:4, 17:5, 17:6, 18:19, 18:22, 69:22, 69:25, 70:9, 84:9, 87:8, 87:16
ordered [1] - 23:20
Osborn [6] - 4:9, 4:12, 4:18, 6:21, 53:7, 81:18
OSBORN [4] - 1:4, 1:8, 1:12, 4:1
otherwise [3] - 8:16, 47:10, 93:25
outer [1] - 72:17
outside [11] - 19:24, 28:19, 33:1, 46:9, 46:15, 46:16, 46:24, 64:22, 90:13, 92:21, 92:23
own [1] - 12:13
owned [1] - 24:15
owner [1] - 61:15
owners [1] - 24:17
ownership [4] - 25:2, 66:5, 66:9, 66:21

## P

P.L.C [1] - 2:16
p.m [3] - 38:18, 96:12, 97:6
Page [1] - 3:2
pages [1] - 36:19
pandemic [1] - 89:22
panic [1] - 23:13
papers [1] - 84:12
paperwork [1] - 61:22
parent [1] - 64:19
parental [3] - 21:7, 69:2, 69:8
parents' [1] - 64:21
parked [5] - 59:16, 70:13, 70:17, 90:10, 90:13
parking [1] - 42:11
parole [1] - 20:18
Parrish [1] - 2:3
part [5] - 6:15, 9:21,

12:7, 50:1, 61:23
part-time [1] - 9:21
particular [1] - 10:3
parties [2] - 98:13, 98:15
partner [1] - 24:23
partner's [1] - 26:8
party [1] - 15:12
passed [3] - 43:9, 66:20, 93:19
passes [3] - 66:9, 66:19, 66:23
passing [1] - 66:22
passive [1] - 79:21
past [3] - 41:25, 42:2, 42:11
path [1] - 46:20
patterns [1] - 30:23
paved [1] - 46:18
pay [1] - 26:22
pending [3] - 17:3, 87:8, 87:15
people [2] - 25:25, 47:19
Pepsi [1] - 94:18
perceive [1] - 23:15
perfectly [1] - 50:4
period [5] - 8:9, 10:4, 10:10, 82:11, 89:14
periods [1] - 44:25
perjury [1] - 44:11
permanency [5] - 16:25, 17:4, 17:5, 17:6, 18:19
permission [15] - 28:25, 35:1, 35:2, 35:6, 61:14, 61:15, 65:21, 76:13, 77:6, 77:24, 78:2, 78:9, 95:8, 95:14, 96:12
person [8] - 55:20, 64:1, 64:4, 64:7, 72:23, 81:19, 87:15, 87:18
personal [5] - 14:19, 14:24, 23:21, 38:3, 87:20
personally [1] - 46:4
phone [12] - 38:3, 41:9, 52:18, 53:23, 55:20, 61:10, 61:17, 63:21, 64:2, 64:12, 84:19, 85:7
physical [2] - 47:13, 47:16
physically [4] - 45:23, 45:25, 46:5, 47:19
pickups [1] - 59:17
pigs [2] - 83:14, 83:15
Pike [1] - 42:13

pillow [1] - 62:1
pills [1] - 22:19
place [4] - 11:23, 16:21, 66:1, 98:5
placed [4] - 17:12, 19:8, 19:12, 26:2
placement [1] - 17:24
places [4] - 8:16, 9:2, 10:3, 88:15
plaintiff [2] - 14:17, 14:23
Plaintiffs [2] - 1:6, 2:2
plan [1] - 55:23
point [26] - 5:9, 11:24, 23:4, 30:14, 34:20, 42:15, 42:24, 45:9, 54:15, 57:10, 60:7, 71:5, 71:7, 73:19, 73:25, 74:7, 75:22, 77:10, 80:16, 80:18, 83:13, 84:14, 86:6, 87:3, 87:9, 95:18
pointed [1] - 5:9
pointing [1] - 75:1
pole [1] - 45:13
police [3] - 24:7, 95:14, 96:12
Polk [4] - 17:13, 20:22, 21:12, 26:2
porch [4] - 90:8, 92:21, 92:23, 93:6
portion [5] - 25:19, 35:25, 48:13, 51:23, 58:8
position [2] - 9:16, 38:17
positive [2] - 88:12, 88:14
possible [2] - 60:21, 96:23
potentially [1] - 7:11
power [1] - 45:13
Powercom [3] - 67:19, 67:20, 67:25
POWERCOMM [1] - 67:21
practice [1] - 64:15
Prairie [2] - 7:16, 7:20
preexisting [1] - 24:6
prefer [1] - 53:7
pregnancy [1] - 30:13
pregnant [7] - 31:3, 31:8, 34:12, 36:12, 36:24, 82:7, 82:14
prepare [1] - 6:8
prescribed [3] - 22:16, 23:7, 23:11
prescription [1] - 22:15
present [6] - 2:19,

42:4, 43:7, 74:1, 74:4, 74:6
pretty [2] - 82:13, 88:14
previous [5] - 32:16, 36:12, 54:18, 57:13, 60:9
previously [4] - 14:22, 15:5, 29:2, 29:21
primary [2] - 7:8, 7:9
printed [1] - 98:9
prison [1] - 8:14
private [4] - 32:5, 32:7, 64:14, 64:17
privilege [3] - 49:19, 49:24, 50:2
privileged [1] - 50:16
privy [1] - 63:13
Probasco [1] - 87:14
probation [1] - 20:19
problem [2] - 60:18, 60:20
proceed [1] - 55:24
process [4] - 21:2, 63:8, 64:14, 64:24
produced [1] - 54:4
products [1] - 62:2
Professional [2] - 1:15, 98:4
PROFESSIONAL [1] - 98:21
professional [1] - 36:11
Program [1] - 9:9
program [2] - 23:18, 30:8
programs [1] - 23:24
properties [2] - 71:23, 79:12
property [62] - 14:10, 24:13, 24:15, 25:3, 25:5, 26:21, 27:1, 27:5, 28:5, 33:14, 34:3, 34:21, 35:12, 35:21, 37:16, 38:20, 39:19, 39:22, 40:25, 41:13, 45:20, 46:6, 46:8, 46:11, 46:14, 48:5, 51:6, 51:13, 52:19, 60:16, 62:10, 62:23, 63:6, 65:7, 66:4, 66:9, 69:24, 70:5, 71:6, 72:2, 72:20, 73:13, 73:17, 74:19, 77:19, 77:24, 78:19, 79:8, 80:6, 80:7, 80:10, 82:5, 85:12, 85:14, 85:23, 86:18, 88:19, 89:8, 95:15, 95:20, 95:21,

96:13
protection [2] - 59:2, 62:5
Protective [3] - 15:17, 16:19, 29:18
protective [2] - 18:14, 59:4
provide [2] - 56:5, 84:9
provided [2] - 36:18, 52:23
pry [1] - 67:1
Public [1] - 1:15
PUBLIC [1] - 98:22
pulled [5] - 42:11, 59:15, 65:11, 90:14, 93:5
pump [1] - 28:19
put [4] - 4:25, 16:21, 34:23, 63:10

## Q

questions [5] - 53:2, 69:20, 73:10, 85:11, 86:10
quickly [1] - 60:21

## R

ran [1] - 28:17
Rape [1] - 9:9
reach [1] - 72:13
read [8] - 25:18, 25:20, 35:23, 36:1, 48:11, 48:14, 51:24, 58:9
really [9] - 16:12, 35:18, 60:18, 64:15, 66:18, 85:4, 88:22, 94:7, 94:20
reason [9] - 24:1, 39:2, 39:23, 40:18, 50:25, 51:5, 58:24, 84:23, 91:22
reasonable [3] - 51:11, 52:2, 68:21
receive [1] - 10:13
received [5] - 10:15, 31:18, 34:1, 59:23, 86:7
recently [2] - 37:5, 77:1
recess [1] - 52:15
recollection [1] - 50:11
record [17] - 4:8, 4:25, 13:24, 17:17, 25:20, 30:17, 36:1, 41:17,

48:14, 51:19, 51:24, 52:11, 52:13, 52:18, 58:9, 73:5, 98:10
**recorded** [1] - 41:18
**recorder** [1] - 25:7
**recording** [8] - 41:19, 43:19, 52:23, 52:24, 53:10, 53:12, 53:18, 54:8
**recordings** [1] - 53:25
**records** [5] - 25:12, 36:16, 36:17, 36:22, 86:7
**RECROSS** [2] - 94:23, 96:7
**RECROSS-EXAMINATION** [2] - 94:23, 96:7
**reduced** [1] - 98:9
**refer** [3] - 4:12, 4:13, 57:9
**referred** [3] - 27:19, 27:24, 27:25
**referring** [1] - 27:14
**regard** [1] - 78:1
**regarding** [4] - 40:21, 55:21, 57:17, 83:1
**regardless** [2] - 58:21, 85:24
**Registered** [2] - 1:14, 98:4
**REGISTERED** [1] - 98:21
**regular** [6] - 5:14, 5:18, 21:25, 22:3, 22:7, 22:11
**regularly** [3] - 30:8, 30:10, 82:13
**relapse** [1] - 11:25
**related** [4] - 14:14, 17:22, 18:1, 98:12
**relation** [1] - 18:8
**relationship** [1] - 25:15
**relative** [1] - 98:14
**remainderman** [1] - 24:22
**remaindermen** [1] - 24:23
**remained** [1] - 70:25
**remains** [1] - 70:18
**remember** [7] - 15:24, 60:14, 76:24, 86:25, 95:7, 96:15, 96:20
**remembered** [1] - 60:11
**removal** [1] - 19:1
**removed** [3] - 16:20, 16:24, 93:23
**rent** [1] - 26:22

**repeat** [7] - 14:20, 27:11, 31:15, 51:3, 51:21, 54:16, 58:4
**repeatedly** [2] - 48:6, 79:1
**report** [4] - 13:10, 34:1, 57:1, 59:24
**reported** [1] - 58:21
**Reported** [1] - 1:24
**reporter** [6] - 5:3, 25:21, 36:2, 48:15, 51:25, 58:10
**REPORTER** [2] - 98:21, 98:22
**Reporter** [4] - 1:14, 1:15, 98:3, 98:4
**reports** [2] - 57:17, 89:14
**represent** [1] - 53:6
**requested** [5] - 25:19, 35:25, 48:13, 51:23, 58:8
**required** [2] - 30:7, 30:10
**reside** [1] - 19:20
**resided** [1] - 51:7
**residence** [2] - 27:4, 51:2
**respond** [2] - 34:4, 39:4
**response** [4] - 34:7, 40:5, 43:12, 95:11
**responses** [2] - 72:24, 73:2
**responsibilities** [5] - 88:20, 88:24, 89:2, 89:3, 89:4
**rest** [1] - 11:5
**restrained** [1] - 46:6
**restraining** [2] - 87:8, 87:16
**restricted** [1] - 76:11
**retry** [1] - 58:12
**returned** [1] - 96:11
**review** [1] - 72:24
**reviewed** [5] - 6:10, 6:12, 74:16, 76:25, 77:1
**reviewing** [1] - 95:5
**rights** [6] - 21:8, 39:9, 64:21, 69:2, 69:8, 71:23
**rocked** [1] - 46:19
**role** [2] - 59:1, 82:4
**rolled** [2] - 59:20, 59:21
**room** [7] - 53:19, 90:24, 91:3, 91:7, 91:20, 94:13
**Rosonke** [5] - 17:19,

64:5, 64:6, 64:7, 84:2
**Rosonkes** [2] - 19:19, 32:9
**roughly** [1] - 89:14
**RPR** [1] - 1:24
**rules** [1] - 4:23
**rumors** [1] - 37:3
**running** [1] - 42:13
**RV** [2] - 75:12, 75:21
**RVAP** [3] - 9:7, 9:8, 10:6
**RVs** [1] - 75:9
**RYAN** [1] - 2:10
**Ryan** [1] - 53:5
**ryan.sheahan @ag. iowa.gov** [1] - 2:13
**Rylan** [1] - 56:18
**RYLAN** [1] - 56:18

## S

**Sac** [2] - 8:20, 11:18
**safe** [1] - 87:18
**safety** [1] - 55:23
**sake** [1] - 73:9
**Sarah** [4] - 17:19, 64:5, 64:10, 84:2
**sat** [2] - 36:6, 63:10
**saved** [1] - 87:2
**saw** [3] - 37:2, 82:12
**scene** [1] - 59:8
**school** [4] - 7:8, 7:9, 7:13, 7:15
**School** [1] - 7:16
**schools** [1] - 7:12
**Scott** [2] - 87:14, 87:19
**screen** [1] - 42:16
**Seaba** [18] - 2:19, 24:21, 25:16, 26:7, 26:23, 42:6, 42:22, 43:1, 45:4, 65:15, 65:20, 66:19, 66:23, 67:3, 70:20, 73:18, 77:22, 78:7
**SEABA** [2] - 1:4, 1:5
**Seaba's** [2] - 54:10, 61:3
**search** [7] - 14:11, 35:9, 45:10, 71:18, 71:19, 71:20, 90:22
**searched** [5] - 87:24, 89:25, 90:6, 90:7, 92:21
**searches** [1] - 90:2
**seat** [3] - 68:24, 69:12, 69:15
**Second** [1] - 2:11

**second** [10] - 52:12, 68:14, 69:20, 69:23, 70:5, 70:12, 76:21, 81:5, 95:9
**seconds** [2] - 45:18, 53:13
**see** [9] - 36:20, 46:3, 46:4, 48:12, 53:11, 61:25, 62:22, 62:25, 84:14
**seeing** [1] - 39:13
**seeking** [2] - 40:6, 40:8
**sees** [1] - 83:14
**send** [1] - 50:21
**sense** [1] - 20:10
**September** [9] - 7:5, 29:22, 29:24, 30:1, 31:8, 33:9, 33:16, 36:13, 89:17
**serious** [2] - 29:17, 37:19
**served** [1] - 84:13
**serves** [1] - 72:11
**Services** [3] - 15:17, 16:19, 29:19
**set** [1] - 92:2
**several** [3] - 11:7, 28:7, 57:17
**sexual** [5] - 9:17, 9:19, 88:4, 88:7, 88:8
**share** [2] - 56:22, 61:8
**SHEAHAN** [12] - 2:10, 25:17, 44:20, 44:24, 53:4, 58:6, 83:10, 86:3, 86:10, 94:24, 96:5, 97:4
**Sheahan** [2] - 3:4, 53:6
**shed** [3] - 75:9, 75:13, 75:22
**sheet** [2] - 53:20, 98:6
**sheriff's** [3] - 70:15, 72:16, 72:20
**shining** [1] - 81:11
**shock** [1] - 49:7
**short** [4] - 11:14, 21:7, 45:6, 60:17
**short-circuit** [1] - 60:17
**shorthand** [1] - 98:9
**Shorthand** [2] - 1:14, 98:3
**SHORTHAND** [1] - 98:21
**shortly** [4] - 67:16, 70:7, 89:21
**shots** [1] - 75:2
**show** [4] - 36:11, 69:25, 95:1, 96:24

**showed** [7] - 55:3, 59:7, 61:21, 65:5, 70:4, 84:12, 87:14
**showing** [1] - 53:20
**shows** [2] - 58:13, 70:10
**shut** [2] - 9:15, 91:17
**sic** [4] - 10:9, 33:9, 61:11, 95:7
**sick** [1] - 67:5
**sic}** [1] - 67:21
**side** [1] - 70:15
**sidewalk** [3] - 46:16, 46:17, 46:18
**signed** [1] - 26:25
**single** [1] - 72:22
**sister** [3] - 24:24, 26:9, 66:7
**sit** [3] - 73:11, 89:10, 94:16
**six** [1] - 56:20
**sixteen** [1] - 21:24
**slapped** [1] - 13:11
**sleep** [1] - 30:23
**sleeping** [1] - 91:10
**slow** [1] - 54:15
**small** [3] - 14:18, 14:23, 24:14
**smaller** [1] - 28:7
**smoke** [1] - 94:17
**someone** [8] - 37:2, 38:17, 45:14, 53:21, 54:22, 63:11, 64:19, 74:20
**sometime** [2] - 50:10, 67:14
**son** [1] - 19:9
**sorry** [10] - 8:5, 16:23, 24:22, 26:13, 26:17, 26:19, 27:11, 27:21, 31:16, 58:4
**sort** [3] - 47:13, 76:23, 77:23
**sought** [1] - 13:16
**sound** [1] - 13:12
**sounds** [1] - 5:13
**SOUTHERN** [1] - 1:2
**space** [1] - 92:9
**speakerphone** [3] - 34:23, 36:7, 63:11
**speaking** [4] - 33:11, 53:9, 87:1, 88:11
**specific** [3] - 88:24, 96:16, 96:21
**specifically** [2] - 34:15, 95:3
**speculation** [1] - 85:19
**speed** [1] - 21:14
**spell** [1] - 4:7

spend [4] - 8:24, 44:19, 89:11, 94:8
SSI [2] - 10:15, 10:16
staircase [1] - 42:15
stairs [5] - 42:18, 91:5, 91:8, 92:1, 92:5
stamps [1] - 10:18
stand [1] - 46:15
standard [1] - 44:12
standing [4] - 43:22, 46:9, 53:14, 79:17
start [2] - 56:13, 73:20
started [1] - 19:1
starting [1] - 26:10
State [5] - 1:16, 2:11, 19:25, 49:12, 98:3
state [2] - 4:7, 49:20
statement [3] - 47:8, 47:12, 47:20
statements [2] - 48:4, 48:8
STATES [1] - 1:1
stating [1] - 38:12
stay [4] - 26:11, 45:4, 47:22, 54:14
stayed [5] - 43:16, 43:18, 80:15, 91:1, 92:11
staying [1] - 28:18
stays [1] - 92:11
step [1] - 94:11
steps [1] - 42:13
still [10] - 17:3, 20:24, 23:24, 29:23, 42:19, 49:7, 59:18, 67:23, 69:16, 77:18
stole [1] - 84:2
stomping [1] - 81:1
stood [1] - 46:24
stop [5] - 42:3, 45:11, 45:12, 54:16, 83:9
store [1] - 87:14
street [1] - 71:9
Street [3] - 2:12, 7:25, 24:10
strengths [1] - 88:17
stretch [1] - 47:1
strike [2] - 31:6, 47:9
structure [11] - 27:19, 27:23, 27:25, 28:4, 28:25, 29:5, 35:4, 45:14, 47:22, 66:5, 66:22
structures [2] - 28:8, 28:13
subject [4] - 14:11, 15:16, 18:15, 39:25
submitted [1] - 6:15
substance [2] - 22:23,

23:17
sue [2] - 40:6, 47:11
sued [7] - 39:1, 39:2, 39:5, 39:17, 39:24, 40:5, 40:15
suing [2] - 40:19
summation [1] - 55:8
Sunset [1] - 2:17
supervision [1] - 98:9
supported [1] - 82:16
Supreme [2] - 21:2, 21:9
suspicion [2] - 31:24, 63:22
Sweeney [3] - 1:13, 1:24, 98:3
switch [1] - 81:18
sworn [2] - 4:3, 98:6

**T**

table [1] - 94:9
team [1] - 61:13
technically [1] - 61:15
teenage [1] - 91:15
ten [8] - 8:8, 8:24, 8:25, 16:3, 16:5, 22:25, 30:3, 30:4
tenant [1] - 24:23
term [1] - 27:12
termed [1] - 18:6
terminated [2] - 69:2, 69:8
termination [3] - 17:9, 18:11, 21:7
terms [12] - 55:18, 61:1, 62:9, 66:21, 68:11, 70:9, 72:1, 88:19, 88:23, 89:6, 89:24, 93:17
terrible [1] - 58:11
test [1] - 30:13
testified [2] - 4:3, 44:9
testifies [1] - 44:8
testify [1] - 98:6
testimony [3] - 59:7, 80:22, 98:10
tests [2] - 30:8, 36:10
texts [2] - 31:12, 31:18
th [1] - 91:3
THE [2] - 1:12, 86:9
theft [7] - 11:19, 11:21, 12:5, 12:7, 12:20, 20:16, 20:19
thereabouts [1] - 23:3
thereupon [1] - 98:8
they've [1] - 75:20
third [1] - 21:18
thirty [1] - 45:18

threaten [1] - 47:19
threats [1] - 47:16
three [5] - 11:16, 19:4, 24:17, 26:14, 56:15
threshold [1] - 45:12
threw [1] - 13:11
throughout [1] - 63:7
tie [1] - 42:13
TIM [1] - 1:4
Tim [27] - 24:24, 27:7, 27:14, 28:18, 28:22, 28:23, 29:1, 34:23, 35:4, 45:15, 46:12, 47:22, 49:5, 61:8, 61:10, 61:17, 66:6, 66:12, 66:14, 66:16, 67:16, 67:18, 69:24, 70:7, 75:24, 79:9, 83:16
Tim's [3] - 27:17, 66:13, 84:10
timeline [1] - 89:25
Timothy [1] - 2:19
title [1] - 88:5
today [13] - 4:11, 4:23, 5:21, 6:8, 36:20, 36:23, 38:12, 52:9, 65:2, 69:16, 73:11, 80:23, 86:8
together [3] - 26:9, 27:8, 56:23
took [1] - 72:11
total [2] - 8:2, 95:20
touch [2] - 46:3, 81:2
touching [2] - 47:13, 98:7
towards [2] - 71:9, 79:3
TPR [12] - 20:25, 21:6, 21:11, 21:14, 21:15, 32:3, 32:5, 61:21, 63:24, 64:14, 64:17
trainer [1] - 84:1
transferred [1] - 89:18
treat [1] - 39:12
treating [1] - 80:25
treatment [1] - 30:11
tree [1] - 42:14
tried [1] - 32:24
trigger [1] - 66:18
true [5] - 43:2, 43:3, 43:9, 58:22, 98:10
truth [2] - 5:21, 98:6
try [1] - 5:3
trying [5] - 21:4, 50:17, 70:2, 78:11, 84:3
tummy [1] - 93:22
turn [1] - 86:13
turned [3] - 42:12,

53:10, 87:6
TV [3] - 94:10, 94:12, 94:13
twelfth [1] - 7:10
two [16] - 19:6, 19:8, 19:12, 20:21, 29:12, 37:17, 39:19, 39:20, 39:24, 44:25, 53:24, 59:17, 59:25, 63:5, 63:19, 68:7
two-month-old [2] - 37:17, 59:25

**U**

unable [1] - 56:5
unclear [2] - 48:21, 56:12
under [10] - 5:19, 5:20, 27:7, 60:1, 61:25, 77:11, 82:15, 95:12, 98:8, 98:9
understood [1] - 58:24
UNITED [1] - 1:1
unlawful [1] - 45:10
unlike [1] - 5:18
unpaid [1] - 11:4
unusual [1] - 30:24
up [29] - 21:14, 31:8, 41:16, 41:25, 42:12, 42:14, 42:18, 53:20, 55:3, 56:21, 58:13, 59:7, 61:24, 65:5, 69:25, 70:4, 70:10, 70:19, 70:22, 81:10, 81:14, 86:14, 89:10, 90:14, 91:5, 91:11, 92:1, 93:5, 96:9
Updegraff [1] - 2:16
upset [1] - 37:21
upstairs [7] - 90:17, 91:6, 91:23, 91:24, 91:25, 92:18
utilities [2] - 28:12, 28:15

**V**

Valley [2] - 7:16, 7:20
van [3] - 36:6, 63:10, 90:9
vehicle [8] - 68:25, 69:12, 69:18, 70:11, 70:19, 70:23, 70:25, 83:14
vehicles [2] - 71:9, 79:4
verbally [1] - 79:18

verification [1] - 95:13
version [1] - 21:7
versus [2] - 4:18, 62:10
via [1] - 55:20
Victim [1] - 9:9
video [7] - 43:19, 54:4, 59:18, 59:19, 81:6, 81:16, 87:1
videos [2] - 41:15, 41:16
violate [1] - 39:8
violated [1] - 45:10
violating [2] - 71:22, 80:25
violence [1] - 88:4
visit [18] - 36:4, 37:7, 57:25, 58:14, 58:23, 60:17, 60:19, 67:11, 68:2, 68:14, 69:21, 69:23, 70:5, 78:20, 81:5, 83:12, 93:12, 95:9
visited [2] - 8:18, 62:6
visiting [1] - 54:22
visits [2] - 57:14, 62:10
Vista [1] - 7:7
vocal [1] - 73:14
voice [2] - 54:8, 54:11
voluntarily [1] - 35:6
vs [1] - 1:7

**W**

wait [1] - 69:22
wake [1] - 91:16
walk [6] - 74:19, 75:11, 78:19, 78:21, 91:2, 94:11
walked [4] - 70:22, 70:23, 75:21, 91:17
walker [1] - 94:1
walking [4] - 71:5, 73:16, 73:20, 75:8
walks [2] - 70:19, 75:10
Walmart [2] - 87:9, 87:12
Walnut [1] - 2:12
warrant [5] - 47:4, 72:23, 77:5, 79:11, 96:19
Washington [27] - 8:22, 12:15, 32:18, 32:20, 32:22, 33:13, 38:23, 39:3, 39:6, 39:7, 39:21, 40:1, 40:11, 40:16, 40:19,

40:24, 49:3, 54:21,
 59:13, 68:1, 68:5,
 70:15, 86:23, 87:7,
 87:12, 87:25, 94:19
**watch** [3] - 41:15,
 74:12, 81:16
**watched** [1] - 74:13
**water** [3] - 28:15,
 28:17, 28:20
**website** [3] - 25:6,
 27:20, 28:2
**Webster** [1] - 13:5
**Wegman** [3] - 6:25,
 15:6, 21:19
**WEGMAN** [1] - 6:25
**welcome** [1] - 4:16
**white** [2] - 59:15,
 59:17
**White** [8] - 81:19,
 81:21, 81:22, 81:23,
 82:18, 82:21, 83:3,
 84:6
**white's** [1] - 82:4
**whole** [3] - 35:22,
 91:1, 94:20
**wife** [2] - 66:14, 66:15
**window** [3] - 59:20,
 72:13
**WITNESS** [1] - 86:9
**witness** [6] - 4:2,
 26:19, 82:6, 95:6,
 98:5, 98:8
**witness's** [1] - 98:6
**Wonder** [1] - 2:7
**words** [1] - 41:2
**worker** [3] - 55:19,
 59:2, 59:4
**workers** [3] - 57:14,
 62:6, 62:11
**works** [1] - 81:25
**worse** [2] - 93:18,
 93:19
**worth** [1] - 39:13
**wrote** [1] - 12:13

## Y

**year** [7] - 7:22, 18:25,
 27:7, 31:5, 34:12,
 36:9, 82:12
**years** [15] - 8:2, 8:3,
 8:8, 8:24, 16:3, 16:5,
 16:13, 22:25, 30:3,
 30:5, 33:5, 60:10,
 60:12, 88:1, 93:24
**yell** [1] - 77:9
**youngest** [5] - 19:11,
 19:14, 21:1, 26:5,
 92:11



## JEFFERSON COUNTY ASSESSOR

Assessor Hub provided by
Vanguard Appraisals, Inc

**Parcel Number:**
04-02-400-008

**Land Holder:**
A,GORDON LIFE EST

**Contract Buyer:**

**Property Address:**
3251 110TH ST
BRIGHTON MAP THIS ADDRESS

**Class:**
RESIDENTIAL

**Map Area:**
WALNUT-R

**Legal Description:**
W PT SW SE 2 73 8

**Property Report:**
PROPERTY REPORT (PDF FILE)



**EXHIBIT**
**I**
3·4·26
PENGAD 800-631-6989



Pin 04-02-400-008 Photo

   

### Current value as of January 01, 2025- Taxes payable September 2026 and March 2027

| Land Value | Dwelling Value | Improvement Value | Total Value |
|---|---|---|---|
| $37,000 | $112,200 | $0 | $149,200 |

### Land Information

| Lot Type | Square Feet | Acres |
|---|---|---|
| Site and Excess | 115,434 | 2.650 |

### Residential Building Information

| Occupancy | Style | Year Built | Total Living Area |
|---|---|---|---|
| ▼ Single-Family / Owner Occupied | 1 Story Frame | 1917 | 1,861 |

### Yard Extra Information

| Description | Item Count | Year Built |
|---|---|---|
| ▼ Canopy | 1 | 1999 |
| DECK | 1 | 1994 |
| Shed | 1 | 1990 |
| ▼ Shed | 1 | 1990 |
| ▼ Shed | 1 | 1990 |
| ▼ Shed | 1 | 2000 |
| ▼ Shed | 1 | 2000 |
| ▼ Shed | 1 | 2016 |

**App. 153**

Sale Information

| Sale Date | Amount | Non-Useable Transaction Code | Recording |
|---|---|---|---|
| ▲ 06/14/2006 | $0 | 1 - Quit Claim Deed | 2006-1377 |

**Sales Detail**

| | |
|---|---|
| Buyer: | SEABA GORDON LIFE ESTATE/MASIKER ARON/SEABA TIMOTHY/SEABA ASHLEY |
| Seller: | HORTON CONNIE M |
| Sale Date: | 06/14/2006 |
| Sale Amount: | $0 |
| Sales Type: | Quit Claim Deed |
| NUT Code: | 1 - Quit Claim Deed |
| Recording: | 2006-1377 |
| Remarks: | FAMILY |
| Additional Information: | Click Here |

| Sale Date | Amount | Non-Useable Transaction Code | Recording |
|---|---|---|---|
| ▼ 07/18/2001 | $0 | 17 - Sale between family members or related parties | 222-691 |
| ▼ 05/06/1994 | $0 | 50 - Other with explaination | 207-040 |
| ▼ 04/21/1988 | $32,000 | 0 - Normal | 185-232 |
| ▼ 04/21/1988 | $0 | 38 - No consideration | 185-235 |

**App. 154**