**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| GAIL OSBORN, TIM MCCONNELL SEABA, AND GORDON SEABA, <br><br> Plaintiffs, <br><br> vs. <br><br> CHAUNCEY MOULDING, KELSEY KOENIG, AND JEFFERSON COUNTY IOWA, <br><br> Defendants. | Case No.: 4:25-cv-183 -SHL-SBJ <br><br><br> **BRIEF OF DEFENDANTS CHAUNCEY MOULDING AND JEFFERSON COUNTY IOWA IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT** <br> **(ORAL ARGUMENT REQUESTED)** |

**TABLE OF CONTENTS**

I. FACTUAL BACKGROUND ........................................................................ 3

II. THE LEGAL STANDARD FOR SUMMARY JUDGMENT ........................ 6

III. ARGUMENT .................................................................................................. 7

   A. Introduction ................................................................................................. 7

   B. Count 1 – 42 U.S.C. § 1983 Action for Violation of the Fourth Amendment Right to be Free from Unreasonable Searches ................................................. 8

   1. Jefferson County Law Enforcement Searched with the Consent of All Plaintiffs .... 9

   2. Defendant Moulding's Search of the Property ........................................... 11

      a. Moulding Searched the Premises with the Consent of the Life Tenant .... 11

      b. Plaintiffs Had No Readily Apparent Privacy Interest in their alleged "Tiny Home" .................................................................................................. 15

      c. Moulding Relied on the Apparent Authority of the Life Tenant ........... 17

1

d. Moulding's Warrantless Search Relied on an Exigency to Render Emergency Aid ........................................................................22

3. The Defendants are Entitled to Qualified Immunity ...................25

C. Count 2 – Trespass ....................................................................29

D. Count 3 – Invasion of Privacy .....................................................32

E. Count 4 – Respondeat Superior ....................................................33

1. Plaintiffs' 42 U.S.C. § 1983 Claim Against Jefferson County Fails as a Matter of Law………………………………………………………….33

a. Individual Capacity…………………………………………………...33

b. Official Capacity …………………………………………………34

2. Jefferson County Cannot be Held Liable for Plaintiffs' State-law Claims Because Moulding is Entitled to Qualified Immunity…………………………………...37

IV. CONCLUSION ........................................................................38

COME NOW the Defendants, Chauncey Moulding and Jefferson County, Iowa, and submit their brief in support of their Motion for Summary Judgment. In support thereof they state the following:

## I. FACTUAL BACKGROUND

On November 15, 2024, the Iowa Department of Health and Human Services ("HHS") received an anonymous complaint alleging that Plaintiff Gail Osborn had given birth to a daughter, Charlotte McConnell, two months prior and was using methamphetamine while caring for that child. ECF 1, ¶ 14, App. JEFFERSON COUNTY IOWA ("JCI") 002. HHS Child Protective Worker Kelsey Koenig was assigned to complete an assessment. ECF 1, ¶ 16, App. JCI 003. At approximately 10:15 am on November 15, 2024, Defendant Kelsey Koenig traveled to Plaintiff Gordon Seaba's property, on which Plaintiffs Timothy McConnell Seaba and Gail Osborn resided. ECF 1, ¶ 17, App. JCI 003.

Upon arrival, Koenig spoke with Gail Osborn regarding the allegations contained in the anonymous complaint. ECF 1, ¶ 18, App. JCI 003. Gail Osborn denied both being under the influence of any illegal substances and having an infant child. ECF 1, ¶ 19, App. JCI 003. Gail Osborn contacted Timothy McConnell Seaba, who also spoke with Koenig. ECF 1, ¶ 21, App. JCI 003. Timothy McConnell Seaba in turn denied that Ms. Osborn had recently given birth and similarly denied that either of them had been using illegal substances. ECF 1, ¶ 22, App. JCI 003.

Gail Osborn then allowed Koenig to inspect her alleged "tiny home" at the back of the property. ECF 1, ¶ 23, App. JCI 003. Koenig's assessment in Osborn's alleged "tiny home" was limited to a bedroom, a shower, and a gun above the bed. Koenig Dep. 22:19-22, App. JCI 048. Koenig felt very uncomfortable and wanted to leave. Koenig Dep. 23:14-22, App. JCI 048.

Gail Osborn also went with Koenig to the main home on the property in which Plaintiff Gordon Seaba then resided.[1] ECF 1, ¶ 28, App. JCI 004. Gordon Seaba agreed to allow Defendant Koenig to inspect his home. ECF 1, ¶ 29, App. JCI 004. Osborn rushed Koenig through Gordon Seaba's house. Koenig Dep. 28:21-31:9, App. JCI 049-050. Throughout the inspection, Koenig felt uneasy and uncomfortable interacting with Osborn. Koenig Dep. 22:19-23:22, App. JCI 048. From Koenig's interactions with Osborn, Koenig felt that she should not conduct this investigation alone. Koenig Dep. 23:17-22, App. JCI 048. Koenig left the property after inspecting both Osborn and Timothy McConnell Seaba's alleged home at the back of the property, along with Gordon Seaba's home. ECF 1, ¶ 31, App. JCI 004.

After leaving from her morning visit, Koenig further reviewed the anonymous complaint alongside Osborn's validated history of HHS complaints. Koenig Dep. 45:22-47:16, App. JCI 051. In Koenig's review, she found that one of Osborn's children had previously tested positive for methamphetamine at birth, that Osborn had falsely reported that her child had epilepsy, three of Osborn's children had been removed from her custody, that Osborn had taken one of her children to Gordon Seaba's house when she was not supposed to have custody of the child and that law enforcement had to take the child back, and that Osborn had been living in her car with eight cats and her child, whose teeth were rotted. *Id.* Around 3:23 pm on November 15, 2024, Koenig spoke to Defendant Chauncey Moulding, and both decided to return to the Gordon Seaba's property with law enforcement to ensure there was not an emergency for the care of an infant child. ECF 1, ¶ 43, App. JCI 005.

At approximately 4:00 pm, Moulding and Koenig arrived at Gordon Seaba's property. ECF 1, ¶ 44, App. JCI 005. Moulding and Koenig were accompanied by Assistant Jefferson County

---

[1] Plaintiff Gordon Seaba passed away in the pendency of this suit on March 6, 2026.

4

Attorney Elizabeth Estey, Jefferson County Sheriff's Deputy Brian Burnett, Jefferson County Sheriff's Deputy Mark Miller, and two Sheriff's Deputies from Washington County, Iowa. ECF 1, ¶ 45, App. JCI 005. The Defendants did not possess a warrant to search the property. ECF 1, ¶ 46, App. JCI 005.

Upon arriving, Moulding proceeded up the driveway of the property to Gordon Seaba's house. ECF 1, ¶ 49, App. JCI 006. Estey and the deputies from Jefferson and Washington Counties remained parked on the road next to the bottom of the driveway. ECF 1, ¶ 51, App. JCI 006.

Moulding and Koenig inspected Gordon Seaba's house for the emergency aid of an infant child. ECF 1, ¶ 58, App. JCI 006. During this time, Timothy McConnell Seaba spoke to law enforcement officers at the bottom of the driveway. ECF 1, ¶ 59, App. JCI 006.

Moulding telephoned Deputy Miller and informed him of the consent granted by Gordon Seaba for the search of his property. ECF 1, ¶ 61, App. JCI 007. Based on the consent granted by Gordon Seaba, law enforcement from both counties entered Gordon Seaba's property. ECF 1, ¶ 62, App. JCI 007. Both Gail Osborn and Timothy McConnell Seaba expressly granted permission for law enforcement to enter and remain on the property. Pl. Osborn Ans. Ints. at 8, App. JCI 022; Pl. McConnell Seaba Ans. Ints. at 8, App. JCI 015. Defendants conducted a search of outbuildings and recreational vehicles present on the premises. ECF 1, ¶ 63, App. JCI 007. Moulding and Koenig participated in the search of Gordon Seaba's property. *Id.*

Moulding approached an outbuilding at the rear of the property in which Gail Osborn and Timonthy McConnell Seaba lived. This outbuilding is recognized and assessed as a "Shed" by the Jefferson County assessor. App. JCI 016-018. Gail Osborn told Moulding that he did not have permission to enter without a warrant. ECF 1, ¶ 66, App. JCI 007. Moulding proceeded to enter this shed. ECF 1, ¶ 68, App. JCI 007. Moulding stepped into the shed, briefly scanned its contents,

and walked out. Moulding Dep. 84:18-25, App. JCI 074. Defendants found no evidence indicating an infant child resided on the property. ECF 1, ¶ 74, App. JCI 008.

All involved proceeded to the driveway of Gordon Seaba's property. Osborn Dep. 78:19-79:1, App. JCI 043. Osborn and Timothy McConnell Seaba told Defendants to leave the property when they were all on the driveway but continued to engage all involved in conversation. *See* Osborn Dep. 79:2-9, App. JCI 043.

## II. SUMMARY JUDGMENT STANDARDS

The standards of summary judgment under F.R.C.P. 56(c) in the federal courts mandate dismissal in a situation where the moving party shows: (1) there are no genuine issues of material fact; and (2) the party is entitled to judgment as a matter of law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). The mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment because the requirement is that there be no genuine issue of material fact. *Id.* The substantive law will identify those disputes that will be considered "material" under the standard. *Id.* Factual disputes that are irrelevant or unnecessary will not be considered material. *Anderson*, 477 U.S. at 248. A dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party. *Id.* A party opposing a motion for summary judgment "may not rest upon the mere allegations or denials in his pleadings, but . . . must set forth specific facts showing that there is a genuine issue for trial." *Id.* (quoting *First Nat'l Bank of Ariz. v. Cities Serv. Co.,* 391 U.S. 253 (1968)).

## III.  ARGUMENT

### A.    Introduction

Plaintiffs' Complaint includes three claims against Defendant Chauncey Moulding and one claim against Defendant Jefferson County, Iowa. First, Plaintiffs have brought a claim against Defendant Moulding alleging a civil rights violation under 42 U.S.C. § 1983. Moulding prevails and is entitled to judgment as a matter of law regarding this claim because (1) Moulding received consent from the property owner, Plaintiff Gordon Seaba; (2) Plaintiffs Gail Osborn and Timothy McConnell Seaba had no readily apparent privacy interest in the alleged "tiny home;" (3) Moulding reasonably believed and relied on Gordon Seaba's actual authority and apparent aurhtority to consent to the search; (4) Moulding reasonably relied on an exigent circumstance to render emergency aid to a child; and (5) Moulding is entitled to qualified immunity from Plaintiffs' claim.

Second, Plaintiffs have brought a claim against Moulding for trespass. Moulding is entitled to judgment as a matter of law regarding Plaintiffs' trespass claim because Moulding received the express consent from the property owner, Plaintiff Gordon Seaba to be on the property and to search it. Next, Plaintiffs have brought a claim against Moulding for invasion of privacy. Moulding is also entitled to judgment as a matter of law regarding Plaintiffs' invasion of privacy claim because he received the express consent from the property owner, Plaintiff Gordon Seaba. Finally, Plaintiffs have brought a claim against Defendant Jefferson County, Iowa for respondeat superior. Jefferson County is entitled to judgment as a matter of law regarding Plaintiffs' respondeat superior claim. Jefferson County did not have an official municipal policy, an unofficial custom, or a deliberately indifferent failure to train or supervise that resulted in Plaintiffs' alleged § 1983 violation. Further, Jefferson County cannot be held liable for Defendant Moulding's conduct for

any of the Plaintiffs' state-law claims because Moulding is entitled to qualified immunity, and, as a result, Jefferson County cannot be held liable pursuant to Iowa Code 670.4A(2). Accordingly, Defendants Moulding and Jefferson County are entitled to judgment as a matter of law for each of Plaintiffs' claims.

**B.**      **Count 1 – 42 U.S.C. § 1983 Action for Violation of the Fourth Amendment Right to be Free from Unreasonable Searches**

Plaintiffs' cause of action for civil rights violation under 42 U.S.C. § 1983 for violation of the Fourth Amendment to the United States Constitution's right to be free from unreasonable searches is predicated upon the allegation that "Defendants violated Plaintiff's clearly established federal constitutional rights by entering and searching their property without probable cause, reasonable suspicion, an exigency, or any other exception allowing them to do so." ECF 1, ¶ 79, App. JCI 008. This allegation stands only so long as the alleged search of Plaintiffs' property indeed occurred without an exigency, without a warrant exception, or was otherwise free from circumstances qualifying such a search as "reasonable."

"The Fourth Amendment prohibits the government from conducting unreasonable searches and seizures." U.S. Const. amend. IV. "It provides, in pertinent part: "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated . . . ." *Id.* "The Supreme Court has interpreted the Fourth Amendment as proscribing unreasonable searches that intrude upon a person's reasonable expectation of privacy." *Bond v. United States*, 529 U.S. 334, 338–39 (2000); *see United States v. Jones*, 565 U.S. 400, 406 (2012); *see also United States v. DE L'Isle*, 825 F.3d 426, 431 (8th Cir. 2016). As such, "the ultimate touchstone of the Fourth Amendment is 'reasonableness.'" *Riley v. California*, 573 U.S. 373, 381 (2014) (quoting *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). While "[i]t is clear

that a physical intrusion or trespass by a government official constitutes a search within the meaning of the Fourth Amendment," "[a] search is reasonable if [an] officer has a valid search warrant or if the search fits within a specific warrant exception." *Id.*

Still, "a violation [can also] occur[ ] when government officers violate a person's 'reasonable expectation of privacy.'" *Id.* at 950 (quoting *Katz v. United States*, 389 U.S. 347, 360 (1967)). For this violation, "the claimant must show both 'an actual (subjective) expectation of privacy, and . . . that the expectation [is] one that society is prepared to recognize as "reasonable."'" *Katz*, 389 U.S. at 361. Yet, "[o]fficial conduct that does not 'compromise any legitimate interest in privacy' is not a search subject to the Fourth Amendment." *Illinois v. Caballes*, 543 U.S. 405, 408 (2005) (quoting *United States v. Jacobsen*, 466 U.S. 109, 123 (1984)).

Defendants' search of Plaintiff's property should at all points be regarded as reasonable under the law, there are no remaining genuine issues of material fact under the law, and the Defendants are entitled to judgment as a matter of law.

### 1. Jefferson County Law Enforcement Searched with the Consent of All Plaintiffs

As a threshold matter, even though Plaintiffs' cause of action for civil rights violation under 42 U.S.C. § 1983 is brought solely against Defendants Moulding and Koenig individually, it should be noted that Jefferson County law enforcement—Deputies Burnett and Miller—searched the property with the valid consent of all Plaintiffs. A valid, consensual search extending to Jefferson County law enforcement stands as an undisputed material fact which frames the cause of action brought against Defendant Moulding individually.

Here, the law is clear that a consensual search is a reasonable search. "A consensual search is consistent with the Fourth Amendment because it is 'reasonable for the police to conduct a

search once they have been permitted to do so.'" *United States v. Garcia-Garcia*, 957 F.3d 887, 891–92 (8th Cir. 2020) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Thus, a "warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search." *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004). "The issue turns not on the defendant's subjective state of mind, but on whether the officer reasonably believed the defendant consented." *United States v. Espinoza*, 885 F.3d 516, 523 (8th Cir. 2018). Therefore, "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness." *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005) (quoting *Jimeno*, 500 U.S. at 251). "[W]hether or not the suspect has actually consented to a search, the Fourth Amendment requires only that the police reasonably believe the search to be consensual." *United States v. Sanchez*, 156 F.3d 875, 878 (8th Cir. 1998).

Both Plaintiff Gail Osborn and Plaintiff Timothy McConnell Seaba actually consented to a search of the property by Jefferson County law enforcement. Gail Osborn recited in her interrogatories, "When Defendants returned at 4:00 PM, I gave the police officers present permission to be on my property, but I asked Defendants Moulding and Koenig to leave." Pl. Osborn Ans. Ints. at 8, App. JCI 022. Gail Osborn affirmed the accuracy of this answer in her deposition. Osborn Dep. 95:18-96:4, App. JCI 046. Timothy McConnell Seaba recited in his interrogatories, "When the Defendants searched my property in the afternoon/evening of November 15th, I gave consent to the sheriff's deputies to be on my property. I expressly asked Defendants Moulding and Koenig to leave the property." Pl. McConnell Seaba Ans. Ints. at 8, App. JCI 015.

While Plaintiffs here do not bring a cause of action against a search by Jefferson County law enforcement, these undisputed, material facts inform and should weigh upon a determination of the consensual search granted to Moulding individually.

### 2. Defendant Moulding's Search of the Property

Plaintiffs bring a cause of action against for civil rights violation under 42 U.S.C. § 1983 against Defendants Moulding and Koenig, individually. Concerning this cause of action, there are no genuine issues of material fact, and Moulding is entitled to judgment as a matter of law. Moulding searched the premises with the consent of the life tenant/property owner Gordon Seaba. The Plaintiffs had no readily apparent privacy interest in their alleged "tiny home" shed. Moulding relied on both the actual and apparent authority of the life tenant. In the alternative, Moulding's warrantless search relied on an exigency to render emergency aid to a newborn. The summation of the above entitles Moulding and Jefferson County, Iowa, to qualified immunity and judgment as a matter of law.

### a. Moulding Searched the Premises with the Consent of the Life Tenant

Defendant Moulding's alleged search of the property is reasonable because he searched with the valid consent granted by the life tenant, Gordon Seaba. *See Garcia-Garcia*, 957 F.3d at 891–92. Accordingly, there is no dispute of material fact, and Defendant Moulding is entitled to judgment as a matter of law.

At approximately 4:00 pm, Moulding and Koenig arrived at Gordon Seaba's property. ECF 1, ¶ 44, App. JCI 005. Upon arriving, Moulding encountered Timothy McConnell Seaba. Moulding first asked, "Are you Gordon Seaba?" Moulding Dep. 55:8-9, App. JCI 069. McConnell Seaba responded, "Do you have a warrant?" Moulding Dep. 55:10-11, App. JCI 069. Moulding asked again, "Are you Gordon Seaba?" and McConnell Seaba was not responsive to this question.

Moulding Dep. 55:12-16, App. JCI 069. This interaction gave Moulding no indication of any alleged possessory interests by Defendant McConnell Seaba. Moulding then proceeded up the driveway of the property to the main house to have a conversation with Gordon Seaba, the individual who Moulding believed to be the property owner. ECF 1, ¶ 49, App. JCI 006; Koenig Dep. 80:14-18, App. JCI 053 ("Gordon himself told me he was the property owner, and Gail told me, when Gordon passed away, specifically that then her and Tim would get the property . . . .").

Moulding did not "just go barge into this residence." Moulding Dep. 57:16-25, App. JCI 070. Gordon Seaba opened his door, and Moulding asked for permission to talk inside because Gail Osborn was "being extremely noisy, and it was difficult to have a conversation." *Id.* To this end, Gail Osborn admits no personal knowledge of the events preceding Moulding's entry into Gordon Seaba's residence. She recalled in her own deposition, "[Moulding pulled in to our parking area . . . I had turned around, and he was already up on the steps. I had Pike [Osborn's dog]. I was running to tie him up on the tree to the left of the staircase. By that point Chauncey already had the screen door and the main door open." Osborn Dep. 42:10-16, App. JCI 036. Defendant Koenig likewise asked consent to enter Gordon Seaba's residence. Koenig Dep. 91:25-92:2, App. JCI 054 ("I asked if I could come in. And Gordon himself said yes, and the I went in."). Against these facts, Plaintiffs assert "[i]t is clearly established that government actors cannot *enter or search* a property without a warrant, absent a recognized exigency or exception." ECF 1, ¶ 78, App. JCI 008.

However, the Eighth Circuit precedent maintains "[l]aw enforcement officers may ask a person for consent to search or other types of cooperation without violating the Fourth Amendment as long as they do not induce cooperation by coercive means." *United States v. Yang*, 345 F.3d 650, 654 (8th Cir. 2003). This should be read alongside similar precedent maintaining "no Fourth Amendment search occurs when police officers who enter private property restrict their

movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways." *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984); *United States v. Ventling*, 678 F.2d 63, 66 (8th Cir. 1982) (discussing no legitimate privacy expectation in residential driveway accessible to and from public highway).

Over Gail Osborn and Timothy McConnell Seaba's objections, Moulding's entry on life tenant Gordon Seaba's property was a reasonable and permissible exercise to ask the landowner with present possessory interest for consent to search his home, its curtilage, and surrounding property. App. JCI 023-024.

Moulding consensually entered into Gordon Seaba's house. As a matter of established law, state actors may enter a residence if they "receive voluntary consent to enter from a person possessing authority over the residence." *United States v. Faler*, 832 F.3d 849, 853 (8th Cir. 2016). Gordon Seaba possessed authority over his own residence. Gail Osborn and Timothy McConnell Seaba's objections do not weigh on this determination. "Voluntary consent may be express or implied." *Id.* Implied consent may be based on a person's "words, gestures, or other conduct." *United States v. Pena-Ponce*, 588 F.3d 579, 584 (8th Cir. 2009). Gordon Seaba granted Moulding access to his home. *See* Moulding Dep. 57:16-25, App. JCI 070.

Moulding was then granted valid consent from Gordon Seaba to search his home, its curtilage, and surrounding property. As recounted by Moulding:

> I indicated to [Gordon Seaba] that, look, the issue here is just confirming whether or not this baby needs care and is in distress on the property. I asked him if we could look around the property, confirm that there's no child, and we would be finished within ten minutes. It was probably a two-minute conversation, possibly two and a half.

Moulding Dep. 58:9-21, App. JCI 070. Gordon Seaba then indicated to Moulding, "look, ten minutes, look around the property, determine whether or not there's a child." *Id.* Gordon Seaba

similarly gave express consent to Defendant Koenig. Koenig asked, "[H]ey, Gordon, these guys just want to look around the property, just looking for a baby that could potentially be on this property, would you mind if we had like ten 10 minutes 10 minutes . . ." to which Gordon Seaba replied "Go ahead." Koenig Dep. 92:3-24, App. JCI 054. At that point, Moulding contacted the Jefferson County deputies to indicate permission to search was granted. Moulding Dep. 58:9-21, App. JCI 070. Plaintiff Gail Osborn attempts to argue that Gordon Seaba revoked consent. According to Gail Osborn, "I heard Gordon tell [Moulding] to get out." Osborn Dep. 43:6, App. JCI 036. However, when pressed on this supposed revocation, Gail Osborn admitted she was not present in the house with Moulding, Koenig, and Gordon Seaba. Osborn Dep. 78:11-18, App. JCI 043. Gail Osborn further admitted that she had no direct personal knowledge of the contents of a conversation between Moulding, Koenig, and Gordon Seaba. *Id.*

As previously established, "[a] consensual search is consistent with the Fourth Amendment because it is 'reasonable for the police to conduct a search once they have been permitted to do so.'" *United States v. Garcia-Garcia*, 957 F.3d 887, 891–92 (8th Cir. 2020) (quoting *Florida v. Jimeno*, 500 U.S. 248, 251 (1991)). Thus, a "warrantless search is valid if conducted pursuant to the knowing and voluntary consent of the person subject to a search." *United States v. Cedano-Medina*, 366 F.3d 682, 684 (8th Cir. 2004). "The issue turns not on the defendant's subjective state of mind, but on whether the officer reasonably believed the defendant consented." *United States v. Espinoza*, 885 F.3d 516, 523 (8th Cir. 2018). Therefore, "[t]he standard for measuring the scope of a suspect's consent under the Fourth Amendment is that of 'objective' reasonableness." *United States v. Sanders*, 424 F.3d 768, 774 (8th Cir. 2005) (quoting *Jimeno*, 500 U.S. at 251). Whether consent to enter was voluntarily given "is a question of fact to be determined from all the

14

circumstances, and the government bears the burden of showing that the consent was freely given." *United States v. Hampton*, 260 F.3d 832, 835 (8th Cir. 2001).

The material facts on record indicate life tenant and Plaintiff Gordon Seaba consented to a search of his home, its curtilage, and surrounding property. Moulding reasonably believed Gordon Seaba consented because Gordon Seaba actually consented. Moulding Dep. 58:9-21, App. JCI 070. Furthermore, Gordon Seaba did not take steps to revoke his consent. "Gordon did not tell [Moulding] to get the hell out . . . He gave us permission to be on the property." Moulding Dep. 60:21-61:15, App. JCI 070-071. Relying on all of the surrounding circumstances, Gordon Seaba's consent was freely given, and Defendant Moulding has met his burden of proof in showing so. *See id.*

### b. Plaintiffs Had No Readily Apparent Privacy Interest in their alleged "Tiny Home"

It was not readily apparent that Plaintiffs Gail Osborn and Timothy McConnell Seaba had any privacy interests in their alleged "tiny home." Moulding could not determine what the alleged "tiny home" was from the outside, and he believed it was a shed or outbuilding. Moulding Dep. 73:22-25, App. JCI 073. The Jefferson County Assessor's website lists that there are five sheds, one garage, and one dwelling on Plaintiff Gordon Seaba's property. App. JCI 018. The "Yard Extras" section on the Jefferson County Assessor's website shows that the most recent "Shed" built was in 2016. App. JCI 016-017. The year the most recent "Shed" was built aligns with Timothy McConnell Seaba's deposition. Seaba Dep. 18:12-15, App. JCI 056. Timothy McConnell Seaba stated that he built the "Shed" approximately 10 years ago. *Id*. The "Shed" that Timothy McConnell Seaba built looks strikingly similar to the other four sheds around the property. The structure that Timothy McConnell Seaba and Gail Osborn claim is their "tiny home" is the

structure that Timothy McConnell Seaba built 10 years ago, which the Jefferson County Assessor's website classifies as one of the five sheds listed on Gordon Seaba's property. App. JCI 018. Timothy McConnell Seaba has never challenged the assessment of the property and believes it is accurately listed on the Jefferson County Assessor's website. Seaba Dep. 17:18-18:5, App. JCI 056. One of the other sheds is Timothy McConnell Seaba's workshop. Seaba Dep. 68:1-6, App. JCI 061. The last shed Moulding looked at was the "tiny home." Seaba Dep. 50:22-51:6, App. JCI 059. The shed that Moulding looked at immediately prior to the "tiny home" was the shed that Timothy McConnell Seaba used as his workshop. Seaba Dep. 50:22-51:6, App. JCI 059. Timothy McConnell Seaba's workshop is adjacent to his "tiny home." Seaba Dep. 68:1-6, App. JCI 061. After looking at the workshop shed, it was not reasonably believable that the "tiny home" shed adjacent to the workshop shed was being used as a home. When Moulding entered the "tiny home" there was no indicia of evidence readily apparent that indicated the "tiny home" belonged to Gail Osborn and Timothy McConnell Seaba. Moulding Dep. 74:2-7, App. JCI 073. Moulding was not able to determine when he entered the "tiny home" that it was Gail's residence. *Id*. There was nothing in the "tiny home" indicating it belonged to anyone other than Gordon Seaba. *Id*.

Moulding reasonably believed that Gordon Seaba was the only property owner. Moulding Dep. 45:4-46:9, App. JCI 068. Moulding did not know there was any property on Gordon Seaba's property that belonged to Timothy McConnell Seaba. Moulding Dep. 44:25-45:3, App. JCI 067-068. Moulding did not know what property, if any, belonged to Timothy McConnell Seaba on Gordon Seaba's property. *Id*. Moulding learned from Koenig that Gail Osborn lived at Gordon Seaba's property. Moulding Dep. 47:2-5, App. JCI 068. However, Moulding had no information about where Gail Osborn precisely lived on Gordon Seaba's property. Moulding Dep. 63:25-64:2, App. JCI 071. Moulding never asked Koenig where Gail Osborn exactly lived at on Gordon

16

Seaba's property. Moulding Dep. 64:21-23, App. JCI 071. Additionally, Moulding never asked Gordon Seaba which outbuildings belonged to Gail Osborn that were located on Gordon's property. Moulding Dep. 64:24-65:1, App. JCI 071-072. *See United States v. Almeida-Perez*, 549 F.3d 1162, 1171 (8th Cir. 2008) (explaining it is reasonable for police officers to "form their impressions from context," and the Fourth Amendment does not "require police to go behind appearances to verify third party authority."). Gail Osborn was yelling at Moulding to "Get the hell out of my house." Moulding Dep. 65:2-17, App. JCI 072. Osborn was referencing Gordon Seaba's house when she made that statement to Moulding, not the "tiny home." *Id*. This led Moulding to believe that Osborn lived in Gordon Seaba's house, not in the alleged "tiny home." Moulding Dep. 68:2-6, App. JCI 072.

Under the totality of the circumstances, Moulding reasonably believed that Gordon Seaba had the actual and apparent authority, as the sole property owner, to consent because Moulding had no information indicating Gail Osborn and Timothy McConnel Seaba lived in a "Shed" or that either of them had an apparent privacy interest in it.

### c. Moulding Relied on the Actual and Apparent Authority of the Life Tenant

Moulding reasonably relied on the consent of Gordon Seaba because Gordon had the actual and apparent authority to consent to a search of his home and the surrounding property. Accordingly, there is no dispute of material fact, and Moulding is entitled to judgment as a matter of law.

"Consent to search . . . may be given either by the suspect or by some other person who has common authority over, or sufficient relationship to, the [area or] item to be searched." *United States v. Wolff*, 830 F.3d 755, 758 (8th Cir. 2016) (quoting *United States v. James*, 353 F.3d 606,

613 (8th Cir. 2003)). "Common authority is a function of mutual use, joint access, and control, and is a question of fact." *James*, 353 F.3d at 613 (citations omitted). "[T]he rule for law-enforcement officers' reliance on a consenting party's apparent authority 'is not that they always be correct, but that they always be reasonable.'" *Id.* at 615 (quoting *Illinois v. Rodriguez,* 497 U.S. 177, 185–86 (1990)). Under *Illinois v. Rodriguez,* the Fourth Amendment is not violated if "'the facts available to the officer' at the time of the search would warrant a reasonable man in the belief that someone with authority over the premises consented to the search." *Iron Wing v. United States,* 34 F.3d 662, 665 (8th Cir.1994) (quoting *Rodriguez,* 497 U.S. at 188). In determining a third party's authority to consent, the officers must reasonably believe that, given the totality of the circumstances, the third party possesses authority to consent. *United States v. Weston*, 443 F.3d 661, 668 (8th Cir. 2006) (citing *Rodriguez,* 497 U.S. at 186) (citing *United States v. Pennington,* 287 F.3d 739, 746–47 (8th Cir. 2002) (stating that "[t]he critical facts . . . are not the actual relationship between the consenter and owner, but how that relationship appears to the officer who asked for consent.") (citation and internal quotations omitted)). "[A]n adult co-occupant of a residence may consent to a search." *United States v. Jones,* 193 F.3d 948, 950 (8th Cir.1999). An officer cannot "rely on a third party's consent to intentionally bypass a person who is present, has a superior privacy interest in the premises, and actively objects to the search." *United States v. Esparza,* 162 F.3d 978, 980 (8th Cir.1998), *citing United States v. Brokaw,* 985 F.2d 951, 953 (8th Cir.1993). "'[A]n officer's credible report of verbal consent can suffice to meet the government's burden of establishing consent' despite conflicting or contradictory evidence from the defense." *United States v. Wolff*, 830 F.3d 755, 758 (8th Cir. 2016) (quoting *United States v. Harper*, 787 F.3d 910, 914 (8th Cir. 2015) (per curiam)). It is reasonable for police officers to "form their impressions from context,"

18

and the Fourth Amendment does not "require police to go behind appearances to verify third party authority." *United States v. Almeida-Perez*, 549 F.3d 1162, 1171 (8th Cir. 2008).

When Moulding arrived at Gordon Seaba's property, given all the surrounding circumstances, Moulding reasonably believed Gordon Seaba had the actual and apparent authority to consent to a search of his home and the surrounding property, including outbuilding and sheds. Moulding Dep. 67:25-68:1, App. JCI 072. Moulding reasonably believed that Gordon Seaba was the only property owner and the primary person responsible for the property. Moulding Dep. 45:4-46:9, App. JCI 068. Before going to Gordon Seaba's property, Moulding looked at the Beacon Assessor's website to determine who the property owner was, and saw it listed Gordon Seaba as the property owner. Moulding Dep. 45:4-10, App. JCI 068.  Additionally, Moulding was told by deputies that the property belonged to Gordon Seaba. Moulding Dep. 46:20-23, App. JCI 068. Moulding, under the totality of the circumstances, reasonably believed that Gordon Seaba was the sole property owner.

Timothy McConnell Seaba was not physically present within the colloquy threshold to object to the search that Gordon Seaba consented to. Seaba 59:18-24, App. JCI 060. Timothy McConnell Seaba was primarily at the end of the driveway during this event. Seaba Dep. 42:12-18, App. JCI 058.  He was not physically present and objecting when Moulding and Koenig received consent from Gordon Seaba to search the house and surrounding property and buildings. *See* Seaba Dep. 39:8-18, App. JCI 057, and 42:12-18, App. JCI 058, and 59:18-24, App. JCI 060. As such, Moulding did not rely on a "third party's consent to intentionally bypass a person who is present, has a superior privacy interest, and actively objects to the search." *United States v. Esparza*, 162 F.3d 978, 980 (8th Cir. 1998) (citing *United States v. Brokaw*, 985 F.2d 951, 953 (8th Cir. 1993)). Timothy McConnell Seaba was not "in fact at the door and object[ing]," but was

19

instead "nearby but not invited to take part in the threshold colloquy." *See Randolph*, 547 U.S. at 121. Under the "fine line" drawn by the Supreme Court, Timothy McConnell Seaba "loses out." *See id*.; *see also United States v. Witzlib*, 796 F.3d 799, 801-02 (7th Cir. 2015) (holding the warrantless search of a house where defendant lived with his grandmother was lawful based on his grandmother's consent to search, despite defendant's objecting to the search while standing in the driveway).

The effect of an occupant's objection on a co-occupant's consent to a search was further refined in *Fernandez v. California*, 571 U.S. 292 (2014). "*Fernandez* clarified that a co-occupant's objection did not preclude his co-occupant's consent in perpetuity; once the objector is no longer 'present,' officers may rely on the present co-occupant's consent." *United States v. Williams*, No. CR419-107, 2019 WL 8504704 (S.D. Ga. Dec. 19, 2019) (quoting *Fernandez*, 571 U.S. at 301-06). Plaintiff Gail Osborn was constantly moving from one area to another of Gordon Seaba's property during this incident. Moulding Dep. 56:11-20, App. JCI 069. Moulding reasonably relied on Gordon Seaba's consent to search his house and property over Osborn's objection because Osborn was no longer present.

In *Georgia v. Randolph*, 547 U.S. 103, 113-14 (2006), the Supreme Court held that if a "co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." The Supreme Court emphasized the narrowness of its holding and stated that "[I]f a potential defendant with self-interest in objecting is in fact at the door and objects, the co-tenant's permission does not suffice for a reasonable search, whereas the potential objector, nearby but not invited to take part in the threshold colloquy, loses out." *Id.* at 121. Thus,

"whether the consenting tenant has the right to admit the police when a physically present fellow tenant objects" depends on "whether customary social understanding accords the consenting tenant authority powerful enough to prevail over the co-tenant's objection." *Id.*

Plaintiff Gordon Seaba had a recognized legal and socially recognized authority to prevail over the objections of Plaintiffs Gail Osborn and Timothy McConnell Seaba. Unlike the wife in *Randolph*, Gordon Seaba possessed a "recognized authority in law [and] social practice to prevail over [her] present and objecting co-tenant." *See Joseph v. Donahue*, 392 F. Supp. 3d 973, 986 (D. Minn. 2019) (quoting *Randolph*, 547 U.S. at 114). Social practices recognize Gordon Seaba's authority as superior because he and Timothy McConnell Seaba "fall within [a] recognized hierarchy," namely "a household of parent and child." *See id.* (quoting *Randolph*, 547 U.S. at 114).

Additionally, the law also recognizes Gordon Seaba's superior authority to admit others into his home and property over the objections of Gail Osborn and Timothy McConnell Seaba. As the permanent occupant of the property, Gordon Seaba was a host to his adult son, Timothy McConnell Seaba, and his son's partner, Gail Osborn. Timothy McConnell Seaba and Gail Osborn were essentially long-term guests of Gordon Seaba, who was the permanent resident host. A host "has ultimate control of the home" and may admit or exclude from the house as he prefers," even over the objection of his guest. *Id.* (quoting *Minnesota v. Olson*, 495 U.S. 91, 99 (1990)). Although a guest has a "legitimate expectation of privacy" in the home, the guest has "no legal interest in the premises and do[es] not have the legal authority to determine who may or may not enter the household." *Olson*, 495 U.S. at 99.

Finally, Osborn stated that she did not object to Koenig's earlier visit that day when Koenig received consent from Gordon Seaba to search Gordon's house because it was not Osborn's house. Osborn Dep. 65:24-66:3, App. JCI 041. Osborn does not pay Gordon Seaba nor anyone else to live

21

on the property. Osborn Dep. 26:21-24, App. JCI 032. Osborn has never signed a lease or an agreement to live on Gordon Seaba's property. Osborn Dep. 26:25-27:3, App. JCI 032. Further, Osborn has never had a key to Gordon Seaba's house. Osborn Dep. 29:5-7, App. JCI 033. Osborn did not have any responsibilities or tasks that came along with her living at Gordon Seaba's property. Osborn Dep. 88:19-22, App. JCI 044. Timothy McConnell Seaba admitted in his deposition that his property interests are different than Gordon Seaba's because Timothy is a remainderman on the deed. Seaba Dep. 49:18-22, App. JCI 059. Gordon Seaba told Koenig that he was the property owner. Koenig Dep. 80:14-15, App. JCI 053. Osborn told Koenig that the property belonged to Gordon Seaba, and once Gordon passed away the property would then become Osborn's and Timothy McConnell Seaba's. Koenig Dep. 24:3-6, App. JCI 048. Thus, Gordon Seaba had authority recognized in law and social practice to prevail over the objections of Osborn and Timothy McConnell Seaba, and Moulding reasonably believed Gordon Seaba had the authority to consent.

### d. Moulding's Warrantless Search Relied on an Exigency to Render Emergency Aid

Arguing in the alternative, Defendant Moulding searched Plaintiffs' property pursuant to an exigent circumstance which creates an exception from the Fourth Amendment's warrant requirement. "[W]arrants are generally required to search a person's home or his person unless 'the exigencies of the situation' make the needs of law enforcement so compelling that the warrantless search is objectively reasonable under the Fourth Amendment." *Mincey v. Arizona*, 437 U.S. 385, 393–94 (1978) (quoting *McDonald v. United States*, 335 U.S. 451, 456 (1948)); *see Payton v. New York*, 445 U.S. 573, 586 (1980) ("[S]earches and seizures inside a home without a warrant are presumptively unreasonable."). The Supreme Court has long considered "the need to

assist persons who are seriously injured or threatened with such injury" as an exigency that justifies a warrantless search. *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006). The Fourth Amendment thus "allows officers to enter a home if they have 'an objectively reasonable basis for believing' that such help is needed, and if the officers' actions inside the home are reasonable under the circumstances." *Caniglia v. Strom*, 593 U.S. 194, 206 (2021) (Kavanaugh, J., concurring) (quoting *Brigham City*, 547 U.S. at 406). Courts will consider "the facts known to the officers at the time they made the decision to enter." *United States v. Sanders*, 4 F.4th 672, 677 (8th Cir. 2021). The emergency exigency can justify a warrantless entry if officers have an "objectively reasonable basis for believing . . . that a person within the house is in need of immediate aid . . . ." *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam). "The question . . . is not whether there were actual probable cause and exigent circumstances, but whether the officers could reasonably have thought so." *Greiner v. City of Champlin*, 27 F.3d 1346, 1353 (8th Cir. 1994) (citation omitted). Courts here consider "the circumstances that confronted police at the time of entry" to determine whether the warrantless entry was justified. *United States v. Leveringston*, 397 F.3d 1112, 1116 (8th Cir. 2005).

The undisputed and material facts known to Defendant Moulding at the time of his search of Plaintiffs' property substantiate a reasonable exigency to render immediate aid. Moulding's first knowledge of this situation came when Gail Osborn called his office. As Moulding recalls, "[t]he phone call was so outside of the ordinary, the claims that [Gail Osborn] was making were odd enough that I thought it would be valuable to have a recording of that." Moulding Dep. 25:12-17, App. JCI 063. Assistant County Attorney Elizabeth Estey also indicated that she received a strange phone call. Estey Dep. 10:13-23, App. JCI 029; Moulding Dep. 26:17-25, 063.

Defendant Moulding then had a conversation with Defendant Koenig during which he gleaned particular facts about this case. Moulding learned "an anonymous phone call had come into DHS [now HHS], that the caller indicated a substantial amount of knowledge about the -- a concern -- a child with concerning features." Moulding Dep. 27:17-28:17, App. JCI 063. Moulding learned that this anonymous reporter had highly specific information such as "date of birth, they had a name [Charlotte McConnell]" and they claimed to have had "personal contact with the child." *Id.* "[I]t was relayed to [Moulding] that [the anonymous reporter] had that information and that the child was in distress and had been utilized -- or that controlled substance, methamphetamine, had been used in its presence, that it possibly needed medical care and possibly needed food." *Id.* Moulding also learned that "Miss Koenig had some contact with an investigator out of Washington County who indicated that Miss Osborn had been calling various fire station safe drop boxes requesting information about the process for, I guess, the no-questions-asked surrender of a child." Moulding Dep. 28:20-29:15, App. JCI 063-064; *see also* App. JCI 076-078.

Moulding also knew that Koenig did not complete a full investigation during her morning visit to the property. "[Koenig] indicated that she went out there. She was alone. She had some conversation with Gail, but that the conversation was -- the investigation was not complete based on some concerns that she had developed. I think she was just kind of freaked out being out there by herself." Moulding Dep. 39:3-9, App. JCI 066; Koenig Dep. 23:7-22, App JCI 048 ("[M]y whole alarms were going off that I just needed to get out of the home. Like I can't explain that any further than that, but I knew I needed to leave and this is not for me to be out here by myself."). In addition, Moulding learned "information that was relayed to [him] that further exacerbated concerns from DHS was that Gail had previously had an engagement with DHS, and I think there was an order for removal, and Gail instead fled the state to the state of Montana with the children

24

. . . [T]hat was another factor that kind of increased the concern here." Moulding Dep. 92:12-20, App. JCI 075; Koenig Dep. 46:3-15, App. JCI 051 ("There was a lot of history that three of Gail's children were removed, that in the one case in particular that Gail had not participated in services particularly, and she was supposed to safety plan her child to her sister that lived in a neighboring town. And when she went to go drop off to her sister, she kind of took off and took the child out to Gordon Seaba's property, and then law enforcement had to go out there to like locate the child when Gail was not supposed to have the child at that time."). Koenig "review[ed] everything" with Moulding; she "review[ed] past history;" she "review[ed] . . . concerns." Koenig Dep. 49:8-12, App. JCI 052. These were the facts known to Moulding at the time of his decision to enter Gordon Seaba's property and at the time of his decision to enter Gail Osborn and Timothy McConnell Seaba's alleged "tiny home."

On these facts, Moulding at all times during the search of the property reasonably believed his "principal concern was providing aid and welfare to a distressed infant." Moulding Dep. 30:16-21, App. JCI 064. Moulding admits that he was not on the premises to criminally investigate the Plaintiffs in any way. "Nobody was going to jail that day." Moulding Dep. 34:23, App. JCI 065. Moulding was "just trying to get eyes on the child in distress." Moulding Dep. 34:23-25, App. JCI 065. Moulding reasonably believed a child was in distress, and Moulding took reasonable steps to verify whether this child was on or concealed somewhere on the property. Moulding's warrantless search was justified.

### 3. The Defendants are Entitled to Qualified Immunity

Federal law under 42 U.S.C. § 1983 provides that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State . . . , subjects, or causes to be subjected, any citizen of the United States . . . to the deprivation of any rights, privileges, or

immunities secured by the Constitution and laws, shall be liable to the party injured." Accordingly, the "essential elements of a § 1983 claim are: (1) violation of a constitutional right, (2) committed by a state actor, (3) who acted with the requisite culpability and causation to violate the constitutional right." *Wheelock v. Nitzschke*, 760 F. Supp. 3d 835, 853–54 (N.D. Iowa 2024) (internal citations omitted). "To prevail on a § 1983 claim, a plaintiff must show each individual defendant's personal involvement in the alleged violation." *Id.* at 854 (quoting *White v. Jackson*, 865 F.3d 1064, 1081 (8th Cir. 2017)).

Still, "qualified immunity shields a government official from individual liability when his conduct does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Here, "[t]he Supreme Court has generously construed qualified immunity protection to shield 'all but the plainly incompetent or those who knowingly violate the law.'" *Davis v. Hall*, 375 F.3d 703, 711–12 (8th Cir. 2004) (quoting *Malley v. Briggs*, 475 U.S. 335, 341 (1986)). "Officials are not liable for bad guesses in gray areas; they are liable for transgressing bright lines." *Id.* (citing *Maciariello v. Sumner*, 973 F.2d 295, 298 (4th Cir. 1992)). "To determine whether defendants are entitled to qualified immunity, courts ask (1) whether the facts viewed in the light most favorable to plaintiff establish a violation of a constitutional right and (2) whether that constitutional right was clearly established as of the time of the alleged violation." *Wheelock*, 760 F. Supp. 3d at 845; *see Pearson v. Callahan*, 555 U.S. 223, 236 (2009). "Unless the answer to both of these questions is yes, the defendants are entitled to qualified immunity." *Id.*; *see Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 791 (8th Cir. 2013).

"For a right to be clearly established, '[t]he contours of the right must be sufficiently clear that a reasonable official would understand that what he is doing violates that right.'" *Barton v.*

*Taber*, 820 F.3d 958, 966 (8th Cir. 2016) (quoting *Meehan v. Thompson*, 763 F.3d 936, 940 (8th Cir. 2014)). "Because qualified immunity protects officials who make bad guesses in gray areas, it gives them breathing room to make reasonable but mistaken judgments." *Estate of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018) (internal citation omitted). "What is 'clearly established law should not be defined at a high level of generality . . . [but] must be particularized to the facts of the case.'" *Frederick v. Motsinger*, 873 F.3d 641, 647 (8th Cir. 2017) (quoting *White v. Pauly*, 580 U.S. 73 (2017)). "The pertinent inquiry is whether the state of the law at the time gave the official 'fair warning' that such conduct was unlawful in the situation he confronted." *Wright v. United States*, 813 F.3d 689, 695 (8th Cir. 2015) (citing *Hope v. Pelzer*, 536 U.S. 730, 741 (2002)).

Further informing this legal framework is the integration of the Defendant's individual knowledge. A "determination whether it was objectively legally reasonable to conclude that a given search was supported by probable cause or exigent circumstances will often require examination of the information possessed by the searching officials." *Anderson v. Creighton*, 483 U.S. 635, 641 (1987). In this case, "the objective (albeit fact-specific) question [is] whether a reasonable officer could have believed [the] warrantless search to be lawful, in light of clearly established law and the information the searching officers possessed." *Id.*

Based on the ingrained and particularized facts of this case, the Plaintiffs did not have a clearly established right such that Defendant Moulding "would understand that what he [was] doing violate[d] that right.'" *See Barton v. Taber*, 820 F.3d 958, 966 (8th Cir. 2016) (quoting *Meehan v. Thompson*, 763 F.3d 936, 940 (8th Cir. 2014)). Here, the alleged search upon which this cause of action is based involved the actions of a County Attorney acting in concert with HHS to assess property for the emergency care of a child in immediate need. Circuit precedent supports

the notion that county law enforcement may assist with child welfare checks and may search without a warrant pursuant to an individual's consent. *See United States v. Alloway*, 25 F.4th 1093, 1096 (8th Cir. 2022); *see also Coates v. Powell*, 639 F.3d 471, 477 (8th Cir. 2011) (explaining it was not a clearly established right that a police officer, who was assisting a social services worker investigating a complaint of child neglect was required to leave a home when the homeowner ordered out the officer but not the worker). As such, Moulding operated in a gray area of law when assisting Defendant Koenig in her assessment of the Plaintiffs' property. During his alleged search, Moulding was entitled to "breathing room to make reasonable but mistaken judgments." *Estate of Walker v. Wallace*, 881 F.3d 1056, 1060 (8th Cir. 2018) (internal citation omitted).

Only aiding this determination is the information possessed by Moulding at the time of his alleged search. Moulding knew of an anonymous complaint involving highly specific allegations that a named child, Charlotte McConnell, was born to Gail Osborn and that Gail Osborn was using methamphetamine while caring for this child. Moulding Dep. 27:17-28:17, App. JCI 063. Moulding knew of Gail Osborn's history of founded HHS complaints. Moulding Dep. 92:12-20, App. JCI 075. Moulding knew that he was searching with the freely-given consent of Gordon Seaba, the landowner. Moulding Dep. 58:9-21, App. JCI 070. Moulding knew he went to the property to immediately render aid to a child in need. Moulding Dep. 30:16-21, App. JCI 064. A reasonable officer could have believed this warrantless search to be lawful pursuant to either consent or exigency in light of clearly established law and the information possessed. Plaintiffs' constitutional rights were not clearly established as of the time of the alleged violation.

In addition, the facts viewed in the light most favorable to the Plaintiffs do not establish a violation of their constitutional rights. For the reasons outlined *supra*, Moulding searched the premises with the consent of the life tenant/landowner, the Plaintiffs had no readily apparent

privacy interest in their alleged "tiny home," Moulding's search relied on the apparent authority of the life tenant/landowner, and barring the above, Moulding's search relied on an exigency to render emergency aid.

Therefore, the Plaintiffs cannot answer "yes" to both prongs necessary to foreclose qualified immunity. *Wheelock*, 760 F. Supp. 3d at 845; *see Burton v. St. Louis Bd. of Police Comm'rs*, 731 F.3d 784, 791 (8th Cir. 2013). Moulding is entitled to qualified immunity as it relates to the Plaintiffs' search claims.

### C.    Count 2 – Trespass

Plaintiffs' cause of action for trespass is predicated upon the allegations that "Defendant Moulding intentionally entered Plaintiffs' property without permission or legal justification to do so," that "Defendant Moulding caused other law enforcement officers to enter Plaintiffs' property without permission or legal justification to do so," and that "Defendant remained on Plaintiffs' property after Plaintiffs instructed them to leave."

Under Iowa law, "a trespasser is one who is not rightfully upon the land or property of another, but enters it without the consent, either express or implied, of the owner or occupier thereof." *Reasoner v. Chicago, R.I. & P.R. Co.*, 101 N.W.2d 739, 741 (1960). "The general rule in Iowa is that '[e]very unauthorized entry is a trespass, regardless of the degree of force used, even if no damage is done, or the injury is slight . . . . It will be presumed that injury resulted even if it was no more than the trampling of herbage.'" *Iowa State Highway Comm'n v. Hipp*, 147 N.W.2d 195, 199 (1966) (quoting 87 C.J.S. *Trespass* § 13b, at 965–66 (1954)). "However, it is incumbent on the plaintiff to plead or prove the alleged trespasser was 'not rightfully upon the property of another, but enter[ed] it without consent, either express or implied, of the owner or occupier.'" *Id.*

29

"Consent, express or implied, negates any finding of trespass, and it exists 'where the plaintiff's conduct reasonably led the defendant to believe the defendant had authority for the actions taken with regard to the property.'" *Butter v. Midwest Prop. Mgmt. IC, LLC*, 29 N.W.3d 626 (Iowa 2025), as amended (Jan. 6, 2026) (quoting *Larson v. Great W. Cas. Co.*, 482 N.W.2d 170, 173 (Iowa Ct. App. 1992)); *see also Alexander v. Med. Assocs. Clinic*, 646 N.W.2d 74, 76 (Iowa 2002) ("A 'trespasser' is one who has no legal right to be upon another's land and enters the land without the express or implied consent of the owner.").

As established *supra*, Eighth Circuit precedent maintains: "Law enforcement officers may ask a person for consent to search or other types of cooperation without violating the Fourth Amendment as long as they do not induce cooperation by coercive means." *United States v. Yang*, 345 F.3d 650, 654 (8th Cir. 2003). Precedent similarly maintains "no Fourth Amendment search occurs when police officers who enter private property restrict their movements to those areas generally made accessible to visitors—such as driveways, walkways, or similar passageways." *United States v. Reed*, 733 F.2d 492, 501 (8th Cir. 1984); *United States v. Ventling*, 678 F.2d 63, 66 (8th Cir. 1982) (discussing no legitimate privacy expectation in residential driveway accessible to and from public highway). Defendant Moulding initially entered Gordon Seaba's property and restricted his movements to those areas generally made accessible to visitors. Moulding proceeded up Gordon Seaba's driveway to his house. Once at Gordon Seaba's house, Moulding asked for permission to search the property. At all points, Moulding entered, searched, and remained on Gordon Seaba's property with the express consent of the life tenant/landowner. *See Iowa State Highway Comm'n*, 147 N.W.2d at 199 (1966). Moulding's actions fall in line with the generally accepted rule in the United States in regard to alleged law enforcement trespass that there is a "privilege to enter property to . . . enforce the criminal law under certain circumstances." *Cedar*

30

*Point Nursery v. Hassid*, 594 U.S. 139, 161 (2021); *see* 75 Am. Jur. 2d *Trespass* § 78, at 82 (2007) ("An officer of the law is privileged to make an entry to . . . arrest for a criminal offense."); Restatement (Second) of Torts § 204 cmt. g, at 383 (Am. L. Inst. 1965) ("[T]he fact that the actor in attempting or making an arrest uses excessive force . . . does not destroy his privilege to be upon the land for the purpose of effecting the arrest . . . ."); *see also State v. Dugan*, 555 P.2d 108, 110 n.1 (Ariz. 1976) (en banc) ("[W]hen the performance of his duty requires an officer of the law to enter upon private property, his conduct, otherwise a trespass, is justifiable.") (quoting *Giacona v. United States*, 257 F.2d 450, 456 (5th Cir. 1958)); *Heinze v. Murphy*, 24 A.2d 917, 922 (Md. 1942) ("It is not a trespass for an officer of the law to go upon another's premises in the line of his duty, although his conduct afterward may make it a trespass."); *Sterling v. City of Albany*, 545 P.2d 1386, 1389 (Or. Ct. App. 1976) (explaining that an officer's entry into a business without consent to investigate crime was not trespass), aff'd, 555 P.2d 23 (Or. 1976) (en banc); *Storms v. State*, 590 P.2d 1321, 1323 (Wyo. 1979) ("If an officer goes upon private premises in the performance of a duty and is investigating a criminal complaint he is not a trespasser . . . . As a matter of fact it is the duty of a police officer to investigate possible violation of law." (citation omitted)).

In regard to the allegation that Moulding, "caused other law enforcement officers to enter Plaintiffs' property without permission or legal justification to do so," these members of law enforcement had express permission to be on the property. Both Gail Osborn and Timothy McConnell Seaba actually consented to a search of the property by Jefferson County law enforcement. Gail Osborn recited in her interrogatories, "When Defendants returned at 4:00 PM, I gave the police officers present permission to be on my property, but I asked Defendants Moulding and Koenig to leave." Pl. Osborn Ans. Ints. at 8, App. JCI 022. Timothy McConnell Seaba recited in his interrogatories, "When the Defendants searched my property in the

31

afternoon/evening of November 15th, I gave consent to the sheriff's deputies to be on my property. I expressly asked Defendants Moulding and Koenig to leave the property." Pl. McConnell Seaba Ans. Ints. at 8, App. JCI 015. These admissions foreclose any argument for trespass or continuing trespass against Jefferson County law enforcement officers. Moulding is entitled to judgment as a matter of law with respect to Plaintiffs' trespass claims.

### D.      Count 3 – Invasion of Privacy

Plaintiffs' cause of action for invasion of privacy is predicated upon the allegations that "Defendants intentionally intruded on Plaintiffs' solitude, seclusion, and/or private affairs" and that "Defendants' actions would be highly offensive to a reasonable person."

Iowa courts have "adopted the definition of invasion of privacy recognized by the Restatement (Second) of Torts, including unreasonable intrusion upon seclusion." *Winegard v. Larsen*, 260 N.W.2d 816, 822 (Iowa 1977); *see also Stessman v. Am. Black Hawk Broad. Co.*, 416 N.W.2d 685, 686 (Iowa 1987). "This form of invasion of privacy generally requires the plaintiff to establish two elements. The first element requires an intentional intrusion into a matter the plaintiff has a right to expect privacy." *Stessman*, 416 N.W.2d at 687. "The next element requires the act to be 'highly offensive to a reasonable person.'" *Id*. (quoting *Winegard*, 260 N.W.2d at 822). Iowa courts hold "that an intrusion upon seclusion occurs when a person 'intentionally intrudes, physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns . . . if the intrusion would be highly offensive to a reasonable person.'" *In re Marriage of Tigges*, 758 N.W.2d 824, 829 (Iowa 2008) (quoting Restatement (Second) of Torts § 652B, at 378).

As established *supra*, Moulding's alleged invasion of privacy occurred at the consent of the life tenant/landowner. It is difficult to square that such a consensual entry then violated an

expected privacy interest. In addition, it is impossible to comprehend that such a consensual entry would then be regarded as offensive to a reasonable person. As above, members of law enforcement had express permission to be on the property. Both Gail Osborn and Timothy McConnell Seaba actually consented to a search of the property by Jefferson County law enforcement. Moulding is entitled to judgment as a matter of law with respect to Plaintiffs' invasion of privacy claims.

E.    **Count 4 – Respondeat Superior**

1.    **Plaintiffs 42 U.S.C. § 1983 Claim Against Jefferson County Fails as a Matter of Law**

a.    **Individual Capacity**

"Personal-capacity suits seek to impose personal liability upon a government official for actions he takes under color of state law." *Kentuck v. Graham*, 473 U.S. 159, 165 (1985). "Official-capacity suits, in contrast, 'generally represent only another way of pleading an action against an entity of which an officer is an agent.'" *Id.* at 165-66 (quoting *Monell v. New York City Dept. of Social Services,* 436 U.S. 658, 690, n. 55, 98 S.Ct. 2018, 2035, n. 55, 56 L.Ed.2d 611 (1978)). "Thus, while an award of damages against an official in his personal capacity can be executed only against the official's personal assets, a plaintiff seeking to recover on a damages judgment in an official-capacity suit must look to the government entity itself." *Id.* at 166.

"A victory in a personal-capacity action is a victory against the individual defendant, rather than against the entity that employs him." *Id*. at 167-68. "Indeed, unless a distinct cause of action is asserted against the entity itself, the entity is not even a party to a personal-capacity lawsuit and has no opportunity to present a defense." *Id.* at 168. "That a plaintiff has prevailed against one

33

party does not entitle him to fees from another party, let alone from a nonparty." *Id*. Cf. *Hensley v. Eckerhart,* 461 U.S. 424, 103 S.Ct. 1933, 76 L.Ed.2d 40 (1983).

Plaintiffs bring their 42 U.S.C. § 1983 cause of action against Defendant Moulding in his individual capacity. Even if Plaintiffs prevail on their claim against Moulding in his individual capacity, Defendant Jefferson County cannot be held liable on a claim of respondeat superior. In order for Plaintiffs to have a cause of action against the Jefferson County, they would need to have brought their cause of action against Moulding in his official capacity. *See Id*. at 167-68. Accordingly, Plaintiffs' respondeat superior claim against Jefferson County based on Plaintiffs' 42 U.S.C. §1983 claim fails. As such, there is no dispute of material fact, and Defendant Jefferson County, Iowa is entitled to judgment as a matter of law.

### b.  Official Capacity

"Respondeat superior or vicarious liability will not attach under § 1983." *Valdivia v. Porsch*, 718 F. Supp. 3d 919, 929 (S.D. Iowa 2024), *aff'd* 163 F.4th 1121 (8th Cir. 2026) (quoting *City of Canton v. Harris*, 489 U.S. 378, 385 (1989)). "The city is not vicariously liable under § 1983 for the constitutional torts of its agents: It is only liable when it can be fairly said that the city itself is the wrongdoer." *Collins v. City of Harker Heights, Tex.*, 503 U.S. 115, 122 (1992).

Specifically, "[§] 1983 liability for a constitutional violation may attach to a municipality if the violation resulted from (1) an official municipal policy, . . . (2) an unofficial custom, . . . or (3) a deliberately indifferent failure to train or supervise[.]" *Corwin v. City of Independence*, 829 F.3d 695, 699 (8th Cir. 2016) (internal quotation marks and citations omitted). Plaintiffs "must prove that a municipal policy or custom was the 'moving force [behind] the constitutional violation.'" *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999) (alteration in original) (quoting *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 694 (1978)). "There must be a causal

34

connection between the municipal policy or custom and the alleged constitutional deprivation in order to state a valid claim under § 1983." *Ulrich v. Pope County*, 715 F.3d 1054, 1061 (8th Cir. 2013) (citing *City of Canton v. Harris,* 489 U.S. 378, 385 (1989)). "Generally, an isolated incident of alleged police misconduct, such as Ulrich alleges occurred here, cannot, as a matter of law, establish a municipal policy or custom creating liability under § 1983." *Ulrich v. Pope County*, 715 F.3d 1054, 1061 (8th Cir. 2013) (citing *Wedemeier v. City of Ballwin,* 931 F.2d 24, 26 (8th Cir.1991)). "[A]bsent a constitutional violation by a city employee, there can be no § 1983 or *Monell* liability for the City." *Valdivia*, 718 F. Supp. 3d at 929 (quoting *Whitney v. City of St. Louis*, 887 F.3d 857, 861 (8th Cir. 2018)).

"Policy and custom are not the same thing." *Corwin v. City of Independence*, 829 F.3d 695, 699–700 (8th Cir. 2016). "[A] 'policy' is an official policy, a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Id.* at 700 (alteration in original) (quoting *Mettler v. Whitledge*, 165 F.3d 1197, 1204 (8th Cir. 1999)). By contrast, to establish municipal liability through an official "custom," a plaintiff must show:

> (1) The existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) that plaintiff was injured by acts pursuant to the governmental entity's custom, i.e., that the custom was a moving force behind the constitutional violation.

*Id.* (quoting *Snider v. City of Cape Girardeau*, 752 F.3d 1149, 1160 (8th Cir. 2014)).

In addition, "[i]n limited circumstances, a local government may be liable for its 'decision not to train certain employees about their legal duty to avoid violating citizens' rights.'" *Folkerts v. City of Waverly*, 707 F.3d 975, 982 (8th Cir. 2013) (quoting *Connick v. Thompson*, 563 U.S. 51, 61 (2011)). "The failure to train must rise to 'deliberate indifference' to be actionable." *Id*. "A

pattern of similar constitutional violations by untrained employees is ordinarily necessary to show deliberate indifference." *Id*. "It may be, however, that 'evidence of a single violation of federal rights, accompanied by a showing that a municipality has failed to train its employees to handle recurring situations presenting an obvious potential for such a violation, could trigger municipal liability.'" *Id*. (quoting *Bd. of Cnty. Comm'rs of Bryan Cnty. v. Brown*, 520 U.S. 397, 409 (1997)). "'[D]eliberate indifference' is a stringent standard of fault, requiring proof that a municipal actor disregarded a known or obvious consequence of his action." *Brown*, 520 U.S. at 410. "A municipality's culpability for a deprivation of rights is at its most tenuous where a claim turns on a failure to train." *Connick*, 563 U.S. at 61.

First, Plaintiffs have not alleged the existence of an unconstitutional official policy because they have not identified "a deliberate choice of a guiding principle or procedure made by the municipal official who has final authority regarding such matters." *Watkins v. City of St. Louis, Missouri*, 102 F.4th 947, 954 (8th Cir. 2024) (quoting *Mettler v. Whitledge*, 265 F.3d 1197, 1204 (8th Cir. 1999)). Plaintiffs have not identified any official policy that arguably played a role in Plaintiffs' allegations.

Second, Plaintiffs have not alleged facts that support the existence of an unconstitutional unofficial custom. Plaintiffs have not alleged any facts plausibly suggesting "(1) the existence of a continuing, widespread, persistent pattern of unconstitutional misconduct by the governmental entity's employees; (2) deliberate indifference to or tacit authorization of such conduct by the governmental entity's policymaking officials after notice to the officials of that misconduct; and (3) an injury by acts pursuant to the government entity's custom." *Mitchell v. Kirchmeier*, 28 F.4th 888, 899–900 (8th Cir. 2022) (internal quotation marks and alterations omitted) (quoting *Ware v. Jackson County*, 150 F.3d 873, 880 (8th Cir. 1998)). Plaintiffs have failed to allege any facts that

36

Defendant Jefferson County had a "policy or custom that was the 'moving force [behind] the constitutional violation.'" *Watkins*, 102 F.4th at 953 (internal citations omitted). Instead, Plaintiffs simply allege Jefferson County is liable for the actions of its employee, Moulding, based on the doctrine of Respondeat Superior.

Finally, Plaintiffs have not alleged any facts that (1) Defendant Jefferson County's "training practices were inadequate," (2) Jefferson County "was deliberately indifferent to the rights of others in adopting these training practices, and" Jefferson County's "failure to train was a result of deliberate and conscious choices it made;" and (3) Jefferson County's "alleged training deficiencies caused [Plaintiffs'] constitutional deprivation." *Ulrich*, 715 F.3d at 1061. Plaintiffs' 42 U.S.C. § 1983 claim fails because Jefferson County cannot be held liable for that claim. *See Monell v. N.Y. Dep't of Soc. Servs.*, 436 U.S. 658, 691 (1978) ("[A] municipality cannot be held liable *solely* because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory.").

Accordingly, Plaintiffs' 42 U.S.C. § 1983 claim fails as a matter of law. As such, there is no dispute of material fact, and Defendant Jefferson County, Iowa is entitled to judgment as a matter of law.

### 2. Jefferson County Cannot be Held Liable for Plaintiffs' State-law Claims Because Moulding Is Entitled to Qualified Immunity

Iowa Code 670.4A(1)(a) grants qualified immunity to employees and law enforcement if "[t]he right, privilege, or immunity secured by the law was not clearly established at the time of the alleged deprivation, or at the time of the alleged deprivation of the state of the law was not sufficiently clear that every reasonable employee would have understood that the conduct alleged constituted a violation of law." In addition, it provides that "[a] municipality shall not be liable for

any claim brought under this chapter where the employee or officer was determined to be protected by qualified immunity." Iowa Code § 670.4A(2). "In enacting § 670.4A, it appears the Iowa Legislature was adopting a state law version of qualified immunity that tracks the qualified immunity doctrine as it exists under federal law." *Stark v. Hamelton*, No. 3-18-CV-00069-RGE-SHL, 2021 WL 4056716, at *4 (S.D. Iowa Sept. 2, 2021).

As established *supra*, Moulding is entitled to qualified immunity from Plaintiffs' claims, pursuant to Iowa Code § 670.4A(1)(a). As such, Jefferson County cannot be liable for Plaintiffs' state-law claims, pursuant to Iowa Code § 670.4A(2). Accordingly, Defendant Jefferson County, Iowa is entitled to judgment as a matter of law.

## IV.  CONCLUSION

WHEREFORE the Defendants, Chauncey Moulding and Jefferson County, Iowa, pray that the Court dismiss the Plaintiffs' complaint for the reasons stated above or in the alternative for the reasons stated in the Defendant Kelsey Koenig's motion for summary judgment. Defendants, Chauncey Moulding and Jefferson County, Iowa, respectfully request the Court to allow oral argument on this Motion for Summary Judgment.

Respectfully submitted,

HINDERS, UPDEGRAFF, FRANKLIN & LIMKEMANN, P.L.C.

By */s/ Brent L. Hinders*
   Brent L. Hinders, AT0003519
   1104 Sunset Dr.
   Norwalk, IA 50211
   Telephone:  515-8917044
   brent@hinderslaw.com
   ATTORNEY FOR DEFENDANTS

CHAUNCEY MOULDING AND
JEFFERSON COUNTY, IOWA

**ORIGINAL FILED.**

## CERTIFICATE OF SERVICE

I hereby certify that on May 29th, 2026, I presented the foregoing to the Clerk of the court for filing and uploading into the ECF system, which will send notification of such filing to the following:

Gina Messamer
Kyle Dawson
Parrish Krudenier
2910 Grand Ave,
Des Moines, IA 50312
T: (515) 284-5737
F: (515) 284-1704
gmessamer@parrishlaw.com
kdawson@parrishlaw.com
ATTORNEYS FOR PLAINTIFFS


Ryan Sheahan
Assistant Attorney General
Iowa Department of Justice
Hoover State Office Building, 2nd Floor
Des Moines, IA 50319
T: (515) 281-6658
F: (515) 281-4209
ryan.sheahan@ag.iowa.gov
ATTORNEY FOR DEFENDANT KELSEY KOENIG


By */s/ Brent L. Hinders*