**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| GAIL OSBORN, TIM MCCONNELL SEABA, and GORDON SEABA, | Case No. <u>4:25-cv-00183-SHL-SBJ</u> |
| Plaintiffs, | |
| vs. | **APPENDIX** |
| CHAUNCEY MOULDING, KELSEY KOENIG, and JEFFERSON COUNTY, IOWA, | |
| Defendants. | |

| <u>DOCUMENT</u> | <u>PAGE</u> |
|---|---|

Exhibit A – 1.  25-05-22 Petition & Jury Demand ...............................................................1

Exhibit B – Pages from Tim's Answers to Jefferson Co's ROGs .....................................14

Exhibit C – Jefferson County Assessor's Page .................................................................16

Exhibit D – Pages from Gail's Answers to Jefferson Co's ROGs.....................................21

Exhibit E – Beacon - Jefferson County, IA - Parcel Report_ 0402400008 ......................23

Exhibit F – Pages from Estey Elizabeth Deposition.........................................................28

Exhibit G – Pages from Osborn Deposition .....................................................................31

Exhibit H – Pages from Koenig Deposition  .....................................................................47

Exhibit I – T. Pages from Seaba Deposition ....................................................................55

Exhibit J – Pages from Moulding Deposition ...................................................................62

Exhibit K – PLFS-OSBORN-40-42...................................................................................76

Exhibit L – PLFS-OSBORN-24-32 ...................................................................................79

Exhibit M – Pages from Gail Osborn Deposition (Vol II). ...............................................88

Respectfully submitted,

HINDERS, UPDEGRAFF, FRANKLIN &
LIMKEMANN, P.L.C.


By /s/ *Brent L. Hinders*
   Brent L. Hinders, AT0003519

   Hinders, Updegraff, Franklin &
   Limkemann, P.L.C.
   1104 Sunset Dr
   Norwalk, IA 50211
   Telephone: 515.981-7504
   E-mail: brent@hindesrlaw.com


**ATTORNEYS FOR DEFENDANTS
CHAUNCEY MOULDING AND
JEFFERSON COUNTY**

Original Filed.
Copy to:

Attorneys for Plaintiffs

Gina Messamer

2

Parrish Kruidenier
2910 Grand Avenue
Des Moines, IA 50312
Telephone: (515) 284-5737
Facsimile: (515) 283-1704
gmessamer@ParrishLaw.com

Edward G. Harvey AT0003350
1600 Wonder Way
Fairfield IA, 52556
Telephone: (641) 919-8696
Email: edwardharvey98@yahoo.com

Ryan P. Sheahan
Assistant Attorney General
Hoover Building, Second Floor
Des Moines, Iowa 50319
Phone: (515) 281-6658
Fax: (515) 281-4209
E-Mail: ryan.sheahan@ag.iowa.gov
ATTORNEY FOR DEFENDANT
KOENIG

**CERTIFICATE OF SERVICE**

The undersigned certifies that the foregoing instrument was served upon each of the attorneys of record of all parties to the above-entitled cause herein at their respective addresses disclosed on the pleadings of record on the 29th day May 2026.

By    ☐ U.S. Mail          ☐ Fax
      ☐ Hand Delivery      ☒ Electronically through CM-ECF
      ☐ Private Carrier    ☐ Other:_____
Signature /s/ Muris Mujic _____

3

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| GAIL OSBORN, TIM MCCONNELL SEABA, and GORDON SEABA, <br><br> Plaintiffs, <br><br> vs. <br><br> CHAUNCEY MOULDING, KELSEY KOENIG, and JEFFERSON COUNTY, IOWA, <br><br> Defendants. | Case No. _____ <br><br><br> **PETITION AT LAW and JURY DEMAND** |

**COME NOW** the Plaintiffs, by and through the undersigned counsel, and for their causes of action, respectfully state the following:

**PARTIES**

1.      Plaintiff Gail Osborn is a United States citizen and was a resident of Jefferson County, Iowa at all times relevant to the events complained of herein.

2.      Plaintiff Tim McConnell Seaba is a United States citizen and was a resident of Jefferson County, Iowa at all times relevant to the events complained of herein.

3.      Plaintiff Gordon Seaba is a United States citizen and was a resident of Jefferson County, Iowa at all times relevant to the events complained of herein.

4.      Defendant Chauncey Moulding is believed to be a citizen and resident of Jefferson County, Iowa and was employed as the Jefferson County Attorney at all times relevant to the events complained of herein.

5.      Defendant Kelsey Koenig is believed to be a citizen of Iowa and was employed by the Iowa Department of Health and Human Services at all times relevant to the events complaint of herein.

1

JEFFERSON COUNTY IOWA - 001

6.      Defendant Jefferson County, Iowa is an Iowa County. Defendant Jefferson County is the employer of Defendant Chauncey Moulding.

7.      Defendants are sued in their official and individual capacities.

## JURISDICTION AND VENUE

8.      This is a civil rights case brought under 42 U.S.C. § 1983 and the Fourth Amendment to the United States Constitution.

9.      This Court has jurisdiction under 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

10.     Venue is proper in this Court under 28 U.S.C. §§ 1391(b)(1)–(2) because all defendants reside in—and all events or omissions giving rise to Plaintiff's claims occurred in—the Central Division of the Southern District of Iowa.

## GENERAL FACTUAL ALLEGATIONS

11.     All events complained of herein occurred in Jefferson County, Iowa.

12.     Plaintiffs all live on a property located in Jefferson County. The property belongs to both Gordon Seaba and Timothy McConnell Seaba.

13.     Gordon Seaba lives in the main house on the property, while Timothy McConnell Seaba and Gail Osborn live in a separate home at the back of the property.

14.     On November 15, 2024, the Iowa Department of Health and Human Services ("HHS") received an anonymous complaint alleging that Gail Osborn had given birth to a daughter, Charlotte McConnell, two months prior and was using methamphetamine while caring for that child.

15.     The information relayed by the anonymous complainant was entirely false. Ms. Osborn was never pregnant in 2024, had not given birth, and was not using methamphetamine while caring for a child.

2

JEFFERSON COUNTY IOWA - 002

16.     HHS Child Protective Worker Kelsey Koenig was assigned to complete an assessment.

17.     Around 10:15am on November 15th, Defendant Koenig traveled to Plaintiffs' property.

18.     Upon arrival, Defendant Koenig spoke with Ms. Osborn regarding the allegations.

19.     Ms. Osborn denied being under the influence of any illegal substances or having an infant child.

20.     Defendant Koenig observed that Ms. Osborn was thin and exhibited no physical indications of having been recently pregnant.

21.     Ms. Osborn contacted Timothy McConnell Seaba on speaker phone, and he also spoke with Defendant Koenig.

22.     Timothy McConnell Seaba denied that Ms. Osborn had recently given birth and denied that either of them had been using illegal substances.

23.     Ms. Osborn allowed Defendant Koenig to inspect her home.

24.     Defendant Koenig observed the home was clean, with a made bed.

25.     Defendant Koenig did not observe anything indicating a baby resided at the home.

26.     Ms. Osborn advised Defendant Koenig that she suspected another person had called in a false complaint about a fictitious child due to a conflict with that person.

27.     Ms. Osborn advised Defendant Koenig that she was close friends with Alicia White and that Ms. White could provide Defendant Koenig with information regarding Ms. Osborn.

3

JEFFERSON COUNTY IOWA - 003

28.     Ms. Osborn went with Defendant Koenig to the main home.

29.     Gordon Seaba agreed to allow Defendant Koenig to inspect his home.

30.     Defendant Koenig did not observe anything indicating a baby had been present in the home or that Ms. Osborn was using illegal substances.

31.     Defendant Koenig left the property after inspecting both Ms. Osborn and Gordon Seaba's homes.

32.     Around 11:36am, Defendant Koenig spoke with Washington County Sheriff's Office Investigator Jayse Horning.

33.     Mr. Horning related to Defendant Koenig that he was familiar with Ms. Osborn from working with Ms. Osborn at the fair, and he had observed that she had not been pregnant that summer.

34.     Around 11:51am, Defendant Koenig contacted Alicia White, who was a local probation officer.

35.     Ms. White explained that she had befriended Ms. Osborn over a year and a half prior. Ms. Osborn would drop by and chat with Ms. White sometimes several times a week.

36.     Ms. White had spoken with Ms. Osborn about Ms. Osborn's older children before and was aware of Ms. Osborn's family members.

37.     Ms. White told Defendant Koenig that she had seen Ms. Osborn in form-fitting clothing over the past year and had never observed that Ms. Osborn was pregnant.

38.     Ms. White further told Defendant Koenig that Ms. Osborn had never shown any signs of drug use.

4

JEFFERSON COUNTY IOWA - 004

39.     Ms. White then emailed Defendant Koenig around 1:15pm on November 15th, confirming the information she had provided on the phone.

40.     Around 2:26pm on November 15th, Defendant Koenig contacted another individual who also had no information suggesting that Ms. Osborn had recently been pregnant.

41.     Defendant Koenig accordingly had no information suggesting that the anonymous complaint was valid.

42.     To the contrary, all of the information Defendant Koenig possessed confirmed that there was no such child and the complaint was false.

43.     Around 3:23pm on November 15th, Defendant spoke to Defendant Moulding, who requested that Defendant Koenig return to Plaintiffs' property with law enforcement and ask Gordon Seaba to search the property.

44.     Around 4:00, Defendant Koenig and Defendant Moulding arrived at Plaintiffs' property.

45.     Defendant Koenig and Defendant Moulding were accompanied by Assistant Jefferson County Attorney Elizabeth Estey, Jefferson County Sheriff's Deputy Burnett, Jefferson County Sheriff's Deputy Miller, and two Washington County Sheriff's Deputies.

46.     Defendants did not possess a warrant to search any part of Plaintiffs' property.

47.     Defendant Moulding arrived first and encountered Timothy McConnell Seaba on the driveway.

48.     Timothy McConnell Seaba informed Defendant Moulding that he was a property owner and that no one was allowed on his property without a warrant.

5

JEFFERSON COUNTY IOWA - 005

49.     Defendant Moulding ignored Timothy McConnell Seaba and continued up the driveway to the main house.

50.     Defendant Koenig followed Defendant Moulding up the driveway in her own vehicle.

51.     The law enforcement officers and Elizabeth Estey remained at the bottom of the driveway and parked on the road.

52.     Defendant Moulding opened the door to the main house and entered Gordon Seaba's home without asking for or receiving consent.

53.     Ms. Osborn and Defendant Koenig followed Defendant Moulding inside Mr. Seaba's home.

54.     Defendant Koenig likewise did not ask for or receive consent to enter Mr. Seaba's home.

55.     Gordon Seaba told Defendant Moulding to get out of his home.

56.     Defendant Moulding did not honor Gordon Seaba's directive.

57.     Gordon Seaba repeatedly refused Defendant Moulding's demand to search the property.

58.     Defendant Moulding and Defendant Koenig proceeded to search Gordon Seaba's home.

59.     Ms. Osborn and Mr. McConnell Seaba spoke to the law enforcement officers at the bottom of the driveway and emphatically stated that the presence of Defendants and law enforcement at their property was a violation of their Fourth Amendment rights.

6

JEFFERSON COUNTY IOWA - 006

60.     Ms. Osborn and Mr. McConnell Seaba emphatically told everyone to leave the property.

61.     Defendant Moulding telephoned Deputy Miller and informed Deputy Miller that Gordon Seaba had consented to a search of his property.

62.     Based on Defendant Moulding's representation, law enforcement entered the property and conducted a search of outbuildings and campers on the property.

63.     Defendant Moulding and Defendant Koenig participated in the search of the property.

64.     No evidence that a baby had ever existed was found on the property.

65.     Defendant Moulding then approached Ms. Osborn and Mr. McConnell Seaba's home.

66.     Ms. Osborn told Defendant Moulding that he did not have permission to enter her home without a warrant.

67.     Ms. Osborn invoked the Fourth Amendment and told Defendant Moulding she would sue him if he entered her home.

68.     Defendant Moulding blatantly ignored Ms. Osborn and entered Ms. Osborn and Mr. McConnell Seaba's home, anyway.

69.     Ms. Osborn commented to Defendant Moulding "Warrant! You're a county attorney. You know the law. And you walk all over it."

70.     Ms. Osborn asked Defendant Moulding, "Are you dumb?" and Defendant Moulding responded, "I don't know, some days."

71.     Ms. Osborn and Mr. McConnell Seaba continued to direct everyone on the property to leave.

7

JEFFERSON COUNTY IOWA - 007

72.  Defendant Moulding laughed at Mr. McConnell Seaba.

73.  Defendant Moulding and Defendant Koenig refused to leave the property for several more minutes.

74.  Defendant Koenig subsequently deemed the anonymous complaint was "unfounded" because there was no evidence that a 2-month-old child existed, or that Ms. Osborn had recently been pregnant, or that Ms. Osborn had used any illegal substances.

75.  As a result of Defendants' actions, Plaintiffs experienced emotional distress.

## CAUSES OF ACTION

### COUNT 1
### CIVIL RIGHTS VIOLATION UNDER 42 U.S.C § 1983
### VIOLATION OF 4th AMENDMENT TO THE UNITED STATES CONSTITUTION
### RIGHT TO BE FREE FROM UNREASONABLE SEARCHES
### (Against Defendants Moulding and Defendant Koenig, Individually)

76.  Defendants Moulding and Koenig are persons for the purpose of a Section 1983 action for damages and this Count is brought against them in their individual capacity.

77.  At all times material hereto, Defendants' actions and omissions were made under the color of authority and law.

78.  It is clearly established that government actors cannot enter or search a property without a warrant, absent a recognized exigency or exception. *Webster v. Westlake*, 41 F.4th 1004, 1011 (8th Cir. 2022).

79.  Defendants violated Plaintiff's clearly established federal constitutional rights by entering and searching their property without probable cause, reasonable suspicion, an exigency, or any other exception allowing them to do so.

80.  Defendants were on notice that their conduct was unconstitutional.

8

JEFFERSON COUNTY IOWA - 008

81. Defendants demonstrated a deliberate indifference to and reckless disregard of Plaintiffs' civil and constitutional rights.

82. Defendants' actions were willful, wanton, unlawful, and in gross disregard of Plaintiff's civil rights, justifying an award of punitive damages.

83. As a result of the Defendants' illegal and unjustified conduct, Plaintiffs were injured and are entitled to recover for what have suffered in the past and will suffer in the future.

## COUNT 2
## TRESPASS
## Against Defendants Moulding

84. Plaintiffs were in possession of the property where their homes were located.

85. Defendants Moulding and Koenig reached an agreement to trespass on Plaintiffs' property and committed acts in furtherance of their conspiracy to trespass.

86. Defendant Moulding intentionally entered Plaintiffs' property without permission or legal justification to do so.

87. Defendant Moulding caused other law enfocement officers to enter Plaintiffs' property without permission or legal justification to do so.

88. Defendant remained on Plaintiffs' property after Plaintiffs instructed them to leave.

89. Plaintiffs were damaged by Defendant's actions.

## COUNT 3
## INVASION OF PRIVACY
## Against Defendant Moulding

90. Defendants intentionally intruded on Plaintiffs' solitude, seclusion, and/or private affairs.

9

JEFFERSON COUNTY IOWA - 009

91.  Defendants' actions would be highly offensive to a reasonable person.

92.  Plaintiffs were damaged by Defendants' actions.

## COUNT 4
## RESPONDEAT SUPERIOR
### against Jefferson County

93.  Defendant Jefferson County, Iowa employed Defendant Moulding and thus is liable for his tortious conduct pursuant to the doctrine of respondeat superior.

94.  The tort against Plaintiffs occurred within the scope of Defendant Moulding's employment relationship with Jefferson County.

95.  Defendant Moulding was performing an act in furtherance of Jefferson County's interests.

## PRAYER FOR RELIEF

Plaintiffs pray for Judgment against the aforementioned Defendants as follows:

a.  Actual, Compensatory, Consequential, and all other allowable damages against Defendants in an amount yet to be determined;

b.  Compensation for violation of their constitutional rights, mental anguish, and humiliation;

c.  Plaintiff's cost in this action, including reasonable attorney's fees and costs pursuant to 42 U.S.C. § 1988;

d.  An award of pre-judgment interest;

e.  Punitive damages; and

f.  Any other relief the Court deems just and equitable.

## JURY DEMAND

Plaintiffs hereby demand a trial by jury in this matter on all counts to which Plaintiffs are entitled to a jury.

10

JEFFERSON COUNTY IOWA - 010

**PARRISH KRUIDENIER, L.L.P.**

By: ___/s/ Gina Messamer_____
        Gina Messamer        AT0011823
        2910 Grand Avenue
        Des Moines, Iowa 50312
        Telephone: (515) 284-5737
        Facsimile: (515) 284-1704
        Email: gmessamer@parrishlaw.com
        **ATTORNEY FOR PLAINTIFFS**

By: ___/s/ Edward Harvey_____
        Edward G. Harvey        AT0003350
        1600 Wonder Way
        Fairfield IA, 52556
        Telephone: (641) 919-8696
        Email: edwardgharvey98@yahoo.com
        **ATTORNEY FOR PLAINTIFFS**

**CERTIFICATE OF SERVICE**

The undersigned hereby certifies that on May 22, 2025, I electronically filed the foregoing with the Clerk of Court using the ECF system and a true copy of the foregoing was served electronically on the attorneys of record.

By: ___/s/ Gina Messamer_____

11

JEFFERSON COUNTY IOWA - 011

# CIVIL COVER SHEET

The JS 44 civil cover sheet and the information contained herein neither replace nor supplement the filing and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. *(SEE INSTRUCTIONS ON NEXT PAGE OF THIS FORM.)*

## I. (a) PLAINTIFFS

Gail Osborn, Timothy McConnell-Seaba, & Gordon Seaba

**DEFENDANTS**

See Attachment.

**(b)** County of Residence of First Listed Plaintiff    Jefferson
*(EXCEPT IN U.S. PLAINTIFF CASES)*

County of Residence of First Listed Defendant _____
*(IN U.S. PLAINTIFF CASES ONLY)*

NOTE:   IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED.

**(c)** Attorneys *(Firm Name, Address, and Telephone Number)*

See Attachment.

Attorneys *(If Known)*

## II. BASIS OF JURISDICTION *(Place an "X" in One Box Only)*

| | | |
|---|---|---|
| ☐ 1 | U.S. Government Plaintiff | ☒ 3 Federal Question *(U.S. Government Not a Party)* |
| ☐ 2 | U.S. Government Defendant | ☐ 4 Diversity *(Indicate Citizenship of Parties in Item III)* |

## III. CITIZENSHIP OF PRINCIPAL PARTIES *(Place an "X" in One Box for Plaintiff*
*(For Diversity Cases Only)*   *and One Box for Defendant)*

| | PTF | DEF | | PTF | DEF |
|---|---|---|---|---|---|
| Citizen of This State | ☒ 1 | ☒ 1 | Incorporated *or* Principal Place of Business In This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated *and* Principal Place of Business In Another State | ☐ 5 | ☐ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. NATURE OF SUIT *(Place an "X" in One Box Only)*

Click here for: Nature of Suit Code Descriptions.

| CONTRACT | TORTS | FORFEITURE/PENALTY | BANKRUPTCY | OTHER STATUTES |
|---|---|---|---|---|
| ☐ 110 Insurance | **PERSONAL INJURY**    **PERSONAL INJURY** | ☐ 625 Drug Related Seizure of Property 21 USC 881 | ☐ 422 Appeal 28 USC 158 | ☐ 375 False Claims Act |
| ☐ 120 Marine | ☐ 310 Airplane    ☐ 365 Personal Injury - | ☐ 690 Other | ☐ 423 Withdrawal 28 USC 157 | ☐ 376 Qui Tam (31 USC 3729(a)) |
| ☐ 130 Miller Act | ☐ 315 Airplane Product      Product Liability | | | ☐ 400 State Reapportionment |
| ☐ 140 Negotiable Instrument |      Liability    ☐ 367 Health Care/ | | **INTELLECTUAL PROPERTY RIGHTS** | ☐ 410 Antitrust |
| ☐ 150 Recovery of Overpayment & Enforcement of Judgment | ☐ 320 Assault, Libel &      Pharmaceutical      Slander      Personal Injury | | ☐ 820 Copyrights | ☐ 430 Banks and Banking |
| ☐ 151 Medicare Act | ☐ 330 Federal Employers'      Product Liability | | ☐ 830 Patent | ☐ 450 Commerce |
| ☐ 152 Recovery of Defaulted Student Loans (Excludes Veterans) |      Liability    ☐ 368 Asbestos Personal ☐ 340 Marine      Injury Product ☐ 345 Marine Product      Liability | | ☐ 835 Patent - Abbreviated New Drug Application ☐ 840 Trademark | ☐ 460 Deportation ☐ 470 Racketeer Influenced and Corrupt Organizations |
| ☐ 153 Recovery of Overpayment of Veteran's Benefits |      Liability    **PERSONAL PROPERTY** ☐ 350 Motor Vehicle    ☐ 370 Other Fraud | **LABOR** | ☐ 880 Defend Trade Secrets Act of 2016 | ☐ 480 Consumer Credit (15 USC 1681 or 1692) |
| ☐ 160 Stockholders' Suits | ☐ 355 Motor Vehicle    ☐ 371 Truth in Lending | ☐ 710 Fair Labor Standards Act | | ☐ 485 Telephone Consumer |
| ☐ 190 Other Contract |      Product Liability    ☐ 380 Other Personal | ☐ 720 Labor/Management | **SOCIAL SECURITY** |      Protection Act |
| ☐ 195 Contract Product Liability | ☐ 360 Other Personal      Property Damage |      Relations | ☐ 861 HIA (1395ff) | ☐ 490 Cable/Sat TV |
| ☐ 196 Franchise |      Injury    ☐ 385 Property Damage | ☐ 740 Railway Labor Act | ☐ 862 Black Lung (923) | ☐ 850 Securities/Commodities/ |
| | ☐ 362 Personal Injury -      Product Liability      Medical Malpractice | ☐ 751 Family and Medical Leave Act | ☐ 863 DIWC/DIWW (405(g)) ☐ 864 SSID Title XVI |      Exchange ☐ 890 Other Statutory Actions |
| **REAL PROPERTY** | **CIVIL RIGHTS**    **PRISONER PETITIONS** | ☐ 790 Other Labor Litigation ☐ 791 Employee Retirement | ☐ 865 RSI (405(g)) | ☐ 891 Agricultural Acts ☐ 893 Environmental Matters |
| ☐ 210 Land Condemnation | ☒ 440 Other Civil Rights    **Habeas Corpus:** |      Income Security Act | **FEDERAL TAX SUITS** | ☐ 895 Freedom of Information |
| ☐ 220 Foreclosure | ☐ 441 Voting    ☐ 463 Alien Detainee | | ☐ 870 Taxes (U.S. Plaintiff |      Act |
| ☐ 230 Rent Lease & Ejectment | ☐ 442 Employment    ☐ 510 Motions to Vacate | |      or Defendant) | ☐ 896 Arbitration |
| ☐ 240 Torts to Land | ☐ 443 Housing/      Sentence | | ☐ 871 IRS—Third Party | ☐ 899 Administrative Procedure |
| ☐ 245 Tort Product Liability |      Accommodations    ☐ 530 General | |      26 USC 7609 |      Act/Review or Appeal of |
| ☐ 290 All Other Real Property | ☐ 445 Amer. w/Disabilities -    ☐ 535 Death Penalty | **IMMIGRATION** | |      Agency Decision |
| |      Employment    **Other:** | ☐ 462 Naturalization Application | | ☐ 950 Constitutionality of |
| | ☐ 446 Amer. w/Disabilities -    ☐ 540 Mandamus & Other      Other    ☐ 550 Civil Rights | ☐ 465 Other Immigration      Actions | |      State Statutes |
| | ☐ 448 Education    ☐ 555 Prison Condition ☐ 560 Civil Detainee -      Conditions of      Confinement | | | |

## V. ORIGIN *(Place an "X" in One Box Only)*

| | | | | | | |
|---|---|---|---|---|---|---|
| ☒ 1 Original Proceeding | ☐ 2 Removed from State Court | ☐ 3 Remanded from Appellate Court | ☐ 4 Reinstated or Reopened | ☐ 5 Transferred from Another District *(specify)* | ☐ 6 Multidistrict Litigation - Transfer | ☐ 8 Multidistrict Litigation - Direct File |

## VI. CAUSE OF ACTION

Cite the U.S. Civil Statute under which you are filing *(Do not cite jurisdictional statutes unless diversity)*:
42 USC 1983

Brief description of cause:   Claims related to illegal seizure of Plaintiff

## VII. REQUESTED IN COMPLAINT:

☐ CHECK IF THIS IS A **CLASS ACTION** UNDER RULE 23, F.R.Cv.P.

DEMAND $

CHECK YES only if demanded in complaint:
**JURY DEMAND:**   ☒ Yes   ☐ No

## VIII. RELATED CASE(S) IF ANY

*(See instructions):*    JUDGE _____   DOCKET NUMBER _____

DATE   5/22/2025

SIGNATURE OF ATTORNEY OF RECORD
/s/ Gina Messamer

**FOR OFFICE USE ONLY**

RECEIPT # _____   AMOUNT _____   APPLYING IFP _____   JUDGE _____   MAG. JUDGE _____

JEFFERSON COUNTY IOWA - 012

**CIVIL COVER SHEET
ATTACHMENT**

Plaintiffs' Attorneys

Gina Messamer  AT0011823
2910 Grand Avenue
Des Moines, Iowa 50312
Telephone: (515) 284-5737
Facsimile: (515) 284-1704
Email: gmessamer@parrishlaw.com


Edward G. Harvey  AT0003350
1600 Wonder Way
Fairfield IA, 52556
Telephone: (641) 919-8696
Email: edwardgharvey98@yahoo.com



Defendants

Chauncey Moulding
Kelsey Koenig
Jefferson County, Iowa

JEFFERSON COUNTY IOWA - 013

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| **GAIL OSBORN, TIM MCCONNELL SEABA, and GORDON SEABA,** | **Case No. 4:25-cv-00183-SHL-SBJ** |
| **Plaintiffs,** | |
| **vs.** | |
| **CHAUNCEY MOULDING, KELSEY KOENIG, and JEFFERSON COUNTY, IOWA,** | **TIM MCCONNELL SEABA'S ANSWERS TO DEFENDANTS CHAUNCEY MOULDING AND JEFFERSON COUNTY IOWA'S FIRST SET OF INTERROGATORIES** |
| **Defendants.** | |

**COMES NOW**, the Plaintiff, Tim McConnell Seaba, by and through his undersigned counsel, and pursuant to Federal Rule of Civil Procedure 33, hereby provides his Answers to Defendant Chauncey Moulding and Jefferson County's Interrogatories.

**PARRISH KRUIDENIER, L.L.P.**

By: ___/s/ Gina Messamer_____
       Gina Messamer       AT0011823
       Kyle Dawson        AT0015700
       2910 Grand Avenue
       Des Moines, Iowa 50312
       Telephone: (515) 284-5737
       Facsimile: (515) 284-1704
       Email: gmessamer@parrishlaw.com
             kdawson@parrishlaw.com

**ATTORNEYS FOR PLAINTIFFS**

1

JEFFERSON COUNTY IOWA - 014

INTERROGATORY NO. 6: Did you give Defendant Moulding, Defendant Koenig, or any representative of Jefferson County permission to search the Property on November 15, 2024? If so, please describe the specific consent you provided and to whom it was given..

ANSWER:  **No, I never gave consent to Defendant Moulding or Defendant Koenig to search my property. When the Defendants searched my property in the afternoon/evening of November 15th, I gave consent to the sheriff's deputies to be on my property. I expressly asked Defendants Moulding and Koenig to leave the property.**

8

JEFFERSON COUNTY IOWA - 015

 **JEFFERSON COUNTY ASSESSOR**


Assessor Hub provided by
Vanguard Appraisals, Inc

**Parcel Number:**
04-02-400-008
**Deed Holder:**
SEABA,GORDON LIFE EST
**Contract Buyer:**

**Property Address:**
3251 110TH ST
BRIGHTON MAP THIS ADDRESS
**Class:**
RESIDENTIAL
**Map Area:**
WALNUT-R
**Legal Description:**
W PT SW SE 2 73 8
**Property Report:**
PROPERTY REPORT (PDF FILE)



Pin 04-02-400-008 Photo

1 / 4

   

### Current value as of January 01, 2026- Taxes payable September 2027 and March 2028

| Land Value | Dwelling Value | Improvement Value | Total Value |
|---|---|---|---|
| $37,000 | $112,200 | $0 | $149,200 |

### Land Information

| Lot Type | Square Feet | Acres |
|---|---|---|
| Site and Excess | 115,434 | 2.650 |

### Residential Building Information

| Occupancy | Style | Year Built | Total Living Area |
|---|---|---|---|
| Single-Family / Owner Occupied | 1 Story Frame | 1917 | 1,861 |

### Yard Extra Information

| Description | Item Count | Year Built |
|---|---|---|
| Canopy | 1 | 1999 |
| DECK | 1 | 1994 |
| Shed | 1 | 1990 |
| Shed | 1 | 1990 |
| Shed | 1 | 1990 |
| Shed | 1 | 2000 |
| Shed | 1 | 2000 |
| Shed | 1 | 2016 |

Year Built: 2016
Description: Shed

| | |
|---|---|
| Type: | Frame Shed |
| Pricing: | Average |
| Width: | 8.00 |
| Length: | 12.00 |
| Area: | 96 Square Feet |
| Count: | 1 |
| Plot Number: | Y8 |

**Sale Information**

| Sale Date | Amount | Non-Useable Transaction Code | Recording |
|---|---|---|---|
| ▼ 06/14/2006 | $0 | 1 - Quit Claim Deed | 2006-1377 |
| ▼ 07/18/2001 | $0 | 17 - Sale between family members or related parties | 222-691 |
| ▼ 05/06/1994 | $0 | 50 - Other with explaination | 207-040 |
| ▼ 04/21/1988 | $32,000 | 0 - Normal | 185-232 |
| ▼ 04/21/1988 | $0 | 38 - No consideration | 185-235 |

JEFFERSON COUNTY IOWA - 017

**Sketch**



Sketch of Pin 04-02-400-008

3 / 3



**GIS Map Information**

JEFFERSON COUNTY IOWA - 018



Pictometry Online



JEFFERSON COUNTY IOWA - 020

**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION**

| | |
|---|---|
| GAIL OSBORN, TIM MCCONNELL SEABA, and GORDON SEABA, <br><br> Plaintiffs, <br><br> vs. <br><br> CHAUNCEY MOULDING, KELSEY KOENIG, and JEFFERSON COUNTY, IOWA, <br><br> Defendants. | Case No. **4:25-cv-00183-SHL-SBJ** <br><br><br> **GAIL OSBORN'S ANSWERS TO DEFENDANTS CHAUNCEY MOULDING AND JEFFERSON COUNTY IOWA'S FIRST SET OF INTERROGATORIES** |

**COMES NOW**, the Plaintiff, Gail Osborn, by and through her undersigned counsel, and pursuant to Federal Rule of Civil Procedure 33, hereby provides her Answers to Defendant Chauncey Moulding and Jefferson County's Interrogatories.

**PARRISH KRUIDENIER, L.L.P.**

By: ___/s/_ Gina Messamer_____
     Gina Messamer       AT0011823
     Kyle Dawson         AT0015700
     2910 Grand Avenue
     Des Moines, Iowa 50312
     Telephone: (515) 284-5737
     Facsimile: (515) 284-1704
     Email: gmessamer@parrishlaw.com
            kdawson@parrishlaw.com

**ATTORNEYS FOR PLAINTIFFS**

1

JEFFERSON COUNTY IOWA - 021

INTERROGATORY NO. 6: Did you give Defendant Moulding, Defendant Koenig, or any representative of Jefferson County permission to search the Property on November 15, 2024? If so, please describe the specific consent you provided and to whom it was given.

ANSWER: **I gave consent to Defendant Koenig to search my property on the morning of November 15, 2024 at approximately 10:15 AM. I expressly told the Defendants they were not welcome on my property when they came back that evening at approximately 4:00 PM. When Defendants returned at 4:00 PM, I gave the police officers present permission to be on my property, but I asked Defendants Moulding and Koenig to leave.**

JEFFERSON COUNTY IOWA - 022

# Jefferson County, IA

## Summary

| | |
|---|---|
| Parcel ID | 0402400008 |
| Alternate ID | 0230150000 |
| Property Address | 3251 110TH ST |
| | BRIGHTON IA 52540 |
| Sec/Twp/Rng | 02-73-8 |
| Brief Tax Description | W PT SW SE 2 73 8 |
| | (Note: Not to be used on legal documents) |
| Deed Book/Page | 2006-1377 (6/14/2006) |
| Contract Book/Page | |
| Gross Acres | 2.65 |
| Net Acres | 2.65 |
| Class | R - Residential |
| | (Note: This is for tax purposes only. Not to be used for zoning.) |
| District | 06 23 - WALNUT TWP/WASHINGTON SCH |
| School District | WASHINGTON COMMUNITY SCHOOL |



DWELLING

## Owners

**Deed Holder**
Seaba,Gordon Life Est
3251 110th St
Brighton IA 52540
**Contract Holder**
**Mailing Address**
Seaba,Gordon Life Est
3251 110th St
Brighton IA 52540

## Land

Lot Area     2.65 Acres ;115,434 SF

## Residential Dwellings

| Residential Dwelling | |
|---|---|
| Occupancy | Single-Family / Owner Occupied |
| Style | 1 Story Frame |
| Architectural Style | Conventional |
| Year Built | 1917 |
| Condition | Poor |
| Grade what's this? | 4 |
| Roof | Asph / Gable |
| Flooring | Vinyl / Hdwd |
| Foundation | C Blk |
| Exterior Material | Stl |
| Interior Material | Plas / Panel |
| Brick or Stone Veneer | |
| Total Gross Living Area | 1,861 SF |
| Attic Type | Fully Finished; 429 SF |
| Number of Rooms | 5 above; 0 below |
| Number of Bedrooms | 3 above; 0 below |
| Basement Area Type | Full |
| Basement Area | 780 |
| Basement Finished Area | |
| Plumbing | 1 Standard Bath - 3 Fixt; |
| Appliances | |
| Central Air | Yes |
| Heat | Yes |
| Fireplaces | |
| Porches | 1S Frame Open (154 SF); 1S Frame Open (112 SF); |
| Decks | |
| Additions | 2 Story Frame (144 SF); |
| | 1 Story Frame (364 SF); |
| Garages | 1,440 SF (30F W x 48F L) - Det Frame (Built 2003); |

JEFFERSON COUNTY IOWA - 023

## Yard Extras

#1 - (1) DECK Quantity=1.00, Units=N/A, Height=0, Built 1994
#2 - (1) Canopy 288 SF, Frame, Low Pricing, Built 1999
#3 - (1) Shed W8.00 x L12.00 96 SF, Frame Shed, Low Pricing, Built 1990
#4 - (1) Shed W10.00 x L20.00 200 SF, Frame Shed, Average Pricing, Built 1990
#5 - (1) Shed W10.00 x L14.00 140 SF, Frame Shed, Average Pricing, Built 1990
#6 - (1) Shed W12.00 x L16.00 192 SF, Frame Shed, Low Pricing, Built 2000
#7 - (1) Shed W12.00 x L20.00 240 SF, Frame Shed, Low Pricing, Built 2000
#8 - (1) Shed W8.00 x L12.00 96 SF, Frame Shed, Average Pricing, Built 2016

## Sales

| Date | Seller | Buyer | Recording | Sale Condition - NUTC | Type | Multi Parcel | Amount |
|---|---|---|---|---|---|---|---|
| 6/14/2006 | HORTON CONNIE M | SEABA GORDON LIFE ESTATE/MASIKER ARON/SEABA TIMOTHY/SEABA ASHLEY | 2006-1377 | Quit Claim Deed | Quit Claim Deed | | $0.00 |
| 7/18/2001 | MC CONNELL,REBECCA FKA SEABA,REBECCA | MC CONNELL,REBECCA/HORTON,CONSTANCE M | 222-691 | Sale between family members or related parties | WD | | $0.00 |
| 5/6/1994 | SEABA,GORDON F/SEABA,REBECCA | SEABA,REBECCA | 207-040 | Other with explaination | Change of Title | | $0.00 |
| 4/21/1988 | STARR,ELIJAH W AKA STARR,JAMES RAY/STARR,BETTY/STARR,BILLIE/STARR,JAMES R | MASSIKER,REBECCA J NKA SEABA,REBECCA J | 185-232 | Normal | WD | | $32,000.00 |
| 4/21/1988 | STARR,MYRTIE S/STARR,NINA P/STARR,PHILLIP E/ | MASSIKER,REBECCA J/SEABA,REBECCA J | 185-235 | No consideration | WD | | $0.00 |

⊞ There are other parcels involved in one or more of the above sales:
Recording: 222-691 - Parcel: 0402400009

## Valuation

| | | 2026 | 2025 | 2024 | 2023 | 2022 |
|---|---|---|---|---|---|---|
| | Classification | Residential | Residential | Residential | Residential | Residential |
| + | Assessed Land Value | $37,000 | $37,000 | $37,000 | $37,000 | $37,000 |
| + | Assessed Building Value | $0 | $0 | $0 | $0 | $0 |
| + | Assessed Dwelling Value | $112,200 | $112,200 | $96,200 | $96,200 | $67,500 |
| = | **Gross Assessed Value** | **$149,200** | **$149,200** | **$133,200** | **$133,200** | **$104,500** |
| - | Exempt Value | $0 | $0 | $0 | $0 | $0 |
| = | **Net Assessed Value** | **$149,200** | **$149,200** | **$133,200** | **$133,200** | **$104,500** |

## Taxation

| | | 2024 Pay 2025-2026 | 2023 Pay 2024-2025 | 2022 Pay 2023-2024 |
|---|---|---|---|---|
| = | **Taxable Value** | **$59,179** | **$57,729** | **$55,258** |
| x | Levy Rate (per $1000 of value) | 29.69739 | 29.59662 | 28.94741 |
| = | **Gross Taxes Due** | **$1,757.46** | **$1,708.58** | **$1,599.58** |
| = | **Net Taxes Due** | **$1,614.00** | **$1,566.00** | **$1,460.00** |

Notice: Due to Iowa House Bill 2382 we are no longer able to provide detailed information related to property tax credits on real estate properties.
Please contact the Assessor's office if you require additional information.

## Tax History

| Year | Due Date | Amount | Paid | Date Paid | Receipt |
|---|---|---|---|---|---|
| 2024 | March 2026 | $807 | Yes | 4/3/2026 | 765547 |
| | September 2025 | $807 | Yes | 9/19/2025 | |
| 2024 | March 2026 | $6 | Yes | 4/3/2026 | 765547 |
| | September 2025 | $0 | No | | |
| 2023 | March 2025 | $783 | Yes | 3/10/2025 | 747244 |
| | September 2024 | $783 | Yes | 8/26/2024 | |
| 2022 | March 2024 | $0 | No | | 729022 |
| | September 2023 | $16 | Yes | 11/20/2023 | |
| 2022 | March 2024 | $730 | Yes | 5/21/2024 | 729022 |
| | September 2023 | $730 | Yes | 11/20/2023 | |
| 2022 | March 2024 | $22 | Yes | 5/21/2024 | 729022 |
| | September 2023 | $0 | No | | |
| 2021 | March 2023 | $15 | Yes | 5/22/2023 | 710681 |
| | September 2022 | $0 | No | | |

JEFFERSON COUNTY IOWA - 024

| Year | Due Date | Amount | Paid | Date Paid | Receipt |
|------|----------|-------:|------|-----------|--------:|
| 2021 | March 2023 | $715 | Yes | 5/22/2023 | 710681 |
|      | September 2022 | $715 | Yes | 9/29/2022 | |
| 2020 | March 2022 | $0 | No | | 655760 |
|      | September 2021 | $22 | Yes | 11/12/2021 | |
| 2020 | March 2022 | $11 | Yes | 5/31/2022 | 655760 |
|      | September 2021 | $0 | No | | |
| 2020 | March 2022 | $725 | Yes | 5/31/2022 | 655760 |
|      | September 2021 | $725 | Yes | 11/12/2021 | |
| 2019 | March 2021 | $714 | Yes | 9/9/2020 | 637469 |
|      | September 2020 | $714 | Yes | 9/9/2020 | |
| 2018 | March 2020 | $744 | Yes | 5/10/2021 | 619130 |
|      | September 2019 | $744 | Yes | 9/18/2019 | |
| 2018 | March 2020 | $112 | Yes | 5/10/2021 | 619130 |
|      | September 2019 | $0 | No | | |
| 2017 | March 2019 | $4 | Yes | 6/7/2019 | 605070 |
|      | September 2018 | $0 | No | | |
| 2017 | March 2019 | $0 | No | | 605070 |
|      | September 2018 | $10 | Yes | 10/25/2018 | |
| 2017 | March 2019 | $689 | Yes | 6/7/2019 | 605070 |
|      | September 2018 | $689 | Yes | 10/25/2018 | |
| 2017 | March 2019 | $31 | Yes | 6/7/2019 | 605070 |
|      | September 2018 | $0 | No | | |

## Pay Property Taxes

Click here to pay your Property Taxes online for this parcel at iowatreasurers.org

## Photos







## Sketches

JEFFERSON COUNTY IOWA - 025







Sketch by www.camavision.com

**Map**



**No data available for the following modules:** Commercial Buildings, Agricultural Buildings, Tax Sale Certificates.

The Jefferson County Assessors Office makes every effort to produce the most accurate information possible. No warranties, expressed or implied are provided for the data herein, its use or interpretation. The assessment information is from the last certified assessment roll. All other data is subject to change.
| User Privacy Policy | GDPR Privacy Notice
Last Data Upload: 5/19/2026, 7:47:46 PM

Contact Us

Developed by


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

GAIL OSBORN, TIMOTHY )
MCCONNELL-SEABA, and )
GORDON SEABA, ) Case No. 4:25-cv-183
)
Plaintiffs, )
)
vs. )
) DEPOSITION OF
CHAUNCEY MOULDING, ) ELIZABETH ESTEY
KELSEY KOENIG, and )
JEFFERSON COUNTY, )
IOWA, )
)
Defendants. )
--------------------)

THE DEPOSITION OF ELIZABETH ESTEY, taken

before Buffy Nelson, Registered Professional

Reporter and Notary Public, commencing at

11:54 a.m. on March 4, 2026, at 2910 Grand

Avenue, Des Moines, Iowa.

Reported by:  Buffy Nelson, R.P.R.

---

APPEARANCES

Plaintiffs by:
    GINA MESSAMER
    Attorney at Law
    Parrish Kruidenier, LLP
    2910 Grand Avenue
    Des Moines, IA 50312
    (515) 284-5737
    gmessamer@parrishlaw.com
        -and-
    EDWARD HARVEY
    Attorney at Law
    1600 Wonder Way
    Fairfield, IA 52556
    (641) 919-8696

Defendants Chauncey Moulding and
Jefferson County, Iowa, by:
    BRENT HINDERS
    CAMRYN HUYSER
    Attorneys at Law
    Hinders, Updegraff & Franklin, PLC
    1104 Sunset Drive
    Norwalk, IA 50211
    (515) 981-7044
    brent@hinderslaw.com
    camryn@hinderslaw.com

Defendant Kelsey Koenig by:
    RYAN PATRICK SHEAHAN
    Assistant Attorney General
    Hoover State Office Building
    1305 East Walnut Street
    Des Moines, IA 50319
    (515) 281-5881
    ryan.sheahan@ag.iowa.gov

---

I N D E X

Examination by:    Page

Ms. Messamer      4

Mr. Sheahan      27

(No exhibits were marked.)

---

ELIZABETH ESTEY,

called as a witness, having been first duly

sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MESSAMER:

Q.    Let's just hear a little bit about your employment background. I don't know any of that. So what year did you finish law school?

A.    '22.

Q.    Okay. Was this your first job out of law school, then?

A.    No. I worked at Disability Rights Iowa.

Q.    What took you to law school?

A.    Wanting to help people.

Q.    Are you from Fairfield?

A.    Kind of.

Q.    So then when did you get the job at the county attorney's office?

A.    March of '23.

Q.    Who makes the hiring decision for you?

A.    There was a committee. It's pretty much everybody, I think, in the office who was at my interview.

JEFFERSON COUNTY IOWA - 028

**9**

where other people are not allowed to carry. I can carry it anywhere in Iowa, but if I wanted to go into the courtroom with it --

Q. That's when you have to get the training?

A. Uh-huh.

Q. Did you know Gail Osborn before the day that this case is about, November 15 of 2024?

A. No.

Q. Have you had any interaction with Gail Osborn since that day?

A. No.

Q. How about, did you have a work relationship with Kelsey Koenig?

A. Yes.

Q. Okay. Back in November of 2024 you worked with her for your job?

A. Yes.

Q. How long had you worked with her?

A. Since I started at the county attorney's office.

Q. Is she, like, your one main DHS person you're working with?

A. No. There are several I work with.

**10**

She's just one of them.

Q. Okay. Tell me, then, the first thing you remember hearing about this issue with Gail Osborn.

A. I believe Gail called the office and I spoke with her.

Q. And you had not talked to Kelsey prior to Gail calling?

A. No.

Q. Any idea what time of day it was that you were called?

A. It was definitely before noon.

Q. What do you remember about that call?

A. I remember her being very frustrated about HHS coming to her property and talking to her about this allegation. Primarily my recollection was she was concerned that there was somebody -- the reporter was maybe harassing her or maybe the reporter was some person who currently had her children or had guardianship of her children, and so I -- as I recall, she was concerned about harassment from that individual.

Q. What did you tell Gail?

A. I definitely know that there was one

**11**

case where we charged harassment for a reporter to HHS. And I don't know if I talked to her about that at the time or not. It's pretty difficult to prove it. Of course, it's all confidential. So I said probably that I was going to speak with Kelsey to get some more information because this was the first I was hearing of any of it.

Q. Okay. So when you hung up with her, what did you do next in relation to this?

A. I'm pretty sure that I texted or -- I think I texted Kelsey.

Q. And then what?

A. And then she and I had a phone conversation.

Q. What did Kelsey say about the situation?

A. I was talking to her about it. It was very unusual. I've never -- so I work in juvenile law, so I handle all the children-in-need-of-assistance cases. I've never been contacted by a parent before or an individual before about HHS. So I was kind of just wondering what was going on.

She said that she had been out to

**12**

where Gail lives to interview her and had maybe -- and she told me about the report, that there were some very specific facts about a child being born to Gail who was born in August, or two months old, an infant, and that this person knew the date of the baby's birth, the baby's name, had seen the baby, and somehow was aware that there -- the baby had been exposed to methamphetamine.

I think we kind of speculated about who the reporter may be, given that that was the reason why I thought Gail was really upset. And then Kelsey told me about how she, since speaking with Gail, had been kind of following up on some of the things Gail told her during that initial discussion.

And I don't know -- I think it was during that conversation she said that there are some things that Gail had told her that weren't lining up and some additional concerns that arose after that interview. And she also mentioned when she went out there the first time feeling very uncomfortable and unsafe and that she felt she would need to interview Gail again, but that she wanted law enforcement

JEFFERSON COUNTY IOWA - 029

present.

Q.   What had she done in terms of following up on what Gail said, and what wasn't lining up?

A.   I don't -- I'm not quite sure of the timeline.  I know that there was somebody, a Washington, maybe, County deputy that she spoke with, somebody at the DOC, I think, who maybe Gail had told Kelsey that they were really close friends.  And then Kelsey spoke with the woman who said, "No, we're not."  There was some -- there was something about what Gail told Kelsey regarding the woman who worked in probation that kind of made Kelsey a little concerned after the conversation with that woman.

I do recall -- and I don't know when Kelsey discovered this information, but at some point she spoke with maybe somebody in Washington County Fire Department about Gail calling regarding Safe Haven boxes and where she could find one or some -- getting some additional information about them.  I think Kelsey found that a little concerning.

Q.   Anything else you can remember about just the facts and what was concerning?

A.   We talked about getting -- you know, if she was able to get any medical records, like any -- you know, I talked to her about going to any hospitals to see if there -- if she could find any information about a baby being born there to Gail, obviously, you know, like some of those basic things, making sure that there wasn't some official record of this child and that it wasn't actually a secret at all.  Maybe they mentioned that Gail had a car seat in her car.  But that's -- that's more vague.  I remember kind of just the basics about our conversation.

Q.   Did Kelsey say that she saw anything at Gail's house that made her think there was a baby there?

A.   No.  But I know she felt very uncomfortable and she really didn't want to look around much, especially given the nature of the property with the different outbuildings.  There was a large number of outbuildings, and I think the property itself was kind of large.

Q.   Okay.  So after that call what was

your understanding what was going to happen next?

A.   She was going to go back out with law enforcement.  And I think I shared with her a deputy's phone number, a deputy who was on duty.

Q.   Would that have been Deputy Miller?

A.   No.  Deputy Torres was on duty at the time.  And I told her, "Why don't you give him a call?"  I think he was probably -- he was in the shift, like the second shift, so he's probably leaving at two.  But when I spoke with her, it was around noon.

Q.   Can you spell that officer's name?

A.   So Torres Rodriguez, so T-o-r-r-e-s and then Rodriguez, R-o-d-r-i-e-g-u-e-z (sic), I believe.  Nelson Torres Rodriguez.

Q.   And were you going to be involved further?

A.   No.

Q.   Did you have any further conversation with Gail?

A.   No.

Q.   Are you aware of Gail having any further conversation with your office?

A.   Yes.

Q.   Tell me about that.

A.   I know that she called and spoke with Chauncey.

Q.   And what do you know about that?

A.   I don't believe that I was in the office.  I think he told me about it later.

Q.   What did he say?

A.   That she was very agitated maybe.  I think that was the gist of it.  I don't know -- I don't remember getting into details.

Q.   And then how did it come to pass that you went out to Gail's house?

A.   So I texted Kelsey.  I asked her if she had gone out yet.  And I think that she maybe called the office.  I don't know if she called me directly or if Chauncey got ahold of her.  She hadn't gone out again by, like, three o'clock.  So I think she called.  I think maybe she was having difficulty finding somebody to go out there with her, law enforcement.

So, as I recall, Chauncey was like, "All right.  Well, we'll just go out."  And at some point Deputy Miller got involved.

JEFFERSON COUNTY IOWA - 030

**Page 1**

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF IOWA

CENTRAL DIVISION

GAIL OSBORN,
TIM MCCONNELL SEABA,
and GORDON SEABA,

        Plaintiffs,

vs.

CHAUNCEY MOULDING,
KELSEY KOENIG, and
JEFFERSON COUNTY, IOWA,

        Defendants.

Case No.
4:25-cv-00183

DEPOSITION OF
GAIL ANN OSBORN

        THE DEPOSITION OF GAIL ANN OSBORN, taken before Gale Sweeney Christensen, Certified Shorthand Reporter, Registered Professional Reporter, and Notary Public of the State of Iowa, commencing at 10:06 a.m., April 21, 2026, at 2910 Grand Avenue, Des Moines, Iowa.

Reported by:  Gale Sweeney Christensen, CSR, RPR

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 2**

A P P E A R A N C E S

Plaintiffs by: GINA MESSAMER
    Attorney at Law
    Parrish Kruidenier, LLP
    2910 Grand Avenue
    Des Moines, Iowa 50312
    gmessamer@parrishlaw.com

    and

    ED HARVEY
    Attorney at Law
    1600 Wonder Way
    Fairfield, Iowa 52556
    Edwardgharvey98@yahoo.com

Defendant Kelsey Koenig
by:    RYAN SHEAHAN
    Assistant Attorney General
    Second Floor
    Hoover State Office Building
    1305 East Walnut Street
    Des Moines, Iowa 50319
    ryan.sheahan@ag.iowa.gov

Chauncey Moulding and Jefferson County, Iowa
by:    BRENT HINDERS
    JONATHAN LEWIS
    Attorneys at Law
    Hinders Updegraff & Franklin, P.L.C.
    1104 Sunset Drive
    Norwalk, Iowa 50211
    brent@hinderslaw.com
    jlewis@hinderslaw.com

Also present:  Timothy McConnell-Seaba

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 3**

INDEX OF EXAMINATION

| Examination by | Page |
| --- | --- |
| Mr. Hinders | 4 |
| Mr. Sheahan | 53, 94 |
| Ms. Messamer | 86, 96 |

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**Page 4**

GAIL ANN OSBORN, called as a witness, having been first duly sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HINDERS:

Q.  Good morning, ma'am.  Could you please state your full name, and spell it for the record.

A.  Gail, G-a-i-l, Ann, A-n-n, Osborn, O-s-b-o-r-n.

Q.  And, Gail, today would you like me to refer to you as Gail, Ms. Osborn?  How would you like me to refer to you?

A.  Gail is fine.

Q.  Thanks, Gail.

A.  You're welcome.

Q.  And are you being deposed in the case of Osborn versus Jefferson County, Iowa?

A.  I am.

Q.  Have you ever been deposed before?

A.  No.

Q.  Has your counsel explained to you any of the rules for the deposition today?

A.  Yes, I have an understanding.

Q.  I'm just going to put on the record a

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 031

25

Q. Prior this lawsuit did you have any knowledge about the life estate ownership of the property?

A. Yes, I knew.

Q. Is that property one that's listed on a Jefferson County Assessor's website?

A. It's listed in the county recorder, yes.

Q. Would the assessor also have that information on there?

A. I believe so.

Q. And do you believe that the Jefferson County Assessor is accurate in the records that it keeps?

A. I believe so.

Q. What was your relationship with Gordon Seaba?

MR. SHEAHAN: Can I have the question read back.

(The requested portion of the record was read by the court reporter.)

A. Gordon was like a father to me.

Q. Okay.

A. He's my daughter's grandfather. They are the best people I ever knew.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

26

Q. Would that have been one of the daughters that was -- that's placed in Polk County?

A. Yes.

Q. Your youngest daughter?

A. Yes.

Q. How did you come to know Gordon Seaba?

A. His daughter is actually my partner's sister. We were in jail together, and I was just starting over. And she invited me to come out to the house and stay until I got on my feet, and I met Gordon.

Q. Sorry. Just to backtrack a little bit, what are the birthdays of your three children?

A. 6/17/09, 10/12/13, and 12/19 -- 12/18/19. Sorry.

Q. 12/18/19?

A. (The witness indicated.) I'm sorry. Yes.

Q. While living on the property in Brighton, Iowa, did you pay rent to Gordon Seaba or anyone else?

A. Not -- no, no.

Q. Have you ever signed a lease or any

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

27

agreement for habitation of any property on that --

A. No.

Q. -- Brighton residence? How long did you live on that property?

A. I lived in the main house with Gordon and Ashley under a year, and then Tim and I moved in together in his house.

Q. When you say his house, what do you mean by that?

A. Can you repeat the question. Sorry.

Q. You used the term you lived in the main house, and then you lived in his house, I believe, referring to Tim.

A. Yes, sir.

Q. What do you mean by his house?

A. Tim's house, our house, the cottage.

Q. Would the main house likely be the structure referred to as the dwelling on the Jefferson County Assessor's website?

A. Dwelling? I'm sorry. I don't understand the question.

Q. Would that likely be the structure -- you referred to the main house. Would that likely be the large structure referred to as

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

28

a dwelling on the Jefferson County Assessor's website?

A. I don't know.

Q. Is it the largest structure on that property?

A. Yes.

Q. And there are several smaller structures; is that correct?

A. It is.

Q. One of those is a garage?

A. It is.

Q. Were there any utilities to any of those -- to any of the structures that were not the main house?

A. Utilities, water and electric go to our house as well.

Q. So there was water and electric ran to where you were staying with Tim?

A. Electric, and we have a pump outside, where we get our water.

Q. Do you know, the building that you live in with Tim, how was that constructed?

A. Tim built it.

Q. Okay. Did anyone else have a key or permission to enter that structure?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 032

A. Only Tim and I.

Q. And you previously lived in, what you call, the main house; is that correct?

A. Correct.

Q. Did you have a key to that structure as well?

A. I did not.

Q. Looking back to November 15, 2024, are you aware that there was an anonymous complaint made that you had given birth to a daughter by the name of Charlotte approximately two months earlier and that the baby was born addicted to methamphetamine?

A. I was made aware of the allegation.

Q. And in your experience do you believe that an allegation that a child is born addicted to methamphetamine is a serious allegation and especially to Child Protective Services?

A. Yes.

Q. And you've previously denied giving birth to a child in September of 2024. Do you still say that you did not give birth to a child in September of 2024?

A. I did not give birth to a child in

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

September of 2024.

Q. And you've denied using methamphetamine in the last ten years. Would you continue to denying using methamphetamine in the last ten years?

A. Yes.

Q. Are you required through DHS or any other program to regularly take drug tests?

A. No.

Q. Are you required to regularly attend drug treatment?

A. No.

Q. Did you ever take a pregnancy test at any point in 2024?

A. I need to confer with Counsel for a moment, please.

(An off-the-record discussion was held.)

A. I probably did through my doctor.

BY MR. HINDERS:

Q. Did you ever express to anyone that you were experiencing changes in energy levels, sleep patterns, feeling nauseous, or having unusual cravings in 2024?

A. No.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

Q. Had you ever discussed with anyone, either jokingly or hypothetically, being pregnant in 2024?

A. No.

Q. And before 2024, in that year did you ever have -- strike that -- did you ever express concern to anyone about being pregnant any time leading up to September 2024?

A. No.

Q. Prior to November 15, 2024, had you ever had any calls, texts or communications, indicating DHS may come and investigate the anonymous complaint?

A. Could you repeat the question. I'm sorry.

Q. Yeah. On or during November 15, 2024, had you ever received any calls, texts or communications, indicating that DHS may come and investigate the anonymous complaint?

A. No.

Q. Do you have any idea who might have made that complaint?

A. I have a suspicion.

Q. Who is that?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

A. The guardians of my daughters.

Q. And why would they do that?

A. Because the TPR was filed just days before that happened.

Q. And that TPR, was that a private TPR, or was that filed through DHS?

A. It was private.

Q. Do you know who the attorney is for the Rosonkes?

A. I do.

Q. Who is that?

A. Caitlyn Kerr.

Q. Prior to November 15, 2024, had you ever had any contact with Kelsey Koenig?

A. Yes.

Q. What's been your previous contact with Ms. Koenig?

A. When I was living in Washington in an apartment complex.

Q. And that would be Washington, Iowa; is that accurate?

A. Yes, my apologies, Washington, Iowa. I believe 2022 to 2023 I had a neighbor who had multiple children. I tried to help her. And the day I met Kelsey for the first time, she

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 033

33

was there for her.  Outside of that, I've had no experience with Kelsey.

Q.  So just prior to that one contact with Kelsey; correct?

A.  Years ago, yes.

Q.  Approximately when was that?

A.  I believe it was 2023.

Q.  And did you speak with Kelsey Koenig on the morning of September {sic} 15, 2024?

A.  I do not recall.

Q.  Do you recall speaking to Kelsey prior to her and Chauncey Moulding and deputies from Washington County and Jefferson County coming onto your property?

A.  I apologize.  I misheard you.  I thought you said September.

Q.  Okay.

A.  November 15th, yes.

Q.  Tell me what you recall about that conversation.

A.  The initial conversation was Kelsey was at the house when I got there that morning.

Q.  Okay.  What do you recall her saying to you and you saying to her?

A.  I asked her what she was doing there.

34

She stated she had received a report of a child, an infant, that was born addicted to meth and hidden on the property.

Q.  What did you respond to that?

A.  I said absolutely not, and I asked her to not be there.  I asked her to leave.

Q.  What did she say in response to that?

A.  She needed to investigate.

Q.  Okay.  Did she leave?

A.  No.

Q.  Did she ask whether you had been pregnant in the last year?

A.  Yes.

Q.  Did she ask whether you had been using drugs, specifically methamphetamine?

A.  She did not ask.  She stated it was an allegation.

Q.  And you denied both those things?

A.  Yes.

Q.  Did Kelsey at that point look around the property?

A.  She was given consent from Gordon, and I called Tim and put him on speakerphone and communicated with him that Kelsey was there and notified him that Gordon had given

35

permission for her to go in the house, and we gave permission for her to go into our house.

Q.  So she went into both the main house and the structure in which you and Tim live in?

A.  Correct.

Q.  And voluntarily gave permission to do that?

A.  Yes.

Q.  About how long did Ms. Koenig's search last?

A.  I don't recall how long she was on the property.

Q.  You just don't recall how long she was there?

A.  I don't recall exactly how long she was there.

Q.  Was it more than an hour?

A.  I -- I really don't recall how long she was there.

Q.  But no objection to anything she did on the property?

A.  I was there with her the whole time.

MR. HINDERS:  Can you read that question back.

(The requested portion of the

36

record was read by the court reporter.)

A.  No.

Q.  How did that visit end?

A.  She stated that she would not be back, and she got in her van.  And she sat in it for a few minutes on the speakerphone on it, and then she left.

Q.  In the year 2024 would you have had any medical exams, blood tests, anything from a medical professional that would show that you were not pregnant during that previous nine months to September 2024?

A.  Yes.

Q.  Can we please have a copy of all those medical records.

A.  All those medical records have been provided.

MR. HINDERS:  We just got 160 pages today, so we'll see.

Q.  But there might be something in there that would indicate that in the records we got today?

A.  That I was not at all pregnant?

Q.  Yeah.

JEFFERSON COUNTY IOWA - 034

A. That's correct.

Q. Is there any way that someone who saw you from a distance or heard rumors could believe genuinely but mistakenly that you had recently given birth?

A. No.

Q. After Kelsey's visit to your house, did you contact County Attorney Chauncey Moulding?

A. I did.

Q. Do you recall what your discussion was with Chauncey?

A. Yes.

Q. What was that?

A. I explained to him that Kelsey had been -- had come out to the property to investigate an allegation of a two-month-old child named Charlotte, and I discussed with Chauncey that that was a very serious allegation and it -- that it had me very upset.

I discussed, you know -- I asked him what my -- you know, if civil action was something I -- I could take, and he stated he's not -- he cannot give legal advice but

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

to contact an attorney.

Q. Prior to November 15, 2024, have you ever had any personal or phone conversations with Chauncey Moulding prior to that time?

A. No.

Q. Never had any discussions with him?

A. No.

Q. Why would you call the county attorney if you've never talked to him before?

A. Because he's the highest authority in the county.

Q. But you're stating today you've never had any conversations with him prior to this?

A. No.

Q. But you felt comfortable enough to call him that day?

A. He's someone in a position of authority.

Q. So later that same day around 4 p.m., Defendants Koenig and Moulding came to your property; is that correct?

A. It is.

Q. And they were accompanied by deputies from Jefferson and Washington County; is that accurate?

A. It is.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

Q. And you sued Jefferson County in this matter. Is there a reason you haven't sued Washington County?

A. I don't know how to respond.

Q. Well, do you know why you haven't sued Washington County?

A. Washington County county attorney did not come to my home. He did not violate my constitutional rights. He did not desecrate my home. He did not make me feel like I was nothing for the entirety of the duration that he was there. He did not treat me like I was not worth seeing, hearing.

Q. What you're describing is Chauncey Moulding?

A. Yes.

Q. He's an official. You've also sued Jefferson County as an entity. That includes the two deputies that came onto your property from Jefferson County, none of the two deputies from Washington County that came onto your property.

Is there a reason why Jefferson County is being sued and those two deputies are subject to this lawsuit, but the

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

Washington County deputies are not, to your understanding?

MS. MESSAMER: I'm going to object as asked and answered. She already gave her response to why they were sued.

Q. So you're just seeking to sue Chauncey Moulding; is that accurate?

A. I'm seeking to hold accountable Kelsey Koenig, Chauncey Moulding and, yes, the County.

Q. But not Washington County?

A. I defer to Counsel.

Q. Well, this is your lawsuit.

A. Yes.

Q. So in your lawsuit you have not sued Washington County; is that accurate?

MS. MESSAMER: Asked and answered.

Q. But you don't have a reason why you're not suing Washington County but you are suing Jefferson, other than what you've stated regarding Chauncey Moulding?

A. That is correct.

Q. Okay. When the deputies from Washington, Jefferson, Mr. Moulding, and Ms. Koenig came onto your property, what was

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 035

the first thing they said to you?

A. Chauncey's first words to me were hi, Gail.

Q. Was what?

A. Hi, Gail.

Q. And you'd never talked to Mr. Moulding prior to this time other than earlier in that morning?

A. Earlier that day with the phone call.

Q. Never had a discussion with him before?

A. No.

Q. Did you tell them explicitly what they could and could not do while on the property?

A. I believe I did.

Q. In the videos -- and we'll watch the videos -- you're holding up a camera. Did you record all of your interactions that day?

A. I recorded an interaction.

Q. Did you keep that recording?

A. Counsel has it.

Q. Have they given it to us yet?

A. That is my understanding.

Q. Okay. After Chauncey said hi, Gail, what do you recall after that time?

A. He drove past me. I had had my hand up

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

like this (indicating). My dog was leashed in this hand (indicating), and he drove past me after I said stop.

Q. Were you present when Chauncey Moulding went to the main house and spoke with Gordon Seaba?

A. Yes.

Q. And what do you recall about that conversation?

A. It was directly after Chauncey drove past me. He pulled in to our parking area. I had turned around, and he was already up on the steps. I had Pike. I was running to tie him up on the tree to the left of the staircase. By that point Chauncey already had the screen door and the main door open.

Q. Okay.

A. When I got up the stairs and got in the house, Gordon was still in his chair.

Q. Okay. And so you didn't hear any of the conversation between Chauncey or Kelsey and Gordon Seaba?

A. Kelsey was not in there when I was in there at that point.

Q. So it would have been just a

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

conversation with Chauncey and Gordon Seaba; is that true?

A. That would be true.

Q. And you didn't hear any of that conversation?

A. I heard Gordon tell him get out.

Q. Was there anyone else present there?

A. Myself, Chauncey and Gordon.

Q. And it's true that Gordon passed away; is that accurate?

A. Yes.

Q. What was Chauncey's response when Gordon said get the hell out?

A. Chauncey ignored it.

Q. How did Chauncey ignore him?

A. He stayed in the house.

Q. He didn't say anything, or he just stayed in the house?

A. In the video recording that I got, I asked Chauncey what he was doing here, and he said I'm not here for you. And Chauncey's back was to the door. I was standing here (indicating), and then Gordon was here (indicating). Gordon wanted him to leave.

Q. How do you know that?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

A. Because he made it clear by saying get out.

Q. And Ms. Koenig was not there?

A. Not while I was there, no.

Q. And she would not have been able to hear any of this conversation?

A. No.

Q. So if Ms. Koenig testifies differently or Mr. Moulding has testified differently, they are not being honest?

A. They are committing perjury.

Q. Well, that's a legal standard, and we are not going to figure that one out. I don't recall talking about your law degree but that they would be being dishonest; is that fair?

A. Yes, they would be being dishonest, yes.

Q. About how long did Ms. Koenig and Mr. Moulding spend inside the main house?

MR. SHEAHAN: I'm just going to object. Did you say Ms. Koenig and Mr. Moulding?

MR. HINDERS: Yes.

MR. SHEAHAN: I think we are talking about two different time periods

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 036

then.

BY MR. HINDERS:

Q. Mr. Moulding, when he met with Mr. Seaba, about how long did he stay there?

A. I don't know the exact time.

Q. Was it a short amount of time, a long amount of time?

A. I don't know for sure.

Q. At what point do you feel that your right against unlawful search was violated?

A. The minute Chauncey did not stop when I asked him to stop at the threshold where the power pole is while I was holding the dog.

Q. Did someone enter the structure that you and Tim lived in?

A. Yes, Chauncey Moulding did.

Q. How long was he in there?

A. Maybe thirty seconds.

Q. Was there any damage done to that property?

A. I don't know how to answer that one.

Q. Was anything broken?

A. Not physically.

Q. Was anything disturbed?

A. Not physically.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

Q. Was anything moved?

A. No.

Q. Did you see him touch anything?

A. I didn't see personally in our home.

Q. Were you ever handcuffed or physically restrained during this time on your property?

A. No.

Q. When Mr. Moulding was in the property, were you standing outside the door?

A. Can you clarify the question, please.

Q. Mr. Moulding entered the property that you and Tim live in; correct?

A. Correct.

Q. When he entered that property, did you stand outside the door?

A. Not directly outside, on the sidewalk, on the grass closer to the sidewalk.

Q. Is there a paved sidewalk there?

A. It's -- it's rocked.

Q. So it's a path? We're not talking about an egress or anything that's created by a city or a county?

A. No.

Q. So you stood outside. Do you recall what you said to Chauncey when he was in that

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

stretch here?

A. Yes.

Q. What did you say?

A. I told him he didn't have a warrant. I gave him a count of 3, 2, 1. I stated I was going in, and I was -- I believe I was told not to go in.

Q. Did you ever make a statement to Mr. Moulding that you're going to strike him or otherwise harm him?

A. I said I was going to sue him.

Q. But you don't recall making a statement about any sort of physical touching of Mr. Moulding?

A. Not to my knowledge.

Q. No physical threats to him?

A. No.

Q. Would you agree with me that you shouldn't physically threaten to harm people?

A. I would agree with that statement.

Q. Did you -- after Mr. Moulding was able to exit the structure that you and Tim stay in, did you continue to talk to him and Ms. Koenig?

A. I believe so, yes.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

Q. Did you continue to talk to the deputies?

A. Yes.

Q. And did you make statements that they should leave the property?

A. Repeatedly.

Q. And then, after you made those statements, did you continue to talk to them?

A. To get them to leave, yes.

MR. HINDERS: I'm going to have you read that question back.

Q. Let's see if you can answer this one.

(The requested portion of the record was read by the court reporter.)

A. Yes, I believe I continued to talk to them.

Q. In your experience did that cause some confusion about what your intent was?

A. I don't think my intent was ever unclear.

Q. How long do you estimate the entire incident went on?

A. An hour, maybe.

Q. You believe an hour?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 037

53

MR. HINDERS:  I don't have any questions.

CROSS-EXAMINATION

BY MR. SHEAHAN:

Q.  Thank you, Gail.  My name is Ryan Sheahan.  I represent Ms. Koenig in this case.  Do you prefer Gail or Ms. Osborn?

A.  Gail is fine.

Q.  Okay.  Thank you.  Speaking of that recording in the event that you turned over, what are we expected to see in that recording?

A.  It is only a few seconds long.  It has Chauncey by the door, Gordon standing here (indicating), me here (indicating).  And I asked Chauncey what are you doing here, and he stated I'm not here for you.

Q.  Okay.  I've seen a recording from, what looks like, a camera in a corner of a room, showing you opening up a bed sheet in front of someone?

A.  Yes, that's a home camera, not a cell phone.

Q.  So are we talking about two different recordings?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

54

A.  That is correct, sir.

Q.  So the one I've described to you we've gotten in discovery.  I've not seen or been produced the other video.  But you say it exists?

A.  It exists, and my counsel has it.

Q.  And it captures Chauncey Moulding's voice on the recording?

A.  That's correct, sir.

Q.  Does it also capture Gordon Seaba's voice?

A.  No.

Q.  I want to ask you -- I'm going to jump around here, so stay with me.  If at any point you get lost, just tell me to slow down or stop, and I will or repeat the question.

But I want to go first to this previous meeting you had with Kelsey Koenig.

A.  Okay.

Q.  You said you were in the City of Washington and you were living next door to someone and Koenig was visiting that lady?

A.  That is correct.

Q.  What was your interaction with Ms. Koenig that day?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

55

A.  I don't recall the depth of it.  I was just there, helping my neighbor with her kids when Kelsey showed up.

Q.  Did you have a conversation with Ms. Koenig?

A.  I believe I said hi, asked her what her name was, told her mine.  I believe that was the summation of it.

Q.  Other than that you had no other interactions with Ms. Koenig until November 15th, 2024?

A.  That is correct, sir.

Q.  Going back to the history of -- your history of DHS with the Iowa DHS, do you know what an assessment is?

A.  I do.

Q.  Tell me your understanding of what an assessment is in terms of DHS.

A.  An assessment is where the worker will either make contact via phone or in person and gather information regarding the family, the dynamic, the concerns, bringing forth the allegations and create a safety plan or proceed to CINA.

Q.  Had you been investigated by DHS for

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

56

living conditions in your home?

A.  Yes.

Q.  For drug use?

A.  Allegations of drug use, yes.

Q.  For being unable to provide food to your children?

A.  Allegations of said thing.

Q.  Of said thing, meaning of having no food in the home?

A.  Yes, it was an allegation.

Q.  And the children that have gone into guardianship, I guess it's unclear to me.  Can we just start again with your children.

A.  And to clarify, my oldest --

Q.  There are three of them?  Can you just tell us the names and the current ages of those.

A.  Rylan, R-y-l-a-n, she's 16; Isabelle, I-s-a-b-e-l-l-e, she's 12; Emelia, E-m-e-l-i-a, she is six.

Q.  Thank you.  That clears it up.  And you and Mr. McConnell here share Emelia?  That's your child together?

A.  Correct.

Q.  You mentioned earlier that there is --

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 038

well, do you know what a founded report is from HHS?

A. Yes.

Q. And I just said HHS and DHS.

A. It's the new --

Q. Do you understand they are the same entity?

A. Yes, they are a change in name.

Q. So maybe I'll just refer to it as HHS from this point forward, considering that they were HHS in 2024.

I think you had mentioned something earlier with Mr. Hinders about previous visits by CPS workers to your home?

A. Yes.

Q. You're also aware that there has been several founded reports by HHS regarding some of the allegations we've talked about, living conditions, no food in the home, things like that? You're aware of that?

A. I believe that they were founded, yes.

Q. And some of those allegations that you've been investigated before, when you heard from Ms. Koenig, who came for the first visit about those allegations, those are

consistent allegations with some of the things that you've been investigated by HHS before; correct?

A. I'm sorry. Could you repeat that question.

MR. SHEAHAN: Can you ask it, please.

(The requested portion of the record was read by the court reporter.)

Q. That's a terrible question. Let me retry that.

When Ms. Koenig shows up for her first visit on November 15th and she tells you the allegations that she's there to looking into, do you agree that those allegations that she was looking into are consistent with what HHS has looked into before with you?

A. I believe that they are the same thing that was reported, regardless of whether it was true or not.

Q. So at least on the first visit, when you understood the reason why Ms. Koenig was there, you thought you were there

appropriately as in her role as a child protection worker?

A. I know she was there as a child protective worker.

Q. Okay. My understanding -- and I think you mentioned this earlier in your testimony -- is that she showed up first, and then you arrived on scene?

A. Yes. So would you like me to explain how that --

Q. I would love for you to. Were you not at the house at the time?

A. I was not. I was in Washington, getting groceries. I was on my way home. I had pulled into the driveway. I observed a white minivan parked in the driveway, closer to the two white pickups that are seen in the video -- they are current still there -- well, they were there in the video.

I rolled down my window. She rolled down hers. I asked her what she was doing there. And she stated, you know, I'm Kelsey Koenig, I've got -- I've received -- you know, we have a report of a child -- two-month-old baby named Charlotte that was

born here without medical care and under the influence of methamphetamine.

Q. Okay. Did you immediately tell her something to the effect of I know you're with DHS or you're HHS, something like that?

A. Yes.

Q. And how did you know at that point that she was with HHS?

A. Because of our previous interaction years before.

Q. So you remembered her that clearly from your couple-minute interaction a couple years before?

A. Yes, I remember things well.

Q. When you're on -- excuse me. When she's on property, I guess it's my understanding, to kind of short-circuit the first visit, is you really have no problem with the first visit with Ms. Koenig; correct?

A. I did have a problem, but I wanted to her to leave as quickly as possible.

Q. Okay. Do you feel like she abided by that?

A. I feel like I gave her the opportunity to complete her job and leave.

Q. And in terms of completing her job, again, the understanding is she went into Mr. Seaba's house, the main house; correct?

A. Yes.

Q. Briefly looked around?

A. Yes.

Q. And then you allowed her to go into your cottage, the one that you and Tim share; correct?

A. Yes. I had made a phone call to Tim while he was at work and notified her {sic} that CPS was at the house. And I -- as we are a team, I asked for his -- also dual permission, you know, to -- because he's technically the owner -- permission for her to go in.

Q. And did Tim give it over the phone?

A. He did.

Q. And so how long was Ms. Koenig in your cottage?

A. Not long. I showed her the TPR paperwork because I believed she -- I believe that that call was part of that. She looked -- I allowed her to lift up our covers to see there was no infant hiding under

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

there, which she found was a body pillow. She observed no baby products, items of any kind. And then she left.

Q. Going back to this notion that there has been -- there has been child protection workers before who visited your homes; correct?

A. Correct.

Q. In terms of what Ms. Koenig did on the property that day versus other visits by CP workers, do you think that her actions were more invasive or less invasive than other experiences with HHS?

A. I think they are all invasive.

Q. Did she move anything?

A. Yes.

Q. What did she do?

A. She moved our comforter.

Q. Was that the extent of it?

A. To the best of my knowledge.

Q. Did it appear to you that she was looking to see if there was actually a child on the property?

A. I think that's -- I think she came to do her assessment and see if that was what was

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

what.

Q. And that's what her job is; right, to do an assessment?

A. That is correct.

Q. How did you two leave it when she left the property the first time?

A. I was very -- I was cordial throughout the process. She stated she didn't need to come back, that she found no -- nothing here. She sat in her van and put it on speakerphone, called someone, and then she left.

Q. Were you privy to that conversation?

A. No.

Q. You said that you were courteous to her. Was she courteous to you?

A. She was civil, yes.

Q. It's my understanding that you think that the current guardian of your two daughters was the one who made this anonymous phone call?

A. I have suspicion, yes.

Q. Well, I know you've talked about this TPR. Is there anything else, any other information that you have that we haven't

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

discussed as to why you think that person made the phone call?

A. No.

Q. And the person we are talking about is this Sarah Rosonke?

A. Rosonke.

Q. Rosonke. That's the person?

A. Yeah, that's the -- the female guardian, yes.

Q. Did you ever attempt to contact Sarah and ask her if she, in fact, made an anonymous phone call about you?

A. No.

Q. This private TPR process, I'm not really -- that's not an area that I practice, so can you just tell me from your understanding what a private TPR is.

A. It is a non-CINA, non-DHS/HHS action, where someone who is not a parent, who has, you know, guardianship or custody of a child chooses to negate the parents' rights.

Q. So that's outside of using the government agencies to do that?

A. That is my understanding of the process.

Q. And you were fighting that at the time?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 040

65

A. Yes.

Q. And you continue to fight that today?

A. I will always fight for my daughter.

Q. So Kelsey Koenig leaves, and, again, my understanding is that she showed up about 10:15 in the morning. How long do you think she was on property, and what time do you think she left?

A. I don't recall the exact time she arrived. And I wouldn't know that because I pulled in after her, so I don't know how long she was there prior to my arrival.

Q. Was it your understanding, when you averaged, though, that she had already talked to Gordon Seaba in the main house?

A. I believe -- I believe Gordon stated after the fact that she had said something to him, asking where I was, but not that there had gotten any further conversation there.

Q. Were you aware that Gordon Seaba had given her permission to look around?

A. While I was there, yes, I observed him give consent while I was there.

Q. And you had no objection to it at the time?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

66

A. It wasn't my place to object or --

Q. And why is that?

A. Because it wasn't my house.

Q. Okay. You've talked about the property ownership structure with Gordon having a life estate. Do you know where Tim comes into that? It's him and his sister and deceased brother. Would you understand kind of how the property ownership passes --

A. Yes.

Q. -- in that? What's your understanding?

A. Tim and Ashley and, I believe, either Kelsey, which is Tim's niece, or Aaron's wife -- Tim and Ashley's deceased brother, Aaron's, wife, either she or Kelsey would be next in line along with Ashley and Tim as life connects.

Q. But the trigger really is when Gordon Seaba passes away; correct?

A. He passed away March 6th.

Q. I know. But in terms of the ownership structure kind of changing and passing, it's when Gordon Seaba passes because he has a life estate. Do you understand that?

A. I do.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

67

Q. I don't want to pry too much, but what is your understanding of the cause of death of Gordon Seaba?

A. He had lung cancer. He -- he was very sick.

Q. Okay.

A. And --

Q. Do you know how old he was at the time?

A. He was eighty.

Q. Going back to when Kelsey Koenig leaves after the first visit, you have no idea what time that was?

A. I don't recall the exact time, no.

Q. The next time they come back is sometime in mid- to late afternoon; correct?

A. Yes. It was shortly after Tim got back from work.

Q. Where does Tim work, by the way?

A. Powercom.

Q. Powercom?

A. I believe it's P-o-w-e-r-c-o-m-m {sic}.

Q. He was working there at the time. Does he still work there?

A. Yes.

Q. Where is Powercom at?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

68

A. It is in Washington, Iowa.

Q. Prior to those -- to the next visit by folks, which at that time was Chauncey, Kelsey Koenig and deputies from Jefferson and Washington County; correct?

A. Along with Elizabeth Este.

Q. Who is Chauncey's number two at the office?

A. That's correct.

Q. Prior to that do you understand anything that those folks are doing in terms of gathering information or having conversations, anything that's happening between the first visit and the second?

A. No. After Kelsey left, we thought it was over.

Q. Okay. If you thought it was over, why did you call Chauncey Moulding?

A. Because the allegation in itself, in being accused of something of that magnitude, it would bother any reasonable human, and it bothered me because that's not something I could ever do.

Q. Did you have a child car seat in your vehicle?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 041

73

Q. Do you think that's consistent with how you answered the discovery responses?

A. I need to confer with Counsel for a moment.

(An off-the-record discussion was held.)

A. Can I have a copy of it, please.

Q. I'm not sure I -- let me -- in the -- for the sake of time, I will look for that, but let me continue to ask you questions.

So, again, as we sit here today, you objected to anybody being on the property?

A. Yes, I believe that I was very vocal that I didn't -- I wanted everybody to leave.

Q. Okay. So prior to them walking around the property, Chauncey is in the house with Gordon Seaba. You're in the house. At a certain point did Kelsey Koenig, before they start walking around the other buildings -- does she come in the house as well?

A. Kelsey was never in the house with me, Chauncey and Gordon.

Q. Does Kelsey ever go into the main house?

A. I believe she does at some point. I was

74

not present for it.

Q. So my understanding is she has a conversation with Gordon at that time in the house, and you're not present for that conversation?

A. I was not present with Kelsey at any point in the main house.

Q. As far as other buildings that Kelsey went into, she went into the main house. She didn't go into any other buildings, did she?

A. I don't know that she did or didn't. I would have to watch the body cam again.

Q. Have you watched the body cam?

A. I have.

Q. And the body cam to you was accurate when you reviewed it?

A. I mean, it is -- the body cams are what happened.

Q. So they walk around the property. Does it appear to you that someone is effectively in charge of looking around and what to look into?

A. Yes, Kelsey and Chauncey both actively are in charge.

Q. Well, and when you say that, what are

75

you pointing to to say that both of these folks were kind of calling the shots?

A. Based on the way things happened, Chauncey would not have been there, had Kelsey not contacted him. So by that, in my opinion, they both had motive to be there.

Q. My question is a little bit different. As they are walking around and they are looking at like the RVs, there is a shed that go -- that a deputy walks into, there is the cottage that you walk into, Chauncey Moulding is the one that says look into that RV, look into that shed, look into the cottage; correct?

A. I believe so.

Q. Kelsey Koenig is not directing anybody to look in the buildings, is she?

A. Not to my knowledge.

Q. The interaction that you have at your cottage, it happens as they -- they've kind of already walked through an RV at that point. They looked into a little shed, and then they get to your cottage with you and Tim, which is out back. You're telling Chauncey Moulding don't go in there?

76

A. Absolutely.

Q. Chauncey Moulding goes in there by himself?

A. Yes.

Q. Koenig never goes in there?

A. She had already been in there prior that day.

Q. Right. That morning; correct?

A. Correct.

Q. When you allowed her to go in there?

A. That's restricted consent.

Q. What does that mean?

A. It means she didn't have permission to go back in.

Q. Is that something you told her that morning?

A. I gave her consent when she was initially there that morning. Consent has not -- lapsed.

Q. But in any event she never asked you to go back in a second time, did she?

A. She did not.

Q. You had some sort of interaction with Chauncey. I can't remember because I haven't reviewed body camera right now, but -- or I

JEFFERSON COUNTY IOWA - 042

77

haven't reviewed it very recently.  But do you then confront them inside your home, or do you just tell them to get out of your home?  What do you do?

A.  I told him he did not have a warrant, he did not have permission to go in there.  And then he decided he was going to go in anyway, so I gave a count 3, 2, 1 and was going to go in and yell until he left.

Q.  At any point did anybody tell you that you're under criminal investigation for anything?

A.  No.

Q.  Anybody say that you -- it's been alleged that you committed a crime?

A.  No.

Q.  Again, your understanding is that they are still looking for whether there is a baby on the property; right?

A.  I -- that is what was -- that was my belief.

Q.  Do you have any idea if Gordon Seaba gave them, hey, you know, some sort of permission to be on the property for X number of minutes?  Do you have any idea whether he

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

78

said anything in that regard?

A.  Gordon never gave permission to anyone to be there.

Q.  And your understanding of that is in conversation that you had after the fact with Gordon?

A.  When Gordon Seaba tells you to get out of his house, you get out.  No one had a right to be there.  No one had permission to be there.

Q.  Okay.  Again, I'm just trying to understand.  You're not there when Kelsey Koenig and Chauncey are with Gordon in the house; correct?

A.  That's correct.

Q.  So you don't know the contents of that conversation?

A.  I do not.

Q.  So these folks walk around the property.  They last visit your cottage, and they all walk around to the back of that -- to the front of the house again on the driveway.  And there is kind of a confrontation there; correct?

A.  Yes, they were asked to leave

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

79

repeatedly.

Q.  Well, as they are making their way back to their -- down the driveway towards their vehicles, isn't that an indication that they are attempting to leave?

A.  Based on body cam and Chauncey's actions, they were going to have a conversation on our property after they were told by Tim to take it off.

Q.  What do you mean by Chauncey's actions?

A.  Being there without a warrant, by entering properties and essentially doing whatever he wanted.

Q.  Okay.  What is Ms. Koenig doing as Chauncey is having this interaction with you guys?

A.  She's standing there.

Q.  She's not verbally aggressive to you or Mr. McConnell, is she?

A.  Not to my knowledge.

Q.  More of a passive bystander than anything else?

A.  I would not describe her as -- no.

Q.  What would you describe it as being?

A.  Complicit.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

80

Q.  So you all have a conversation at the front of the driveway.  And what's being discussed?

A.  That they are going -- Chauncey and Kelsey are going to have another conversation before they leave the property after being told to leave the property.

Q.  Okay.  And then do they then have this conversation away from you and Mr. McConnell?

A.  They do not leave the property.  Chauncey laughs at us.

Q.  Ms. Koenig doesn't do anything?

A.  I don't recall her exact facial expression or if she laughed or if she didn't.  She stayed.

Q.  At some point these folks leave, though; right?

A.  At some point, yes.

Q.  What is the impetus for them -- do you know why they -- what causes them to leave?

A.  I don't know what made them leave.

Q.  You mentioned earlier in your testimony today about these folks desecrating your home.  What do you mean by that?

A.  Violating my home, treating it like a --

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 043

85

was the one who handled the HHS complaints.

Q. And what was your contents of your conversation with Ms. Este?

A. I don't really recall what the conversation entailed that morning.

Q. Okay. Have you done anything else to investigate who made this anonymous phone call?

A. I haven't, because how would I? It was anonymous.

Q. Just asking you questions. If there was a baby in need that was on your property that day, would you have wanted HHS to find it?

A. There wasn't a baby on my property that day.

Q. I know, but if there was, would you want HHS to find a baby that's in need?

MS. MESSAMER: Objection, speculation.

Q. You can answer.

A. There was no baby to find.

Q. You don't want to answer my question?

A. I would not want HHS on my property, regardless of what the issue was.

Q. Even with a baby in need?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

86

A. If there was a baby in need, I would call 911.

MR. SHEAHAN: With that, I think I am done, with the agreement that we are going to need to continue your deposition to talk about damages at some point in the future because we just received your medical records today.

THE WITNESS: Okay.

MR. SHEAHAN: No further questions.

CROSS-EXAMINATION

BY MS. MESSAMER:

Q. So now it's my turn. One thing I wanted to follow up on, you were asked about kind of your opinion of law enforcement before this happened. I wanted to ask you about, did you know any of the officers that were on your property that night?

A. I did.

Q. Or afternoon, I should say. Which officers did you know or from which departments?

A. Washington County.

Q. Was it just one or more than one?

A. I can't remember his name. He was the

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

87

one I was speaking to on the video. He had -- he had essentially saved my life at one point.

Q. Explain what your interactions with this officer were.

A. I had helped -- I had turned in a drug dealer, a meth dealer in Washington, and there was a restraining order pending at that point. And I had gone into Walmart late at night. This deputy was -- I called dispatch. They said this -- the deputy was not far out from Walmart in Washington.

He got there, and he met me in the store. And I showed him where Scott Probasco was, who was the person that I had a pending restraining order against. This deputy followed me all the way home, made sure I was safe, because he knew that this person was -- he -- Scott was dangerous.

Q. Did you have any other personal interactions with any of the other law enforcement that were at your house that afternoon for when Chauncey came and searched?

A. I worked the county fair in Washington

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

88

for multiple years. I interacted with probably all of them and never had a bad experience.

Q. And in your job as the sexual violence kind of coordinator -- what was the title there?

A. Sexual assault advocate.

Q. -- sexual assault advocate, did you work with law enforcement in that job?

A. I did.

Q. So generally speaking, as of the fall of 2024, did you have a positive or negative attitude about law enforcement?

A. I had a pretty positive one. I mean, I'm a firm believer we all have places where we can grow. And I think we can build on each other's strengths, and I think that matters.

Q. In terms of living on the property with Gordon, did you have any responsibilities then that came along with you living there?

A. Honestly, not really.

Q. In terms of the animals, did you have any specific responsibilities with them?

A. Taking care of them.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 044

89

Q. Did you have any caretaking responsibilities for Gordon or like cooking responsibilities, anything like that?

A. They weren't responsibilities. I -- I did it because I loved him.

Q. Anything else in terms of like housework or kind of farm work that you did on the property when you lived there?

A. I used to clean Gordon's house a lot. I would bring food up for him or sit with him or spend time with him, but -- yeah.

Q. There was some discussion of your prior involvement with HHS and there being founded reports. Roughly what time period would that have been?

A. Montana CPS would have been September 6th, 2017, when that case initiated in Montana before it was transferred to Iowa.

Q. Is that the only one?

A. That's for Isabelle. Emelia, I believe the first call came in 2021, shortly after the pandemic ended.

Q. One thing I wanted to understand a little bit better is, so in terms of the timeline, I understand Kelsey searched your

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

90

home and then also went through Gordon's home. Which one of those searches happened first?

A. On the first --

Q. In the morning when she came.

A. I believe she searched ours first -- no, she searched Gordon's first because we were already -- he was already on the porch. And then she drove back in her van around the garage to our house and parked there.

Q. So most of your conversation with Kelsey, where did that happen?

A. Outside, where we were parked, initially, where I pulled up. We did talk in the -- in Gordon's house. She never went above the first floor. She never went upstairs the first time. And then probably in our house was where the most conversation happened.

Q. Inside of your house?

A. Yes.

Q. Tell about what the search of Gordon's house looked like. Just kind of describe where she went, where you were, what room she went in.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

91

A. I stayed beside her the whole time. She -- obviously, when you walk in, there is the living room to the left, th dining room to the right. You go through that doorway. There is -- the stairs go up, but she did not go upstairs. Then you go into the kitchen, which you can enter through the dining room or that entryway by the stairs.

She went in the kitchen, and then our nephew, Colten, was sleeping because he worked late that evening and hadn't gotten up for work yet. I knocked on the door. I opened it, and I said, Colten, CPS is here. They want to know if I've had a baby. And he goes (indicating), just, you know, teenage boy, don't wake me. And then I was like, okay, and I shut the door, and then we walked out.

Q. Was Kelsey with you when you opened the door to Colton's room?

A. Yes.

Q. Is there a reason you didn't go upstairs? What's upstairs?

A. She didn't ask to go upstairs.

Q. What is upstairs?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

92

A. You go up the stairs. Then you come to a -- well, the first set you'll come to a landing, and then there used to be a bathroom. I don't know what's in there now. And then you go around the stairs. There is a bedroom here (indicating) and a bedroom here (indicating), and then there is a closet before the bathroom.

Q. Did anyone use that space in the house?

A. Ashley and -- Ashley lived in one bedroom. Kayden stayed -- her youngest stays in the other.

Q. Did they live there at the time Kelsey came?

A. No, Colten did, but Kayden and Ashley did not.

Q. So when she came into the house, nobody was living upstairs?

A. Correct.

Q. Was Gordon inside with you, too, or was he outside on the porch when she searched his house the first time?

A. He was outside on the porch.

Q. What kind of conversation did she have with Gordon?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 045

93

A. It was just explaining -- she explained why she was there, what the allegation was. And he -- Gordon kind of laughed at it, like no, because I -- when she had initially pulled in, I hollered up to him because he was on the porch. I was like, hey, Dad, have you seen any magical miracle babies around here, and he laughed and said no.

Q. Any more conversation that they had?

A. No.

Q. And I wasn't sure. You mentioned that Kelsey at the end of her visit said that she didn't need to come back or that she did need to come back?

A. She didn't, stated that she did not need to come back.

Q. In terms of Gordon back in 2024, I know his health obviously got worse here. His health got worse, and he passed away. But back in 2024 what was his health like?

A. I mean, he -- he had a few bouts of bronchitis and tummy issues, things like that. He had his gallbladder removed couple years prior and issues with that, but otherwise he was -- he was an older man.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

94

Q. Did he use a walker or anything like that?

A. No, he had full mobility.

Q. Was he able to drive?

A. Yes.

Q. Did he leave the house very much?

A. Not really.

Q. Where did he spend most of his time?

A. In his chair at the kitchen table.

Q. Is there a TV in there?

A. You'd walk -- step -- his chair was here (indicating), and the TV was in the living room, complete opposite, very large TV. He always complained about the crack in it. It had like -- I don't know what happened. It had fuzzy colors. But he would sit there most of the time, smoke cigarettes, drink Pepsi. He would occasionally go into Washington and go to McDonald's, go to Dollar General. He didn't really leave a whole lot.

MS. MESSAMER: I think that's all I have. Thank you.

RECROSS-EXAMINATION

BY MR. SHEAHAN:

Q. I just have one more thing. I'm going

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

95

to show you your answers to the interrogatories to Chauncey Moulding and Jefferson County, specifically Interrogatory Number 6. Let me know when you're done reviewing that.

A. (The witness complied.)

Q. Okay. Ms. Koenig {sic}, do you remember when I asked you who you gave permission to on the second visit?

A. Yes.

Q. Your interrogatory response, which is attested to under oath -- excuse me -- there is verification attached -- it says that you gave the police officers permission to be on your property, but you asked Defendants Moulding and Koenig to leave; is that correct?

A. I believe at one point I offered or allowed them to be there to get Chauncey and Kelsey off the property, but in total I wanted them all off the property.

Q. Is your Answer to Interrogatory 6 correct or not?

A. I need to confer with Counsel.

Q. I don't think so.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

96

MS. MESSAMER: You can just go ahead and answer to the best of your knowledge.

A. It is to the best of my knowledge.

MR. SHEAHAN: That's all I have. Thank you.

RECROSS-EXAMINATION

BY MS. MESSAMER:

Q. Well, and I'll just follow up. So I think what we are talking about here is this last line: When Defendants returned at 4 p.m., I gave the police officers permission to be at my property, but I asked Defendants Moulding and Koenig to leave.

What do you remember about any specific conversations you would have had with officers about whether they could be there or not?

A. It comes back to do you have a warrant.

Q. Do you remember ever giving an officer specific consent to be there?

A. I don't recall that I -- I'm -- it's possible, but I don't recall fully.

Q. Would the body camera show what happened with the officers?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 046

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF IOWA

CENTRAL DIVISION

GAIL OSBORN,
TIM MCCONNELL SEABA,
and GORDON SEABA,

    Plaintiffs,

vs.

CHAUNCEY MOULDING,
KELSEY KOENIG, and
JEFFERSON COUNTY, IOWA,

    Defendants.

)
)
)
)
)Case No.
)4:25-cv-00183
)
)DEPOSITION OF
)KELSEY KOENIG
)
)
)

THE DEPOSITION OF KELSEY KOENIG,

taken before Gale Sweeney Christensen,

Certified Shorthand Reporter, Registered

Professional Reporter, and Notary Public of

the State of Iowa, commencing at 2:37 p.m.,

April 21, 2026, at 2910 Grand Avenue,

Des Moines, Iowa.

Reported by:  Gale Sweeney Christensen,
CSR, RPR

---

A P P E A R A N C E S

Plaintiffs by: GINA MESSAMER
    Attorney at Law
    Parrish Kruidenier, LLP
    2910 Grand Avenue
    Des Moines, Iowa 50312
    gmessamer@parrishlaw.com

    and

    ED HARVEY
    Attorney at Law
    1600 Wonder Way
    Fairfield, Iowa 52556
    edwardgharvey98@yahoo.com

Defendant Kelsey Koenig
by:    RYAN SHEAHAN
    Assistant Attorney General
    Second Floor
    Hoover State Office Building
    1305 East Walnut Street
    Des Moines, Iowa 50319
    ryan.sheahan@ag.iowa.gov

Chauncey Moulding and Jefferson County, Iowa
by:    BRENT HINDERS
    JONATHAN LEWIS
    Attorneys at Law
    Hinders Updegraff & Franklin,
    P.L.C.
    1104 Sunset Drive
    Norwalk, Iowa 50211
    brent@hinderslaw.com
    jlewis@hinderslaw.com

Also present:  Timothy McConnell-Seaba
    Gail Osborn

---

INDEX OF EXAMINATION

| Examination by | Page |
|---|---|
| Ms. Messamer | 4 |
| Mr. Hinders | 115 |
| Mr. Sheahan | 118 |

---

KELSEY KOENIG,

called as a witness, having been first duly

sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MESSAMER:

Q.  Hi there.  I'm Gina.

A.  Thank you.

Q.  One question we've had, I feel like everybody has been bouncing around, is how do you pronounce your last name?

A.  Koenig.

Q.  Okay.  And you still work for DHS right now?

A.  Yes.

Q.  But you are not in Jefferson County anymore; is that right?

A.  Right.

Q.  Where are you now?

A.  Des Moines County.

Q.  How come you made that move?

A.  It's closer to where I live.

Q.  When did you switch offices?

A.  Good question.  It was all -- I think the end of February, the last week of February.

JEFFERSON COUNTY IOWA - 047

21

that necessarily. I'm not trying to sound -- I don't want to really -- her body type is thinner, but like she did have a belly, I do believe. I mean, she has had children in the past as well.

Q. And then you said you didn't see any indication she was on meth. Have you been trained on indicators for people that are --

A. Behavioral indicators, yes. I didn't notice any that day that she was actively on meth. Like I -- or on -- I didn't have any behavioral indicators that day that she had just used.

Q. What are the behavioral indicators of meth?

A. It's like movement, your pupils. I guess, mostly that, just how you're moving and talking and communicating. But, I mean, I stated that, but there were -- I did have concerns about the way she was communicating. It was -- like I said, there wasn't behavioral indicator of meth.

But the way she was communicating to me was the reason that I felt uneasy. And that's more of my gut instinct like than

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

22

anything that I can state. A lot of the things weren't -- just weren't making sense, and I was just trying to kind of sort it out at that point.

Q. When you first got there and talked to Gordon on his front porch, did you ask him if Gail had a baby?

A. No. Well, I mean, I didn't know that -- at that point if Gail was going to be frustrated, or I didn't know, you know, if I could just talk to Gail. At that point I didn't know what I didn't know. Like I could have easily went and found Gail, and, you know, it could have been an easier conversation, I think, but that's kind of how it went.

Q. All right. So you drive back to Gail's house. What then happens?

A. Well, at that point she shows me -- it's just like a little bedroom with a shower. I think I'm in there. There was a gun above the bed. It was -- and I just kind of see it, and Gail is kind of telling me all these things that -- or just making me uneasy.

Like she was trying -- or stating

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

23

that there was -- somebody was like setting her up for DHS to -- because they were trying to take her children, I think is like what she had stated. But I was getting really confused as to how we got to that conversation.

And then she said she was getting like terminated parental rights. She had just gotten a letter and that she believed these people were the reason that I was there. And then she random -- I don't know. I kind of was just very -- she was trying to tell me -- she had given me a business card about what her business was. And I just was escalated of like my whole alarms were going off that I just needed to get out of the home. Like I can't explain that any further than that, but I knew I needed to leave and this is not for me to be out here by myself just by the way this conversation was going. I don't have an explicit like explanation for that besides my gut.

But Gail then went outside. So I got outside, and I felt a little bit more comfortable at the moment. I think Gail was

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

24

maybe chatting with me because then she started to -- or she was, but then she started to feed the pigs. And she had told me that this was Gordon's property, and as soon as he passes away, this will be her and Tim's property. And I was -- just remembered thinking that she just kept stating things to me that I wasn't asking, and it just felt very uncomfortable.

So I go, and I say, okay, Gail, give me a minute. I go into the van again. I call my supervisor again. I say I've seen the home, I've talked to Gail, I don't have, you know, anything at this moment like that I've seen that like I can do. I'm going to go.

And my supervisor said, no, you have to -- David Rippey, he said you have to go to the main house and you have to look in the main house. So I'm like I don't -- I didn't necessarily want to. I said I don't really want to do that. I remember him telling that, not by myself. I don't know who is in there, I don't know anything about it, and my gut it telling me to go away, like

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 048

to get out, you know, and I don't know why. And he said, nope, you have to go.

And okay. So I hang up the phone, and I go ask Gail like, okay, hey, my supervisor wants me to go see the main house. So I don't recall if we walked or if -- we had to have driven. We must have driven because it's like far or -- yeah, it's far like to walk.

So I'm like trying to think. I feel like we started, and then I think I changed my mind. But we started to walk because she started to walk. And I said, no, I'm going to drive, because it's pretty far, not just a little scoot like by foot. Like in case something were to be dangerous, like I needed to have my van. And I'm always hypervigilant, no matter where I am, so my van needs to be out where I can leave, if I need to.

So we get to the front, and I think I remember I did start to talk to Gordon, and Gail just continuously was just talking over him, like would not let me -- like she did not want me talk to Gordon. And I remember

being like, okay, I'm just -- I will not talk to Gordon. Let's see.

We'd walk through the house very quickly. Like she was frustrated at this point. She was mad at this point. It wasn't to the point like -- she was very frustrated. Like it wasn't to the point that I thought she was going to physically harm me at that time or anything like that, but she went back to being frustrated.

She walked me very quickly through the house, and I just remember kind of being in defense mode. I kept my eyes open. I didn't say anything. I got in the house. I got out of the house. I left.

I called my supervisor, listen, I got in the house, I don't see anything that's -- that has a baby or anything at this point here like that I can say. So then I leave. So my supervisor -- I don't think we talked about much more right in that moment. I think he's -- I'm just letting him know, too, I'm off the property so that he can be like move on, because I remember it was an extremely busy day, like back to back things

too. So then I left.

Q. Okay. Pause here for a second. Okay. You went up, and then you talked to Gordon again. Where did that conversation take place with Gordon the second time?

A. I think Gordon was on the porch still.

Q. Like in a rocker, or what's he have out there?

A. There is a chair out there. I don't know what the chair -- he was just sitting out there, so --

Q. And I understand that Gail was around, too, but what do you remember your conversation with Gordon was? What did he say? What did you say to him?

A. Well, I can't recall, because I think Gail might have started running around being like has anybody seen me with a baby? Like I think he was eccentric and like -- so even if like I would have had a chance to explain, she was kind of overtalking the whole situation. But I also wasn't going to escalate her. So I -- she was kind of yelling out, okay, no baby, everybody -- like let's get out of here, like you need to go.

And so then I'm like, okay, I'm going to go.

I know she had mentioned that point, when we were going to go in the house, that that was when she was stating that I needed to contact Alisha White because that was her best friend and that she -- that I was going to be in trouble and that Alisha White was going to get me in trouble. And so -- and that she -- that I should contact her. So that's -- I think also was stated before I entered the main home.

Q. So when Gail is saying does somebody see a baby around here or making statements about not seeing a baby, did Gordon agree there was no baby? Did you get any indication from Gordon about whether a baby was there?

A. I wouldn't say Gordon agreed or disagreed. I don't think anybody really understood why she was saying that. Like it wasn't stopped and explained, like, hey, there is a concern. It was like has anybody, you know, seen me with a baby and get me out of here as fast as possible. Like I said, I was kind of in defense mode at that point. I was nervous to go into the big house.

JEFFERSON COUNTY IOWA - 049

Q. Did you see anybody else inside of the house?

A. I recall -- I thought there might have been somebody sleeping in a bedroom, but I couldn't -- she wasn't letting me stop. Like I don't know who it was, but I thought -- and there was a bedroom off the kitchen that I think she had stopped and said like there was a person sleeping. I didn't see if it was a male or a female.

She wouldn't let me -- because she came out and led me right back through, but she yelled at that person do you see me having a baby. And she goes, see, no baby. And I'm like I didn't even hear what he -- what they said or he or she. I'm like I didn't hear them. I didn't see them, but the way she was rushing me through, I just went with her to get out. You know, like, again, if that's her -- if that's how we are going, like I didn't want to stay any longer than I had to, so --

Q. When you say she was rushing you, was she ahead of you, or was --

A. Right next to me, showing me what I

could look at. Like I only got through the downstairs. Like there was just like a room. It almost looked like construction-y. Like there was tools, I feel like. And then you go into the kitchen, and there is a side bedroom. And then I was like escorted like right out the front door. Like I got to go in around just that loop of the kitchen and right back out. So I just abided by her requests, and I left. So she let me in, and I got out.

Q. Did you ask to see the upstairs?

A. She told me before I went in this is all that I was seeing. She had let me know. And that's okay. I mean, that's okay, you know, for now. Like you can -- she's letting me see that, you know, at that point. Like, okay, because people are allowed to do that, like I said, at that point, until I -- later with staff with my supervisor.

But like I said, she didn't live there. She showed me the downstairs. She let me in. Well, Gordon let me in too, but that's what she said all I could see. So she told me that's all I was seeing, and if I

wanted to go talk to that person, I'm getting like rushed out like around the circle and right back out the door.

Q. Did you ask to see the upstairs?

A. I don't recall. I did -- yeah, I did ask to see the home in its entirety, and so that would include everything. So she had stated before I went in like this is what I was seeing and got me out. And she did not want me to speak with Gordon. That was obvious. Anything I even tried to say, like hi or any kind of small talk, was kind of interrupted and the Alisha White stuff. And then she was back to escalated, so I just went around the downstairs and left.

Q. Did she tell you you couldn't talk with Gordon?

A. I don't recall. That is a possibility, because of the way that I felt that I knew I wasn't able to communicate with this person, or it was just body language and the way she was speaking. I don't recall.

Q. And where were you when you were talking to Gordon? Were you up on the porch?

A. Yes, I believe we were on the porch

before we went into the home.

Q. Where were you, and where was Gail?

A. Gail would have been in front of me. And I don't -- Gail would have been like right in front of me, and Gordon would have been to the side of me, is what I recall, anyway, to my best recollection.

Q. So, you know, correct me if I'm wrong. But it sounds like you could have talked to Gordon some more but just that you were feeling uncomfortable and you were just trying to hustle out of there?

A. Nope, I was worried that I couldn't have talked to Gordon, even if I wanted to, because I was so interrupted. And Gail was -- her presence was so frustrated that, when I attempted to, I knew that she did not want me speaking to Gordon and that I just was not trying to frustrate her any further. And we went along into the home to walk through.

Q. Did you specifically ask Gail to talk to Gordon?

A. I don't recall.

Q. Did you ever ask Gail to like step away

JEFFERSON COUNTY IOWA - 050

45

was just sometime randomly in this time.

So I finally get back to the office. I feel like this was within a span of like three-ish hours probably. So I get back to the office. I start reviewing. So then I can get in, and I can review the details of past child abuse assessments. So then, because I can see it on my phone, but it's small, like I said.

So when I'm being told to go straight out there, that's really not typical if we have a lot going on, but he also -- my supervisor, David Rippey, will also send you right out like if he's concerned. Like go now like, and you're not going to be like, no, thank you. You know, I have to go. I have to do what I'm told.

So I go back up to the office. I review all of the information myself. Do you have any questions so far?

Q. Keep going.

A. Okay. So I get back to the office. I review all the information myself. I'm reviewing past history. Especially my focus would have been the methamphetamine and the

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

46

child born positive in that case. And so I reviewed that case.

There was a lot of history that three of Gail's children were removed, that in the one case in particular that Gail had not participated in services particularly, and she was supposed to safety plan her child to her sister that lived in a neighboring town. And when she went to go drop off to her sister, she kind of took off and took the child out to Gordon Seaba's property, and then law enforcement had to go out there to like locate the child when Gail was not supposed to have the child at that time. She knew like at that point.

So that's when I started getting concerned as the credibility, and I'm like -- this sounds pretty repetitive, and a lot of the things she was stating in that assessment sounded like a lot of the statements she was giving me. Like she wasn't up front with that worker either at first. So then I'm starting to be like I don't know. Like what don't I know.

So I'm sharing this with my

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

47

supervisor. This is just the process. So as I'm reading through, there was another allegation of Gail stating that her child had epilepsy. There was in that -- in that assessment there was a part where Gail had resided in her car with eight cats and her child. I don't recall which one, if this was the one that was removed out of Montana, I believe, but she was completely not well cared for. Her teeth were rotted.

And so there were a history, a long history, an elaborate history of concerns that if there were a child born, which then when you read my assessment there is additional information page. So that's the one that I don't think we have.

So that would be the page that -- I don't think we have it, unless you do. I would be surprised because they don't normally print -- that's what I'm like trying -- the additional information page is what the reporter says. So this is all directly -- since this is confidential, this is that sheet that I have access to on the computer. I don't think it's on these.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

48

So that additional information page is very elaborate and explains like where this child's name, the date of birth, like that they were seen either with Gail or at the property, et cetera.

So I review all of that, and then I staff it with my supervisor. I tell him I've talked to Elizabeth today. I tell him, Jayse. I tell him the fireman box thing. I tell him all of the things at this point, and he says staff that with the county attorney.

So then I call -- I don't remember if I called Chauncey or if I called Elizabeth back, because I've been communicating with Elizabeth. But at this point I think either I talk to Elizabeth and she put me on speakerphone and I talked to her and Chauncey at the same time, and/or I had -- Chauncey had to call me back, or I called Chauncey and he had to call me right back. And I don't recall who was there, and I'm trying to be as honest as possible because there has been a lot of staff meetings with those two.

But for this case in particular, I just remember I talked to Elizabeth earlier,

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 051

49

but I don't necessarily remember talking to her the second time. I think I called Chauncey directly, or he had also called me because of the concern with Gail, too, that he had a follow-up question about her visit. So I wish I could tell you that a hundred percent, but I can't.

But when I get on the phone within Chauncey, I review everything. I review past history. I review my concerns. The county attorney is the only one that had access to the reporters as well. So the county attorney is the only one that can like disseminate that information to like law enforcement, just so you guys are aware, to make it clear, so -- but I don't know if the county attorney in a different county has access to. So like the things I described to you would have been Henry County, just to make that clear.

But -- so I provided Chauncey with all of the information, all of the concerns. I read him the entire additional information sheet per my supervisor. Like I -- per David Rippey, he told me to call Chauncey, which is

50

not typical -- or not not typical. That's a normal procedure in Jefferson County, like I said. So in Washington County you would contact the detective first, per se. And in Jefferson County they don't have like a detective, so you would contact the county attorney or Elizabeth first, is just kind of how it goes.

So I contact Chauncey. I tell him all the things. At this point I don't know. So this is like where my mind was truly. I don't know what he knows or what he -- or if he's not -- I don't ever know at this point if law enforcement tells you everything, too. Like I don't know.

So I'm just sitting here. Like he asked me -- he said we need to go back out there, let's go back out there. I did not want to go out there because I didn't want to be out there. And after reviewing that, there was also a piece in there that I read in particular.

I don't know that -- I believe I shared there was concerns with her being like an outburst or aggressive against the

51

department, but there was even a statement made in the past history that she had like tried to back into another worker's car. Like I just knew something was telling me not to go out there.

So Chauncey is like let's go out there. And I'm thinking nobody necessarily just goes out there because I'm providing concern. So I'm thinking that they have more or know something different that I don't. And that is truly where my head was at in that moment. I mean, I'm not saying the things I shared were not very concerning, but the county attorney says let's go back out there.

So I call my supervisor. I don't -- I wasn't like -- I know I wasn't like sure, like let's go out there, because I didn't want to go. It was like 3:00 on a Friday, if I'm being super honest. I've already been out there. I'm not like somebody who is going to go -- like I would love to -- I would love to miraculously know what the truth is. You know, like so this is where I was at, you know, at that time.

52

Like I'm not going to go be this helper, is what I'm thinking, you know, but if there was a child that was located, given the circumstance, if there had been a child hidden, you know, out there essentially to divert DHS in the past, then I have to be there because I'm the department who is going to have to be there if a child is located.

So I call my supervisor, David Rippey. I say I don't want to go out there. I said I have got the worst feeling ever. I do not want to go out there. I don't think this is -- like I don't know what it is, but I don't want to go. This is like word for word, because I won't forget it because I didn't want to go out there.

And it had nothing to do with like anything but my gut instinct. It had nothing to do with anything but that. So there is nothing really further about that, except for I just didn't want to go. So he says you have to go, you have to go, the county attorney is going, you have to go out there.

So I'm like, okay, well, let's go out. Again, it's probably 3:30 by this time.

JEFFERSON COUNTY IOWA - 052

**77**

a little bit more. Like it's a bigger area too. It's not such a small area, so then I don't call the county attorney myself there. It would be my supervisor.

Q. As you sit here today, if you had this to do over again, you would have been more assertive on speaking with Chauncey or to your supervisor about handling this differently?

A. As I sit here today, I would have pushed back and stated that I was not willing to help out and take the case, if I'm being honest, because that's where it all starts in the first place, is that my coworker was busy, this was not my turn, so -- if I was being completely honest.

But secondly, I could not have -- no, I could not have said no to my supervisor, who I -- I -- I showed my frustration with communication because I didn't even want to go in the main house the first time. And so -- and I do believe, like I said, in those situations now I -- I -- like I'm -- if I'm following my gut, so if I'm nervous and I'm not going in somewhere,

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**78**

that's what I'm stating. I think those are the only things I would change.

But in this situation, after reading what I read and the concerns that I had, I couldn't not provide any of that to my supervisor and to my county attorney. I could not do that. So then, when they tell me I have to go out, I can't say no. And so that's where I would be at with that. It's just that this was, I would say, a unique situation.

Q. And in terms of the training that you get for HHS, do they train you on like people's Fourth Amendment rights and what you can and cannot do with searches or going in people's homes?

A. I don't recall -- there is not a specific Fourth-Amendment-type training, no.

Q. Are you taught that you can go into people's house for any reason, even if they don't consent?

A. I got -- I gained consent. So we would get consent from the homeowner. So, yes, as long as you have consent by the homeowner, you are able to whatever the homeowner agrees

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**79**

to.

Q. I guess I'm kind of curious about the opposite and your understanding from your training. If a homeowner doesn't give consent, are there any reasons where you can go in, even if they don't consent?

A. If the homeowner or property owner didn't give consent -- sorry. Like why would you go in? Is that what you asked me?

Q. Just like have you done any training on --

A. No, there is no training on -- no, there is not a particular training on if a homeowner doesn't give consent to be on their property. Is that what you're asking me?

Q. Yeah. Have you ever been told you can go in under certain circumstances, even if a homeowner doesn't give consent?

MR. SHEAHAN: You're asking if she's been trained by that?

A. Told by who? I'm confused.

Q. Yeah, yeah, in your, either your supervisor or official training --

A. I haven't --

Q. Let me finish so that she can -- when we

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

**80**

talk over, she can't get it.

A. Go ahead.

Q. Yeah. My question is, have you ever been told at work any kind of training that you can go into somebody's house, even if they don't consent?

A. No. But, again, even with this situation, Gail had provided me that Tim -- or that Gordon Seaba was the homeowner. My supervisor looked up also and verified that Gordon Seaba was the property owner, nobody else at that time that I was provided the information to.

Gordon himself told me he was the property owner, and Gail told me, when Gordon passed away, specifically that then her and Tim would get the property, which I didn't ask. I didn't even think of it. I was there to see Gail's back property and to go. So like that wasn't even a priority in my mind. And then the county attorney told me that this is Gordon Seaba's property, in which he's -- though any time I had interact with him, was fine with me being there or being present and said it was okay. So --

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 053

89

Q. Did she ever like point down the driveway, like go that way, anything like that, when you saw them bickering in the driveway?

A. I don't particularly recall that.

Q. So you see them bickering. And then, when you got out of the car, were they still in the driveway, or where had they gone from there?

A. Well, they -- that's where I'm -- I -- I can't recall when I got out of the car where they were standing. I remember getting out of the car, and they were still bickering, and I got back into the car. But I think it was not my car. I think I got into Chauncey's car, but I actually think he directed me to because I would have never just jumped in his truck. I think he said get in his truck like immediately.

Like so that's what happened, so that's why -- yes, because I'm like why are you doing this. And then nothing was said -- he had then gotten in the truck, and nothing was said. Like there was no -- he did get in the truck for a second, and I don't remember

90

anything being said at all in that moment.

But I know he got right back out of the truck and, I think, went up to talk to Gordon. I think he said he was going to go attempt to talk to Gordon. And so then I stayed back again because I didn't want to get out, because Gail was out there, and I wasn't sure at that point what the plan was going to be. So then I -- I don't recall at that moment.

Q. So you're sitting in his truck right in front of Gordon's main house; correct?

A. Yes.

Q. And when Chauncey got up to go and talk to Gordon, where was Gail at that point?

A. Gail was kind of all over the place. So that's hard to say. Gail was truly like in the front and the side and the -- down the driveway. So I can't say at that moment where Gail was.

Q. Did you ever see Gail with a dog?

A. I don't -- well, I don't recall a dog, if I did.

Q. Did you see Chauncey go up to, then, Gordon's door?

91

A. Yes.

Q. And you don't remember where Gail was at that point?

A. No.

Q. Well, tell me then about what you saw next.

A. I think Chauncey had -- he was up, knocking on the door. All I know is that I think I -- I looked -- I got -- I don't know how he ended up at the house, so I can't state that. Like I did see Gordon at some point. I believe I can't state when. It was such chaos, but I know he got out and went up to the house. That's what I know for sure. So I was in the truck still. He got out and went up to the house.

Q. Where is the first place you were seeing Gordon?

A. In the house.

Q. Did you go in the house, or you like saw this from a truck?

A. No. So I -- at some point there was another officer, I thought, also in the house. So when I went up to the house, I knocked on the door. And I yelled, and I

92

asked if I could come in. And then Gordon himself said yes, and then I went in.

And then I kind of just asked everybody, because they still -- I don't even know what the conversation was. But I just asked, hey, Gordon, these guys just want to look around the property, just looking for a baby that could potentially be on this property, would you mind if we had like ten minutes 10 minutes out and look.

I remember I was the one who stated that. I don't know if Chauncey had asked that right before I walked in, but I specifically stated that and asked if we could have ten minutes, because I wanted to like get out of here, like why are we still here. So I did that to rush everybody along.

Gordon was super friendly to me. Like even his mannerisms lightened up a little bit from the conversation with Chauncey to then the conversation with me. He was like go ahead. He said ten -- I think he even replied like ten minutes. I'm like, okay, let's go.

So then I didn't do anything. And

JEFFERSON COUNTY IOWA - 054

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF IOWA

CENTRAL DIVISION

GAIL OSBORN,
TIM MCCONNELL SEABA,
and GORDON SEABA,

          Plaintiffs,                Case No.
                                     4:25-cv-00183

vs.                                  DEPOSITION OF

CHAUNCEY MOULDING,                   TIMOTHY RYAN
KELSEY KOENIG, and                   MCCONNELL-SEABA
JEFFERSON COUNTY, IOWA,

          Defendants.
_____

          THE DEPOSITION OF TIMOTHY RYAN

MCCONNELL-SEABA, taken before Gale Sweeney

Christensen, Certified Shorthand Reporter,

Registered Professional Reporter, and Notary

Public of the State of Iowa, commencing at

12:23 p.m., April 21, 2026, at 2910 Grand

Avenue, Des Moines, Iowa.

Reported by:  Gale Sweeney Christensen,
              CSR, RPR

---

INDEX OF EXAMINATION

| Examination by | Page |
|---|---|
| Mr. Hinders | 4 |
| Mr. Sheahan | 47 |
| Ms. Messamer | 66 |

EXHIBITS

| Exhibit Number | Description | Marked |
|---|---|---|
| Exhibit 13 | Assessment | 33 |
| Exhibit 14 | Video | 38 |
| Exhibit 15 | Body cam video | 45 |

INDEX OF ATTORNEY REQUESTS

| Request by | Page | Line |
|---|---|---|
| Mr. Hinders | 29 | 4 |
| Mr. Hinders | 31 | 7 |

---

A P P E A R A N C E S

Plaintiffs by: GINA MESSAMER
               Attorney at Law
               Parrish Kruidenier, LLP
               2910 Grand Avenue
               Des Moines, Iowa 50312
               gmessamer@parrishlaw.com

               and

               ED HARVEY
               Attorney at Law
               1600 Wonder Way
               Fairfield, Iowa 52556
               Edwardgharvey98@yahoo.com

Defendant Kelsey Koenig
by:            RYAN SHEAHAN
               Assistant Attorney General
               Second Floor
               Hoover State Office Building
               1305 East Walnut Street
               Des Moines, Iowa 50319
               ryan.sheahan.ag.iowa.gov

Chauncey Moulding and Jefferson County, Iowa
by:            BRENT HINDERS
               JONATHAN LEWIS
               Attorneys at Law
               Hinders Updegraff & Franklin,
               P.L.C.
               1104 Sunset Drive
               Norwalk, Iowa 50211
               brent@hinderslaw.com
               jlewis@hinderslaw.com

Also present:  Gail Osborn

---

TIMOTHY RYAN MCCONNELL-SEABA,

called as a witness, having been first duly

sworn, testified as follows:

DIRECT EXAMINATION

BY MR. HINDERS:

Q.  Can you please speak and spell your name for the record.

A.  Timothy, T-i-m-o-t-h-y, Ryan, R-y-a-n, McConnell-Seaba, M-c-C-o-n-n-e-l-l, hyphen, S-e-a-b-a.

Q.  And, Mr. McConnell-Seaba, would you like me to refer to you as Timothy?  Tim?  Mr. McConnell-Seaba during the depositions?

A.  Tim is fine.

Q.  Tim?  Okay.  Tim, are you aware you're being deposed in the case of Osborn versus Jefferson County that is filed in federal court in the State of Iowa?

A.  Yes.

Q.  Have you ever been deposed before?

A.  No.

Q.  Now, you were in here when Gail Osborn was deposed; is that correct?

A.  Yes.

Q.  And you heard I went through some rules

JEFFERSON COUNTY IOWA - 055

17

A. Washington.

Q. Do you have any relationship with Gail's other children that she doesn't share with you?

A. No.

Q. Have you ever met those children?

A. No.

Q. Other than the child you had with Gail, do you have any other children?

A. No.

Q. Was Gordon Seaba your father?

A. Yes.

Q. And I think you had already said this, but how long had you lived with Gordon at the property in Brighton?

A. He moved in after my mom died, which was 20 years ago.

Q. Okay. Is that property on the Jefferson County Assessor's website?

A. I believe so.

Q. As far as you know, is everything accurate on there?

A. I would believe so.

Q. Have you ever challenged the assessment of that property?

18

A. No.

Q. Are you aware of any time Gordon has ever challenged the assessment of that property?

A. No.

Q. I understand that Gordon had a life estate during the term of his life. What is the current ownership interest that you have in it, if any?

A. I am a partial owner with my sister and my deceased brother.

Q. Okay. Previously Gail stated that you had constructed the structure that you live in. Approximately, when did you do that?

A. Ten years ago, so 2016.

Q. Okay. Do you have any licenses as a contractor, an electrician, plumber, anything along those lines?

A. No.

Q. Did anyone help you with that construction?

A. My best friend helped me build it, yes.

Q. Who is that?

A. Jeremy Payne.

Q. Now, you're aware that on November 15,

19

2024, that there was an anonymous complaint made about a child living at the property you shared with your sister and your father and Gail. Are you aware of that fact?

A. Yes.

Q. How did you become aware of that?

A. I was at work, and Gail called me, stating that there was an HHS worker there to investigate the claim.

Q. Would that have been on the morning of November 15th?

A. Yes.

Q. What did you do when you received that phone call?

A. I asked if Dad was going to give permission. I stated that he didn't have to, that was his choice, but he was willing to give permission, and I stated that I would be okay with our house being looked into just so the worker could do their job.

Q. Okay. Do you agree that an allegation of a drug-addicted newborn, an ongoing methamphetamine use by a caretaker is, generally speaking, an extremely serious matter?

20

A. Yes.

Q. Is it your understanding that child protective services was allowed onto the property to look both in the structure in which you and Gail reside as well as the main house?

A. Yes.

Q. And to your knowledge did Gail give birth to a child in September 2024?

A. No.

Q. Has Gail ever used methamphetamine in your presence?

A. No.

Q. You've known Gail for eight years; is that accurate?

A. Yes.

Q. She's never used any illegal drugs, or specifically methamphetamine, during that time?

A. No.

Q. In 2024 did Gail ever exhibit any signs of pregnancy in your opinion?

A. No.

Q. Prior to the investigation by HHS on November 15, 2024, had you or Gail in your

JEFFERSON COUNTY IOWA - 056

37

Q. Would that have involved your daughter that you share with Gail?

A. Yes.

Q. You didn't have any involvement in that?

A. No.

Q. That did not occur while you two were together?

A. I was not present for those, no.

Q. Any of the other four listed in 2017, 2012, 2021, or 2020? Were you present for any of those?

A. No.

Q. Has Gail shared that information with you previously?

A. Yes.

Q. All right. Let me see. We'll get this video going.

(An off-the-record discussion was held.)

(Video was played back.)

BY MR. HINDERS:

Q. I'm going to pause this for one second. Tim, have you seen this video before?

A. Yes.

Q. Did you review this prior to the

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

38

deposition?

A. Yes.

Q. I'm going to ask that -- well, number one, I'm going to ask that Defendants' Exhibit 13 be admitted. Any objection?

MS. MESSAMER: No.

MR. SHEAHAN: No objection.

MR. HINDERS: And I ask that this be marked as Defendants' 14 and be admitted. Any objections?

MS. MESSAMER: No.

MR. SHEAHAN: No.

(Deposition Exhibit 14 was marked for identification by the reporter.)

(Video played back.)

BY MR. HINDERS:

Q. Tim, is that you on the tractor in this video?

A. Yes.

Q. Do you recall talking to the officer there?

A. Yes.

Q. Do you remember what you said?

A. Essentially I was asking them what I

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

39

stated earlier to you about wanting to trespass these people from my property because I felt like I was being harassed, I was asking them for help.

Q. And what was the response by the officer?

A. They didn't know why they were there.

Q. At this point in time did you have any knowledge about whether or not your father had granted consent to search the property?

A. No.

Q. No idea whether he had revoked consent to search the property?

A. No.

Q. Were you aware at this time whether he had previously granted consent to search the property to Ms. Koenig earlier in the day?

A. Yes.

(Video being played back.)

Q. Do you recall who you were calling at that point?

A. Gail.

Q. Now, you saw Ms. Osborn, Gail, holding up a phone there; correct?

A. Yes.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

40

Q. Do we have any of those recordings?

A. I don't know.

Q. Do you know if she was recording during that period of time?

A. I don't know.

Q. In holding up the camera like that, would that normally make you think that she was recording that?

A. Yes.

Q. Do you have any independent recollection of what Gail was saying during that period of time?

A. No.

Q. Is it your understanding or belief that while this is going on here that a search is occurring?

A. Yes.

Q. During the period of time that's showing right now, would you have still been on your tractor at the end of the driveway?

A. Yes.

MR. SHEAHAN: Brent, is there any way to turn the volume up?

MR. HINDERS: That's a wonderful question.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 057

41

MS. MESSAMER: It's not working?

MR. HINDERS: I don't know. I'm hitting "volume up."

MS. MESSAMER: This is a little louder; right?

MR. HINDERS: Yes. Good.

(Video being played back.)

BY MR. HINDERS:

Q. Tim, is it true we've been watching this all the way through? We saw you in your tractor at the end of the driveway, but we haven't seen you reappear since then?

A. Correct.

Q. Who is that individual in the -- the woman right there in the white, Tim?

A. Kelsey.

Q. Okay. Had you had any contact with Kelsey prior to this day?

A. No.

Q. Looking at the porch there, was that your father sitting on the porch?

A. Yes.

Q. And there was another individual next to him. Who was that?

A. I didn't catch that.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

42

Q. I'll rewind it, if you can see it. I'll pause it here for one second. Can you see that individual standing there by the door?

A. I do.

Q. Any idea who that individual is?

A. I believe that's my nephew's girlfriend.

Q. Okay. What's her name, if you recall?

A. I don't know her name, honestly.

Q. All right. Okay. So, Tim, is that you in the red shirt there?

A. Yes, sir.

Q. This is the first time we are seeing you off the tractor. What had you been doing in that period between the beginning and now since you weren't with the other parties?

A. I waited at the end of the driveway, and then I came up the driveway, and I briefly talked to my dad.

Q. Okay. Do you recall what your dad said to you?

A. I asked him since these people are trespassing if it's okay if I ask them to leave the property because they are trespassing. And he said they are going to do whatever they want. I don't have any

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

43

control over it, that he didn't give them consent, and that he agreed that I could try and get them to leave again.

(Video being played back.)

Q. So we are at 23 minutes. Looking at the video, does it seem to indicate that Mr. Moulding at least has gotten into his vehicle at this point?

A. For the time being he's in his vehicle.

Q. Does he get back out?

A. Yes.

Q. What is that?

A. Here in just a moment.

Q. And why does he do that, if you recall?

A. So that he can have the DHS lady say why she was here to me.

MR. SHEAHAN: Hit that volume a couple more times.

MR. HINDERS: Trying to.

MR. SHEAHAN: Thanks.

BY MR. HINDERS:

Q. At this point, Tim, is it fair to say that they are not actively searching the property?

A. They are not actively searching the

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

44

property, no.

Q. And they are on your driveway?

A. Yes.

Q. Tim, now does it appear that the Washington County deputy is trying to leave your property and the area?

A. Yes, it appears that way.

Q. Tim, why didn't you choose to sue the Washington County or the Washington County Sheriff's Department?

A. Because I reside in Jefferson County. Jefferson County was running the show, it seemed like.

Q. But Washington County was also on your property; is that fair to say?

A. That is fair to say.

Q. And they were there as a law enforcement agency, not as private citizens; is that true?

A. That's true.

Q. And they entered onto that property, stayed on that property during the same period of time as Jefferson County; is that accurate?

A. Yes.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 058

49

that they violated.

Q. Did anybody indicate that they were investigating you for criminal activity?

A. No.

Q. I mean, did they seem to be concerned about finding a baby if there was one?

A. I don't know.

Q. Do you think that's a valid concern for an HHS worker?

A. Absolutely.

Q. What about law enforcement?

A. Yes.

Q. I want to just clarify this ownership issue on the property, because it sounds like your father owned a life estate, and you and your siblings were remaindermen; correct?

A. I believe so.

Q. So when you say you were on the deed, you may be on the deed as a remainderman, but your property interests are different than your father's; correct?

A. I believe so.

Q. In fact, the property doesn't pass to you and your siblings -- really you and your sister, because I know your brother was

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

50

deceased -- until your father had passed?

A. I don't know enough about the law.

Q. Well, that's the reason why you went and asked your father if I can ask them to leave the property because he was the owner of the property; wasn't he?

A. I did it out of respect for him because he was my father.

Q. He's also the owner of the property, and you knew that you had to have his blessing; correct?

A. I'm also an owner of the property. I asked him out of respect because he's my father.

Q. Did we learn anything new from the videos that you haven't already known about the interactions that day?

A. I don't believe so.

Q. Everything was just the same as when you reviewed those videos the first time?

A. Yeah, the videos were the same.

Q. I did not -- other than Ms. Koenig going into the main house to speak with your father, I did not see Ms. Koenig once go into a structure on your land. Would that be

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

51

accurate?

A. I saw her and Chauncey leaving my shop before Chauncey went into my house.

Q. Is that on the body cam video?

A. It's her and Chauncey exiting my shop, yes.

Q. In terms of going in -- and then in terms of going into your cottage, that appeared to be Mr. Moulding himself?

A. Yes.

Q. I'm trying to recall, you were kind of walking up to the scene at that point, correct, after Mr. Moulding had just exited your residence?

A. Correct.

Q. Going back to this anonymous complaint, sir, because it sounds like you and Ms. Osborn believed that it may have been the guardian of your daughter; right?

A. If we had to guess.

Q. Right. And you didn't do anything to investigate that?

A. I wouldn't know how to investigate it.

Q. Well, did you try to call this person and say, hey, did you make an anonymous

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

52

complaint about us?

A. No.

Q. Did you try to investigate or -- well, withdrawn.

Why do you believe that one of the guardians would be making an anonymous complaint against you?

A. They are the only people I would think that would have anything to gain.

Q. And, again, at that point the kids -- they are already the guardian of your daughter; correct?

A. Correct.

Q. So in terms of gain, what would they be gaining by making this anonymous complaint?

A. Complete custody of our child.

Q. Well, how long had it been since your child was taken from your home and was placed in their custody?

A. About three and a half years.

Q. So your daughter had been living with these folks for three and a half years prior to November 15th of 2024?

A. Yes.

Q. And you think that on that particular

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 059

57

don't know just because I don't know what's going to happen.

Q. Sir, does that happen a lot at your property?

A. No, it doesn't, but when it does, I don't know what's going to happen, you know, because things like this happen. And it turns into a horrible experience.

Q. Well, how many times has a CPS worker showed up to your property that's the subject of this lawsuit -- how many times has that happened to you in your lifetime living there?

A. Two or three, maybe.

Q. And the two earlier events, so not the 15th of November of '24, but those two earlier events, those resulted in what, your children being taken away?

A. That was the end goal of it all, yes.

Q. And of course at that time on those earlier events you had children living on the property, and those were the ones who were ultimately taken away?

A. No, the child was living with Gail at the time.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

58

Q. Okay. But -- I'm sorry. The child was living with Gail. Was that at a different residence than the one we are talking about?

A. Yes.

Q. Gotcha. But in any event, you've had CPS workers at this farmhouse on prior occasions, and that was factoring into your fear of, you know, what was happening that day?

A. Possibly, yes.

Q. Okay. I'm going to shift gears a little bit and just talk about your damages. I know Brent's asked you a few questions, but has this affected your ability to work for Powercom?

A. I'm here rather than being at work today, so yes.

Q. Well, I understand that. You also brought the lawsuit, but has it in any other way affected your job?

A. I don't think so.

Q. Have you have you tried for any sort of either employment opportunities or some other opportunity that you believe existed that was denied or withdrawn because of this incident?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

59

A. I don't think so.

Q. What I'm trying to understand is you're pissed that they were there that day, and the question for you is what is the monetary value of you being pissed that they were there that day? Do you have one in mind?

A. I don't have that number today.

Q. When are you going to get that number, sir?

A. I don't have that answer.

Q. Well, I mean, is it something where when you get that answer we should come back and ask you some questions about it?

A. I don't understand.

Q. We're just trying to be mindful of your time, sir. So I'll just keep asking some questions, and we'll see where we go here.

Again, second visit, just to confirm, you're not in the house with Moulding and the -- Ms. Koenig when they talk to your father. Any information you have pertaining to that conversation was given to you by Gail?

A. And my father.

Q. And your father. Okay. Speaking of

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

60

your father, I know Gail had talked about a couple of the ailments, and it sounds like they were more having to do with movement and stuff, but mentally faculty-wise he seemed to be doing okay?

A. Yes.

Q. I mean, his ability to recall conversations and such, you didn't believe that to be an issue on November 15th of 2024?

A. No.

Q. And so anything he was telling you, you believed to be accurate because there was no cognitive or mental issuing happening with your father on that date?

A. Absolutely.

Q. The same could be said, then, for any conversations that Mr. Moulding and Ms. Koenig had with your father then; right? They could trust what your father was saying on that day?

A. Yes.

Q. And finally just, again, at no point did any law enforcement officer, the county attorney, or Ms. Koenig say we are here to investigate a crime on your property?

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 060

65

interactions?

A. About halfway.

Q. Do you feel like they were trying to let Moulding and Koenig do their job, so to speak, and then they would be on their way? Did you get that feeling?

A. They were complicit with it, yes.

Q. Well -- never mind. I did want to ask you just in terms of who -- because of a situation like that, it seemed like there was a certain individual directing traffic, if you will, on your property. Did you believe that was Chauncey Moulding?

A. Yes.

Q. Did you believe anybody else was kind of telling people where to go and where to search?

A. I don't know.

Q. Well, you were there and you witnessed it?

A. I witnessed about half of it.

Q. And from the half that you witnessed, it looked like Moulding was kind of calling the shots?

A. Yes.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

67

he had with Chauncey Moulding?

A. Essentially that he said no, get out of my house. And they kept on badgering him and, you know, we got to do this, we got to do this. And my dad's the type where at that point he'll just -- he'll shut down, he'll sit down, you know. And that's why, when I asked him when he was on the porch, can I ask these people to leave, and he said they're going to do whatever they want. He didn't have any control. He said no, and they did whatever they wanted anyways.

Q. Did he tell you anything more in terms of a conversation that he would have had with the DHS person?

A. No.

Q. So that, what you just told me, was kind of the total of what he had to say in those conversations with Chauncey or Kelsey?

A. Yes.

Q. And that conversation that you had with him would have been when he walked up the driveway before you joined everybody who was searching?

A. Correct.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

66

Q. Are there any videos or recordings or any other documentation that you haven't provided yet to your attorney?

A. No.

Q. So everything as far as any of that stuff related to this lawsuit, you've already turned over and we should have?

A. Yes.

MR. SHEAHAN: I think that's all I have. Thank you.

CROSS-EXAMINATION

BY MS. MESSAMER:

Q. Just a few from me, too, Tim. With this mental health treatment or the counseling that you went to get, do you know like what type of provider you saw? Was it your regular doctor, or was it like somebody who was just a counselor?

A. Just a counselor.

Q. And was it at the hospital?

A. No, it was at a private counseling service.

Q. In terms of your conversations with your dad the day that the search happened, what did your dad tell you about the conversation

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

68

Q. You mentioned that your shop on the property was searched. Can you kind of just describe what that building is?

A. It's adjacent to my house. It's a little blacksmith shop. It's where I keep my tools at and stuff, yeah.

Q. Are there any buildings or campers or structures on the property that you consider more yours versus other structures are ones your dad used more?

A. Yeah, my barn where I keep my pigs and my house and my shop.

Q. And then what ones would be more considered Gordon's?

A. His house, the garage, the campers.

Q. Were any of the campers yours?

A. No.

MS. MESSAMER: That's all I have too. Thank you.

MR. SHEAHAN: Do you have any more?

MR. HINDERS: I don't have any more, no.

MR. SHEAHAN: I have nothing further. Thank you, Tim.

(Deposition concluded at 2:07 p.m.)

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 061

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

GAIL OSBORN, TIMOTHY )
MCCONNELL-SEABA, and )
GORDON SEABA,        ) Case No. 4:25-cv-183
                     )
    Plaintiffs,      )
                     )
    vs.              )
                     ) DEPOSITION OF
CHAUNCEY MOULDING,   ) CHAUNCEY MOULDING
KELSEY KOENIG, and   )
JEFFERSON COUNTY,    )
IOWA,                )
                     )
    Defendants.      )
--------------------)

THE DEPOSITION OF CHAUNCEY MOULDING,

taken before Buffy Nelson, Registered

Professional Reporter and Notary Public,

commencing at 12:34 p.m. on March 4, 2026, at

2910 Grand Avenue, Des Moines, Iowa.

Reported by:  Buffy Nelson, R.P.R.

---

I N D E X

| Examination by: | Page |
| --- | --- |
| Ms. Messamer | 4, 90 |
| Mr. Hinders | 77 |
| Mr. Sheahan | 81 |

| Exhibit | | Marked/Offered |
| --- | --- | --- |
| Exhibit 10 | Newspaper Article | 20 |
| Exhibit 11 | Text Messages | 76 |
| Exhibit 12 | Email from Alisha White to Kelsey Koenig | 76 |
| Exhibits 1-12 | | 93 |

---

A P P E A R A N C E S

Plaintiffs by:
    GINA MESSAMER
    Attorney at Law
    Parrish Kruidenier, LLP
    2910 Grand Avenue
    Des Moines, IA 50312
    (515) 284-5737
    gmessamer@parrishlaw.com
        -and-
    EDWARD HARVEY
    Attorney at Law
    1600 Wonder Way
    Fairfield, IA 52556
    (641) 919-8696

Defendants Chauncey Moulding and
Jefferson County, Iowa, by:
    BRENT HINDERS
    CAMRYN HUYSER
    Attorneys at Law
    Hinders, Updegraff & Franklin, PLC
    1104 Sunset Drive
    Norwalk, IA 50211
    (515) 981-7044
    brent@hinderslaw.com
    camryn@hinderslaw.com

Defendant Kelsey Koenig by:
    RYAN PATRICK SHEAHAN
    Assistant Attorney General
    Hoover State Office Building
    1305 East Walnut Street
    Des Moines, IA 50319
    (515) 281-5881
    ryan.sheahan@ag.iowa.gov

---

CHAUNCEY MOULDING,

called as a witness, having been first duly

sworn, testified as follows:

DIRECT EXAMINATION

BY MS. MESSAMER:

    Q.  Hi there.

    A.  Hi.

    Q.  I'm Gina.  So let's just maybe start out talking a little bit about your background. You are from Fairfield; correct?

    A.  I wasn't born there, but I grew up there, so yeah.

    Q.  And then you went to elementary -- I heard mention of this MSAE school.

    A.  Yes.

    Q.  That's not a traditional public school; is that correct?

    A.  It's a private school.

    Q.  What is different about it than a public school, to the extent you know?

    A.  It's associated with the transcendental meditation movement.

    Q.  Do you take a similar curriculum?

    A.  Yeah.

    Q.  Are there classes that are different

JEFFERSON COUNTY IOWA - 062

**25**

A.   So, actually, I believe my first kind of involvement in any of this was that phone call from Gail to my office, which I gave it some thought last night.  I don't have an exact time, but I think it was sometime after lunch, between maybe 12 and 1:30, she contacted my office.  A portion of that phone call, I think, has been provided.  So that was my first hint that something was going on.

Q.   We have that recording.  What's the mechanism by which you recorded that?

A.   I recorded that on my work phone.  And I -- I don't normally make a practice of doing that, but, frankly, the phone call was so outside of the ordinary, the claims that she was making were odd enough that I thought it would be valuable to have a recording of that.

Q.   Okay.  So she called and you got that recording.  Anything else notable that she told you during that phone call that is not represented in the recording?

A.   Sure.  I'm certain that she had made a statement that bothered me enough to start the recording, but I don't recall what her specific statement was that was odd enough to start

**26**

that.

Q.   Have your -- has your office prosecuted someone for making a false complaint to DHS before, to HHS?

A.   There was a case.  I'm trying to recall if we got a conviction or not or if it was just stopped at the investigative stage.  I do believe somebody had made 38 separate phone calls to DHS over the course of several months, and that was definitely investigated.  I can't recall the outcome of that.  It would have been a while ago, maybe 2019, 2020.  That's the one that jumps out just because it was so egregious.

Q.   So after you had that phone call with Gail, what did you do next?

A.   So there was a phone call with Gail.  I believe -- and the order of this could be swapped.  I either spoke with Assistant County Attorney Estey or the DHS investigator.  My -- I want to say that I talked with Miss Estey first and asked her like, "Hey, I got a weird phone call from Miss Osborn."  And then Elizabeth indicated that she had also gotten a phone call.

**27**

I've been doing this for a while, and I cannot recall a single instance where a mother under investigation by DHS has contacted my office the same day.  So the fact that she contacted my office twice certainly jumped out as out of the ordinary.  So I think that was the order.

Conferred with Miss Estey, and then I believe I received a call -- I don't know -- I don't know if my office contacted the DHS investigator or if she contacted my office.  But certainly there was a conversation with Miss Koenig.

Q.   And what, between those conversations, did you understand the allegations to be and kind of the factual concerns?

A.   Sure.  Certainly the bulk of the information came from Miss Koenig.  She indicated that she had been at the -- take a step back -- that an anonymous phone call had come into DHS, that the caller indicated a substantial amount of knowledge about the -- a concern -- a child with concerning features.  They had date of birth, they had a name, they had personal contact with the child.  This is

**28**

being relayed thirdhand, so I'm sure if there's a record of the call, or Miss Koenig would be better able to state what came in.  But it was relayed to me that they had that information and that the child was in distress and had been utilized -- or that controlled substance, methamphetamine, had been used in its presence, that it possibly needed medical care and possibly needed food.

And it was kind of my reading of it or -- I don't want to speak for Miss Koenig, but it sounded like the reporting party was trying to report these things without admitting that maybe they were at the residence utilizing methamphetamine.  That was kind of the -- between the lines, but that -- that certainly wasn't said in any report.

Q.   Anything else supporting the concern that there was a kid out there?

A.   Yeah.  So Miss Koenig got the anonymous reporting.  Frankly, I'm not the juvenile prosecutor in the office, so I'm a little rusty on this in Keokuk County.  But they -- I think the anonymous report comes into the standardized central reporting system, and

JEFFERSON COUNTY IOWA - 063

**29**

the work flow from there, I'm not sure, but at some point it was assigned to Miss Koenig. And then it's my understanding that she made some -- some contacts to -- for some reason there's some confusion about the jurisdiction. I think that there was a belief -- the residence is right on the county line, so there was some belief that it might have actually been in Washington County. So I believe Miss Koenig had some contact with an investigator out of Washington County who indicated that Miss Osborn had been calling various fire station safe drop boxes requesting information about the process for, I guess, the no-questions-asked surrender of a child.

And I'm not sure where this information came from, but there was some -- a belief that Mr. -- that Tim Seaba, who is Miss Osborn's paramour, was starkly against having a child, which I think raised some concerns on the part of DHS that this would have been a secret child.

There were some conversations back and forth, and I believe I told Miss Osborn on the phone that it's not -- it's not a criminal

**30**

offense to have a secret child. That's not -- it's not a crime in Iowa, a requirement to report. So, in any event, better person to ask about those things would be Miss Koenig.

But from my recollection of my conversation with her, those were the principal matters of concern that raised her alarm.

Q. Did you consider getting a search warrant for the property at that point?

A. We did not. There was no crime.

Q. If somebody had meth at their residence and had a child there, that would be child endangerment; correct?

A. It could be, but that wasn't -- that wasn't being considered.

Q. If a child wasn't receiving adequate medical care or food, that would be child endangerment too; right?

A. That wasn't being investigated. The principal concern was providing aid and welfare to a distressed infant.

Q. Well, my question is, yes or no, if somebody isn't providing necessary food and medical care to a child, that is child endangerment; correct?

**31**

A. Certainly could be.

Q. And if you've used meth around the child, that would also be child endangerment; correct?

A. It's not that black and white, but it could be.

Q. The statute says that child endangerment is knowingly permitting a child to be present at a location where amphetamine or methamphetamine is manufactured or possessed; correct?

A. I don't have the statute in front of me, but that sounds right.

Q. Were you provided any information from Koenig that the baby had been wounded?

A. I don't recall a wound conversation, no.

Q. How about if the baby was actually dead or had been murdered?

A. No, that was never reported. There might have been a report of that. I wasn't provided that information.

Q. Okay. So under your conversations with Koenig and --

A. Let me pause. There certainly was

**32**

some conversation that we hoped that if the baby was there, it was alive, but there wasn't any information to suggest otherwise.

Q. Okay. So you talked to both Elizabeth and Kelsey to get this information. Anyone else that you talked to before going out to the residence about this matter?

A. I can't recall if I spoke with Deputy Miller or if Kelsey spoke with Deputy Miller. Somebody spoke with Deputy Miller, and I think it was Kelsey, but I think I was there. I think that was the nature of it. But it could have been me. But Deputy Miller was definitely involved in the conversation. I just don't think I called him. I think it was Kelsey. But if the phone records show otherwise, I would stand by those.

Q. What's your involvement with applying for warrants?

A. What's my involvement with applying for warrants? It depends on the context, I guess.

Q. I don't know anything about this. You just tell me the different contexts. We'll start there.

JEFFERSON COUNTY IOWA - 064

**33**

A. Well, we're not dealing with a search warrant case in this case. But, generally speaking, an officer would swear out an affidavit, send it to my office. These days -- I can't recall if we switched over to electronic search warrants at this point or not. These days they go to an application on my phone, I consider, approve, send it to the magistrate, and then the magistrate says whether you get a search warrant.

Q. If there's an emergency where you really need to get in and search someplace, how do you expedite that process?

A. Depends on the context and the circumstance.

Q. What do you do to make it go faster between when the application is filed and when it would be granted?

A. It's a relatively expeditious process.

Q. Like how long would it take on the short end?

A. On the short end, well, depending how long it takes to prepare the affidavit, you can get a warrant in an hour.

Q. Is that the fastest you think you

**34**

could get one?

A. Depends on how fast you can type or the officer can type.

Q. But in terms of your approval and the judge's approval, that would just take getting somebody on the phone?

A. Once the warrant is put together, the approval process is pretty rapid.

Q. Based on the information that Kelsey relayed to you, do you think there would have been probable cause to apply for a warrant?

A. This isn't a criminal investigation, so no.

Q. If it were a criminal investigation, would -- like if you were investigating child endangerment, would there have been enough information for probable cause for a warrant?

A. I don't know how to answer that. It wasn't being investigated as a criminal matter.

Q. What's the significance to you of the fact that you weren't investigating it as a crime?

A. Nobody was going to jail that day. It was just trying to get eyes on the child in distress.

**35**

Q. Do you think that different rules apply if you're not pursuing a criminal matter?

A. Do I think different rules apply? Well, there are certain constitutional protections and shields that exist to protect people from criminal liability.

Q. Do you think that -- well, I'm trying to understand, I guess, did you ever tell anybody explicitly that you were not doing a criminal investigation?

A. I think that conversation probably happened at the Seaba residence, but I would defer to the body cam. I don't recall. But I think that conversation definitely happened with the Seabas or with Miss Osborn and the Seabas. But I would defer to the recordings.

Q. Did you have any knowledge of Gail Osborn before this date?

A. So Miss Osborn knew me. I did not recall how I knew her. When I was in Washington County, there was a case that I prosecuted, I think it was 2017, where she was involved in a multi-county fraud -- what would you call that? I don't know how to describe it. The case involved her staying in bed and

**36**

breakfasts in various towns all over the state utilizing either -- I can't recall if it was a bad check or a bad credit card. So I think it might have been seven different felony charges, could be a couple more or less, in various counties throughout the state. Washington County was one of them, and I was the prosecutor on the case.

So I didn't have any independent recollection of that matter, but I do recall now that I was involved in that prosecution. But I don't even know that I ever put a name to a face, that I ever had individual face-to-face contact with Miss Osborn. I could have. But there were so many counties involved, and I don't recall where she was living at the time, but during the pendency of that case I would have just liaised with her attorney probably.

Q. Okay. So besides this involvement with that case that you discovered kind of afterwards, anything else about Gail that you knew going into this day that you just knew yourself, not that you heard from Kelsey?

A. Right. So I did have a conversation with her in 2022 -- I think I indicated that in

JEFFERSON COUNTY IOWA - 065

**37**

my filings here -- where she was sitting on my office stoop when I came back from lunch when I was running a county attorney's election against plaintiffs' counsel here, and she was extremely emotional, tears in her eyes. It was an odd conversation. And she was very concerned about ensuring that Mr. Harvey didn't become county attorney. That was an odd conversation.

Q.   How long do you think you talked to her?

A.   How long did that conversation take? Less than ten minutes, probably more than five. Somewhere between five and ten minutes.

Q.   What were her concerns?

A.   As indicated in the filing, she was concerned about his behavior when he was her attorney on a different matter.

Q.   How about your relationship with Kelsey Koenig? Is she somebody that you worked with before?

A.   Yes.

Q.   And what about Tim Seaba? Had you had any interaction with him?

A.   I don't think I had ever seen him or

**38**

heard of him before that day.

Q.   How about Gordon?

A.   No, definitely not him.

Q.   And since that November 15, 2024, have you had any interaction with the three of them since then?

A.   No, I don't think so.

Q.   So it sounds like what you described so far is also oral communication. Did you have any email communication about this incident?

A.   With the plaintiffs?

Q.   No. With Kelsey or Elizabeth.

A.   No. We were all in the same place. I don't think there was any email communication about it.

Q.   Did you actually ever see the anonymous complaint or hear it?

A.   No. I would have liked to. I don't know how that process works. But I didn't hear it or see it. And I don't know that anybody from DHS did either. Anybody that -- Kelsey didn't. Somebody who works for DHS did. I'm not aware if those types of calls are recorded or what type of documentation exists.

**39**

Q.   Did Kelsey tell you that she had been out there and talked to Gail?

A.   Yes. She indicated that she went out there. She was alone. She had some conversation with Gail, but that the conversation was -- the investigation was not complete based on some concerns that she had developed. I think she was just kind of freaked out being out there by herself.

Q.   Did she tell you that she had gone inside Gail's house?

A.   I don't recall.

Q.   Did she tell you that she had talked to Tim on the phone while she was out there?

A.   I don't recall. I do recall her talking about her conversation with Gail, but beyond that, I don't recall any mention of Tim.

Q.   Do you know who Alisha White is?

A.   I have talked to her on the phone. I don't think I've ever met her in person. I know she is a DOC probation/parole officer.

Q.   Did Kelsey tell you that she had spoken with Alisha White?

A.   I believe she did.

Q.   What did she tell you about that?

**40**

A.   It's on the -- it's on the recording. Something about -- something about Alisha being my best friend. She knows -- honestly, I don't recall exactly. But Alisha did come up.

Q.   And what recording are you referencing?

A.   The phone call that she made to my office.

Q.   Okay. Did --

A.   And maybe not. If it's not on there -- if it's not on there, Alisha White's name maybe did come up from Miss Koenig.

Q.   And that's what I was going to ask you about. Did she tell you that she had talked to Alisha White?

A.   I don't recall, but maybe. Yeah, I -- you know what? I do recall. She did say that, yeah. She indicated that she called Alisha, that Alisha said that she knows Gail, but that they're not best friends. I think that Miss Osborn had possibly indicated that they were closer than maybe Miss White would attest to.

Q.   Did Alisha indicate that Gail had been pregnant?

JEFFERSON COUNTY IOWA - 066

41

A.    I wasn't on that call, but Miss Koenig didn't indicate that Alisha said that.

Q.    Was there anything from the anonymous complaint that you understood had been corroborated?

A.    Corroborated how?  I think there was a lot of identifying information, but I don't think that that was independently corroborated by any other party.  I think that the specificity of the complaint was what was notable.

Q.    As you understand the law, is DHS allowed to search a property absent probable cause or consent?

A.    I would defer to DHS on that.

Q.    When you went out to the property on November 15 of 2024, did you believe that DHS could search a property without probable cause or consent?

A.    Well, the objective there was to speak with the property owner and see if he would provide consent, so that was the objective.

Q.    I understand that.  But my question still is, the day you were there, you know, absent consent or probable cause, was it your

42

understanding that DHS could search the property?  Did you think it was a requirement that you had to get consent before you could take further action?

A.    I wouldn't -- I don't know.  Our objective was to see if the property owner would provide consent.  That was the point of talking to her.

Q.    Did you think that it was necessary in order to search the property?

A.    Did I think it was necessary to search the property?  Well, this case involved exigency and permission, consent.  Those are the two -- that's why we're here.  So I don't know that DHS's individual authorities to preserve health and welfare of children -- I'm not sure how to kind of square that with your question, I guess.

Q.    Would you agree that a person is not obligated to cooperate with HHS?

A.    Yes.

Q.    Would you agree that the Fourth Amendment still applies with investigations by DHS?

A.    Fourth Amendment always applies.

43

Q.    Would you agree that co-tenant's consent does not allow law enforcement to search if the other tenant objects?

A.    I don't know that it's always that simple, but I think that there's a reality there, yes.

Q.    Do you agree or disagree that a landlord cannot consent to the search of a tenant's property?

A.    Yes.

Q.    Do you agree or disagree that community caretaking is not a stand-alone exception to the Fourth Amendment?

A.    I don't know that I would necessarily agree with that.  Community caretaking exception to the Fourth Amendment -- when you say "stand-alone," when do you mean by that?

Q.    Would you agree or disagree that an anonymous tip does not ordinarily contain sufficient indicia of viability to provide reasonable suspicion or probable cause?

A.    I would disagree on the facts as stated, but I know what you're saying.  It depends on the tip, though.

Q.    What about this tip provided

44

sufficient indicia of reliability?

A.    I'm not saying it did.  I'm saying the question as posed is broad.

Q.    Okay.

A.    Not to split hairs, but --

Q.    Okay.  Do you believe that this anonymous complaint had sufficient indicia of reliability to provide reasonable suspicion or probable cause?

A.    For a search warrant or --

Q.    For --

A.    -- that a crime had occurred?  Because probable cause is a criminal standard.

Q.    Yeah.

A.    This was not a criminal investigation.  So nobody was investigating probable cause and reasonable suspicion regardless.

Q.    But a search occurred; correct?

A.    There was an attempt to locate a child in distress, yes.

Q.    Do you agree or disagree that you searched Gordon's property?

A.    Yeah.  Well, so okay.  In the broadest definition of search, certainly, yes.

Q.    Do you agree or disagree that you

JEFFERSON COUNTY IOWA - 067

**45**

searched Tim's property?

A. It's not clear to me where Tim's -- what is Tim's property.

Q. Before you went out there, did you pull up any information about this property?

A. Yes.

Q. What did you pull up?

A. Beacon website, I believe, indicated that this was property belonging to Gordon Seaba.

Q. Is Beacon the same thing as the assessor's website?

A. I believe so, yeah.

Q. Okay. Like this Exhibit 1, is this Jefferson County assessor, is that the type of format?

A. Yeah. And there's a -- there's a hole through the part I was hoping to look at there. But, yes, this is -- looks like Beacon to me.

Q. And if you flip onto the back side, does it have information about who owns the property?

A. There it is. Okay. It does.

Q. And Tim Seaba would be an owner of that property?

**46**

A. Looks like it. Well, I'm not sure what this second line is on this document.

Q. It looks like there's a hole through the word "Seaba." Gordon Life Estate is deed holder.

A. Okay.

Q. And then --

A. So I believe that's why we believed Gordon Seaba to be the property owner.

Q. And then the buyer, in terms of who had the property in 2006, that's where it lists Tim Seaba?

A. Uh-huh.

Q. Are you saying you just didn't read that part?

A. No. I'm not sure that all the information that we were looking at at the time of the review with Beacon is contained on that document.

Q. What do you recall seeing on Beacon?

A. I recall -- and also I think this was indicated by conversations with the deputies, that that property belonged to Gordon Seaba.

Q. Did you have information that Tim Seaba lived there?

**47**

A. I didn't know who Tim Seaba was.

Q. Did you have any information that Gail Osborn lived there?

A. According to Miss Koenig, yes, that was where she saw Gail.

Q. Is it your understanding that you can rely on an anonymous complaint as long as you're not trying to investigate a crime?

A. What do you mean by "rely"?

Q. You can search a place based on an anonymous complaint as long as you're not investigating a crime?

A. I don't know how to answer that. I don't know that that's what happened in this case. Are you saying that's what happened in this case?

Q. No. I'm just asking you a question.

A. Okay. I don't know.

MS. MESSAMER: Can you re-read that question for me?

(The requested portion of the record was read.)

A. I can't answer that yes or no. That's not a black-or-white question. It's a legal question that's very complicated. I think

**48**

you're oversimplifying the consideration. Again, I'm not trying to be difficult.

Q. What was the exigent circumstance here that allowed you to search the property?

A. The concern of the well-being of an infant.

Q. How would you define probable cause?

A. How would I define it? It's the legal standard that determines whether or not there are grounds to arrest and charge with a crime.

Q. What is the legal standard?

A. What is the legal standard for probable cause? That the acts probably occurred and that the individual charged probably performed the act.

Q. Based on the information you had in this case, do you think that there was enough information to say there was probably a baby out there?

A. I don't know. Based on the information I have now? Could you re-ask the question? Now or then?

Q. Let's start with now.

A. Knowing now, knowing what I know now, I don't think that there was a baby on the

JEFFERSON COUNTY IOWA - 068

**53**

the intersection of the driveway and the street; correct?

A.   He was on a tractor.  I don't recall exactly where his tractor was.  It was somewhere -- he was on the street.

Q.   And did you talk to him as you approached?

A.   So I drove up.  I asked him, "Are you Mr. Seaba?  Are you Gordon?"
And he asked me if I had a warrant.
And I asked him again, "Are you Gordon?"
And I can't recall what he said after that.  Something nonresponsive to the question, at which point I realized that Gordon, who I'd never met, nor Tim -- I knew Gordon to be an elderly gentleman, and I determined that he was not Gordon.

Q.   Where was Kelsey at this point?

A.   She might have been in my car.  She might have been in my car.

Q.   And you were still in your car when you talked to Tim?

A.   I was in my car when I talked to him. I don't recall where Kelsey was.  But I believe

**54**

she was in my car.

Q.   What did Tim say after he asked you if you had a warrant?

A.   Like I said, I don't recall what his next statement was, but it was -- I recall that it wasn't responsive to my request who I was talking to.  I was trying to talk to Gordon. "Are you Mr. Seaba?  Are you Gordon?"  Because I -- then I figured out he wasn't Gordon.

Q.   Did he tell you to leave the property?

A.   I wasn't on the property, so I don't think he told me to leave the property.  He also -- he might have had his cell phone out. I don't recall.  So if he did, that would be a better indication of what was said.  But this is just running off my memory.  I think -- I wasn't on the property, so I don't think he told me to get off the property.

Q.   Did he indicate he did not want you to come onto the property?

A.   That was indicative by his tone, if nothing else.

Q.   Did you ask him who he was in relation to the property?

A.   I asked him who he was.  I didn't ask

**55**

that specific question.

Q.   Did he tell you?

A.   He didn't tell me who he was.

Q.   What did he say when you asked him who he was?

A.   He didn't answer the question at all.

Q.   What did he do?

A.   Like I said, my first question was, "Are you Gordon Seaba?"
His response was, "Do you have a warrant?"
I then asked him again, "Are you Gordon Seaba?"
And his next statement, I don't recall what it was, but it was not responsive to the question.

Q.   Had Kelsey mentioned anything to you about who the father of this supposed child was?

A.   I don't think so.  I mean, look.  I don't think anybody would have been in a position to know at that point, so -- but I don't recall Kelsey indicating who the father was.  I do recall Kelsey indicating that Tim was Gail's paramour or significant other and

**56**

that there were concerns that Tim was extremely opposed to having a child.

Q.   Okay.  So you drive past Tim.  What does he do?

A.   I don't know.  I don't recall who was behind me.  There was another car behind me.  I don't know what he did after that.

Q.   Okay.  What did you do next?

A.   I went to the house and spoke with Mr. Seaba, Gordon Seaba.

Q.   Was anyone else at the house?

A.   So I was with Miss Koenig.  Gail Osborn was in and out of that -- that house at that time, so she -- and she had her phone with her.  I believe that was recording.  But she was in the house, and then she left the house, and I think she came back into the house and then left the house.  So in the house at various times were Mr. -- was Gordon Seaba, Miss Koenig, myself, and at times Miss Osborn.

Q.   Anyone else?

A.   I don't think there was anybody else in the residence.

Q.   Tell me about going up to the house. What's the entrance to the house like?

JEFFERSON COUNTY IOWA - 069

**57**

A.   It's an old house.  There's a front porch, steps up to the front porch, wood construction, older, probably early 1900s build, farmhouse.  There was a burn pit on the south side of the house, RV on the property southeast corner.

Q.   Did the house have a doorbell, or did you knock?

A.   I don't think it has a doorbell.

Q.   Did you knock?

A.   I don't think so.  I think Kelsey knocked.  Someone knocked.  I can't recall if it was me or Miss Koenig.

Q.   Then what happened?

A.   Miss Osborn -- Miss Osborn may have entered -- I don't recall.  I know there's an allegation that I opened the door and entered into Gordon Seaba's residence.  That is blatantly false.  I would never do such a thing.  I didn't just go barge into this residence.  So that didn't happen.

Who opened the door, I think it was Gordon.  And I think I asked if we could talk inside because Gail was being extremely noisy, and it was difficult to have a conversation.

**58**

Q.   What was Gordon like?

A.   Gordon was subdued.  He looked tired. He's an elderly gentleman.  I think he was wanting -- well, he wanted this -- all the stuff with Gail to subside.  I talked to him about concerns.  Kelsey did, I think, most of the talking about the report from the anonymous caller.

And I indicated to him that, look, the issue here is just confirming whether or not this baby needs care and is in distress on the property.  I asked him if we could look around the property, confirm that there's no child, and we would be finished within ten minutes. It was probably a two-minute conversation, possibly two and a half.

Gordon indicated, look, ten minutes, look around the property, determine whether or not there's a child.

At that point I contacted Deputy Miller and indicated we had permission.

Q.   Where were you in the house when you had this conversation?

A.   So you walk in.  And I think when you walk in, you are in the southwest corner of the

**59**

residence.  There's kind of a main living room. You turn to the right, there's kind of a table, I don't know if it's a kitchen table or dining room table.  Mr. Seaba went and sat at a table that would have been -- I think it would have been the southernmost center room of the house. I would probably call that a living room, but they might call it a dining room.  He sat at a chair.

Q.   He sat in the living room, you said?

A.   I would call it a dining room.  There was a dining room table there.  I don't know what you would call the room.

Q.   Okay.  So you recall him opening the door and inviting you guys inside?

A.   I think I might have asked if we can have this conversation inside in order to get away from the disruption of Miss Osborn.

Q.   What did Gordon say?

A.   Yes.

Q.   At what --

A.   I don't know if he said the word yes. He assented.

Q.   At what point -- and how did he assent?

**60**

A.   I don't recall his words.  Either, "Sure," or, "Come on in," or, "That's all right," something along those lines.

Q.   Where was Gail when you were at the front door?

A.   She was back and forth.  I think what happened was a deputy drove up after me, and she went to -- I don't recall.  I don't recall exactly where she went.  She was at times on the porch and at times away from the porch. But my attention was not on her.  It was on Mr. Seaba.

Q.   Gail has indicated in the video -- have you watched the body cam video?

A.   I watched parts of it.  I think there's -- are there four?  How many do you have?

Q.   There are five.

A.   There's five?  Okay.  I've only seen portions of some of them.

Q.   And Gail indicated at various times in the video that Gordon had told you guys to get the hell out.  Did that happen?

A.   He didn't -- Gordon didn't tell me to get the hell out, no.

JEFFERSON COUNTY IOWA - 070

**61**

Q. Gordon never said that?

A. To get the hell out?

Q. Uh-huh.

A. No. He gave us permission to be on the property.

Q. Do you have any idea why Gail would say that?

A. I'll be honest with you, ma'am, I don't have any idea why Gail was behaving the way she was to begin with. Part of this whole case was her extremely unusual behavior from the jump to start with the phone calls to my office. I've never seen somebody acting the way that she was acting. So I don't know if that answers your question.

Q. You thought it was strange that somebody would be upset about somebody calling DHS and falsely reporting that she had a baby?

A. I understand her concern, frustration about that, I do. It's the way that she manifested her frustrations.

Q. How do you think she should have manifested them?

A. I'm not going to pass judgment on that, but, like I said, I've handled DHS cases

**62**

for over a decade, and I've never seen somebody respond the way Gail responded.

Q. Have you ever had a false complaint about a baby being born that didn't exist?

A. I am certain that a percentage of reports to DHS are false. I don't know what the percentage is. But I'm certain that happens. Like I said, we had at least one prior for prosecuting such claims. And the response was Miss Osborn I've never had.

Q. Have you ever had a case where someone has had a baby that they didn't tell anybody about and the baby was being abused?

A. The baby was what?

Q. Being abused or mistreated.

A. Well, in what time frame?

Q. Since you've been county attorney.

A. No. What I mean is -- it's not a crime to have a secret baby. Do babies that don't have Social Security numbers at some point in their lives get abused? I'm sure. So have I had a case? I don't recall. But maybe.

Q. Have you had any cases with babies that were unreported and they didn't get Social Security numbers?

**63**

A. That's not a crime. So I wouldn't have that case. It's not -- that's not a case; right? Whether the child gets abused or not, that can be a case.

Q. Okay. Well, have you had that case where there's been an unregistered baby that was being abused?

A. Have I had a case where an unregistered baby was being abused? We don't register babies, so I don't know. Have I had cases where babies are abused? Yes. Have I had criminal cases about unregistered babies? No.

Q. Okay. So what's Gordon say exactly that he gives you permission to do?

A. To search the property. I told him that if -- we want to be out of his hair. "We'll be out of here in ten minutes."

He said, "Fine. You can look on the property, confirm that" -- he indicated, "There's no baby here. You can look at the property to make sure."

We did so. Or we indicated we would do so after he provided his consent.

Q. What was your understanding about

**64**

where Gail specifically resided?

A. I had no information.

Q. It was clear to you that Gail did not want you to search her property; correct?

A. Gail was very adamant, yes.

Q. Did you think that Gordon had given consent to search somewhere Gail lived?

A. I had no information about possessory layout of that property at the time.

Q. Do you think it's important or unimportant to know who has possessory interests of places before you search them?

A. Gail tried to keep me from talking to Gordon.

Q. My question is, do you think it's important or unimportant to find out who has possessory interests before you search various locations?

A. Possessory interests are always relevant.

Q. Did you ask Kelsey where Gail lived?

A. I don't specifically recall asking Kelsey that. I think that I did not.

Q. Did you ask Gordon which outbuildings belonged to Gail?

JEFFERSON COUNTY IOWA - 071

**65**

A.   I don't recall doing that.

Q.   Did you do anything to try to determine which of these places that Gail had possessory interest in?

A.   Gary -- Gail, from my first attempt to talk with Gordon, was telling me to, "Get the hell out of my house."  And I believe one of my concerns was that this was not your house.  Her attempts to keep us from even conversing with Gordon from the jump were odd and added to the concern.  So she was claiming -- she was claiming possession over Gordon's house specifically when she was telling me not to talk to him.  But, again, I didn't know whose possessory interests lied -- laid where.  We had permission from Gordon to search the property.

Q.   At the point that you went into the building at the back of the house -- or, you know, behind the back of the house where Gail was telling you not to go in there -- do you recall what I'm talking about?

A.   The one that ended up being Gail's house?

Q.   Yes.

**66**

A.   Okay.

Q.   Is it your testimony as you went into that house, you did not know that's where Gail resided?

A.   I think she probably said that.  Well, I would defer to the body camera.  I don't recall what she said specifically about that residence.  She was talking the entire time.

Q.   As you sit here today, do you think that you had legal justification to enter Gail's home?

A.   Yes.

Q.   And what would that be?

A.   Exigency, permission.

Q.   You believe that Gordon can give you permission to enter a home where Gail lived?

A.   At the time we entered, I believe that Gordon had provided consent to search the property.

Q.   And you thought that could trump Gail's denial?

A.   I believe that included the outbuilding.

Q.   And you thought that that trumped Gail's denial; is that correct?

**67**

A.   Gail's denial, what way?

Q.   Of consent.

A.   So I didn't know what Gail had interest in and not.  But we had the property owner's consent.  She -- Gail's behavior from the beginning really made it difficult to converse with her about these issues.  She was acting -- well, she was very difficult to talk to.

Q.   Do you believe that Gordon could give consent to search Gail's home over Gail's denial of consent?

A.   At the time I believe Gordon had provided valid consent to search the property, including the outbuildings.

MS. MESSAMER:  Could you please read that question back.  It's a yes-or-no question.

MR. HINDERS:  Let me interpose an objection to form of the question and the term "home."  It has not been established in the record.

(Requested portion of the record was read.)

A.   I believe Gordon could give permission

**68**

to search the buildings on the property.

Q.   Did you think Gail lived somewhere else besides this property?

A.   Honestly, I thought Gail might have lived in the main house based on the way she was acting.  Wasn't sure.

Q.   So if you thought Gail lived in the main house, you entered the main house against Gail's consent too; is that correct?

A.   I entered the main house at Gordon's invitation.

Q.   While Gail was actively telling you not to go in there; correct?

A.   She was trying to keep me from putting eyes on Gordon and talking to him.  He invited me and Miss Koenig into the residence to talk with him.

Q.   And Gail didn't -- expressed to you she did not want you to go into the main house?

A.   Can I ask you, does Gail have a recording of that conversation?  Because I would defer to that.  But from my recollection, she said, "No, you can't talk to him."  I think she says the words, "No, you can't talk to him."

JEFFERSON COUNTY IOWA - 072

73

A.   I don't know Hansen.  I think he might be Lyle Hansen's son.  You asked me who I have the closest relationship with?

Q.   Yeah.

A.   Well, I work with Burnett and Miller, and I work with Kelsey.  I worked with Dave.  But he's no longer with the agency.

Q.   Have you talked to Dave about this case at all?

A.   You know, I want to say no, but it may have come up ancillarily, but not in any meaningful sense.

Q.   Did you have any communication with Dave Rippey before going out to the property that day?

A.   No.  Not about this case.

Q.   It seems like as we sit here today, you recognize that that back property that you entered was Gail's residence; is that correct?

A.   I've been informed that, certainly.  Yeah.

Q.   At what point did you realize that?

A.   Well, look, you couldn't really tell what it was from the outside.  It looked like a shed, like an outbuilding.  It looked like a

74

residence on the inside, so --

Q.   Were you able to determine at that point that it was Gail's residence versus someone else?

A.   I certainly didn't search looking for indicia of ownership.  I had no reason to believe that it was.

Q.   I'm going to pull up Deputy Burnett's second body camera here.

(Portion of video played.)

Q.   So he's approaching the house.  This truck that we see at, like, second 4 off to the right, is that your truck?

A.   It is.

Q.   And this white vehicle that's closer to the street than yours, whose vehicle is that?

A.   I don't know.

Q.   Okay.  Skipping ahead to second 17, there's a woman out front in a purple T-shirt.

A.   Could you get closer?  I don't know that I recognize that.  No, I don't know who that is.

Q.   Did you have any interaction with that person when you were there?

75

A.   Not in any meaningful way.

Q.   Was that person inside the house?

A.   I don't recall.  But I don't know that person's name.  I have no recollection of who that would be.

Q.   And then the person on the porch, do you know who that is?

A.   Not from this distance.

Q.   Are you able to tell at all as we got closer?

A.   No.  Yeah, I'm not sure.

Q.   Do you expect officers that you're working with to wear a body camera when they are engaged with the public?

A.   It's regular practice, but if they didn't, I wouldn't say it's an egregious violation of policy.  But it's normal.

Q.   It's what?

A.   It's normal for them to do so.

Q.   To wear it or to not wear it?

A.   To wear it.

Q.   Why didn't you just have law enforcement search the property and not do it yourself?

A.   Why?

76

Q.   Uh-huh.

A.   I don't know what to tell you.  I'm not sure how to answer that question.

(Exhibit 11 was marked for identification by the reporter.)

Q.   So just to mark this one for the record, this was provided in discovery.  My assumption, when I got this, was that this was a text -- on page 1 here where it's marked Jefferson - 4 at the bottom, that this was a text that you sent to Deputy Miller and Elizabeth Estey; is that correct?  Or, wait, no.  Yeah, Elizabeth Estey.

A.   I think that's correct, yeah.

Q.   And then the back side of this, which would be Jefferson - 5 at the bottom, this I took to be a text you had sent to Kelsey Koenig.

A.   That sounds accurate.

(Exhibit 12 was marked for identification by the reporter.)

Q.   So this, what I just marked number 12, this is an email from Alisha White to Kelsey Koenig.  Did Kelsey provide this to you?

A.   I don't think that I've ever seen

JEFFERSON COUNTY IOWA - 073

**81**

MR. HINDERS: I don't have any further questions.

CROSS-EXAMINATION

BY MR. SHEAHAN:

Q.   That last question by Mr. Hinders was about taking direction from Miss Koenig. What direction did you take from her?

A.   **Maybe taking direction is the wrong way to phrase it. It was a collaborative conversation and operation.**

Q.   You talked to Miss Koenig over the phone prior to going back to the scene with her --

A.   **I think she was at my office.**

Q.   You now think she was at your office telling you this?

A.   **I don't think I indicated it was on the phone. I don't think I had a phone call with Miss Koenig that day. She came to the Jefferson County Attorney's Office to discuss it.**

Q.   Okay. Did she tell you that she had been there that morning, that there was no -- as far as the allegation of dangerous substances, that was not confirmed, did she

**82**

tell you that?

A.   **I don't know if she told me that that was unconfirmed, but she did say that Miss Osborn didn't appear to be under the influence of controlled substances.**

Q.   And in terms of the baby or evidence of a baby being there, what specifically did she tell you?

A.   **She indicated that there was a car seat in the back of the car, that there was some dispute over the age of the child who was sitting in that car seat. I didn't inquire as to the relevance of that, but there was a conversation about that. We talked in detail about the concerns from the anonymous reporting party and the conversation that Miss Koenig had with the Washington County investigator about the fire station drops or Safe Haven drops. And then we discussed the conversations that -- well, I discussed the conversation that I had with Miss Osborn, and I believe Miss Estey also indicated the nature of the conversation she had with Miss Osborn earlier in the day.**

Q.   The reason I ask is my understanding is that she cleared the area or she cleared the

**83**

report that morning. And so when you're having this conversation after the fact and it's talking about going back to the crime scene, why would Miss Koenig -- not the crime scene, excuse me, the house, why would Miss Koenig be asking you to go back?

A.   **Why would she be asking me to go back? She doesn't have to ask me. This was her matter, but we were discussing it. And, frankly, we all thought it was extremely odd --**

Q.   Yeah.

A.   **-- and concerning.**

Q.   I guess my point is, weren't you the one saying, "Let's go back to the scene"?

A.   **I definitely said, "Let's go back to the scene." I don't know that I was the only one saying, "Let's go back to the scene."**

Q.   And when you got there, because it's on body cam, I mean, you're the one who's directing the officers in terms of which outbuildings to go and look at; correct?

A.   **I definitely called Deputy -- I think it was Deputy Miller after Mr. Seaba gave permission and asked that he would take a look at -- I think I asked him to look at the RV.**

**84**

I'm not sure.

Q.   And then you -- there was one building that looked -- ultimately ends up looking like a shed of some kind, like a work shed, and you open the door, and you had Miller go look in that. Do you recall that happening?

A.   **I recall that. I don't think we entered. But there were no windows. We tried to look in windows. There were no windows there. So we just opened it up, saw it was empty, and closed it.**

Q.   And then after that you went over to what appeared to be Gail Osborn's residence because she's yelling at you at that point, "Don't go in there"?

A.   **After the fact it's very clear that is the place she's asserting to be her residence. Opened the door, went in there. Honestly, I wouldn't have gone in if it was visible from the exterior, and I would have been out of there far more quickly -- I reviewed the body camera. I think I was in there a total of fifteen seconds. I would have been out of there in a couple if Miss Osborn wasn't threatening to assault me from outside.**

JEFFERSON COUNTY IOWA - 074

**89**

not possible, but it's not something we've ever done.

Q.    Maybe an investigator who is adjacent to CPS or HHS would be the one responsible for drafting an affidavit, maybe running it by -- obviously submitting it to the magistrate for approval, but a CPS worker, you've never heard of that, have you?

A.    I think there may have been instances where the information came from a CPS worker, was utilized during the determination for probable cause, but they were not the affiant on the search warrant.

Q.    Thank you.

The typical way for a CPS worker is usually to start with a, "Hey, can I have your permission to look around?"  Is that fair?

A.    Yes.

Q.    And your understanding, both in the morning visit by Miss Koenig and then when you two had talked with Mr. Seaba that afternoon, you believed you had permission to be on the property and search around?

A.    Yes, sir.

MR. SHEAHAN:  I think that's all I

**90**

have.  Thank you, sir.

REDIRECT EXAMINATION

BY MS. MESSAMER:

Q.    I think it's been asked already, but just to make sure, when you talked to Gordon in the house, he confirmed he had not seen any baby; correct?

A.    Yeah.  I think he indicated -- I don't know how he -- he said it in kind of a colloquial way.  He's a funny guy.  But the thrust of his statement was, "You can look. You're not going to find a baby."

Q.    And when you say he's a funny guy, how so?

A.    He's just got a funny air about him. He wasn't in a great mood that day, but I think he has a good sense of humor.

Q.    What makes you say he wasn't in a good mood?

A.    He was frustrated by -- by the whole dynamic.  He just seemed like a -- like an elderly gentleman that was exasperated by the circumstances.

Q.    Did he say anything to indicate he was frustrated?

**91**

A.    It was more of his mannerisms.

Q.    There was a question about checking a certificate of occupancy.  I guess, as I understand it, there would not have been a certificate of occupancy for this property? You're not required to do that?

A.    I don't have a knowledge of a requirement for that on a county level.  There are issues, obviously, if it's sanitarian issues and determining the number of, you know, rest- -- bath- -- bedrooms flowing into a particular septic system.  There are issues with that, but that's separate from this.

Q.    Did Gordon ever indicate to you and/or Kelsey when you were there that he wanted you and/or Kelsey to leave the property?

A.    Gordon did not.

Q.    And you mentioned that there was some inquiry Gail made about a Safe Haven drop?

A.    I don't have any personal knowledge of that.  That was relayed to me by Miss Koenig.

Q.    Any idea of the time frame?

A.    I don't have that information.  I don't know if that was relayed from the Washington County investigator.

**92**

Q.    Was the information you got that Gail had a baby she wanted to drop there?

A.    That was certainly the implication if it wasn't outright stated.  I don't recall. Again, this is the investigator telling -- DHS or HHS investigator telling me, so I don't actually know what was relayed in that conversation.

Q.    And before you went out there, you did know that Gail had other children that she had some visitation with; correct?

A.    I think I forgot to mention this.  A piece of information that was relayed to me that further exacerbated concerns from DHS was that Gail had previously had an engagement with DHS, and I think there was an order for removal, and Gail instead fled the state to the state of Montana with the children.  And I forgot to mention that.  But that was another factor that kind of increased the concern here.

Q.    My question was, you knew Gail had other kids that she had visitation with; correct?

A.    I don't know that I personally knew that she had other kids and had visitation with

JEFFERSON COUNTY IOWA - 075

## Safe Haven Baby Boxes

message

**Molly Jennings** <mjennings@co.washington.ia.us>                              Tue, Jun 20, 2023
to: Gail Espinoza <auroraday2017@gmail.com>

Gail, thank you for the information. Just a quick glance at the packet, it looks like Iowa does no
the legislation passed to allow the placement of baby boxes, but they do say it is possible to pas
ordinance permitting placement.  That would require talking to the city leaders to see what is
involved in that process.

It also looks like they have some very specific guidelines regarding fundraising, so I'd read thos
carefully before thinking about raising any money.  The last page of the packet shows an estima
the cost of the initial fee, annual recertification/maintenance and other fees.

Looks like you've got some great information and a great start!

Thank you,

Molly Jennings, CVSP

Victim Witness Coordinator

Washington County Attorney's Office

222 W Main

P.O Box 841

Washington, Iowa 52353

Ph: 319-653-7746

FAX: 319-653-7784

[Quoted text hidden]

PLFS-OSBORN-40

JEFFERSON COUNTY IOWA - 076

## Safe Haven Baby Boxes

message

Holly Jennings <mjennings@co.washington.ia.us>                                    Tue, Jun 20, 2023

To: Gail Espinoza <auroraday2017@gmail.com>

Actually, I was mistaken.  We DO have legislation covering the baby boxes.  I've attached it, if you like to read it.  It might be helpful along the way.

[Quoted text hidden]

PLFS-OSBORN-41

JEFFERSON COUNTY IOWA - 077

## Safe Haven Baby Boxes
message

mariah@safehavenbabyboxes.com>
o: auroraday2017@gmail.com

Mon, Jun 19, 202:

Dear Supporter,
Thank you so much for reaching out to Safe Haven Baby Boxes! We are so thrilled to have your support and interest in procuri
Box for your community. We have seen how our efforts are working at protecting women in crisis and their infants, together w
end infant abandonment. Attached below you will find a few documents that will help walk you through the process of obtain
Box for your community. Feel free to share these documents with your community leaders, fire station, or hospital as well to F
any questions that may surround the program. Now that you have all the information, please let us know when you are ready t
forward to adding a Baby Box to your community and helping us change the narrative. We look forward to hearing back from
working together! Feel free to reach out should any questions arise. We will be hosting a weekly Google Meet meeting for indi
looking to place a Safe Haven Baby Box. During this meeting we will go over the basics of the program and walk you through
of the process. Should you have any questions, you will be able to ask those during this meeting as well. If you would like to b
to the next call please respond to this email requesting an invitation to the next meeting.

**Mariah Betz**
Development Coordinator
888-742-2133 ext 703
mariah@safehavenbabyboxes.com
*Please visit our website for more information on our program: www.shbb.org*



*Please visit and follow our social media pages:*

    

Powered by **monday** sales CRM

 FAQ's w_...-1.pdf           Informat...re.pdf           SHBB Pro...ef.pdf

Safe Haven Baby Boxes, Inc. Communication Disclosure
This email and any files transmitted with it are confidential and intended solely for the use of the individual or entity to whom
addressed. It may also be privileged or otherwise protected by work-product immunity or other legal rules. Please notify the s
immediately by email if you have received this email by mistake and delete this email from your system.
Please note that any views or opinions presented in this email are solely those of the author and do not necessarily represent
the organization.
No member of Safe Haven Baby Boxes, Inc. is authorized to conclude any binding agreement on behalf of Safe Haven Baby B
another party by email without express written confirmation by the Safe Haven Baby Box Board of Directors.
If you are not the intended recipient, you are notified that disclosing, copying, distributing or taking any action in reliance on th
contents of this information is strictly prohibited.

PLFS-OSBORN-42

JEFFERSON COUNTY IOWA - 078

PLFS-OSBORN-24 (92-20-BWC_1264_111524171050_2)

JEFFERSON COUNTY IOWA - 079

PLFS-OSBORN-25 (92-21-BWC_1405_111524173736_15)

JEFFERSON COUNTY IOWA - 080

PLFS-OSBORN-26 (Deputy Burnett body cam 1 of 2)

JEFFERSON COUNTY IOWA - 081

PLFS-OSBORN-27 (Deputy Burnett body cam 2 of 2)

JEFFERSON COUNTY IOWA - 082

PLFS-OSBORN-28 (Deputy Burnett car cam front)

JEFFERSON COUNTY IOWA - 083

PLFS-OSBORN-29 (Deputy Miller body cam 1 of 3)

JEFFERSON COUNTY IOWA - 084

PLFS-OSBORN-30 (Deputy Miller body cam 2 of 3)

JEFFERSON COUNTY IOWA - 085

PLFS-OSBORN-31 (Deputy Miller body cam 3 of 3)

JEFFERSON COUNTY IOWA - 086

PLFS-OSBORN-32 (Deputy Miller car cam rear)

JEFFERSON COUNTY IOWA - 087

UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF IOWA

CENTRAL DIVISION

GAIL OSBORN,
TIM MCCONNELL SEABA,
and GORDON SEABA,
                              )Case No.
          Plaintiffs,   )4:25-cv-00183
                              )
     vs.                   )DEPOSITION OF
                              )
CHAUNCEY MOULDING,   )GAIL ANN OSBORN,
KELSEY KOENIG, and   )VOLUME II
JEFFERSON COUNTY, IOWA, )
                              )
          Defendants.   )
_____)

THE DEPOSITION OF GAIL ANN OSBORN,

VOLUME II, taken before Gale Sweeney

Christensen, Certified Shorthand Reporter,

Registered Professional Reporter, and Notary

Public of the State of Iowa, commencing at

10:07 a.m., May 20, 2026, at 2910 Grand

Avenue, Des Moines, Iowa.

Reported by:  Gale Sweeney Christensen,
              CSR, RPR

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

APPEARANCES

Plaintiffs by: GINA MESSAMER
               Attorney at Law
               Parrish Kruidenier, LLP
               2910 Grand Avenue
               Des Moines, Iowa 50312
               gmessamer@parrishlaw.com

Defendant Kelsey Koenig
by:          RYAN SHEAHAN
             Assistant Attorney General
             Second Floor
             Hoover State Office Building
             1305 East Walnut Street
             Des Moines, Iowa 50319
             ryan.sheahan@ag.iowa.gov

Chauncey Moulding and Jefferson County, Iowa
by:          BRENT HINDERS
             Attorney at Law
             Hinders Updegraff & Franklin,
             P.L.C.
             1104 Sunset Drive
             Norwalk, Iowa 50211
             brent@hinderslaw.com

Also present:  Alexander Hilgerson, clerk

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

INDEX OF EXAMINATION

| Examination by | Page |
| --- | --- |
| Mr. Hinders | 4, 36 |
| Mr. Sheahan | 24, 39 |

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

---

GAIL ANN OSBORN,

called as a witness, having been first duly

sworn, testified as follows:

REDIRECT EXAMINATION

BY MR. HINDERS:

Q.  Gail, again, I'm Brent Hinders.  I represent Jefferson County and Chauncey Moulding in this matter.  You were just readministered the oath.  Do you also recall all your obligations as far as answering questions, that sort of thing, or do you need a reminder?

A.  I understand.

Q.  And have you provided all your medical records through current in the discovery process here?

A.  I believe so.

Q.  Okay.  And anything that we haven't had, you would be willing to supplement that; correct?

A.  I would.

Q.  In looking at your medical records, were you always honest with your health care provider?

A.  Yes.

SWEENEY COURT REPORTING (515) 244-6373
320 Insurance Exchange Bldg., Des Moines, IA 50309

JEFFERSON COUNTY IOWA - 088

17

she left.

Q. And then Kelsey returned in the afternoon with Chauncey Moulding, the Jefferson County Sheriff's Office, the Washington County Sheriff's Office --

A. Elizabeth Este.

Q. -- and Elizabeth Este. Describe your emotional state during the afternoon.

A. Can you clarify as to whether you're referring to prior to Chauncey and everyone pulling in my driveway or after the initial introduction?

Q. While they were on the property.

A. I felt like I was -- -- I asked Chauncey to stop. I asked him to leave. I asked him in a thousand different ways to leave because he did not have a warrant. He laughed at me. He disrespected me. He made me feel like I was not human, that my opinion, my thoughts, my words did not matter to him. I felt horrified, like this is my life, this is what can happen, and then to not be taken seriously at all throughout any of it, to have my home disrespected, to watch my father-in-law go through so much stress in

18

one day, to have nobody listening to you, and you're literally -- I'm literally screaming at the top of my lungs. I felt invisible.

Q. Do you own a cell phone?

A. I do.

Q. What sort of cell phone do you own?

A. It's an old Samsung Galaxy.

Q. In the videos you're holding up that cell phone in a manner which looks like you're recording or taking pictures. Did you record any of this or take any pictures?

A. I took a very short video of the initial encounter with Chauncey, myself, and Gordon.

Q. So the other times you're holding up the phone, you're not taking any video? You're taking pictures?

A. No, I don't believe I was.

Q. You don't believe you were or you were not?

MS. MESSAMER: I'm going to object to this line of questioning as not related to damages.

MR. HINDERS: I believe it is.

A. No, outside of that very short video, no.

19

Q. The body camera is there. You viewed those as well, have you not?

A. I have.

Q. Are those an accurate depiction of what happened that day?

A. Outside of the prior time period where nothing was caught on body cam.

Q. So the earlier interaction with Kelsey where nothing is on body cam, that would be the time that relates -- Kelsey's statements and your statements would be the only real evidence of what happened there?

A. Yes, because Gordon is dead.

Q. Yeah. Do you recall Kelsey Koenig's testimony that Gordon Seaba agreed to a ten-minute walk-around inspection?

A. I do not recall that because I was not here for her deposition.

Q. Would you disagree with her statement?

A. I would disagree with it.

Q. Okay. If Chauncey Moulding testified to the same thing, would you disagree with that statement?

A. Absolutely.

Q. Would Gordon giving that consent make

20

you feel different about the incidences that day?

A. Gordon did not give consent.

MR. HINDERS: Can you please read back my question.

(The requested portion of the record was read by the court reporter.)

A. No.

Q. Why?

A. Because what happened happened.

Q. Was Gordon the owner of the property?

A. One of the owners.

Q. So he had a life estate; correct?

A. Correct.

Q. So during his life, he's the owner of the property? Is that your understanding?

A. He's not the owner. He's the life tenant.

Q. So he has the only control over the property during his life? Is that your understanding?

A. It is my understanding that he has right of tenant as a tenant. He does not have the right to sell it. He does not have the right

JEFFERSON COUNTY IOWA - 089

Q. And you saw that what they were doing in terms of looking around; correct?

A. I saw Chauncey trying to go into the house.

Q. I saw that too. It's on the body cam. And you went after him; correct?

A. I didn't go in the house after him.

Q. But how long was Mr. Moulding in the house for?

A. I don't know, seconds.

Q. Did he walk out with anything?

A. Not to my knowledge.

Q. Obviously you were upset by that?

A. It violated my Fourth Amendment. He did not have a warrant to search.

Q. What other property -- I know that you consider that your residence. What other property did you consider yours on that land?

A. That was it.

Q. Did Ms. Koenig ever go into your cottage?

A. Yes, earlier that day.

Q. In terms of the afternoon visit with Mr. Moulding, she didn't go into your cottage, did she?

A. No, she went into the shop.

Q. When you described your emotions in the second visit, you have directed all of your feelings and anger at Mr. Moulding. That's who you have a beef with in this case, isn't it?

A. No, I have an issue with both of them.

Q. With both of them?

A. Both Kelsey and Chauncey.

Q. What is the interaction that you have with Ms. Koenig? When did that occur on the second visit?

A. I don't think we actually interacted at all.

Q. What specific damage did Ms. Koenig cause you?

A. She came back to my home. She engaged in an illegal search.

Q. These statements that you made earlier about Mr. Moulding, he disrespected you, he laughed at you, Ms. Koenig didn't do any of those things during that second visit?

A. No.

Q. Saying that "my words and thoughts did not matter," you were referring to

Mr. Moulding, not Ms. Koenig; correct?

A. Yes.

Q. "I felt horrified, this is my life, this is what can happen," that statement you attribute that to how Mr. Moulding made you feel; correct?

A. Yes.

Q. To have nobody listening to you, again, that was your statement about Mr. Moulding, wasn't it?

A. Not just him.

Q. What did Ms. Koenig ignore that you told her, either during the first visit or the second visit?

A. The second visit I explicitly told everybody to get off the property. If you don't have a warrant, you don't have a right to search. You don't have a right to be on that property. That was stated not just by me or by Tim. We both got ignored that day.

Q. Were you in emotional distress after Ms. Koenig's first visit?

A. I was stressed out, yes.

Q. Is that why you called Mr. Moulding's office?

A. I called Chauncey's office because at that point I thought he could do something to correct the situation, knowing how big of an allegation that was, and that was categorically untrue.

Q. And then in the conversation that you had with Mr. Moulding or his office, were your concerns satisfied, I guess?

A. No.

Q. And why not?

A. Because it was -- Chauncey told me what I wanted to hear.

Q. Okay. And so when you make that statement, in terms of your emotional distress, what did he tell you to hear and what were you feeling after that?

A. He falsely reassured me that he would look into it.

Q. Okay. And when he told you that, that didn't satisfy you in terms of the concerns that you had?

A. That's -- the magnitude of that allegation, something that horrific, no, it was not addressed the way I would have hoped he would have at that point.