**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| **GAIL OSBORN, TIMOTHY MCCONNELL-SEABA, and GORDON SEABA,** | **Case No. 4:25-cv-183** |
| **Plaintiffs,** | |
| **vs.** | |
| **CHAUNCEY MOULDING, KELSEY KOENIG, and JEFFERSON COUNTY, IOWA,** | **BRIEF IN SUPPORT OF MOTION FOR PARTIAL SUMMARY JUDGMENT ON LIABILITY ON ALL COUNTS IN FAVOR OF OSBORN AND MCCONNELL-SEABA** |
| **Defendants.** | |

## TABLE OF CONTENTS

INTRODUCTION .................................................................................................... 2
FACTS ................................................................................................................... 2
   I.   Anonymous complaint & initial HHS search of property ...................... 2
   II.   Follow-up investigation and conversations ........................................ 6
   III.   Second search of property ................................................................. 9
SUMMARY JUDGMENT STANDARDS ................................................................ 19
ARGUMENT........................................................................................................21
   I.   Count 1: 4th Amendment................................................................. 21
      A.   Osborn and McConnell-Seaba had an objectively reasonable expectation of privacy .................................................................... 21
      A.   Moulding and Koenig needed a warrant, consent, or exigency to search....... 23
      B.   Search of curtilage was unconstitutional ........................................ 24
      C.   Search of home was unconstitutional .............................................. 26
      D.   Co-tenant consent is no defense..................................................... 29
      E.   No exigency justified the search ...................................................... 30
      F.   Prosecutorial immunity does not apply ............................................ 35
      G.   Conclusion....................................................................................... 36
   II.   Count 2: Trespass ........................................................................... 36
   III.   Count 3: Invasion of Privacy ............................................................ 37
   IV.   Count 4: Respondeat Superior ........................................................ 38
CONCLUSION ..................................................................................................... 38

**INTRODUCTION**

After receiving an anonymous report that Gail Osborn had secretly given birth to a methamphetamine-exposed infant, Defendants investigated the allegation and were unable to corroborate anything about it. Quite to the contrary, the evidence all indicated Osborn had never been pregnant. Osborn and McConnell-Seaba denied the allegations, cooperated with the investigation, allowed an initial inspection of their home, and asked Defendants to investigate who had made the false complaint. Nevertheless, without a warrant, without valid consent, and over Osborn and McConnell-Seaba's express objections, Defendants searched the curtilage of Osborn and McConnell-Seaba's home and Defendant Moulding searched their residence a second time. The search uncovered exactly what Defendants had already been told: there was no baby. Because the material facts are undisputed and the body-camera footage confirms what occurred, Osborn and McConnell-Seaba are entitled to summary judgment on liability on all of their claims.

**FACTS**

**I.    Anonymous complaint & initial HHS search of property**

The morning of November 15, 2024, Iowa Health and Human Services (HHS) social worker Kelsey Koenig was assigned a child abuse assessment case. (Conf Appx[1] 6). An anonymous complaint had come into HHS that Gail Osborn had secretly delivered a baby, named Charolette, and the baby was 2 months old and had been exposed to methamphetamine. (Appx 229 (Koenig DT 12:22–24); Conf Appx 6–7; Appx 201 (Estey DT 12:4–9)). In her HHS paperwork, Koenig documented the "concern reported" as: "It is

---

[1] A confidential appendix is being submitted under seal, separate from the main appendix supporting this brief.

alleged that Gail Osborn used methamphetamine and was a caretaker for her daughter, Charlotte McConnell (age 2 months). Dangerous Substances are Alleged." (Conf Appx 4). The baby's father was alleged to be Tim McConnell-Seaba. (Conf Appx 3). The anonymous complainant did not suggest the baby was wounded or dead. (Appx 213 (Estey DT 24:2–9)). Koenig reviewed HHS records and saw that Osborn had previous HHS cases, with the most recent in 2021. (Conf Appx 7).

The complaint was false; there was no baby. Osborn had not been pregnant in 2024 or delivered a baby. (Conf Appx 12–13).

Osborn and McConnell-Seaba lived together at 3251 110th Street, Brighton, Iowa 52540, in Jefferson County, Iowa. (Conf Appx 1, 3; Appx 52, 54, 55 (Osborn DT at 24:9–25, 26:25–27:8)). Tim Seaba is listed on the County Assessor's website as the buyer of the property, along with his siblings and the "Seaba Gordon Life Estate." (Appx 26). The property is in the country, fenced on three sides with barbed wire, bordered by trees, and accessible only by a long driveway. (*See* Miller BC 2 at 1:00, 2:10, 4:20, 5:14, 11:41, Burnett BC 2 at 2:45; Ex 6). The yard of the property cannot be viewed from the street. (*See generally* Miller BC 2, Burnett BC 2).

To investigate the complaint, Koenig drove to Osborn and McConnell-Seaba's property around 10:15am and spoke with a friendly, elderly man, Gordon Seaba, at the main home on the property:





(Appx 27, 28, 232 (Koenig DT 15:5–14)). Koenig spoke with Seaba on the front porch of his home. (Appx 233 (Koenig DT 16:1–3)).

Seaba told Koenig that Osborn and McConnell-Seaba lived there, too, in a home at the back of the property. (Appx 232 (Koenig DT 15:15–19)).



(Appx 28).

Osborn walked up the driveway and joined Koenig and Seaba at the main house. (Appx 233 (Koenig DT 16:6–7)). Koenig told Osborn about the allegations, which Osborn denied. (Appx 234 (Koenig DT 17:3–5)). Osborn lifted up her shirt to show Koenig she was not pregnant. (Appx 234 (Koenig DT 17:7–8)). Koenig did not observe any behavioral indicators that Osborn was under the influence of drugs. (Appx 234, 238 (Koenig DT 17:10–12, 21:6–13); Conf Appx 7). Osborn called her partner, Tim McConnell-Seaba, via speakerphone, and Koenig read him the allegations, as well. (Conf Appx 7). McConnell-Seaba denied that Osborn recently had a baby. (Conf Appx 7).

Koenig and Osborn then went back to Osborn's home at the back of the property. (Appx 237 (Koenig DT 20:6–9)). Koenig noticed that Osborn had a car seat in her car, but it was not a car seat appropriate for a newborn. (Conf Appx 7). Osborn explained that the car seat was for her older daughter. (Conf Appx 7). Osborn allowed Koenig into her home so Koenig could look around. (Appx 239 (Koenig DT 22:17–20); Conf Appx 7). Koenig reviewed the entire home, observed that it was clean, and saw nothing baby-related in the home. (Conf Appx 7; Appx 300 (Koenig DT 83:1–12)).

While Koenig called her supervisor to give him an update on the situation, Osborn fed pigs nearby on the property. (Conf Appx 7). Koenig then chatted some more with Osborn. (Conf Appx 7). Osborn told Koenig that she had recently gotten a letter seeking to terminate her parental rights over her children. (Koenig DT 23:7–11). Osborn suspected that the people behind the termination of parental rights were also responsible for the false complaint to HHS. (Appx 237 (Koenig DT 23:9–11); Conf Appx 7).

Koenig and Osborn then went back to the main home on the property. (Conf Appx 7). Koenig asked Seaba if she could view the inside of his home, and he agreed. (Conf Appx 7). Koenig looked around the downstairs of the home and did not observe any baby items. (Conf Appx 7). Koenig then left the home because Osborn was becoming more upset and wanted Koenig to leave. (Conf Appx 7; Appx 243, 244 (Koenig DT 26:3–15, 27:23–25)).

## II.    Follow-up investigation and conversations

After leaving the property, Koenig contacted a local detective at 11:36am, Detective Horning, to review the matter. (Conf Appx 7). Detective Horning "stated that he had information that Gail was inquiring about fire man boxes and/or haven boxes." (Conf Appx 7).

Koenig next contacted Alisha White, a probation officer whom Osborn had mentioned was her friend. (Conf Appx 7). White stated that she had known Osborn for 1.5 to 2 years and Osborn visited her at least weekly, but they were not friends. (Conf Appx 7; Appx 253 (Koenig DT 36:11–12)). White told Koenig that Osborn never showed signs of drug use. (Conf Appx 7). White also told Koenig she had never witnessed Osborn pregnant, despite seeing Osborn all summer in leggings and tank tops. (Conf Appx 7). As

an officer later noted, Osborn "is not a large woman, so it would be kind of easy to tell if [she was] pregnant." (Hansen BC at 3:55–4:05).

In the meantime, Osborn had reached out to the Jefferson County Attorney's office. Osborn first spoke with Assistant County Attorney Elizabeth Estey. (Appx 199 (Estey DT 10:2–9)). Osborn first called sometime before noon. (Appx 199 (Estey DT 10:10–12)). Osborn expressed frustration about HHS coming to her property and the false allegation. (Appx 199 (Estey DT 10:14–16)). Osborn told Estey that she was concerned that the guardian of her children was harassing her. (Appx 199 (Estey DT 10:16–23)). Osborn did not sound as if she was under the influence. (Appx 215 (Estey DT 26:1–3)).

Osborn called back to the Jefferson County Attorney's office a bit later. This time, she spoke with County Attorney Chauncey Moulding. (Appx 481 (Moulding DT 25:1–9)). They spoke "sometime after lunch, between maybe 12 and 1:30." (Appx 481 (Moulding DT 25:1–9)). Moulding recorded the call. (Phone call).

Osborn told Moulding that she had moved in with her partner a year ago. (Phone call at :25–:35). Osborn described the HHS allegations to Moulding and explained why she believed the guardians of her daughter were behind the false complaint. (Phone call at :35–1:16, 1:52–2:05, 2:35–3:15, 4:35–:4:49). Osborn told Moulding that she had allowed Koenig to look around to visually confirm that she hadn't had a baby. (Phone call at 1:16–1:30). Osborn also told Moulding that Koenig had spoken to her youngest daughter's father at work. (Phone call at 6:20–6:36).

Osborn explicitly told Moulding that she hadn't had a baby and that she had been sober for 10 years. (Phone call at 1:42–2:24). Osborn relayed that Koenig had remarked to her "You don't look like you're on meth." (Phone call at 2:05–2:15). Moulding told her

that HHS had to follow up on reports, and it wasn't personal. (Phone call at 5:00–5:14). Osborn expressed concern that there was no accountability for someone making a false complaint to HHS. (Phone call at 5:50–6:09).

After speaking with Osborn, Moulding spoke with Estey and Koenig. (Appx 482 (Moulding DT 26:15–25)). Most of the information Moulding received came from Koenig. (Appx 483 (Moulding DT 27:17–25)). Koenig reviewed everything she had learned with Moulding. (Appx 266, 267, 323, 324 (Koenig DT 49:8–10, 49:21–24, 50:9–15, 106:5–107:2)). Koenig told Moulding that HHS had received an anonymous phone call relaying the birthdate and name of a child. (Appx 483 (Moulding DT 27:17–25)). Koenig relayed that the anonymous complainant had stated the child was in distress, had been exposed to methamphetamine, and possibly needed medical care and food. (Appx 484 (Moulding DT 28:3–9)). Koenig did not indicate that the baby was wounded. (Appx 487 (Moulding DT 31:14–17)). Koenig told Moulding that Osborn had called fire stations for information about safe drop boxes for surrendering a child. (Appx 485 (Moulding DT 29:10–15)). Koenig also told Moulding that she had been to Osborn's home. (Appx 495 (Moulding DT 39:1–4)). Koenig told Moulding that Osborn did not appear to be under the influence of controlled substances. (Appx 82 (Moulding DT 82:2–5)).

Moulding told Koenig that they needed to go back to the property with law enforcement to ask Seaba if they could search. (Appx 267, 285 (Koenig DT 50:16–18, 68:17–21); Conf Appx 7). Koenig did not want to go back. (Appx 267 (Koenig DT 50:18–20)). Koenig thought that was the wrong approach and would rather have contacted Osborn instead of just showing back up. (Appx 270 (Koenig DT 53:19–22)). HHS has 20 days to complete a child abuse assessment, and Koenig did not want to rush back to the

property given Osborn's irritation during the first visit. (Appx 271 (Koenig DT 54:1–12)). Koenig believed it would be helpful to give Osborn time to decompress. (Appx 271 (Koenig DT 54:6–8)). Koenig thought, "why are we going out?" (Appx 303 (Koenig DT 86:14–16)). Nevertheless, Koenig did not feel she could tell Moulding no. (Appx 292 (Koenig DT 75:6–11)).

Moulding called and text Deputy Mark Miller about the situation at 3:47pm. (Appx 452, 454). Moulding sent a text message to Estey and Deputy Miller at 3:54pm with the address of Osborn and McConnell-Seaba's property. (Appx 453).

## III. Second search of property

If there is an emergency in Jefferson County, a warrant can be obtained rapidly, within an hour and as quickly as 10 minutes. (Appx 489 (Moulding DT 33:11–24); Appx 433 (Miller DT 27:23–24:9)). Neither Moulding, nor anyone else from law enforcement, possessed a warrant to search any part of Plaintiffs' property. (ECF No. 10 ¶ 46).

Moulding testified he did not consider getting a warrant to search the property because "There was no crime." (Appx 486 (Moulding DT 30:8–10)). Moulding was not considering the crime of child endangerment. (Appx 486 (Moulding DT 30:11–21)). Moulding testified, "The principal concern was providing aid and welfare to a distressed infant." (Appx 486 (Moulding DT 30:19–21)). Moulding did not believe there was probable cause for a warrant. (Appx 490 (Moulding DT 34:9–13)). Moulding testified, "This was not a criminal investigation. So nobody was investigating probable cause and reasonable suspicion regardless." (Appx 500 (Moulding DT 44:15–17)). For his part, Deputy Miller was not aware of probable cause that would authorize entry into Osborn and McConnell-Seaba's home. (Appx 430 (Miller DT 24:23–25:2)).

Moulding did not have enough information to say there was probably a baby on the property. (Appx 505 (Moulding DT 49:3–7)). Moulding and Estey knew that the anonymous complaint was not independently corroborated. (Appx 497 (Moulding DT 41:3–9), Appx 210 (Estey DT 21:13–22:1)). Moulding did nothing to verify the information from the anonymous complaint prior to traveling to the property. (Appx 505 (Moulding DT 49:8–11)).

Estey did not consider getting a warrant because she didn't think that was the appropriate mechanism. (Appx 208 (Estey DT 19:5–11)). She believed that if consent to search was denied, the appropriate next step would be to request a motion to compel Osborn to present the child. (Appx 208 (Estey DT 19:11–20:8)). Likewise, Koenig believed that if consent to search was denied, then HHS and the county attorney could apply for an order to compel Osborn to produce the child for review by HHS. (Appx 280 (Koenig DT 63:6–64:5)).

Moulding, Estey, and law enforcement arrived at the property shortly before 5:00pm. (Appx 452). Moulding knew that Osborn lived there. (Appx 502 (Moulding DT 46:21–5)). Before going to the property, Moulding looked up the property on the assessor's website, which indicates "Seaba, Gordon Life Est" is the deed holder, and lists "Seaba Gordon Life Estate" and "Seaba Timothy" as the most recent buyers. (Appx 501 (Moulding DT 45:4–13); Appx 25–26).

Moulding was first to arrive, with Koenig driving behind him. (Appx 301 (Koenig DT 84:4–8); Appx 415 (Miller DT 9:11–20)). Estey, Jefferson County Deputy Miller, Jefferson County Deputy Brian Burnett, and three deputies from Washington County also converged at the property. (Appx 235 (Koenig DT 17:7–19); Appx 415 (Miller DT 9:3–10);

Appx 176 (Burnett DT 50:1–8)). Estey remained parked in the road out front of the property. (Appx 207 (Estey DT 18:10–22); Burnett BC 1 at 3:30; Miller BC 1 at 2:25).

As Moulding approached the property, he encountered McConnell-Seaba on a tractor grading the driveway. (Appx 508–09 (Moulding DT 52:25–53:18)). Moulding asked McConnell-Seaba, "Are you Mr. Seaba? Are you Gordon?" (Appx 509 (Moulding DT 53:8–9)). McConnell-Seaba responded by asking Moulding if he had a warrant. (Appx 509 (Moulding DT 53:10)). Moulding asked McConnell-Seaba again if he was Gordon. (Appx 509 (Moulding DT 53:1–12)). McConnell-Seaba said something nonresponsive, and Moulding determined that McConnell-Seaba was not Gordon. (Appx 509 (Moulding DT 53:13–18)). Moulding could tell from McConnell-Seaba's tone that McConnell-Seaba did not want Moulding on the property. (Appx 510 (Moulding DT 54:19–22)). Moulding then drove past McConnell-Seaba, up to the house. (Appx 512 (Moulding DT 56:3–10); Appx 152 (Burnett DT 26:16–21); Burnett BC 1 at :40–45).

When Koenig arrived, Moulding was already out of his car, standing near the driveway, and arguing with Osborn. (Koenig DT 84:4–25). Moulding's truck was parked furthest up the driveway, with Koenig's van behind him, and then Deputy Miller's vehicle. (Koenig DT 84:4–8; Miller DT 9:11–20). After arguing with Osborn for awhile, Moulding briefly got back into his truck. (Koenig DT 89:10–25).

Moulding then got out of his truck and walked up to the main house to talk to Seaba. (Appx 299 (Koenig DT 90:2–5)). According to Moulding,[2] he went up to the house

---

[2] Moulding's description of his entry into Seaba's home and his conversation with Seaba is sharply disputed. Koenig denies being with Moulding when he entered Seaba's home. (Appx 226 (Koenig DT 9:02–92:2)). Osborn witnessed Seaba tell Moulding to "get the fuck out" after Moulding barged into Seaba's house. (Ulin BC at 15:50–16:10). In light

with Koenig and someone knocked on the door. (Appx 503 (Moulding DT 57:10–13)). Moulding testified that Seaba opened the door. (Appx 513 (Moulding DT 57:22–23)). Moulding asked Seaba to come inside and Seaba assented. (Appx 515 (Moulding DT 59:14–23)). Seaba gave Moulding permission to search the property, except for Osborn and McConnell-Seaba's residence. (Appx 517, 519 (Moulding DT 61:4–5, 63:14–22); Appx 442 (Miller DT 36:22–37:1); Miller BC 2 at 3:52–4:24). Seaba confirmed to Moulding that he had not seen a baby on the property. (Appx 546 (Moulding DT 90:4–12)).

When Deputy Miller arrived, he parked in the road and walked up to speak with McConnell-Seaba, who was still on his tractor at the bottom of the driveway. (Miller BC 1 at :15–:20). McConnell-Seaba explained that HHS had been there earlier and that he was planning to call law enforcement to have them trespassed if they came again because it was harassment. (Miller BC 1 at :20–:40). McConnell-Seaba described the allegations as "pretty far out there" and "pretty silly" and asked to have the people trespassed from his property. (Miller BC 1 at :40–1:04). McConnell-Seaba confirmed that he lived in a house in the back yard of the property. (Miller BC 1 at 1:08–1:11). McConnell-Seaba asked one more time for "the DHS people" to be trespassed from his property. (Miller BC 1 at 1:25–:30). McConnell-Seaba agreed to give the people five minutes to talk to Osborn, but said he felt like it was harassment at that point and he wanted them gone. (Miller BC 1 at 1:33–1:55).

After talking to McConnell-Seaba, Deputy Miller then chatted with Estey, who was inside her car on the side of the road. (Miller BC 1 at 2:47; Miller BC 2 at :00–:50). Soon,

---

of the standard of review, for purposes of this motion Plaintiffs present Moulding's version of events, though they believe his version of events is untrue.

12

Osborn came walking down the driveway asking everyone to identify themselves. (Miller BC 2 at :50–1:20). Osborn said "You are violating our 4th Amendment on a false allegation." (Miller BC 2 at 1:25–:27). Osborn said "Chauncey walked into the house, like what's-her-face did, without permission." (Miller BC 2 at 1:34–:37). Osborn told Estey that she had told Moulding and Koenig, at the threshold, not to enter. (Miller BC 2 at 1:40–:45).

McConnell-Seaba asked the deputies standing nearby to assist in getting the people out of his father's house. (Miller BC 2 at 1:50–:55). Deputy Miller mentioned that Gordon Seaba could give Moulding permission to enter, at which point Osborn explained, "Gordon said get out! Gordon flat out said get out, which is why I hauled ass in there. When my father-in-law says get the fuck out of his house, you get the fuck out. Get him out of there!" (Miller BC 2 at 1:55–2:20).

Deputy Miller then climbed into his truck and drove up the driveway. (Miller BC 2 at 2:25–3:37). As he reached the top of the driveway, he received a call from Moulding. (Miller BC 2 at 3:40–4:07). Moulding told Deputy Miller that they were "good to go" for the search. (Appx 421 (Miller DT 15:19–25)). Deputy Miller assumed that Moulding had gotten permission to search from Seaba. (Appx 422 (Miller DT 16:17–21)). Deputy Miller asked Moulding, "What about the house in the back that is claimed to be theirs?" (Miller BC 2 at 3:52–3:58). Moulding told Miller that they did not have permission to search Osborn and McConnell-Seaba's residence. (Appx 442 (Miller DT 36:22–37:1)).

Deputy Miller exited his truck and told a Washington County deputy, "Gordon has given the county attorney permission to search the outbuildings. He's asking if you and I

could search the outbuildings, with the exception of what Gail and Tim are claiming is their residence." (Miller BC 2 at 4:10–4:24).

Meanwhile, back at the bottom of the driveway, McConnell-Seaba spoke with Deputy Burnett. (Burnett BC 1 at :30). McConnell-Seaba asked Deputy Burnett to get the people off of his property because it was the second time they'd been there and they were harassing him. (Burnett BC 1 at :30–:50). McConnell-Seaba asked for everyone except the police to be trespassed. (Burnett BC at :50–1:00). McConnell-Seaba asked if Deputy Burnett could help him, and Deputy Burnett said he could try, but he would have to talk to the County Attorney. (Burnett BC at 1:00–1:20). McConnell-Seaba reported to Deputy Burnett that Moulding had walked into Seaba's home against his Fourth Amendment rights. (Burnett 1 at 1:20–:40). McConnell-Seaba explained to Deputy Burnett that he was a property owner, as well as Seaba. (Burnett 1 at 1:40–2:00).

Deputy Miller walked further into the property and called Deputy Burnett to tell him, "Chauncey's told us that Gordon gave us consent to look in the outbuildings, with the exception of what they're claiming is their residence. And they're looking inside the house—Chauncey and DHS." (Miller BC 2 at 6:11–6:43). Deputy Miller proceeded to search a camper on the property. (Miller BC 2 at 7:20–8:17).

After Deputy Miller exited the camper, he encountered Moulding and Koenig approaching from the main house. (Miller BC 2 at 8:13–8:18; Ulin BC at 12:28). Moulding told Deputy Miller "the house is clear." (Miller BC 2 at 8:20–:24). Deputy Miller told Moulding, "Tim's quite riled up. That's Gail's significant other." (Miller BC 2 at 8:25–:32).

Moulding asked Washington County Deputy Ulin if both Osborn and McConnell-Seaba were both "down there" at the bottom of the driveway. (Ulin BC at 13:10–:15).

14

Deputy Ulin confirmed that Osborn and McConnell-Seaba were "down there," to which Moulding responded, "Let's go clear this small house that we think that they're in, then, 'cause they're not gonna be in it." (Ulin BC at 13:09–:19). Koenig asked, "Who's both, her and her baby daddy?" (Ulin BC at 13:18–13:21). Moulding clarified, "her and Tim." (Ulin BC at 13:20–13:23).

Deputy Miller searched another camper, then joined Moulding and Koenig again outside. (Miller BC 2 at 8:35–9:48). Moulding and Koenig had been searching around a fire pit nearby. (Miller BC 2 at 9:45; Ulin BC at 13:55).

Moulding said to Deputy Miller, "Let's get back to that shack before they get back there." (Miller BC 2 at 9:45–:50; Appx 427 (Miller DT 21:15–24)). The group walked together to the back of the property. (Miller BC 2 at 11:00–:08). As they reached the back, Deputy Miller asked Koenig "which one do they kind of live in?" and Koenig pointed Osborn and McConnell-Seaba's home out to Deputy Miller. (Miller BC 2 at 11:08–:15). Moulding turned back to look as Koenig gestured towards the home. (Miller BC 2 at 11:08–:15).

Moulding led the group around an outbuilding, which he opened up and looked inside. (Miller BC 2 at 11:15–12:08). This was McConnell-Seaba's blacksmith shop. (McConnell-Seaba DT at 68:4–6). As Deputy Miller, Koenig, and Moulding looked inside the outbuilding, Osborn approached, chanting "4th Amendment violation, 4th Amendment violation. That was a closed door. You gotta have a warrant." (Miller BC 2 at 12:04–12:15; Ulin BC at 16:20–:35).

Moulding next walked towards the door to Osborn's home, and she repeated, "Warrant! Get a fucking warrant. You go in there and I'll fucking sue your ass." (Miller BC

2 at 12:15–12:39). Moulding opened the door and went in, anyway. (Miller BC 2 at 12:33–12:58). Osborn waited for a brief period, then walked up to the door, opened it, and directed Moulding out of her home. (Miller BC 2 at 12:55–13:00). She said to Moulding, "Warrant! You are a county attorney, you know the law. And you walked all over it! (Miller BC 2 at 13:05–:10).

Moulding said to Osborn, "All we need to do, is confirm there's no child on the property." (Miller BC 2 at 13:10–:17). Osborn pointed out that she had confirmed there was no child earlier, when she let Koenig go through her home. (Miller BC 2 at 13:17–:29).

Moulding then turned away and began to walk back towards the front of the property. (Miller BC 2 at 13:58–14:10). As Moulding walked away, Osborn followed him, saying, "You have to have probable cause! . . . You don't have a right to be here and violate every fucking constitutional right. . . . You think I'm going to let that by, you have got the wrong woman. . . . Get a fucking warrant!" (Burnett BC 2 at 1:28–1:52). Osborn yelled at Moulding, Estey, and the officers, "Get off the property!" (Burnett BC 1 at 2:16–2:19).

Following along with the group, McConnell-Seaba stated, "You entered my father's house against his 4[th] Amendment rights," to which Moulding responded, "I definitely entered your father's house. Definitely wasn't against his rights." Osborn added, "He told you to get the fuck out and I was a witness and I'll put that on everything, including the Bible in front of a judge." (Burnett BC 2 at 2:30–2:48).

As the group walked back towards the main house, McConnell-Seaba asked, "I would like to know what I need to do to have anybody who's not a police officer trespassed

from my property." (Burnett BC 2 at 2:45–:51). Moulding responded, "You can ask for people to be trespassed. Right now . . . this is a health and safety concern right now." (Burnett BC 2 at 2:51–3:02). At the same time, Osborn yelled, "You're all fucking trespassed! Get a warrant buddy. (Burnett BC 2 at 2:51–3:02).

Moulding stated, "If you put yourself in our shoes, I hope you understand, you would do the same thing." (Burnett BC 2 at 3:35–3:41). McConnell-Seaba responded, "I would not violate anyone's rights. I would leave the property when I was asked to." (Burnett BC 2 at 3:41–3:47).

Back standing in front of the main house, McConnell-Seaba again asked everyone to leave his property. (Burnett BC 2 at 3:48–:51). Moulding responded, "We gotta do one little conversation, then I think we're done here." (Burnett BC 2 at 3:51–4:00; Ulin BC at 20:45). Osborn added, "Get off!" and pointed down the driveway. (Burnett BC 2 at 4:00–4:04). Osborn pointed at Moulding and Estey, saying "trespassed, trespassed." (Burnett BC 2 at 4:04–:19). McConnell-Seaba again stated, "Anybody who's not a police officer is trespassed from my property." (Burnett BC 2 at 4:20–:25; Ulin BC at 21:10).

Moulding, Estey, and the other officers did not leave the property. Instead, they continued to stand on the property. Moulding again stated, "We just need to have a quick conversation, then we'll probably get out of your hair here." (Burnett BC 2 at 5:20–5:25). McConnell-Seaba responded, "You can have a conversation at the end of the driveway. Everybody off my property. Otherwise, I'll sit in on the conversation, let's have a talk right now." (Burnett BC 2 at 5:24–5:33). Moulding laughed at McConnell-Seaba and said "Well, it's not your conversation." (Burnett BC 2 at 5:32–:35). McConnell-Seaba gestured down the driveway and said, "Then off my property, please, sir." (Burnett BC 2 at 3:35–:37).

17

Instead of leaving, Moulding stepped to the side and waved Koenig over to join him in his truck. (Burnett BC 2 at 3:36). Osborn yelled at Moulding, "Get off the property!" as he walked back to his pick-up truck. (Ulin BC at 22:40–:50). Moulding told Osborn, "get the fuck back." (Ulin BC at 22:50; Hansen BC at 12:50). Moulding got into his truck with Koenig, started it, and sat in the driveway for a brief time. (Burnett BC 2 at 6:05–:53; Miller BC 3 at :17–:30).

Still, Moulding and Koenig did not leave. Moulding and Koenig exited his vehicle and walked over to McConnell-Seaba. (Burnett BC 2 at 6:53; Ulin BC at 23:42–24:44). Koenig said she needed to speak with McConnell-Seaba, "just to make sure." (Burnett BC 2 at 6:58–7:02). McConnell-Seaba asked, "Can we have this conversation at the end of the driveway? I really want you guys off my property." (Burnett BC 2 at 7:02–7:09; Miller BC 3 at 1:30–:40). McConnell-Seaba agreed to speak with her, but said "let's go for a walk, with a police officer if you'd like." (Burnett BC 2 at 7:09–:11). Koenig stayed where she was. (Burnett BC 2 at 7:11–). Koenig repeated the allegations: "I have information provided to me, that I do feel like if it was provided to anybody. A child was born here, addicted to meth, on August 31st. And that you are hiding the child. I only have your word for it." (Burnett BC 2 at 7:50–8:10; Miller BC 3 at 3:20–3:40). Osborn pointed out, "But Alicia's wasn't good enough, right, Alicia White?" (Burnett BC 2 at 8:08–8:15).

Koenig continued to explain why they had come there and search, then stated, "So now we're going to leave. We are not planning on coming back. We are leaving the property. Unless there is anything else, thank you for your time." (Burnett BC 2 at 8:15–9:26; Miller BC 3 at 3:20–:30). Everyone finally got into their respective vehicles to leave the property. (Burnett BC 21 at 9:30–10:08).

No evidence that a baby had ever existed was found on the property. (ECF No. 10 ¶ 64). Koenig spoke with Moulding after the search and they agreed there was not enough evidence to justify a further search. (Conf Appx 8). Koenig subsequently contacted the local hospital, the guardian of Osborn's children, and Osborn's sister—none of whom had any information to corroborate the anonymous complaint. (Conf Appx 8). Koenig deemed the allegation of child abuse "not confirmed" because there was no evidence to show a child had been born. (Conf Appx 9).

### SUMMARY JUDGMENT STANDARDS

Summary judgment is appropriate when there is no genuine issue of material fact, so that the dispute may be decided solely on legal grounds. *Holloway v. Lockhart*, 813 F.2d 874 (8th Cir. 1987); Fed. R. Civ. P. 56. Courts may not draw inferences of fact on summary judgment in favor of the moving party. *Tolan v. Cotton*, 572 U.S. 650, 660 (2014). This is particularly true in cases concerning qualified immunity. *See Bell v. Kansas City Police Dep't*, 635 F.3d 346, 347 (8th Cir. 2011); *Gardner v. Buerger*, 82 F.3d 248, 251 (8th Cir. 1996). "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge[.]" *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The elements of a claim under § 1983 are "(1) violation of a constitutional right, (2) committed by a state actor, (3) who acted with the requisite culpability and causation to violate the constitutional right." *Kuha v. City of Minnetonka*, 365 F.3d 590, 606 (8th Cir. 2003), *abrogated on other grounds by Szabla v. City of Brooklyn Park, Minn.*, 486 F.3d 385 (8th Cir. 2007). Where "the undisputed facts clearly make out a Fourth Amendment violation and do not support [exceptions to the Fourth Amendment requirements]," a plaintiff "is entitled to summary judgment regarding the liability aspect of her claim for a

Fourth Amendment violation unless defendants are entitled to qualified immunity." *Canny v. Bentley*, 307 F. Supp. 3d 940, 949-50 (N.D. Iowa 2018). If a plaintiff establishes a constitutional violation, the burden is on defendants to establish their entitlement to qualified immunity.

The defendants have raised qualified immunity as an affirmative defense. A law enforcement officer is entitled to qualified immunity if two elements are met. First, the court asks, "[t]aken in the light most favorable to the party asserting the injury, do the facts alleged show the officer's conduct violated a constitutional right?" *Saucier v. Katz*, 533 U.S. 194, 201 (2001). This is "a legal issue that can be decided with reference only to undisputed facts and in isolation from the remaining issues of the case." *Johnson v. Jones*, 515 U.S. 304, 313 (1995).

Second, the court asks "whether the right was clearly established." *Katz*, 533 U.S. at 201. Courts take "a broad view of what constitutes 'clearly established law' for the purposes of a qualified immunity inquiry." *Boswell v. Sherburne Cnty.*, 849 F.2d 1117, 1121 (8th Cir. 1988). The operative question is whether an officer had "fair warning that their conduct violated the Constitution." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002); *Vaughn v. Ruoff*, 253 F.3d 1124, 1129–30 (8th Cir. 2001) ("Even in the complete absence of any decisions involving similar facts, a right can be clearly established if a reasonable public official would have known her conduct was unconstitutional."). This is "'a flexible standard, requiring some, but not precise factual correspondence with precedent, and demanding that officials apply general, well-developed legal principles.'" *Whisman Through Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997).

A party *asserting* qualified immunity always has the burden to establish the relevant predicate facts. *White v. McKinley*, 519 F.3d 806, 813 (8th Cir. 2008) (emphasis added). The issue of whether summary judgment on grounds of qualified immunity is appropriate from a set of undisputed facts is a question of law. *Lambert v. City of Dumas*, 187 F.3d 931, 935 (8th Cir. 1999).

### ARGUMENT

## I.     Count 1: 4th Amendment

Moulding and Koenig's entry onto McConnell-Seaba and Osborn's property, their search of the property, and—most egregiously—Moulding's search of McConnell-Seaba and Osborn's home all violated McConnell-Seaba and Osborn's 4th Amendment rights. Consent and exigency do not excuse the search. Because the law is clearly established, summary judgment on liability is appropriate against Moulding and Koenig.

### A.     *Osborn and McConnell-Seaba had an objectively reasonable expectation of privacy*

Osborn and McConnell-Seaba were entitled to 4th Amendment protections for the yard at 3251 110th Street, their dwelling, and McConnell-Seaba's shop. The "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978).

Osborn and McConnell-Seaba both lived at 3251 110th Street, where they had full access to the yard and the buildings on the property. (Appx 25, 26; Appx 52, 54 (Osborn DT at 24:9–25, 26:25–27:8)). Moulding and Koenig *knew* that McConnell-Seaba and Osborn were lawful occupants of the property they were searching. (Conf Appx 1, 3; Ulin

21

BC at 13:09–:23; Miller BC 2 at 3:52–3:58, 4:10–4:24, 9:45–:50; Appx 427, 442–43 (Miller DT 21:15–24, 36:22–37:1); Miller BC 2 at 11:08–:15).

Obviously, the whole reason Moulding and Koenig were searching the entire property was because of their understanding that McConnell-Seaba and Osborn lived there, had access to the entire property, and thus could have hidden a baby there. Koenig had observed Osborn walking around the property and feeding pigs on the property. Osborn accompanied Koenig in the main house when Koenig searched it in the morning. (Conf Appx 7). Moulding and Koenig both passed McConnell-Seaba on his tractor grading the property's driveway. McConnell-Seaba is listed as a buyer on the assessor's website. (Appx 25, 26). There was no reason for Moulding or Koenig to believe that McConnell-Seaba and Osborn did *not* have full legal access and rights over the entire property.

It doesn't matter if Moulding or Koenig believed that Gordon Seaba was actually the owner of the property, when there was no question that Osborn and McConnell-Seaba also lived there. Even assuming that Osborn and McConnell-Seaba were merely tenants, "a landlord cannot give consent to a warrantless search of leased premises." *U.S. v. Williams*, 523 F.2d 64, 66 (8th Cir. 1975).

Osborn and McConnell-Seaba, as residents with full access to the property, had a reasonable expectation of privacy and right to exclude strangers from (at minimum) the yard at 3251 110th Street, their dwelling, and McConnell-Seaba's shop. The facts here are akin to *United States v. Schroeder*, 129 F.3d 439, 442 (8th Cir. 1997):

> Regardless of who actually owned the land he lived on, or how many other people resided on the same piece of property, Mr. Schroeder had a socially recognized expectation of privacy in his residence. His home was surrounded with foliage, a ditch, and a barbed wire fence. He had his own, separate driveway. His family lived in the camper trailer with him, and they used the land and the camper trailer inside the fence as a residence.

*Id.*

### A. *Moulding and Koenig needed a warrant, consent, or exigency to search*

The Eighth Circuit considered government agents' ability to investigate an HHS complaint in *Webster v. Westlake*, 41 F.4th 1004 (8th Cir. 2022). In that case, a complaint was made to HHS that a little girl's father had injured her legs by disciplining her with a belt. *Id.* at 1008. An HHS social worker went to the mother's house, but the mother refused to allow the social worker into the house or let her check on the two children. *Id.* The social worker returned to the house later with two police officers. *Id.* The mother would not allow the group into her home (although she offered to allow only the social worker inside) and declined to bring her children to the police station, instead. *Id.* After arguing with the mother for several minutes, the officers arrested her for interferences with official acts. *Id.* The mother subsequently filed a civil rights lawsuit for arresting her without probable cause

The Eighth Circuit rejected the officer's argument that a parent cannot deny HHS or law enforcement access to a child:

> Iowa Code § 232.71B(3)(a) imposes a duty on law enforcement to support the DHS and ensure child safety. It does not, however, impose any obligation on citizens. Nor does it abrogate a citizen's constitutional protections. Moreover, § 232.71B(3)(a) only allows law enforcement to take *lawful* actions to protect a child. So—and this almost goes without saying— the acts that officers can take to fulfill their duty are bound by the Constitution. This is not to say that law enforcement has no options. Court orders—such as warrants or removal orders—are lawful constitutional options.

*Id.* at 1011 (emphasis in original); *see also* Iowa Code § 232.71B(6) (authorizing court to grant HHS application for home entry upon showing of probable cause).

The *Webster* court recognized that the Fourth Amendment as a key constitutional protection implicated by investigations of HHS complaints. 41 F.4th at 1011. If consent is

not given, government agents have several legal options available: 1) pursue a warrant; 2) look for an exigency or exception to the warrant requirement; 3) seek a removal order compelling the parent to produce the child. *Id.* Otherwise, government agents must rely on a parent's cooperation. *Id.*

Just as the mother in *Webster*, Osborn and McConnell-Seaba retained the right to refuse access to their property. As *Webster* reaffirmed, "citizens enjoy the right to refuse or terminate voluntary encounters with police." *Id.* at 1012.

### B.    *Search of curtilage was unconstitutional*

"[T]he Fourth Amendment protects the curtilage of a house." *United States v. Dunn*, 480 U.S. 294, 300 (1987). The "area around the home is 'intimately linked to the home, both physically and psychologically,' and is where 'privacy expectations are most heightened.'" *Fla. v. Jardines*, 569 U.S. 1, 7 (2013). To define the curtilage of a home, courts reference four factors:

> the proximity of the area claimed to be curtilage to the home, whether the area is included within an enclosure surrounding the home, the nature of the uses to which the area is put, and the steps taken by the resident to protect the area from observation by people passing by.

*Dunn*, 480 U.S. at 301.

The fenced yard surrounding McConnell-Seaba and Osborn's property was all part of their curtilage. It was enclosed and shielded from observation by people passing by. The yard contained a burn pile, a workshop, and a barn for their pigs. (Appx 388, 405 (McConnell-Seaba DT at 51:2–3, 68:4–12)). The outbuilding that served as McConnell-Seaba's shop was only a few yards away from McConnell-Seaba and Osborn's dwelling. (Miller BC 2 at 11:15–12:30; App 405 (McConnell-Seaba DT at 68:4–6)).  A person could reach their yard only by walking up their long driveway and past the main house. (Appx

28; *see generally* Body Camera). McConnell-Seaba and Osborn's dwelling on the property could be reached only by walking past a second row of hedges and trees that further sheltered their home from view of the road. (Appx 28; Ulin BC at 15:50–16:10). McConnell-Seaba and Osborn had a reasonable expectation of privacy in the yard of the property.

McConnell-Seaba and Osborn's yard was no different than the backyard found to be "curtilage" by the Eighth Circuit in *United States v. Wells*, 648 F.3d 671, 677 (8th Cir. 2011). In *Wells*, the backyard "contain[ed] a child's wagon and sled, a boat, a lawnmower, a rabbit hutch, and a burn barrel." *Id.* Like McConnell-Seaba and Osborn's yard, the *Wells* backyard was "accessible only by walking around the side of a home." *Id. Wells* cited two Sixth Circuit cases holding the same, *Daughenbaugh v. City of Tiffin*, 150 F.3d 594, 601–02 (6th Cir. 1998) and *United States v. Jenkins*, 124 F.3d 768, 772–73 (6th Cir. 1997).

*Wells* clearly establishes that Moulding and Koenig's search of McConnell-Seaba and Osborn's curtilage was unconstitutional. *Wells* recognized that government agents must have a warrant, consent, or exigent circumstances with probable cause to enter onto a backyard curtilage. 648 F.3d at 679. The *Wells* court found that officers violated the Fourth Amendment by walking on the homeowner's unpaved driveway around the side of the home and into the backyard, for purposes of peering into an outbuilding. *Id.* at 680. Numerous cases in the Eighth Circuit have applied *Wells* to hold that backyard and attendant structures to a home are "curtilage." *See, e.g., United States v. McGhee*, 129 F.4th 1095, 1101 (8th Cir.) (2025) (enclosed side yard obstructed from view by trees and fence); *Davidson v. Garcia*, No. 1:24-CV-00197-CMS, 2026 WL 1077439, at *3 (E.D. Mo. Apr. 21, 2026) (backyard); *United States v. Neadeau*, No. 17-CR-173, 2017 WL 8944017,

25

at *5 (D. Minn. Nov. 6, 2017), *report and recommendation adopted*, 2018 WL 301192 (D. Minn. Jan. 5, 2018) (backyard and sideyard); *United States v. Conerd*, No. 14-CR-2040-LRR, 2015 WL 4599360, at *3 (N.D. Iowa July 29, 2015), *aff'd in part,* 828 F.3d 1009 (8th Cir. 2016) (sideyard); *see also Canny v. Bentley*, 307 F. Supp. 3d 940, 947 (N.D. Iowa 2018) (holding clearly established law prohibited officers from lingering near front door and surreptitiously surveilling home's occupants);

Here, Koenig and Moulding walked around McConnell-Seaba and Osborn's curtilage, digging in their burn pit, opening up McConnell-Seaba's shop, and generally searching the property. This was a violation of McConnell-Seaba and Osborn's reasonable expectation of privacy and their Fourth Amendment rights. *Schroeder*, 129 F.3d at 443 ("'[T]hough the boundaries of curtilage are naturally and necessarily imprecise, the officers undertook a search that caused them to invade what they could not fail to have known was potentially [another's] curtilage.'"); *Jardines*, 569 U.S. at 11 (2013) ("That the officers learned what they learned only by physically intruding on Jardines' property to gather evidence is enough to establish that a search occurred.").

### C.    Search of home was unconstitutional

The law has very little tolerance for warrantless home searches. "[P]hysical entry of the home is the chief evil against which the wording of the Fourth Amendment is directed[.]" *United States v. U.S. Dist. Ct. for E. Dist. of Mich., S. Div.*, 407 U.S. 297, 313 (1972). "'Freedom from intrusion into the home or dwelling is the archetype of the privacy protection secured by the Fourth Amendment.'" *Payton v. New York*, 445 U.S. 573 (1980). "[W]hen it comes to the Fourth Amendment, the home is first among equals." *Jardines*, 569 U.S. at 6. "[A]ny physical invasion of the structure of the home, 'by even a fraction of an inch,' [is] too much[.]" *Kyllo v. United States*, 533 U.S. 27, 37 (2001). "In the home, our

cases show, *all* details are intimate details, because the entire area is held safe from prying government eyes." *Kyllo v. United States*, 533 U.S. 27, 37 (2001). "[T]he Fourth Amendment has drawn a firm line at the entrance to the house. Absent exigent circumstances, that threshold may not reasonably be crossed without a warrant." *Payton v. New York*, 445 U.S. 573, 590 (1980).

The body camera reveals that Moulding *knew* that the building he was entering at the back of the property was Osborn and McConnell-Seaba's dwelling. Moulding's deposition testimony feigning ignorance about where Osborn and McConnell-Seaba lived is not worthy of credence given the video. (Appx 501–03, 520, 521, 523, 529 (Moulding DT 45:2–47:1, 64:6–9, 65:2–17, 67:3–4, 73:17–74:7)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The video shows Moulding was specifically looking for Osborn and McConnell-Seaba's home so he could search it. Moulding asked Deputy Ulin where Osborn and McConnell-Seaba were and then, when he found out they were still at the bottom of the driveway, Moulding said, "Let's go clear this small house that we think that they're in, then, 'cause they're not gonna be in it." (Ulin BC at 13:09–:23). Moulding said to Deputy Miller, "Let's get back to that shack before [Osborn and McConnell-Seaba] get back there." (Miller BC 2 at 9:45–:50; Appx 427 (Miller DT 21:15–24)).

As they reached the back of the property, Deputy Miller asked Koenig "which one do they kind of live in?" and Koenig pointed Osborn and McConnell-Seaba's home out to

Deputy Miller. (Miller BC 2 at 11:08–:15). Moulding turned back to look as Koenig gestured towards the home. (Miller BC 2 at 11:08–:15).

Though Osborn and McConnell-Seaba's dwelling was small, it was marked by domestic touches that indicated it was a home, including a screen door, porch light, string lights above the door, and decorative statue and metal chairs out front on a rock patio. (Miller BC 2 at 12:43; Hansen BC at 6:40–:55). Three vehicles were parked outside the front door. (Miller BC 2 at 12:23). The fact that Osborn was standing outside the front door telling Moulding not to go inside or she'd sue him was another a good indicator that the home was hers. No "man of reasonable caution" would believe under these circumstances that Gordon Seaba had authority to consent to a search of that particular structure. *See Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (holding "determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises" (cleaned up)). Moulding's "warrantless entry without further inquiry" was therefore unlawful. *Id.*

Moulding knew that he did not have consent to search Osborn and McConnell-Seaba's residence—both because Osborn was telling him to get a warrant as he walked up to it and because Seaba hadn't given Moulding permission to search Osborn and McConnell-Seaba's home to begin with. (Miller BC 2 at 3:52–3:58, 6:11–6:43, Appx 442 (Miller DT 36:22–37:1)). Moulding's entry into McConnell-Seaba and Osborn's home— over Osborn's vehement objection—is a cut-and-dry violation of McConnell-Seaba and Osborn's 4th Amendment rights.

### D. Co-tenant consent is no defense

The fact dispute regarding Gordon Seaba's consent does not excuse Moulding and Koenig's search of the property or Moulding's entry into Osborn and McConnell-Seaba's home. Gordon Seaba's consent could not trump Osborn and McConnell-Seaba's objection.

"[T]he co-tenant wishing to open the door to a third party has no recognized authority in law or social practice to prevail over a present and objecting co-tenant, his disputed invitation, without more, gives a police officer no better claim to reasonableness in entering than the officer would have in the absence of any consent at all." *Georgia v. Randolph*, 547 U.S. 103, 114 (2006). Accordingly, "the cooperative occupant's invitation adds nothing to the government's side to counter the force of an objecting individual's claim to security against the government's intrusion into his dwelling place." *Id.* at 115; *see also United States v. Esparza*, 162 F.3d 978, 980 (8th Cir. 1998) (recognizing government actors "may not rely on a third party's consent to intentionally bypass a person who is present, has a superior privacy interest in the premises, and actively objects to the search").

Osborn and McConnell-Seaba were present and objecting. McConnell-Seaba objected to Moulding when Moulding passed him at the end of the driveway. Koenig saw Osborn arguing with Moulding before Moulding entered the main house. After Koenig and Moulding went into the main house, Osborn continued to make her objections known. Koenig and Moulding could not legally continue searching the property over these objections. They should have immediately left the property.

Further, as a factual matter, Seaba did not give Moulding consent to search McConnell-Seaba and Osborn's property. (Miller BC 2 at 3:52–3:58, 4:10–4:24; Appx 442

(Miller DT 36:22–37:1)). Osborn's privacy interest in her own dwelling was superior to that of Seaba's. *Esparza*, 162 F.3d at 980. There was especially no excuse for Moulding's entry into and search of McConnell-Seaba and Osborn's personal dwelling.

### E. No exigency justified the search

Moulding claims that his entry into their home "was in response to a credible report of an infant in need of emergency aid, to provide care to said infant in distress." (Appx 12, 13). There was no exigency authorizing Moulding's entry into Osborn and McConnell-Seaba's home because 1) there was ample time to secure a warrant and 2) there was insufficient evidence to believe an infant in need of assistance would be found on the property or in McConnell-Seaba and Osborn's dwelling, particularly.

"[W]arrantless entry by criminal law enforcement officials may be legal when there is compelling need for official action and no time to secure a warrant." *Michigan v. Tyler*, 436 U.S. 499, 509 (1978). The narrow exigency exception "countenances warrantless entries because of the urgency of the situation." *United States v. Duchi*, 906 F.2d 1278, 1282 (8th Cir. 1990). Under the exigency exception, "law enforcement officers may enter a home without a warrant to render emergency assistance to an injured occupant or to protect an occupant from imminent injury." *Brigham City, Utah v. Stuart*, 547 U.S. 398, 403 (2006).

No exigency existed here because there was time to apply for a warrant. *See Duchi*, 906 F.2d at 1283 (recognizing the opportunity to seek a warrant is "certainly relevant" to whether the exigency exception applies). Moulding learned about the allegations of an at-risk baby around 1:30pm when Osborn called him. (Appx 481 (Moulding DT 25:1–9)). Koenig had already talked to Estey about Osborn by then—they spoke at 12:17pm. (Conf Appx at 7). Moulding talked Koenig about the situation at 3:23pm

30

and then called Deputy Mark Miller about the situation at 3:47pm. (Conf Appx at 8; Appx 452). Moulding, Estey, and law enforcement arrived at the property shortly before 5:00pm. (Appx 452). A warrant can be obtained in Jefferson County within an hour. (Appx 489 (Moulding DT 33:11–24); Appx 433 (Miller DT 27:23–24:9)).

Accordingly, there was more than enough time to request a warrant. *See Duchi*, 906 F.2d at 1283 (finding no exigency existed when officers knew relevant facts earlier in the day and had time to request a warrant); *United States v. Templeman*, 938 F.2d 122, 124 (8th Cir. 1991) (finding no exigency when officers "had ample opportunity to apply for and obtain a search warrant"); *United States v. Alcala*, No. CRIM. 02-250, 2003 WL 1233077, at *5 (S.D. Iowa Feb. 19, 2003) (finding no exigency when officers waited 55 minutes before acting on information and could have applied for a warrant in that time); *Myers v. Halbleib*, No. 4:05CV3219, 2007 WL 2030293, at *8 (D. Neb. May 25, 2007) (finding no exigency when officers had 1 hour and 15 minutes prior to search, which was sufficient time to get a warrant).

Further, no exigency existed because the information about this mysterious baby was far too flimsy. An officer must have an "objectively reasonable basis for believing" the occupant was in need of immediate aid. *Brigham City*, 547 U.S. at 406. "[I]f there is no reasonable basis for concluding there was a threat to life or property, the entry and search are deemed improper." *United States v. Selberg*, 630 F.2d 1292, 1296 (8th Cir. 1980). When assessing a claim of exigency, the Court considers the facts known to Moulding and Koenig at the time he decided to search. *United States v. Sanders*, 4 F.4th 672, 677 (8th Cir. 2021).

Koenig knew everything about the situation; she was the main information gatherer. Her initial search of Osborn and McConnell-Seaba's home revealed nothing baby-related. Osborn and McConnell-Seaba had denied a pregnancy. Osborn had gone so far as to show Koenig her stomach. (Appx 237 (Koenig DT at 20:10–13)). Gordon Seaba and another occupant at the main house at the property appeared to know nothing about a baby. (Conf Appx at 7; Appx 244 (Koenig DT at 27:12–28:25)). White, the probation officer Osborn frequently visited with, had never seen Osborn pregnant or seen signs of drug use. (Conf Appx at 7). Koenig had been unable to corroborate anything in the anonymous complaint; she discovered no clues that Osborn had in fact been pregnant. The fact that Koenig did not want to go back to the property that day also demonstrates that she saw no reason to believe there was a baby in need of urgent assistance. (Appx 267, 270, 271, 303 (Koenig DT 50:18–20, 53:19–22, 54:1–12, 86:14–16)).

Likewise, Moulding did not have enough information to say there was probably a baby on the property. (Appx 505 (Moulding DT 49:3–7)). Moulding knew that the information about an at-risk baby was provided by an anonymous complainant. *See Fla. v. J.L.*, 529 U.S. 266, 269 (2000) (recognizing anonymous tips are "generally less reliable than tips from known informants and can form the basis for reasonable suspicion only if accompanied by specific indicia of reliability, for example, the correct forecast of a subject's 'not easily predicted" movements" (cleaned up)). Moulding also knew that, despite Koenig's best efforts that day, she had been unable to corroborate anything from the anonymous complainant. (Appx 497 (Moulding DT 41:3–9)). *See United States v. Anderson*, 688 F.3d 339, 346 (8th Cir. 2012) ("Something more than a speculative hunch

is required for police to conduct a protective sweep."); *Myers v. Halbleib*, No. 4:05CV3219, 2007 WL 2030293, at *8 (D. Neb. May 25, 2007) (unspecified threat to girl several days before she'd gone missing did not create exigent circumstances allowing officers to search the home of person who had made threat). An objectively reasonable officer in Moulding's position would *not* have concluded there was a reasonable basis to believe a baby even existed. Deputy Miller recognized that an anonymous complaint most likely does not provide enough information to establish probable cause. (Appx 447 (Miller DT 41:12–18)).

Importantly, when he entered Osborn and McConnell-Seaba's home, Moulding searched an area that *had already been searched by Koenig earlier that day. See United States v. Young*, 553 F.2d 1132 (8th Cir.) (holding initial entry proper but subsequent entry by evidence technicians improper). It strains credulity to believe that there was an emergent need to search Osborn and McConnell-Seaba's home a *second time* in order to save an unsubstantiated baby that wasn't found during the first search. An objectively reasonable officer would not believe that he would find a different situation than Koenig encountered when she arrived unannounced in the morning and conducted her own search.

In sum, there was not a reasonable basis for Moulding or Koenig to conclude there was a threat to life requiring an immediate search of the property. *See Luer v. Clinton*, 987 F.3d 1160, 1170 (8th Cir. 2021) (holding officers' search of home without a warrant to look for taxi fare-skipper was clearly established constitutional violation, in light of "Supreme Court's frequent cautions that exigent circumstances rarely justify a warrantless home intrusion"); *Selberg*, 630 F.2d at 1296 (finding search of home illegal

33

when "carried out under circumstances which did not objectively demonstrate any emergency threat to persons or property").

The scope of Moulding and Koenig's search also exceeded the exigency they claim. "The community caretaking exception to the Fourth Amendment warrant requirement 'allows officers to respond to potential emergencies if (1) they have a reasonable belief an emergency exists, and (2) their response is carefully tailored to address the emergency.'" *United States v. Diaz*, 154 F.4th 621, 627 (8th Cir. 2025). Moulding and Koenig's search of the property was not carefully tailored to look for a distressed infant. Moulding and Koenig searched the fire pit (clearly no baby hiding there) and Moulding re-searched the home. (Miller BC 2 at 9:45; Ulin BC at 13:55). Both of these actions were beyond the scope of the alleged exigency.

As a final point, Moulding's attempt to dodge the constitutional violation by claiming that his actions were unrelated to criminality is totally unavailing. Moulding suggests that he did not need a warrant because "No criminal investigation occurred. There was no allegation of a crime. No search for evidence of a crime took place." (Appx 15). To begin, this is blatantly false. The allegation that Osborn gave birth to a baby who was now in distress and not properly cared for would obviously constitute child abuse. Iowa Code § 726.6(1)(a) defines the crime of child endangerment as acting in a manner that "creates a substantial risk to a child or minor's physical, mental, or emotional health or safety." Moreover, the allegation that Osborn had allowed the baby to be around methamphetamine is an explicit statutory ground for child endangerment. Iowa Code § 726.6(1)(g). Deputy Burnett certainly understood that there was a criminal aspect to the allegations. (Appx 174 (Burnett DT 48:18–22)). And the search of the property was

34

certainly investigatory—see, e.g., the search of the fire pit, where there was obviously no distressed baby to be found. *See Luer*, 987 F.3d at 1168 ("The community caretaker exception does not apply where a "'law enforcement officer physically intrudes on the curtilage *to gather evidence*' of a crime."). Moulding remarked to Deputy Miller that there were black gloves in the trash and fire pit. (Miller BC 2 at 10:08–:17). This was a search for evidence, not a baby.

Regardless, even if Moulding's motive was solely to rescue a distressed infant and unrelated to criminal enforcement, this does not change the fact that 1) he had time to get a warrant and 2) he did not have a reasonable basis to believe there was a distressed infant on the property for him to rescue.

### F.    *Prosecutorial immunity does not apply*

Moulding is not entitled to prosecutorial immunity. Prosecutors are entitled to immunity for activities that are "intimately associated with the judicial phase of the criminal process" *Imbler v. Pachtman*, 424 U.S. 409, 430 (1976). But "[w]hen a prosecutor performs the investigative functions normally performed by a detective or police officer, it is 'neither appropriate nor justifiable that, for the same act, immunity should protect the one and not the other.'" *Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993).

Searching someone's home is an investigative function normally performed by a police officer, and therefore is outside the scope of prosecutorial immunity. *See, e.g., Buckley v. Fitzsimmons*, 509 U.S. 259, 273 (1993) (denying prosecutorial immunity to prosecutor who investigated alleged crime); *Meade v. Smith*, No. C17-4034-LTS, 2020 WL 1180410, at *9 (N.D. Iowa Mar. 11, 2020) (denying prosecutorial immunity to prosecutor who investigated plaintiff); *Richter v. Smith*, No. C16-4098-LTS, 2018 WL 6728515, at *8 (N.D. Iowa Dec. 21, 2018) (denying motion to dismiss based on

prosecutorial immunity because complaint alleged actions by prosecutor unassociated with the judicial phase); *Hicks v. Clay County*, 636 F. Supp. 2d 903, 913–14 (W.D. Mo. 2008) (reasoning that an assistant attorney general's actions were not entitled to prosecutorial immunity at a motion to dismiss stage because the complaint plausibly alleged he provided improper advice to law enforcement).

### G. Conclusion

The 4th Amendment law Moulding and Koenig violated is clearly established. Uncorroborated anonymous complaints are known to be insufficient to establish even reasonable suspicion. *J.L.*, 529 U.S. at 269. Not only is it a bedrock principle of Fourth Amendment law that government agents cannot conduct searches of a home and its attendant curtilage without a warrant or exigency, the Eighth Circuit has applied these principles within the context of a child abuse report. *Webster*, 41 F.4th at 1011. *Georgia* clearly established that a co-tenant's consent cannot trump an objecting co-tenant. 547 U.S. at 114. Moulding and Koenig thus are not entitled to summary judgment for their violations of Osborn and McConnell-Seaba's 4th Amendment rights.

Despite the important interests at stake when child abuse is suspected, such interests do not negate the 4th Amendment. The Court should therefore grant summary judgment on Count 1 against Defendant Moulding for his search of McConnell-Seaba and Osborn's dwelling and their curtilage and against Defendant Koenig for her search of the curtilage.

## II. Count 2: Trespass

"A trespasser is one who is not rightfully upon the property of another, but enters it without consent, either express or implied, of the owner or occupier." *Iowa State Hwy. Comm'n v. Hipp*, 259 Iowa 1082, 1089 (1966). A person is liable for trespass if the person

remains on another's land after being told to leave. *Robert's River Rides, Inc. v. Steamboat Dev. Corp.*, 520 N.W.2d 294, 301 (Iowa 1994). "Anyone who intentionally and without consent enters land in possession of another is liable as a trespasser to the other irrespective of whether harm is caused to any legally protected interest." *Long v. Lauffer*, 797 N.W.2d 621 (Iowa App. 2011).

As discussed above, Moulding entered McConnell-Seaba and Osborn's property despite McConnell-Seaba's objection and request for a warrant. Moulding then remained on McConnell-Seaba and Osborn's property after being told to leave. Moulding had no legal right to enter the property without consent or remain on it after told multiple times to leave. Seaba did not consent to a search of Osborn and McConnell-Seaba's home. (Miller BC 2 at 3:52–3:58, 6:11–6:43, Appx 442 (Miller DT 36:22–37:1)). The Court should grant summary judgment in favor of McConnell-Seaba and Osborn against Moulding on liability on Count 2 of their petition.

## III.    Count 3: Invasion of Privacy

The right to privacy can be invaded by "unreasonable intrusion upon the seclusion of another." *In re Marriage of Tigges,* 758 N.W.2d 824, 829 (Iowa 2008) (quoting Restatement (Second) of Torts § 652A(2) (1977)). Under this theory, [o]ne who *intentionally intrudes* physically or otherwise, upon the solitude or seclusion of another or his private affairs or concerns, is subject to liability to the other for invasion of privacy, if the intrusion would be *highly offensive to a reasonable person. Id.* (emphasis in original).

There can be no question that Moulding's entry into Osborn and McConnell-Seaba's home—over Osborn's contemporaneous, vigorous objection—was an intentional intrusion into her private affairs and seclusion. As a matter of law, this is an

intrusion that would be highly offensive to a reasonable person. The Court should grant summary judgment in favor of McConnell-Seaba and Osborn against Moulding on liability on Count 3 of their petition.

## IV.     Count 4: Respondeat Superior

Under the Iowa Municipal Tort Claims Act (IMTCA), "every municipality is subject to liability for its torts and those of its officers and employees, acting within the scope of their employment or duties, whether arising out of a governmental or proprietary function." Iowa Code § 670.2(1). The IMTCA defines "tort" to include the "denial or impairment of any right under any constitutional provision, statute or rule of law." Id. § 670.1(4).

Moulding was acting within the scope of his employment when he illegally searched Osborn and McConnell-Seaba's property and home. The officers present, as well as Koenig, all deferred to Moulding because of his role as the Jefferson County Attorney. (*See* Appx 292 (Koenig DT 75:6–11); Burnett BC at 1:00–1:20). As a matter of law, Jefferson County is vicariously liable for Moulding's actions. *Clinton v. Garrett*, 551 F. Supp. 3d 929, 958 (S.D. Iowa 2021), *aff'd,* 49 F.4th 1132 (8th Cir. 2022). Osborn and McConnell-Seaba are entitled to judgment as a matter of law on Counts 1, 2, and 3 against Moulding, and thus also Count 4 against Jefferson County.

**<u>CONCLUSION</u>**

Because the material facts are undisputed and Defendants' actions cannot survive constitutional scrutiny, summary judgment in favor of Osborn and McConnell-Seaba is appropriate. Osborn and McConnell-Seaba respectfully request that the Court enter an order granting this partial motion for summary judgment and set this matter for trial as to damages.

38

**PARRISH KRUIDENIER, L.L.P.**

By: ___/s/ Gina Messamer_____
      Gina Messamer        AT0011823
      2910 Grand Avenue
      Des Moines, Iowa 50312
      Telephone: (515) 284-5737
      Facsimile: (515) 284-1704
      Email: gmessamer@parrishlaw.com
      **ATTORNEY FOR PLAINTIFFS**

By: ___/s/ Edward Harvey_____
      Edward G. Harvey      AT0003350
      1600 Wonder Way
      Fairfield IA, 52556
      Telephone: (641) 919-8696
      Email: edwardgharvey98@yahoo.com
      **ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on May 29, 2026, I electronically filed the foregoing with the Clerk of Court using the ECF system and a true copy of the foregoing was served electronically on the attorneys of record.

By: ___/s/ Gina Messamer_____