**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| **GAIL OSBORN, TIMOTHY MCCONNELL-SEABA, and GORDON SEABA,** | **Case No. 4:25-cv-183** |
| **Plaintiffs,** | |
| **vs.** | |
| **CHAUNCEY MOULDING, KELSEY KOENIG, and JEFFERSON COUNTY, IOWA,** | **STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON LIABILITY** |
| **Defendants.** | |

**COME NOW** Plaintiff Gail Osborn and Timothy McConnell-Seaba and for their statement of undisputed material facts in support of her motion for summary judgment on liability, state as follows:

## I. Anonymous complaint & initial HHS search of property

1. The morning of November 15, 2024, Iowa Health and Human Services (HHS) social worker Kelsey Koenig was assigned a child abuse assessment case. (Conf Appx 6).

2. An anonymous complaint had come into HHS that Gail Osborn had secretly delivered a baby, named Charolette, and the baby was 2 months old and had been exposed to methamphetamine. (Appx 229 (Koenig DT 12:22–24); Conf Appx 6–7; Appx 201 (Estey DT 12:4–9)).

3. In her HHS paperwork, Koenig documented the "concern reported" as: "It is alleged that Gail Osborn used methamphetamine and was a caretaker for her daughter,

1

Charlotte McConnell (age 2 months). Dangerous Substances are Alleged." (Conf Appx 4).

4. The baby's father was alleged to be Tim McConnell-Seaba. (Conf Appx 3).

5. The anonymous complainant did not suggest the baby was wounded or dead. (Appx 213 (Estey DT 24:2–9)).

6. Koenig reviewed HHS records and saw that Osborn had previous HHS cases, with the most recent in 2021. (Conf Appx 7).

7. The complaint was false; there was no baby. Osborn had not been pregnant in 2024 or delivered a baby. (Conf Appx 12–13).

8. Osborn and McConnell-Seaba lived together at 3251 110th Street, Brighton, Iowa 52540, in Jefferson County, Iowa. (Conf Appx 1, 3; Appx 52, 54, 55 (Osborn DT at 24:9–25, 26:25–27:8)).

9. Tim Seaba is listed on the County Assessor's website as the buyer of the property, along with his siblings and the "Seaba Gordon Life Estate." (Appx 26).

10. The property is in the country, fenced on three sides with barbed wire, bordered by trees, and accessible only by a long driveway. (*See* Miller BC 2 at 1:00, 2:10, 4:20, 5:14, 11:41, Burnett BC 2 at 2:45; Ex 6).

11. The yard of the property cannot be viewed from the street. (*See generally* Miller BC 2, Burnett BC 2).

12. To investigate the complaint, Koenig drove to Osborn and McConnell-Seaba's property around 10:15am and spoke with a friendly, elderly man, Gordon Seaba, at the main home on the property:





(Appx 27, 28, 232 (Koenig DT 15:5–14)).

13.     Koenig spoke with Seaba on the front porch of his home. (Appx 233 (Koenig DT 16:1–3)).

14.     Seaba told Koenig that Osborn and McConnell-Seaba lived there, too, in a home at the back of the property. (Appx 232 (Koenig DT 15:15–19)).



(Appx 28).

15. Osborn walked up the driveway and joined Koenig and Seaba at the main house. (Appx 233 (Koenig DT 16:6–7)).

16. Koenig told Osborn about the allegations, which Osborn denied. (Appx 234 (Koenig DT 17:3–5)).

17. Osborn lifted up her shirt to show Koenig she was not pregnant. (Appx 234 (Koenig DT 17:7–8)).

18. Koenig did not observe any behavioral indicators that Osborn was under the influence of drugs. (Appx 234, 238 (Koenig DT 17:10–12, 21:6–13); Conf Appx 7).

19. Osborn called her partner, Tim McConnell-Seaba, via speakerphone, and Koenig read him the allegations, as well. (Conf Appx 7).

20. McConnell-Seaba denied that Osborn recently had a baby. (Conf Appx 7).

21. Koenig and Osborn then went back to Osborn's home at the back of the property. (Appx 237 (Koenig DT 20:6–9)).

22. Koenig noticed that Osborn had a car seat in her car, but it was not a car seat appropriate for a newborn. (Conf Appx 7).

23. Osborn explained that the car seat was for her older daughter. (Conf Appx 7).

24. Osborn allowed Koenig into her home so Koenig could look around. (Appx 239 (Koenig DT 22:17–20); Conf Appx 7).

25. Koenig reviewed the entire home, observed that it was clean, and saw nothing baby-related in the home. (Conf Appx 7; Appx 300 (Koenig DT 83:1–12)).

26. While Koenig called her supervisor to give him an update on the situation, Osborn fed pigs nearby on the property. (Conf Appx 7).

27. Koenig then chatted some more with Osborn. (Conf Appx 7).

28. Osborn told Koenig that she had recently gotten a letter seeking to terminate her parental rights over her children. (Koenig DT 23:7–11).

29. Osborn suspected that the people behind the termination of parental rights were also responsible for the false complaint to HHS. (Appx 237 (Koenig DT 23:9–11; Conf Appx 7).

30. Koenig and Osborn then went back to the main home on the property. (Conf Appx 7).

31. Koenig asked Seaba if she could view the inside of his home, and he agreed. (Conf Appx 7).

32. Koenig looked around the downstairs of the home and did not observe any baby items. (Conf Appx 7).

33. Koenig then left the home because Osborn was becoming more upset and wanted Koenig to leave. (Conf Appx 7; Appx 243, 244 (Koenig DT 26:3–15, 27:23–25)).

## II. Follow-up investigation and conversations

34. After leaving the property, Koenig contacted a local detective at 11:36am, Detective Horning, to review the matter. (Conf Appx 7).

35. Detective Horning "stated that he had information that Gail was inquiring about fire man boxes and/or haven boxes." (Conf Appx 7).

36. Koenig next contacted Alisha White, a probation officer whom Osborn had mentioned was her friend. (Conf Appx 7).

37. White stated that she had known Osborn for 1.5 to 2 years and Osborn visited her at least weekly, but they were not friends. (Conf Appx 7; Appx 253 (Koenig DT 36:11–12)).

38. White told Koenig that Osborn never showed signs of drug use. (Conf Appx 7).

39. White also told Koenig she had never witnessed Osborn pregnant, despite seeing Osborn all summer in leggings and tank tops. (Conf Appx 7).

40. As an officer later noted, Osborn "is not a large woman, so it would be kind of easy to tell if [she was] pregnant." (Hansen BC at 3:55–4:05).

41. In the meantime, Osborn had reached out to the Jefferson County Attorney's office. Osborn first spoke with Assistant County Attorney Elizabeth Estey. (Appx 199 (Estey DT 10:2–9)).

42. Osborn first called sometime before noon. (Appx 199 (Estey DT 10:10–12)). Osborn expressed frustration about HHS coming to her property and the false allegation. (Appx 199 (Estey DT 10:14–16)).

43.     Osborn told Estey that she was concerned that the guardian of her children was harassing her. (Appx 199 (Estey DT 10:16–23)).

44.     Osborn did not sound as if she was under the influence. (Appx 215 (Estey DT 26:1–3)).

45.     Osborn called back to the Jefferson County Attorney's office a bit later. This time, she spoke with County Attorney Chauncey Moulding. (Appx 481 (Moulding DT 25:1–9)).

46.     They spoke "sometime after lunch, between maybe 12 and 1:30." (Appx 481 (Moulding DT 25:1–9)).

47.     Moulding recorded the call. (Phone call).

48.     Osborn told Moulding that she had moved in with her partner a year ago. (Phone call at :25–:35).

49.     Osborn described the HHS allegations to Moulding and explained why she believed the guardians of her daughter were behind the false complaint. (Phone call at :35–1:16, 1:52–2:05, 2:35–3:15, 4:35–:4:49).

50.     Osborn told Moulding that she had allowed Koenig to look around to visually confirm that she hadn't had a baby. (Phone call at 1:16–1:30).

51.     Osborn also told Moulding that Koenig had spoken to her youngest daughter's father at work. (Phone call at 6:20–6:36).

52.     Osborn explicitly told Moulding that she hadn't had a baby and that she had been sober for 10 years. (Phone call at 1:42–2:24).

53.     Osborn relayed that Koenig had remarked to her "You don't look like you're on meth." (Phone call at 2:05–2:15).

54.     Moulding told her that HHS had to follow up on reports, and it wasn't personal. (Phone call at 5:00–5:14).

55.     Osborn expressed concern that there was no accountability for someone making a false complaint to HHS. (Phone call at 5:50–6:09).

56.     After speaking with Osborn, Moulding spoke with Estey and Koenig. (Appx 482 (Moulding DT 26:15–25)).

57.     Most of the information Moulding received came from Koenig. (Appx 483 (Moulding DT 27:17–25)).

58.     Koenig reviewed everything she had learned with Moulding. (Appx 266, 267, 323, 324 (Koenig DT 49:8–10, 49:21–24, 50:9–15, 106:5–107:2)).

59.     Koenig told Moulding that HHS had received an anonymous phone call relaying the birthdate and name of a child. (Appx 483 (Moulding DT 27:17–25)).

60.     Koenig relayed that the anonymous complainant had stated the child was in distress, had been exposed to methamphetamine, and possibly needed medical care and food. (Appx 484 (Moulding DT 28:3–9)).

61.     Koenig did not indicate that the baby was wounded. (Appx 487 (Moulding DT 31:14–17)).

62.     Koenig told Moulding that Osborn had called fire stations for information about safe drop boxes for surrendering a child. (Appx 485 (Moulding DT 29:10–15)).

63.     Koenig also told Moulding that she had been to Osborn's home. (Appx 495 (Moulding DT 39:1–4)).

64.     Koenig told Moulding that Osborn did not appear to be under the influence of controlled substances. (Appx 82 (Moulding DT 82:2–5)).

65. Moulding told Koenig that they needed to go back to the property with law enforcement to ask Seaba if they could search. (Appx 267, 285 (Koenig DT 50:16–18, 68:17–21); Conf Appx 7).

66. Koenig did not want to go back. (Appx 267 (Koenig DT 50:18–20)). Koenig thought that was the wrong approach and would rather have contacted Osborn instead of just showing back up. (Appx 270 (Koenig DT 53:19–22)).

67. HHS has 20 days to complete a child abuse assessment, and Koenig did not want to rush back to the property given Osborn's irritation during the first visit. (Appx 271 (Koenig DT 54:1–12)).

68. Koenig believed it would be helpful to give Osborn time to decompress. (Appx 271 (Koenig DT 54:6–8)).

69. Koenig thought, "why are we going out?" (Appx 303 (Koenig DT 86:14–16)).

70. Nevertheless, Koenig did not feel she could tell Moulding no. (Appx 292 (Koenig DT 75:6–11)).

71. Moulding called and text Deputy Mark Miller about the situation at 3:47pm. (Appx 452, 454).

72. Moulding sent a text message to Estey and Deputy Miller at 3:54pm with the address of Osborn and McConnell-Seaba's property. (Appx 453).

## III.   Second search of property

73. If there is an emergency in Jefferson County, a warrant can be obtained rapidly, within an hour and as quickly as 10 minutes. (Appx 489 (Moulding DT 33:11–24); Appx 433 (Miller DT 27:23–24:9)).

74. Neither Moulding, nor anyone else from law enforcement, possessed a warrant to search any part of Plaintiffs' property. (ECF No. 10 ¶ 46).

75. Moulding testified he did not consider getting a warrant to search the property because "There was no crime." (Appx 486 (Moulding DT 30:8–10)).

76. Moulding was not considering the crime of child endangerment. (Appx 486 (Moulding DT 30:11–21)). Moulding testified, "The principal concern was providing aid and welfare to a distressed infant." (Appx 486 (Moulding DT 30:19–21)).

77. Moulding did not believe there was probable cause for a warrant. (Appx 490 (Moulding DT 34:9–13)).

78. Moulding testified, "This was not a criminal investigation. So nobody was investigating probable cause and reasonable suspicion regardless." (Appx 500 (Moulding DT 44:15–17)).

79. For his part, Deputy Miller was not aware of probable cause that would authorize entry into Osborn and McConnell-Seaba's home. (Appx 430 (Miller DT 24:23–25:2)).

80. Moulding did not have enough information to say there was probably a baby on the property. (Appx 505 (Moulding DT 49:3–7)).

81. Moulding and Estey knew that the anonymous complaint was not independently corroborated. (Appx 497 (Moulding DT 41:3–9), Appx 210 (Estey DT 21:13–22:1)).

82. Moulding did nothing to verify the information from the anonymous complaint prior to traveling to the property. (Appx 505 (Moulding DT 49:8–11)).

10

83. Estey did not consider getting a warrant because she didn't think that was the appropriate mechanism. (Appx 208 (Estey DT 19:5–11)).

84. She believed that if consent to search was denied, the appropriate next step would be to request a motion to compel Osborn to present the child. (Appx 208 (Estey DT 19:11–20:8)).

85. Likewise, Koenig believed that if consent to search was denied, then HHS and the county attorney could apply for an order to compel Osborn to produce the child for review by HHS. (Appx 280 (Koenig DT 63:6–64:5)).

86. Moulding, Estey, and law enforcement arrived at the property shortly before 5:00pm. (Appx 452).

87. Moulding knew that Osborn lived there. (Appx 502 (Moulding DT 46:21–5)).

88. Before going to the property, Moulding looked up the property on the assessor's website, which indicates "Seaba, Gordon Life Est" is the deed holder, and lists "Seaba Gordon Life Estate" and "Seaba Timothy" as the most recent buyers. (Appx 501 (Moulding DT 45:4–13); Appx 25–26).

89. Moulding was first to arrive, with Koenig driving behind him. (Appx 301 (Koenig DT 84:4–8); Appx 415 (Miller DT 9:11–20)).

90. Estey, Jefferson County Deputy Miller, Jefferson County Deputy Brian Burnett, and three deputies from Washington County also converged at the property. (Appx 235 (Koenig DT 17:7–19); Appx 415 (Miller DT 9:3–10); Appx 176 (Burnett DT 50:1–8)).

91. Estey remained parked in the road out front of the property. (Appx 207 (Estey DT 18:10–22); Burnett BC 1 at 3:30; Miller BC 1 at 2:25).

11

92. As Moulding approached the property, he encountered McConnell-Seaba on a tractor grading the driveway. (Appx 508–09 (Moulding DT 52:25–53:18)).

93. Moulding asked McConnell-Seaba, "Are you Mr. Seaba? Are you Gordon?" (Appx 509 (Moulding DT 53:8–9)).

94. McConnell-Seaba responded by asking Moulding if he had a warrant. (Appx 509 (Moulding DT 53:10)).

95. Moulding asked McConnell-Seaba again if he was Gordon. (Appx 509 (Moulding DT 53:1–12)).

96. McConnell-Seaba said something nonresponsive, and Moulding determined that McConnell-Seaba was not Gordon. (Appx 509 (Moulding DT 53:13–18)).

97. Moulding could tell from McConnell-Seaba's tone that McConnell-Seaba did not want Moulding on the property. (Appx 510 (Moulding DT 54:19–22)).

98. Moulding then drove past McConnell-Seaba, up to the house. (Appx 512 (Moulding DT 56:3–10); Appx 152 (Burnett DT 26:16–21); Burnett BC 1 at :40–45).

99. When Koenig arrived, Moulding was already out of his car, standing near the driveway, and arguing with Osborn. (Koenig DT 84:4–25).

100. Moulding's truck was parked furthest up the driveway, with Koenig's van behind him, and then Deputy Miller's vehicle. (Koenig DT 84:4–8; Miller DT 9:11–20).

101. After arguing with Osborn for awhile, Moulding briefly got back into his truck. (Koenig DT 89:10–25).

102. Moulding then got out of his truck and walked up to the main house to talk to Seaba. (Appx 299 (Koenig DT 90:2–5)).

103. According to Moulding, he went up to the house with Koenig and someone knocked on the door. (Appx 503 (Moulding DT 57:10–13)).

104. Moulding testified that Seaba opened the door. (Appx 513 (Moulding DT 57:22–23)).

105. Moulding asked Seaba to come inside and Seaba assented. (Appx 515 (Moulding DT 59:14–23)).

106. Seaba gave Moulding permission to search the property, except for Osborn and McConnell-Seaba's residence. (Appx 517, 519 (Moulding DT 61:4–5, 63:14–22); Appx 442 (Miller DT 36:22–37:1); Miller BC 2 at 3:52–4:24).

107. Seaba confirmed to Moulding that he had not seen a baby on the property. (Appx 546 (Moulding DT 90:4–12)).

108. When Deputy Miller arrived, he parked in the road and walked up to speak with McConnell-Seaba, who was still on his tractor at the bottom of the driveway. (Miller BC 1 at :15–:20).

109. McConnell-Seaba explained that HHS had been there earlier and that he was planning to call law enforcement to have them trespassed if they came again because it was harassment. (Miller BC 1 at :20–:40).

110. McConnell-Seaba described the allegations as "pretty far out there" and "pretty silly" and asked to have the people trespassed from his property. (Miller BC 1 at :40–1:04).

111. McConnell-Seaba confirmed that he lived in a house in the back yard of the property. (Miller BC 1 at 1:08–1:11).

13

112. McConnell-Seaba asked one more time for "the DHS people" to be trespassed from his property. (Miller BC 1 at 1:25–:30).

113. McConnell-Seaba agreed to give the people five minutes to talk to Osborn, but said he felt like it was harassment at that point and he wanted them gone. (Miller BC 1 at 1:33–1:55).

114. After talking to McConnell-Seaba, Deputy Miller then chatted with Estey, who was inside her car on the side of the road. (Miller BC 1 at 2:47; Miller BC 2 at :00–:50).

115. Soon, Osborn came walking down the driveway asking everyone to identify themselves. (Miller BC 2 at :50–1:20).

116. Osborn said "You are violating our 4th Amendment on a false allegation." (Miller BC 2 at 1:25–:27).

117. Osborn said "Chauncey walked into the house, like what's-her-face did, without permission." (Miller BC 2 at 1:34–:37).

118. Osborn told Estey that she had told Moulding and Koenig, at the threshold, not to enter. (Miller BC 2 at 1:40–:45).

119. McConnell-Seaba asked the deputies standing nearby to assist in getting the people out of his father's house. (Miller BC 2 at 1:50–:55).

120. Deputy Miller mentioned that Gordon Seaba could give Moulding permission to enter, at which point Osborn explained, "Gordon said get out! Gordon flat out said get out, which is why I hauled ass in there. When my father-in-law says get the fuck out of his house, you get the fuck out. Get him out of there!" (Miller BC 2 at 1:55–2:20).

14

121. Deputy Miller then climbed into his truck and drove up the driveway. (Miller BC 2 at 2:25–3:37).

122. As he reached the top of the driveway, he received a call from Moulding. (Miller BC 2 at 3:40–4:07).

123. Moulding told Deputy Miller that they were "good to go" for the search. (Appx 421 (Miller DT 15:19–25)).

124. Deputy Miller assumed that Moulding had gotten permission to search from Seaba. (Appx 422 (Miller DT 16:17–21)).

125. Deputy Miller asked Moulding, "What about the house in the back that is claimed to be theirs?" (Miller BC 2 at 3:52–3:58).

126. Moulding told Miller that they did not have permission to search Osborn and McConnell-Seaba's residence. (Appx 442 (Miller DT 36:22–37:1)).

127. Deputy Miller exited his truck and told a Washington County deputy, "Gordon has given the county attorney permission to search the outbuildings. He's asking if you and I could search the outbuildings, with the exception of what Gail and Tim are claiming is their residence." (Miller BC 2 at 4:10–4:24).

128. Meanwhile, back at the bottom of the driveway, McConnell-Seaba spoke with Deputy Burnett. (Burnett BC 1 at :30).

129. McConnell-Seaba asked Deputy Burnett to get the people off of his property because it was the second time they'd been there and they were harassing him. (Burnett BC 1 at :30–:50).

130. McConnell-Seaba asked for everyone except the police to be trespassed. (Burnett BC at :50–1:00).

15

131. McConnell-Seaba asked if Deputy Burnett could help him, and Deputy Burnett said he could try, but he would have to talk to the County Attorney. (Burnett BC at 1:00–1:20).

132. McConnell-Seaba reported to Deputy Burnett that Moulding had walked into Seaba's home against his Fourth Amendment rights. (Burnett 1 at 1:20–:40).

133. McConnell-Seaba explained to Deputy Burnett that he was a property owner, as well as Seaba. (Burnett 1 at 1:40–2:00).

134. Deputy Miller walked further into the property and called Deputy Burnett to tell him, "Chauncey's told us that Gordon gave us consent to look in the outbuildings, with the exception of what they're claiming is their residence. And they're looking inside the house—Chauncey and DHS." (Miller BC 2 at 6:11–6:43).

135. Deputy Miller proceeded to search a camper on the property. (Miller BC 2 at 7:20–8:17).

136. After Deputy Miller exited the camper, he encountered Moulding and Koenig approaching from the main house. (Miller BC 2 at 8:13–8:18; Ulin BC at 12:28).

137. Moulding told Deputy Miller "the house is clear." (Miller BC 2 at 8:20–:24).

138. Deputy Miller told Moulding, "Tim's quite riled up. That's Gail's significant other." (Miller BC 2 at 8:25–:32).

139. Moulding asked Washington County Deputy Ulin if both Osborn and McConnell-Seaba were both "down there" at the bottom of the driveway. (Ulin BC at 13:10–:15).

140. Deputy Ulin confirmed that Osborn and McConnell-Seaba were "down there," to which Moulding responded, "Let's go clear this small house that we think that they're in, then, 'cause they're not gonna be in it." (Ulin BC at 13:09–:19).

141. Koenig asked, "Who's both, her and her baby daddy?" (Ulin BC at 13:18–13:21). Moulding clarified, "her and Tim." (Ulin BC at 13:20–13:23).

142. Deputy Miller searched another camper, then joined Moulding and Koenig again outside. (Miller BC 2 at 8:35–9:48).

143. Moulding and Koenig had been searching around a fire pit nearby. (Miller BC 2 at 9:45; Ulin BC at 13:55).

144. Moulding said to Deputy Miller, "Let's get back to that shack before they get back there." (Miller BC 2 at 9:45–:50; Appx 427 (Miller DT 21:15–24)).

145. The group walked together to the back of the property. (Miller BC 2 at 11:00–:08).

146. As they reached the back, Deputy Miller asked Koenig "which one do they kind of live in?" and Koenig pointed Osborn and McConnell-Seaba's home out to Deputy Miller. (Miller BC 2 at 11:08–:15).

147. Moulding turned back to look as Koenig gestured towards the home. (Miller BC 2 at 11:08–:15).

148. Moulding led the group around an outbuilding, which he opened up and looked inside. (Miller BC 2 at 11:15–12:08). This was McConnell-Seaba's blacksmith shop. (McConnell-Seaba DT at 68:4–6).

149. As Deputy Miller, Koenig, and Moulding looked inside the outbuilding, Osborn approached, chanting "4th Amendment violation, 4th Amendment violation. That

was a closed door. You gotta have a warrant." (Miller BC 2 at 12:04–12:15; Ulin BC at 16:20–:35).

150. Moulding next walked towards the door to Osborn's home, and she repeated, "Warrant! Get a fucking warrant. You go in there and I'll fucking sue your ass." (Miller BC 2 at 12:15–12:39).

151. Moulding opened the door and went in, anyway. (Miller BC 2 at 12:33–12:58).

152. Osborn waited for a brief period, then walked up to the door, opened it, and directed Moulding out of her home. (Miller BC 2 at 12:55–13:00).

153. Osborn said to Moulding, "Warrant! You are a county attorney, you know the law. And you walked all over it! (Miller BC 2 at 13:05–:10).

154. Moulding said to Osborn, "All we need to do, is confirm there's no child on the property." (Miller BC 2 at 13:10–:17).

155. Osborn pointed out that she had confirmed there was no child earlier, when she let Koenig go through her home. (Miller BC 2 at 13:17–:29).

156. Moulding then turned away and began to walk back towards the front of the property. (Miller BC 2 at 13:58–14:10).

157. As Moulding walked away, Osborn followed him, saying, "You have to have probable cause! . . . You don't have a right to be here and violate every fucking constitutional right. . . . You think I'm going to let that by, you have got the wrong woman. . . . Get a fucking warrant!" (Burnett BC 2 at 1:28–1:52).

158. Osborn yelled at Moulding, Estey, and the officers, "Get off the property!" (Burnett BC 1 at 2:16–2:19).

18

159. Following along with the group, McConnell-Seaba stated, "You entered my father's house against his 4th Amendment rights," to which Moulding responded, "I definitely entered your father's house. Definitely wasn't against his rights." Osborn added, "He told you to get the fuck out and I was a witness and I'll put that on everything, including the Bible in front of a judge." (Burnett BC 2 at 2:30–2:48).

160. As the group walked back towards the main house, McConnell-Seaba asked, "I would like to know what I need to do to have anybody who's not a police officer trespassed from my property." (Burnett BC 2 at 2:45–:51).

161. Moulding responded, "You can ask for people to be trespassed. Right now . . . this is a health and safety concern right now." (Burnett BC 2 at 2:51–3:02).

162. At the same time, Osborn yelled, "You're all fucking trespassed! Get a warrant buddy. (Burnett BC 2 at 2:51–3:02).

163. Moulding stated, "If you put yourself in our shoes, I hope you understand, you would do the same thing." (Burnett BC 2 at 3:35–3:41).

164. McConnell-Seaba responded, "I would not violate anyone's rights. I would leave the property when I was asked to." (Burnett BC 2 at 3:41–3:47).

165. Back standing in front of the main house, McConnell-Seaba again asked everyone to leave his property. (Burnett BC 2 at 3:48–:51).

166. Moulding responded, "We gotta do one little conversation, then I think we're done here." (Burnett BC 2 at 3:51–4:00; Ulin BC at 20:45).

167. Osborn added, "Get off!" and pointed down the driveway. (Burnett BC 2 at 4:00–4:04).

19

168. Osborn pointed at Moulding and Estey, saying "trespassed, trespassed." (Burnett BC 2 at 4:04–:19).

169. McConnell-Seaba again stated, "Anybody who's not a police officer is trespassed from my property." (Burnett BC 2 at 4:20–:25; Ulin BC at 21:10).

170. Moulding, Estey, and the other officers did not leave the property. Instead, they continued to stand on the property. Moulding again stated, "We just need to have a quick conversation, then we'll probably get out of your hair here." (Burnett BC 2 at 5:20–5:25).

171. McConnell-Seaba responded, "You can have a conversation at the end of the driveway. Everybody off my property. Otherwise, I'll sit in on the conversation, let's have a talk right now." (Burnett BC 2 at 5:24–5:33).

172. Moulding laughed at McConnell-Seaba and said "Well, it's not your conversation." (Burnett BC 2 at 5:32–:35).

173. McConnell-Seaba gestured down the driveway and said, "Then off my property, please, sir." (Burnett BC 2 at 3:35–:37).

174. Instead of leaving, Moulding stepped to the side and waved Koenig over to join him in his truck. (Burnett BC 2 at 3:36).

175. Osborn yelled at Moulding, "Get off the property!" as he walked back to his pick-up truck. (Ulin BC at 22:40–:50).

176. Moulding told Osborn, "get the fuck back." (Ulin BC at 22:50; Hansen BC at 12:50).

177. Moulding got into his truck with Koenig, started it, and sat in the driveway for a brief time. (Burnett BC 2 at 6:05–:53; Miller BC 3 at :17–:30).

178.    Still, Moulding and Koenig did not leave. Moulding and Koenig exited his vehicle and walked over to McConnell-Seaba. (Burnett BC 2 at 6:53; Ulin BC at 23:42–24:44).

179.    Koenig said she needed to speak with McConnell-Seaba, "just to make sure." (Burnett BC 2 at 6:58–7:02).

180.    McConnell-Seaba asked, "Can we have this conversation at the end of the driveway? I really want you guys off my property." (Burnett BC 2 at 7:02–7:09; Miller BC 3 at 1:30–:40).

181.    McConnell-Seaba agreed to speak with her, but said "let's go for a walk, with a police officer if you'd like." (Burnett BC 2 at 7:09–:11).

182.    Koenig stayed where she was. (Burnett BC 2 at 7:11).

183.    Koenig repeated the allegations: "I have information provided to me, that I do feel like if it was provided to anybody. A child was born here, addicted to meth, on August 31st. And that you are hiding the child. I only have your word for it." (Burnett BC 2 at 7:50–8:10; Miller BC 3 at 3:20–3:40).

184.    Osborn pointed out, "But Alicia's wasn't good enough, right, Alicia White?" (Burnett BC 2 at 8:08–8:15).

185.    Koenig continued to explain why they had come there and search, then stated, "So now we're going to leave. We are not planning on coming back. We are leaving the property. Unless there is anything else, thank you for your time." (Burnett BC 2 at 8:15–9:26; Miller BC 3 at 3:20–:30).

186.    Everyone finally got into their respective vehicles to leave the property. (Burnett BC 21 at 9:30–10:08).

187. No evidence that a baby had ever existed was found on the property. (ECF No. 10 ¶ 64).

188. Koenig spoke with Moulding after the search and they agreed there was not enough evidence to justify a further search. (Conf Appx 8).

189. Koenig subsequently contacted the local hospital, the guardian of Osborn's children, and Osborn's sister—none of whom had any information to corroborate the anonymous complaint. (Conf Appx 8).

190. Koenig deemed the allegation of child abuse "not confirmed" because there was no evidence to show a child had been born. (Conf Appx 9).

191. Osborn and McConnell-Seaba both lived at 3251 110th Street, where they had full access to the yard and the buildings on the property. (Appx 25, 26; Appx 52, 54 (Osborn DT at 24:9–25, 26:25–27:8)).

192. Osborn accompanied Koenig in the main house when Koenig searched it in the morning. (Conf Appx 7).

193. The yard contained a burn pile, a workshop, and a barn for their pigs. (Appx 388, 405 (McConnell-Seaba DT at 51:2–3, 68:4–12)).

194. The outbuilding that served as McConnell-Seaba's shop was only a few yards away from McConnell-Seaba and Osborn's dwelling. (Miller BC 2 at 11:15–12:30; App 405 (McConnell-Seaba DT at 68:4–6)).

195. A person could reach their yard only by walking up their long driveway and past the main house. (Appx 28; *see generally* Body Camera).

196. McConnell-Seaba and Osborn's dwelling on the property could be reached only by walking past a second row of hedges and trees that further sheltered their home from view of the road. (Appx 28; Ulin BC at 15:50–16:10).

197. McConnell-Seaba and Osborn's dwelling was marked by domestic touches that indicated it was a home, including a screen door, porch light, string lights above the door, and decorative statue and metal chairs out front on a rock patio. (Miller BC 2 at 12:43; Hansen BC at 6:40–:55).

198. Three vehicles were parked outside the front door of McConnell-Seaba and Osborn's dwelling. (Miller BC 2 at 12:23).

199. Seaba did not give Moulding consent to search McConnell-Seaba and Osborn's property. (Miller BC 2 at 3:52–3:58, 4:10–4:24; Appx 442 (Miller DT 36:22–37:1)).

200. Gordon Seaba and another occupant at the main house at the property appeared to know nothing about a baby. (Conf Appx at 7; Appx 244 (Koenig DT at 27:12–28:25)).

201. Deputy Burnett understood that there was a criminal aspect to the allegations. (Appx 174 (Burnett DT 48:18–22)).

202. Moulding remarked to Deputy Miller that there were black gloves in the trash and fire pit. (Miller BC 2 at 10:08–:17).

**WHEREFORE**, Osborn and McConnell-Seaba respectfully request that the Court enter an order granting this partial motion for summary judgment and set this matter for trial as to damages.

**PARRISH KRUIDENIER, L.L.P.**

23

By: __/s/ Gina Messamer_____
     Gina Messamer      AT0011823
     2910 Grand Avenue
     Des Moines, Iowa 50312
     Telephone: (515) 284-5737
     Facsimile: (515) 284-1704
     Email: gmessamer@parrishlaw.com
     **ATTORNEY FOR PLAINTIFFS**

By: __/s/ Edward Harvey_____
     Edward G. Harvey      AT0003350
     1600 Wonder Way
     Fairfield IA, 52556
     Telephone: (641) 919-8696
     Email: edwardgharvey98@yahoo.com
     **ATTORNEY FOR PLAINTIFFS**

<u>**CERTIFICATE OF SERVICE**</u>

The undersigned hereby certifies that on May 29, 2026, I electronically filed the foregoing with the Clerk of Court using the ECF system and a true copy of the foregoing was served electronically on the attorneys of record.

By: __/s/ Gina Messamer_____