**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF IOWA**
**CENTRAL DIVISION**

| | |
|---|---|
| GAIL OSBORN, AND TIM MCCONNELL-SEABA,<br><br>      **Plaintiff,**<br><br>vs.<br><br>KELSEY KOENIG, AND JEFFERSON COUNTY IOWA,<br><br>      **Respondents.** | **CASE NO. 4:25-cv-00183**<br><br><br>**PLAINTIFF'S COMBINED RESISTANCE TO DEFENDANTS' CROSS MOTION FOR SUMMARY JUDGMENT, ECF Nos. 29 & 32** |

**TABLE OF CONTENTS**

INTRODUCTION .................................................................................................... 2

FACTUAL DISPUTES ........................................................................................... 2

ARGUMENT ........................................................................................................... 4

   I.   Seaba's consent did not authorize Koenig's search of the property .................... 4

     A.   Moulding's entry into Seaba's home was illegal and rendered Seaba's subsequent consent involuntary. ............................................................. 5

     B.   Seaba's consent did not trump Osborn and McConnell-Seaba's objection ....... 6

     C.   Moulding knew that Osborn and McConnell-Seaba had a privacy interest in the home he searched ............................................................................... 9

   II.   There were no exigent circumstances. ............................................................. 11

   III.   The "community caretaker" exception does not apply ....................................... 14

   IV.   Plaintiffs' constitutional rights were clearly established .................................... 15

   V.   Trespass ........................................................................................................ 17

   VI.   Invasion of privacy ......................................................................................... 17

   VII.   Respondeat superior ...................................................................................... 18

CONCLUSION ...................................................................................................... 18

**INTRODUCTION**

Given the overlapping issues, Plaintiffs submit this single resistance to both Defendants' summary judgment motions. Both Defendants claim qualified immunity on the grounds that the search comported with the 4th Amendment under the recognized exceptions of consent, exigency, and the community caretaking function. (ECF 29-1, Def. Koenig Brief at 10; ECF No. 32-3, Moulding/Jefferson Brief at 9–29). None of these exceptions apply. Defendants' search was a violation of the Plaintiffs' clearly established 4th Amendment rights. Plaintiffs respectfully request the Court deny Defendants' respective Motions for Summary Judgment and grant Plaintiffs' Motion for Summary Judgment on liability.

**FACTUAL DISPUTES**

There are few factual disputes in this case. Most of the material facts are reflected in the HHS report Koenig authored and the body camera video of the second visit to Plaintiffs' property. The primary factual disputes involve Moulding and are less relevant to Koenig.

Plaintiffs dispute that Gordon Seaba invited Moulding into his home. Contrary to Moulding's claim, he was not invited into Gordon Seaba's home. When Koenig arrived, Moulding was already out of his car, standing near the driveway, arguing with Osborn. (Plaintiffs MSJ Appx 301 (Koenig DT 84:4–25)). Moulding then walked up to Gordon Seaba's door. *Id.* Osborn stood outside the main house, telling Moulding he didn't have permission to enter and he didn't have a warrant. (Plaintiffs MSJ Appx 74–75 (Osborn DT 46:14–47:7); Appx 77 (Osborn DT 77:5–9)).

Moulding did not knock; he opened the door and went in without invitation. Moulding then remained after being told to leave. (Plaintiffs MSJ Appx 70–71 (Osborn DT

2

42:10–43:24)). Osborn verbally counted down from 3 and then told Moulding she was coming in. (Plaintiffs MSJ Appx 75 (Osborn DT 47:3–:7); Appx 77 (Osborn DT 77:5–9)). After joining Moulding and Seaba inside the house, Osborn witnessed Seaba, who was still sitting in his chair inside the home, tell Moulding to "get the fuck out." (Ulin BC at 15:50–16:10; Plaintiffs MSJ Appx 70–71 (Osborn DT 42:18–43:6)). Osborn recounted these events several times to the officers on scene. (Burnett BC 1 at 1:33–:49; Ulin BC at 15:50–16:10; Burnett BC 2 at 2:36–:45; Miller BC 2 at 1:22–2:20, 13:01–:13). Moulding never denied that Seaba had told him to "get the fuck out." (*See* Burnett BC 2 at 2:36–3:20; Miller BC 2 at 13:01–:20; Miller BC 3 at 3:13–3:29).

Koenig waited outside in Moulding's truck as Moulding argued with Osborn and then entered Gordon Seaba's home. (Plaintiffs MSJ Appx 302, 306–07, 308 (Koenig DT 85:1–24, 89:6–90:20, 91:7–16)). She sat in the truck for a few minutes. (Plaintiffs MSJ Appx 314 (Koenig DT 97:11–17)). Koenig wondered "what was taking so long there anyway with Gordon." (Plaintiffs MSJ Appx 312 (Koenig DT 95:22–23)). Osborn left the house and went down the driveway to talk to law enforcement. (Burnett BC 1 at :20; Miller BC 2 at 1:00)

Only after Koenig exited the truck, entered Gordon Seaba's home, and asked for his consent to search the property for 10 minutes, did Seaba consent to a search. (Plaintiffs MSJ Appx 308–09 (Koenig DT 91:22–92:24)). There was silence between Moulding and Seaba when Koenig entered the home. (Plaintiffs MSJ Appx 318 (Koenig DT 101:13)). Koenig described Seaba's "mannerisms lightened up a little bit from the conversation with Chauncey to then the conversation with [her]." (Plaintiffs MSJ Appx 309 (Koenig DT 92:18–21)).

Moulding/Jefferson claim that "Gail Osborn and Timothy McConnell-Seaba actually consented to a search of the property by Jefferson County law enforcement." (ECF No. 32-2 at 33). This is false.[1] Osborn and McConnell-Seaba consented only to Jefferson County's *presence* to help assist in getting Moulding and Koenig off their property for trespassing. Osborn says she "gave the police officers present permission to be on my property, but I asked Defendants Moulding and Koenig to leave." (Pl. Osborn Ans. Ints. At 8). And in her deposition, Osborn states "I believe at one point I offered or allowed them to be there to get Chauncey and Kelsey off the Property, but in total I wanted them all off the property." (ECF 33-3, Appx 123, Pl. Osborn Dep. 95:18-21). McConnell-Seaba asked Jefferson County Deputy Miller to have the "DHS people" trespassed from his property. (Miller BC 1 at 1:25–:30). He asked Deputy Burnett to get the people off his property because it was the second time they'd been there and they were harassing him. (Burnett BC 1 at :30–:50). In his deposition, McConnell-Seaba states; "I thought the sheriffs were going to help me get those two people off my property. I never said I was okay with them searching. I said I was okay with them being there because I thought they were going to help me remove these people." (ECF 33-3: Plaintiffs MSJ Appx 401, Pl. McConnell-Seaba  DT 64:16-21).

## ARGUMENT

### I.  Seaba's consent did not authorize Koenig's search of the property

Defendants first contend their search was constitutional based on the consent of Gordon Seaba. They rely on Gordon Seaba granting Koenig's request to look around for

---

[1] Moulding/Jefferson do not include this false statement in their statement of material facts.

ten minutes. The problem for Moulding, however, is that he illegally entered Seaba's home and any subsequent consent is invalid. Further, it was not reasonable for Defendants to rely on Seaba's consent, given Osborn and McConnell-Seaba's contemporaneous objection.

**A. Moulding's entry into Seaba's home was illegal and rendered Seaba's subsequent consent involuntary.**

Moulding's entry into Seaba's home without Seaba's consent or invitation was a violation of the 4th Amendment. *Kyllo v. United States*, 533 U.S. 27, 37 (2001) (recognizing that entry into a person's home violates the 4th Amendment). When consent to search follows an illegal entry, the government must show that the taint of the illegal entry was dissipated. *United States v. Lakoskey*, 462 F.3d 965, 975 (8th Cir. 2006). In determining whether a person's consent "purged the taint of the illegal entry," courts consider factors such as 1) Miranda warnings; 2) the temporal proximity of the illegal entry and the consent; 3) the presence of intervening circumstances; and 4) the purpose and flagrancy of the official misconduct. *Id.*

Here, all the factors indicate that Seaba's subsequent consent was not an act of free will sufficient to purge the taint of Moulding's illegal entry. Seaba was not told by either Moulding or Koenig that he was free to deny them consent. The circumstances certainly indicated to Seaba that his wishes would not be honored. Seaba had already told Moulding to "get the fuck out" and Moulding had refused, instead remaining in Seaba's home. Moulding likewise ignored Osborn's protests.

Koenig entered and obtained Seaba's consent while Moulding was actively violating Seaba's 4th Amendment rights. There were no intervening circumstances or break in time. Moulding's conduct was flagrant. He is the highest-ranking law enforcement

5

officer in his county and an officer of the court. He did not have a warrant or even reasonable suspicion. Nevertheless, he blatantly ignored the objections of McConnell-Seaba, Osborn, and Seaba and invaded their right to privacy.

Seaba's consent was therefore invalid and did not excuse, in any way, Moulding and Koenig's subsequent search. *See Lakoskey*, 462 F.3d at 975 (finding consent that followed on the heels of an illegal entry did not remedy the constitutional violation).

## B.    Seaba's consent did not trump Osborn and McConnell-Seaba's objection

Defendants' argument regarding McConnell-Seaba's life estate is a red herring. Even assuming that Seaba was the sole owner and Osborn and McConnell-Seaba were merely tenants, "a landlord cannot give consent to a warrantless search of leased premises." *U.S. v. Williams*, 523 F.2d 64, 66 (8th Cir. 1975). It is immaterial if Moulding or Koenig believed that Gordon Seaba was actually the owner of the property, when there was no question that Osborn and McConnell-Seaba also lived there. In the same way, it is immaterial that Osborn did not pay rent or have a signed lease. Rent and a lease are not pre-requisites to a privacy interest; even overnight guests have a recognized privacy interest.

There is no dispute that Osborn and McConnell-Seaba lived on the property. The whole reason Moulding and Koenig were searching the entire property was because of their understanding that McConnell-Seaba and Osborn lived there, had access to the entire property, and thus could have hidden a baby there. Osborn and McConnell-Seaba had a reasonable expectation of privacy in the yard at 3251 110th Street, their dwelling, and McConnell-Seaba's shop. *See United States v. Schroeder*, 129 F.3d 439, 442 (8th

Cir. 1997) (recognizing person who resides on property is entitled to privacy regardless of who owns the land).

Accordingly, it was unreasonable for Koenig to ignore Osborn and McConnell-Seaba's objections. It is clearly established that government agents cannot search a property based on the consent of one occupant, when another occupant of the property is present and objecting. *Georgia v. Randolph*, 547 U.S. 103, 115 (2006).

Defendants claim *Georgia* does not apply because "customary social understanding accords the consenting tenant authority powerful enough to prevail over the co-tenant's objection." *Georgia*, 547 U.S. at 121. Namely, because Seaba is McConnell-Seaba's father, Defendants claim he had "authority powerful enough to prevail" over McConnell-Seaba. (ECF No. 32-2, Moulding/Jefferson Br. at 21).

But this is not a situation where McConnell-Seaba was merely playing temporary host to an adult child. McConnell-Seaba was a grown man; a legal owner of the property with his own separate dwelling on the property. This was not a "household of parent and child" with a "societal understanding of superior and inferior." *Georgia*, 547 U.S. at 114. And of course Osborn was not a child of Seaba or his inferior in any societally-recognized hierarchy. Seaba was not a "host" to McConnell-Seaba and Osborn. McConnell-Seaba and Osborn lived on the property, in their own separate dwelling, for years, and contributed to the maintenance of the property. *Cf. Joseph v. Donahue*, 392 F. Supp. 3d 973, 986 (D. Minn. 2019) (finding mother could validly consent to search of her home, despite son's objection, where her son was *temporarily* staying *in her home*).

Defendants next assert that *Georgia* does not apply because McConnell-Seaba "was not physically present and objecting when Moulding and Koenig received consent

7

from Gordon Seaba." (ECF No. 32-2, Moulding/Jefferson Br. at 19). They claim McConnell-Seaba and Osborn therefore missed out on their chance to object to the search. (ECF No. 32-2, Moulding/Jefferson Br. at 20). This argument ignores the fact that McConnell-Seaba and Osborn had already told Moulding they didn't want him there before he ever talked to Gordon Seaba. McConnell-Seaba had asked Moulding for a warrant and expressed that he didn't want him on the property. (Plaintiffs MSJ Appx 509–10 (Moulding DT 53:1–54:22)). Osborn then argued with Moulding before he barged into Seaba's home, telling him not to go in because he didn't have a warrant. (Plaintiffs MSJ Appx 301 (Koenig DT 84:4–25); Appx 74–75 (Osborn DT 46:14–47:7); Appx 77 (Osborn DT 77:5–9)).

And of course Osborn and McConnell-Seaba remained present on the property. Unlike *Fernandez v. California,* 571 U.S. 292, 293, (2014), also cited in Moulding/Jefferson's brief, Plaintiffs were not removed for a reasonable cause by law enforcement. (ECF No. 32-2, Moulding/Jefferson Br. at 20). To the extent Osborn and McConnell-Seaba were not in Moulding and Koenig's direct presence, it was because they were seeking help from law enforcement to remove Moulding and Koenig from their property. (Plaintiffs MSJ Appx 123 (Osborn DT 95:18-21); Miller BC 1 at 1:25–:30; Burnett BC 1 at :30–:50).

The video shows that Moulding intentionally attempted to evade Osborn and McConnell-Seaba. Moulding asked Deputy Ulin where Osborn and McConnell-Seaba were and then, when he found out they were still at the bottom of the driveway, Moulding said, "Let's go clear this small house that we think that they're in, then, 'cause they're not gonna be in it." (ECF 33-3, Ulin BC at 13:09–:23). Moulding said to Deputy Miller, "Let's

get back to that shack before [Osborn and McConnell-Seaba] get back there." (ECF 33-3, Miller BC 2 at 9:45–:50); ECF 33-3, Plaintiffs MSJ Appx at 427 (Miller DT 21:15–24)). Knowing they would not allow a search of their home, Defendants deliberately avoided Plaintiffs.

Defendants violated the clear line established by *Georgia.* They violated Osborn and McConnell-Seaba's 4th Amendment rights by searching their property despite their objections. Seaba's consent is no legal excuse.

### C.    Moulding knew that Osborn and McConnell-Seaba had a privacy interest in the home he searched

Moulding claims he "could not determine what the alleged 'tiny home' was from the outside, and he believed it was a shed or outbuilding." (ECF No. 32-2: Moulding/Jefferson Br. at 15). He does not, however, include this allegation in his statement of material facts.

The body camera reveals that Moulding *knew* that the building he was entering at the back of the property was Osborn and McConnell-Seaba's dwelling. Moulding's deposition testimony feigning ignorance about where Osborn and McConnell-Seaba lived is not worthy of credence given the video. (Plaintiffs' MSJ Appx 501–03, 520, 521, 523, 529 (Moulding DT 45:2–47:1, 64:6–9, 65:2–17, 67:3–4, 73:17–74:7)). "When opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007).

The video shows Moulding was specifically looking for Osborn and McConnell-Seaba's home so he could search it. Moulding asked Deputy Ulin where Osborn and McConnell-Seaba were and then, when he found out they were still at the bottom of the

9

driveway, Moulding said, "Let's go clear this small house that we think that they're in, then, 'cause they're not gonna be in it." (Ulin BC at 13:09–:23). Moulding said to Deputy Miller, "Let's get back to that shack before [Osborn and McConnell-Seaba] get back there." (Miller BC 2 at 9:45–:50; Appx 427 (Miller DT 21:15–24)).

As they reached the back of the property, Deputy Miller asked Koenig "which one do they kind of live in?" and Koenig pointed Osborn and McConnell-Seaba's home out to Deputy Miller. (Miller BC 2 at 11:08–:15). Moulding turned back to look as Koenig gestured towards the home. (Miller BC 2 at 11:08–:15).

Though Osborn and McConnell-Seaba's dwelling was small, it was marked by domestic touches that indicated it was a home, including a screen door, porch light, string lights above the door, and decorative statue and metal chairs out front on a rock patio. (Miller BC 2 at 12:43; Hansen BC at 6:40–:55). Three vehicles were parked outside the front door. (Miller BC 2 at 12:23). The fact that Osborn was standing outside the front door telling Moulding not to go inside or she'd sue him was another good indicator that the home was hers.

Finally, Moulding had already searched the only other outbuilding in the backyard and found that it was McConnell-Seaba's shop. The home he searched was the last structure on the property. By process of elimination, Moulding knew that the structure was Osborn and McConnell-Seaba's home.

No "man of reasonable caution" would believe under these circumstances that Gordon Seaba had authority to consent to a search of that particular structure. *See Illinois v. Rodriguez*, 497 U.S. 177, 188 (1990) (holding "determination of consent to enter must be judged against an objective standard: would the facts available to the officer at the

10

moment warrant a man of reasonable caution in the belief that the consenting party had authority over the premises" (cleaned up)). Moulding's "warrantless entry without further inquiry" was therefore unlawful. *Id.*

Moulding knew that he did not have consent to search Osborn and McConnell-Seaba's residence—both because Osborn was telling him to get a warrant as he walked up to it *and* because Seaba hadn't given Moulding permission to search Osborn and McConnell-Seaba's home to begin with. (Miller BC 2 at 3:52–3:58, 6:11–6:43, Appx 442 (Miller DT 36:22–37:1)). Moulding's entry into McConnell-Seaba and Osborn's home— over Osborn's vehement objection—is a cut-and-dry violation of McConnell-Seaba and Osborn's 4th Amendment rights.

## II.    There were no exigent circumstances.

Next, Defendants argue the warrantless search was justified due to an exigent circumstance based on an anonymous tip, Osborn's behavior during an earlier visit, and Osborn's past conduct. (ECF 29-1, Koenig Br. at 13-14; ECF No. 32-2, Moulding/Jefferson Br. at 22). This argument fails because there was no reasonable basis to believe a child was in need of immediate aid.

Koenig and Moulding were acting on extremely thin information—nothing more than an anonymous complaint. *Alabama v. White*, 496 U.S. 325, 329 (1990) (recognizing "an anonymous tip alone seldom demonstrates the informant's basis of knowledge or veracity"). Koenig's morning visit provided no information indicating a child needed emergency aid. In fact, her visit corroborated Osborn's claims that she did not have a baby and was not on meth. Koenig said herself that Osborn did not appear to be on drugs. (ECF 33-3: Plaintiffs MSJ Appx 234-38 (Koenig DT 17:10-12, 21:6-13)). Detective Horning and Probation Officer White confirmed that Osborn had never appeared to be

11

pregnant. (Plaintiffs Conf Appx at 7; Koenig SOMF ¶ 33). And of course Koenig searched Osborn/McConnell-Seaba's home and the ground floor of Seaba's home and found nothing baby-related in either of the homes.

Osborn did not hide or fail to respond to officers in a way that would cause them to believe she was evading emergency aid. *Cf. Case v. Montana*, 607 U.S. 107, 118 (2026) (finding Case's failure to respond to urgent knocking contributed to officers objectively reasonable belief that emergency aid was needed). When Koenig visited in the morning, Osborn allowed Koenig to search and showed Koenig her stomach to prove she had no baby. (ECF 33-3: Plaintiffs MSJ Appx (Koenig DT 22:17-20, 20:10-13)). Osborn provided Probation Officer Alisha White as a reference. Osborn called McConnell-Seaba so he could confirm to Koenig that Osborn had not been pregnant. Instead of evading police, Osborn contacted the County Attorney's office to bring further attention to the false claim, with hopes that the situation would be resolved and the person making false accusations would be investigated. This is not the behavior of someone who is trying to evade authorities. As such, the allegations against Osborn were completely unsubstantiated and could not justify an emergency, warrantless search. (ECF 33-3: Plaintiffs MSJ Appx 497 (Moulding DT 41:3-9); Appx 210 (Estey DT 21:13-22:1)).

Defendants grasp at straws to try to overcome the complete dearth of evidence that there was a distressed baby in need of aid. The fact that Osborn was the subject of a child abuse investigation *three years prior* was completely insufficient to establish that Osborn had a new baby who had been exposed to meth. Koenig's assertion that Osborn exhibited "aggressive and erratic behavior during the morning visit," (ECF No. 29-1 (Koenig MSJ Br. at 14)), is unsupported by any citation and completely false. Koenig

never testified that Osborn was aggressive or erratic. To the contrary, Koenig observed that Osborn did *not* appear to be under the influence. Osborn cooperated with Koenig by showing her stomach, speaking with Koenig, allowing Koenig to search both Osborn and Seaba's homes, and calling McConnell-Seaba. Osborn also disputes Koenig's claim that she limited Koenig's inspection of Seaba's home. (ECF No. 33-3: Plaintiff MSJ Appx at 119 (Osborn DT at 22:24)). Koenig never asked to search the upstairs. *Id.*

Moulding piles on by claiming that it was "odd" that Osborn had called his office to complain about the false HHS report. (ECF No. 32-2: Moulding/Jefferson Brief at 23). The Court can listen to that call itself; Osborn is rational and understandably frustrated that someone made a false complaint. Moulding does not explain how that call substantiated the allegation that Osborn had a meth-exposed baby.

Koenig certainly did not believe that there was an immediate threat to life requiring emergent action. Koenig testified that she saw no reason to go back to the home that afternoon. Koenig thought that was the wrong approach and would rather have contacted Osborn instead of just showing back up. (Plaintiffs MSJ Appx 270 (Koenig DT 53:19–22)). Koenig pointed out that HHS has 20 days to complete a child abuse assessment, and Koenig did not want to rush back to the property given Osborn's irritation during the first visit. (Plaintiffs MSJ Appx 271 (Koenig DT 54:1–12)). Koenig thought, "why are we going out?" (Plaintiffs MSJ Appx 303 (Koenig DT 86:14–16)). Koenig, very reasonably, did *not* seek the need for immediate action. *United States v. Selberg*, 630 F.2d 1292, 1296 (8th Cir. 1980) ("[I]f there is no reasonable basis for concluding there was a threat to life or property, the entry and search are deemed improper.").

Furthermore, exigency authorizes a search of a premises limited only to what is reasonable needed to deal with the emergency. *Case*, 607 U.S. at 117 (holding "emergency-aid entry provides no basis to search the premises beyond what is reasonably needed to deal with the emergency while maintaining the officers' safety"). Koenig and Moulding searched beyond those areas where a baby could be found—most obviously when they were searching through the fire pit on the property. (Miller BC 2 at 9:45; Ulin BC at 13:55).

Finally, no exigency existed here because there was time to apply for a warrant. A warrant can be obtained in Jefferson County within an hour (ECF 33-3: Appx 489 (Moulding DT 33:11-24)). Koenig knew of the allegations and had spoken to Detective Horning prior to noon. (Plaintiffs Conf. Appx 7). Yet she made no effort to seek an emergency motion to compel or warrant. Moulding learned of the allegations around 1:30 pm and the search of the property began shortly before 5:00 pm. (ECF 33-3: Plaintiffs MSJ Appx 481 (Moulding DT 25:1-9); Appx 452 (Dep. Miller's Report)). Because there was time to seek a warrant, Defendants cannot rely on the exigency exception. *United States v. Duchi*, 906 F.2d 1278, 1283 (finding no exigency existed when officers knew relevant facts earlier in the day and had time to request a warrant).

## III.    The "community caretaker" exception does not apply

Lastly, Koenig relies on the "community caretaker" exception to justify her search. The Supreme Court held in *Caniglia v. Strom* that "there is no overarching 'community caretaking' doctrine" under the 4th Amendment." 593 U.S. 194, 200–01 (2021) (Alito, J., concurring). Community caretaking is simply one aspect of the exigency doctrine, to the extent an emergency is presented that does not allow time to obtain a warrant. *See United States v. Maxwell*, No. 21-CR-2013-CJW, 2021 WL 5856806, at *9 (N.D. Iowa Oct. 1,

14

2021), report and recommendation adopted, No. 21-CR-2013-CJW-MAR, 2021 WL 5015617 (N.D. Iowa Oct. 28, 2021), aff'd, 89 F.4th 671 (8th Cir. 2023) ("[W]hile 'caretaking,' alone, is not sufficient justification for a warrantless entry, something akin to "exigent caretaking" still justifies a warrantless entry."); *State v. Abu Youm*, 988 N.W.2d 713, 720 (Iowa 2023) ("We conclude that *Caniglia* does not foreclose use of the emergency aid doctrine under the community caretaking exception to the warrant requirement under the Fourth Amendment.").

As discussed above, there was no emergency aid exigency. Koenig's community caretaking argument fails for the same reasons.

## IV.    Plaintiffs' constitutional rights were clearly established

Courts take "a broad view of what constitutes 'clearly established law' for the purposes of a qualified immunity inquiry." *Boswell v. Sherburne Cnty.*, 849 F.2d 1117, 1121 (8th Cir. 1988). The operative question is whether an officer had "fair warning that their conduct violated the Constitution." *Hope v. Pelzer*, 536 U.S. 730, 741 (2002). This is "'a flexible standard, requiring some, but not precise factual correspondence with precedent, and demanding that officials apply general, well-developed legal principles.'" *Whisman v. Rinehart*, 119 F.3d 1303, 1309 (8th Cir. 1997).

Caselaw makes plain that any state official, including HHS or a county attorney, violates the constitution by conducting a warrantless search absent consent or exigent circumstances. *Webster v. Westlake*, 41 F.4th 1004 (8th Cir. 2022) clearly established that the 4th Amendment applies no differently in the context of HHS investigations. *Webster* held that an individual can refuse HHS access to their property. When consent is refused, HHS is limited to *lawful* actions when faced with a resistive individual: 1) pursue a warrant; 2) look for an exigency or exception to the warrant requirement; 3) seek a

15

removal order compelling the parent to produce the child. *Id.* Koenig and Moulding did not follow these basic rules.

The exigency rules are also clearly established and Defendants knew or should have known there was no legitimate exigency. Uncorroborated anonymous complaints are known to be insufficient to establish even reasonable suspicion. *Fla. v. J.L.*, 529 U.S. 266, 269 (2000). Defendants had no corroborating evidence. To the contrary, their search and investigation indicated that Osborn had never been pregnant. Koenig subjectively did not feel there was an emergency requiring her to return to the property that same day. If she believed there was an emergency, she had ample time to apply for a warrant or motion to compel.

Finally, *Georgia* clearly established that an objecting cotenant trumps a consenting cotenant. 547 U.S. 103 at 114. And it is clearly established that ownership of a property is not determinative of privacy rights. *Williams*, among others, clearly established that "a landlord cannot give consent to a warrantless search of leased premises." 523 F.2d at 66. "Regardless of who actually owned the land [Osborn and McConnell-Seaba] lived on, or how many other people resided on the same piece of property," Osborn and McConnell-Seaba have a reasonable expectation of privacy in the property where they reside. *Schroeder*, 129 F.3d at 442.

The 4th Amendment's protection of illegal searches and seizures does not exclude boyfriends, girlfriends, tenants, or remaindermen. The "capacity to claim the protection of the Fourth Amendment depends not upon a property right in the invaded place but upon whether the person who claims the protection of the Amendment has a legitimate expectation of privacy in the invaded place." *Rakas v. Illinois*, 439 U.S. 128, 143 (1978);

16

*see also Schroeder*, 129 F.3d at 442. Osborn and McConnell-Seaba were entitled to privacy in their property. By unreasonably searching that property, Defendants violated Plaintiffs' 4th Amendment rights.

## V.   Trespass

Moulding contends he had consent to search the property. As argued above, Moulding entered and remained on McConnell-Seaba and Osborn's property despite McConnell-Seaba's objection and request for a warrant. Accordingly, Moulding's trespass cannot be defended by consent.

Moulding also claims that absent consent, he had the right to enter the property to investigate a crime. (ECF 32-2, Moulding/Jefferson Br. at 30-31). Yet in his defense to the § 1983 claim, Moulding is adamant he was not at McConnell-Seaba and Osborn's property to investigate criminal activity, but instead to render emergency aid. (ECF 3202 Def. Moulding's Brief at 8). Moulding can't have it both ways. In any event, Moulding was not authorized to enter the property when he did not have probable cause to do so. *State v. Wright*, 961 N.W.2d 396, 405 (Iowa 2021) ("We have long held that a peace officer engaged in general criminal investigation acted unreasonably and unlawfully when he trespassed against a citizen without first obtaining a warrant based on probable cause.").

Finally, Moulding claims Osborn and McConnell-Seaba's consent to allow Jefferson County on the property somehow conferred consent to Moulding's entry as well. (ECF 32-2, Moulding/Jefferson Br. at 31). As stated above, this claim mistakes the record. Osborn and McConnell-Seaba did not consent to a search, but rather the presence of law enforcement to help have Moulding trespassed.

## VI.   Invasion of privacy

Moulding's motion for summary judgment on Plaintiffs' invasion of privacy claim rests on his claim that he had consent. As discussed above, viewing the facts in the light most favorable to Plaintiffs, Seaba's consent was invalid because Moulding illegally entered and remained in his home, which tainted Seaba's consent. And no one gave consent for Moulding to enter McConnell-Seaba and Osborn's home. (Plaintiffs MSJ Appx 442 (Miller DT 36:22–37:1)).

**VII.    Respondeat superior**

Plaintiffs recognize that § 1983 liability is personal, but the Iowa Municipal Tort Claims Act provides statutory respondeat superior liability for even constitutional violations. Iowa Code § 670.2(1); § 670.1(4). If Plaintiffs prevail on any of their claims, Jefferson County is responsible as a matter of law.

**CONCLUSION**

**WHEREFORE**, Plaintiffs Gail Osborn and Timothy McConnell-Seaba respectfully request the Court deny Defendants Kelsey Koenig and Jefferson County, Iowa's Motion for Summary Judgment, and request the Court grant Plaintiffs' Motion for Summary Judgment.

**PARRISH KRUIDENIER, L.L.P.**

By: ___/s/ Gina Messamer_____
        Gina Messamer            AT0011823
        2910 Grand Avenue
        Des Moines, Iowa 50312
        Telephone: (515) 284-5737
        Facsimile: (515) 284-1704
        Email: gmessamer@parrishlaw.com
        **ATTORNEY FOR PLAINTIFFS**

By: ___/s/ Edward Harvey_____
        Edward G. Harvey         AT0003350
        1600 Wonder Way

Fairfield IA, 52556
Telephone: (641) 919-8696
Email: edwardgharvey98@yahoo.com
**ATTORNEY FOR PLAINTIFFS**

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on July 7, 2026, I electronically filed the foregoing with the Clerk of Court using the ECF system and a true copy of the foregoing was served electronically on the attorneys of record.

By: ___/s/ Gina Messamer_____

19