UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| GAIL OSBORN, TIM MCCONNELL SEABA, AND GORDON SEABA,<br><br>    Plaintiffs,<br><br>v.<br><br>CHAUNCEY MOULDING, KELSEY KOENIG, AND JEFFERSON COUNTY IOWA,<br><br>    Defendants. | Case No. 4:25-cv-183 -SHL-SBJ<br><br><br>**DEFENDANT KELSEY KOENIG'S SEPARATE STATEMENT OF ADDITIONAL MATERIAL FACTS IN SUPPORT OF RESISTANCE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT ON LIABILITY.** |

**COMES NOW** Defendant, Kelsey Koenig, and for her Separate Statement of Additional Undisputed Material Facts in Support of Resistance to Plaintiffs' Motion for Summary Judgment on Liability, states the following:

1.    Gordon Seaba owned the subject property with a life estate, while Tim McConnell Seaba, his sister Ashley, and their deceased brother Aaron, were remaindermen.  (Def.  Koenig's MSJ App. 123, Osborn Dep., 24:15-25; Def. Koenig's MSJ App. 104, McConnell Dep., 49:13-17; Def. Koenig's MSJ App. 180, Plaintiffs' Responses to Interrogatory No. 17; Def. Koenig's MSJ App. 153-154, Jefferson County Assessor Records).

2.    Gordon Seaba lived in the main house, while Osborn and McConnell Seaba lived in a small cottage behind the main house.  (ECF 1, Pet., ¶ 13; MSJ App. 123, Osborn Dep., 24:13-14).

### Report to IHHS on Morning of November 15, 2024

3.    On the morning of November 15, 2024, IHHS received an anonymous complaint alleging that Gail Osborn had given birth to a daughter, Charlotte, two months prior and was using methamphetamine.  (ECF 1, Pet., ¶ 14).

1

4.    IHHS Child Protection Worker Kelsey Koenig was assigned to complete an assessment by her supervisor, David Rippey.  (ECF 1, Pet., ¶ 16; MSJ App. 056, Koenig Dep., 24:17-20).

5.    According to her Position Description Questionnaire (PDQ) for Social Worker 3, the majority of Koenig's work duties (65%) involve conducting assessments.  (Def. Koenig MSJ App. 200, Koenig PDQ, p. 1).

6.    For an assessment—as indicated by the "Assessment/Evaluation Activity" section in her PDQ—Koenig is to "evaluate the immediate safety of the child/dependent adult, conduct multiple interviews with subjects and other collateral sources, gather physical and documentary evidence, etc., in order to determine whether the abused occurred…" (Def. Koenig MSJ App. 200, Koenig PDQ, p. 1; Def. Koenig MSJ App. 193-195, Safety Assessment, Form 470-4132 or 470-4132(S)).

7.    Koenig was already out in the field that day, driving between Brighton and Washington, Iowa, when her supervisor requested that she go out to the Seaba property right away. (Def. Koenig MSJ App. 052, Koenig Dep., 6:21-7:18).

## First Visit to Seaba Property

8.    Around 10:15 a.m. on November 15th, Koenig arrived at Plaintiffs' property.  (ECF 1, Pet., ¶ 17).

9.    Koenig first encountered Gordon sitting on his porch and he indicated that he lived in the main house, and Gail and Tim lived in a house at the back of the property.  (Def. Koenig MSJ App. 054, Koenig Dep., 15:15-25; Koenig Dep., 16:1-3).

10.    When Osborn arrived, she invited Koenig to come back and view her and Tim's residence.  (Def. Koenig MSJ App. 055, Koenig Dep., 17:15-18:3).

11.   Once they were done, Osborn went outside and started to feed some pigs. While doing so, Osborn told Koenig that it was Gordon Seaba's property, and that when Gordon dies, it will be her and Tim's property. (Def Koenig MSJ App. 056, Koenig Dep., 23:23-24:9).

12.   Osborn then went with Koenig to the main home. (ECF 1, Pet., ¶ 28).

13.   Gordon Seaba gave permission to Koenig to inspect his home. (ECF 1, Pet., ¶ 29).

14.   Koenig asked her to see the house in its entirety. (Def. Koenig, MSJ App. 058, Koenig Dep., 31:5-15).

15.   But Osborn only permitted Koenig to see the downstairs of the house. (Def. Koenig MSJ App. 058, Koenig Dep., 29:23-30:2).

**Events Between First and Second Visit to Seaba Property**

16.   After speaking with multiples individual on the phone concerning this reported complaint, Koenig arrived back at her office and started reviewing old IHHS assessments related to Gail Osborn. (Def. Koenig MSJ App. 062, Koenig Dep., 45:18-24).

17.   Koenig reviewed one assessment where one of Osborn's children had been found to be positive for methamphetamine when born. (Def. Koenig MSJ App. 062, Koenig Dep., 45:22-46:2; Def. Koenig MSJ App. 205, GO 1.13.20 Assessment, p. 2).

18.   In one particular case, Koenig discovered that Osborn did not participate in services offered by IHHS and was supposed to have a safety plan where her child would live with Osborn's sister in a neighboring town. (Def. Koenig MSJ Appendix 062, Koenig Dep., 46:3-9; Def. Koenig MSJ App. 214-218, GO 3.31.21 Assessment, pp. 3-7).

19.   But rather than drop her child off with her sister, Osborn took the child back to the Seaba property, and law enforcement had to go out there and locate the child. (Def. Koenig MSJ

3

App. 062, Koenig Dep., 46:3-15; Def. Koenig MSJ App. 214-218, GO 3.31.21 Assessment, pp. 3-7).

20.     Koenig reviewed another assessment where Osborn had falsely claimed that her and McConnell Seaba's child had epilepsy, and an another one where Osborn had been found living with a different child of hers in a car in Montana, and the child had rotted teeth.  (Def. Koenig MSJ App. 062, Koenig Dep., 47:1-10; Def. Koenig MSJ App. 237-241, GO 10.26.21 Assessment, pp. 2-6; Def. Koenig MSJ App. 258-259, GO 9.11.17 Assessment, pp. 5-6).

21.     Based on her review of these assessments, Koenig became concerned about Osborn's credibility, as her actions in past assessments were similar to how she acted with Koenig earlier.  (Def Koenig MSJ App. 062, Koenig Dep., 46:16-24).

22.     Around 3:23 p.m. on November 15th, Koenig spoke with Moulding.  (ECF 1, Pet., ¶ 43).

23.     In Jefferson County, the normal procedure for IHHS is to contact the county attorney's office about a situation like this, rather than a local detective.  (Def. Koenig MSJ App. 063, Koenig Dep., 49:21-50:8).

24.     When Koenig spoke with Moulding, she reviewed everything with him, including past Osborn's past history, her concerns, and additional information on the IHHS assessment form for this case.  (Def. Koenig MSJ App. 063, Koenig Dep., 49:8-10, 49:21-24; Def. Koenig MSJ App. 037, Moulding Dep., 82:6-23; Def. Koenig MSJ App. 183, GO 12.16.24 Assessment, p. 2).

25.     In response, Moulding said that they needed to go back out to the Seaba property. (Koenig MSJ App. 063, Koenig Dep., 50:16-18).

4

**Second Visit to Seaba Property**

26.    At approximately 4 p.m., the Defendants arrived at Plaintiffs' property. (ECF 1, Pet. ¶ 44).

27.    Koenig and Moulding were joined by Assistant Jefferson County Attorney Elizabeth Estey, Jefferson County Sheriff's Deputy Burnett, Jefferson County Sheriff's Deputy Miller, and two Washington County Sheriff's deputies, because there was some confusion with where this property was located and in which county the plaintiffs resided.  (Def. Koenig MSJ App. 002, Miller Dep., 6:16-7:1).

28.    Defendants did not posses a warrant to search any part of Plaintiffs' property.  (ECF 1, Pet., ¶ 46).

29.    Moulding did not view the situation as a criminal investigation, but rather as investigation to check on the health and welfare of a reported newborn baby.  (Def. Koenig MSJ App. 024, Moulding Dep. 30:8-21).

30.    Moulding then drove up the driveway and parked his vehicle. (ECF 1, Pet., ¶ 49).

31.     Koenig followed Moulding up the driveway and parked her own vehicle. (ECF 1, Pet., ¶ 50).

32.    Both sets of sheriffs' deputies and assistant county attorney Estey remained at the bottom of the driveway and parked on the road.  (ECF 1, Pet., ¶ 51).

33.    Koenig then watched Moulding walk up to the front door of Gordon's house and knock on the door.  (Def. Koenig MSJ  App. 073, Koenig Dep., 91:5-8).

34.    Moulding entered Gordon's house at Gordon's invitation. (Def. Koenig MSJ App. 033, Moulding Dep., 68:7-11).

35. Eventually, Koenig got out of the truck, walked up to the house, knocked on the door, and asked to come inside. (Def. Koenig MSJ App. 073, Koenig Dep., 91:20-92:2).

36. Neither Osborn nor McConnell Seaba were present in the main house when Koenig spoke with Gordon. (Def. Koenig MSJ App. 136-137, Osborn Dep., 73:16-74:1; 78:11-15; Def. Koenig MSJ App. 097, McConnell Seaba Dep., 24:11-13).

37. Koenig proceeded to tell Seaba that Moulding and the deputies wanted to look around the property for a baby. (Def. Koenig MSJ App. 073, Koenig Dep., 92:5-10).

38. Gordon told Koenig to go ahead and agreed to a 10-minute time limit. (Def. Koenig MSJ App. 073, Koenig Dep., 92:22-24).

39. Once Moulding obtained permission for Gordon, he contacted Jefferson County Deputy Mark Miller to inform him of this consent and to begin the search. (Def. Koenig MSJ App. 004, Deputy Miller Dep., 15:19-16:9).

40. Deputy Miller had been out to the Seaba residence for other calls in the past, and had always known the property to belong to Gordon Seaba. (Def. Koenig MSJ App. 002, Deputy Miller Dep., 7:7-25; Def. Koenig MSJ App. 005, Deputy Miller Dep., 18:3-11).

41. Moulding began directing the deputies where to look. (MSJ App. 136, Osborn Dep., 75:7-15).

42. At one point, Moulding entered Osborn and McConnell's small cottage. (Def. Koenig MSJ App. 35, Moulding Dep., 73:17-74:1).

43. He was inside the cottage for approximately 30 seconds. (Def. Koenig MSJ App. 129, Osborn Dep., 45:14-18).

44. Koenig did not go into Osborn and McConnell Seaba's small cottage. (Def. Koenig MSJ App. 071, Koenig Dep., 81:5-6; MSJ App. 136, Osborn Dep., 76:2-4).

45.    Nobody told Osborn or McConnell Seaba that they were under criminal investigation for anything.  (Def. Koenig MSJ  App. 137, Osborn Dep., 77:10-13; Def. Koenig MSJ  App. 104, McConnell Seaba Dep., 49:2-4).

46.    Afterward, Moulding, Koenig, and the deputies walked back to their vehicles, while Osborn continued to tell them to leave, and they eventually left.  (Def. Koenig MSJ  App. 137, Osborn Dep., 78:19-79:1).

47.    Before leaving, Koenig advised McConnell Seaba and Osborn down by the driveway that Gordon had given permission to her and Moulding to conduct a limited search, and that neither of them were present when this consent was given.  Neither McConnell Seaba nor Osborn disputed fact by Koenig.  (Pls' Appx., Miller BC 3 at 3:10-3:35).

48.    As depicted on Deputy Miller's body camera video, from the time the deputies began to search the outbuildings, which culminates with Moulding entering and exiting Gail and Tim's residence, the entire search lasts approximately 7 minutes.  (Def. Koenig MSJ App. 263, Deputy Miller Body Camera Video, Length 14:58).

Respectfully Submitted,

**BRENNA BRID**
Attorney General of Iowa

**/s/ RYAN P. SHEAHAN**
**RYAN P. SHEAHAN**
Assistant Attorney General
Hoover Building, Second Floor
Des Moines, Iowa 50319
PHONE: (515) 281-6658
FAX: (515) 281-4209
E-MAIL: ryan.sheahan@ag.iowa.gov
ATTORNEYS FOR DEFENDANT
KOENIG

*Original filed electronically.*
*Copy electronically served on all parties of record.*

<table>
<tr><td colspan="2" align="center"><b>PROOF OF SERVICE</b></td></tr>
<tr><td colspan="2">The undersigned certifies that the foregoing instrument was served upon each of the persons identified as receiving a copy by delivery in the following manner on July 7, 2026:</td></tr>
<tr><td>☐ U.S. Mail</td><td>☐ FAX</td></tr>
<tr><td>☐ Hand Delivery</td><td>☐ Overnight Courier</td></tr>
<tr><td>☐ Federal Express</td><td>☐ Other</td></tr>
<tr><td colspan="2">☒ ECF System Participant (Electronic Service)</td></tr>
<tr><td colspan="2">Signature: /s/Jodi R. Watson</td></tr>
</table>