IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF IOWA
CENTRAL DIVISION

| | |
|---|---|
| GAIL OSBORN & TIMOTHY MCCONNELL-SEABA,<br>Plaintiffs,<br>vs.<br>KELSEY KOENIG,<br>Defendant. | 4:25-cv-00183-SHL-SBJ<br><br>ORDER ON CROSS MOTIONS FOR SUMMARY JUDGMENT |

## I. INTRODUCTION.

On November 15, 2024, someone made an anonymous call to the Iowa Department of Health and Human Services ("DHHS") claiming that Plaintiff Gail Osborn secretly had a baby and was using drugs. Child Protective Services ("CPS") worker Kelsey Koenig went to the property where Osborn lived, first by herself and later with Jefferson County Attorney Chauncey Moulding and law enforcement officers. During the second visit, Moulding and Koenig searched the property even though they had no warrant and Osborn and Tim McConnell-Seaba (who also lived on the property) told them to leave. They never found a baby, and CPS ultimately determined the anonymous tip to be "not confirmed." Osborn and McConnell-Seaba later filed this action under 42 U.S.C. § 1983, alleging that Koenig and others violated their Fourth Amendment rights. For reasons stated below, the Court concludes as a matter of law that Koenig violated Plaintiffs' Fourth Amendment rights when she searched an enclosed shed on the property but not when she searched a fire pit in an open area. The Court therefore GRANTS IN PART and DENIES IN PART Koenig's Motion for Summary Judgment (ECF 29) and GRANTS IN PART and DENIES IN PART Plaintiffs' (Cross-)Motion for Partial Summary Judgment on Liability (ECF 33).

## II. BACKGROUND.

### *A. Undisputed Facts.*

"When cross-motions for summary judgment are presented to the Court, the standard summary judgment principles apply with equal force." *Wright v. Keokuk Cnty. Health Ctr.*, 399 F. Supp. 2d 938, 945–46 (S.D. Iowa 2005). "[T]he court views the record in the light most favorable to plaintiff when considering defendant's motion, and the court views the record in the light most

favorable to defendant when considering plaintiff's motion." *Thompson-Harbach v. USAA Fed. Sav. Bank*, 359 F. Supp. 3d 606, 614 (N.D. Iowa 2019). The recitation of facts in this section is designed to be consistent with this dichotomous standard.

During the events in this case, Plaintiffs lived on a property in Jefferson County, located at 3251 110th Street, Brighton, Iowa. (ECF 44-1, ¶ 1.) The property is in the country, fenced in on three sides, and accessible only by a long driveway. (ECF 45-1, ¶ 10.) An aerial view of the property shows the following:



(ECF 33-3, p. 28; ECF 33-1, p. 5.) Gordon Seaba ("Gordon") lived in the main house on the property, while Osborn and McConnell-Seaba, who were in a romantic relationship, lived in a small cottage behind the main house (circled in yellow above). (ECF 44-1, ¶¶ 4–5.) There is confusion about who owned the property, but at least some records reflected it as jointly owned by "Seaba Gordon Life Estate/Masiker Aron/Seaba Timothy/Seaba Ashley." (Id., ¶ 2; ECF 33-3, p. 26.) It appears that people generally understood Gordon to be the property owner. (ECF 44-1, ¶¶ 25, 68.) Gordon is McConnell-Seaba's father. (ECF 33-3, p. 354.) Gordon died in March 2026. (ECF 44-1, ¶ 3.)

Osborn has a history of methamphetamine and other drug use, as well as criminal convictions. (Id., ¶¶ 7, 12.) She has three children, but they are not in her custody. (Id., ¶ 8.) Osborn has been the subject of multiple investigations by CPS, including for poor living conditions, drug use, and not providing food for her children. (Id., ¶¶ 9, 10.) Prior to this case, the most recent investigation occurred in 2022 and resulted in the removal of her daughter. (Id., ¶ 11.)

On the morning of November 15, 2024, DHHS received an anonymous complaint alleging that Osborn had given birth two months ago to a daughter, Charlotte, and was using methamphetamine. (Id., ¶ 13.) McConnell-Seaba was alleged to be the father. (ECF 45-1, ¶ 4.)

CPS worker Kelsey Koenig was assigned to complete an assessment, meaning she would evaluate the immediate safety of the child, conduct interviews with subjects and collateral sources, and gather evidence to determine whether abuse occurred. (ECF 44-1, ¶¶ 14–16.) Koenig's supervisor, David Rippey, instructed her to go to the Seaba property right away. (Id., ¶¶ 14, 17.)

Koenig arrived around 10:15 a.m. and encountered Gordon sitting on his porch. (Id., ¶¶ 18, 19.) Gordon said he lived in the main house and Osborn and McConnell-Seaba lived in a house at the back of the property. (Id., ¶ 19.) Shortly thereafter, Osbon drove up the driveway and was immediately upset. Koenig told Osborn about the allegations, which Osborn denied. (ECF 45-1, ¶ 16.) Osborn lifted up her shirt to show Koenig that she was not pregnant and asked Koenig whether it looked like she was on drugs, to which Koenig replied that she did not see any indicators. (ECF 44-1, ¶¶ 21–22.) Osborn called McConnell-Seaba, who denied via speakerphone that Osborn recently had a baby. (ECF 45-1, ¶¶ 19–20.) Osborn said she *did* recently have children with her, but she showed Koenig a car seat for an older child, not a two-month-old baby. (ECF 44-1, ¶ 23.)

Osborn invited Koenig to come back and view her and McConnell-Seaba's residence. (Id., ¶ 24.) Koenig went through the entire home and observed that it was clean and did not contain anything baby-related. (ECF 45-1, ¶ 25.) She and Osborn then went outside, where Osborn explained that the property belonged to Gordon but, when he died, it would go to Osborn and Seaba-McConnell. (ECF 44-1, ¶ 25.) Osborn also told Koenig that she had recently gotten a letter seeking to terminate parental rights and suspected the people who wrote it were also responsible for the false complaint to CPS. (ECF 45-1, ¶¶ 28, 29.)

Osborn and Koenig proceeded to the main house, and Gordon gave Koenig permission to inspect his home. (ECF 44-1, ¶¶ 26–27.) Koenig viewed the downstairs of the house and did not observe anything indicating a baby had been in the home or that Osborn was using illegal drugs. (Id., ¶¶ 29–30.) Koenig left the house because Osborn was becoming more upset and wanted her to leave. (ECF 45-1, ¶ 33.)

After the visit, Koenig spoke with several people, starting with Washington County Sheriff's Office Investigator Jayce Horning. (ECF 44-1, ¶ 32.) Horning said he was familiar with Osborn and that she did not appear pregnant when he saw her that summer. (Id., ¶ 33.) Horning also told Koenig, however, that Osborn had recently called the local police station to inquire about safe haven boxes to drop off newborn babies. (Id., ¶ 34.) Osborn disputes the accuracy of what Horning said but admits Horning said it. (Id.) Horning expressed concerns about the situation to

Koenig but concluded it would not be his case given that the property was in Jefferson County. (Id., ¶¶ 35–36.) Koenig then spoke with Alicia White, a local probation officer who was familiar with Osborn. She, too, had not seen Osborn pregnant recently. (Id., ¶¶ 37–39.)

Assistant Jefferson County Attorney, Elizabeth Estey, contacted Koenig and told her that Osborn had contacted the county attorney's office a couple of times after Koenig's visit. (Id., ¶ 40.) In the first call, Osborn expressed frustration to Estey about CPS coming to the property and the false allegation, which she attributed to her child's guardian. (ECF 45-1, ¶¶ 42–43.) Osborn later called back and spoke to Jefferson County Attorney Chauncey Moulding, who recorded the conversation. (Id., ¶¶ 45–52.) Osborn said she had not recently had a baby and had been sober for ten years. (Id.) These calls created concerns for the County Attorney's Office. (ECF 44-1, ¶ 40.) Later, Koenig spoke with Sarah Rosonke, the guardian of Osborn's youngest child, who said Osborn had not seen her children since December 2023, and McConnell-Seaba had never visited his daughter. (Id., ¶ 42.)

When Koenig arrived back at her office, she began reviewing prior DHHS assessments related to Osborn. Among other things, the assessments showed that one of Osborn's children tested positive for methamphetamine at birth; Osborn failed to participate in DHHS services during one of her cases; and, at one point, Osborn and her child lived in a car in Montana and the child had rotted teeth. (Id., ¶¶ 44– 47.) This made Koenig concerned about Osborn's credibility, particularly given that Osborn's behavior in past assessments seemed similar to how she acted with Koenig that day. (Id., ¶ 48; ECF 29-3, p. 64.)

Consistent with DHHS procedures, Koenig spoke with Moulding and shared her concerns, Osborn's history, and information about the new allegation. (ECF 44-1, ¶¶ 49–51; ECF 29-3, p. 65.) Moulding said they needed to return to the property. (ECF 44-1, ¶ 52.) Koenig did not want to go back due to Osborn's agitated emotional state and instead preferred to contact Osborn in some other way and give DHHS time to complete the assessment. (ECF 45-1, ¶¶ 66–67.) Koenig, however, felt that she could not tell Moulding "no." (Id., ¶ 70.)

Koenig, Moulding, Estey, two Jefferson County Sheriff's Office deputies, and two or three Washington County Sheriff's Office deputies drove to the property. (ECF 44-1, ¶ 54; ECF 45-1, ¶ 90.) They did not have a warrant. (ECF 44-1, ¶ 56.) In his deposition, Moulding testified that he did not consider getting a warrant to search the property because "there was no crime," although he estimated he could obtain a warrant in as little as ten minutes in an emergency. (ECF 45-1, ¶¶

73, 75.) Moulding maintained that because it was not a criminal investigation, "nobody was investigating probable cause and reasonable suspicion." (Id., ¶ 78.) Deputy Miller testified in his deposition that he did not believe there was probable cause to authorize entry into Osborn and McConnell-Seaba's home. (Id., ¶ 79.) Estey testified that if consent to search was denied, the appropriate next step would be to request a motion to compel Osborn to present the child. (Id., ¶ 84.) This was Koenig's understanding as well. (Id., ¶ 85.)

Upon arrival at the property, Moulding had a brief interaction with McConnell-Seaba that led Moulding to conclude that McConnell-Seaba did not want Moulding there. (ECF 45-1, ¶¶ 96–97.) Moulding went up the driveway anyway, however, and promptly encountered Osborn. (Id., ¶¶ 98–99.) The two began arguing. (Id.) After briefly getting back in his truck, Moulding went to the front door of the main house. (Id., ¶¶ 101–02.) The parties dispute whether he knocked on the door or simply went inside. (ECF 44-1, ¶¶ 61, 62.) Either way, Koenig later approached the house, knocked on the door, and asked to come inside. (Id., ¶ 63.) Koenig told Gordon that Moulding and the deputies wanted to look around the property for a baby. (Id., ¶ 65.) Neither Osborn nor McConnell-Seaba were present for this conversation. (Id., ¶ 64.) Gordon told Koenig to go ahead but imposed a ten-minute limit and did not authorize a search of Osborn and McConnell-Seaba's residence. (Id., ¶ 66; ECF 45-1, ¶¶ 106, 199.) Gordon confirmed to Moulding that he had not seen a baby on the property. (Id., ¶ 107.)

When Deputy Miller arrived at the property, he spoke with McConnell-Seaba, who agreed to give people five minutes to speak to Osborn but also asked for "the DHS people" to be trespassed from his property because he felt it was harassment. (Id., ¶¶ 108–113.) Osborn then came down the driveway and asked everyone to identify themselves. (Id., ¶ 115.) Osborn accused them of violating her Fourth Amendment rights and told Estey that she had instructed Moulding and Koenig not to enter. (Id., ¶ 118.) McConnell-Seaba asked deputies to help get people out of his father's house. (Id., ¶ 119.) According to Osborn, Gordon himself told Moulding to get out. (Id., ¶ 120.) McConnell-Seaba shared these statements to other deputies on the property. (Id., ¶¶ 128–33.) Nonetheless, as Deputy Miller returned to his vehicle and drove up the driveway, he received a call from Moulding that they were "good to go" for the search. (Id., ¶ 123.)

Moulding began the search, directing the deputies where to look but telling them they did not have permission to search Osborn and McConnell-Seaba's residence. (Id., ¶¶ 124–26.) Deputy Miller told another deputy that Gordon gave permission to search the outbuildings but not Osborn

and McConnell-Seaba's residence. (Id., ¶ 127.) However, after Moulding confirmed with another deputy that Osborn and McConnell-Seaba were at the bottom of the driveway, he stated: "Let's go clear this small house that we think that they're in, then, 'cause they're not gonna be in it." (Id., ¶ 140.) In other words, Moulding decided to search the home for which consent had been specifically denied. The group then walked toward the small residence, which Koenig pointed out to the others. (Id., ¶ 146.) Along the way, the group looked into another outbuilding, a shed containing McConnell-Seaba's workshop. (Id., ¶¶ 148–49.) As they did so, Osborn approached and told them they were committing a Fourth Amendment violation, needed a warrant, and would be sued if they entered her home. (Id., ¶¶ 149–50.)

Moulding went into Osborn and McConnell-Seaba's residence anyway and remained inside for approximately thirty seconds. (ECF 44-1, ¶¶ 70, 71.) Koenig did not go inside. (Id., ¶ 72.) Osborn walked up to the door, opened it, and told Moulding to leave. (ECF 45-1, ¶ 152.) Osborn said that Koenig had been in the home earlier and confirmed there was no baby. (Id., ¶ 155.) After Moulding went back outside, he and the others (including Koenig) began walking back to their vehicles while Osborn continued to tell them to leave. (Id., ¶¶ 157–82.) Koenig told McConnell-Seaba why they came to the property in the first place and said they would leave and did not plan to come back. (Id., ¶ 185.) Moulding, Koenig, and the others then left. (Id., ¶ 186.)

No one located a baby on the property during their visit. (Id., ¶ 187.) At no point were Osborn or McConnell-Seaba advised that they were under criminal investigation. (ECF 44-1, ¶ 73.) Following the visit, Koenig contacted the local hospital, the guardian of Osborn's children, and Osborn's sister, but did not learn information to corroborate the anonymous complaint. (ECF 45-1, ¶ 189.) Koenig deemed the allegation of child abuse "not confirmed" because there was no evidence to show a child had been born. (Id., ¶ 190.)

*B. Procedural History.*

Plaintiffs originally brought four claims: Count One alleges unlawful search and seizure in violation of the Fourth Amendment under 42 U.S.C. § 1983 against Moulding and Koenig individually; Count Two alleges trespass against Moulding; Count Three alleges invasion of privacy against Moulding; and Count Four alleges respondeat superior against Jefferson County. (ECF 1.) Each party filed a motion for summary judgment, although Plaintiffs' motion was on liability only. (ECF 29; ECF 32; ECF 33.) Defendants Moulding and Jefferson County later notified the Court that they had reached a settlement agreement (ECF 42; ECF 54), prompting the

Court to deny as moot their motions for summary judgment. (ECF 56). Plaintiffs and Defendants Moulding and Jefferson County later filed a voluntary and stipulated dismissal with prejudice pursuant to Fed. R. Civ. P. 41(a). (ECF 60.) The cross-motions for summary judgment between Plaintiffs and Koenig remain pending, although Gordon is no longer a plaintiff due to his death. (ECF 59.) The only remaining claim is therefore Osborn and McConnell-Seaba's § 1983 claim against Koenig individually (Count One). For simplicity, the remainder of this ruling will refer to Osborn and McConnell-Seaba as "Plaintiffs" collectively except when it is necessary in context to distinguish between them.

## III. LEGAL STANDARDS.

### *A. Summary Judgment Standard.*

Summary judgment is appropriate where, viewing the evidence in the light most favorable to the nonmoving party, "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a); *see Smith v. Ashland, Inc.*, 250 F.3d 1167, 1171 (8th Cir. 2001). "A fact is material if it 'might affect the outcome of the suit.'" *Dick v. Dickinson State Univ.*, 826 F.3d 1054, 1061 (8th Cir. 2016) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson*, 477 U.S. at 248).

### *B. Section 1983 Claims and Qualified Immunity.*

Plaintiffs bring their claim against Koenig pursuant to 42 U.S.C. § 1983, which imposes liability on any person who, acting under color of law, "subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. They allege violations of the Fourth Amendment, which protects the "right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.

Government officials are protected against § 1983 claims by the doctrine of qualified immunity, which frees them from liability unless their conduct violates "clearly established statutory or constitutional rights of which a reasonable person would have known." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). "Qualified Immunity is an immunity from suit rather than merely a defense to liability." *Jones v.*

*McNeese*, 746 F.3d 887, 894 (8th Cir. 2014) (internal quotation marks omitted) (quoting *Solomon v. Petray*, 699 F.3d 1034, 1038 (8th Cir. 2012)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." *Pearson*, 555 U.S. at 231. Qualified immunity is "effectively lost if a case is erroneously permitted to go to trial." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). "Accordingly, it is important that the question of qualified immunity be resolved as early as possible in the proceedings." *Solomon*, 699 F.3d at 1038.

Law enforcement officers are entitled to qualified immunity "unless: (1) [they] violated a constitutional right, and (2) that constitutional right was clearly established so that a reasonable officer would know of the right at the time of the alleged violation.'" *Thurairajah v. City of Fort Smith*, 925 F.3d 979, 982 (8th Cir. 2019). Courts may address these issues in either order, and a plaintiff must satisfy both prongs before a claim may proceed to trial. *See Pearson*, 555 U.S. at 241. "Under either prong of the inquiry, the district court 'may not resolve genuine disputes of fact' relevant to the issue of qualified immunity." *Wealot v. Brooks*, 865 F.3d 1119, 1125 (8th Cir. 2017) (quoting *Tolan v. Cotton*, 572 U.S. 650, 656 (2014) (per curiam)). Moreover, all disputed facts must be interpreted in the plaintiff's favor when defendants move for judgment as a matter of law based on qualified immunity. *Tolan*, 572 U.S. at 657.

## IV. ANALYSIS.

Although Koenig concedes (as she must) that there was no warrant, she argues that all aspects of her search were permissible based on consent, exigency, and/or community caretaking. (ECF 29.) She further argues there is no existing circuit precedent or robust set of cases establishing the violation of a clearly established right, particularly keeping in mind DHHS's statutory duties as outlined in Iowa Code § 232.71B. (ECF 45.) By contrast, Plaintiffs argue that Koenig violated their clearly established Fourth Amendment rights. (ECF 33; ECF 44.)

### *A. The Court GRANTS IN PART and DENIES IN PART Koenig's Motion for Summary Judgment.*

As a threshold matter, it is important to recognize that the Court is only evaluating Koenig's actions, not those of Moulding or others on the scene. This is because courts must "conduct an individualized analysis of each officer's alleged conduct to determine whether the factual allegations against each individual officer were sufficient to overcome qualified immunity." *Roberts v. City of Omaha*, 723 F.3d 966, 974 (8th Cir. 2013). Thus, although Moulding almost

certainly violated Plaintiffs' Fourth Amendment rights when he went into their personal residence without consent or a warrant, this is immaterial to Koenig's liability because she did *not* enter that residence except during her first visit when she had consent to do so. Instead, for Koenig, the alleged Fourth Amendment violations involve her search of the fire pit in the yard and McConnell-Seaba's shed.

1. The Searches Occurred within the Curtilage.

Under Eighth Circuit precedent, it is clearly established that "[t]he area 'immediately surrounding and associated with the home—what our cases call the curtilage—is part of the home itself for Fourth Amendment purposes.'" *United States v. McGhee*, 129 F.4th 1095, 1101 (8th Cir.) (quoting *Luer v. Clinton*, 987 F.3d 1160, 1165 (8th Cir. 2021)), *cert. denied*, 146 S. Ct. 620 (2025); *see also United States v. Bennett*, 972 F.3d 966, 971 (8th Cir. 2020) ("[T]he Fourth Amendment's protections extend to the 'curtilage surrounding a home, which is the area to which extends the intimate activity associated with the sanctity of a man's home and the privacies of life, and therefore has been considered part of the home itself for Fourth Amendment purposes.'" (quoting *United States v. Wells*, 648 F.3d 671, 675 (8th Cir. 2011))). "Determining whether a particular area is part of the curtilage of an individual's residence requires consideration of 'factors that bear upon whether an individual reasonably may expect that the area in question should be treated as the home itself.'" *McGhee*, 129 F.4th at 1101 (quoting *United States v. Bausby*, 720 F.3d 652, 656 (8th Cir. 2013)). "Those factors (the *Dunn* factors[[1]]) include: (1) 'the proximity of the area claimed to be curtilage to the home,' (2) 'whether the area is included within an enclosure surrounding the home,' (3) 'the nature of the uses to which the area is put,' and (4) 'the steps taken by the resident to protect the area from observation by people passing by.'" *Id*. (quoting *Bausby*, 720 F.3d at 656).

Koenig's counsel wisely conceded that she was within the curtilage. (*See generally* ECF 29-1, ECF 45, ECF 53.) The record supports this concession, as the property was surrounded by trees, fenced on three sides, and only accessible via a long driveway. (ECF 45-1, ¶ 10; ECF 33-3, p. 28.) Much of the property cannot be viewed from the street. (ECF 45-1, ¶ 11.) The fire pit is comfortably within the first line of trees, while the shed can be accessed only by walking past a

[1] *United States v. Dunn*, 480 U.S. 294, 301 (1987).

secondary row of hedges and trees near Plaintiffs' cottage. (ECF 33-3, p. 28; Miller BWC[2] 2, 10:25–12:30.)

The Eighth Circuit has held that property with similar attributes constitutes "curtilage." *See, e.g.*, *Wells*, 648 F.3d at 677 ("A backyard that is accessible only by walking around the side of a home is a place generally recognized as 'an area intimately linked to the home, both physically and psychologically, where privacy expectations are most heightened.'" (quoting *Florida v. Riley*, 488 U.S. 445, 452 (1989) (O'Connor, J., concurring))); *McGhee*, 129 F.4th at 1101 (concluding side yard was part of the home's curtilage where it was "directly adjacent to McGhee's home, was enclosed by a fence, contained items like a grill that suggested it was for family use, and was partially obstructed from further view by trees and a back fence"). The same conclusion is appropriate here. In fact, "curtilage may reach a larger area in a rural setting." *United States v. Reilly*, 76 F.3d 1271, 1277 (2d Cir.), *on reh'g,* 91 F.3d 331 (2d Cir. 1996). "The realities of rural country life dictate that distances between outbuildings will be greater than on urban or suburban properties and yet still encompass activities intimately associated with the home; this is the nature of the 'farmstead.'" *United States v. Johnson*, 256 F.3d 895, 902 (9th Cir. 2001). "In rural pieces of property, as here, natural boundaries such as thick trees or shrubberies may also indicate an area 'to which the activity of home life extends.'" *Id.* (quoting *Dunn*, 480 U.S. at 302); *see also United States v. Diehl*, 276 F.3d 32, 41 (1st Cir. 2002) (finding driveway to be curtilage in part because the nature of the property "created a locus as free from observation by passersby as one could conceive"). The Court thus starts from the premise that Koenig was in the curtilage of the property. *See Wells*, 648 F.3d at 679.

2. Plaintiffs Have Established as a Matter of Law That They Possessed a Subjective Expectation of Privacy in the Fire Pit and Shed.

In addition to showing that the relevant portion of the property is curtilage, Plaintiffs also must show that Koenig violated their legitimate expectations of privacy in the shed and fire pit. *See United States v. Boyster*, 436 F.3d 986, 992 (8th Cir. 2006) ("Even if the land in question were within the curtilage, Boyster would still have to demonstrate that he maintained a legitimate expectation of privacy which was infringed by the aerial surveillance."). This showing is necessary because the Fourth Amendment does not "prevent all investigations on private property." *United*

[2] "____ BWC" refers to the respective deputies' body-worn camera footage, submitted by Plaintiffs as part of their Appendix. (*See* ECF 33-3, p. 1.) Pin citations are to the time on the video player.

*States v. Bennett*, 972 F.3d 966, 970 (8th Cir. 2020). "Whether a particular search violates the Fourth Amendment 'requires examination of whether the person claiming the constitutional violation had a "legitimate expectation of privacy in the premises" searched.'" *Id.* (quoting *Byrd v. United States*, 584 U.S. 395, 403 (2018)). To show a legitimate expectation of privacy, Plaintiffs must establish (1) a subjective expectation of privacy in the areas searched and (2) the objective reasonableness of this expectation. *United States v. Douglas*, 744 F.3d 1065, 1069 (8th Cir. 2014). "The first question is a question of fact, the second is a question of law." *Id*.

Plaintiffs have established a subjective expectation of privacy as to both the shed and fire pit as a matter of law. This is evident from the fact that they resided on the property and their repeated and unambiguous statements that Koenig and others were not welcome. Indeed, Koenig left the property the first time specifically because Osborn was so upset and wanted her to leave. (ECF 45-1, ¶ 33.) When Koenig returned with Moulding and others, McConnell-Seaba told two different deputies that he considered their presence to constitute trespass and wanted them removed (Miller BWC 1, 0:32–0:37, 1:02–1:06, 1:25–1:30; Burnett BWC 1, 0:44–0:57.) In his words, "I want them trespassed from my property," with the word "them" referring to "anyone who is not a police officer." (Id.) Osborn, too, told Koenig and Moulding "you are not allowed to enter" when they approached the home (Miller BWC 2, 1:30–1:42) and was, in Koenig's words, "yelling and belligerent and telling everyone to get off her property." (ECF 30, p. 35.)

Plaintiffs continued to object as the search continued. Deputy Miller told Koenig and Moulding near the fire pit that McConnell-Seaba "is quite riled up." (Miller BWC 2, 8:21–8:30.) A few minutes later, when Moulding and Koenig approached the shed, Osborn can be heard in the background shouting: "Fourth Amendment violation, Fourth Amendment violation. That was a closed door. You've gotta have a warrant, buddy." (Miller BWC 2, 11:59–12:18.) Throughout these interactions, Plaintiffs repeatedly referred to the property as "my property" (McConnell-Seaba) and said things like "I live here too" (Osborn), thus making clear that they claimed the property as their own and did not want Koenig and Moulding there. No reasonable juror could conclude on this record that Plaintiffs lacked a subjective expectation of privacy in the property.

3. Plaintiffs Have Established as a Matter of Law That They Possessed an Objectively Reasonable Expectation of Privacy in the Fire Pit and Shed.

The next question is whether Plaintiffs have shown as a matter of law that they had an objectively reasonable expectation of privacy in the shed and fire pit. As to the shed, the answer is "yes." It is an enclosed structure with a closed door located well within the curtilage of the property

and just a few feet away from the cottage. It is clearly established that a person has an objective expectation of privacy in such a structure. *See United States v. Mooring*, 137 F.3d 595, 596 (8th Cir. 1998) ("The Fourth Amendment protects people from unreasonable searches of their home and buildings within the home's curtilage . . . .").

The same is true for the fire pit. Because it was not accessible to the public or visible from the street, it is entitled to Fourth Amendment protection as an area reflecting the sanctity of the home and privacies of life. *See Wells*, 648 F.3d at 677 ("Among other things, [the backyard] contains a child's wagon and sled, a boat, a lawnmower, a rabbit hutch, and a burn barrel." (internal citations omitted)). It is not the same as trash placed on the curb. *Contrast with United States v. Thompson,* 881 F.3d 629, 632 (8th Cir. 2018) (holding that there is no objectively reasonable "expectation of privacy in trash left for collection in an area accessible to the public" (quoting *California v. Greenwood*, 486 U.S. 35, 41 (1988)); *State v. Amble*, 22 N.W.3d 265, 271 (Iowa 2025) (similar).

It does not matter that Plaintiffs were not legal owners of the property. The Supreme Court and Eighth Circuit have recognized that "[t]he authority which justifies the third-party consent does not rest upon the law of property, with its attendant historical and legal refinements." *United States v. Matlock*, 415 U.S. 164, 172 n.7 (1974). In other words, what matters is whether a person has a *possessory* interest or some other reasonable expectation of privacy, not simply whether they have an *ownership* interest. *See Georgia v. Randolph*, 547 U.S. 103, 110 (2006) ("Fourth Amendment rights are not limited by the law of property."); *United States v. Nichols*, 574 F.3d 633, 636 (8th Cir. 2009). ("[Defendant's] argument that [his girlfriend] had no authority to consent because she had no property interest in the residence is without merit and has been rejected by the Supreme Court."). Plaintiffs clearly had the requisite interest here based on the fact (known to Koenig) that they resided in the cottage, considered the property their own, and otherwise reasonably expected that they were entitled to privacy there.

4. <u>Koenig Violated Plaintiffs' Clearly Established Fourth Amendment Rights by Searching the Shed but Not by Searching the Fire Pit.</u>

Koenig argues that even if Plaintiffs had an objectively reasonable expectation of privacy in the fire pit and shed, she nonetheless did not violate their clearly established Fourth Amendment rights because Gordon appeared to her to have a legally superior ownership right in the property and provided consent to the searches of those areas. (ECF 29-1, p. 12.) The Court agrees in part and disagrees in part.

As a threshold matter, the law is clear that there were limits to Gordon's authority to consent to searches of the property despite his putative ownership of the entire parcel. "When multiple people have houses on a piece of property, we have explained that '[r]egardless of who actually owned the land [the defendant] lived on, or how many other people resided on the same piece of property, [the defendant] had a socially recognized expectation of privacy in his residence.'" *United States v. Ralston*, 88 F.4th 776, 780 (8th Cir. 2023) (quoting *United States v. Schroeder*, 129 F.3d 439, 442 (8th Cir. 1997)). As applied here, *Ralston* means that Gordon's legal ownership of the property does not vitiate the fact (known to Koenig) that Plaintiffs were adult residents of the property who lived there, too. They clearly had rights co-extensive to Gordon's at least as to the cottage and the area immediately surrounding it. *See id.*

Moreover, the undisputed facts show that Plaintiffs vocalized those rights both before and after Gordon provided consent—and prior to the search itself. Accordingly, this situation is like *Randolph*, in which the police asked the defendant's wife for consent to search the home after the defendant "unequivocally refused." 547 U.S. at 107. The Supreme Court held that "a warrantless search of a shared dwelling for evidence over the express refusal of consent by a physically present resident cannot be justified as reasonable as to him on the basis of consent given to the police by another resident." *Id.* at 120. *Randolph* is governing here and establishes that, whatever the scope of Gordon's authority, he could not override Plaintiffs' objections as to areas of the property where Plaintiffs had co-extensive rights. In the Supreme Court's words:

> [T]o ask whether the consenting tenant has the right to admit the police when a physically present fellow tenant objects is not to question whether some property right may be divested by the mere objection of another. <u>It is, rather, the question whether customary social understanding accords the consenting tenant authority powerful enough to prevail over the co-tenant's objection.</u>

*Id.* at 121 (emphasis added).

The undisputed facts show that Plaintiffs had the necessary level of authority to object to the search of the shed. As noted above, it was an enclosed structure located just a few feet from the cottage where Plaintiffs lived and at the opposite end of the property from the main home where Gordon lived. Accordingly, Koenig cannot reasonably claim to have believed that Gordon's consent to search "the property" could outweigh Plaintiffs' objections to searches of that specific portion of the property. *See id.*; *see also, e.g.*, *Mooring*, 137 F.3d at 596.

The same is not true for the fire pit. Osborn and McConnell-Seaba themselves recognized in their depositions that there were places on the property where Gordon *did* have superior rights, including "[h]is house, the garage, the campers." (ECF 29-3, p. 110; ECF 33-3, pp. 93–94.) To the best of the Court's understanding, the fire pit was located closer to Gordon's house than Plaintiffs' cottage. In fact, it was separated from the cottage by the second row of trees and hedges. Accordingly, *Randolph* is not directly on point, nor have Plaintiffs identified any other Supreme Court or Eighth Circuit case with similar facts. The Court therefore must conclude that Koenig did not violate Plaintiffs' clearly established rights when she searched an outdoor area of the property where Gordon at least arguably had rights superior to those possessed by Plaintiffs.

5. <u>The Community Caretaking and Exigent Circumstances Exceptions Do Not Apply, Nor Does the Iowa Code Authorize an Otherwise-Unconstitutional Search</u>.

With her consent argument having failed (at least as to the shed), Koenig's only remaining arguments are that the search of the shed was justified by the community caretaking and exigent circumstances exceptions and her statutory duties under the Iowa Code. None of these arguments are persuasive. By the time of the second search, Koenig had already walked through Gordon's house and Plaintiffs' cottage without seeing any evidence of the presence of a baby. She also had talked to Osborn, who showed no signs of recent pregnancy or drug use. Accordingly, there is no factual basis to conclude that the community caretaking or exigent circumstances exceptions authorized the search of the enclosed shed during Koenig's second visit to the property. *See Luer*, 987 F.3d at 1170 (rejecting defendants' attempt to rely on community caretaking and exigent circumstances doctrines because there was no evidence of "imminent danger to persons or property"); *United States v. Selberg*, 630 F.2d 1292, 1296 (8th Cir. 1980) (similar).

Koenig's attempt to rely on her statutory duty under Iowa Code Chapter 232 to conduct child abuse investigations is also unpersuasive. No matter how well intended, state statutes cannot "abrogate a citizen's constitutional protections." *Webster v. Westlake*, 41 F.4th 1004, 1011 (8th Cir. 2022). Instead, "[it] almost goes without saying [that] the acts that officers can take to fulfill their duty are bound by the Constitution." *Id.* Accordingly, in the absence of a warrant or some other recognized exception, Koenig does not have the authority to conduct searches of private property without consent even when performing her duties under the Iowa Code.

6. <u>Summary.</u>

For reasons stated above, Koenig has established as a matter of law that she is entitled to qualified immunity for her search of the fire pit but not for the search of the shed. Accordingly, the Court GRANTS IN PART and DENIES IN PART her Motion for Summary Judgment.

*B. The Court GRANTS IN PART and DENIES IN PART Plaintiffs' Partial Motion for Summary Judgment.*

The only remaining issue is whether Plaintiffs are entitled to summary judgment as to liability on their Motion for Partial Summary Judgment. For purposes of Plaintiffs' Motion, the Court must resolve disputed facts in the light most favorable to Koenig. There are, however, no material disputed facts. Instead, the record shows as a matter of law that Koenig violated Plaintiffs' clearly established Fourth Amendment rights when she searched the shed but not when she searched the fire pit. The Court therefore GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Partial Summary Judgment.

## V. CONCLUSION.

For the foregoing reasons, the Court GRANTS IN PART and DENIES IN PART Koenig's Motion for Summary Judgment (ECF 29) and GRANTS IN PART and DENIES IN PART Plaintiffs' Motion for Partial Summary Judgment (ECF 33). A jury trial will be held to determine the amount of Plaintiffs' damages on the portion of Count I for which summary judgment has been granted in their favor.

IT IS SO ORDERED.

DATED this 14th day of October, 2026.

BY THE COURT:

STEPHEN H. LOCHER
District Judge